**FILED**

**December 29, 2025**
KAREN MITCHELL
CLERK, U.S. DISTRICT
COURT

**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| |
|---|
| IN RE: 3M COMBAT ARMS EARPLUG<br>PRODUCTS LIABILITY LITIGATION |

MDL No.: 2885

## MOTION TO TRANSFER TAG-ALONG ACTION
## *BRANDON CANUP V. BRYAN F. AYLSTOCK, ET AL.* TO THE *IN RE 3M* COMBAT
## ARMS EARPLUG PRODUCTS LIBAILITY LITIGATION MDL

Pursuant to Judicial Panel on Multi-District Litigation Rule 7.1(b)(i), Defendant Bryan F. Aylstock respectfully moves the Panel for an Order transferring *Brandon Canup v. Bryan F. Aylstock, et al.*, No. 4:25-cv-01255 (N.D. Texas) as a tag-along action to the United States District Court for the Northern District of Florida for inclusion in MDL No. 2885. Despite being labeled as a legal malpractice action, the *Canup* complaint is nothing of the sort. Rather, Canup is clearly attempting to use his complaint as a trojan horse to collaterally attack the orders of the MDL Court. Indeed, even a cursory reading of the *Canup* complaint is replete with attacks on the MDL Court's orders, the MDL Settlement in the MDL overseen by the Honorable M. Casey Rodgers, and the opt out provisions of that settlement. More importantly, the entire basis of his lawsuit is based upon the fact that Defendants, Aylstock, Bradford, and Burns appeared in their capacity as appointed leadership of the MDL Court at an MDL hearing, an appearance that the official MDL transcript clearly reveals was at the request of the MDL Court, and only in their appointed roles as MDL leadership.

Indeed, the *Canup* complaint falsely alleges that Bryan F. Aylstock, Bobby Bradford and the lawyers at Aylstock, Witkin, Kreis and Overholtz, PLLC, were his lawyers – but the official MDL transcript directly contradicts that allegation and makes clear that their only interaction with

Mr. Canup or the attorney who appeared with him at the MDL hearing, was in their appointed roles as MDL leadership. Any fair reading of the underlying complaint would reveal that what is actually happening is that these lawyers, and the MDL Court itself, are being attacked for their roles related to a hearing held by the MDL Court on March 13, 2024.[1] At no point did Aylstock or any member of his firm represent Mr. Canup. As such, this so-called "malpractice case" is not only "related to" the MDL 2885, but the MDL Court and the interpretation of its orders (and even the meaning of the official MDL transcript of the March 13, 2024, hearing) are central to every claim alleged. Any other Court deciding these issues would therefore be attempting to interpret the orders of the MDL Court itself, which would make no sense; rather transfer of this proceeding to MDL 2885 would clearly "promote the just and efficient conduct" of the *Canup* action and serve the interests of justice. *See* 28 U.S.C. 1407(a).

Finally, it is worth noting that on September 19, 2025, the MDL Court recommended termination of this MDL "subject to this Court's continuing jurisdiction to enforce its Orders, handle any matters related to the settlement, or address any other miscellaneous issues necessary to complete the administration of these cases." The MDL Court further provided it, "would welcome the reopening of the MDL docket and transfer of any such action to this Court for further proceedings, given the Court's familiarity and experience with this litigation" (see JPML Dkt. 2027). As such, transfer is not only appropriate, but necessary. The MDL Court has important institutional knowledge about the litigation, settlement and the MDL Court's Orders at issue in this lawsuit. The *Canup* case provided in the attached Schedule of Action clearly qualifies for transfer under the MDL Court's Order and 28 U.S.C 1407.

---

[1] See Status Conference Hearing Transcript Dated March 13, 2024, attached as Exhibit 3 to the memorandum in support of this motion, and see also Pretrial Order No. 7 (Dkt. 376), Plaintiff Leadership Appointments, In Re: 3M Combat Arms Product Liability Litigation, Case No. 3:19md2885, United States District Court for the Northern District of Florida, Pensacola Division, May 22, 2019.

The motion is supported by the accompanying memorandum of law and exhibits, a

Schedule of Action, a copy of the docket sheet and petition, and a proof of service.

DATE: December 10, 2025        Respectfully submitted,

*/s/ Bryan F. Aylstock*
Bryan F. Aylstock, Florida Bar No. 782634
AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
17 East Main Street, Suite 200
Pensacola, FL 32502
Phone: (850) 202-1010
Facsimile: (850) 916-7449
Email: baylstock@awkolaw.com

*Plaintiffs' Counsel*

**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

<table>
<tr><td>IN RE: 3M COMBAT ARMS EARPLUG<br>PRODUCTS LIABILITY LITIGATION</td><td>MDL No.: 2885</td></tr>
</table>

**MEMORANDUM IN SUPPORT OF MOTION TO TRANSFER TAG-ALONG ACTION
*BRANDON CANUP V. BRYAN F. AYLSTOCK, ET AL.* TO THE *IN RE 3M* COMBAT
ARMS PRODUCT LIABILITY LITIGATION MDL**

## I.     INTRODUCTION

This purported "legal malpractice" lawsuit, which falsely alleges that the undersigned was his attorney, is nothing more than a full-throated attack on the 3M Combat Arms Earplug MDL Court's ("MDL Court") orders and the 3M Combat Arms global settlement ("MDL Settlement"). *See* Plaintiff's Original Petition ("Petition") (attached as Exhibit 1).  Plaintiff's Complaint is replete with allegations regarding the interpretation and implementation of the MDL Court's Orders, and its sole basis for the alleged "malpractice" by Aylstock and Bradford (and Burns) is based upon their appearance at an MDL hearing wherein the official MDL transcript clearly states that the MDL asked for their attendance as only on behalf "Plaintiffs' Leadership."  Indeed, Canup's own attorney was present and represented him at the MDL hearing, as reflected in that transcript.

What this case is really about is the MDL Settlement, and the MDL Court's implementation of that settlement and management of its docket, including Case Management Order No. 57 wherein the MDL Court created a specific framework for those litigants like this Plaintiff who opted not to participate in the Settlement Program as outlined in the MDL Settlement. Also directly referenced and challenged by this lawsuit are the MDL Courts' Common Benefit Order No. 3,

1

Pretrial Order No. 9 Stipulated Order Governing Confidentiality and Privilege, and the Orders granting withdrawal of Plaintiff's actual former counsel, Cliff Roberts, Gregory Brown and Fleming, Nolen & Jez.[1] Plaintiff's complaint then falsely impugns the MDL Settlement and the MDL Court, alleging that the MDL Settlement's terms cause material conflicts of interest between Plaintiffs and Defendants. Finally, the complaint then falsely states that Aylstock and Bradford were his attorneys based solely upon their appearance on behalf of MDL Leadership and at the explicit request of the MDL Court as reflected in the official MDL transcript of those proceedings – proceedings in which Canup himself brought his own attorney who appeared on the record specifically on behalf of Canup.

It goes without saying that the Orders of the MDL Court, and the MDL Settlement overseen by the Court, are common to all 3M MDL cases. Further, it would be contrary to judicial efficiency to allow 3M claimants, such as *Canup*, to litigate the propriety and interpretation of the MDL Court's orders and MDL Settlement implementation in courts other than the MDL Court. As such, transfer is proper to promote centralization and the efficient conduct of this case and of the litigation overall. *See* 28 U.S.C. § 1407(a).

## II.    ARGUMENT

The facts that give rise to this case stem from one of the largest mass torts cases ever handled by the Federal Court system – the 3M combat arms earplug litigation – with more than 350,000 individual claimants at its peak. A global settlement of all cases was reached in MDL

---

[1] *See* Case Management Order No. 57 (Dkt. 3811), Case Management Order for Any Ongoing Litigation Against Defendants, In Re: 3M Combat Arms Product Liability Litigation, Case No. 3:19md2885, United States District Court for the Northern District of Florida, Pensacola Division, August 29, 2023; Common Benefit Order No. 3 (Dkt. 1659), 3M Combat Arms Product Liability Litigation, Case No. 3:19md2885, United States District Court for the Northern District of Florida, Pensacola Division, February 17, 2021; and Pretrial Order No. 9 (Dkt. 442), Stipulated Order Governing Confidentiality and Privilege, 3M Combat Arms Product Liability Litigation, Case No. 3:19md2885, United States District Court for the Northern District of Florida, Pensacola Division, June 17, 2019.

2885 in August of 2023, which ultimately covered more than 252,000 claimants. The Honorable

M. Casey Rodgers made the following comments at the September 8, 2023, Case Management

Conference (*See* Twenty-Third Case Management Conference transcript attached as Exhibit 2):

> But the message here this morning, aside from thanking people for their efforts in getting to the litigation – and getting the litigation to this result, and **I will be thanking some people here in just a moment, but what I want to say on the record this morning, once and for all, is that this settlement is fair. It is fair to the 250,000-plus plaintiffs in the MDL.** (emphasis added). … [But] I also believe it is fair to 3M. And I say this from the perspective of someone who is rather uniquely positioned. I'm positioned as a neutral. And I don't think there's anyone who knows and understands this litigation, both its intricacies and broader whole of it, as well as its risks, more thoroughly as I do as a neutral.
>
> I've been in the trenches of the litigation with the parties since day one, April 3rd, 2019. I've dealt with discovery. I've worked with the government. I've reviewed and ruled on thousands of motions, thousands of objections. I've presided over six trials with nine plaintiffs and listened to the record of ten other trials. I followed closely the appeals of the bellwethers and the Aearo defendant's bankruptcy. No one is in a better position or more credible position to evaluate this settlement than I am. And again I say to all of you that the settlement is fair and the settlement is smart. (Transcript at 6:10 – 7:8)
> \*\*\*
> And importantly, those who criticize the settlement, they have no knowledge of the extraordinary risk and extraordinary costs associated with continued litigation of any Combat Arms Earplug claim, much less the costs and the risk of litigating hundreds of thousands of claims; and to criticize it based simply on jury verdicts, theoretical ideals, or market vagaries is just simply not to understand this uniquely complex litigation at all. (Transcript at 8:2-9)
> \*\*\*
> And also thank the mediators -- Judge Herndon, Judge Cannon, Judge Keyes -- for bringing us to this resolution. And I also want to thank the negotiating plaintiffs' counsel -- Bryan Aylstock, Clayton Clark, Chris Seeger, Dan Gustafson -- and their teams for working with 3M and Aearo, both to bring this settlement to fruition but also in the coming months as we go forward to work together to successfully reach the participation levels set forth in the Settlement Agreements. I think, as Judge Jones said, this is going to be a long-term commitment for both sides to work together. (Transcript at 25:15-24).

The MDL Settlement was posted on the official website for MDL 2885. *See https://www.uscourts.gov/courts/flnd/3M-MSA_I.pdf* (last accessed Dec. 10, 2025). The MDL Court issued multiple orders implementing the settlement, and explained the process for those claimants who chose to opt-out of the settlement. *See https://www.uscourts.gov/courts/flnd/3M-Case_Management_Order_No_57_Docket_Control_Order_and_Exhibits_1-3.pdf* (last accessed Dec. 10, 2025). As part of the process under CMO 57, the MDL Court ordered Plaintiff *Canup* to appear at an official hearing to discuss his decision to opt out of the MDL settlement. Following that MDL hearing, *Canup* voluntarily settled his lawsuit against 3M during the CMO 57 opt out process on September 30, 2024. Petition at ¶ 5.20. Plaintiff was represented by attorney David Gamble at the MDL hearing and when he settled his 3M lawsuit. *Id.* at ¶ 5.6.

After voluntarily settling his 3M case, Plaintiff filed this action on October 27, 2025. *See* Petition (Exhibit 1). Plaintiff's lawsuit contains allegations against eight Defendants which Plaintiff identified as two separate groups, the "Texas Defendants" and the "Florida Defendants". *Id.* at ¶¶ 2.10-2.11. The "Texas Defendants" are Cliff Robert, Gregory Brown and Fleming, Nolan & Jez LLP. Those lawyers and law firm were hired by Plaintiff and represented him in the 3M litigation until the MDL Court granted their withdrawal motion in January 2024. *Id.* at ¶ 5.6. The "Florida Defendants" are Aylstock, Bradford, Aylstock, Witkin, Kreis & Overholtz, PLLC ("AWKO"), Burns and Mostyn Law. Aylstock was appointed as Plaintiffs' Lead Counsel by the MDL Court. *See* https://www.flnd.uscourts.gov/sites/flnd/files/mdl/Pretrial_Order_No._7.pdf (last accessed Dec. 10, 2025). Burns of Mostyn Law was appointed Plaintiffs' Liaison Counsel by the MDL Court. *Id.* It is undisputed that the Florida Defendants were never hired by *Canup* to represent him. Their only involvement and interactions with Plaintiff were on behalf of Plaintiffs' MDL Leadership at the request of the MDL Court, specifically leading up to the March 13, 2024,

4

MDL Court-ordered Status Conference and subsequent settlement conference.   *See* Petition (Exhibit 1) and Status Conference Transcript (attached as Exhibit 3).[2]

Despite the fact that the MDL Court granted the Texas Defendants' withdrawal motion, the fact that the Florida Defendants' only involvement in Plaintiff's case was their appearance at hearing on behalf of Plaintiffs' MDL Leadership at the request of the MDL Court, the fact that Plaintiff hired new counsel, David Gamble, who appeared on his behalf at that conference before the MDL Court, and the fact that Plaintiff voluntarily settled his case against 3M during the opt-out process, Plaintiff *Canup* filed this action under the false pretense of a legal malpractice claim,[3] and in so doing seeks to collaterally attack the Orders of the MDL Court, appointed leadership for the MDL for fulfilling their duties under the MDL Court's Orders, and the MDL Settlement.

Specifically, Plaintiff's allegations against the Texas Defendants are premised upon criticisms of the MDL Settlement terms and the disclosure thereof, the MDL Court's Settlement Implementation Orders (including CMO 57), and the Texas Defendants withdrawal motion which was granted by the MDL Court.   None of these Orders of the MDL Court were ever opposed by Plaintiff *Canup* in the MDL, and none was ever appealed.   *See* Petition at ¶¶ 5.5, 5.6, 5.7, 6.1-6.26.

---

[2] The status conference began with the Court welcoming Mr. Canup and his attorney Mr. Gamble, introducing herself, and then telling Mr. Canup: "Also in the courtroom today from plaintiffs' leadership there's Mr. Bryan Aylstock, Mr. Brad Bradford and Mr. Mike Burns." Exhibit 3, Status Conference Transcript at 3:8-9. The MDL Court continued by explaining why she thought it was important to meet with those plaintiffs litigating their cases (like Mr. Canup) so that she could give her perspective of the litigation having overseen it for 5 years, stating: "Also, as you can see, leadership counsel from the plaintiffs' side is here if you have questions of them." *Id.* at 4:23-25. The MDL Court continued by explaining why she thought it was important to meet with those plaintiffs litigating their cases (like Mr. Canup) so that she could give her perspective of the litigation having overseen it for 5 years, stating: "Also, as you can see, leadership counsel from the plaintiffs' side is here if you have questions of them." *Id.* at 28:25-29:1.

[3] Plaintiff's counts for Fraud, Failure to Disclose Facts, Fraudulent Inducement, Breach of Fiduciary Duty, Fraud by Non-Disclosure and Civil Conspiracy are simply legal malpractice allegations under attempted different names.

Plaintiff's allegations against the Florida Defendants are similarly based upon criticisms of the MDL Settlement terms, the MDL Court's Settlement Implementation Orders (including CMO 57), and most importantly, the Florida Defendants' appearance at the March 13, 2024 status conference and review of Plaintiff's information at the MDL Court's request, and the requirement that Plaintiff comply with the MDL Courts Orders, including MDL Common Benefit Order No. 3, and MDL Pretrial Order No. 9 Stipulated Order Governing Confidentiality and Privilege allowing Plaintiff to access common benefit work product.

## A.     The MDL Settlement

Plaintiff's allegations of there being actionable misconduct by Plaintiff's Leadership in the MDL Settlement structure, terms, and disclosure has potentially broad implications because the MDL Settlement terms apply to all 252,000 of the settled cases in the 3M MDL.  After many years of litigation in the MDL, including no less than 16 bellwether trials, the MDL Settlement was brought about under the guidance of the MDL Court, and specifically negotiated under the watchful eyes of the Honorable David Herndon (Ret.), who was the Court-appointed special master, and the Honorable Hope Cannon – the magistrate judge assigned by the MDL Court. Further, it goes without saying that the MDL Court is intimately familiar with the MDL Settlement's terms and has remained active in the administration of the settlement.  Given the MDL Court's "familiarity and experience with this litigation" and the potential implications of Plaintiff's allegations to the MDL Settlement, transfer is warranted.  *See* JPML Dkt. 2027; 18 U.S.C. 1407.

## B.     CMO 57 and Florida Defendants role in Plaintiff's case

Case Management Order No. 57 outlines the process and procedures for claimants who chose to opt out of the MDL Settlement.  *See* *https://www.uscourts.gov/courts/flnd/3M-*

*Case_Management_Order_No_57_Docket_Control_Order_and_Exhibits_1-3.pdf* (last accessed Dec. 10, 2025). Part of that Court-ordered process includes a required in-person status conference before the MDL Court and a subsequent settlement conference. The MDL Court requested Florida Defendants, on behalf of Plaintiffs' MDL leadership, to review the specific case facts for those claimants, including Plaintiff, who chose to opt out of the Global Settlement and litigate their cases (Exhibit 3, Status Conference Transcript at 33:19-25). The MDL Court wanted Florida Defendants to familiarize themselves with the case-specific information to assist those Plaintiffs who were considering whether or not to opt out of the settlement program with the pros and cons of litigating their cases, how the specific facts of their cases would pertain to the litigation generally and how the specific facts of their cases could apply to both parts of the settlement program, the expedited or deferred pay portion, and the extraordinary injury fund (Exhibit 3, Status Conference Transcript at 4:6-12, 5:7-15). The MDL Court also asked Florida Defendants to attend Plaintiff *Canup*'s Status Conference on March 13, 2024, and to be available if requested during the subsequent settlement conference (Exhibit 3, Status Conference Transcript at 4:20-5:6). The MDL Court is intimately familiar with CMO 57 and the circumstances surrounding Plaintiff's Status Conference and Settlement Conference and is certainly in the best position to address Plaintiff's allegations involving both (see JPML Dkt. 2027).

## C.   Common Benefit Order No. 3, Pretrial Order No. 9 Stipulated Order Governing Confidentiality and Privilege

Finally, *Canup* criticizes Florida Defendants for their roles on behalf of MDL Leadership for requiring Plaintiff and his lawyer, David Gamble, to review, execute and comply with Orders of the MDL Court related to common benefit, confidentiality and privilege. Each of these Orders required a claimant (or his attorney) to execute of documents before access could be granted to

any confidential information or work product generated in the context of the 3M Combat Arms MDL.

*See* https://www.flnd.uscourts.gov/sites/flnd/files/mdl/Pretrial_Order_No._9.pdf and https://www.flnd.uscourts.gov/sites/flnd/files/mdl/Common_Benefit_Order_No._3_and_Exhibit_A.pdf (last accessed Dec. 10, 2025). As stated above, the MDL Court is certainly in the best position to determine the rights and requirements of its Orders and address *Canup*'s allegations involving those Orders.

### III.    CONCLUSION

If plaintiffs could challenge MDL Orders or MDL Settlement terms by filing in separate courts throughout the state and federal systems, every adverse order in a nationwide MDL could be sidestepped simply by filing a "malpractice" claim against appointed MDL leadership and asking those courts to "take a different view." Such would defeat the essential purpose of MDL consolidation and undermine nationwide judicial management of the 3M Combat Arms Product Liability Litigation.

The MDL Court specifically retained jurisdiction for circumstances just like this one, recommending termination of the MDL, "subject to this Court's continuing jurisdiction to enforce its Orders, handle any matters related to the settlement, or address any other miscellaneous issues necessary to complete the administration of these cases." The MDL Court further provided it "would welcome the reopening of the MDL docket and transfer of any such action to this Court for further proceedings, given the Court's familiarity and experience with this litigation" (see JPML Dkt. 2027).

Because Plaintiff's claims hinge on attacking or revisiting MDL Orders and the MDL Settlement, the only appropriate forum is the MDL Court. For the reasons discussed above, the panel should grant this Motion and transfer the above-captioned case into the MDL.

Dated: December 10, 2025    /s/ *Bryan F. Aylstock*
           Bryan F. Aylstock, Florida Bar No. 782634
           AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
           17 East Main Street, Suite 200
           Pensacola, FL 32502
           Phone: (850) 202-1010
           Facsimile: (850) 916-7449
           Email: baylstock@awkolaw.com

           *Plaintiffs' Counsel*

**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | MDL No.: 2885 |

## SCHEDULE OF ACTION

| CASE CAPTION | COURT | CIVIL ACTION NO. | JUDGE |
|---|---|---|---|
| **Plaintiff:** Brandon Canup<br><br>**Defendants:** Bryan F. Aylstock; Bobby Bradford; Michael Burns; Cliff Roberts; Gregory Brown; Aylstock, Witkin, Kreis & Overholtz, PLC; Fleming Nolen & Jez LLP; Mostyn Law Firm PC | N.D. of Texas, Fort Worth Division | 4:25-cv-01255-Y | Judge Terry R. Means |

Dated: December 10, 2025

/s/ *Bryan F. Aylstock*
Bryan F. Aylstock, Florida Bar No. 782634
AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
17 East Main Street, Suite 200
Pensacola, FL 32502
Phone: (850) 202-1010
Facsimile: (850) 916-7449
Email: baylstock@awkolaw.com

*Plaintiffs' Lead Counsel*

# EXHIBIT 1

FILED
TARRANT COUNTY
10/27/2025 1:29 PM
THOMAS A. WILDER
DISTRICT CLERK

CAUSE NO. _067-371499-25_____

| | |
|---|---|
| BRANDON CANUP, | IN THE _____ |
| Plaintiff | DISTRICT COURT |
| v. | |
| BRYAN F. AYLSTOCK, BOBBY BRADFORD, MICHAEL BURNS, CLIFF ROBERTS, GREGORY BROWN, AYLSTOCK WITKIN KREIS & OVERHOLTZ PLC, FLEMING NOLEN & JEZ LLP and MOSTYN LAW FIRM PC, | TARRANT COUNTY, TEXAS |
| Defendants | |

## PLAINTIFF'S ORIGINAL PETITION

COMES NOW Plaintiff, Brandon Canup, appearing pro se, and files this Original Petition against the Defendants named herein. Plaintiff makes this filing based on personal knowledge as to all matters concerning himself and upon information and belief as to all other matters. In support thereof, Plaintiff respectfully shows the Court as follows:

## I.

## DISCOVERY CONTROL PLAN

ORIGINAL PETITION                                    **PAGE**        1

1.1   Plaintiff pleads that discovery should be conducted in accordance with discovery control plan, level 3, pursuant to Rule 190 of the Texas Rules of Civil Procedure.

## II.

## PARTIES

### A.   Plaintiff

2.1   Brandon Canup ("Canup") is an individual residing in Tarrant County, Texas.

### B.   Defendants

2.2   Aylstock, Witkin, Kreis & Overholtz, P.L.C. ("AWKO") is a foreign professional limited liability company formed under the laws of Florida, doing business in Texas. Its principal office is located at 17 East Main Street, Suite 200, Pensacola, Florida 32502. AWKO may be served via its registered agent for service of process: Justin Witkin, 17 East Main Street, Suite 200, Pensacola, Florida 32502, or wherever it may be found. In the event AWKO does not maintain a registered agent or cannot otherwise be located with reasonable diligence, it may be served through the Texas Secretary of State as provided by *Tex. Bus. Orgs. Code § 5.251* and *Tex. Civ. Prac. & Rem. Code §§ 17.041–17.045.*

2.3   Mostyn Law Firm, P.C. ("Mostyn") is a Texas professional corporation formed under the laws of Texas, with its principal office at 3810 W. Alabama Street,

Houston, Texas 77027-5204. Mostyn may be served via its registered agent for service of process: Andrew Browning, at the same address, or wherever it may be found.

2.4     Fleming, Nolen & Jez, L.L.P. ("FNJ") is a Texas limited liability partnership with its principal office located at 2800 Post Oak Blvd., Suite 6000, Houston, Texas 77056-6128. FNJ may be served via a General Partner for service of process: George Fleming, at the same address, or wherever it may be found. Because FNJ does not have a registered agent listed on file with the Texas Comptroller as of the date of this filing, it may also be served with process through the Texas Secretary of State pursuant to *Tex. Bus. Orgs. Code § 5.251*, who shall forward process to FNJ's last known address on file.

2.5     Bryan Frederick Aylstock ("Aylstock") is an attorney licensed in the State of Florida (Florida Bar No. 78263), and a founding partner of AWKO. He may be served at his primary business address: Aylstock, Witkin, Kreis & Overholtz, PLC, 17 East Main Street, Suite 200, Pensacola, Florida 32502, or wherever he may be found. If service cannot with reasonable diligence be effected at this address, then pursuant to the Texas long-arm statute, service may be made on the Texas Secretary of State as agent for service of process for this Defendant.

2.6     Bobby J. Bradford ("Bradford") is an attorney licensed in the State of Florida (Florida Bar No. 173223) and a partner at AWKO. He may be served at at

ORIGINAL PETITION                                         **PAGE**          3

his primary business address: Aylstock, Witkin, Kreis & Overholtz, PLC, 17 East Main Street, Suite 200, Pensacola, Florida 32502, or wherever he may be found. If service cannot with reasonable diligence be effected at this address, then pursuant to the Texas long-arm statute, service may be made on the Texas Secretary of State as agent for service of process for this Defendant.

2.7    Michael Andrew Burns ("Burns") is an attorney licensed in the State of Florida (Florida Bar No. 973130). At all times relevant to this case, he was affiliated with Mostyn Law Firm, a Texas-based law firm. He may be served at his Florida business address: Burns Law LLC, 362 Gulf Breeze Parkway, #294, Gulf Breeze, Florida 32561-4492, or wherever he may be found. If service cannot with reasonable diligence be effected at this address, then pursuant to the Texas long-arm statute, service may be made on the Texas Secretary of State as agent for service of process for this Defendant.

2.8    Gregory Donald Brown ("Brown") is an attorney licensed in the State of Texas (Texas Bar No. 24078266). At all times relevant to this case, he was affiliated with FNJ. Brown is listed as an attorney at FNJ on their website and as an attorney at Sorrels Law on his Texas State Bar profile. He may be served at his primary business address: Sorrels Law, 230 Westcott St., Ste. 100, Houston, Texas 77007, or at Fleming, Nolen & Jez, LLP, 2800 Post Oak Blvd., Suite 6000, Houston, Texas 77056-6128, or wherever he may be found.

2.9   Cliff Lee Roberts ("Roberts") is an attorney licensed in the State of Texas (Texas Bar No. 17002900). He may be served at his business address: 8191 Southwest Freeway, Suite 116, Houston, Texas 77074-1700, or wherever he may be found.

2.10   For ease of reference, Defendants AWKO, Mostyn, Aylstock, Bradford, and Burns may collectively be referred to as the ("Florida Defendants"). Although Mostyn is a Texas law firm, it is included in this group because of its affiliation with Burns, a Florida-based attorney, and its role in the conduct giving rise to this case.

2.11   Defendants FNJ, Brown, and Roberts may collectively be referred to as the ("Texas Defendants").

2.12   All Defendants may collectively be referred to as the ("Defendants").

## III.

## JURISDICTION AND VENUE

3.1   This Court has subject matter jurisdiction over this action pursuant to Section 24.007, et seq. of the Texas Government Code. The amount in controversy exceeds the Court's minimum jurisdictional requirements, exclusive of interest and costs, and the relief sought is within the jurisdictional limits of this Court.

3.2   This Court has personal jurisdiction over all named Defendants. One or more Defendants are residents of Texas, maintain their principal place of business

ORIGINAL PETITION                                    **PAGE**      5

in Texas, and/or regularly conduct business in Texas. Additionally, pursuant to the Texas Long-Arm Statute, *Tex. Civ. Prac. & Rem. Code §§ 17.041–17.069*, this Court may exercise jurisdiction over out-of-state Defendants who have purposefully directed activities toward Texas. Out-of-state Defendants purposefully directed activities toward Texas, including but not limited to: providing legal services to a Texas resident, accessing confidential records of a Texas resident, and appearing and purporting to act on behalf of a Texas resident in litigation proceedings connected to Texas, including matters designated for trial in the Northern District of Texas. Furthermore, all out-of-state Defendants performed common benefit work in the underlying litigation entitling them to collect fees from thousands of Texas Residents. Out-of-state Defendants have purposefully availed themselves of the privileges and benefits of conducting business in Texas and are subject to the jurisdiction of this Court. These actions demonstrate the Defendants' purposeful involvement in matters connected to Texas, making it both appropriate and consistent with due process for a Texas court to exercise jurisdiction over them.

3.3    Venue is proper in this Court pursuant to Section 15.001, *et seq.* of the Texas Civil Practice and Remedies Code.  All or a substantial part of the harm resulting from Defendants' conduct was suffered by Plaintiff in Tarrant County, Texas, where Plaintiff resides and relied upon Defendants' actions and representations. Additionally, this lawsuit concerns contracts and attorney-client

ORIGINAL PETITION    **PAGE**    6

relationships that were to be performed, in whole or in part, in Tarrant County. Plaintiff's case was designated for trial in the United States District Court for the Northern District of Texas, and Tarrant County was the central location of Plaintiff's litigation preparation, reliance on Defendants, and resulting injury.

## IV.

## STATEMENT PURSUANT TO RULE 47

4.1    Pursuant to Rule 47 of the Texas Rules of Civil Procedure, Plaintiff states that he seeks monetary relief of less than $250,000, including damages of any kind, penalties, costs, expenses, pre and post-judgment interest. Plaintiff further affirms that he seeks less than $75,000 in monetary damages, exclusive of interest and costs.

## V.

## BACKGROUND FACTS

5.1    On April 3, 2019, the United States Judicial Panel on Multidistrict Litigation transferred multiple actions to the Northern District of Florida for coordinated pretrial proceedings in *In re: 3M Combat Arms Earplug Products Liability Litigation*, Cause No. 3:19-md-02885 ("MDL").

5.2    On May 22, 2019, the MDL court issued Pretrial Order No. 7, appointing various plaintiffs' attorneys to leadership roles ("PSC") to conduct common benefit

work on behalf of all claimants in the MDL. These appointments were set to expire after one year unless renewed.

5.3    On June 21, 2019, Canup retained Texas Defendants Brown, FNJ, and Roberts, to investigate, develop, and litigate his claims in the MDL. Despite this agreement, Texas Defendants failed to meaningfully investigate Canup's injuries or develop his case during their years of representation.

5.4    On August 29, 2023, a global settlement agreement ("MSA") was announced between 3M and Plaintiffs' Leadership in the MDL. The agreement imposed obligations on plaintiffs' attorneys to recommend settlement to 100% of their clients, to withdraw from representation of any claimant who declined to participate and other terms that were hidden from Plaintiffs in the MDL in Exhibit 10 of the MSA. These provisions created undisclosed conflicts of interest between attorneys and their clients.

5.5    Canup received several letters and emails from Texas Defendants pressuring him to accept the settlement, warning that rejection would result in withdrawal of representation, delayed access to trial, and onerous litigation deadlines. However, Texas Defendants never disclosed the full terms of the settlement, including Exhibit 10, which contained material provisions.

5.6    Following multiple communications from Texas Defendants indicating their intent to withdraw if Canup declined to participate in the global settlement,

Canup retained attorney David Gamble ("Gamble") in January 2024. At the time, Texas Defendants were still counsel of record for Canup in the MDL but did not provide substantive legal support. Canup retained Gamble to preserve his ability to litigate, anticipating Texas Defendant's formal withdrawal and recognizing their abdication of duty.

5.7     On January 21, 2024, Canup officially opted out of the MSA triggering his production obligations under Case Management Order 57 ("CMO 57"). Canup and Gamble immediately began preparing for the CMO 57 production requirements which included gathering, organizing, and submitting over 25 GB of data within 30 days under threat of dismissal with prejudice. Despite knowing of these requirements for months, Texas Defendants did not assist in meeting these obligations. Brown filed a motion to withdraw as counsel of record for Canup in the MDL within a week of Canup's CMO 57 production deadline. His motion was granted one day before the CMO 57 deadline.

5.8     Canup requested his file from FNJ in January of 2024. Canup received a few documents but never his full file. FNJ sent Gamble Canup's file which only contained a single four-page pdf.

5.9     On February 5, 2024 Canup was ordered by the MDL Court to appear "in person, with counsel" at a status conference in Pensacola, Florida scheduled for March 13, 2024. In preparation for the March 13, 2024 status conference Bradford

contacted Gamble seeking privileged and confidential information about Canup and his case against 3M and to give advice about the settlement programs in the MSA. Gamble and Bradford spoke several times about Canup's case including but not limited to his medical claims and potential recovery. Bradford informed Gamble that Aylstock and Bradford would be present at the status conference but never informed Gamble of Florida Defendants' intent to make a formal appearance.

5.10    Unbeknownst to either Canup or Gamble, Florida Defendants made a formal appearance in the MDL Court on Canup's behalf at the March 13, 2024 status conference. The hearing transcript lists Aylstock and Bradford from AWKO and Burns from Mostyn as appearing "FOR THE PLAINTIFF." Aylstock participated in the hearing by addressing the MDL Court on the record speaking about the MSA in an attempt to convince Canup to accept the global settlement offer.

5.11    Following the first hearing, Canup and Gamble were led to a conference room where Magistrate Judge Hope Cannon conducted a closed-door settlement conference. This settlement conference was a second official proceeding on March 13, 2024. Judge Cannon brought in Aylstock, Bradford, and Burns, who then gave individual legal advice, reviewed Canup's medical records and discussed Canup's case directly with Canup. The medical documents that were already in Florida Defendants' possession when they entered the room included but were not limited to audiograms and post-deployment health assessments from Canup's time in the US

ORIGINAL PETITION                                        **PAGE**        10

Army. These confidential and privileged documents were not provided to Florida Defendants by Canup or Gamble. Florida Defendants had gained access to these confidential and privileged documents from another source unknown to Canup or Gamble.

5.12    During that discussion, Aylstock, Bradford, and Burns attempted to pressure Canup to accept the MSA which Canup had already expressly rejected. Florida Defendants were formerly part of the PSC in the MDL and were bound by the terms of the MSA. Florida Defendants did not disclose that their continued compensation was contingent upon claimant participation levels in the MSA, they did not disclose the full terms of the MSA including Exhibit 10, nor did they inform Canup of the conflict created by the MSA's provisions requiring them to recommend settlement to 100% of claimants and to withdraw from clients who opted out. They also failed to disclose that they were making another formal appearance in this second proceeding in the MDL Court on Canup's behalf.

5.13    Florida Defendants' conduct and formal appearances as Canup's counsel created, at minimum, an implied attorney-client relationship, and arguably an express attorney-client relationship. Bradford reached out to Gamble to obtain confidential and privileged information and to discuss Canup's case strategy prior to the proceedings, conduct consistent with representation. At the hearing itself, Defendants Aylstock, Bradford, and Burns formally appeared "FOR THE

ORIGINAL PETITION    **PAGE**    11

PLAINTIFF" on the record, communicated directly with Plaintiff, gave individualized legal advice, and attempted to pressure him into accepting the MSA. These actions, individually and collectively, establish an implied attorney-client relationship, because they would cause any reasonable client to believe Florida Defendants were acting as his attorneys. The formal appearance on the record not only arguably created an express attorney-client relationship but, at the very least, reinforced and confirmed the implied relationship already created by Florida Defendants' conduct. This imposed fiduciary duties including, but not limited to, the duties of loyalty, candor, honesty, disclosure, and conflict avoidance. Despite these obligations, Defendants failed to disclose their intent to appear, their actual formal appearance, their roles in the settlement conference, or their financial stake in maximizing claimant participation.

5.14    Had Canup known that Florida Defendants would appear on his behalf, he could have satisfied the MDL Court's order to appear "in person, with counsel" without transporting Gamble to Florida. Canup incurred substantial costs for Gamble's airfare, lodging, and time. These are expenses he would not have borne had Florida Defendants fulfilled their duty to disclose their participation.

5.15    After the March hearing, Aylstock, Bradford, and Burns took no further action on Canup's behalf, never filed a notice of withdrawal, and never

explained their involvement. Canup did not become aware of their official appearance until he obtained a transcript of the hearing in January 2025.

5.16    Meanwhile, Canup encountered roadblocks accessing the unredacted Master Long Form Complaint ("Master Complaint"). The master complaint was filed on behalf of all claimants and was referenced by all Short Form Complaints filed by the Plaintiffs in this MDL. When the motion to file this document under seal was filed in 2019 it stated that all counsel of record were sent an unredacted copy. Canup was denied access to this document by FNJ. FNJ later contacted Gamble and recommended that he reach out to the PSC to ask for permission to access the master complaint from PSC.

5.17    In April of 2024 Gamble contacted Bradford to get access to the master complaint. On April 24, 2024, Bradford informed Gamble that he would only release the unredacted complaint if Gamble signed a Common Benefit Work Participation Agreement assigning a 9% interest in any future recovery in Canup's case to the PSC. Canup consented to Gamble's signing the agreement to move forward with the litigation.

5.18    On May 1, 2024, Canup filed an amended complaint and Lexecon non-waiver statement as ordered by the MDL Court on April 17, 2024. The order requiring Canup to amend his pleadings stated that he could not add new allegations or causes of action. 3M moved to dismiss. On July 18, 2024, the MDL Court granted

the motion in part, dismissing Canup's hearing-loss-related claims as procedurally barred because they were new allegations and/or causes of action.

5.19    The MDL Court's order stated that Canup's former attorneys never attempted to amend his pleadings to include hearing loss claims, despite representing him for years. The MDL Court cited this as a reason that Canup should not be allowed to add new allegations or causes of action. Canup was harmed by being forced to retain expert witnesses whose work became worthless due to the dismissal of the hearing-loss-related claims, harm that would have been avoided had the Texas Defendants investigated and developed Canup's case as they were legally obligated to do.

5.20    On September 30, 2024, Canup entered into a direct settlement agreement with 3M. Canup's ability to reach this resolution was made possible only through his efforts and the efforts of independent counsel, despite the harm caused by the misconduct of the attorneys named herein.

## VI.

## CAUSES OF ACTION

<u>Alternative Pleadings</u>.  To the extent necessary, each of the claims set forth below is pleaded in the alternative.

### A.    CLAIMS AGAINST TEXAS DEFENDANTS

**Claim 1:  Fraud and Failure to Disclose Facts (pled alternatively
as Fraudulent Inducement)**

6.1     Canup restates and realleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

6.2     **Material Misrepresentation:** Texas Defendants Brown, Roberts, and FNJ made material representations to Canup, including that they would actively pursue Canup's claims in the MDL and litigate the case on his behalf. These representations were expressly contained in the written contingency fee retainer agreement executed between Canup and Texas Defendants, which promised diligent investigation, development, and prosecution of Canup's claims. These representations were made to induce Canup to sign the agreement and place exclusive control of his case with Texas Defendants.

6.3     **Knowledge of Falsity:** At the time these representations were made, Texas Defendants knew they were false, or at minimum had no reasonable basis to believe them true. FNJ had prior MDL experience and knew that their business model involved securing clients for global settlements without undertaking individualized litigation. Their subsequent conduct, failing to advance Canup's claims for four years, not amending pleadings to preserve critical causes of action, and abandoning Plaintiff just one day before the CMO 57 production deadline, confirms they never intended to perform the promised litigation services.

6.4     **Intent to Induce Reliance:** Texas Defendants made these misrepresentations with the intent and purpose of inducing Canup to rely on them

ORIGINAL PETITION                                         **PAGE**         15

and execute the contingency fee agreement, thereby binding Canup to pay them a percentage of any recovery while avoiding the cost and effort of actively litigating his claims.

6.5    **Justifiable Reliance:** Canup justifiably relied on these representations by signing the retainer agreement and allowing Texas Defendants to control and manage his claims in the MDL for approximately four years, without seeking alternative representation or taking independent action, in the belief that Texas Defendants were diligently working on his behalf.

6.6    **Injury Caused by Reliance**: As a direct and proximate result of Canup's reliance on Texas Defendants' misrepresentations, Canup suffered injury. The MDL court cited Texas Defendants' failure to amend pleadings and advance his case as a basis for dismissing Canup's hearing-loss claims, which diminished the value of expert reports prepared for the litigation. Texas Defendants' abandonment of Canup before the CMO 57 compliance deadline caused significant stress, confusion, inconvenience, and anxiety, disrupted Canup's daily life for several months, and forced him to devote substantial time and effort to untangling the MDL process and uncovering how his own attorneys were deceiving him.

6.7    Texas Defendants' conduct also contradicts the terms of the written agreement, which stated that Canup retained ultimate authority over settlement decisions and that Texas Defendants would provide full legal support. Instead, Texas

ORIGINAL PETITION    **PAGE**    16

Defendants used the contract to obtain control of Canup's claims, then abandoned those claims for financial reasons when he exercised his right to opt out of the settlement.

6.8    Texas Defendants violated Section 32.46 of the Texas Penal Code when they engaged in the above-described conduct. Texas Defendants acted knowingly and intentionally. Such violations constitute fraud.

6.9    To the extent FNJ is not found directly liable for its own independent misconduct, FNJ is also vicariously liable for any wrongful acts or omissions committed by Brown and/or Roberts in the course and scope of their employment and/or partnership and/or agency under the doctrine of respondeat superior and Texas agency law.

6.10    Accordingly, Canup pleads for, and is entitled to monetary damages in an amount sufficient to compensate him for the harm sustained.

6.11    Because Texas Defendants' conduct was fraudulent and/or malicious, Canup pleads for, and is also entitled to recover exemplary damages in an amount to be determined by the trier of fact. Canup further pleads for expenses and pre- and post-judgment interest at the maximum rate permitted by law.

### Claim 2:  Breach of Fiduciary Duty

6.12    Canup restates and realleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

ORIGINAL PETITION                                                    **PAGE**         17

6.13 **Existence of a Fiduciary Duty:** Texas Defendants Brown, Roberts, and FNJ entered into a written contingency fee retainer agreement with Canup to represent him in the MDL. By virtue of this attorney-client relationship, Texas Defendants owed Canup fiduciary duties of loyalty, candor, disclosure, and zealous representation among others. These duties included the obligation to place Plaintiff's interests above their own, to fully inform Plaintiff of all material facts affecting his case, and to diligently pursue his claims.

6.14 **Breach of the Duty:** Texas Defendants breached their fiduciary duties including but not limited to, duty of full disclosure, duty of good faith and fair dealing, duty of care and duty of loyalty in multiple respects. They failed to investigate and develop Canup's case over a four-year period, leading to the MDL court's dismissal of his hearing-loss claims. They concealed material information about the global settlement structure, including Exhibit 10, and failed to disclose that they intended to recommend settlement to all clients regardless of individual circumstances. They also abandoned Canup at a critical stage of litigation, withdrawing representation one day before the CMO 57 compliance deadline, despite having known of those deadlines for months. In addition, Texas Defendants failed to provide Canup with his full client file and withheld the master complaint from him.

6.15  **Causation:** Texas Defendants' breaches directly and proximately caused injury to Canup. Their failure to amend pleadings was specifically cited by the MDL court as a reason for barring and dismissing Canup's hearing-loss claims, which rendered costly expert reports largely useless. Their last-minute withdrawal disrupted Canup's ability to comply with CMO 57 requirements. Their concealment of material settlement information deprived Canup of the ability to make informed decisions regarding his claims.

6.16  **Damages:** As a result of Texas Defendants' breaches, Canup suffered both economic and non-economic damages. Economically, Canup incurred wasted expert fees. Non-economically, Plaintiff endured significant stress, confusion, inconvenience, and anxiety, disruption Canup's daily life for several months, and forced him to devote substantial time and effort to untangling the MDL process and uncovering how his own attorneys were deceiving him.

6.17  To the extent FNJ is not found directly liable, FNJ is also vicariously liable for the breaches of fiduciary duty committed by Brown and/or Roberts in the course and scope of their employment and/or partnership and/or agency under the doctrine of respondeat superior and Texas agency law.

6.18  Accordingly, Canup pleads for, and is entitled to monetary damages in an amount sufficient to compensate him for the harm sustained.

6.19   Because Texas Defendants' conduct was fraudulent and/or malicious, Canup pleads for, and is also entitled to recover exemplary damages in an amount to be determined by the trier of fact. Canup further pleads for expenses and pre- and post-judgment interest at the maximum rate permitted by law.

### Claim 3:  Negligence (pled in the alternative)

6.20   Canup restates and realleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

6.21   **Existence of a Duty:** Texas Defendants Brown, Roberts, and FNJ entered into a written contingency fee retainer agreement with Canup to represent him in the MDL. By virtue of this attorney-client relationship, Texas Defendants owed Canup a duty to exercise reasonable care, skill, and diligence commonly possessed and exercised by attorneys similarly situated in the State of Texas. This duty included, but was not limited to, properly investigating and preparing Canup's claims, maintaining adequate communication with the client, meeting applicable court deadlines, and taking reasonable steps to protect Plaintiff's interests before, during, and after withdrawal of representation.

6.22   **Breach of the Duty:** Texas Defendants breached their duty of care in multiple respects. They failed to investigate and develop Canup's case over a four-year period, leading to the MDL court's dismissal of his hearing-loss claims. They concealed material information about the global settlement structure, including

ORIGINAL PETITION     **PAGE**     20

Exhibit 10, and failed to disclose that they intended to recommend settlement to all clients regardless of individual circumstances. They also abandoned Canup at a critical stage of litigation, withdrawing representation one day before the CMO 57 compliance deadline, despite having known of those deadlines for months. In addition, Texas Defendants failed to provide Canup with his full client file and withheld the master complaint from him.

6.23 **Causation:** Texas Defendants' breaches directly and proximately caused injury to Canup. Their failure to amend pleadings was specifically cited by the MDL court as a reason for barring and dismissing Canup's hearing-loss claims, which rendered costly expert reports largely useless. Their last-minute withdrawal disrupted Canup's ability to comply with CMO 57 requirements. Their concealment of material settlement information deprived Canup of the ability to make informed decisions regarding his claims.

6.24 **Damages:** As a result of Texas Defendants' breaches, Canup suffered both economic and non-economic damages. Economically, Canup incurred wasted expert fees. Non-economically, Plaintiff endured significant stress, confusion, inconvenience, and anxiety, disruption Canup's daily life for several months, and forced him to devote substantial time and effort to untangling the MDL process and uncovering how his own attorneys were deceiving him.

6.25    To the extent FNJ is not found directly liable, FNJ is also vicariously liable for the breaches of fiduciary duty committed by Brown and/or Roberts in the course and scope of their employment and/or partnership and/or agency under the doctrine of respondeat superior and Texas agency law.

6.26    Accordingly, Canup pleads for, and is entitled to monetary damages in an amount sufficient to compensate him for the harm sustained.

### B.    CLAIMS AGAINST FLORIDA DEFENDANTS

### Claim 1:  Fraud by Non-Disclosure

6.27    Canup restates and re-alleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

6.28    **Failure to Disclose:** Florida Defendants deliberately failed to disclose material facts. Florida Defendants Aylstock, Bradford, and Burns, while acting on behalf of their respective firms AWKO and Mostyn, deliberately failed to disclose that they intended to formally appear as counsel for Canup at the March 13, 2024 status conference and that they intended to formally appear and participate in a closed-door settlement conference concerning Canup's case. By withholding these facts, Florida Defendants concealed their involvement in Canup's case. These omissions occurred despite their knowledge of a court order requiring Canup to appear "in person, with counsel" if represented.

ORIGINAL PETITION                                              **PAGE**       22

6.29  **Duty to Disclose:** The Defendants had a duty to disclose such facts to Canup. The Florida Defendants' duty to disclose arose from multiple sources:

a) By making a formal appearance on the record, Florida Defendants created at least an implied and arguably an express attorney-client relationship with Canup, triggering fiduciary duties of candor, loyalty, and disclosure. They had a duty to disclose their intent to make a formal appearance.

b) By partially disclosing their intent to attend the March 13, 2024 status conference to Canup through Gamble while concealing their intent to formally appear, Florida Defendants created a duty to disclose the full scope of their role.

c) By seeking privileged and confidential information about Canup and his case against 3M prior to the March 13, 2024 status conference and by obtaining and using Canup's confidential medical records, Defendants assumed fiduciary-like duties of confidentiality and fair dealing, requiring them to disclose their access and intent.

6.30  **Canup's Ignorance:** Canup was ignorant of the facts and did not have an equal opportunity to discover them. Canup had no knowledge that Florida Defendants intended to appear in court on his behalf, nor that they had accessed his private medical records from an undisclosed source. Because these actions were being concealed and misrepresented Canup had no equal opportunity to discover their conduct or protect his own interests before incurring unnecessary expenses and attending the conference under false pretenses.

ORIGINAL PETITION                                                    **PAGE**        23

6.31  **Intent to Induce:** Florida Defendants intended Canup to act or refrain from acting based on the nondisclosure. Florida Defendants knew that the MDL Court's order required Canup to appear "in person, with counsel." Their nondisclosure was calculated to induce Canup to continue treating Gamble as his sole counsel and to incur the costs of transporting and compensating him to attend the status conference in Florida. By concealing their intention to appear "FOR THE PLAINTIFF," Florida Defendants prevented Canup from making an informed choice such as declining to bring Gamble, objecting to their unauthorized involvement, or challenging their improper access to his records. Their concealment ensured that Canup remained unaware and passive while Florida Defendants acted in ways that advanced their own interests in the MDL.

6.32  **Reliance and Injury:** Canup relied on the Florida Defendants' nondisclosure, which directly resulted in injury. In reliance on their concealment, Canup unnecessarily paid for Gamble's travel, lodging, and appearance at the Florida status conference, expenses that would not have been incurred had he known Florida Defendants would appear as his counsel. Florida Defendants also accessed and used his confidential medical records without consent, depriving him of control over his case and the opportunity to make informed legal decisions with full knowledge of who was acting on his behalf. These harms, including financial costs and disruption of his autonomy, were the direct and foreseeable result of Florida

Defendants' deliberate concealment of material facts they had a duty to disclose.

6.33    Bryan Aylstock, as a founding partner of AWKO, had actual authority to bind the firm. AWKO and Mostyn Law benefitted directly from the concealment and actions of their employees and partners. As such, both firms are directly liable for the misconduct described herein.

6.34    Florida Defendants' omissions and concealments were intentional, material, and calculated to mislead Canup during a critical phase of litigation. This conduct constitutes actionable fraud by non-disclosure under Texas law.

6.35    To the extent AWKO and Mostyn Law are not found directly liable, they are vicariously liable for the acts and omissions of Aylstock, Bradford, and Burns committed within the course and scope of their employment and/or partnership and/or agency under the doctrine of respondeat superior and Texas agency law.

6.36    Accordingly, Canup pleads for, and is entitled to monetary damages in an amount sufficient to compensate him for the harm sustained.

6.37    Because Florida Defendants' conduct was fraudulent and/or malicious, Canup pleads for, and is also entitled to recover exemplary damages in an amount to be determined by the trier of fact. Canup further pleads for expenses and pre and post-judgment interest at the maximum rate permitted by law.

**Claim 2:  Breach of Fiduciary Duty**

6.38   Canup restates and re-alleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

6.39   **Existence of Fiduciary Duty:** By formally appearing on the record as counsel "FOR THE PLAINTIFF" at the March 13, 2024 status conference, and by participating in a closed-door settlement discussion regarding Canup's case, the Florida Defendants created at least an implied and arguably an express attorney-client relationship with Canup. This appearance, coupled with their access to Canup's confidential medical records, imposed fiduciary duties of loyalty, candor, and full disclosure. Having assumed the role of Canup's representatives in court and in private negotiations, Florida Defendants were obligated to act in Canup's best interests, disclose material facts, and avoid self-dealing or deception.

6.40   **Breach of Duty:** Florida Defendants breached their fiduciary duties including but not limited to, duty of full disclosure, duty of good faith and fair dealing, duty of care and duty of loyalty in multiple respects. Florida Defendants breached these fiduciary duties in multiple ways. They deliberately failed to inform Canup of their intent to appear as his counsel, concealed their formal appearance in settlement negotiations, and accessed Canup's confidential medical records without authorization. They further failed to disclose material conflicts of interest, including their obligations under the MSA to secure 100% plaintiff participation and the financial penalties they faced if Canup declined to settle. Florida Defendants also

ORIGINAL PETITION                                                        **PAGE**      26

failed to disclose Exhibit 10 to the MSA which contained material terms to the agreement. Instead of candor and loyalty, Florida Defendants acted in their own financial interests by pressuring Canup toward settlement while depriving him of the opportunity to make informed decisions about his representation and case strategy.

6.41   **Causation:** Florida Defendants' breaches directly caused Canup to act and incur expenses that he otherwise would not have. Because Florida Defendants concealed their intent to formally appear as counsel, Canup reasonably believed Gamble was his only representative and paid to transport and lodge Gamble in Florida for the status conference. Canup was further deprived of the ability to object to Florida Defendants' unauthorized access to his confidential medical records, or to challenge their improper participation in court and settlement proceedings. Their concealment and deception stripped Canup of control over his own case and forced him to rely on incomplete and misleading information.

6.42   **Damages:** As a direct and proximate result of Florida Defendants' misconduct, Canup suffered both financial and significant inconvenience damages. He incurred unnecessary out-of-pocket expenses for Gamble's travel and representation. Florida Defendants' concealment and breaches also forced Canup to spend substantial time, energy, and effort to learn about the role and duties of a lawyer, MDL procedures, settlement structures, and fiduciary obligations, simply to understand how his rights were being compromised. Instead of being able to trust

Defendants, Canup was required to divert time away from his personal and professional life to protect himself from those who owed him loyalty and candor. This disruption and burden are concrete injuries that flow directly from Florida Defendants' breaches of fiduciary duty.

6.43  To the extent AWKO and Mostyn Law are not found directly liable, they are also vicariously liable for the fiduciary breaches committed by Aylstock, Bradford, and Burns committed within the course and scope of their employment and/or partnership and/or agency under the doctrine of respondeat superior and Texas agency law.

6.44  Accordingly, Canup pleads for, and is entitled to monetary damages in an amount sufficient to compensate it for the harm sustained.

6.45  Because Florida Defendants' conduct was fraudulent and/or malicious, Canup pleads for, and is also entitled to recover exemplary damages in an amount to be determined by the trier of fact. Canup further pleads for expenses and pre and post-judgment interest at the maximum rate permitted by law.

### Claim 3: Fraudulent Inducement

6.46  Canup restates and realleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

6.47  **Material Misrepresentation:** Defendants Bradford and AWKO represented to Canup, through Gamble, that if Gamble agreed to allocate a 9%

interest in Canup's recovery in the MDL to PSC, Canup and Gamble would receive full access to the MDL's common benefit work, including the master complaint and other litigation materials. This promise was material because access to the common benefit work was essential for evaluating Canup's claims, preparing pleadings, and ensuring that Canup's case was prosecuted on equal footing within the MDL.

6.48 **Knowledge of Falsity:** At the time Bradford made these representations, he and AWKO had no intention of providing the promised access beyond the master complaint. Bradford and AWKO also knew their representation was false because the master complaint had been filed on behalf of all Plaintiffs in the MDL, and the motion to file it under seal expressly stated that an unredacted copy had already been provided to all counsel of record, making all Plaintiffs in the MDL, including Canup, entitled to it without additional conditions. Bradford and AWKO's subsequent refusal to respond to Canup's request for the remaining common benefit materials demonstrates they knowingly misrepresented their willingness to perform and concealed their true intent.

6.49 **Intent to Induce Reliance:** Defendants Bradford and AWKO made these false promises for the purpose of inducing Canup and or Gamble as an agent of Canup to agree to the 9% common benefit interest. By doing so, Bradford and AWKO sought to secure both financial gain and strategic leverage within the MDL, binding Canup to terms that benefitted Bradford, AWKO and PSC as a whole while

depriving Canup of the resources promised.

6.50    **Reliance:** Canup, through Gamble, reasonably relied on Bradford and AWKO's misrepresentations by entering into the agreement and granting PSC a 9% interest in his recovery. Canup through Gamble did so in the belief that he would receive the full scope of common benefit materials, which were essential to advancing his claims in the MDL.

6.51    **Injury:** As a direct and proximate result of Bradford and AWKO's fraudulent inducement, Canup suffered injury. He incurred the financial burden of allocating 9% of his recovery to PSC while receiving only the master complaint, which he was entitled to without further conditions, and being deprived of the other promised materials. This left Canup disadvantaged in prosecuting his claims, forced him to expend additional time and effort to understand the underlying issues without the benefit of the promised work product, and unjustly enriched Bradford and AWKO at his expense.

6.52    Defendants Bradford and AWKO violated Section 32.46 of the Texas Penal Code when they engaged in the above-described conduct. Defendants Bradford and AWKO committed this conduct knowingly and intentionally. Such violations constitute fraud.

6.53    To the extent AWKO is not found directly liable, it is also vicariously liable for the fraudulent inducement committed by Bradford within in the course and

ORIGINAL PETITION                                              **PAGE**        30

scope of his employment and/or partnership and/or agency under the doctrine of respondeat superior and Texas agency law.

6.54   Accordingly, Canup pleads for, and is entitled to monetary damages in an amount sufficient to compensate him for the harm sustained.

6.55   Because Bradford and AWKO's conduct was fraudulent and/or malicious, Canup pleads for, and is also entitled to recover exemplary damages in an amount to be determined by the trier of fact. Canup further pleads for expenses and pre and post-judgment interest at the maximum rate permitted by law.

## C.    CLAIMS AGAINST ALL DEFENDANTS

### Claim 1:  Civil Conspiracy

6.56   Canup restates and realleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

6.57   **Combination of two or more persons:** Defendants FNJ, Brown, Roberts, Aylstock, Bradford, Burns, AWKO, and Mostyn Law combined and acted together in connection with the MDL. Their actions were coordinated, not isolated, and each Defendant assumed complementary roles under the framework of the MSA which tied their compensation to Plaintiff participation thresholds and withdrawal requirements. This combination reflects a deliberate, concerted effort to protect their financial interests at Canup's expense.

ORIGINAL PETITION                                                              **PAGE**    31

6.58 **Common object or course of action:** The common object of the conspiracy was to secure maximum Plaintiff participation in the MSA, protect Defendants' fees, and eliminate or marginalize clients unwilling to settle. To accomplish this, Defendants withheld material settlement terms, including Exhibit 10 of the MSA and provisions tying attorney compensation to client participation and mandatory withdrawals, while conditioning access to critical litigation documents on Canup's compliance. The Florida Defendants also concealed their formal appearance as Canup's counsel, depriving him of notice that they were representing him in court and settlement discussions. These coordinated acts were calculated to undermine Canup's autonomy, deprive him of full disclosure, and coerce his participation in the settlement program.

6.59 **Meeting of the minds:** Defendants reached a meeting of the minds through coordinated conduct. Texas defendants abandoned Canup for not agreeing to participate in the MSA. Florida Defendants then formally appeared "FOR THE PLAINTIFF" in court allowing them to pressure Canup, in person, to participate in the MSA. Florida Defendants did this without disclosing their intent to formally appear forcing Canup to take Gamble from Texas to Florida to comply with the MDL Court's order to appear "in person, with counsel" resulting in unnecessary economic pressure on Canup. Texas Defendants then withheld the master complaint, a document that was part of Canup's file, and directed Gamble to obtain it from the

ORIGINAL PETITION                                    **PAGE**        32

PSC. Bradford and AWKO then conditioned its release on signing a fraudulent participation agreement giving PSC a 9% interest in any recovery in Canup's case. These coordinated acts evidence agreement, whether formal or informal, to act in unison toward their shared objective.

6.60   **Unlawful overt acts:** In furtherance of the conspiracy, Defendants engaged in multiple unlawful overt acts, including:

   a) concealing material settlement terms from Canup;

   b) concealing their intent to appear, and then appearing as Canup's counsel without authority or disclosure;

   c) accessing and reviewing Canup's confidential medical records without authorization;

   d) concealing their financial and ethical conflicts tied to the MSA; and

   e) requiring Canup's counsel to sign a fraudulent 9% participation agreement as the condition for obtaining the master complaint.

Each of these acts breached duties of candor, loyalty, and disclosure owed to Canup, and unlawfully advanced Defendants' scheme to manipulate settlement participation.

6.61   **Damages:** As a direct and proximate result of this conspiracy, Canup suffered damages. He incurred unnecessary expenses transporting substitute counsel to Florida for a hearing where Florida Defendants secretly appeared on his behalf,

was deprived of access to promised common benefit work, and saw his recovery reduced by the 9% diversion of settlement funds. Canup also suffered significant inconvenience by being forced to investigate and learn about complex legal processes in order to uncover and counteract Defendants' scheme, burdens that arose solely because of Defendants' coordinated misconduct.

6.62    To the extent the law firms named herein are not found directly liable, they are also vicariously liable for the actions of their partners, associates, employees, or agents committed within the scope of employment and in furtherance of the conspiracy.

6.63    Additionally, because Canup's injuries were caused by the joint and concerted actions of multiple Defendants, including acts of fraud, breach of fiduciary duty, and conspiracy, all Defendants are jointly and severally liable under Texas law.

6.64    For the avoidance of doubt, Canup pleads that if any law firm named herein is not found directly liable, it is nonetheless vicariously liable under the doctrine of respondeat superior for the conduct of its partners, agents, or employees acting within the course and scope of their duties.

6.65    Accordingly, Canup pleads for, and is entitled to monetary damages in an amount sufficient to compensate him for the harm sustained.

6.66    Because Defendants' conduct was fraudulent and/or malicious, Canup pleads for, and is also entitled to recover exemplary damages in an amount to be

determined by the trier of fact. Canup further pleads for expenses and pre and post-judgment interest at the maximum rate permitted by law.

# VII.

# DAMAGES

7.1    For each of his claims, Canup demands recovery of all of the following categories of damages as a direct and proximate result of the Defendants' wrongful conduct, which include:

7.2    **Actual Damages**

Canup suffered actual damages totaling **$19,807.35 + common benefit fee set aside from settlement in underlying litigation (common benefit fee is less than $20,000)**, including:

    (a) $6,520.00 for representation by David Gamble at the March 13, 2024 status conference in Pensacola, Florida;

    (b) $884.59 in related travel and lodging expenses;

    (c) $11,925.00 for expert reports and litigation preparation rendered futile by Defendants' misconduct; and

    (d) $477.76 in miscellaneous litigation costs;

    (e) amount set aside from settlement to cover common benefit fee

ORIGINAL PETITION                       **PAGE**    35

These damages are recoverable under all applicable causes of action, including fraud and breach of fiduciary duty.

### 7.3   Inconvenience Damages

Defendants' misconduct forced Canup to learn about and understand duties that competent counsel should have performed, including analyzing complex legal issues as well as studying fiduciary duties owed by attorneys, and uncovering fraud and concealment theories that revealed how his own counsel had deceived him. These burdens disrupted Canup's daily life, imposed unnecessary strain, and deprived him of reliable representation. Canup seeks damages for loss of time, disruption, and inconvenience. The amount is left to the discretion of the trier of fact.

### 7.4   Exemplary Damages

Defendants acted with fraud, malice, and conscious disregard of Canup's rights by:

(a) appearing as counsel without consent;

(b) accessing confidential medical records without authorization;

(c) concealing material terms and conflicts of interest;

(d) withdrawing or refusing to act during critical litigation phases; and

(e) pressuring Canup toward an unfair settlement.

Canup seeks exemplary damages under *Tex. Civ. Prac. & Rem. Code ch. 41.003*, in an amount sufficient to punish and deter.

### 7.5   Disgorgement

ORIGINAL PETITION                                        **PAGE**        36

Canup seeks disgorgement of any common benefit fees traceable to his settlement, Florida Defendants as former members of the PSC in the MDL obtained such benefits through fraud and in breach of duty.

## 7.6   Interest and Costs

Canup seeks pre- and post-judgment interest as authorized by law, together with all taxable court costs and litigation expenses.

## VIII.

## JURY DEMAND

8.1   Canup requests a jury trial on all claims and issues so triable.

## IX.

## CONDITIONS PRECEDENT

9.1   All conditions precedent have occurred and been satisfied.

## X.

## NOTICE PURSUANT TO T.R.C.P. 193.7

10.1   Canup provides notice to Defendants pursuant to Rule 193.7 of the Texas Rules of Civil Procedure that Canup may utilize as evidence during the trial of this lawsuit all documents exchanged by the parties in discovery in this case.

## XI.

## PRAYER

11.1   ACCORDINGLY, Canup respectfully requests that Defendants be cited to appear and answer, and that Canup be granted judgment against Defendants awarding Canup all damages he is entitled to, including all damages and other relief (at law or in equity) pled in the causes of action and other parts of this instrument above, actual damages and losses, economic damages, compensatory damages, exemplary damages, costs, pre- and post-judgment interest, disgorgement of any fees or benefits wrongfully obtained by Defendants, and all other damages Canup is entitled to in equity or by other applicable law.

11.2   Canup further requests such other and further relief, general or special, at law or in equity, to which Canup may show himself justly entitled.

Dated October 27, 2025

Respectfully submitted,

*/s/ Brandon Canup*
Brandon Canup

4812 Hidden Oaks Ln
Arlington, Texas 76017
(972) 762-4314

canup.brandon@gmail.com

pro se

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Envelope ID: 107325134
Filing Code Description: Petition
Filing Description: Original Petition
Status as of 10/27/2025 4:25 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Brandon Canup | | canup.brandon@gmail.com | 10/27/2025 1:29:54 PM | NOT SENT |

# EXHIBIT 2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


IN RE:   3M COMBAT ARMS EARPLUG    )    Case No: 3:19md2885
PRODUCTS LIABILITY LITIGATION     )
                                  )    Pensacola, Florida
                                  )    September 8, 2023
                                  )
                                  )    9:05 a.m.
_____)


TWENTY-THIRD CASE MANAGEMENT CONFERENCE

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE
(Pages 1 through 87)


APPEARANCES:

(via Zoom)                    The Honorable **JUDGE LAURIE MILLER**,
                              Fourth Judicial District of Minnesota

(via Zoom)                    The Honorable **GARY R. JONES**
                              United States Magistrate Judge (ret.)


For the Plaintiffs:           Aylstock Witkin Kreis & Overholtz, PLLC
                              by:   **BRYAN F. ALYSTOCK**
                              17 East Main Street
                              Pensacola, Florida 32502
                              *balystock@awkolaw.com*

                              Clark Love & Hutson, PLLC
                              by:   **SHELLEY HUTSON**
                              400 Louisiana Street, Suite 1600
                              Houston, Texas 77002
                              *shutson@triallawfirm.com*

                              Seeger Weiss, LLP
                              by:   **CHRISTOPHER A. SEEGER**
                              55 Challenger Road, Sixth Floor
                              Ridgefield Park, New Jersey 07660
                              *cseeger@seigerweiss.com*

APPEARANCES CONT'D:

For the Defendant:            Moore Hill & Westmoreland, PA
                              by:  **CHARLES F. BEALL, JR.**
                              350 West Cedar Street
                              100 Maritime Place
                              Pensacola, Florida 32502
                              *cbeall@mhw-law.com*


                              Jenner & Block, LLP
                              by:  **THOMAS J. PERRELLI** and
                                   **JOANNA WRIGHT**
                              1099 New York Avenue NW
                              Suite 900
                              Washington, DC 20001-4412
                              *tperrelli@jenner.com*
                              *jwright@jenner.com*


                              White & Case, LLP
                              by:  **MICHAEL C. ANDOLINA**
                              111 South Wacker Drive
                              Suite 5100
                              Chicago, Illinois 60606-5055
                              *mandolina@whitecase.com*

**P R O C E E D I N G S**

*(Call to Order of the Court.)*

THE COURT:  All right.  Good morning.  Welcome to what is Case Management Conference Number 23 in the 3M Combat Arms Earplug litigation, MDL 2885.

I'm going to make some remarks, but before I do, I want to state on the record my reasons for recording these proceedings today.  Most of you know, at least the lawyers in the room do, that recording of judicial proceedings is prohibited by Judicial Conference policy, but there are exceptions to that policy and this proceeding fits one of those exceptions.

The CMC today will be recorded for purposes of furthering judicial administration.  The Settlement Program that we'll be addressing here this morning, we'll be discussing, impacts more than 250,000 plaintiffs nationwide in the MDL, as well as thousands more plaintiffs in Minnesota state court.  And unfortunately there is no medium that would enable live attendance by all of those plaintiffs and/or their counsel, not even -- you know, obviously not in the courthouse, not even through the Zoom connection or our court's telephone conferencing system.  But the educational information that will be presented today needs to be disseminated in a way that as many individuals as possible can be informed about the settlement, can make an informed decision about whether to

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 58 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 5 of 88

4

participate in the Settlement Program, and for that reason, I have authorized the recording of this CMC today.  The recording will be made available on the Court's public website for the MDL, as will the presentation materials that you'll be seeing today.  Most likely, though, not until Monday.  It will take us some time to get that done.

All right.  Well, we're here this morning for a couple of reasons.  The first of which is to more formally announce and celebrate the parties' global resolution of the MDL litigation as well as the related Minnesota state court litigation.  The settlement, as you know, was reached approximately a week ago.  We're also here to discuss implementation of the settlement going forward.

Before proceeding any further, though, I'd like to introduce Judge Laurie Miller from the Fourth District -- Judicial District Court of Minnesota in Hennepin County, Minnesota.  Judge Miller and her court have been engaged and committed partners with this court for quite a while, both during the litigation phase as well as during the settlement process, and it is safe to say that the settlement would not have been possible without her, and I thank her personally.  This is the first time we've met, I guess in person here, and I personally thank you, Judge Miller, for your support and your many collaborative efforts with our court.  In just a few moments I know you'll be making some remarks as well, but let me

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 59 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 6 of 88

5

return to my remarks and start with the settlement itself.

Last week I told the MDL leadership counsel on both sides, more specifically those who had been most heavily involvement in the settlement negotiations, that with this settlement they have accomplished something extraordinary. I told them that in my 21 years on the federal bench, I have never seen litigation as intense and as hard fought as I had seen in this MDL but that I had also never seen such remarkable collaboration, such remarkable determination to resolve litigation as they've shown over the past several months. And I told them that they had done a great service to their clients and to the federal judiciary. Every word of that was and continues to be true.

Let me speak for a moment to that last part about the tremendous service that this global resolution represents. This MDL, as most in this courtroom know, is the largest in the federal judiciary's history. And for the past two years the MDL has comprised a shocking one third of the federal judiciary's entire civil docket. You can take shots at those statistics all day long, but this was the reality for and the responsibility of those of us involved in the MDL, plaintiffs and defendants and the Court, to find ways to deal with the magnitude of the litigation. And we did.

A tremendous amount of effort went into trying to separate the wheat from the chaff. There was sweeping

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 60 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 7 of 88

6

corporate, military, expert, and case-specific discovery over the course of the MDL. As you know, there were 16 bellwether trials with 19 different plaintiffs. There were wins and there were losses on both sides. There were 1500 cases in overlapping wave-, case-specific discovery. And over the years, the Court dismissed nearly 100,000 cases in the MDL; and in the end, what I think we've learned is that some cases have a lot of merit, some cases have zero merit, and some cases fall in between. And that's -- I think that's the lesson.

But the message here this morning, aside from thanking people for their efforts in getting to the litigation -- and getting the litigation to this result, and I will be thanking some people here in just a moment, but what I want to say on the record this morning, once and for all, is that this settlement is fair. It is fair to the 250,000-plus plaintiffs in the MDL. I believe it is fair to the Minnesota plaintiffs -- but I will leave that to Judge Miller to discuss further -- but I also believe it is fair to 3M. And I say this from the perspective of someone who is rather uniquely positioned. I'm positioned as a neural. And I don't think there's anyone who knows and understands this litigation, both its intricacies and broader whole of it, as well as its risks, more thoroughly as I do as a neutral.

I've been in the trenches of the litigation with the parties since day one, April 3rd, 2019. I've dealt with

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 61 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 8 of 88

7

discovery. I've worked with the government. I've reviewed and ruled on thousands of motions, thousands of objections. I've presided over six trials with nine plaintiffs and listened to the record of ten other trials. I followed closely the appeals of the bellwethers and the Aearo defendant's bankruptcy. No one is in a better position or more credible position to evaluate this settlement than I am. And again I say to all of you that the settlement is fair and the settlement is smart.

Notably, among those who are closest to litigation and most impacted by it, there's been tremendous support for the settlement that the parties have reached. But not surprisingly, there have also been critics already of the settlement, largely academic pundits and market analysts, as best I can tell; but these folks know very little about the actual litigation that's taken place here. I doubt seriously that they sat through one bellwether trial, much less multiple trials. They know and recite jury verdicts, but that's it. They certainly have never spoken to a jury, as I did with the parties multiple times. They know nothing about the relative strengths and weaknesses of individual claims. They know nothing about the nuanced evidentiary record that was developed by the parties over nearly five years of legal proceedings across one state court and four federal court dockets: The MDL docket, of course; the Eleventh Circuit Court of Appeals; the United States Bankruptcy Court for the Southern District of Indiana; and also the Seventh Circuit

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 62 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 9 of 88

8

Court of Appeals.

And importantly, those who criticize the settlement, they have no knowledge of the extraordinary risk and extraordinary costs associated with continued litigation of any Combat Arms Earplug claim, much less the costs and the risk of litigating hundreds of thousands of claims; and to criticize it based simply on jury verdicts, theoretical ideals, or market vagaries is just simply not to understand this uniquely complex litigation at all.

Those who reject the settlement will learn hard lessons that Judge Miller and I already know, but that's for another day. For those who embrace the settlement and recognize it for the success that it is, I say to you congratulations. In just a moment, there will be presentations, as I said, about how to participate in the Settlement Program and also for what's in store in the coming months as far as the Settlement Program.

But before we get into that -- and I promise I'm almost done. Lengthy remarks but it's been a lengthy, lengthy litigation. I say that lightly -- I do want to acknowledge the extraordinary work of others who have been in the trenches also over the life of this litigation and whose contributions, while largely unsung, have been important to achieving the successful resolution that we celebrate here today.

First, I want to start with our court's incredible staff: Our clerk's office under the leadership of our Clerk of

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 63 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 10 of 88

9

Court, Jessica Lyublanovits; court reporters; IT staff; court security officers; even our judges. And I thank especially Chief Judge Mark Walker who could not have been more gracious and generous with his support of the MDL. And also I thank the other judges of my court but also around the Eleventh Circuit who assisted in trying bellwether cases here.

And, of course, I'm going to take a moment to thank my law clerks, many of whom have come and gone over the life of this litigation, but each one of whom left an indelible mark on the litigation. The parties had armies of lawyers tackling the demands of the litigation. My law clerks were an army of four, and later three, but you'd never have known it from the volume and quality of work that they produced on the tightest of timelines, particularly during the bellwether phase. Most of them I think are on the Zoom right now. I can't see you, but I thank you for all of the support you gave to this litigation.

I want to mention one of them by name. She has been with me on this litigation from the start, and that's Tevenia Jacobs. And she will be upset with me for mentioning her by name. But most of you who have been involved in this litigation know Tevenia, and you know that she has given it her all, heart and soul, and I'm grateful to her for that and so much else. I mean, she worked on this litigation day and night, weekends, and holidays for the nearly five years we've been at it.

And regarding the clerk's office again, I have to say

that they have set a very high bar throughout the federal judiciary for how to manage a massive MDL docket. We are a small court and a small clerk's office, but they have handled it like pros. They're now considered -- these individuals in our clerk's office are considered powerhouses in the MDL world. We are often contacted by other courts about how to do this with multiple dockets and managing thousands and thousands of cases. I couldn't be more proud of them or more thankful to them for all of their work in responding to my urgent eleventh-hour requests for data and reports and other statistical information.

Next, nothing this extraordinary happens in a vacuum. And, in fact, the settlement itself is in no small part a testament to the tireless efforts of numerous special masters, including retired United States District Court Judge Dave Herndon, Magistrate Judge Gary Jones from this court, and Magistrate Judge Hope Cannon, also from this court.

Judge Cannon, most of you know, succeeded Judge Jones as the magistrate judge assigned to this litigation when Judge Jones retired. Judge Cannon quickly -- she is a very quick study. If you know her, you know that -- did not take her long at all to become an integral member of the mediation team, and I don't believe there would have been a settlement had it not been for her.

Judge Jones is also here with us today. I see him on Zoom. Many of you remember Judge Jones and his work in the

Case 3:26-cv-03359-MCR-ZCB   Document 23   Filed 12/29/25   Page 65 of 234
Case MDL No. 2885   Document 2033-4   Filed 12/10/25   Page 12 of 88

11

litigation from the start in April of 2019 until his retirement in September of 2022, and he was -- he was involved in many aspects of the litigation, but particularly discovery and also privilege issues.

We've missed you, Gary.  Glad you're back with us here today.  I know you have a few remarks you'll make in a moment, but I want to personally thank you for everything you did to contribute to the litigation.

And then one special master that I'd like to mention and I think deserves special mention is BrownGreer, and they are here today.  Orran Brown is here, Jake Woody is here, Roma Petkauskas I believe is on Zoom; but they have been integral, indispensable.  Their litigation support apparatus, MDL Centrality, has assisted this litigation in ways that I can't even express.  The data analytics they've provided, the industry knowledge that they have, their professionalism -- all of it is top rate, and we appreciate very much.

There's Jake.

Thank you very much for everything you've done in responding to all of my, again, eleventh-hour requests for massive amounts of data.  I seen Orran smiling because he knows that's true.  Also, they are here today, as you'll hear in just a moment, because they have been appointed as the settlement data administrator going forward for the Settlement Program.

There was a village of other special masters over the

Case 3:26-cv-03359-MCR-ZCB    Document 23    FILED 12/29/25    Page 66 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 13 of 88

12

course of the litigation. I don't have time to announce all of them and mention them by name, but they all played a unique role, and I thank them for that as well.

Another mention I want to make, and it's no small shout-out, and that is to the Department of Defense, to the United States Army, the Department of Justice, and the Veterans Administration. They've been involved in this litigation from almost day one. Some of the attorneys in this room traveled with me -- two or three times, I think -- to Washington to meet with them, and they made this litigation a priority. As massive as it is, they did, and it was indispensable support of the discovery and data needs of the litigation, and I very much appreciate all of their cooperation.

There is also a thanks to be made -- and I'm going to let, I think, the plaintiffs do this in their presentation about the settlement, but there's also a thanks to be offered to the Veterans Administration in particular for a letter that they've provided in connection with the settlement dealing with liens as well as benefits. And I'm just -- I'll leave it at that and ask the parties to mention that, please, in just a little bit.

And then, of course, last, but certainly not least, is the parties. All of you, from the bellwether gladiators -- and there were gladiators; that is an understatement -- to those who have been diplomats more recently in the negotiations. And frankly, the negotiations -- I say diplomats, but the

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 67 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 14 of 88

13

negotiations were hard fought as well when they needed to be. But from what -- from that extreme of litigators to the negotiators and everyone in between, everyone was instrumental in arriving at this historic resolution. Every document reviewed, every deposition taken, every motion filed, every oral argument made, every trial conducted -- you all develop the data points that were necessary to resolve the litigation. You brought insight into the litigation, and then that was taken forward into the negotiations which resulted, again, what I think is a very fair and successful conclusion.

No one will be surprised to hear me say that I pushed counsel very hard. I'm sure there will be snickers about that. But most everyone rose to the occasion like the professionals that you are, and in my view the leadership teams on both sides really do exemplify the very best of the legal profession. And because we have so many individual plaintiffs, I want to speak to them in -- just for a second in saying that they have all been extremely well represented by the leadership counsel in this litigation on the plaintiff side. 3M, ably represented as well. But I want those 250,000-plus plaintiffs to know that they were represented very well.

Now, there's one more unsung party whose contributions to the resolution of this may not be fully appreciated by everyone, and that individual is Michael Roman. Michael Roman is 3M's chef executive officer and its chairman of

Case 3:26-cv-03359-MCR-ZCB   Document 23   Filed 12/29/25   Page 68 of 234
Case MDL No. 2885   Document 2033-4   Filed 12/10/25   Page 15 of 88

14

the board.  You may recall that he was personally asked to attend mediation here in Pensacola earlier this year, and he came.  And while he was here -- and I was present for much of it, and I can attest to the fact that while he was here, he was very, very much engaged in this process; and it was clear to me in meeting and talking with him that he was committed to forging a mutually agreeable resolution.

His engagement didn't stop at that mediation.  I don't think it's an overstatement to say that we would not be here today celebrating this settlement had it not been for Mr. Roman and his determination to find a solution to the litigation amidst the overwhelming reality of that litigation and as massive as it was.

And those are my thanks.  Again, I'm sure I've left people out, but I just want everyone to know that I think everyone had a part in this, and I'm extremely proud of everyone for getting us here.  So I'm going to turn it over to Judge Miller for a few remarks and then Judge Jones, and then a couple of individual lawyers I think have some remarks to make.

So, Judge Miller.

JUDGE MILLER:  Thank you, Judge Rodgers.  And let me say it's an honor to be appearing in your courtroom, virtually if not in person.  It would have been great if I could have worked out a way to get there, but it just wasn't meant to be this week.

Case 3:26-cv-03359-MCR-ZCB   Document 23   Filed 12/29/25   Page 69 of 234
Case MDL No. 2885   Document 2033-4   Filed 12/10/25   Page 16 of 88

15

But I join in everything that Judge Rodgers has just said, and I have a few Minnesota-specific remarks that I did want to make this morning.

This litigation has had as long an odyssey in Minnesota state court as it has in federal court. In fact, it may have begun here earlier, because I think cases began being filed here in February of 2019. Right off the bat they were all being removed to federal court. And so shout-outs will be given to the courts involved down south, but these were all removed to the federal district court here in Minnesota. And then the removal issue had to go up to the Eighth Circuit before it could be sorted out, which cases were going to be heard where, and it was an Eight Circuit ruling that resulted in kind of a military-civilian plaintiff split, if you will. The civilian cases all ended up staying here in state court. The military cases ended up all going to the MDL. And so our active litigation began after that remand, the remand started coming back, in the wake of the Eighth Circuit ruling.

So we didn't actually end up trying any cases here, but we did everything but. We had massive motion practice, many bellwether cases, many bellwether trials that were worked up and at the point of going to trial but ended up not starting to pick a jury for a variety of reasons, case specific and some settlement related. But we had many lawyers and many court staff, many people very busily working up these cases, and we

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 70 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 17 of 88

16

were prepared to start our first bellwether trial, believe it or not, this coming Monday.  September 11 was going to be our go-date for the first civilian bellwether trial.  Global settlement has now made that trial date moot.  I'm not going to have the pleasure of seeing the trial lawyers here put on a show, which I have no doubt would have been equally as entertaining as the shows that you had down in Florida.

But I would like to express my appreciation to all concerned for all the work that has been done to produce the global settlement that has resolved not only the MDL case but the Minnesota cases.  We may not have as many cases here in percentage terms of the overall total, but it has been an overwhelming undertaking for my court as well.  Our cases are not in the hundreds of thousands; they're in the mere thousands.  But nevertheless, my assistant chief judge came by a few weeks ago to tell me that, you know, you are, according to our weighted caseload, doing the work of at least four judges on our bench.  So I appreciated that.

It isn't just me, though.  Like Judge Rodgers, I am supported by a host of folks here who I want to express appreciation to:  My court staff, our civil administrative staff who have been managing our large number of cases that are filed here, my law clerks who have come and gone.  But this hasn't been mine from the get-go.  Unlike Judge Rodgers, I was not the first judge assigned to these cases.  I was the presiding judge

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 71 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 18 of 88

17

of our civil division when these cases came in, and I assigned them to my colleague, Judge Tom Fraser -- (Zoom audio distortion) -- in many a year, and he willingly took it on.  And I thought for sure that Judge Fraser would get it across the finish line before he retired, but he was required to retire in 2021, because in Minnesota we do have mandatory retirement for judges.  When he turned 70, he had to leave, and he then bequeathed these cases to me.  So they've been mine ever since.

So I really want to give a shout-out to Judge Fraser because he worked the initial case here, the *Graves'* case, up for trial.  He was prepared to try it.  That case resolved for its own reasons short of trial, but he issued any number of rulings that created the solid foundation for me then to come in and take over without having to do a lot of that groundwork.  So thank you, thank you, Judge Fraser, for all your work.

Thank you, Judge Rodgers, for your work as well, because many of the issues that I ended up deciding had previously been presented to your court, and it was very helpful to have the guidance of how you thought about these issues before I began to look at them and weigh in on them.  I had state law considerations that didn't always lead in the same directions as federal law, but it was very helpful to have your thoughts and your rulings as I began considering those issues.

I, too, want to express my appreciation to the settlement special masters and, in particular, to the special

Case 3:26-cv-03359-MCR-ZCB     Document 23     Filed 12/29/25     Page 72 of 234
Case MDL No. 2885     Document 2033-4     Filed 12/10/25     Page 19 of 88

18

master for the Minnesota litigation.  Retired judge -- Magistrate Judge Jeffrey Keyes has been absolutely invaluable in assisting me and assisting, I believe, the other special masters in guiding this global settlement resolution.

And I also want to express appreciation to the lawyers for the Minnesota group of cases.  I've had very able leadership on both the plaintiff and the defense side in Minnesota.  On the plaintiff side in particular, I would like to mention Dan Gustafson and Rick Paul who've been there for everything, through thick and thin.  And Mr. Gustafson, in particular, has been involved in the settlement negotiations at the end and I think was very helpful in making this happen for the Minnesota cases as well as the MDL.

My understanding is that this global settlement would not have been possible without my folks being on board.  And I appreciate the leadership on the plaintiff side as well as 3M side, and Ben Hulse for 3M here in Minnesota has been really helpful as well to make sure that our batch of cases were represented, were included, were able to get on board with the settlement as it got across the finish line.  So thanks to all of you.

I've got to say, presiding over this litigation has been fascinating, but, like everyone else here, I think I'm relieved that it has resolved such that we're not going to have to continue with trying massive numbers of cases going forward.

Case 3:26-cv-03359-MCR-ZCB   Document 23   Filed 12/29/25   Page 73 of 234
Case MDL No. 2885   Document 2033-4   Filed 12/10/25   Page 20 of 88

19

I know there's a lot of work left to be done on the implementation front. We're going to hear more about what that entails in a minute. But I look forward to working with everyone in keeping this process moving forward, keeping this implementation on track, taking care of all of these plaintiffs here in Minnesota, as well as those in the MDL, so that everyone receives a fair resolution.

And, like Judge Rodgers -- I haven't had as deep an immersion in this since I didn't get to try a case and I haven't seen the hundreds of thousands of MDL cases, but from the perspective of the Minnesota piece of this -- I, too, believe that this is a fair and just resolution and will serve the litigants here in state court just as it does those in federal court.

So thank you again, Judge Rodgers, for giving me a piece of your podium today, and I turn the proceedings back to you.

THE COURT: Absolutely. Thank you so much, Judge Miller. I appreciate your remarks. I know everyone here does.

All right. Judge Jones, remarks?

JUDGE JONES: Yeah, thank you. Thank you, Judge Rodgers.

I just wanted to voice your applause for the parties in reaching the settlement. And I think you used the words "fair" and "smart." It's definitely fair and smart, but the

20

settlement is really good for both sides.  This is a good thing for 3M, and this is a good thing for service members.  Everyone did not get what they wanted, but that's what settlements are about:  something that's mutually agreeable.

And I mediate a lot of cases, even as a retired judge, and it's always the word I use, "mutually agreeable," and I think you really had that here.  And I believe that and I know, Judge Rodgers, you believe that.  I'm sure Judge Cannon does as well.  And probably the three of us are in the best objective position to assess all of the pros and cons of the merits, of the arguments of the parties, and I think all three of us truly believe this is a good settlement.

I'd like to make one other comment.  This goes back to early in the case, and my early involvement in the case was largely involved with a number of the e-discovery issues.  And I do want to thank both sides and applaud both sides for their professional participation in the e-discovery process.  And as many of you might know, I lecture frequently on e-discovery issues, and I use the -- this case as the blueprint for how e-discovery ought to operate in a large case like this.  So the parties should be applauded for that.  And I think early on in the case, that helped the case to move on as best as it could in a large litigation like this.

Then the last thing I wanted to say, you know, we have a global settlement.  We're going to hear in a moment about the

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 75 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 22 of 88

21

details, but there is an expression, and the expression is "the devil is in the details." So I encourage the parties to continue to cooperate and work in the utmost good faith in ironing out any details that might arise. And I can assure you that Judge Rodgers, Judge Cannon and, to the extent I'm involved, I will also do everything in my power to push this settlement to its final conclusion.

So congratulations again to everyone. I'll be interested in hearing the details in a moment when we hear the presentations from the parties.

Thanks again, Judge Rodgers.

THE COURT: Thanks, Judge Jones. And I will be calling on you to help with that push when the time comes, but thank you very much for those remarks and your contributions to the litigation as a whole.

Let me turn to the parties and introduce those on each side that are here from leadership. On the plaintiff side we have Mr. Aylstock, Mr. Seeger, and Ms. Hutson. On -- and I know there are numerous other plaintiffs' lawyers here, but I'm talking about at counsel table. And then on the defense side, Mr. Beall, Mr. Perrelli, Ms. Wright, and Mr. Andolina present for 3M.

So I'm going to call on -- I believe Mr. Seeger is going to make a few remarks on behalf of the plaintiffs and then Mr. Perrelli on behalf of the defendants.

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 76 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 23 of 88

22

All right.  So, Mr. Seeger.

MR. SEEGER:  Thank you, Your Honor.  Good morning.

Good morning, Judge Miller.  I haven't seen you in a long time.  It's nice to see you again by Zoom.

Judges Herndon and Cannon, who are here, and Judge Keyes who I believe is on Zoom as well.

I'd like to just start by saying -- some of my comments are going to repeat some of the things you said, Judge, but I think it bears repeating in some respects.  But it really has been a honor to represent these clients, particularly the men and women of our armed forces.  Some of whom are here in the courtroom here today.  So it's been a tough road, but it's been worth it.

So -- and I also want to thank you, Judge, for giving me the opportunity to sort of address this landmark settlement that we've achieved.

So, Your Honor, the plaintiffs' committee you appointed in May of 2019 stuck together and showed incredible solidarity through a staggering amount of work done on behalf of our clients through the COVID pandemic, through 16 bellwether trials that Your Honor oversaw, through wave discovery in more than 1500 cases, through an attempt to move the case into bankruptcy court, and finally, after more than -- feels like longer, but -- about two solid years of negotiating, we've achieved this result.  The negotiations were often contentious

Case 3:26-cv-03359-MCR-ZCB   Document 23   Filed 12/29/25   Page 77 of 234
Case MDL No. 2885   Document 2033-4   Filed 12/10/25   Page 24 of 88

23

and always hard fought, but the result makes it all worth it.

I don't say this -- make this next comment to be contentious in any way, but I do think we have to contextualize the result. It's important for the men and women watching and for people who might be reading this transcript. But when 3M decided to file Aearo for bankruptcy, they had estimated the liability here at $1 billion. The result that we've achieved and negotiated is $6 billion. And I'm very proud to offer this settlement to my clients, and I'm proud to stand with Bryan and Shelley and Clayton and all of us who negotiated this and offer it and recommend it to everyone's clients. It is a fair settlement.

Before I hand this off to Bryan, I think I'd be remiss if I didn't make the following comments, and I'm going to be -- as I said, I'm going to be brief.

Your Honor, we owe you a debt of gratitude. I had in my prepared comments that you had oversaw hundreds of motions, and now that you mention it, I think it's thousands of motions. And in every single one --

THE COURT: Well, we can ask Tevenia. I think it's closer to thousands, but...

MR. SEEGER: I'm sorry to talk over you, Your Honor.

In every single one of those, you gave us decisions promptly. This litigation moved. You oversaw 16 bellwether trials when most of the courts in the country were shut down.

24

And I don't say that as a criticism to any district.  But you opened your court, your brought us in, you figured out how to get through that; and we -- we and our can clients owe you a tremendous amount of gratitude for that and the way that you've managed and helped us get through this case.  So thank you, Your Honor.

I also have to thank Judge Herndon and Magistrate Judge Cannon for constantly giving us -- helping us with solutions to our problems, forcing us to meet, locking us in the room and making sure we continued to meet until we got to this result.

So thank you for that to both of you.

Finally, you need a dance partner to get to this result, and I have to compliment the lawyers that were hired by 3M -- Tom Perrelli, Mike Andolina, and Joanna Wright -- for doing this with us.  They are tough adversaries.  It wasn't easy, but they were reasonable, and we were able to do this.  Both parties were able to pull this off for our clients.

So thank you, Your Honor for that.  I'm giving it off to Bryan.

Oh, it is Bryan or --

THE COURT:  Okay.  I think first we're going to hear from Mr. Perrelli.  Thank you, Mr. Seeger.

MR. PERRELLI:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. PERRELLI:  And on behalf of 3M and Aearo, I want to thank the Court for the role that you have played in bringing us to this settlement and also the decision to hold this Case Management Conference to provide a platform for the parties and the administrators to provide important substantive and logistical information for people looking to participate in the settlement.

I'm only going to speak for a couple of minutes because I think we really should be focused on disseminating complete and accurate information to all the claimants on how they can participate.

Again, I want to thank the MDL Court, Judge Miller.

Pleased to meet you, Judge Miller.  I've mediated a case for you but have never met you.

And also thank the mediators -- Judge Herndon, Judge Cannon, Judge Keyes -- for bringing us to this resolution.  And I also want to thank the negotiating plaintiffs' counsel -- Bryan Aylstock, Clayton Clark, Chris Seeger, Dan Gustafson -- and their teams for working with 3M and Aearo, both to bring this settlement to fruition but also in the coming months as we go forward to work together to successfully reach the participation levels set forth in the Settlement Agreements.  I think, as Judge Jones said, this is going to be a long-term commitment for both sides to work together.

I really don't want to talk about the past or events

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 80 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 27 of 88

26

in the litigation.  Having said that, this settlement is a moment for 3M to turn the page and devote its time and focus to business and continued innovation rather than litigation.  The parties can cease litigating and fighting over a product that Aearo stopped selling more than seven years ago.

But as I said, it is often the case that parties sign settlements and go their separate ways.  That's not what we have here.  We're going to be working together for years to educate and enroll every plaintiff who chooses to join.

As the Court knows, 3M's focus has been on reaching a settlement structured with the goal of fully resolving all disputes related to Combat Arms Earplugs, not simply entering a few settlements with a few lawyers while litigation continues into the future with all the ramifications on the federal judiciary.  That's what this settlement seeks to achieve: resolution with all Combat Arms claimants.

As you'll hear, the settlement is structured to promote broad participation, first through the identification order process and the Court's orders, by which we hope as many Combat Arms claimants as possible will be identified and given the opportunity to participate in the settlement.  The success really does depend on claimants showing up and registering, first to reach the 98 percent participation level, and then with additional funds being unlocked at higher and higher percentages as claimants come forward and join.

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 81 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 28 of 88

27

And that's what 3M wants.  We want all claimants to come forward and be part of the settlement, recognizing that the company will pay more, up to $6.01 billion, provided all claimants register for the settlement.

We very much believe in the settlement.  We think it's fair, as the Courts have said.  We want it to be successful; and that success is going to depend on everyone doing their part, from the ID order, getting information to claimants, getting registrations in.  We want every claimant to know their options and to hopefully see that the settlement is the best path when compared to the delays and burdens and uncertainty of further litigation.

We appreciate that both the MDL Court and Minnesota Court have recognized in their Case Management Orders that it's in the parties' interest to focus now on this settlement and that litigation will continue to be stayed as we work on it. That's our focus, and we will work with the Courts, the plaintiffs -- all of the plaintiffs' lawyers, the Qualified Settlement Fund, and all the administrators to obtain the maximum participation possible.

So thank you again, Your Honor, for all of your efforts here.  I know -- I have seen how much effort you have put into this.  We appreciate you helping us to get to this place, which I think is fair to all, and we will -- we are committed to continuing to work with you on it.

Case 3:26-cv-03359-MCR-ZCB   Document 23   Filed 12/29/25   Page 82 of 234
Case MDL No. 2885   Document 2033-4   Filed 12/10/25   Page 29 of 88

28

Thank you.

THE COURT:  Thank you, Mr. Perrelli, and thank you to your team.

All right.  Next I think we're on to implementations.  I'm going to turn this over to Mr. Aylstock.

And, again, the point of all of this is -- going forward this morning is to make sure that all plaintiffs in the litigation have the opportunity to make an informed decision about participation.

MR. AYLSTOCK:  Thank you, Your Honor.  May it please the Court.

Nice to meet you, Judge Miller.  Thank you for all of your efforts as well.  I say that on behalf of the entire Negotiating Plaintiffs' Committee, on behalf of the leadership for the MDL that would not have been able to prosecute this case without the teams of people that were able to represent the veterans, service members, and civilians that are brought forward, their claims.  It's been an enormous honor and a responsibility to help these clients, and we're going to continue to help them in a collaborative way with my colleagues from the other side to implement this settlement.

We do have a number of settlement administrators that Your Honor has appointed.  I wanted to introduce them to the people on the Zoom and those in the courtroom.

I'll start with Jake Woody and Orran Brown.  Your

Honor called them out specifically for all of their work leading up to this point.  And I want to echo those comments and also thank Your Honor for encouraging this resolution.  Simply would not have happened without Your Honor, your staff, Judge Miller and her staff, all of the hard work that went into it, including Judge Herndon and Judge Cannon pushing us over the edge.

But one of the inflection points I think that created this settlement was, in fact, all of the data that BrownGreer was able to house, the Data Day that Your Honor put forward and we've implemented -- and you'll see this in Mr. Garretson's presentation in a little bit -- a lot of the principles that were brought forth through the Data Day that Your Honor held with the BrownGreer team.  So I thank you for all of that effort in getting us to that point.

I'd like to also introduce the Archer team, Scott Freeman and Blake Deady.  They'll be giving a presentation on additional implementation aspects of the settlement, in particular the registration process.  That will follow the identification process that we'll talk about in just a minute.

And then Mr. Garretson, who's on the end, is the Settlement Allocation Administrator.  He's worked with biostatisticians and medical experts to come up with a fair way to divide the settlement proceeds that are part of the settlement so that each and every client gets their own case evaluated based upon the objective factors that are contained

largely within the DOEHRS data and the data from the DOD and DOJ -- that we also thank for all of their efforts in providing that data.  They didn't have to do it.  And Your Honor worked hard, Judge Herndon worked hard, and we very much appreciate that data because that is the data that forms the basis of most of these claims.

Finally, Mr. Chris Klotz is the Extraordinary Injury Administrator that you've appointed.  There are outlier claims in this litigation that don't fit neatly within the data points of an audiogram, and Mr. Klotz will work with the parties to make sure that those people also get a fair settlement throughout this process.

And finally Mr. Sansom, in the back, is the court-appointed CPA.  He's also -- has a significant role in this settlement, Your Honor, with regard to co-administrator of Qualified Settlement Fund.  The Settlement Fund will hold the money until it's divided pursuant to the procedures and then distributed.  But part of the settlement is a stock transfer, and it was a creative solution brought forth by Mr. Perrelli and his team.  The stock will be need to be liquidated and turned into cash because we don't expect to give stock to the claimants but, rather, cash.  So that will be an enormous role, and he'll be an enormous help.

So thank you, Mr. Sansom, for that.

I'll now go to, just briefly, a presentation.  Some of

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 85 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 32 of 88

31

it will be a little bit repetitive of what you'll hear in a little bit, but I think it's bear -- it's worth repeating certain aspects of the settlement because in order to efficiently manage and implement this settlement of more than 250,000 people, it's going to require a lot of work not just by the administrators and the Court and the masters but each and every individual plaintiff's counsel will be expected to help in the implementation of the settlement for their individual claimants.

As Mr. Perrelli mentioned, this settlement is a global settlement. It is intended to resolve all claims and if, in fact, we are able to do that -- and I believe that we will -- it will total over $6 billion.

Is this working, Brian?

Here we go.

It does have a very high participation threshold, and in large part that's because, as Mr. Seeger mentioned, we intend to recommend this settlement to 100 percent of our people that we represent, and I'm proud to be able to do so because it is, in fact, a fair settlement.

The settlement is -- the payments are spread over a period of time. That's a function of the hard-fought negotiations. But ultimately, all of the claimants are designed to be paid throughout this settlement, and there will be an expedited payment program that will start, we believe, early

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 86 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 33 of 88

32

next year.  It's intended to include all Combat Arms Version 2 cases.  All represented cases, all *pro se* claimants will be permitted to participate in the settlement, as well as the bellwether verdicts; the Wave cases that you mentioned; the Minnesota cases being overseen by Judge Miller and her able special master, Judge Keyes; cases on the Administrative Docket that the Court created early in the litigation to facilitate the transfer of information from the DOD and DOJ; as well as those cases that are not yet filed but represented by counsel.

However, in order to participate in the settlement, there is an identification process, and that is to allow the Court and parties and the administrators to know what is the scope of the litigation, how many claimants are indeed eligible to participate.  And the identification or reference date is coming up.  It's on Tuesday.  And --

THE COURT:  Four days a way.

MR. AYLSTOCK:  It's four days away.  BrownGreer's going to speak to that.

And the Court entered CMO 60 to address the identification of claimants that the parties negotiated in the MSA.  I encourage people to not wait until Tuesday to file their list of claimants and their declaration of list -- of claimants because there's no reason to wait.

In the -- there's also some registration deadlines for the Wave cases that are part of a separate MSA and different

deadlines that the Archer folks will identify.

Primary counsel, according to CMO 60, must, in fact, identify all of the claimants that they represent. BrownGreer has been good enough to provide primary counsel for all of the cases that are currently in their system in the MDL a prefilled-out list that identifies them. But it's incumbent on primary counsel to participate -- who want to participate in this list, and even those who don't, to comply with CMO 60 and provide their information pursuant to that order no later than Tuesday.

If you have claimants that are not yet filed but you represent them, they also must be on that identification order. The purpose of this is to include everybody. This is indeed a global settlement, and those claimants that do not comply with this order are subject, pursuant to CMO 60, to a dismissal with prejudice.

And I know from having practiced before Your Honor in this case for four and a half years, and other cases, you treat these orders as orders and not suggestions.

So I encourage everybody to read and comply with those orders.

The information that is necessary pursuant to the identification order is important to the entire administration of the settlement. And that is because Archer, who is the Settlement Administrator, will need this information to

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 88 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 35 of 88

34

administer the settlement and create the registration forms that will be provided to each and every settlement member so that they can make an informed decision about the risks and benefits of the settlement and/or moving forward as a litigating plaintiff.  That includes the Social Security number, it includes the date of birth, and, for deceased plaintiffs -- claimants, rather, you also must provide the information about the surviving representative so that they, too, can participate in the settlement should they so desire.

There will be a four-month registration period, and that will be handled through the Archer system, and each and every claimant will be evaluated based upon their own audiometric data and their records with regard to tinnitus, and they receive what we know will be a fair settlement offer based upon that information, along with an opportunity to cure or provide additional information should they so desire.

Claimants who choose not to participate in the settlement, as Your Honor knows, will be subject to CMO 57. That has additional requirements to proceed outside of the settlement.  But every claimant must register, and that registration process includes the option to become a litigating plaintiff.

So our steps, very briefly:  We need to identify all of our claimants by Tuesday, no later than.  And then each and every client will be supplied a registration form by Archer, and

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 89 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 36 of 88

35

they will have the decision on how to proceed.  They will have options, Your Honor.  Based upon the payment schedule, we've created two options to participate in the Settlement Program. We'll include an expedited pay option.  That will be a simplified process in a first-in/first-out basis, and that Mr. Garretson will explain further, how those claimants will be stratified based upon their -- that objective data.

They'll also have the opportunity to participate in a full evaluation program that will take a deep dive, pursuant to the Court's Data Day and the BrownGreer work, into the specifics of their specific audiometric data, as well as their tinnitus claims, and have the opportunity for an extraordinary injury fund as well; and that will be a points-based system that, again, has been created in conjunction with biostatisticians and medical experts to ensure sure everybody is treated fairly and evaluated individually in this program.

For those that don't choose to participate in the program -- and we do not recommend -- we will not be recommending that for any of our clients -- but they will be subject to CMO 57.  Those requirements are, I think it's safe to say, onerous but I think necessary to make sure that the claimants that go forward outside the settlement choose the correct option and, in fact, have their claims properly vetted before they proceed.

So with that, I'm going to turn it over to my

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 90 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 37 of 88

36

colleagues at BrownGreer, Jake Woody, who's going to further discuss the implementation as it relates to the identification order requirements.

Thank you, Your Honor.

THE COURT: All right. And let me, as you're transitioning -- thank you, Mr. Aylstock.

And, Mr. Woody, if you'll give me one minute. Let me just stress something or reiterate something that Mr. Aylstock just said about the identification order and the deadlines for the declaration forms. That deadline is not aspirational. It is four days away. And Mr. Woody's probably going to speak to this, but I'm going to go ahead and let you all know something he'll I'm sure address.

But I've instructed Mr. Woody and Mr. Brown to unplug their computers at midnight on September 12th, and that's central time. What that means is they will not accept a declaration form from any of you after that time. They simply -- they won't be able to accept it. And I have given them that instruction. That wasn't their decision; it was mine. Again, this is not aspirational. We have to have an accurate inventory of the eligible claimants in order to administer this program going forward. It's absolute necessity. Whether you end up participating in the settlement or not, we have to have that information.

Go ahead.

MR. WOODY:  Thank you, Your Honor.

My name's Jake Woody.  I'm with BrownGreer.  I'm here to give you a report on our job as Data Administrator in this litigation so far.

Bear with me one moment, Your Honor.

THE COURT:  That's all right.

MR. WOODY:  Thank you, Brian.

I'm just building the anticipation for my next slide.

THE COURT:  Mr. Marbut, is it just sticking or --

All right.  Okay.

MR. WOODY:  There we go.

THE COURT:  Very good.  Thank you.

MR. WOODY:  Thank you, Brian.

So, Your Honor, our job is as follows.  Under the order appointing us as Data Administrator and in particular CMO 60, which sets out our duties, which are, as Bryan mentioned, to implement the ID order process.

What that means, Your Honor, is that we have provided lists to counsel of the data that we have in MDL Centrality on their claimants that we have in our system.  We've prefilled it with the information that we have on hand.  Those lists are for counsel to review, update, and I'll talk about that in a minute.  And also there's a PDF declaration they need to submit in addition to that Excel list.  We will take that data, review it, deduplicate it if necessary, provide it to Archer and the

parties, and it will the basis of this settlement going forward. Everybody on it will be an eligible claimant.

There are other duties that we have, which I won't talk much about today. Bryan mentioned CMO 57. There are other things we'll be doing, but today I'm going to talk mostly about the ID order process.

This timeline, Your Honor, sets forth the dates that govern. These are all from your orders. The first five deal with the ID order process.

On August 29th the Administrative Docket reopened. On September 1st we implemented CMO 60 module, which I'll talk about in a minute, that allows counsel to review what we have, update it, and give it back to us. Bryan mentioned September 12th is the deadline. That is a hard deadline, as you noted. After that, we'll issue -- we'll review the data, provide it to the parties and Archer on or before September 27, and then the final step in this process is on October 12th, which is the deadline for anybody to challenge what we have in our report.

There are other things in this timeline, but I'll leave that -- the rest of it to my friends at Archer to discuss. I'm going to talk about mostly about the first five items on here.

THE COURT: I asked -- Mr. Woody, are you going to be addressing the prepopulating that you've all --

39

MR. WOODY:  Yes, Your Honor.

THE COURT:  -- you've been doing?  Okay.

MR. WOODY:  Yes, Your Honor, I will.

This is our CMO 60 module, which we placed on MDL Centrality, as I mentioned, on September 1st.  There are a couple of important things that I want to talk about.  I'm going to spend some time on this slide and talk about the mechanics of giving this information back to us and a couple of important notes.

You'll note -- you'll see in the module, which is available on our MDL Centrality home page for all counsel, that there are a few important links here.  One of them is the PDF that people need to download and sign.  The other one is the eligible claimant list, which is what I've mentioned is the Excel.  We've prepopulated with the data that we have on hand.  Counsel should review that information carefully.  We've collected it over the last four years.  It is what we have, but it is incumbent on counsel, I believe, to review it and make sure that it is correct.

In addition to that, they should add anybody who is not already on the list.  We have prefilled everything that we have, which is generally name, date of birth, social, and the docket number, and also the MDL Centrality ID that we have assigned to each claimant in our system.  If you have a new person who does not have an ID, you should leave that column

Case 3:26-cv-03359-MCR-ZCB   Document 23   Filed 12/29/25   Page 94 of 234
Case MDL No. 2885   Document 2033-4   Filed 12/10/25   Page 41 of 88

40

blank. And when you submit this list to us, we'll assign them an ID. And the reason we're doing that is so that they're in our system and that counsel can then complete the other steps that they may have to do in our system to move forward in the settlement process, mostly involving census forms and other documents that they need to give us.

So if there are people that you need to add to the list, you should do it. You should feel free to do it. It will not be prepopulated, obviously. You'll have to fill out the whole thing, but we will assign them an ID and store that data. So that is -- that should help this move seamlessly through the process with no hiccups, is our objective there.

THE COURT: And, Mr. Woody, approximately how many claimants do you have in your system, in MDL Centrality, for this litigation, now that you're doing this work is prepopulating work for?

MR. WOODY: Judge, we prepopulated about 170,000 claimant information. We do have more in our system, but they have been deactivated or they're not -- they don't appear to be eligible to participate, so we did not prefill them. However, if people need to put them back on the list, they can do it. We're not going to stop you. But we prefilled the information for the active plaintiffs that we have in our system, and it was about 170,000.

THE COURT: But that's active -- when you say active,

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 95 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 42 of 88

41

you don't mean just active docket, you mean -- it's active in Administrative Docket as well?

MR. WOODY:  Yes, Your Honor.  When I talk about active in MDL Centrality, it's largely linked to those things, but there are also -- it is sort of independent, and there can be people in our system -- we allow people to put anything they need to put in there, and that's who we prefilled there.

THE COURT:  And you've prefilled for approximately 170,000?

MR. WOODY:  Yes, Your Honor.  And I believe it was about --

THE COURT:  Which is extraordinary.

MR. WOODY:  Yeah.  Thank you, Your Honor.  Well, we appreciate it.  There is a reason to do this, and that's because we can do that sort of thing.  But we can only do it because we've been working on this for four years, and we have all that information.  We obviously didn't make it up.  It was given to us by counsel.  So they have worked very hard to give us that information as well, and I believe it's a benefit to everybody that it's there now.  And it's making this a little bit easier because these timelines are a bit tight.

So you download the list, you fill it out, you update it, correct anything that needs to be corrected, and then you upload it back to us.  And when you do that, we'll send you an email confirming that we received it.  And then we'll process

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 96 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 43 of 88

42

it, meaning we'll assign new IDs, examine the data, make sure it was the correct spreadsheet. It is important that people don't make up their own spreadsheet, Your Honor. They should use the one that we've provided. We cannot accept homemade Excels. They need to use the list that we have. And that's because we need to be able to track this data, and we can't do it if we're getting a hodgepodge of different formats.

So we've prefilled it, and there's a reason for that. It allows us to store the data effectively and move it forward.

THE COURT: I want counsel to hear that. The spreadsheet that you're going to resubmit to BrownGreer must be the BrownGreer spreadsheet.

MR. WOODY: Yes, Your Honor.

THE COURT: Not something that you or your law firm has made up.

MR. WOODY: And you mentioned the deadline. And there's a couple reasons why I think it's very important that counsel should probably go ahead and do this, if they haven't already. We have received a significant number of submissions already, but we know there is much more to come. And the reasons to do it now, not wait, are -- I think there's three of them, Your Honor.

One of them is obviously when you're using the internet, things can happen. We don't want people to wait till the last minute and have problems with the connection and things

like that, which does happen.  I don't think it will, but it's better not to wait for that reason alone.  But also because we'll be able to tell you.  If you give us your information now, we can tell you if it was -- if it worked.  We can tell you if you gave us the wrong spreadsheet.  We can tell you what the data looks like that we received.

And this is here.  There's a link down at the bottom.

After you upload it, you can review the submission and make sure that it looks like.  You can update it if you need to before the deadline, add more people to it if you need to.  But I think it's important that people go ahead and do this now, review the data that we've gotten, we'll show it to you, and we'll send you an email confirming whether it worked or not.  It will tell you if you have a hundred people on your Excel, we've processed a hundred of them.  If we processed -- we were are able to process 50, we'll tell you that.

And the only reason we wouldn't process anything, Your Honor, is because there's no name.  That's the only thing we're looking for in terms of accepting it.  And also it's got to be our spreadsheet.  So we'll tell if you there is something wrong with it.  Obviously, if you do it at midnight on Tuesday, we're going to not be able to tell you in time for you to fix it.  So I think it's important for people to do that now.

And then the third reason is the one you just mentioned, Your Honor.  This page will go away at midnight

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 98 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 45 of 88

44

central time on September 12th, and you will not be able to give us this information.  We obviously have no independent authority to grant extensions.  We won't entertain them.  And I think it's important that counsel go ahead and do this now and get this done.

THE COURT:  I agree.  Thank you.

MR. WOODY:  And then, again, the upload button is at the bottom, Your Honor, just to talk a little bit about the mechanics.  And there's two things that you need to give us, a PDF, the declaration PDF, and the Excel list.  That's what needs to be done here.

There is a provision in one of the orders that mentions a hard copy.  We do not need paper.  Do not send us paper, please.  You can upload a PDF of your Excel through this process as well to satisfy that requirement.

THE COURT:  Okay.

MR. WOODY:  Just to touch on a few others things, Your Honor.  One is the -- our integration with Archer.  We've transferred a significant amount of information to them.  We've provided our census data on approximately 250,000 people and also transferred 5.5 terabytes of data to them.  I believe that transfer is complete.  We've been working closely with them all week to get that done.

5.5 terabytes of data, it's about 2.2 million documents, which is quite a bit.  I struggle with the way to

sort of visualize 5.5 terabytes, and the best I could do -- I know Orran didn't quite like my idea, but -- if you have an iPhone and you have 16 iPhones that will hold 1 terabyte of data. So what we've done is essentially filled up a hundred iPhones completely with documents and provided that to Archer and will continue to process new documents and transfer those as we receive them as well. And I think that process has run smoothly, and we'll work hard to make that work. We know that Archer needs this information to do their job, and we'll work expeditiously to get it to them.

And I want to touch briefly on what we'll do after September 12th. We're going to review the data we've received, deduplicate it. We have already deduplicated most of -- everything in our system that we've prepopulated, which I think was another good reason to do it, so that we don't get -- we don't get problems that we've already solved back. We've deduplicated all that stuff.

I imagine there will be some duplicates, Your Honor, but I'm hopeful that this process is not too difficult, especially because we should have full socials and dates of birth. I think the deduping process will not be too hard. Of course, I say that. We'll see how it goes. But I -- we've done it before and we can do it again. We'll finish that on or before September 26th and provide it to the parties and Archer on the 27th.

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 100 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 47 of 88

46

And after that, I believe the next deadline is the 12th for anybody to challenge what we provided and look at their list and see if they need to do anything different with it.

THE COURT:  That challenge provision is for a challenge to the overall list.  It is not a challenge to, hey, I didn't get my form in in time, so --

MR. WOODY:  Yes.

THE COURT:  -- I'm challenging that I'm not on the list because I didn't get my form in in time.

MR. WOODY:  Thank you, Your Honor.  Thank you for that clarification.  That's right.

That is the mechanics of the ID order process.  We've tried to make it as easy as possible.  We have actually done this before in other settlement programs.  We've done this exact process, which I believe greatly assisted us in being able to do this so quickly.  We know what works and what doesn't work and learned a lot of lessons from those processes that we've applied here.  And I think so far it's working great, Your Honor.  We have not had any issues.  We will be monitoring everything over the weekend and up until the deadline to make sure that everything's working.

And we have a help desk, we have a hotline, and email inboxes that people can email.  I'll show that information here at the end, but we do have a lot of people back in our offices making sure that this works, getting back to people as soon as

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 101 of 234

Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 48 of 88

47

they can.  We have received a lot of questions.  If we don't know the answers, we are working with the PEC to get the right answers and make sure they know what they're doing and we know what they're doing and what everybody is telling each other is the same.  I think that process has worked very well as well, so we'll continue to do that.

We'll work very hard to make sure that everybody doesn't have any trouble doing this, and if they do, we'll help them fix it.  But, again, after the 12th, we can't do anything. We're going to turn it off.  So it is important that people do that.  And if they need help, go ahead and ask us.  If you're worried about something, go ahead and email us.  We're happy to help you with anything that you have questions about.

In addition to the ID order process, there are a few other things that I wanted to mention we'll continue to work on. We'll continue to process short-form complaints, which is a process that has worked well over the last four years.  That -- there's a way to give us that information in bulk, on a spreadsheet or fill it out, the actual short-form complaint PDF. Then give that to us, that process will continue.

The census forms will continue.  We have those up. They need to be filled out for people who haven't done them. That process is the same that it's been over the last four years, and I think we are well aware -- everybody should be well aware of how that works.

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 102 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 49 of 88

48

And in addition to that, we have new documents we expect to receive. And like I said, we'll transfer those to Archer as we receive them. We'll monitor new case filings, and we will also be handling the plaintiff fact sheet process, which I didn't touch on much today. Bryan mentioned it. It is a significant plaintiff fact sheet. That template is up on our portal now. People can review it. If they're thinking about how to proceed, they can take a look at that fact sheet and see if they want to fill it out. It's available on our home page for anybody who would like to take a look it.

THE COURT: Mr. Woody, am I right, as far as new case filings, that with BrownGreer's assistance and the clerk's office, their efforts, we are making sure that we don't have new filed cases that do not appear on a declaration?

MR. WOODY: Yes, Your Honor. We are -- we've appreciated the assistance of the clerk's office over the last four years. We've worked very well with them. We have not -- we would not really able to do this without a lot of help from the courthouse, and the clerk's office in particular, to process this data and make sure that we know it's on the docket and they know what we have, and we'll continue to do that.

And lastly, Your Honor, just our contact information here. The email inbox where people can email us if they need help is is 3mearplugs@BrownGreer.com. Our number is 888-361-0741. And the website for MDL Centrality is

mdlcentrality.com.

And I appreciate your kind words earlier, Your Honor. They were very nice. I will -- I do want to say that none of this would be -- would have been possible without the help of quite a few people back in our offices. So I'm happy to be here representing BrownGreer. I'm proud to do it. And I appreciate your kind words. And unless you have any questions, Your Honor, that's the end of my presentation.

THE COURT: I don't have any more questions. Thank you, Mr. Woody, for the extraordinary support. We've come a long ways from the prevalence analysis days, bellwethers, haven't we?

MR. WOODY: Yes, we have. Thank you, Your Honor.

THE COURT: All right. Thank you very much.

All right. Mr. Aylstock.

MR. AYLSTOCK: I'll introduce Scott Freeman from Archer, and his partner, Blake Deady, will presenting on the registration process and moving forward, as well as the lien resolution process.

THE COURT: Okay.

MR. FREEMAN: Thank you, Bryan.

Your Honor, good morning. Scott Freeman, chairman of Archer. I want to introduce Blake Deady. He's our president and general counsel. The goal was for me to do the entire presentation. This is a settlement that has absolutes and

deadlines that cannot move.  It's static.  With this much importance, I talk off the cuff.  We felt like our most detail-oriented individual should cover some of the key dates and timing and process-related items for the parties.

Again, we're honored to accept this appointment. We're excited about the process, and we understand the task at hand.  We know this is a six-plus-year project.  From my standpoint -- you touched on this earlier -- we've already got some early wins.  Archer was appointed --

I guess we'll load the presentation.  Sorry.

So this is our rough agenda for today.  Again, I'm going to cover our role.  I'm going to talk mainly about liens. I'm going to talk a little bit about Qualified Settlement Fund administration because it's a little bit different process than some might expect it to be.  And then I'm going to turn to over to Blake to really hammer into the details on the process, the logistics, the coordination.

I would also like to thank BrownGreer.  We've been working with them the last couple, you know, weeks getting data, which is really important for us to ingest it, to process it. Like BrownGreer, we've got hundreds of people working on this settlement.  It is -- you know, something of this magnitude requires the work of many, and it's appreciated, for their responsiveness and things that they've done for us to help start analyzing the data that we have and how to get it set up in our

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 105 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 52 of 88

51

system.

We were appointed -- and, Judge Rodgers, you talked on this earlier, about the VA liens, and I do want to touch on that in a second. But, you know, first these are the parties that we're working with. These are the court-appointed individuals. You know, I would call it the dream team. And these are the roles that you've got for each party. Bryan has touched on some of these folks.

Obviously Archer will be doing lien resolution, will be the QSF administrator, will be administering the settlement. Randy was -- pointed out in the back. Randy has a very vital and critical role. Not only does he have to help us with the investments and the corpus of the trust, but with the way money's going to be moving back and forth, the sale of stock, it's very important to have an expert like that on our team. And obviously he's got duties related to common benefit, but when we do digital disbursements and we pay claimants, we have to have a lot of people doing a lot of work. So having Randy as the co-trustee is really important, and I appreciate them being appointed.

We've touched on BrownGreer a number of times. They will be handling the settlement data. BrownGreer is one of the most experienced firms doing this. We're very confident that the data that we're going to be getting, assuming all of the law firms are compliant, is going to be in good order, and we'll be

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 106 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 53 of 88

52

able to process through that relatively quickly so we can get on with the important part of the settlement as it relates to the registration and releases.

The settlement special master, John Perry, from Louisiana, I've known John for 15 years. He's an incredible guy. He will be dealing with any disputes related to the MSA, challenges to that identification order, any challenges to the calculations of participation levels, just making sure that the MSA is followed and the parties are consistently following the MSA.

Matt Garretson's going to be speaking after us. Most people know Matt in this industry. I've been doing this for around 20 years. I've known Matt since I started. We couldn't have a more experienced special master to figure out how to handle the allocations and the methodology. He is, you know, lawyer, scientist -- he's a lot of things -- data engineer, and we're -- we couldn't be more happy to have Matt on the team to help us so we can obviously get the ord numbers out and make it very clear and something that everybody can understand.

Mr. Klotz has been appointed as the extraordinary injury settlement master. He's obviously a key part of that. There's people that have a lot of extenuating circumstances to their case. When we talk about supplementing data and providing us more data, that firms will do, some of those things -- PTSD claims, things like that -- are things you can't necessarily,

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 107 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 94 of 88

53

you know, get the full breadth of without having an additional master in that role.

When we get to -- you know, when we talk about liens -- little delay.

So this is, you know, an early win, and Judge Rodgers referenced this. You know, Archer was appointed as the Lien Resolution Administrator in February of 2020. So we've been kind of behind the scenes. There's not a lot of work to do on the lien side till you have a settlement, but the good news is is we worked with a very understanding VA office. Neil Stallings in the Revenue Law Group had worked with us because we had received hundreds and hundreds of emails throughout this process of: I don't know that I want to participate in the settlement because I'm going to lose my benefits, or it's going to impact something I have.

And a lot of settlements that we've dealt with in the past, people worry about losing Medicaid and special needs trusts, but this is something unique to this particular demographic. And the good news is is we do have a waiver of all the VA liens, which is really important. So that means no claimant's disability rating is going to be adversely affected.

Neil put a letter that we had him revise, and the Court has put that up on the website. It's August 22nd, 2023. It just reconfirms what we had discussed with them in 2021 in the Memorandum of Understanding. But, again, I've got this

54

bullet point at the bottom, you know:  Enrolled member of Department of Veteran Affairs will not lose health or disability benefits or have their disability rating adversely adjusted. Okay.

So that's really important.  A lot of people think, great, no liens.  Well, not so fast, right?  So we are the Lien Resolution Administrator.  We have a duty, statutory duty, to resolve government liens in this situation.  Medicare, Medicaid, and Tricare.  And I'm going to touch on Tricare a little bit because there's not a central processing source for Tricare, and it's going to require counsel to have -- make sure their claimants are providing Archer with information -- what branch, where they might have treated -- because we have to go to that specific, you know, branch and that specific, you know, base to try to get data on Tricare so we can accurately resolve those liens.

So while we do have great news on the VA side, we still have things that we've got to do, that the government requires, and we will do our job doing that.

There we go.

So we do have to submit every claimant to Medicare, okay, for verification of entitlement.  We're going to do this on a global basis.  The good news is is we feel that when Medicare churns through the data that we've been going back and forth with them, there's not going to be a ton of related care,

55

is our opinion.  There will be a -- we hope this -- sometime later this fall, this winter, we'll finalize that global for Medicare and we'll be able to put that part of the lien process behind us.

So, you know, again, maybe it's -- we put December 15th, 2023.  If it happens sooner, that's great.  But they've been mining the data and going through the data already, and that's where we're at as it relates to Medicare.

Medicaid, as many of you know on past settlements, is when you were injured what states were you living in.  There's not -- it's not like Medicare where it's the federal side.  It's state specific.  So we've got to know -- and I need claimants' counsel on this call to understand -- that we need to know where people might have lived when they were treating with this when you -- when the injuries had started and where they might have treated in states, because we do have a duty to resolve any Medicaid liens that are related as it pertains to the settlement.

Tricare, I talked about this earlier.  When we send out registration forms, we will have an additional document for Tricare, and it's really important.  Again, we need to know if there's an agency that might have a medical lien that's related to some place that they treated at during their military service and those regions, and there is not some central area we can go.  So we're going to have to go branch by branch, you know, venue

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 110 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 57 of 88

56

by venue and figure out what we have there on Tricare for what the claimants are telling us on their forms. And if they didn't treat, they don't need to worry about it; but if they treated, it's really important that we get that information so we can check with Tricare to see for related claims.

I do want to take a step back and just remind everybody this is recorded, as the judge mentioned. Our materials will be available. I'm not somebody that reads every line on the power point, but this is a really important settlement as it relates to the process and the deadlines. So Blake will be doing a lot of that when he follows up with me to talk about those deadlines. You know, the BrownGreer -- the BrownGreer MDL Centrality, you know, being shut off on that date. Again, we can't reiterate enough, please get your data in as soon as you can.

This settlement, we will be paying every claimant directly. So we're the QSF Administrator, the Qualified Settlement Fund Administrator. It's also called a 468B trust. We need to pay the clients directly. The only way we can do that is if we get fee and expense information from law firms. So we will be working in a cadence where we're sending, here's your cleared list of claimants, please provide your fees and expenses. I'll be working with Randy to make sure we update the Court.

If we've got -- I don't want to say bad actors. I

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 111 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 58 of 88

57

want to assume everybody's doing it, but we need to put some deadlines in place.  When we've got a cleared client, we would like to get them paid.  We cannot wait on law firms to dig through files.  So I encourage anybody on the call now.

We will host some town halls.  We will show people our technology and ways that we can transfer data back and forth, but it's really important for us to get your fee and expense information.  And hopefully we can lock some fees and people know what they have and they can have their client list ready so when they see them on a cleared list, we have that information.

And our cadence would be that we pay the clients one week, we pay the lawyers the following week.  And we just expect to do that for as long as we need to.  Six years, right?  I've got an 11-year-old.  I guess he'll be graduating high school when this finishes.  Maybe my wife doesn't share the enthusiasm that I do.

But, you know, there are other duties that we're getting a lot of questions about.  Bankruptcy's come up a lot.  That's dealt with in the MSA.  Same with probate.  Blake's going to touch on these things.

But, again, this settlement only works with cooperating parties, and the claimants' counsel that represents these folks, we are -- you know, I'm running this project.  I'm the chairman of Archer.  I'll be involved.  I'll be in front of this Court probably many times talking about the settlement and

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 112 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 59 of 88

58

where we're at.  Reporting is going to be really important, and we're going to give you every report so you can figure out what bucket and where your clients stand and have the opportunity to be extremely involved in the process from registration and releases and getting them paid.

And Huntington Bank is the QSF custodial bank. They've got a great payment platform for digital payments.  So if your clients want PayPal or Venmo or ACH, we have all the capabilities to do that.  So you don't have to worry about the U.S. Postal Service and, you know, check fraud and things like that.  So electronic payments will be available for those that want it, and we'll have some fraud prevention and things like that in place.

But I am going to turn it over to Blake because this next part is extremely important, again.  I think my team thought wisely to allow Blake to finish this presentation.

Thank you.

THE COURT:  Mr. Freeman, thank you.  I look forward to working with you --

MR. FREEMAN:  Thank you.

THE COURT:  -- and seeing this successful settlement implemented.

MR. DEADY:  Good morning.  Your Honor.

THE COURT:  Good morning.

MR. DEADY:  One thing that I wanted to add on to

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 113 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 60 of 88

59

Mr. Freeman's comments were, to counsel -- particularly counsel listening by video -- is do not become overwhelmed right now with the amount of information that we're placing upon you.  The presentation will be available on the settlement website.  I'll provide that.  It's also -- will be at the end of the presentation today.

Don't worry about your fee and expense ledgers yet.  Let's focus on the identification order.  It's due Tuesday.  And then registration will be coming up in short order after that, and here's the timeline.  Mr. Aylstock presented some of these dates.  But again -- and so did -- so did Mr. Woody.  Again, I'll -- it bears repeating, the identification order deadline expires Tuesday, September 12th.

Right now it is Archer's at least target date to issue registration forms in early October, approximately October 9th.  I'll talk a little bit more about that in just a second; but, of course, that largely depends upon the amount of data that is transmitted to BrownGreer in the identification process and then BrownGreer's ability to scrub that data, get it into a form that they're already transmitting to Archer, and then Archer using that data to prepopulate registration forms.  Very critically, and like BrownGreer's doing in the identification order, it is Archer's intent to prepopulate registration forms as much as possible with, of course, claimant demographic data and injury data based upon the census forms and the DOEHRS data.

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 114 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 61 of 88

60

So we're looking at a target date to begin delivering registration forms which will been done electronically to claimants.  That's one of the reasons why email addresses are absolutely critical on the identification order and declaration. We need to send your claimants a unique token that identifies them where they can go on and complete their registration forms. That is critical.  There's always going to be outliers, claimants that may not participate in email or refuse to or be in a situation where they cannot access their registration form electronically.  There will be alternative methods for us to reach out to those claimants.

December 29th, which is 14 days prior to the expiration of initial registration for MSA I.  We will send a notification out to law firms and claimants that have failed to register.  Seven days prior to the expiration of registration, we'll do that again.  The initial registration deadline expires on January 12th, 2024.  That is four months from the reference date.

There's some information on the following slide, which I'll go to in just a second here, related to claimants that may opt out, that change their mind.  That allows for an 60-day additional timeline for them to change their minds and decide they wish to participate in the settlement.  Again, this is a little bit more of a narrative description of the dates related to the initial registration date and some disengagement lists

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 115 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 62 of 88

61

that are owed to the Court and to the administrator by the end of January for claimants that fail to participate by registering.

The wave cases have a separate settlement agreement and a separate timeline.  I think everyone may be familiar with that by this point.  The reference date -- well, first of all, the identification with BrownGreer remains the exact same.  It's no different.  It's the same for any claimant related to MSA I or MSA III.  The same reporting from BrownGreer to Archer and to the Court.  Archer is endeavoring to launch the registration process for wave cases a little bit earlier than the non-wave cases in early October, again prepopulating registration forms with as much data, including injury information if possible.

I believe the cases in Waves 1 through 3 have pretty extensive medical record discovery completed.  So those cases should be easier to get the registration forms in proper order.  The registration deadline for wave cases is three months.  So non-wave cases is four.  The registration deadline for wave cases is three months and expires on December 12th, 2023, the end of this year.  Again, we'll be notifying claimants that we're seeking their registration forms and working with plaintiffs' counsel to ensure that those arrive timely prior to the deadline.

A couple points.  Mr. Freeman mentioned just a second ago -- my colleague, Scott -- that there will be an additional

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 116 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 63 of 88

62

form going out with registration forms. We're calling it a lien questionnaire. It will be a document that will look like the registration form, but it will provide additional information to Archer which will assist us in governmental lien resolution.

Scott mentioned Tricare. It's very important that we get military branch information and any location where a claimant may have treated for their hearing injury, hearing loss, or tinnitus. It will help us with Tricare. There is no central place for us to go resolve liens with Tricare. It's critical for -- that we get that data in addition to any state of residence where a claimant may have lived, either during the time they used the product or treated for the injuries so that we can most efficiently get through Medicaid lien resolution.

Again, I mentioned this a minute ago, these registration forms will be delivered electronically. So conceptually, again -- stressing again -- email addresses are critical in the ID order. Please try to get valid email addresses for all of your claimants. Conceptually, we'll -- Archer will receive the information from BrownGreer, we will then process census data and DOEHRS records and employ Mr. Garretson's settlement allocation methodology.

And to establish the preliminary eligibility, we will prepopulate registration forms. They will be published to law firms and claimants alike. The law firms will get a report of the registration forms going to their claimants. Their

claimants can log into the claimant portal that Archer is building and creating right now to access their registration form and review their release. Signatures will be -- will be required for these documents. The good news is we are -- the parties have agreed to accept electronic signatures through DocuSign. So all of this will be done electronically.

Critically important -- we've got a lot of questions about this -- plaintiff law firms and claimants will have an opportunity to review their prepopulated registration forms, and if they believe that there is information that they need to supplement regarding their injury, their category of hearing loss, whether it's mild or moderate, or if they have tinnitus but our records don't show it, they will an opportunity to supplement their registration form and documents with Archer. And at that point in time, we can amend the registration form and resend it to the claimant if the supporting documents support their contention.

Once the registration form gets into a position where claimants and their lawyers both agree that it's correct and accurate, they will go out to claimants for final execution, and then those can be, like I mentioned a second ago, returned to Archer with a DocuSign electronic signature.

This slide has a little bit more of a schematic that I won't go all the way through because it's effectively what I just said. But the critical thing to take away from this piece

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 118 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 65 of 88

64

is if you look at the green boxes, that's where a law firm can interact with the workflow process.  The claimant has that same opportunity.  The arrows actually on here, we demonstrate how the claim can proceed through the workflow process where there's opportunities to actually put up a stop sign, review the registration form, and offer any supporting supplemental records.

Again, every law firm is going to have an opportunity to update or supplement the claimant information to Archer. Every law firm will have the opportunity to review the prepopulated registration forms and confer with their clients prior to distribution to the claimants.  We will notify firms before any general correspondence is distributed to claimants. I would encourage you as CAE counsel right now to introduce Archer to your clients.  We have a very important role as we're charged and appointed by the Court to make sure that we administer the settlement as efficiently and as completely as possible.

Scott mentioned this earlier.  We're going to continue to host town halls.  We hosted one last Tuesday with BrownGreer and leadership counsel to try to answer as many questions as we could in an hour, both through a Q-and-A session that was in written form and live as we were taking those questions submitted to us in written form.  So as we get through -- past the identification process and the registration, we'll continue

to schedule town halls to provide counsel and their claimants with as much information as we possibly can and to answer any questions as the process develops.

For debtor claimants, there is a requirement to resolve your bankruptcies. This is -- presentation is pulled directly -- language directly from both MSA I and III. Each eligible claimant shall agree and, by executing that release, that will indicate in the registration form whether there is a bankruptcy action that's currently pending or whether he or she is seeking bankruptcy protection. The language is almost identical in each release, except release -- or MSA III references wave cases.

Importantly, on the registration form, there are questions related to this that are very straightforward. I've included them here for you. I won't read this, but essentially if you have a claimant that answers yes to these questions, the claimant's required to provide the bankruptcy court the jurisdiction and case number. Archer will assist the claimant in coordinating that bankruptcy -- or coordinating the settlement through that bankruptcy. We will, through the registration process, identify claimants which indicate the same and begin reaching out to trustees to assist in the coordination of the settlement award through the bankruptcy estate, if it is an asset of the bankruptcy estate, working directly with the trustee.

For deceased claimants -- there it is.

Importantly, again, this information is available in the MSA, but I'll hit a couple high points here. If you have a claimant that is deceased and that is going to receive greater than $75,000, their release, importantly, will not be effective until executed by a representative of the deceased eligible claimant in accordance with applicable state law. Importantly, Archer will work with those representatives of the deceased claimant and local counsel, if necessary, to ensure that the proper personal representatives are appointed by a court so that they have the authority to execute the release per the requirements of the parties and, importantly, 3M.

If you have a claimant that's going resolve their case for less than $75,000, there's a different alternative there which includes satisfying the small estate administration rules under applicable state law or having all the beneficiaries identified enter into a family settlement affidavit which Archer will be putting together in short order and conferring with the parties to get approval for a global application of the same.

It bears repeating here, I guess, or at least mentioning, that Archer shall not have or distribute any settlement funds on behalf of a deceased eligible claimant until Archer, as the claims administrator, confirms the release has been executed in conformance to the party's MSA.

Mr. Freeman talked about this a few minutes ago

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 121 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 68 of 88

67

related to Archer's QFS administration responsibilities.   I won't go over too much of this again, but I do want to reiterate that Archer is responsible, working with Mr. Sansome, to effectively distribute settlement proceeds to any stakeholder related to a claimant that may be receiving a settlement award. That includes the claimants, most importantly, to their medical lienholders, to counsel for fees and costs, or anyone else that may receive a portion of the settlement award.

Again, at some point, probably getting through the end of registration process, Archer will begin putting together the fee and expense ledger information for law firms, and it's important that law firms comply with the deadlines that we're going to set in place so that as claimants begin getting into a position to be paid, we can effectively do that without waiting for fee and expense ledgers from firms.

Mr. Freeman mentioned electronic payments, and that will be an option in addition to robust fraud prevention.

Reporting is always a critical question by everyone involved, and it is Archer's intent to provide most importantly the Court with reporting related to the registration process in addition to CAE counsel, the defendants, 3M.  There will be dashboards.  I won't flip through the rest of these slides.  I think one's enough that everyone can access this presentation I think both through the Court's website, certainly the settlement website that Archer's created.

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 122 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 69 of 88

68

But importantly, we intend to report on -- across every function that Archer's going to perform, whether that's registration, lien resolution, bankruptcy coordination, or probate coordination, in addition to QSF distributions, both from a holistic QSF level to a law firm level, even through a claimant level. And transparency is obviously the most important factor in this. This reporting for everyone will at least provide real-time status as to the settlement and how it's progressing, both in terms of submission deficiencies and one day when we get this thing completed.

So I will tell you right now that Archer's very flexible on this reporting. We'll start creating, but I know that we're going to have requests, and we will try to satisfy all those requests as we get them. We'll get that contact information up here.

There is a settlement website. It will be up in a second here, but we stood this up last week. It's 3m-earplugsettlement.com. Again, there it is. 3m-earplugsettlement.com. There's the Archer website. And, importantly, we have an Archer email address right now for anyone to contact us at 3mcaecounsel@archersystems.com.

On short order, once we get past the identification process into registration, we'll also have a toll-free number that is dedicated to this settlement. And like our partners and colleagues at BrownGreer, we encourage you to call us when we

get through that process.  We're going to have folks helping both through live telephone calls, emails, chat functions if we need it.  And, you know, look, we're as incentivized as anyone to make sure this project goes as efficiently and smoothly as possible.

Thank you, Your Honor.

THE COURT:  Thank you, Mr. Deady.

Let me follow up with a couple of comments.  A lot of information, comprehensive, dense, full, but intentionally so. Judge Miller and I wanted to make sure that all of the law firms, lawyers involved in the litigation, here and in Minnesota, as well as the claimants themselves, have the information that they need in order to make an informed decision about participating in the settlement.  And this is the best way I could think of doing that, and Judge Miller agreed.

The other thing is the deadlines are tight, but as we've just heard from Mr. Woody and Mr. Deady, this process is extremely user friendly.  Deadlines are tight, but it's very user friendly.  I mean, I heard -- you know, I heard prepopulated declarations, prepopulated registration forms, electronic signatures, direct electronic cash pay to clients. Again, extremely user friendly if you engage and get involved in the process.

And so I appreciate Archer and I appreciate BrownGreer for making this so user friendly to the people involved in the

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 124 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 71 of 88

70

litigation who elect to participate, which we hope will be everyone.

I do want to make one other comment. If you're a law firm or a *pro se* and you have no -- a law firm with clients or *pro se*, you have no cell phone -- in this day and age, that's rare, but I think it's -- it certainly is possible. No cell phone, no email address, I think I saw on the slides, Mr. Deady, you had, that those people need to be identified sooner rather than later, because they have to be dealt with, and we need to -- I don't need to, they need to figure out the best way to communicate with those folks. So if that's any of your clients, I would suggest you identify them as soon as you can.

Also, I'd like to ask BrownGreer and Archer to hold another town hall within the next two weeks. I think now all of this information is out there, people will have time to digest it. It will be on websites -- Court's website, Archer's website, BrownGreer's website -- time to digest it and come up with more questions, and today we're simply not going to have time to entertain questions. And so if you all would plan for that, I would certainly appreciate it. I'm sure Judge Miller would as well.

Mr. Garretson, how long is your presentation? And I'm not trying to cut it short. I just need to decide if we should take a recess before we start.

MR. GARRETSON:  15 minutes.

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 125 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 72 of 88

71

THE COURT:  15?  Everybody okay?  Can we keep going?

(Parties all nodding heads.)

THE COURT:  All right.  Mr. Garretson, you're up.

MR. GARRETSON:  Thank you, Your Honor.

I hope it's truly 15 minutes after I said that with such confidence.

Good morning, Your Honor.  My name is Matt Garretson, and I'm are pleased and very thankful to be appointed as the special master to oversee the settlement allocation process. And while this is my first appearance in front of you, Your Honor, I do want to assure you, the Court and all who are listening today, that I have been working feverishly with many people in this room since my appointment to get my head around the data and to work with the experts to get up to speed quickly so we could put together this framework I'm about to present to you here today.  And I also am reminded by several of my colleagues that I have been doing this for 25-plus years of designing and overseeing settlement programs.

In the course of doing that, you know, I've kind of come to believe there's this gold rule for every settlement allocation program.  That gold standard is that we have to make sure that similarly situated plaintiffs receive similar and fair compensation consistent with their unique harm, and it needs to be done as quickly as possible.  And so with this in mind, we've designed this -- these two settlement allocation methodologies

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 126 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 73 of 88

72

that I'll outline here today.  But, first and foremost, let me just say I'm committed and believe that that standard can be achieved in this settlement.

The payment program overview.  As I mentioned, there are two payment program options for claimants in this settlement.  The first being the expedited pay program, and the second being a deferred pay/full evaluation program.  That's a mouthful, so throughout this I'll just call them the expedited program and the full evaluation program.

And there will also be an extraordinary injury fund available which I will touch on here as we conclude today.

The expedited pay program.  Eligibility for the expedited pay program is fairly straightforward.  A claimant must elect at the time of registration that they would like to participate in the expedited pay program.  They must establish that they have tinnitus or recorded tinnitus or hearing loss as defined in this program outline.  And, of course, they must execute a release and dismissal.

While these categories remain subject to slight refinement, we do foresee the following five expedited pay program categories.  And the first being -- and when I say yet-to-be defined, we do believe as we get through the data, we may need a miscellaneous category for cases that reach a threshold of compensation or compensability but do not reach the level of these other five categories -- or other four

Case 3:26-cv-03359-MCR-ZCB   Document 23   Filed 12/29/25   Page 127 of 234
Case MDL No. 2885   Document 2033-4   Filed 12/10/25   Page 74 of 88

73

categories.

So the first being this miscellaneous.  I used an example up there that I think is blocked by the screen of, like, non-U.S. military contractors, or something to that effect.

The second being tinnitus only, and these would also be claims that produce no evidence through audiological data of hearing loss but do have a history of tinnitus.

Level 3 has two categories, subcategory A and B.  A being recorded tinnitus, and those would be records of diagnosis of tinnitus or records establishing that the claimant sought treatment for symptoms of tinnitus within two years of last earplug use.  And then 3 -- the subcategory B would be slight hearing loss.  And the reason these are in the same category is they are anticipated to have the same compensable amount.  But slight hearing loss would be defined as a 15-decibel hearing-loss shift in at least one of the testing frequency in at least one of the ears.  Mild hearing loss, 20-decibel to 35-decibel hearing loss at one of the testing frequencies.

And the last category for the expedited pay being moderate or greater hearing loss, which would be defined as 40 or greater decibel hearing loss at one of the testing frequencies.

So to accomplish this, at least to establish hearing loss in those categories, a claimant will need two audiograms and one that precedes the last use of earplugs.  And we refer to

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 128 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 75 of 88

74

these in both the expedited pay program and the full evaluation program as the reference audiogram, or baseline, and the injury audiogram. And I referred in the previous slide of the testing frequencies, and in both programs we're evaluating testing frequencies at 2,000; 3,000; 4,000; and 6,000 hertz.

The payment amounts and timing of the expedited pay. With respect to Payments Levels 2 through 5, we will have minimum guaranteed payment amounts. I'll cover that in a few more moments. The timing, of course, is a function of the claimants who participate in the expedited program as opposed to the full evaluation program. A FIFO rank -- or the first in, first out -- will be ranked, and that's the order in which Archer will process those claims. And because this is a multitiered funding mechanism in this settlement, it also may have to do with the timing of funds being available.

And so for illustrative purposes, I put up these three scenarios where, like, the early payment which would be triggered by your FIFO rank, your first in, first out rank, those who are higher in that schedule, we believe could receive their expedited pay prior to December 31st, 2023.

The majority payment scenario refers to what we estimate the majority of people participating in the expedited pay program. This is the date by which we believe they could receive their full payment, and you see we have that as prior to December 31st, 2024. And the later payment scenario just

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 129 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 76 of 88

75

accommodates for the fact that if there are -- if there is a high participation threshold or high participation in the expedited pay program, the latest those late registrants into the expedited pay program may receive their payment is prior to September 30th, 2025.

Other expedited pay considerations. We are working through the math on a potential for a secondary payment to the expedited pay claimants. And basically what we envision here is that would be triggered by some ratio being achieved where the average payment to the full evaluation program claimants begins to exceed a ratio of the payment of expedited pay claimants. We are working with experts to determine what that trigger may be, but we believe there could be a scenario where we go back with additional funds to the expedited pay claimants once we have the final registration and participation figures and once all the scoring is done for the full evaluation program claimants.

But, again, what we will publish here shortly is the guaranteed minimum payments should a claimant elect to participate in the expedited pay program.

I've referenced the extraordinary injury fund, which I'll speak about as we conclude today. Expedited pay settlement program participants are not eligible for the EIF, the extraordinary injury fund, with one exception. The Level 3 claimants with evidence of recording tinnitus will have the option to participate or to file an additional claim, if you

will, within the extraordinary injury fund.

So that is an outline of the expedited pay program. I'll turn now to the full evaluation program.

Let me first talk for a moment about how the funds are divided between these two programs. And, again, being complex at this point because we have these funding dates so the total settlement fund amounts may increase as certain thresholds are met. So we have that as the starting point. And then to determine the funds available for the full evaluation program, we are deducting the -- from the total settlement funds available all the funds required to pay the guaranteed minimum payments to the expedited pay claimants, the funds that are set aside for the extraordinary injury fund, and a registration payment which we would pay to every full evaluation claimant upon their registration.

So I know that's a lot of math. All this will be available -- you'll see, kind of, my punch line at the end -- as we're going to create some great exemplars and materials to help claimants and their counsel make a full and informed decision. But this is the basic math of how we get a pot of money now available for the full evaluation program.

The eligibility criteria for the full evaluation settlement program is very similar. Claimants will elect the deferred pay/full evaluation program at the time of the registration. They must establish that they had mild or greater

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 131 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 78 of 88

77

hearing loss, as established by a shift between the reference and the injury audiogram during the time of their earplug usage. And like the claimants participating in the expedited pay program, they'll have to execute a release and dismissal.

The way in which a claimant establishes the hearing loss, which is the baseline for the measurements or the beginning of the scoring process in the full evaluation program, as I mentioned, they have to supply the reference audiogram and an injury audiogram.  As we stand here today, we're defining the reference audiogram and injury audiogram as follows:  The reference being dated within one year, post or prior of the date of the first use of the earplugs, as stated in the registration form.  With the injury audiogram dated within one year of the last use.

And because -- when we designed these models, I tend to get spooked by hard cliffs.  Like if you're just outside by one day that somehow you're not eligible at all, and so what we are designing is a value adjustment that after the final points, which I'm about to go into, are calibrated for -- and calculated for each claimant, that if someone is outside of that one-year time frame, they could have -- they could still participate, but they would have their overall points reduced, depending on the variance they are outside of the those time frames for up to a total of four years on either end.

And as I mentioned the testing frequencies are the

same in the full evaluation program and the expedited pay program.

I would also say that the full evaluation methodology utilizes what I believe to be the state of the art with respect to allocating settlement proceeds, and that is it utilizes an objective point-scoring system. And why I call it the state of the art is, you know, it is the methodology which is utilized in, I believe, most contemporary, large mass tort settlements. And I also believe it's the state of the art because I think it's the most effective way to inform claimants before they sign up for a settlement program, the way in which they'll be treated on account of their unique injuries compared to all other claimants and all other similarly situated claimants.

So it is a point-based system, and we will assign points based on the severity of injury and the strength of the association between that injury and the claimant's use of the earplugs. When I talk about severity of injury, we're really talking about in these cases severity of impairment, and we will award points based on a claimant's injury audiogram impairment score. Impairment scores ranging from mild to severe at each of the testing frequencies.

So you can envision left ear; right ear; 2,000; 3,000; 4,000; 6,000 hertz being the testing frequencies. We now have, kind of, eight columns, right? And they -- the claimant can be eligible based off their shift in each of those columns

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 133 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 80 of 88

79

for points.   The more severe the shift is, the greater the points.   And so the points will slide across in each of those silos, if you will -- each of those silos being testing frequencies -- across the impairment score from mild to severe.

And when I speak about strength of association, what we're getting at here is that the -- we're talking about the percent of that deficit.   That percent of the shift that is related to the claimant's earplug usage.   It's what, you know, what we would assume is that each claimant came into their usage with some different level of audiological readout to begin with.   So the more a claimant's impairment is related to the time period during which the claimant wore the earplugs, the greater the point award will be.

Other point-modifying factors.   We are utilizing a bilateral impairment multiplier, and that is to recognize the real-world implications of having bilateral hearing impairment.   Not to minimize unilateral hearing impairment, but when we look at the point score as I reference across each of those ear-scoring testing frequencies, if there is bilateral impairment, at least a moderate level in both ears, we will add additional points on top of the otherwise total sum of the testing frequencies in the left and right ear.

For instance, a moderately severe in left ear and profound in the right ear bilaterally impaired claimant would receive an adjustment that is greater than a moderate left

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 134 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 81 of 88

80

ear/moderate right ear bilaterally impaired claimant.

Two points that will factor into this is an age adjustment. Just to recognize that there is a decline in hearing as we age, and so there is a slight adjustment built into the points calculator based off the age of diagnosis, the age being the injury audiogram, and then an adjustment in the full evaluation methodology as well for individuals with recorded tinnitus.

So I mentioned that we're awarding points, and the question I get from claimants most of all is, you know, I want to be awarded dollars not points. So the question is how do we determine a claimant's dollar award amount by utilizing a point system. Well, what we have to do to be able to factor or determine a claimant's dollar award amount is to be able to multiply their final award points times the point dollar value. So that gets to my statement that we need to know the point dollar value.

The point dollar value is determined by dividing the deferred full payment funds -- that pot of money I showed a few slides back, how we calculate that -- that becomes our numerator by the denominator, which is the entire total of all points awarded to all claimants in the full evaluation program.

So there's an element of this, as you can see, that can't be determined -- the final point dollar value can't be determined until all cases have been scored, but we are working

with experts to do predictive modeling on how we believe the claimants will score at the mean and the median and the maximum, if you will, across that entire point system so that we can come up with a high end and a low end of the probable value -- dollar value of a point.

So as we roll this compensation methodology out to claimants, they and their counsel will be able to make an informed decision of which model, which program they would elect, because they'll have access to the point system, they'll have access to the high and low predictive amounts of the dollar -- the dollar value of a point, and they'll be able to make a determination, do they believe they would fare better in the full evaluation program or in the expedited pay program.

This will be -- oh, my gosh. I promised 15. I'm at 20. Let me wrap it up.

Calculation dates. Because this is a multitiered funding settlement, meaning it's -- the funding is occurring over a series of certain dates, even though we can't pay a claimant their entire amount until the end of these funds being deposited, we can at each of -- having calculated the points for each claimant, every time a payment comes in to the fund that is eligible to be distributed to the full evaluation claimants, we can make a payment because we know their points amount already. So at every funding date, we can calculate a payment to the claimants who participate in the full evaluation program.

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 136 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 83 of 88

82

Other full evaluation program considerations.  I did reference that under this methodology that at the time of selecting and registering and becoming an eligible full evaluation payment claimant, there will be an immediate payment upon registration and then will continue through with the point evaluation.

And finally, Your Honor, as I referenced, the Extraordinary Injury Fund.  Been working with Special Master Chris Klotz, who's in the courtroom here today, collaborating on the design, guidelines for that program for compens -- for compensating injuries that are not fully considered in this framework I've just outlined here today.

So with that, I conclude and -- oh, sorry.

THE COURT:  I was just going to -- I was just going to compliment you and say this is a remarkable amount of information you put together in a very short period of time.  I appreciate.  I know everybody else does --

MR. GARRETSON:  Thank you so much.

THE COURT:  -- as well.  Thank you.  I hope you'll participate in the town hall as well.

MR. GARRETSON:  I'd love to, Your Honor.  Thank you.

THE COURT:  All right.  Thank you so much.

Let me mention one other matter related to the program.  It's rather unique, I think, in the MDL world with the global settlement for the settlement proceeds to be paid

directly to the claimant as opposed to the law firm and to an escrow account or trust fund account and held and then we wait for the lawyers to distribute all the money.  As you heard, this will be different.  But I do want to say to all of the law firms and lawyers involved in this here today listening and later who watch the recorded proceeding, that with Mr. Sansom and his firm's help, I assure you that there will be a very strict, close accounting of the distribution of these funds.

And if any of you have been keeping track of your time, as plaintiff lawyers throughout the life of this litigation, you know that Mr. Sansome takes very good notes, keeps very close track of numbers.  And so I have full -- I'm fully confident in his ability to be the eyes and ears of the Court, and he will have very strict and regular reporting requirements to me as well in that regard.

All right.  We are wrapping up, but before we do, I have to take just another couple of minutes to mention a few people who I know would rather not be mentioned and identified and highlighted, but I'm going to do it anyway, and then we will conclude.

But first is Judge Herndon.  So from the beginning of this litigation -- really, I mean, almost the very beginning -- he has been involved in this litigation.

I know this is -- you're not going to be happy about this.

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 138 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 85 of 88

84

So he's been involved in this litigation.  I mean, he has been there with the Court, with the parties every step of the way.  Early on, discovery and moved into bellwethers, and then his role just got expanded and expanded because he did such a good job in every role, and I just kept expanding it.  And then of course, and lastly, in the mediation process.

I've made a lot of decisions throughout the life of this MDL, but bringing Dave Herndon in to help me manage the litigation was, by far, the best decision I made throughout the litigation.  The only thing I would do differently if I had the opportunity to change anything is his title would have been Special Master of All.

That would have just been one order, and I wouldn't have had to modify and expand your role.  But from the bottom of my heart, thank you for everything.

And then finally, nothing as extraordinary as this settlement -- it's been referred to as landmark, it's historic, it is unprecedented obviously in its size and magnitude, but nothing like this occurs in litigation without skilled professional leadership on both sides.  And I want to right now take a moment to reference individuals that were involved the last few intense months.

Chris Seeger was right.  The parties have been negotiating and trying to find a resolution for the better part of two years, but the last four to six months have been intense.

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 139 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 86 of 88

85

There were, I know, a number of individuals involved in those meetings and negotiations, some of whom I'm probably not even aware of. I do know from the plaintiff side we have Mr. Aylstock, Mr. Seeger, Mr. Clark, Mr. Moreland, Mr. Seeley. Very, again, intensely different roles in that process, but all important roles.

And then on the defense side we had Mr. Perrelli, Ms. Wright, and Mr. Andolina, who -- and maybe others, but those I'm aware of from the last few months.

And I want to take a final minute to award the MDL MVP award to Bryan, Chris, Tom, and Mike. As I said, nothing like this and this extraordinary happens without extraordinary leadership, and you all here at the end really brought this to the finish line. Something like this, again, doesn't happen without that leadership. And I mentioned you four because I saw it -- I heard it, I saw it, I heard about it from Judge Herndon, Judge Cannon. They shared my feelings in this regard.

But, again, you all had to have a professional respect for one another and a level of trust as well as a joint resolve on both sides to reach an agreement or this would never have happened. If any one of you four had faltered or blinked -- and I'm sure you blinked a few times, but you all understand -- this just wouldn't have been achieved. And so I would like to say to each of you that you got it done, you should be very proud of what you've gotten done, it is fair and it is smart, and I

congratulate you on that job very well done.

Okay.  Judge Miller, thank you for being here.  I wish you could have been here in person as well, but maybe next time I'll come to Minnesota if we need to have another hearing.  I've never been to Minnesota, and so I would like to do it sooner rather than later because it's going to get really cold there soon.  But I appreciate you being here today for this historic Case Management Conference and offering the remarks you did.

Do you have anything you'd like to say in closing?

JUDGE MILLER:  I really can't build upon what you just said.  I agree with everything you said, other than giving a shout-out to my leadership too.

THE COURT:  Yes.

JUDGE MILLER:  Judge Keyes is as essential to me as Judge Herndon has been to you.  And then also my folks -- Dan Gustafson, Rick Paul, Ben Hulse -- I know you have all been working your fingers to the bone in the last few weeks and months as well.  So thank you.

I agree this settlement is monumental, but it is fair, and I hope every claimant who is aware of this, watching this today or in the future, takes everything that was said here today to heart and signs up.

THE COURT:  Okay.  Very good.  And I echo that.

And I think our next hearing will likely be the fairness hearing on the stock transfer, unless something else

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 141 of 234
Case MDL No. 2885    Document 2033-4    Filed 12/10/25    Page 88 of 88

87

comes up in the meantime.  And if so, you'll let me know.  But otherwise, I don't think we have a date for that scheduled yet, and we will get that scheduled when it's convenient for the parties.  I don't want to put it off too long, but we'll get that scheduled.

And otherwise this proceeding is adjourned.  I wish you all well.

*(Proceedings adjourned at 11:14 a.m.)*

\* \* \* \* \* \* \* \*

I hereby certify that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter, pursuant to the provisions of Section 753, Title 28, United States Code.

*Julie A. Wycoff*                                    9/11/23

_____        _____
Julie A. Wycoff, RMR, CRR                Date
Official U.S. Court Reporter

# EXHIBIT 3

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 143 of 234
Case MDL No. 2885    Document 2033-5    Filed 12/10/25    Page 2 of 48

1

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION, ) ) ) ) In re:  BRANDON CANUP ) 8:20cv14021 ) ) ) ) | Case No. 3:19md2885 Pensacola, Florida March 13, 2024 10:06 a.m. |

STATUS CONFERENCE

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE

(Pages 1-47)

A P P E A R A N C E S

FOR THE PLAINTIFF:     Law Office of David G. Gamble
                       By:  **DAVID G. GAMBLE**
                            *davidgamblelaw@gmail.com*
                       2805 Vermont Court
                       Arlington, Texas  76001

                       Aylstock, Witkin, Kreis & Overholtz, PLLC
                       By:  **BRYAN F. AYLSTOCK**
                            *baylstock@awkolaw.com*

                            **BOBBY J. BRADFORD**
                            *bbradford@awkolaw.com*
                       17 E Main Street, Suite 200
                       Pensacola, Florida  32502

*Donna L. Boland, RPR, FCRR
Certified Court Reporter
1702 E Baars Street * Pensacola, Florida  32503*
**DLBolandUSCR@gmail.com**

2

APPEARANCES: (cont'd)

FOR THE PLAINTIFF:           Mostyn Law
                            By: **MICHAEL A. BURNS**
                                *epefile@mostynlaw.com*
                            3810 W Alabama Street
                            Houston, Texas  77027

FOR THE DEFENDANT:          Moore, Hill & Westmoreland, PA
                            By: **CHARLES F. BEALL, JR.**
                                *cbeall@mhw-law.com*
                            350 W Cedar Street, Suite 100
                            Pensacola, Florida  32502

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 145 of 234
Case MDL No. 2885    Document 2033-5    Filed 12/10/25    Page 4 of 48

3

P R O C E E D I N G S

**THE COURT:**  Good morning, Mr. Canup and Mr. Gamble, I believe.  It's nice to see you both, and I appreciate you coming this morning.

I'm Judge Casey Rodgers.  I am the judge presiding over the 3M Combat Arms Earplug MDL.  I've been presiding over it for some time now, more specifically since April of 2019.

Also in the courtroom today from plaintiff's leadership there's Mr. Bryan Aylstock, Mr. Brad Bradford, and Mr. Mike Burns.

Good morning.

And then, from 3M, Mr. Charles Beall.

So, at the time that the parties entered into that global settlement agreement, which was in August of 2023, it was contemplated that the Court would schedule a conference -- this conference -- with every plaintiff who elected to opt out of the settlement.  And there were a couple of reasons for that.

First and foremost, I thought it would be important and hopefully helpful given the sort of massive undertaking of the MDL and enormous amount of time and energy, I'm sure you can imagine, resources and money went into that litigation and contributed to the global settlement.

You all -- neither one of you were here for that litigation.

4

Mr. Gamble, you actually came in very recently as counsel for Mr. Canup.  Previously he had separate counsel throughout his case, but his case was like hundreds of thousands of others that never saw the inside of the courtroom, for obvious reasons.

But, because of that, I felt it would be important to meet with those who are going to continue forward with their cases to have some understanding from me, from my perspective, about the litigation and the extraordinary nature of the litigation before you decide ultimately to go forward with your case, although I know that's the decision you've made, and that's fine.  We'll talk about that.

But I also felt -- along those lines, I also felt, as a second reason for these conferences, that it's important for me to afford all plaintiffs who have opted out -- and there are not very many, frankly, which is quite extraordinary -- that you all be afforded one final opportunity to participate in the settlement, if you choose to do so, before the final settlement registration deadline, which is March 25th.

And I felt it would be important for you to be here to meet with me, be able to ask me questions, if you have any questions.

Also, as you can see, leadership counsel from the plaintiffs' side is here, if you have questions of them and/or 3M as well.

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 147 of 234
Case MDL No. 2885    Document 2033-5    Filed 12/10/25    Page 6 of 48

5

And then there's also an opportunity following my remarks for you all to meet with the magistrate judge assigned to this litigation, Judge Hope Cannon, who is very, very familiar with the settlement. She was an instrumental part of that settlement, and she knows the program very well, in case you have questions about the settlement program.

From experience, I've seen where -- and this isn't -- I'm not talking about you all specifically, but in other instances it may be that the plaintiff didn't have a full understanding of the settlement program and how he or she might fit within the various aspects of the program, including the EIF aspect of the settlement program. And there have been some questions about that from other opt-out litigants. So, again, that will be an option for you, if you choose to take advantage of it.

I realize that being here for you today is a big commitment. And again, I appreciate you making that commitment, both of you. I know you're not local. 99.9 percent of the plaintiffs in this litigation are not local.

But it's also a good opportunity for me just to let you know, particularly if you had been *pro se*, Mr. Canup, which you're not. But some who are similarly situated to you in terms of having opted out, they are *pro se*, meaning they're representing themselves. They don't have counsel. They either never had counsel or their counsel has withdrawn.

6

And so, it's a good time for me to make sure that everyone understands that appearing in court -- believe it or not, even though, you know, we're in this age of technology where we can do things like Zoom very easily, appearing in court is part of litigation.

With you having counsel means for you fortunately most of the time your counsel can appear on your behalf other than today.  But for a *pro se* litigant, those individuals need to know that it's just part and parcel of litigating.  You have to follow court orders.  And if the Court directs you to appear in person in the courtroom, then you have to be here.

Mr. Gamble certainly knows that as an officer of the Court.

So, I'm not going to twist your arm today.  You're not here for that purpose in trying to get you to settle your case.

I do want you to have an opportunity to talk more about that, if you'd like.  You're not required to.

We're here.  I mean, you've made the decision to opt out of the program, and that's your right.  And you've made that decision and, frankly, that's why we're here.

But it's not -- we're going to talk about this.  But it's not as simple in just saying *I want to take my case to trial, I want to fight, you know, I want a jury trial*.  It's not that simple.

And Mr. Gamble, I'm sure, has had some discussions

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 149 of 234
Case MDL No. 2885    Document 2033-5    Filed 12/10/25    Page 8 of 48

7

with you about that; and if he hasn't yet, he will.  There is a lot more to litigating a case than simply saying *I want to litigate my case.*

And this litigation takes on a new meaning because there are certain hurdles that you have to get over -- all people or claimants who are situated like you, you have to get over before you'll ever get to a jury trial.  So we'll talk about those challenges.

But let me first, before I talk about the challenges, just briefly discuss the settlement program and the litigation.

And from my perspective -- and, frankly, I don't know of anyone who has a better perspective than I do to talk to you about the settlement program and about the litigation.  Because, frankly, I'm the only neutral in the courtroom, and I have been very closely associated with the litigation for the nearly five years that I've had the MDL.

I'm very familiar with the claims, very familiar with the defenses, very familiar, obviously, with the management of the litigation throughout the four-and-a-half years or so prior to the settlement, and I'm very, very familiar with the settlement as well.

But the litigation, from my perspective, this litigation in particular, has been extraordinary for several different reasons, not the least of which is the fact that it's the largest MDL in the history of the judiciary.

8

Never before -- not asbestos, not mesh, not BP Deepwater Horizon -- none of those MDLs even come close to the size of this MDL.  And for most of its life, this MDL has occupied a third of the federal judiciary's entire civil docket.

And so, it's extraordinary in that sense because not only is it a big litigation for the parties to have to deal with, but it's a huge undertaking for the judiciary. Extraordinary.  And there's a lot of strain and toll that has come with the litigation.  So it's been extraordinary in that respect.

It was also extraordinary -- and these are things you won't really know any firsthand knowledge about.  Maybe you've heard about some of the things I'm going to mention to you. But you weren't here, like I said, you weren't here on the ground in the trenches for the litigation.

But one of the things right out of the gate that was unique about the 3M litigation was the fact that so much of the discovery, which, Mr. Canup, that means the factual information, the data this is typically in the hands of either the parties, sometimes it's in the hands of a third party, but not to this magnitude.

And what I'm referring to is that most of the factual data was in the hands of the Department of Defense and the Department of Veterans Affairs or the Veterans Affairs

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 151 of 234
Case MDL No. 2885    Document 2033-5    Filed 12/10/25    Page 10 of 48

9

Administration.

And trying to convince those government agencies to produce the amount of data that was necessary to be produced in this litigation, given the number of plaintiffs, was difficult, to say the least.

I traveled to the Pentagon with the parties on a couple of different occasions to the Department of Justice. There was a couple of years' worth of relationship building in trying to get the data. Because there's no question in my mind, if we have to do this on an individual basis, claimant by claimant or plaintiff by plaintiff, servicemember by servicemember, without a centralized process for obtaining that data, we would have been here for years and years and years.

I'm a veteran Army soldier. And when I was first assigned the MDL, I decided to -- because I knew this was going to be an issue, I decided to apply to the National Archives for my records from the '80s, and I still haven't gotten them.

So it's obvious that that would have been unrealistic to think with that many plaintiffs -- at the time I'm talking about we were probably 150,000 to 200,000. Of course, it grew from there.

The other thing that's extraordinary, a couple of other things, in addition to the common, sort of, the military discovery that was in addition to the corporate discovery that was conducted here was some of the defenses in the litigation.

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 152 of 234
Case MDL No. 2885    Document 2033-5    Filed 12/10/25    Page 11 of 48

10

And one of those, notably, is the government contractor defense.

Mr. Gamble is probably familiar with this.

Mr. Canup, you are probably familiar and understand that, as a servicemember, you're precluded, just like I was precluded, from suing the military based on a service-connected or service-related injury.  It's called the Feres Doctrine.

Well, when you have a government contractor who builds things for the government -- designs or builds for the government and then people are injured as a result of that, that contractor can raise what's called the government contractor defense.

And if it's granted -- if that defense is accepted, then that contractor moves into the shoes of the United States military and is entitled to sovereign immunity like the military from those claims.

And so, 3M raised that defense right off the bat in the litigation, and I frontloaded that because I didn't know what my ruling would be, I had no idea, but I knew it was a potentially dispositive issue.

And what that means is, the issue was such that, if I granted 3M the defense, if I said, yes, you're entitled to the defense, the game is over, the case is over for everyone, there is no live case.

So that was something that had to be dealt with, and

11

it was unique. At the end of the day, I ruled in favor of the plaintiffs and against 3M and actually granted judgment in favor of the plaintiffs on the issue.

However, the issue was part of every appeal that was taken -- I'm getting a little ahead of myself. But you know there were trials in this litigation, and every one of those plaintiff verdicts was appealed by 3M.

The settlement was reached before those appeals had been decided, although one was -- the first was very close to a decision. There had been oral argument and I suspect a decision was imminent at the time of -- certainly at the time of the settlement.

It's anybody's guess what the Eleventh Circuit, which is the circuit that -- court of appeals that decides issues in this geographic area from my court -- anybody's guess what the court ultimately would have done with that.

They could have decided that I was entirely wrong and granted 3M the defense, which would have meant game over for everybody. They may have decided that I was partially wrong or incorrect, in that, there was a jury question on that issue, which would have meant that those verdicts would have been reversed, those cases would have come back from the appellate court for retrial here, and that issue of the government contractor defense would have been a jury question. And then the juries would have each decided -- the parties would have

12

litigated that issue in front of the jury, and the jury would have made a decision on that defense.

But I guess the point of this is it is -- that was a bit extraordinary.  But the other thing that's something you should keep in mind, both of you, is this is still a live issue.

As I said, it was never decided -- the issue was never decided on appeal by the Eleventh Circuit.

And so, Mr. Canup, if you continue forward and you end up at some point with a trial, if you prevail at that trial, there is no doubt that 3M -- I'll let Mr. Beall speak to this -- but 3M will appeal, and that issue is still a live issue on appeal.  So they will argue it and the Eleventh Circuit will -- ultimately may have to decide it.

Also, I mentioned, again, the verdicts, so obviously there were trials.  This was most certainly extraordinary as part of this litigation or any litigation, frankly.

There were 16 bellwether trials.  Bellwether means we selected the most representative sample of cases that we could come up with, and they were truly -- in my mind it was a -- one day, if you're interested, I can explain it to you.

But it was a very good process that we went through statistically -- it was random at first and then there was a statistical analysis applied called a prevalence analysis to come up with a representative sample.

13

And we did that and ultimately there were 19 plaintiffs who went to trial over the course of 14 months in 16 different trials. So two of the trials had consolidated plaintiffs, so they had more than one case in a trial. But there were 19 verdicts in 14 months.

I presided personally over six of those trials. I covered for judges in two of the other trials. And I observed every single trial -- if I didn't preside over it, I observed it live via Zoom. And sometimes I had more than one Zoom going at a time because we had trials that were overlapping throughout the district. Again, it was pretty extraordinary.

But I saw, as part of those trials, 13 plaintiffs prevail, and I saw a devastated six plaintiffs lose entirely. And then, from there, again, appeals in every one of those cases.

The other thing that was extraordinary about the litigation -- and again, this was done at random, too. You may be sitting there thinking, Mr. Canup, why was I on the sidelines with -- you weren't alone, I promise you that. There were hundreds of thousands.

The bellwethers were pulled at random, as I said, literally at random. And then the wave cases, which I'm getting ready to talk about, there were four waves. We called them waves because they were cases that were worked up for discovery and they're called waves because they overlapped in

Case 3:26-cv-03359-MCR-ZCB   Document 23   Filed 12/29/25   Page 156 of 234
Case MDL No. 2885   Document 2033-5   Filed 12/10/25   Page 15 of 48

14

terms of their discovery periods. But there were 500 per wave, so roughly 2,000 cases in the beginning, and they were all pulled at random.

So it's just the luck or not the luck, however you want to look at it, whatever your perspective it, of the draw, in terms of what claimant got into the courtroom versus claimants who didn't. There was nothing intentional about that other than to have a random process and then a representative process for the bellwethers.

One other unique aspect of this litigation that I'm sure both of you are aware of, and I'll just touch on it briefly, was the Aearo bankruptcy. And that was -- "detour" seems to be maybe an understatement. But it certainly took this litigation out of commission for a while.

Aearo was essentially a subsidiary of 3M. They were the company that 3M purchased in 2008 that actually designed the plug. And they filed a bankruptcy. We're not going to get into the specifics of that, but it was -- that direction that the litigation was heading in at that point would have looked very, very different in terms of an ending for the plaintiffs than what happened here.

There are -- again, I don't want to get too technical, but there are automatic stays that come into play when a company files bankruptcy. The company is always seeking a channeling injunction that would prevent future litigation

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 157 of 234
Case MDL No. 2885    Document 2033-5    Filed 12/10/25    Page 16 of 48

15

against that company, they're always seeking third-party releases.

There's a super majority rule where individuals, if there's a plan that is confirmed and it is agreed to by a certain number of the claimants in existence at the time, it can be decided for other claimants who may not agree with the plan that the plan is acceptable and those plaintiffs have to live with that at least for the moment.

The Supreme Court is right now considering some of these issues. But, as it stands right now, state of the law, that's how it works in bankruptcy.

It didn't happen here, but it can still happen. I guess the point is 3M never filed bankruptcy in this litigation. Aearo filed bankruptcy.

However, 3M, they can still file bankruptcy. There's nothing that precludes them from filing bankruptcy. I don't want them to file bankruptcy, but I can't preclude them from filing bankruptcy.

Do I think it's going to happen? No.

Do I know it's not going to happen? No.

I don't know anything about, really, their business model, what pressures they face. I know what I read, just like everybody else, what you read in the press about their business model and spin-offs and things that they're doing and stocks and dividends and those kind of things. I don't know. I mean,

Case 3:26-cv-03359-MCR-ZCB   Document 23   Filed 12/29/25   Page 158 of 234
Case MDL No. 2885   Document 2033-5   Filed 12/10/25   Page 17 of 48

16

I don't know.

I know they have other litigation hanging over their head -- "they" meaning 3M -- that is substantial, and it's not just this litigation. It's the PFAS litigation that you may have heard something about. So that's another sort of extraordinary aspect of this.

And then finally, the last point I'll make as far as how extraordinary this litigation has been -- and this speaks to, in my view, the fairness of the settlement, and I do believe the program is fair under the circumstances, most of what I've just discussed -- but the fact that there's nearly 100 percent participation by claimants.

So there were just over 300,000 plaintiffs who appeared on a declaration form on September 12th of 2023 -- that was the reference date -- and then ultimately some were -- many were dismissed for different reasons, but ultimately just over 250,000 claimants registered for the settlement -- or registered for the program.

You had to register to -- you registered. But then, when you register, you decide are you opting in or are you opting out.

And so, as far as registering and opting out, we have under 20 cases, 20 plaintiffs who have chosen not to participate in the settlement in favor of litigating. Everyone else has opted into the program. That is extraordinary. The

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 159 of 234
Case MDL No. 2885    Document 2033-5    Filed 12/10/25    Page 16 of 48

17

percentage is, I don't know, 99.99999, something like that. It's very, very, very, very high in terms of participation rate.

So let me speak just a minute, Mr. Canup and Mr. Gamble, to how your case will proceed going forward.

For the reasons I just went over with you, the magnitude of the litigation, the toll of it on not just the parties but also on this Court but also on the judiciary as a whole, it was my decision at the time of the settlement to enter case management orders to effectuate the settlement program but also to manage the litigation going forward.

And at that time, obviously, we had no idea -- I certainly had no idea about how many plaintiffs would actually opt in versus opt out. I didn't know.

But given the toll that the litigation had taken already and the advanced stage of it, you know, pushing five years at that point, the amount of data points that the parties had already gained through the bellwether process, I felt it was important to put in place CMO 57, which is Case Management Order No. 57, and require people going forward to comply with the requirements of that order.

And some may say, *Well, Judge, I don't think that's fair. This isn't the type of order that you enter in a one-off case or in your other civil cases on your docket.*

And I guess my response to that is there's nothing

Case 3:26-cv-03359-MCR-ZCB   Document 23   Filed 12/29/25   Page 160 of 234
Case MDL No. 2885   Document 2033-5   Filed 12/10/25   Page 19 of 48

18

ordinary about this litigation.

You may feel like, well, it is ordinary, it's unique -- or it's unique, it's ordinary to me or it's unique to me, and I shouldn't be lumped in with all these other people who have made up this litigation. But you are. I mean, it is what it is. You are a part of this litigation.

And this Court has lived this litigation for nearly five years, and I understand it. I understand the complexities of it. I understand the science, which I'll talk to you about in a minute. I understand what juries have done and what they can do, what they won't likely do with certain types of evidence.

Again, there's a great deal of data that I have and the parties have. And so, people who are going to go forward in the litigation, they'll have to meet these requirements in order to do that because there's a lot at stake.

It's a lot to try these cases, and, if you go forward, you will certainly figure that out.

So I'm not going to walk -- you have counsel. And even if you were *pro se*, I wouldn't walk you through every line of CMO 57. It's 39 pages.

I'm sure Mr. Gamble has familiarized himself with it. He understands that you and he are both bound by it.

But just to highlight a few of the features, there are 30-day deadlines, and there's a number of different sort of

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 161 of 234
Case MDL No. 2885    Document 2033-5    Filed 12/10/25    Page 20 of 48

19

categories of production and things you're required to do. And those deadlines for you passed on February 20th.

There is a cure period in CMO 57. And what that means is it's a period where 3M will notify the plaintiff of anything they perceive to be deficient as far as the production of documents, and then there's a 30-day cure period following that notification.

And then, following the cure period, if there are still deficiencies, then there will be a show-cause order, and the parties will come before the Court, and I'll resolve it.

You and Mr. Gamble may say there are no deficiencies. Mr. Beall and his stable of lawyers may say, yes, there are deficiencies. And then I'll need to decide if there are. And if you have been noncompliant with the order, then I will take that and I will rule.

There has been a deficiency letter issued to you. It was issued on the 8th. And so the cure deadline for that would be April 8th. I think the 7th is a Sunday. But there are a number of deficiencies. Mr. Beall can speak to this, if he wishes.

There's also a requirement in CMO 57 that I don't believe has been complied with, and it was for you to provide an affidavit regarding the statute of limitations.

Given the age of the cases that were filed -- and yours, I believe, might have been filed in 2020. I could look

Case 3:26-cv-03359-MCR-ZCB   Document 23   Filed 12/29/25   Page 162 of 234
Case MDL No. 2885   Document 2033-5   Filed 12/10/25   Page 21 of 48

20

back and confirm that.  But given when the plug was last -- and I know the answers to these questions.  You and your counsel may not know.  But given the time frame where the earplug ceased to be in existence in terms of being manufactured and distributed, there's a good bit of time between that date and the date that cases were filed.

I've made a number of different rulings on the statute of limitations throughout the bellwethers.  But for purposes here, you are required to submit that affidavit, and I don't believe you've done that.

And so, frankly, Mr. Gamble, the case is subject to dismissal on that basis alone if that hasn't been done.  I don't know why it hasn't been done, but keep that in mind.

If you are allowed to submit that, if there's -- I don't know that there's a cure period for the affidavit.  I'd have to look back at CMO 57.

But to the extent you're not in violation yet of the order or if you are in violation of it and I agree with you that there's some sufficient reason for that and I allow you to submit it out of time, one of the first things that will happen in this litigation going forward is that I will set up an early dispositive motion structure for statute of limitations.

And that will include a limited deposition, Mr. Canup, of you by 3M strictly on the issue of statute of limitations, not everything else to do with your case and your claims and

Case 3:26-cv-03359-MCR-ZCB   Document 23   Filed 12/29/25   Page 163 of 234
Case MDL No. 2885   Document 2033-5   Filed 12/10/25   Page 22 of 48

21

damages and all of that. But on statute of limitations, that will happen.

And then 3M will be given an opportunity -- you, too, as well, either side -- to file a dispositive motion on the issue of statute of limitations. That will need to be addressed before the case goes forward.

The other thing that CMO 57 imposes, I guess, as a requirement is the need to disclose experts and expert reports. And you have 60 days from the date you elected to litigate to do that. That deadline is March 18th. That is subject to a cure period, another 30-day cure period.

So, depending on 3M's notice to you of any deficiency with regards to expert reports, your reports could be due as early as April 18th. Again, that depends on the notice from 3M.

But this expert deadline is a red line. It is a strict deadline. You cannot move forward in your case without an expert. The litigation regarding -- well, the litigation, as I've said, was complex. But it was complex not just because of the size of the litigation. It was complex because of the medical science and what was required as far as proof by the plaintiffs to convince a jury, you know, that not only that the plug was defective -- that's a big part of it -- but also that that defect caused your specific injury.

And the medical science on hearing is complex. I'll

22

say it's complex. No plaintiff in any jurisdiction in this country, whether it's here or some other jurisdiction in some other district in federal court or state court, can get to trial in one of these cases without a medical expert. It won't happen.

What we saw in the bellwether trials were multiple -- not just one expert, there were multiple experts. There were audiologists, there were ENT doctors, there was a subspecialty of ENT of surgeons called neurotologists, there were acoustical engineering experts, there were ballistics experts, there were military contracting experts.

And I'm sure I'm leaving some out, but there were a number of experts and not just on the defense side. I mean, these were on the plaintiffs' side and then they were met with defense experts.

But for the bellwether plaintiffs, those experts cost over $200,000 per case, and that did not include travel cost. And I know this because I keep track of costs in the bellwether litigation.

And so, in excess of $200,000 per plaintiff bellwether case just for experts. And those are the expert costs, not the attorney time, but these were expert fees.

I saw, Mr. Gamble, in your disclosure -- there was a 26(a) disclosure that your expert witnesses will be disclosed -- I'm quoting -- "by the deadline specified in the Court's

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 165 of 234
Case MDL No. 2885    Document 2033-5    Filed 12/10/25    Page 24 of 48

23

orders."

I just want to make sure you know and it's clear that you have a court-imposed deadline for your experts.

**MR. GAMBLE:** Yes, Your Honor. And we do intend to have both a medical expert and a vocational/damages expert disclosed by that time.

**THE COURT:** Okay, very good. I just didn't want you to think there was going to be some other order entered setting a different deadline.

Okay. So, Mr. Canup, as I said, I've served in the military, and I can only imagine -- you know, no doubt, you've suffered a great deal, you've sacrificed a great deal and I have no doubt you've suffered a great deal.

And I suspect that you -- I don't know you personally, but I suspect that you believe strongly that the CAEv2, the earplug at issue in this case, is responsible for the suffering you've endured. And I sympathize with that. And as I said, I sat through many, many, many, many of these trials.

But something -- I would be remiss if I didn't say this to you, having sat through all of the trials and seen what it takes to get through a trial, is that it's not enough to believe in the merits of your case. I mean, it's just not.

Obviously, you have to prove -- you have to prove your claims, again, no matter how strongly you believe in them. And everyone I've met in connection with this litigation, every

24

plaintiff I've met believes vehemently to their core in the merits of their case.  And even your lawyer believes in the merits of your case.

You still have to prove it on legal issues to me but then from a factual standpoint ultimately to those people who sit over there in the jury box.

And you've got to prove it to them based upon the law and based upon the evidence.  And that evidence has to be admissible, and it will have to show by a preponderance of the evidence that the CAEv2 is defective.

And by the way, you don't get to use other jury verdicts to do that.  Those jury verdicts are inadmissible.  So no one will ever stand up in this courtroom or any other courtroom and argue to your jury that they should find that the CAEv2 is defective in your case because some other juries found that in another case.  That will never be permissible in the courtroom.  So you have to prove that yourself with your own evidence.

And then, also, that the specific defect caused, as I said just a moment ago, caused your specific injury and damages.  And in your case, I don't believe you have a hearing loss claim.  Your short form complaint references only tinnitus.

If you had a hearing loss claim, you'd have to show that you sustained a hearing loss at a certain decibel level

25

from noise exposure, and then, for tinnitus, that you sustained a noise-induced injury causing your tinnitus while you were wearing the Combat Arms Earplug and that you wouldn't have otherwise suffered.

And that was the cases where 3M -- the trials where 3M came away with a defense verdict were cases where the juries just did not believe the plaintiff's injury had been caused while the plaintiff was wearing the earplug.

So, in the military -- I know this and you know this -- there is a lot of noise a lot of the time. Noise is everywhere in the military. And again, I can say that as an enlisted soldier.

Whether you're in the motor pool, whether you're on the range, whether you're flying a helicopter, whether you're fixing helicopters on a flight line, there's noise everywhere, like I said. Could be generators. But you'll have to contend with that. And in every bellwether trial that had to be contended with as well.

And it's not because these jurors in the six cases that I'm talking didn't like the plaintiffs or didn't believe the plaintiffs. In fact, nothing could be further from the truth or the case.

These plaintiffs in those six cases or six trials were extraordinarily likeable. I mean, they were personable. They were nice people. They served our country.

26

One in particular that comes to mind, a Mr. McCombs, had a story of incredible bravery.  He was in a forward operating base in Afghanistan and out on missions to find the bad guys.  Very compelling story from him.  And he had injury.  He had both tinnitus as well as hearing loss.

And if I recall, he had significant injuries.  But the jury could not find that he was able to prove that his injuries were suffered while wearing the plug and exposed to noise and not from some other exposure to noise.  And that was difficult.

Mr. McCombs's jury in particular, a couple of the jurors had tears in their eyes.  They were very saddened that they had to reach the decision that they did.  But under the law, this jury followed the jury instructions and ruled against Mr. McCombs.  Hard for them to do.

And there were others.  Like I said, Mr. McCombs wasn't the only plaintiff who went to trial and lost their case, but they lost everything.  It was over.  And no issues really to appeal on the plaintiff's side.  So that was difficult.

But I just, again, I know that folks have heard a lot about the bellwether trials so there's been a lot reported about them.  None of those reports are by people like me, a judge who sat and listened to every single bit of evidence and knew the law in every single one of those cases.

But there are reports of huge verdicts.  And there

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 169 of 234
Case MDL No. 2885    Document 2033-5    Filed 12/10/25    Page 28 of 48

27

were huge verdicts, but there were also goose egg verdicts, and those people were devastated.

And it wasn't because their lawyers didn't do a phenomenal job.  They did a phenomenal job trying those cases, and they had some of the best experts -- Mr. Beall will tell you that -- some of the best experts you could imagine on the various issues that I've just discussed, but they still lost. And it wasn't because they weren't injured.  They just couldn't prove that causation.

So I understand -- Mr. Gamble said that you are going to have your experts disclosed and the reports done in a timely fashion, and that's good.

One of the things that I wanted to go over with you, again, because you're here today for me to have a discussion with you about -- and I feel like I would be remiss if I didn't -- about some of the pitfalls of going forward.

I wouldn't want you or anyone else similarly situated to you, Mr. Canup, to have your case dismissed or to have a jury find in favor of 3M and tell you, like they did Mr. McCombs and others, *We don't believe you've proven your case*, without me having had this discussion with you.

It's expensive to go forward with what you're going to take on.  And maybe you're independently wealthy and Mr. Gamble has plenty of money to spend.  They will see to it that you spend it, that I can assure you.

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 170 of 234
Case MDL No. 2885    Document 2033-5    Filed 12/10/25    Page 29 of 48

28

I would be remiss, I feel like, if I didn't have this discussion with you. And you're not the only one I'm talking to like this. I've talked to others, and there's more still to go. As I said, there's some 20 or so people who have opted out.

But, in reviewing your specific DOEHRS data -- and again, I don't believe you have a hearing loss claim. Your complaint is based on tinnitus. And that's probably because your audiograms are all within normal limits.

There was one -- and I don't want to get too in the weeds, but these are things you should know to talk to your expert about. There was one 15 decibel shift at 4000 hertz, and I think it was 2011. But you're still at a 15 dB, so this is still within normal limits. I think you went from a 0 to 15, but you're still within normal limits.

And so, your audiograms are all within normal limits. Maybe that's why there is no hearing loss claim in your case. That would make sense.

But even with normal audiograms -- so, in a courtroom, a normal audiogram is the sort of kiss of death for a hearing loss claim. But in the settlement program, there is an opportunity or a possibility/opportunity for an EIF claim, which is an extraordinary injury fund claim, even with someone with normal audiograms.

And I will let you talk with, if you and your counsel

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 171 of 234
Case MDL No. 2885    Document 2033-5    Filed 12/10/25    Page 30 of 48

29

would like, with leadership more about this, or Judge Cannon, if you like, but there's something called hidden hearing loss that the settlement program has recognized as a category of EIF.

So, with ordinary or normal audiograms, there's no space for you in EPP or DPP with just hearing loss because you have normal audiograms. But there is a space in the EIF possibly, again, for hidden hearing loss. And that means those are people who have normal audiograms but otherwise have injury to their auditory pathway. And so that can be discussed with you as well.

But your tinnitus claim -- and I believe that is the claim that you have -- and by the way, just for Mr. Gamble's benefit, I don't believe -- and Mr. Aylstock can correct me if I'm wrong -- I don't believe any of the bellwether cases were tried based on tinnitus alone. I don't believe we had a strict tinnitus alone -- that that was the only claim.

I think there was a question about one of the plaintiffs where the jury hung their hat. But I think that the case that was presented in all of them included tinnitus and hearing loss.

Am I wrong or right?

**MR. AYLSTOCK:** I think that's right, Judge. There was a dispute on one case about whether -- I think it was Mr. Adkins -- had hearing loss or not, but we certainly presented

Case 3:26-cv-03359-MCR-ZCB   Document 23   Filed 12/29/25   Page 172 of 234
Case MDL No. 2885   Document 2033-5   Filed 12/10/25   Page 31 of 48

30

it.

THE COURT:  Right, it was presented that way, yeah.

MR. AYLSTOCK:  Yes, Judge.

THE COURT:  So I guess my point is there has not yet been a test case that I'm aware of on just tinnitus alone.  I'm not aware of.  That doesn't mean that there can't be.  I'm just saying we don't have anything to point to as far as just that type of case.

But regarding your tinnitus, Mr. Canup, there actually is no -- there's no record or any indication of tinnitus in DOEHRS data.

You do have a 10 percent VA rating service-connected for tinnitus from 2013 at the same time the bilateral hearing loss rating was denied, but the tinnitus was granted.  And that service-connected rating would open a door for you with EPP as far as the settlement program.

But with the courtroom, it's going -- it's difficult, I mean, it's going to be more difficult to prove your tinnitus than --

When you're in the settlement program, what the settlement administrators look for is evidence to support your claim.  They don't really look at evidence to contradict your claim.  Do you have evidence to support it.  They're not really interested in whether there's evidence to contradict it.

In the courtroom, quite the contrary, because that's

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 173 of 234
Case MDL No. 2885    Document 2033-5    Filed 12/10/25    Page 32 of 48

31

what these guys -- that's what they do.

And here, you have this tinnitus rating from 2013. And there's a reference also, in addition to -- and I guess this is what the VA sort of hung its hat on, there was a reference to tinnitus in 2013.  But there were other references in 2013 that indicate you don't have any difficulty hearing.

There's also -- and I think this is something to take note of -- during the time frame that you say you wore the plug -- the earplug and were injured was during your deployments in 2010 and 2011.  Those are the years you say you wore the earplug.  But on your post-deployment assessments, both of them, you report "no" to tinnitus.

So I'm not saying you can't prove your tinnitus claim. If the jury just disregards these records and just believes you from the witness stand, maybe so.  But again, that's a problem. I can tell you that's a problem.

There also is something else that I think that you and Mr. Gamble do need to be aware of because this was a feature in some of the trials, but I don't know that I ever saw it to this level or degree.  But there are references in your records to you never wearing hearing protection devices during your deployment.  And that's when your -- obviously, that's when you claim your ears were damaged.

But if there were periods on your deployment where you never wore hearing protection, that's going to be a problem for

Case 3:26-cv-03359-MCR-ZCB   Document 23   Filed 12/29/25   Page 174 of 234
Case MDL No. 2885   Document 2033-5   Filed 12/10/25   Page 33 of 48

32

you.

I don't know whether that's true or not. And I'm not here to make any credibility -- obviously, that's not why we're here. But I don't even know if you know this, that this is in your records. And maybe you and Mr. Gamble have a good response for that. You'll need one, because these guys don't miss anything.

So I'm not telling you that you're not going to win your case, if you get to trial, or that you're going to lose your case. I have no idea. I just know that there's certainly a possibility you will lose your case. That's how it is with any litigation. No one knows what a jury will do.

And I know for some people I've talked to, you know, they want their day in court. They believe they've been injured, they believe they've been injured by the earplug, they've suffered greatly, and they want some vindication for that.

And believe me, I understand that. But I don't know, if you asked Mr. McCombs or Angela Kelly or some of the others who lost at trial, whether they felt any better or vindicated at having a jury tell them, *We don't accept your case, we don't accept your claim, you haven't proven your case.* Even though you're injured, even though you're hurt, you've suffered, you didn't prove your case, and so case over.

Now, you may be one of the ones that walks out of here

with lots of money.  That's also a possibility.  I just want you and Mr. Gamble to know getting there, even if you do win, is going to take a lot, and then these folks will appeal.

Mr. Beall can speak to that.  They appealed every verdict before.  So there won't be any money until -- no matter how big the verdict is -- until the Eleventh Circuit rules on the issues raised on appeal.

So my purpose today was just to meet with you, to explain to you what this is going to be like going forward, and to give you an opportunity, as I said, to speak with me.  If you have questions, if there's something that I can address for you, I'm happy to do that, if I'm able to.

You have a lawyer, so I certainly -- even if you didn't have a lawyer, I wouldn't try to give you any legal advice.  I'm just giving you my perspective as the judge who has been presiding over this litigation for a long time and has a great deal of familiarity with it so you go forward with your eyes wide open.

And then if you'd like an opportunity, you or Mr. Gamble, to talk with leadership counsel about some of what I've said about the settlement program, some of the more nuanced aspects of the settlement program, that's going to be available to you as an opportunity, if you'd like, and then also Judge Cannon, who is available to speak with you as well and answer any questions.

34

And then, at the end of the day, if you leave here, you know, you're leaving without settling, you're leaving here having heard from me, you know, I feel better about that. You've had an opportunity to ask questions. And then, if you decide to roll the dice, again, that's your case.

That's what our system is about. The courtroom is here. We try cases. And if it's not here, your case will be tried in a different jurisdiction. I certainly cannot tell you when that will happen, though.

Okay. So let me ask, Mr. Aylstock, if you have anything you all want to add, and then Mr. Beall, and then I'll give Mr. Gamble and Mr. Canup an opportunity if they have any questions of me.

**MR. AYLSTOCK:** Thank you, Your Honor.

Mr. Gamble and Mr. Canup, first of all, thank you for your service. I'm the court-appointed lead counsel. Judge Rodgers gave me the honor and responsibility to lead from the plaintiffs' perspective.

I'll give you a little bit of my take because it might be helpful to you in understanding how we got to where we are.

When this case started, it was sent to Pensacola. And we didn't -- had no idea how big it was going to be. I think I was in chambers with Judge Rodgers and defense counsel, and we estimated maybe there would be 30- or 40,000 cases, maybe up to 50,000.

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 177 of 234
Case MDL No. 2885    Document 2033-5    Filed 12/10/25    Page 36 of 48

35

And it became, as Judge Rodgers said, the largest MDL in history at the time, over 300,000 soldiers and veterans and some contractors as well were in litigation with individual lawsuits.

And that presented a lot of challenges to us as plaintiffs' leadership in trying the cases. It presented a lot of challenges, frankly, to 3M, because they don't -- you know, they're a large company, but they're not -- they don't print money like the United States Government does.

But when we got into this case, we knew our first hurdle was going to be this government contractor defense that the judge indicated. In fact, there were memos written I can show you from so-called experts on our side saying this case is a loser because the government contractor defense gives 3M and its subsidiary Aearo immunity.

And we worked very hard to convince Judge Rodgers that that's not the case, but that issue is still alive. In fact, although we tried all of those cases, my partner Brad, my late partner Neil and I and others, we probably tried half the cases and we were involved in every single one. Mr. Burns was here as well and can attest to that. But everything about this litigation was hard fought.

When it came to the trials, there were no offers provided. We knew we were going to the mat and going to the Eleventh Circuit on that issue, and so we won some and we lost

Case 3:26-cv-03359-MCR-ZCB   Document 23   Filed 12/29/25   Page 178 of 234
Case MDL No. 2885   Document 2033-5   Filed 12/10/25   Page 37 of 48

36

some.

Mr. McCombs, we tried that case, and it was tough on all of us but especially on him to lose it.

But as we progressed and we got over 300,000 claimants, we realized something has to be done, not just -- I mean, obviously, the court system doesn't have the judges, the juries -- nobody would have gotten relief except a select few in our lifetimes because of the timing of it.

We also realized when it came time to pay, there's a limit to what even 3M could pay. And Aearo is the company that developed the drug *[sic]*. It's a little, tiny company out of Indiana and that's who went into bankruptcy and delayed our resolution for a year.

But there's nothing that prevents them, even Aearo, from doing that again, nor 3M, not that we think that they will because we do have the settlement.

But when it came time to negotiate the settlement, we had to take that into account. Because, had the bankruptcy worked -- and I can assure you they thought it was going to work and we fought very hard against it because the amount of money that was being offered to everybody -- and it would have been open to everybody who filed a lawsuit or not. Every soldier, every veteran who said they used the earplugs, it could have been half a million people. And the amount of money that was being offered in the bankruptcy was under a billion

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 179 of 234
Case MDL No. 2885    Document 2033-5    Filed 12/10/25    Page 38 of 48

37

dollars, so we're talking under $2,000 a case potentially.

And the bad thing about a bankruptcy, from my perspective as a trial lawyer who has tried a bunch of cases in this courtroom, is it doesn't give anybody a real choice. You're stuck. If the majority want to confirm the plan or the super majority, it doesn't give our veterans and active duty people a choice.

So we fought very hard for the better part of a year and ultimately won that issue. And that got us, frankly, back to the settlement table, and we were able to get more than six times the amount of money for just the people who had filed lawsuits or were represented at the time.

So the settlement, as a practical matter -- we knew what the net worth of 3M is, and it's different for market cap. Net worth is assets and liabilities. So about 12-and-a-half, I think, was one of the stipulations, and we were able to get about half of that from them. And that's despite the other challenges 3M faced that are completely unrelated to this, including the forever chemicals and there was another settlement for that.

And so I feel very proud of the settlement. Just so you know, I know that we didn't leave anything on the table. In fact, we knew that they didn't have the cash, and we even got them to give us some stock that's now back into cash.

But when it comes time to think about whether the

Case 3:26-cv-03359-MCR-ZCB   Document 23   Filed 12/29/25   Page 180 of 234
Case MDL No. 2885   Document 2033-5   Filed 12/10/25   Page 39 of 48

38

settlement is a good thing, I just want you to know, as lead counsel and a guy who was in the room negotiating it with Brad and others, that we feel that we did the absolute best for you and all the other 250,000 people who decided to participate in the settlement.

The other thing -- and we can go over this if you're at all interested -- we tried to do it in a very objective way with regard to looking at the audiograms.

We had the benefit, because Judge Rodgers and some of us traveled to the Pentagon to get this information from the DoD, of your audiograms and everybody's audiograms that was housed at the DoD.  And that was an enormous effort in and of itself.  But we were able, because of that, to design a system that is very objective.

We look at, okay, what's your military service, how did you get in, when did you get out for your hearing loss, and then, of course, the tinnitus is the other component of it.

So there are potential issues or potential ways to get into the extraordinary injury fund for various things.  Judge Rodgers mentioned that.  Happy to discuss that with you as well.

Because not every tinnitus case is the same.  Some are somewhat bothersome, others it's a heck of a lot worse.  And there's lots of treatment and we can talk about that.

So I guess that's sort of my perspective as lead

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 181 of 234
Case MDL No. 2885    Document 2033-5    Filed 12/10/25    Page 40 of 48

39

counsel about the settlement, the process.  But everything about this case was hard fought.

There was a lot of, a lot of hours spent.  And Mr. Beall and the firms associated with 3M have armies of lawyers, and we fought them back as best we could and got as much as we could for you and everybody else.

**THE COURT:**  All right.  Thank you.  And I can attest to what Mr. Aylstock just said about how hard fought the litigation was.  And I'll turn it over to Mr. Beall in just a minute.

But I've never seen any litigation -- I've been on the bench over 20 years.  I've never seen anything fought as hard as this was fought.  And the stakes were high, no question. But from, I mean, every turn, you know, 3M was right there, and they were not rolling over, just not rolling over.

And I think Mr. Beall maybe will talk further about that.  Because sometimes I worry that some of these -- maybe not you, Mr. Canup, so I don't want to throw you in this pot. But some of these opt-out plaintiffs, they've heard about big jury verdicts, they're not thinking about the plaintiffs who lost their jury trials, they hear about these big verdicts, and they think, well, even if I don't get it to a jury, at some point 3M will just settle with me outside of the settlement program.

I cannot speak directly for 3M.  Mr. Beall can do

40

that.  But I can tell you from my perspective that will never happen.  That will never, ever happen.  They will take you to trial or you will take them to trial, and they will fight you every step of the way getting there, they will fight you all the way through that trial, and then they will fight after that trial.  You may go to bankruptcy in the meantime, depending on how big your verdict is, if you went.  And then they'll appeal.

And my belief -- and again, I don't -- I can't say this based on anything I've heard from 3M directly to me.  But based on my experience with this company, they will pay a verdict before they will settle a case at this juncture.  After everything that's happened, that's my belief.

But, Mr. Beall, why don't you speak for your client instead of me speaking for your client.

**MR. BEALL:**  Thank you, Your Honor.

Thank you, Mr. Aylstock.

And it's a pleasure to meet you, Mr. Gamble and Mr. Canup.  We met just a second ago.

My name is Charles Beall.  I work for a firm called Moore, Hill & Westmoreland here in Pensacola.  But I'm one of the many, many lawyers who are representing 3M in this case.

And we do want to thank you for your service.  We understand that, and we do feel bad for the tinnitus that you say you have.  And we understand that's not something that's fun or enjoyable by any stretch.  We don't want to belittle

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 183 of 234
Case MDL No. 2885    Document 2033-5    Filed 12/10/25    Page 42 of 48

41

that as all.

I know you all feel very strongly about your case, like the people that Mr. Aylstock represented at trial. But I do think it's important to know that 3M feels every bit as strongly on the other side, and not just about whether you can prove the causation issue. But, to this day, we do not believe this plug was defective at all. And at every trial we've had, we've brought in experts to test that, to discuss that.

We have government documents where the government itself tested the earplug and found it to be effective. So, you know, we are going to test that issue the entire time.

We settled this case for business reasons. Because, as Mr. Aylstock pointed out, this is the kind of thing that, you know, you just can't try 300,000 cases over the course of lifetimes and everything. So we made a business decision to settle this case and put a lot of money in the settlement for that reason.

And we did it on a structure that's going to allow for independent medical review of all the claims remaining in litigation.

Judge Rodgers has already talked about your DOEHRS data, which she has access to, and we have experts who are looking at these things. So that's part of what we're doing is making sure that we're getting independent people who are not just people that we pay or that they pay who are looking at

42

this and seeing are these cases worth proceeding on.

And that structure is supported by the leadership, who settled -- negotiated the settlement, by the hundreds of other plaintiffs' lawyers who have agreed to the settlement, and by the Court itself.

We respect that some people may decide to not take the settlement and to litigate. If so, we're going to, obviously, stick firmly to the requirements the Court has set, we're going to ask the Court to enforce, and I know the Court will enforce the requirements of the Case Management Order 57 you've heard a lot about today and other things.

We are, as Judge Rodgers noted, prepared to try these cases. We have a host of experts lined up that we could probably try this case in a matter of weeks, if we had to do it, because we have all the experts ready.

We tried 16 cases. I don't think that I've ever heard of an MDL where 16 cases were tried before. I was at 12 of them myself. I believe the shortest trial was two weeks. We might have had a trial that ended in nine days, but that would be the exception. These were basically two-weeks-at-a-time trials. So it's a long, expensive process, and that's what we're used to doing.

We will appeal if we lose. We will appeal the government contractor issue. We will appeal evidentiary rulings that we think are against us. Obviously, it's got to

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 185 of 234
Case MDL No. 2885    Document 2033-5    Filed 12/10/25    Page 44 of 48

43

be an issue we think we can win on appeal, but we feel strongly about that. And I'm sure you will feel strongly the other side of our appeals.

For the first set of appeals and I suspect for the future appeals, the attorney we hired to handle this was the leading United States Supreme Court lawyer in the country. I mean, he's the guy that's probably argued the single most cases -- I think over a hundred now -- before the U.S. Supreme Court. So, you know, we're going to spend the money to bring the best people here that we can do.

As Judge Rodgers pointed out, there were six plaintiffs who went to trial and lost. There were, I believe, several of them -- more than half of the trials ended up with a plaintiff verdict. But there were also a number of cases that were in the bellwether process that were going to be tried where the plaintiffs dismissed their cases before they even got to a jury.

For one reason or another, they thought -- I don't know the full reason. I think some of them realized they just can't win or they didn't want to deal with the stress or whatever.

So, of the 27 bellwether cases that were set, 14 of them resulted in no recovery at all. So that's over half. So you can't just look at the ones that were tried.

And those cases were done before the requirements that

44

Judge Rodgers has talked about earlier were put into place. So you have a much harder battle than the people that were there before for that very reason.

And I know there is a mediation process in the CMO that we have to go to mediation, which we're willing to do. But just as Judge Rodgers pointed out, we don't view the mediation process as a chance for us to sweeten the pot. We view it as a requirement that we're going to go through in good faith and talk about the reasons why we believe you should accept the settlement.

But if you think it's going to be sort of let's hold out and then we'll sort of throw more money on the table, it's not my money, but I can assure you that would be the first time that's happened in this litigation, and I don't expect it to happen now.

Again, you have the right to make these decisions. And I'm not going to -- obviously, I'm on the other side, so I have an interest in this myself. But we just want you to be aware where we're coming from as you proceed forward.

And I do appreciate you coming down here. And again, thank you for your service.

THE COURT: All right. Thank you, Mr. Beall.

So, Mr. Canup or Mr. Gamble, any questions?

And, of course, you have counsel, Mr. Canup. You don't have to speak. But I want to give you the opportunity,

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 187 of 234
Case MDL No. 2885    Document 2033-5    Filed 12/10/25    Page 46 of 48

45

if there are any questions from either one of you.

MR. GAMBLE: Yes. Thank you, Your Honor. And I'll just be real brief.

I understand you have a job to do, and you've done a fine job, and these gentlemen over here have done a fine job. But we do believe in the strength of our case and that, for what he's going to have to deal with the rest of his life and that he's dealing with, $10,000 just isn't going to come near to cut it.

But I understand you've got your job to do and you've got -- 3M has got the big pockets. These two veterans are not going to bankrupt 3M, though. We're not worried about that. That would be quite amazing if we could, but I don't think that part is an issue.

And then going to the procedural stuff, Your Honor, we worked our way through order No. 57, and we have recently got this letter that he gave me today, and we will go through this and try to cure everything that is possible.

THE COURT: Okay.

MR. GAMBLE: And if there's something -- if it turns out there's one or two things that we think we've done and he doesn't, then I guess maybe that's where the Court would come into play.

THE COURT: Yes.

MR. GAMBLE: There was one thing that I was slightly

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 188 of 234
Case MDL No. 2885    Document 2033-5    Filed 12/10/25    Page 47 of 48

46

disturbed about. The affidavit regarding statute of limitations, I may have missed that in order 57. I'm kind of Johnny-come-lately to all this.

THE COURT: I understand. But there is a requirement in CMO 57, and it does apply to Mr. Canup. And so you'll find it in the order, but it's a statute of limitations affidavit.

MR. GAMBLE: Okay. And I believe Your Honor said, you know, "if the Court were to allow it." This is not a motion hearing, but to the extent -- if this is proper, I would respectfully request and move to be allowed to supplement that within seven days to get this affidavit in.

THE COURT: Okay, I'll let you do that.

MR. GAMBLE: Thank you, Your Honor.

THE COURT: I'll give you permission to do that.

MR. GAMBLE: I think that's all we have, Your Honor.

THE COURT: All right. One other thing I did not reference -- and again, I'm not trying to pile on. I know it probably feels like that.

But again, in terms of me making sure that I've covered everything I wanted to cover, the last thing I'll add is -- we've talked about 300,000 cases -- and these were all cases. These aren't people parked out somewhere, you know, in some software litigation platform. These were filed cases.

I have dismissed -- and again, this is not directly to your case, but just in general about the litigation and the

Case 3:26-cv-03359-MCR-ZCB    Document 23    Filed 12/29/25    Page 189 of 234
Case MDL No. 2885    Document 2033-5    Filed 12/10/25    Page 48 of 48

47

claims and lawyers' review of those claims and the merits of them and then also a lawyer's ability to comply with deadlines, there have been well over 100,000 cases dismissed with prejudice.

So I guess the point, Mr. Gamble, is, I'm very serious about the deadlines, and largely because I've been so serious about the deadlines with others.

You know, I'm a judge looking at having dismissed over 100,000 cases for noncompliance. I'm not going to start making exceptions now. So just keep that in mind.

All right. Judge Cannon actually walked in -- hello, Judge Cannon -- to the courtroom a few minutes ago.

I encourage you to at least speak to her for a few minutes and see if she can add anything to the equation for you. If not, then we'll just monitor your compliance with CMO 57, and we'll move on according to a schedule.

All right. It was very nice to meet you both. Thank you for coming.

(Proceedings concluded at 11:16 a.m.)

――――――――――――――――――

*I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. Any redaction of personal data identifiers pursuant to the Judicial Conference Policy on Privacy are noted within the transcript.*

*s/Donna L. Boland*                                    *10-16-2024*
*Donna L. Boland, RPR, FCRR*                           *Date*
*Certified Court Reporter*

## BEFORE THE UNITED STATES JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

IN RE: 3M COMBAT ARMS EARPLUG
PRODUCTS LIABILITY LITIGATION

MDL No.: 2885

## PROOF OF SERVICE

In compliance with Rule 4.1(a) of the Rules of Procedure for the United States Judicial

Panel on Multidistrict Litigation, I hereby certify that on December 10, 2025, I caused to be

served true and correct copy of the foregoing via U.S. Mail on the parties listed in these actions

at the addresses below:

Brandon Canup
4812 Hidden Oaks Ln
Arlington, TX 76017
Email: canup.brandon@gmail.com
*Pro Se Plaintiff*
*Case No. 4:25-cv-01255 (NDTX)*

Bryan F. Aylstock
Bobby Bradford
Aylstock, Witkin, Kreis & Overholtz, PLC
17 East Main Street, Suite 200
Pensacola, FL 32502
*Defendants*
*Case No. 4:25-cv-01255 (NDTX)*

Michael Burns
Bums Law LLC
362 Gulf Breeze Parkway, #294
Gulf Breeze, FL 32561-4492
*Defendant*
*Case No. 4:25-cv-01255 (NDTX)*

1

Cliff Roberts
Roberts Law Office
8191 SW FWY, Ste. 116
Houston, TX 77074
*Defendant*
*Case No. 4:25-cv-01255 (NDTX)*

Gregory Brown
The Sorrels Law Firm
230 Westcott Street, Ste. 100
Houston, TX 77007
*Defendant*
*Case No. 4:25-cv-01255 (NDTX)*

Fleming Nolen & Jez, LLP
2800 Post Oak Blvd., Suite 6000
Houston, TX 77056-6128
*Defendant*
*Case No. 4:25-cv-01255 (NDTX)*

Mostyn Law Firm PC
c/o Registered Agent, Andrew Browning
3810 W. Alabama Street
Houston, TX 77027-5204
*Defendant*
*Case No. 4:25-cv-01255 (NDTX)*

Clerk of Court
United States District Court
Northern District of Texas
501 West 10th Street, Room 310
Fort Worth, TX 76102-3673

Dated: December 10, 2025

/s/ *Bryan F. Aylstock*
Bryan F. Aylstock, Florida Bar No. 782634
AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
17 East Main Street, Suite 200
Pensacola, FL 32502
Phone: (850) 202-1010
Facsimile: (850) 916-7449
Email: baylstock@awkolaw.com

*Plaintiffs' Counsel*

2

Query    Reports ▾    Utilities ▾    Help    Log Out

JURY

# U.S. District Court
# Northern District of Texas (Fort Worth)
## CIVIL DOCKET FOR CASE #: 4:25-cv-01255-Y

Canup v. Aylstock et al                                    Date Filed: 11/05/2025
Assigned to: Senior Judge Terry R Means                    Jury Demand: Plaintiff
Case in other court: 67th Judicial District Court, Tarrant County,    Nature of Suit: 190 Contract: Other Contract
              TX, 067-371499-25                            Jurisdiction: Diversity
Cause: 28:1332 Diversity-Notice of Removal

## Plaintiff

**Brandon Canup**                              represented by   **Brandon Canup**
                                                                4812 Hidden Oaks Ln
                                                                Arlington, TX 76017
                                                                972-762-4314
                                                                Email: canup.brandon@gmail.com
                                                                PRO SE

V.

## Defendant
**Bryan F. Aylstock**

## Defendant
**Bobby Bradford**

## Defendant
**Michael Burns**

## Defendant
**Cliff Roberts**

## Defendant

**Gregory Brown**                              represented by   **Gregory Donald Brown**
*pro se*                                                        Fleming Nolen & Jez LLP
                                                                2800 Post Oak Blvd
                                                                Suite 4000
                                                                Houston, TX 77056
                                                                713-621-7944
                                                                Fax: 713-621-9638
                                                                Email: gregory_brown@fleming-law.com
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

## Defendant

**Alystock Witkin Kreis & Overholtz PLC**

**Defendant**

**Fleming Nolen & Jez LLP**

**Defendant**

**Mostyn Law Firm PC**

| Date Filed | # | Docket Text |
|---|---|---|
| 11/06/2025 | 1 | NOTICE OF REMOVAL filed by Gregory Donald Brown, Alystock, Witkin, Kreis & Overholtz, PLL. In each Notice of Electronic Filing, the judge assignment is indicated, and a link to the Judges Copy Requirements and Judge Specific Requirements is provided. The court reminds the filer that any required copy of this and future documents must be delivered to the judge, in the manner prescribed, within three business days of filing. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms and Instructions found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (Attachments: # 1 Exhibit(s) Plaintiff's State Court Petition, # 2 Exhibit(s) State Court Docket Sheet) (Sorrels, Randy) (Entered: 11/06/2025) |
| 11/06/2025 | 2 | New Case Notes: A filing fee has not been paid. No prior sanctions found. (For court use only - links to the national and circuit indexes.) File to: appropriate staff attorney. Pursuant to Misc. Order 6, Plaintiff is provided the Notice of Right to Consent to Proceed Before A U.S. Magistrate Judge. Clerk to provide copy to plaintiff if not received electronically. (jnp) (Entered: 11/06/2025) |
| 11/06/2025 | 3 | Notice and Instruction to Pro Se Party (jnp) (Entered: 11/06/2025) |
| 11/06/2025 | | ***Clerk's Notice of delivery: (see NEF for details) Docket No:2, 3. Thu Nov 6 09:37:25 CST 2025 (crt) (Entered: 11/06/2025) |
| 11/10/2025 | 4 | NOTICE of Filing Executed Return of Service filed by Brandon Canup (jnp) (Entered: 11/10/2025) |
| 11/10/2025 | 5 | Appendix in Support filed by Brandon Canup re: 4 Notice of Filing Executed Return of Service (jnp) (Entered: 11/10/2025) |
| 11/10/2025 | 6 | CERTIFICATE OF SERVICE by Brandon Canup re 5 Appendix in Support, 4 Notice (Other) *Corrected Certificate of Service* (Canup, Brandon) (Entered: 11/10/2025) |
| 11/21/2025 | 7 | SUMMONS Returned Unexecuted as to Gregory Brown, Cliff Roberts. (Attachments: # 1 Affidavit(s) Attempted Service on Defendant Gregory Brown, # 2 Affidavit(s) Attempted Service on Defendant Cliff Roberts) (Canup, Brandon) (Entered: 11/21/2025) |
| 11/21/2025 | 8 | First MOTION to Remand filed by Brandon Canup with Brief/Memorandum in Support. (Attachments: # 1 Proposed Order) (Canup, Brandon) (Entered: 11/21/2025) |
| 11/21/2025 | 9 | Appendix in Support filed by Brandon Canup re 8 First MOTION to Remand (Canup, Brandon) (Entered: 11/21/2025) |

| **PACER Service Center** |
|---|
| **Transaction Receipt** |
| 11/26/2025 12:42:46 |

| PACER Login: | aw000389 | Client Code: | |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 4:25-cv-01255-Y |
| Billable Pages: | 2 | Cost: | 0.20 |

FILED
TARRANT COUNTY
10/27/2025 1:29 PM
THOMAS A. WILDER
DISTRICT CLERK

**CAUSE NO.** 067-371499-25 _____

| | |
|---|---|
| BRANDON CANUP, | IN THE _____ |
| Plaintiff | DISTRICT COURT |
| v. | |
| BRYAN F. AYLSTOCK, BOBBY BRADFORD, MICHAEL BURNS, CLIFF ROBERTS, GREGORY BROWN, AYLSTOCK WITKIN KREIS & OVERHOLTZ PLC, FLEMING NOLEN & JEZ LLP and MOSTYN LAW FIRM PC, | TARRANT COUNTY,  TEXAS |
| Defendants | |

## PLAINTIFF'S ORIGINAL PETITION

COMES NOW Plaintiff, Brandon Canup, appearing pro se, and files this Original Petition against the Defendants named herein. Plaintiff makes this filing based on personal knowledge as to all matters concerning himself and upon information and belief as to all other matters. In support thereof, Plaintiff respectfully shows the Court as follows:

## I.

## DISCOVERY CONTROL PLAN

ORIGINAL PETITION                                    **PAGE**        1

1.1    Plaintiff pleads that discovery should be conducted in accordance with discovery control plan, level 3, pursuant to Rule 190 of the Texas Rules of Civil Procedure.

## II.

## PARTIES

### A.    Plaintiff

2.1    Brandon Canup ("Canup") is an individual residing in Tarrant County, Texas.

### B.    Defendants

2.2    Aylstock, Witkin, Kreis & Overholtz, P.L.C. ("AWKO") is a foreign professional limited liability company formed under the laws of Florida, doing business in Texas. Its principal office is located at 17 East Main Street, Suite 200, Pensacola, Florida 32502. AWKO may be served via its registered agent for service of process: Justin Witkin, 17 East Main Street, Suite 200, Pensacola, Florida 32502, or wherever it may be found. In the event AWKO does not maintain a registered agent or cannot otherwise be located with reasonable diligence, it may be served through the Texas Secretary of State as provided by *Tex. Bus. Orgs. Code § 5.251* and *Tex. Civ. Prac. & Rem. Code §§ 17.041–17.045*.

2.3    Mostyn Law Firm, P.C. ("Mostyn") is a Texas professional corporation formed under the laws of Texas, with its principal office at 3810 W. Alabama Street,

ORIGINAL PETITION    **PAGE**    2

Houston, Texas 77027-5204. Mostyn may be served via its registered agent for service of process: Andrew Browning, at the same address, or wherever it may be found.

2.4     Fleming, Nolen & Jez, L.L.P. ("FNJ") is a Texas limited liability partnership with its principal office located at 2800 Post Oak Blvd., Suite 6000, Houston, Texas 77056-6128. FNJ may be served via a General Partner for service of process: George Fleming, at the same address, or wherever it may be found. Because FNJ does not have a registered agent listed on file with the Texas Comptroller as of the date of this filing, it may also be served with process through the Texas Secretary of State pursuant to *Tex. Bus. Orgs. Code § 5.251*, who shall forward process to FNJ's last known address on file.

2.5     Bryan Frederick Aylstock ("Aylstock") is an attorney licensed in the State of Florida (Florida Bar No. 78263), and a founding partner of AWKO. He may be served at his primary business address: Aylstock, Witkin, Kreis & Overholtz, PLC, 17 East Main Street, Suite 200, Pensacola, Florida 32502, or wherever he may be found. If service cannot with reasonable diligence be effected at this address, then pursuant to the Texas long-arm statute, service may be made on the Texas Secretary of State as agent for service of process for this Defendant.

2.6     Bobby J. Bradford ("Bradford") is an attorney licensed in the State of Florida (Florida Bar No. 173223) and a partner at AWKO. He may be served at at

ORIGINAL PETITION                                                              **PAGE**        3

his primary business address: Aylstock, Witkin, Kreis & Overholtz, PLC, 17 East Main Street, Suite 200, Pensacola, Florida 32502, or wherever he may be found. If service cannot with reasonable diligence be effected at this address, then pursuant to the Texas long-arm statute, service may be made on the Texas Secretary of State as agent for service of process for this Defendant.

2.7     Michael Andrew Burns ("Burns") is an attorney licensed in the State of Florida (Florida Bar No. 973130). At all times relevant to this case, he was affiliated with Mostyn Law Firm, a Texas-based law firm. He may be served at his Florida business address: Burns Law LLC, 362 Gulf Breeze Parkway, #294, Gulf Breeze, Florida 32561-4492, or wherever he may be found. If service cannot with reasonable diligence be effected at this address, then pursuant to the Texas long-arm statute, service may be made on the Texas Secretary of State as agent for service of process for this Defendant.

2.8     Gregory Donald Brown ("Brown") is an attorney licensed in the State of Texas (Texas Bar No. 24078266). At all times relevant to this case, he was affiliated with FNJ. Brown is listed as an attorney at FNJ on their website and as an attorney at Sorrels Law on his Texas State Bar profile. He may be served at his primary business address: Sorrels Law, 230 Westcott St., Ste. 100, Houston, Texas 77007, or at Fleming, Nolen & Jez, LLP, 2800 Post Oak Blvd., Suite 6000, Houston, Texas 77056-6128, or wherever he may be found.

2.9    Cliff Lee Roberts ("Roberts") is an attorney licensed in the State of Texas (Texas Bar No. 17002900). He may be served at his business address: 8191 Southwest Freeway, Suite 116, Houston, Texas 77074-1700, or wherever he may be found.

2.10    For ease of reference, Defendants AWKO, Mostyn, Aylstock, Bradford, and Burns may collectively be referred to as the ("Florida Defendants"). Although Mostyn is a Texas law firm, it is included in this group because of its affiliation with Burns, a Florida-based attorney, and its role in the conduct giving rise to this case.

2.11    Defendants FNJ, Brown, and Roberts may collectively be referred to as the ("Texas Defendants").

2.12    All Defendants may collectively be referred to as the ("Defendants").

## III.

## JURISDICTION AND VENUE

3.1    This Court has subject matter jurisdiction over this action pursuant to Section 24.007, et seq. of the Texas Government Code. The amount in controversy exceeds the Court's minimum jurisdictional requirements, exclusive of interest and costs, and the relief sought is within the jurisdictional limits of this Court.

3.2    This Court has personal jurisdiction over all named Defendants. One or more Defendants are residents of Texas, maintain their principal place of business

ORIGINAL PETITION                                    **PAGE**        5

in Texas, and/or regularly conduct business in Texas. Additionally, pursuant to the Texas Long-Arm Statute, *Tex. Civ. Prac. & Rem. Code §§ 17.041–17.069*, this Court may exercise jurisdiction over out-of-state Defendants who have purposefully directed activities toward Texas. Out-of-state Defendants purposefully directed activities toward Texas, including but not limited to: providing legal services to a Texas resident, accessing confidential records of a Texas resident, and appearing and purporting to act on behalf of a Texas resident in litigation proceedings connected to Texas, including matters designated for trial in the Northern District of Texas. Furthermore, all out-of-state Defendants performed common benefit work in the underlying litigation entitling them to collect fees from thousands of Texas Residents. Out-of-state Defendants have purposefully availed themselves of the privileges and benefits of conducting business in Texas and are subject to the jurisdiction of this Court. These actions demonstrate the Defendants' purposeful involvement in matters connected to Texas, making it both appropriate and consistent with due process for a Texas court to exercise jurisdiction over them.

3.3     Venue is proper in this Court pursuant to Section 15.001, *et seq.* of the Texas Civil Practice and Remedies Code.  All or a substantial part of the harm resulting from Defendants' conduct was suffered by Plaintiff in Tarrant County, Texas, where Plaintiff resides and relied upon Defendants' actions and representations. Additionally, this lawsuit concerns contracts and attorney-client

ORIGINAL PETITION                                                            **PAGE**       6

relationships that were to be performed, in whole or in part, in Tarrant County. Plaintiff's case was designated for trial in the United States District Court for the Northern District of Texas, and Tarrant County was the central location of Plaintiff's litigation preparation, reliance on Defendants, and resulting injury.

## IV.

### STATEMENT PURSUANT TO RULE 47

4.1    Pursuant to Rule 47 of the Texas Rules of Civil Procedure, Plaintiff states that he seeks monetary relief of less than $250,000, including damages of any kind, penalties, costs, expenses, pre and post-judgment interest. Plaintiff further affirms that he seeks less than $75,000 in monetary damages, exclusive of interest and costs.

## V.

### BACKGROUND FACTS

5.1    On April 3, 2019, the United States Judicial Panel on Multidistrict Litigation transferred multiple actions to the Northern District of Florida for coordinated pretrial proceedings in *In re: 3M Combat Arms Earplug Products Liability Litigation*, Cause No. 3:19-md-02885 ("MDL").

5.2    On May 22, 2019, the MDL court issued Pretrial Order No. 7, appointing various plaintiffs' attorneys to leadership roles ("PSC") to conduct common benefit

work on behalf of all claimants in the MDL. These appointments were set to expire after one year unless renewed.

5.3    On June 21, 2019, Canup retained Texas Defendants Brown, FNJ, and Roberts, to investigate, develop, and litigate his claims in the MDL. Despite this agreement, Texas Defendants failed to meaningfully investigate Canup's injuries or develop his case during their years of representation.

5.4    On August 29, 2023, a global settlement agreement ("MSA") was announced between 3M and Plaintiffs' Leadership in the MDL. The agreement imposed obligations on plaintiffs' attorneys to recommend settlement to 100% of their clients, to withdraw from representation of any claimant who declined to participate and other terms that were hidden from Plaintiffs in the MDL in Exhibit 10 of the MSA. These provisions created undisclosed conflicts of interest between attorneys and their clients.

5.5    Canup received several letters and emails from Texas Defendants pressuring him to accept the settlement, warning that rejection would result in withdrawal of representation, delayed access to trial, and onerous litigation deadlines. However, Texas Defendants never disclosed the full terms of the settlement, including Exhibit 10, which contained material provisions.

5.6    Following multiple communications from Texas Defendants indicating their intent to withdraw if Canup declined to participate in the global settlement,

Canup retained attorney David Gamble ("Gamble") in January 2024. At the time, Texas Defendants were still counsel of record for Canup in the MDL but did not provide substantive legal support. Canup retained Gamble to preserve his ability to litigate, anticipating Texas Defendant's formal withdrawal and recognizing their abdication of duty.

5.7    On January 21, 2024, Canup officially opted out of the MSA triggering his production obligations under Case Management Order 57 ("CMO 57"). Canup and Gamble immediately began preparing for the CMO 57 production requirements which included gathering, organizing, and submitting over 25 GB of data within 30 days under threat of dismissal with prejudice. Despite knowing of these requirements for months, Texas Defendants did not assist in meeting these obligations. Brown filed a motion to withdraw as counsel of record for Canup in the MDL within a week of Canup's CMO 57 production deadline. His motion was granted one day before the CMO 57 deadline.

5.8    Canup requested his file from FNJ in January of 2024. Canup received a few documents but never his full file. FNJ sent Gamble Canup's file which only contained a single four-page pdf.

5.9    On February 5, 2024 Canup was ordered by the MDL Court to appear "in person, with counsel" at a status conference in Pensacola, Florida scheduled for March 13, 2024. In preparation for the March 13, 2024 status conference Bradford

ORIGINAL PETITION    **PAGE**    9

contacted Gamble seeking privileged and confidential information about Canup and his case against 3M and to give advice about the settlement programs in the MSA. Gamble and Bradford spoke several times about Canup's case including but not limited to his medical claims and potential recovery. Bradford informed Gamble that Aylstock and Bradford would be present at the status conference but never informed Gamble of Florida Defendants' intent to make a formal appearance.

5.10    Unbeknownst to either Canup or Gamble, Florida Defendants made a formal appearance in the MDL Court on Canup's behalf at the March 13, 2024 status conference. The hearing transcript lists Aylstock and Bradford from AWKO and Burns from Mostyn as appearing "FOR THE PLAINTIFF." Aylstock participated in the hearing by addressing the MDL Court on the record speaking about the MSA in an attempt to convince Canup to accept the global settlement offer.

5.11    Following the first hearing, Canup and Gamble were led to a conference room where Magistrate Judge Hope Cannon conducted a closed-door settlement conference. This settlement conference was a second official proceeding on March 13, 2024. Judge Cannon brought in Aylstock, Bradford, and Burns, who then gave individual legal advice, reviewed Canup's medical records and discussed Canup's case directly with Canup. The medical documents that were already in Florida Defendants' possession when they entered the room included but were not limited to audiograms and post-deployment health assessments from Canup's time in the US

ORIGINAL PETITION                                          **PAGE**        10

Army. These confidential and privileged documents were not provided to Florida Defendants by Canup or Gamble. Florida Defendants had gained access to these confidential and privileged documents from another source unknown to Canup or Gamble.

5.12  During that discussion, Aylstock, Bradford, and Burns attempted to pressure Canup to accept the MSA which Canup had already expressly rejected. Florida Defendants were formerly part of the PSC in the MDL and were bound by the terms of the MSA. Florida Defendants did not disclose that their continued compensation was contingent upon claimant participation levels in the MSA, they did not disclose the full terms of the MSA including Exhibit 10, nor did they inform Canup of the conflict created by the MSA's provisions requiring them to recommend settlement to 100% of claimants and to withdraw from clients who opted out. They also failed to disclose that they were making another formal appearance in this second proceeding in the MDL Court on Canup's behalf.

5.13  Florida Defendants' conduct and formal appearances as Canup's counsel created, at minimum, an implied attorney-client relationship, and arguably an express attorney-client relationship. Bradford reached out to Gamble to obtain confidential and privileged information and to discuss Canup's case strategy prior to the proceedings, conduct consistent with representation. At the hearing itself, Defendants Aylstock, Bradford, and Burns formally appeared "FOR THE

ORIGINAL PETITION                                          **PAGE**      11

PLAINTIFF" on the record, communicated directly with Plaintiff, gave individualized legal advice, and attempted to pressure him into accepting the MSA. These actions, individually and collectively, establish an implied attorney-client relationship, because they would cause any reasonable client to believe Florida Defendants were acting as his attorneys. The formal appearance on the record not only arguably created an express attorney-client relationship but, at the very least, reinforced and confirmed the implied relationship already created by Florida Defendants' conduct. This imposed fiduciary duties including, but not limited to, the duties of loyalty, candor, honesty, disclosure, and conflict avoidance. Despite these obligations, Defendants failed to disclose their intent to appear, their actual formal appearance, their roles in the settlement conference, or their financial stake in maximizing claimant participation.

5.14    Had Canup known that Florida Defendants would appear on his behalf, he could have satisfied the MDL Court's order to appear "in person, with counsel" without transporting Gamble to Florida. Canup incurred substantial costs for Gamble's airfare, lodging, and time. These are expenses he would not have borne had Florida Defendants fulfilled their duty to disclose their participation.

5.15    After the March hearing, Aylstock, Bradford, and Burns took no further action on Canup's behalf, never filed a notice of withdrawal, and never

explained their involvement. Canup did not become aware of their official appearance until he obtained a transcript of the hearing in January 2025.

5.16    Meanwhile, Canup encountered roadblocks accessing the unredacted Master Long Form Complaint ("Master Complaint"). The master complaint was filed on behalf of all claimants and was referenced by all Short Form Complaints filed by the Plaintiffs in this MDL. When the motion to file this document under seal was filed in 2019 it stated that all counsel of record were sent an unredacted copy. Canup was denied access to this document by FNJ. FNJ later contacted Gamble and recommended that he reach out to the PSC to ask for permission to access the master complaint from PSC.

5.17    In April of 2024 Gamble contacted Bradford to get access to the master complaint. On April 24, 2024, Bradford informed Gamble that he would only release the unredacted complaint if Gamble signed a Common Benefit Work Participation Agreement assigning a 9% interest in any future recovery in Canup's case to the PSC. Canup consented to Gamble's signing the agreement to move forward with the litigation.

5.18    On May 1, 2024, Canup filed an amended complaint and Lexecon non-waiver statement as ordered by the MDL Court on April 17, 2024. The order requiring Canup to amend his pleadings stated that he could not add new allegations or causes of action. 3M moved to dismiss. On July 18, 2024, the MDL Court granted

ORIGINAL PETITION                                                    **PAGE**    13

the motion in part, dismissing Canup's hearing-loss-related claims as procedurally barred because they were new allegations and/or causes of action.

5.19    The MDL Court's order stated that Canup's former attorneys never attempted to amend his pleadings to include hearing loss claims, despite representing him for years. The MDL Court cited this as a reason that Canup should not be allowed to add new allegations or causes of action. Canup was harmed by being forced to retain expert witnesses whose work became worthless due to the dismissal of the hearing-loss-related claims, harm that would have been avoided had the Texas Defendants investigated and developed Canup's case as they were legally obligated to do.

5.20    On September 30, 2024, Canup entered into a direct settlement agreement with 3M. Canup's ability to reach this resolution was made possible only through his efforts and the efforts of independent counsel, despite the harm caused by the misconduct of the attorneys named herein.

## VI.

## CAUSES OF ACTION

<u>Alternative Pleadings</u>.  To the extent necessary, each of the claims set forth below is pleaded in the alternative.

### A.    CLAIMS AGAINST TEXAS DEFENDANTS

**Claim 1:  Fraud and Failure to Disclose Facts (pled alternatively as Fraudulent Inducement)**

ORIGINAL PETITION                                                    **PAGE**      14

6.1    Canup restates and realleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

6.2    **Material Misrepresentation:** Texas Defendants Brown, Roberts, and FNJ made material representations to Canup, including that they would actively pursue Canup's claims in the MDL and litigate the case on his behalf. These representations were expressly contained in the written contingency fee retainer agreement executed between Canup and Texas Defendants, which promised diligent investigation, development, and prosecution of Canup's claims. These representations were made to induce Canup to sign the agreement and place exclusive control of his case with Texas Defendants.

6.3    **Knowledge of Falsity:** At the time these representations were made, Texas Defendants knew they were false, or at minimum had no reasonable basis to believe them true. FNJ had prior MDL experience and knew that their business model involved securing clients for global settlements without undertaking individualized litigation. Their subsequent conduct, failing to advance Canup's claims for four years, not amending pleadings to preserve critical causes of action, and abandoning Plaintiff just one day before the CMO 57 production deadline, confirms they never intended to perform the promised litigation services.

6.4    **Intent to Induce Reliance:** Texas Defendants made these misrepresentations with the intent and purpose of inducing Canup to rely on them

and execute the contingency fee agreement, thereby binding Canup to pay them a percentage of any recovery while avoiding the cost and effort of actively litigating his claims.

6.5    **Justifiable Reliance:** Canup justifiably relied on these representations by signing the retainer agreement and allowing Texas Defendants to control and manage his claims in the MDL for approximately four years, without seeking alternative representation or taking independent action, in the belief that Texas Defendants were diligently working on his behalf.

6.6    **Injury Caused by Reliance**: As a direct and proximate result of Canup's reliance on Texas Defendants' misrepresentations, Canup suffered injury. The MDL court cited Texas Defendants' failure to amend pleadings and advance his case as a basis for dismissing Canup's hearing-loss claims, which diminished the value of expert reports prepared for the litigation. Texas Defendants' abandonment of Canup before the CMO 57 compliance deadline caused significant stress, confusion, inconvenience, and anxiety, disrupted Canup's daily life for several months, and forced him to devote substantial time and effort to untangling the MDL process and uncovering how his own attorneys were deceiving him.

6.7    Texas Defendants' conduct also contradicts the terms of the written agreement, which stated that Canup retained ultimate authority over settlement decisions and that Texas Defendants would provide full legal support. Instead, Texas

ORIGINAL PETITION    **PAGE**    16

Defendants used the contract to obtain control of Canup's claims, then abandoned those claims for financial reasons when he exercised his right to opt out of the settlement.

6.8    Texas Defendants violated Section 32.46 of the Texas Penal Code when they engaged in the above-described conduct. Texas Defendants acted knowingly and intentionally. Such violations constitute fraud.

6.9    To the extent FNJ is not found directly liable for its own independent misconduct, FNJ is also vicariously liable for any wrongful acts or omissions committed by Brown and/or Roberts in the course and scope of their employment and/or partnership and/or agency under the doctrine of respondeat superior and Texas agency law.

6.10    Accordingly, Canup pleads for, and is entitled to monetary damages in an amount sufficient to compensate him for the harm sustained.

6.11    Because Texas Defendants' conduct was fraudulent and/or malicious, Canup pleads for, and is also entitled to recover exemplary damages in an amount to be determined by the trier of fact. Canup further pleads for expenses and pre- and post-judgment interest at the maximum rate permitted by law.

### Claim 2:  Breach of Fiduciary Duty

6.12    Canup restates and realleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

ORIGINAL PETITION                                                    **PAGE**        17

6.13 **Existence of a Fiduciary Duty:** Texas Defendants Brown, Roberts, and FNJ entered into a written contingency fee retainer agreement with Canup to represent him in the MDL. By virtue of this attorney-client relationship, Texas Defendants owed Canup fiduciary duties of loyalty, candor, disclosure, and zealous representation among others. These duties included the obligation to place Plaintiff's interests above their own, to fully inform Plaintiff of all material facts affecting his case, and to diligently pursue his claims.

6.14 **Breach of the Duty:** Texas Defendants breached their fiduciary duties including but not limited to, duty of full disclosure, duty of good faith and fair dealing, duty of care and duty of loyalty in multiple respects. They failed to investigate and develop Canup's case over a four-year period, leading to the MDL court's dismissal of his hearing-loss claims. They concealed material information about the global settlement structure, including Exhibit 10, and failed to disclose that they intended to recommend settlement to all clients regardless of individual circumstances. They also abandoned Canup at a critical stage of litigation, withdrawing representation one day before the CMO 57 compliance deadline, despite having known of those deadlines for months. In addition, Texas Defendants failed to provide Canup with his full client file and withheld the master complaint from him.

6.15 **Causation:** Texas Defendants' breaches directly and proximately caused injury to Canup. Their failure to amend pleadings was specifically cited by the MDL court as a reason for barring and dismissing Canup's hearing-loss claims, which rendered costly expert reports largely useless. Their last-minute withdrawal disrupted Canup's ability to comply with CMO 57 requirements. Their concealment of material settlement information deprived Canup of the ability to make informed decisions regarding his claims.

6.16 **Damages:** As a result of Texas Defendants' breaches, Canup suffered both economic and non-economic damages. Economically, Canup incurred wasted expert fees. Non-economically, Plaintiff endured significant stress, confusion, inconvenience, and anxiety, disruption Canup's daily life for several months, and forced him to devote substantial time and effort to untangling the MDL process and uncovering how his own attorneys were deceiving him.

6.17 To the extent FNJ is not found directly liable, FNJ is also vicariously liable for the breaches of fiduciary duty committed by Brown and/or Roberts in the course and scope of their employment and/or partnership and/or agency under the doctrine of respondeat superior and Texas agency law.

6.18 Accordingly, Canup pleads for, and is entitled to monetary damages in an amount sufficient to compensate him for the harm sustained.

6.19    Because Texas Defendants' conduct was fraudulent and/or malicious, Canup pleads for, and is also entitled to recover exemplary damages in an amount to be determined by the trier of fact. Canup further pleads for expenses and pre- and post-judgment interest at the maximum rate permitted by law.

### Claim 3:  Negligence (pled in the alternative)

6.20    Canup restates and realleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

6.21    **Existence of a Duty:** Texas Defendants Brown, Roberts, and FNJ entered into a written contingency fee retainer agreement with Canup to represent him in the MDL. By virtue of this attorney-client relationship, Texas Defendants owed Canup a duty to exercise reasonable care, skill, and diligence commonly possessed and exercised by attorneys similarly situated in the State of Texas. This duty included, but was not limited to, properly investigating and preparing Canup's claims, maintaining adequate communication with the client, meeting applicable court deadlines, and taking reasonable steps to protect Plaintiff's interests before, during, and after withdrawal of representation.

6.22    **Breach of the Duty:** Texas Defendants breached their duty of care in multiple respects. They failed to investigate and develop Canup's case over a four-year period, leading to the MDL court's dismissal of his hearing-loss claims. They concealed material information about the global settlement structure, including

ORIGINAL PETITION                                        **PAGE**      20

Exhibit 10, and failed to disclose that they intended to recommend settlement to all clients regardless of individual circumstances. They also abandoned Canup at a critical stage of litigation, withdrawing representation one day before the CMO 57 compliance deadline, despite having known of those deadlines for months. In addition, Texas Defendants failed to provide Canup with his full client file and withheld the master complaint from him.

6.23    **Causation:** Texas Defendants' breaches directly and proximately caused injury to Canup. Their failure to amend pleadings was specifically cited by the MDL court as a reason for barring and dismissing Canup's hearing-loss claims, which rendered costly expert reports largely useless. Their last-minute withdrawal disrupted Canup's ability to comply with CMO 57 requirements. Their concealment of material settlement information deprived Canup of the ability to make informed decisions regarding his claims.

6.24    **Damages:** As a result of Texas Defendants' breaches, Canup suffered both economic and non-economic damages. Economically, Canup incurred wasted expert fees. Non-economically, Plaintiff endured significant stress, confusion, inconvenience, and anxiety, disruption Canup's daily life for several months, and forced him to devote substantial time and effort to untangling the MDL process and uncovering how his own attorneys were deceiving him.

6.25   To the extent FNJ is not found directly liable, FNJ is also vicariously liable for the breaches of fiduciary duty committed by Brown and/or Roberts in the course and scope of their employment and/or partnership and/or agency under the doctrine of respondeat superior and Texas agency law.

6.26   Accordingly, Canup pleads for, and is entitled to monetary damages in an amount sufficient to compensate him for the harm sustained.

## B.    CLAIMS AGAINST FLORIDA DEFENDANTS

### Claim 1:  Fraud by Non-Disclosure

6.27   Canup restates and re-alleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

6.28   **Failure to Disclose:** Florida Defendants deliberately failed to disclose material facts. Florida Defendants Aylstock, Bradford, and Burns, while acting on behalf of their respective firms AWKO and Mostyn, deliberately failed to disclose that they intended to formally appear as counsel for Canup at the March 13, 2024 status conference and that they intended to formally appear and participate in a closed-door settlement conference concerning Canup's case. By withholding these facts, Florida Defendants concealed their involvement in Canup's case. These omissions occurred despite their knowledge of a court order requiring Canup to appear "in person, with counsel" if represented.

6.29    **Duty to Disclose:** The Defendants had a duty to disclose such facts to Canup. The Florida Defendants' duty to disclose arose from multiple sources:

a) By making a formal appearance on the record, Florida Defendants created at least an implied and arguably an express attorney-client relationship with Canup, triggering fiduciary duties of candor, loyalty, and disclosure. They had a duty to disclose their intent to make a formal appearance.

b) By partially disclosing their intent to attend the March 13, 2024 status conference to Canup through Gamble while concealing their intent to formally appear, Florida Defendants created a duty to disclose the full scope of their role.

c) By seeking privileged and confidential information about Canup and his case against 3M prior to the March 13, 2024 status conference and by obtaining and using Canup's confidential medical records, Defendants assumed fiduciary-like duties of confidentiality and fair dealing, requiring them to disclose their access and intent.

6.30    **Canup's Ignorance:** Canup was ignorant of the facts and did not have an equal opportunity to discover them. Canup had no knowledge that Florida Defendants intended to appear in court on his behalf, nor that they had accessed his private medical records from an undisclosed source. Because these actions were being concealed and misrepresented Canup had no equal opportunity to discover their conduct or protect his own interests before incurring unnecessary expenses and attending the conference under false pretenses.

6.31  **Intent to Induce:** Florida Defendants intended Canup to act or refrain from acting based on the nondisclosure. Florida Defendants knew that the MDL Court's order required Canup to appear "in person, with counsel." Their nondisclosure was calculated to induce Canup to continue treating Gamble as his sole counsel and to incur the costs of transporting and compensating him to attend the status conference in Florida. By concealing their intention to appear "FOR THE PLAINTIFF," Florida Defendants prevented Canup from making an informed choice such as declining to bring Gamble, objecting to their unauthorized involvement, or challenging their improper access to his records. Their concealment ensured that Canup remained unaware and passive while Florida Defendants acted in ways that advanced their own interests in the MDL.

6.32  **Reliance and Injury:** Canup relied on the Florida Defendants' nondisclosure, which directly resulted in injury. In reliance on their concealment, Canup unnecessarily paid for Gamble's travel, lodging, and appearance at the Florida status conference, expenses that would not have been incurred had he known Florida Defendants would appear as his counsel. Florida Defendants also accessed and used his confidential medical records without consent, depriving him of control over his case and the opportunity to make informed legal decisions with full knowledge of who was acting on his behalf. These harms, including financial costs and disruption of his autonomy, were the direct and foreseeable result of Florida

Defendants' deliberate concealment of material facts they had a duty to disclose.

6.33    Bryan Aylstock, as a founding partner of AWKO, had actual authority to bind the firm. AWKO and Mostyn Law benefitted directly from the concealment and actions of their employees and partners. As such, both firms are directly liable for the misconduct described herein.

6.34    Florida Defendants' omissions and concealments were intentional, material, and calculated to mislead Canup during a critical phase of litigation. This conduct constitutes actionable fraud by non-disclosure under Texas law.

6.35    To the extent AWKO and Mostyn Law are not found directly liable, they are vicariously liable for the acts and omissions of Aylstock, Bradford, and Burns committed within the course and scope of their employment and/or partnership and/or agency under the doctrine of respondeat superior and Texas agency law.

6.36    Accordingly, Canup pleads for, and is entitled to monetary damages in an amount sufficient to compensate him for the harm sustained.

6.37    Because Florida Defendants' conduct was fraudulent and/or malicious, Canup pleads for, and is also entitled to recover exemplary damages in an amount to be determined by the trier of fact. Canup further pleads for expenses and pre and post-judgment interest at the maximum rate permitted by law.

### Claim 2:  Breach of Fiduciary Duty

6.38   Canup restates and re-alleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

6.39   **Existence of Fiduciary Duty:** By formally appearing on the record as counsel "FOR THE PLAINTIFF" at the March 13, 2024 status conference, and by participating in a closed-door settlement discussion regarding Canup's case, the Florida Defendants created at least an implied and arguably an express attorney-client relationship with Canup. This appearance, coupled with their access to Canup's confidential medical records, imposed fiduciary duties of loyalty, candor, and full disclosure. Having assumed the role of Canup's representatives in court and in private negotiations, Florida Defendants were obligated to act in Canup's best interests, disclose material facts, and avoid self-dealing or deception.

6.40   **Breach of Duty:** Florida Defendants breached their fiduciary duties including but not limited to, duty of full disclosure, duty of good faith and fair dealing, duty of care and duty of loyalty in multiple respects. Florida Defendants breached these fiduciary duties in multiple ways. They deliberately failed to inform Canup of their intent to appear as his counsel, concealed their formal appearance in settlement negotiations, and accessed Canup's confidential medical records without authorization. They further failed to disclose material conflicts of interest, including their obligations under the MSA to secure 100% plaintiff participation and the financial penalties they faced if Canup declined to settle. Florida Defendants also

failed to disclose Exhibit 10 to the MSA which contained material terms to the agreement. Instead of candor and loyalty, Florida Defendants acted in their own financial interests by pressuring Canup toward settlement while depriving him of the opportunity to make informed decisions about his representation and case strategy.

6.41   **Causation:** Florida Defendants' breaches directly caused Canup to act and incur expenses that he otherwise would not have. Because Florida Defendants concealed their intent to formally appear as counsel, Canup reasonably believed Gamble was his only representative and paid to transport and lodge Gamble in Florida for the status conference. Canup was further deprived of the ability to object to Florida Defendants' unauthorized access to his confidential medical records, or to challenge their improper participation in court and settlement proceedings. Their concealment and deception stripped Canup of control over his own case and forced him to rely on incomplete and misleading information.

6.42   **Damages:** As a direct and proximate result of Florida Defendants' misconduct, Canup suffered both financial and significant inconvenience damages. He incurred unnecessary out-of-pocket expenses for Gamble's travel and representation. Florida Defendants' concealment and breaches also forced Canup to spend substantial time, energy, and effort to learn about the role and duties of a lawyer, MDL procedures, settlement structures, and fiduciary obligations, simply to understand how his rights were being compromised. Instead of being able to trust

ORIGINAL PETITION                                                        **PAGE**      27

Defendants, Canup was required to divert time away from his personal and professional life to protect himself from those who owed him loyalty and candor. This disruption and burden are concrete injuries that flow directly from Florida Defendants' breaches of fiduciary duty.

6.43    To the extent AWKO and Mostyn Law are not found directly liable, they are also vicariously liable for the fiduciary breaches committed by Aylstock, Bradford, and Burns committed within the course and scope of their employment and/or partnership and/or agency under the doctrine of respondeat superior and Texas agency law.

6.44    Accordingly, Canup pleads for, and is entitled to monetary damages in an amount sufficient to compensate it for the harm sustained.

6.45    Because Florida Defendants' conduct was fraudulent and/or malicious, Canup pleads for, and is also entitled to recover exemplary damages in an amount to be determined by the trier of fact. Canup further pleads for expenses and pre and post-judgment interest at the maximum rate permitted by law.

### Claim 3:  Fraudulent Inducement

6.46    Canup restates and realleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

6.47    **Material Misrepresentation:** Defendants Bradford and AWKO represented to Canup, through Gamble, that if Gamble agreed to allocate a 9%

ORIGINAL PETITION                                          **PAGE**      28

interest in Canup's recovery in the MDL to PSC, Canup and Gamble would receive full access to the MDL's common benefit work, including the master complaint and other litigation materials. This promise was material because access to the common benefit work was essential for evaluating Canup's claims, preparing pleadings, and ensuring that Canup's case was prosecuted on equal footing within the MDL.

6.48 **Knowledge of Falsity:** At the time Bradford made these representations, he and AWKO had no intention of providing the promised access beyond the master complaint. Bradford and AWKO also knew their representation was false because the master complaint had been filed on behalf of all Plaintiffs in the MDL, and the motion to file it under seal expressly stated that an unredacted copy had already been provided to all counsel of record, making all Plaintiffs in the MDL, including Canup, entitled to it without additional conditions. Bradford and AWKO's subsequent refusal to respond to Canup's request for the remaining common benefit materials demonstrates they knowingly misrepresented their willingness to perform and concealed their true intent.

6.49 **Intent to Induce Reliance:** Defendants Bradford and AWKO made these false promises for the purpose of inducing Canup and or Gamble as an agent of Canup to agree to the 9% common benefit interest. By doing so, Bradford and AWKO sought to secure both financial gain and strategic leverage within the MDL, binding Canup to terms that benefitted Bradford, AWKO and PSC as a whole while

depriving Canup of the resources promised.

6.50 **Reliance:** Canup, through Gamble, reasonably relied on Bradford and AWKO's misrepresentations by entering into the agreement and granting PSC a 9% interest in his recovery. Canup through Gamble did so in the belief that he would receive the full scope of common benefit materials, which were essential to advancing his claims in the MDL.

6.51 **Injury:** As a direct and proximate result of Bradford and AWKO's fraudulent inducement, Canup suffered injury. He incurred the financial burden of allocating 9% of his recovery to PSC while receiving only the master complaint, which he was entitled to without further conditions, and being deprived of the other promised materials. This left Canup disadvantaged in prosecuting his claims, forced him to expend additional time and effort to understand the underlying issues without the benefit of the promised work product, and unjustly enriched Bradford and AWKO at his expense.

6.52 Defendants Bradford and AWKO violated Section 32.46 of the Texas Penal Code when they engaged in the above-described conduct. Defendants Bradford and AWKO committed this conduct knowingly and intentionally. Such violations constitute fraud.

6.53 To the extent AWKO is not found directly liable, it is also vicariously liable for the fraudulent inducement committed by Bradford within in the course and

ORIGINAL PETITION                                                   **PAGE**     30

scope of his employment and/or partnership and/or agency under the doctrine of respondeat superior and Texas agency law.

6.54    Accordingly, Canup pleads for, and is entitled to monetary damages in an amount sufficient to compensate him for the harm sustained.

6.55    Because Bradford and AWKO's conduct was fraudulent and/or malicious, Canup pleads for, and is also entitled to recover exemplary damages in an amount to be determined by the trier of fact. Canup further pleads for expenses and pre and post-judgment interest at the maximum rate permitted by law.

## C.    CLAIMS AGAINST ALL DEFENDANTS

### Claim 1:  Civil Conspiracy

6.56    Canup restates and realleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

6.57    **Combination of two or more persons:** Defendants FNJ, Brown, Roberts, Aylstock, Bradford, Burns, AWKO, and Mostyn Law combined and acted together in connection with the MDL. Their actions were coordinated, not isolated, and each Defendant assumed complementary roles under the framework of the MSA which tied their compensation to Plaintiff participation thresholds and withdrawal requirements. This combination reflects a deliberate, concerted effort to protect their financial interests at Canup's expense.

6.58  **Common object or course of action:** The common object of the conspiracy was to secure maximum Plaintiff participation in the MSA, protect Defendants' fees, and eliminate or marginalize clients unwilling to settle. To accomplish this, Defendants withheld material settlement terms, including Exhibit 10 of the MSA and provisions tying attorney compensation to client participation and mandatory withdrawals, while conditioning access to critical litigation documents on Canup's compliance. The Florida Defendants also concealed their formal appearance as Canup's counsel, depriving him of notice that they were representing him in court and settlement discussions. These coordinated acts were calculated to undermine Canup's autonomy, deprive him of full disclosure, and coerce his participation in the settlement program.

6.59  **Meeting of the minds:** Defendants reached a meeting of the minds through coordinated conduct. Texas defendants abandoned Canup for not agreeing to participate in the MSA. Florida Defendants then formally appeared "FOR THE PLAINTIFF" in court allowing them to pressure Canup, in person, to participate in the MSA. Florida Defendants did this without disclosing their intent to formally appear forcing Canup to take Gamble from Texas to Florida to comply with the MDL Court's order to appear "in person, with counsel" resulting in unnecessary economic pressure on Canup. Texas Defendants then withheld the master complaint, a document that was part of Canup's file, and directed Gamble to obtain it from the

PSC. Bradford and AWKO then conditioned its release on signing a fraudulent participation agreement giving PSC a 9% interest in any recovery in Canup's case. These coordinated acts evidence agreement, whether formal or informal, to act in unison toward their shared objective.

6.60  **Unlawful overt acts:** In furtherance of the conspiracy, Defendants engaged in multiple unlawful overt acts, including:

a) concealing material settlement terms from Canup;

b) concealing their intent to appear, and then appearing as Canup's counsel without authority or disclosure;

c) accessing and reviewing Canup's confidential medical records without authorization;

d) concealing their financial and ethical conflicts tied to the MSA; and

e) requiring Canup's counsel to sign a fraudulent 9% participation agreement as the condition for obtaining the master complaint.

Each of these acts breached duties of candor, loyalty, and disclosure owed to Canup, and unlawfully advanced Defendants' scheme to manipulate settlement participation.

6.61  **Damages:** As a direct and proximate result of this conspiracy, Canup suffered damages. He incurred unnecessary expenses transporting substitute counsel to Florida for a hearing where Florida Defendants secretly appeared on his behalf,

was deprived of access to promised common benefit work, and saw his recovery reduced by the 9% diversion of settlement funds. Canup also suffered significant inconvenience by being forced to investigate and learn about complex legal processes in order to uncover and counteract Defendants' scheme, burdens that arose solely because of Defendants' coordinated misconduct.

6.62   To the extent the law firms named herein are not found directly liable, they are also vicariously liable for the actions of their partners, associates, employees, or agents committed within the scope of employment and in furtherance of the conspiracy.

6.63   Additionally, because Canup's injuries were caused by the joint and concerted actions of multiple Defendants, including acts of fraud, breach of fiduciary duty, and conspiracy, all Defendants are jointly and severally liable under Texas law.

6.64   For the avoidance of doubt, Canup pleads that if any law firm named herein is not found directly liable, it is nonetheless vicariously liable under the doctrine of respondeat superior for the conduct of its partners, agents, or employees acting within the course and scope of their duties.

6.65   Accordingly, Canup pleads for, and is entitled to monetary damages in an amount sufficient to compensate him for the harm sustained.

6.66   Because Defendants' conduct was fraudulent and/or malicious, Canup pleads for, and is also entitled to recover exemplary damages in an amount to be

determined by the trier of fact. Canup further pleads for expenses and pre and post-judgment interest at the maximum rate permitted by law.

# VII.

# DAMAGES

7.1    For each of his claims, Canup demands recovery of all of the following categories of damages as a direct and proximate result of the Defendants' wrongful conduct, which include:

7.2    **Actual Damages**

Canup suffered actual damages totaling **$19,807.35 + common benefit fee set aside from settlement in underlying litigation (common benefit fee is less than $20,000)**, including:

    (a) $6,520.00 for representation by David Gamble at the March 13, 2024 status conference in Pensacola, Florida;

    (b) $884.59 in related travel and lodging expenses;

    (c) $11,925.00 for expert reports and litigation preparation rendered futile by Defendants' misconduct; and

    (d) $477.76 in miscellaneous litigation costs;

    (e) amount set aside from settlement to cover common benefit fee

These damages are recoverable under all applicable causes of action, including fraud and breach of fiduciary duty.

### 7.3    Inconvenience Damages

Defendants' misconduct forced Canup to learn about and understand duties that competent counsel should have performed, including analyzing complex legal issues as well as studying fiduciary duties owed by attorneys, and uncovering fraud and concealment theories that revealed how his own counsel had deceived him. These burdens disrupted Canup's daily life, imposed unnecessary strain, and deprived him of reliable representation. Canup seeks damages for loss of time, disruption, and inconvenience. The amount is left to the discretion of the trier of fact.

### 7.4    Exemplary Damages

Defendants acted with fraud, malice, and conscious disregard of Canup's rights by:

(a) appearing as counsel without consent;

(b) accessing confidential medical records without authorization;

(c) concealing material terms and conflicts of interest;

(d) withdrawing or refusing to act during critical litigation phases; and

(e) pressuring Canup toward an unfair settlement.

Canup seeks exemplary damages under *Tex. Civ. Prac. & Rem. Code ch. 41.003*, in an amount sufficient to punish and deter.

### 7.5    Disgorgement

Canup seeks disgorgement of any common benefit fees traceable to his settlement, Florida Defendants as former members of the PSC in the MDL obtained such benefits through fraud and in breach of duty.

### 7.6    Interest and Costs

Canup seeks pre- and post-judgment interest as authorized by law, together with all taxable court costs and litigation expenses.

## VIII.

## JURY DEMAND

8.1    Canup requests a jury trial on all claims and issues so triable.

## IX.

## CONDITIONS PRECEDENT

9.1    All conditions precedent have occurred and been satisfied.

## X.

## NOTICE PURSUANT TO T.R.C.P. 193.7

10.1    Canup provides notice to Defendants pursuant to Rule 193.7 of the Texas Rules of Civil Procedure that Canup may utilize as evidence during the trial of this lawsuit all documents exchanged by the parties in discovery in this case.

## XI.

## PRAYER

ORIGINAL PETITION                                                              **PAGE**    37

11.1 ACCORDINGLY, Canup respectfully requests that Defendants be cited to appear and answer, and that Canup be granted judgment against Defendants awarding Canup all damages he is entitled to, including all damages and other relief (at law or in equity) pled in the causes of action and other parts of this instrument above, actual damages and losses, economic damages, compensatory damages, exemplary damages, costs, pre- and post-judgment interest, disgorgement of any fees or benefits wrongfully obtained by Defendants, and all other damages Canup is entitled to in equity or by other applicable law.

11.2 Canup further requests such other and further relief, general or special, at law or in equity, to which Canup may show himself justly entitled.

Dated October 27, 2025

Respectfully submitted,

*/s/ Brandon Canup*
Brandon Canup

4812 Hidden Oaks Ln
Arlington, Texas 76017
(972) 762-4314

canup.brandon@gmail.com

pro se

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 107325134
Filing Code Description: Petition
Filing Description: Original Petition
Status as of 10/27/2025 4:25 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Brandon Canup | | canup.brandon@gmail.com | 10/27/2025 1:29:54 PM | NOT SENT |



Hasler
12/10/2025
US POSTAGE $015.75

ZIP 32502
011E11679380

X-RAY



Clerk of Court
United States District Court
Northern District of Texas
501 West 10th Street, Room 310
Fort Worth, TX 76102-3673

RECEIVED

DEC 2 9 2025

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS