**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA PENSACOLA DIVISION**

| | | |
|---|---|---|
| BRANDON CANUP | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: 3:26-cv-03359-MCR-ZCB |
| v. | ) | |
| | ) | |
| BRYAN F. AYLSTOCK, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS BRYAN F. AYLSTOCK, AYLSTOCK, WITKIN, KREIS & OVERHOLTZ PLLC, AND BOBBY BRADFORD'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW**

Defendants, **BRYAN F. AYLSTOCK, AYLSTOCK, WITKIN, KREIS & OVERHOLTZ PLLC**, and **BOBBY BRADFORD** ("AWKO Defendants"), hereby file their *Motion to Dismiss Plaintiff's Amended Complaint*. In support, the AWKO Defendants state the following:

**INTRODUCTION AND SUMMARY OF ARGUMENT**

The extensive backdrop of the underlying litigation in this purported legal malpractice claim, which masquerades as some sort of fraud/breach of fiduciary duty claim, is important to the Court's analysis of the Plaintiff's claims. First, the facts that give rise to this case stem from one of the largest mass tort cases ever handled by the Federal Court system – the 3M earplug litigation – with more than 350,000

individual claimants at its peak. Second, the AWKO Defendants never represented Plaintiff, but rather were appointed as Lead Counsel (Bryan Aylstock, specifically) for the MDL by United States District Judge M. Casey Rodgers on or about May 22, 2019.[1] There can be no dispute that Bryan F. Aylstock, Bobby Bradford and the lawyers at Aylstock, Witkin, Kreis and Overholtz, PLLC's only interactions with Plaintiff were on behalf of Plaintiffs' MDL Leadership at the request of the MDL Court.

Finally, it is clear that Plaintiff's *Amended Complaint* is really nothing more than a collateral attack on the 3M Combat Arms global settlement, the MDL Court's Orders, including Case Management Order No. 57 wherein Judge Rodgers created a specific framework for those litigants, like this Plaintiff, who opted not to participate in the Settlement Program as outlined in the Master Settlement Agreement, Common Benefit Order No. 3, Pretrial Order No. 9, the Order sealing Exhibit No. 10 to the MSA, and the Orders granting withdrawal of Plaintiff's actual former counsel, Cliff Roberts, Gregory Brown and Fleming, Nolen & Jez. [2]

---

[1] See Pretrial Order No. 7, Plaintiff Leadership Appointments, *In Re: 3M Combat Arms Product Liability Litigation*, Case No. 3:19md2885, United States District Court for the Northern District of Florida, Pensacola Division, May 22, 2019 (Dkt. 376).

[2] See Case Management Order No. 57, Case Management Order for Any Ongoing Litigation Against Defendants, *In Re: 3M Combat Arms Product Liability Litigation*, Case No. 3:19md2885, United States District Court for the Northern District of Florida, Pensacola Division, August 29, 2023, (Dkt. 3811); Common Benefit Order No. 3, *In Re: 3M Combat Arms Product Liability Litigation*, Case No. 3:19md2885, United States District Court for the Northern District of Florida, Pensacola Division, February 17, 2021, (Dkt. 1659); Pretrial Order No. 9, Stipulated Order Governing Confidentiality and Privilege, *In Re: 3M Combat Arms Product Liability Litigation*,

5350236_1

Plaintiff's *Amended Complaint* should be dismissed because it is premised upon legally defective theories that fail as a matter of law and cannot be cured through another conclusory pleading. At its core, the *Amended Complaint* improperly attempts to transform apparent dissatisfaction with court-supervised MDL administration into individualized tort and fiduciary-duty claims against court-appointed Plaintiffs' MDL Leadership counsel who never represented Plaintiff personally. Plaintiff was represented throughout the relevant proceedings by independent retained counsel, and Plaintiff is incapable of establishing either an attorney-client or quasi-attorney-client relationship necessary to support claims for fraud in the inducement, breach of fiduciary duty, or fraudulent inducement. The Amended Complaint likewise fails to plausibly allege the essential elements of fraudulent misrepresentation because it identifies no actionable false statement, no reasonable reliance, and no particularized facts satisfying Rule 9(b).

Equally fatal, Plaintiff cannot establish the causation element for any asserted cause of action. Plaintiff admits his own independently retained counsel advised him throughout the litigation, and Plaintiff voluntarily elected to participate in the CMO

---

Case No. 3:19md2885, United States District Court for the Northern District of Florida, Pensacola Division, June 17, 2019, (Dkt. 442); Order to Seal, *In Re: 3M Combat Arms Product Liability Litigation*, Case No. 3:19md2885, United States District Court for the Northern District of Florida, Pensacola Division, August 29, 2023, (Dkt. 3810); and Order Granting Withdrawal of Counsel, *Canup v. 3M Company, et al.*, Case No. 8:20cv14021, United States District Court for the Northern District of Florida, Pensacola Division, February 20, 2024, (Dkt. 12).

5350236_1

57 opt-out process and resolved his case via direct settlement with 3M due only to his and his independent counsel's efforts.

Finally, Plaintiff lacks Article III standing to pursue the vague and speculative damages and equitable remedies sought because he alleges no concrete injury fairly traceable to AWKO Defendants' conduct, identifies no personal ownership interest in any challenged fees or MDL procedures, and no cognizable damages beyond the ordinary burdens attendant to the litigation Plaintiff voluntarily chose to pursue. Accordingly, dismissal is warranted under Rule 12(b)(6) with prejudice, as Plaintiff has already sought leave from this Court to file an *Amended Complaint* and any additional amendments would be futile.

## PROCEDURAL HISTORY

Plaintiff originally filed this lawsuit on October 27, 2025, in the 67th Judicial District Court of Tarrant County, Texas. (*Brandon Canup v. Bryan F. Aylstock, et al.*, Cause No. 067-371499-25, 67th Judicial District Court of Tarrant County, Texas). The lawsuit was removed to the United States District Court for the Northern District of Texas on November 6, 2025 wherein the Fleming Nolen & Jez and AWKO Defendants filed motions to dismiss. (*Brandon Canup v. Bryan F. Aylstock, et al.*, Case No. 4:25-cv-01255-Y, U.S.D.C., Northern District of Texas, Fort Worth Division, Dkts. 10, 27).

4

5350236_1

AWKO Defendants moved under 28 U.S.C. §1407(c) to transfer the lawsuit to the MDL Court. (Mot. to Transfer, *In Re: 3M Combat Earplugs Products Liability Litigation*, No. 2885 (J.P.M.L. December 10, 2025, Dkt. 2033)). The JPML granted the AWKO Defendants' transfer motion on April 2, 2026 (Transfer Order, *In Re: 3M Combat Earplugs Products Liability Litigation*, No. 2885 (J.P.M.L. April 2, 2026, Dkt. 2051)). Following transfer to this Court, Plaintiff requested to amend his Complaint on April 6, 2026. This Court granted Plaintiff's Motion to Amend without opposition on May 6, 2026 (Order, *Canup v. Bryan F. Aylstock et al.*, May 6, 2026, Dkt. 54). AWKO Defendants file this *Motion to Dismiss* in response to Plaintiff's *Amended Complaint*.

## FACTUAL ALLEGATIONS RELEVANT TO PLAINTIFF'S CLAIMS AND AWKO DEFENDANTS' MOTION TO DISMISS

The following factual allegations arise from Plaintiff's *Amended Complaint*, the hearing transcript from the March 13, 2024, Status Conference referenced in Plaintiff's *Amended Complaint*, emails referenced in Plaintiff's *Amended Complaint*, and information from Plaintiff's case docket from which this Court can take judicial notice.[3]

On June 21, 2019, Plaintiff hired Cliff Roberts, Gregory Brown, and Fleming Nolen & Jez ("Texas Defendants) to represent him in his 3M Combat Arms Earplug

---

[3] AWKO Defendants request the Court to take judicial notice of all docket references in this Motion to Dismiss.

5350236_1

case. (¶ 28 Amnd. Comp.).  On June 3, 2020, the Texas Defendants filed suit on Plaintiff's behalf against 3M, styled *Canup v. 3M Company et al.*, Case No. 8:20-cv-14021. (¶ 34 Amnd. Comp.).  Plaintiff's case was not selected for the bellwether or wave process. (See Docket, U.S.D.C. Northern District of Florida, Pensacola Division, *Canup v. 3M Company et al.*, Case No. 8:20-cv-14021). On August 29, 2023, a global settlement agreement was announced by 3M and Plaintiffs' Leadership in the MDL. (¶ 38 Amnd. Comp.).  In January 2024, after the Texas Defendants indicated they would withdraw from representing Plaintiff if he decided to opt-out of the settlement, Plaintiff hired David Gamble ("Gamble") to represent him in his 3M Combat Arms Earplug Lawsuit. (¶ 64 Amnd. Comp.).

On January 21, 2024, Plaintiff formally opted out of the settlement, triggering his obligations under CMO 57, which included production obligations within 30 days of opting out and filing expert reports within 60 days of opting out. (¶ 66-67 Amnd. Comp.).  On February 5, 2024, Plaintiff was ordered by this Court to appear "in person, with counsel" at a status conference in Pensacola, Florida scheduled for March 13, 2024. (¶ 77 Amnd. Comp.).  On February 20, 2024, this Court granted the Texas Defendants motion to withdraw as Plaintiff's counsel in the 3M Combat Arms Litigation.  (¶ 78 Amnd. Comp.).  Plaintiff, having already hired Gamble to represent him in his 3M lawsuit, did not oppose Texas Defendants' motion to withdraw. (Motion to Withdraw and Order Granting, U.S.D.C. Northern District of Florida,

6

5350236_1

Pensacola Division, *Canup v. 3M Company et al.*, Case No. 8:20-cv-14021, Dkts. 10, 12).

The AWKO Defendants' first involvement regarding Plaintiff's 3M lawsuit was on February 22, 2024. (¶ 79 Amnd. Comp.). The Court requested Plaintiffs' MDL Leadership be present at all status conferences for 3M Combat Arms claimants who opted out of the settlement, including Plaintiff (Exhibit A, Status Conference Transcript at p. 3:8-9, March 13, 2024, *Canup v 3M Company, et al.*, Case No. 8:20-cv-14021) and for Plaintiffs' MDL Leadership to be familiar with opt out claimants' cases to assist them with the pros and cons of settling or continuing to litigate. (*Id.* at p. 33:19-25). Bradford emailed Gamble on February 22, 2024, requesting a call to discuss Plaintiff's case. (¶ 79 Amnd. Comp.). Gamble called Bradford and after discussing Plaintiff's case and potential avenues of recovery through the settlement, on February 23, 2024 Bradford emailed Gamble settlement-related materials, including the EIF protocol and FAQs at Gamble's request. (¶ 79 Amnd. Comp.). Additionally, Bradford informed Gamble he and Aylstock would be in attendance at the March 13, 2024, Status Conference. (¶ 79 Amnd. Comp.).

The AWKO Defendants attended the March 13, 2024, Status Conference. (¶ 81 Amnd. Comp.). The status conference began with the Court welcoming Plaintiff and his attorney Gamble, introducing herself, and then telling Plaintiff: "Also in

5350236_1

the courtroom today from plaintiffs' leadership there's Mr. Bryan Aylstock, Mr. Brad

Bradford and Mr. Mike Burns." (Exhibit. A, Status Conference Transcript at 3:8-9).

The MDL Court continued by explaining why she thought it was important to

meet with those plaintiffs litigating their cases (like Plaintiff) so that she could give

her perspective of the litigation having overseen it for 5 years, stating: "Also, as you

can see, leadership counsel from the plaintiffs' side is here if you have questions of

them." *Id.* at 4:23-25.  The Court went on to advise Plaintiff:

> "So my purpose today was just to meet with you, to explain to you what this is going to be like going forward, and to give you an opportunity, as I said, to speak with me. If you have questions, if there's something that I can address for you, I'm happy to do that, if I'm able to.  You have a lawyer, so I certainly – even if you didn't have a lawyer, I wouldn't try to give you any legal advice. I'm just giving you my perspective as the judge who has been presiding over this litigation for a long time and has a great deal of familiarity with it so you go forward with your eyes wide open.  And then if you'd like an opportunity, you or Mr. Gamble, to talk with leadership counsel about some if what I've said about the settlement program, some of the more nuanced aspects of the settlement program, that's going to be available to you as opportunity, if you'd like …" *Id. at 32:8-33:23.*

> And then, at the end of the day, if you leave here, you know, you're leaving without settling, you're leaving here having heard from me, you know, I feel better about that. You had an opportunity to ask questions.  And then, if you decide to roll the dice, again, that's your case.  That's what our system is about.  The courtroom is here.  We try cases …" *Id at 34:1-7.*

5350236_1

Aylstock also spoke at the Status Conference, referencing Plaintiff's specific circumstances. (¶ 81 Amnd. Comp.). The MDL Court also addressed Plaintiff's specific medical records and case specific issues in the Status Conference when discussing Plaintiff's case. (Exhibit A at 33:19-25). Neither Gamble nor Plaintiff objected to AWKO Defendants' presence at the Status Conference (See Exhibit A generally).

The Court gave Plaintiff and Gamble the opportunity to voluntarily meet with Magistrate Judge Hope Cannon for a settlement conference after the Status Conference. (¶ 83 Amnd. Comp.). The Court also gave Plaintiff and Gamble the opportunity to voluntarily meet with Aylstock, Bradford and Burns after the Status Conference. (¶ 83 Amnd. Comp.). Plaintiff and Gamble chose to meet with Judge Cannon and then with Judge Cannon, Aylstock, Bradford and Burns. (¶ 84 Amnd. Comp.). During the meeting, the AWKO Defendants engaged directly with Plaintiff and Gamble regarding multiple specific aspects of Plaintiff's case. The AWKO Defendants recommended Plaintiff participate in the programs available within the 3M settlement and to settle his case. Despite the Aylstock Defendant's recommendation, Plaintiff declined to settle his case as was his right. (¶ 84 Amnd. Comp.).

After the Status Conference on March 13, 2024, the AWKO Defendants had no involvement with Plaintiff's case until Gamble contacted Bradford on April 24,

9

5350236_1

2024, to obtain the un-redacted Master Complaint.  Bradford responded the same day and advised that he would provide requested information once Gamble signed and returned the Confidentiality and Protective Order documents required by PTO 9 and the Participation Agreement required by Common Benefit Order No. 3.  (¶ 95 Amnd. Comp.) and (Common Benefit Order No. 3, *In Re: 3M Combat Arms Product Liability Litigation*, Case No. 3:19md2885, United States District Court for the Northern District of Florida, Pensacola Division, February 17, 2021, (Dkt. 1659); and Pretrial Order No. 9, Stipulated Order Governing Confidentiality and Privilege, *In Re: 3M Combat Arms Product Liability Litigation*, Case No. 3:19md2885, United States District Court for the Northern District of Florida, Pensacola Division, June 17, 2019, (Dkt. 442).

On April 25, 2024, Gamble returned the required documents and Bradford forwarded the requested information. (¶ 95 Amnd. Comp.).  The AWKO Defendants had no other involvement with Plaintiff's case until July 9, 2024, when Plaintiff, despite being represented by Gamble, emailed Bradford seeking access to common benefit work product. (¶ 99 Amnd. Comp.).  Bradford, who responded immediately to Gamble's previous requests, did not respond to Plaintiff's email since he was represented by Gamble.  (¶ 99, 79, 95 Amnd. Comp.). Plaintiff's *Amended Complaint* contains no allegations that Gamble (or Plaintiff after the one time) ever followed up or requested additional common benefit work product from the AWKO

10

Defendants or any other member of Plaintiffs' MDL Leadership.  (*See generally* Amended Complaint).  The AWKO Defendants had no further involvement with Plaintiff's 3M case.  (*See generally* Amended Complaint). With the assistance of Gamble, Plaintiff satisfied the MDL requirements to proceed with his individual opt out case.  (See docket - *Canup v. 3M Company, et al.*, U.S.D.C. Northern District of Florida, Pensacola Division, Case No. 8:20-cv-14021). On September 30, 2024, Plaintiff settled his 3M case outside of the settlement program. (¶ 100 Amnd. Comp.).  Plaintiff's "ability to reach this resolution was made possible only through his efforts and the efforts of independent counsel, despite harm caused by the misconduct of all Defendants named herein." (¶ 100 Amnd. Comp.).

Based on the above allegations, Plaintiff brings four claims against the AWKO Defendants: (1) fraud by nondisclosure; (2) breach of fiduciary duty; (3) fraudulent inducement; and (4) civil conspiracy.

## STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of a complaint.  The "complaint must include 'enough facts to state a claim to relief that is plausible on its face.'" *Hunt v. Amico Props., L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility is found where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Iqbal*, 556 U.S. at 679 (noting the plausibility inquiry presents a "context-specific task," requiring the court to draw on "judicial experience and common sense"). Mere legal conclusions lacking "adequate factual support" are not entitled to an assumption of truth. *Mamani v. Berzain*, 654 F.3d 1148, 1153 (11th Cir. 2011); *see also Twombly*, 550 U.S. at 555 (noting "a formulaic recitation of the elements of a cause of action will not do").

The allegations in the complaint must set forth enough facts "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Additionally, "a complaint is subject to dismissal under Rule 12(b)(6) when its factual allegations, on their face, establish an affirmative defense that bars recovery." *Myrick v. Fulton Cnty., Ga.*, 69 F.4th 1277, 1297 (11th Cir. 2023). The Court limits its "consideration to the well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed." *LaGrasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004).

Additionally, fraud claims are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). Rule 9(b) requires a plaintiff alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy Rule 9(b), a complaint must allege: "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and

12

(2) the time and place of each such statement and the person responsible for making same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Brooks v. Blue Cross & Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1380–81 (11th Cir. 1997). Rule 9(b) must be read in conjunction with Rule 8(a)'s plausibility requirement. Thus, a complaint alleging fraud must contain sufficient factual matter to state a plausible claim for relief and cannot rely on conclusory allegations, unwarranted deductions, or formulaic recitations of elements. See *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–57 (2007).

## MEMORANDUM OF LAW

**A.  PLAINTIFF CANNOT ESTABLISH AN ACTIONABLE FIDUCIARY RELATIONSHIP OR AN ATTORNEY-CLIENT, QUASI ATTORNEY-CLIENT, OR IMPLIED ATTORNEY-CLIENT RELATIONSHIP WITH THE AWKO DEFENDANTS.**

Plaintiff's claims for Breach of Fiduciary Duty, Fraud by Non-Disclosure and Civil Conspiracy are premised on Plaintiff establishing an actionable fiduciary or attorney-client relationship. Despite Plaintiff's effort to the contrary, his *Amended Complaint* fails to plausibly allege any attorney-client, quasi-attorney-client, implied attorney-client or independently actionable fiduciary relationship between Plaintiff and Defendants. Under Florida law, the test for an attorney-client relationship, "is a subjective one and hinges upon the client's belief that he is consulting a lawyer in

13

that capacity and his manifested intention is to seek professional legal advice. However, this subjective belief must ... be a reasonable one." *The Fla. Bar v. Beach,* 675 So. 2d 106, 109 (Fla. 1996) (citation and internal quotation marks omitted). *Mansur v. Podhurst Orseck, P.A.*, 994 So. 2d 435, 438 (Fla. 3d DCA 2008).

> For belief of an attorney-client relationship to be reasonable, the client must have "consulted the attorney with the manifested intention of retaining him for legal services." Jackson, 372 F.3d at 1282 (emphasis in original). Jackson noted that "[t]he plain meaning of 'manifest' is 'to show plainly,' and ... it is the lawyer being charged with representing a client who must have been plainly shown the client's intention to form the attorney-client relationship." Id. at 1282 n.30.

*Nat'l Equestrian League, LLC v. White*, No. 20-21746-CIV, 2021 WL 4690665, at *6 (S.D. Fla. Oct. 7, 2021).

The information properly before this Court for its consideration[4] makes clear the extraordinary implausibility of Plaintiff's theory that AWKO Defendants represented him at all, much less at an actionable level. Here, the *Amended Complaint* affirmatively establishes Plaintiff hired and was represented his own counsel during the entirety of his 3M Combat Arms Earplug lawsuit, first by the Texas Defendants and then as of January 2024 by Gamble. (¶ 28, 64 Amnd. Comp.). The AWKO Defendants never represented Plaintiff, and never even had any involvement or contact with Plaintiff until February 22, 2024, when Bradford

---

[4] Including Plaintiff's factual allegations, documents central to or referenced in the complaint, and matters judicially noticed.

14

reached out to Plaintiff's counsel Gamble at the MDL Court's request leading up to the March 13, 2024 Status Conference.  (*See generally* Amended Complaint and ¶ 70 Amnd. Comp.).

The transcript of the Status Conference makes abundantly clear that the MDL Court carefully delineated AWKO Defendants' limited role and never suggested AWKO Defendants were acting as Plaintiff's personal attorneys. To the contrary, the Court repeatedly framed AWKO Defendants' responsibilities as part of their court-appointed MDL Leadership functions, namely, facilitating communications regarding settlement programs and options, and responding to questions from represented claimants and their counsel. Nothing in the transcript remotely suggests the formation of an attorney-client relationship between AWKO Defendants and individually represented plaintiffs such as Plaintiff. The Status Conference transcript makes it equally clear that Gamble was present as Plaintiff's counsel, which makes sense considering he was Plaintiff's attorney of record.   (Exhibit A, Status Conference Transcript at p. 4:1-2).

Plaintiff's attempted reliance on the transcript from the Status Conference listing Aylstock, Bradford and Burns as appearing "FOR THE PLAINTIFF" as a basis for establishing an attorney-client relationship is unreasonable and contrary to all relevant facts before this Court.  First, the Court made Aylstock, Bradford and Burns' role at the Status Conference abundantly clear. (Exhibit A, Status Conference

15

Transcript at p. 3:8-9). Second, the AWKO Defendants never represented Plaintiff, never filed an appearance on his behalf or appeared on his behalf. (*See generally* the docket, U.S.D.C. Northern District of Florida, Pensacola Division, *Canup v. 3M Company et al.*, Case No. 8:20-cv-14021).

Third, Plaintiff knew Aylstock and Bradford were going to attend the Status Conference. (¶ 79 Amnd. Comp.). Fourth, the Minute Entry for the Status Conference referenced in the Court's Docket Report (Dkt. 13) clearly shows Aylstock, Bradford and Burns were present on behalf of Plaintiffs' MDL Leadership Counsel. (U.S.D.C. Northern District of Florida, Pensacola Division, *Canup v. 3M Company et al.*, Case No. 8:20-cv-14021). Fifth, every pleading filed on Plaintiff's behalf in the 3M MDL was filed by the Texas Defendants, until their withdrawal was granted, and then by Gamble. All pleadings filed by 3M in Plaintiff's case from the 3M MDL were served on the Texas Defendants until their withdrawal was granted, and then Gamble. None were filed by or served upon AWKO Defendants. (See generally the docket, U.S.D.C. Northern District of Florida, Pensacola Division, *Canup v. 3M Company et al.*, Case No. 8:20-cv-14021).

Sixth, the docket from Plaintiff's case in the 3M MDL which shows subsequent mediations, including the mediation wherein Plaintiff voluntarily settled his case against 3M, were attended by Plaintiff's counsel, Gamble, and not AWKO

16

Defendants. (*See* Dkts. 54, 55, U.S.D.C. Northern District of Florida, Pensacola Division, *Canup v. 3M Company et al.*, Case No. 8:20-cv-14021).

Plaintiff's conclusory allegations cannot transform generalized litigation-management communications into individualized attorney-client relationships, particularly where the plaintiff remained represented by separate counsel. Allowing that would improperly convert routine MDL leadership functions, including responding to claimant inquiries, communicating court-approved settlement procedures, and explaining available litigation options, into personal representation of thousands of separately represented claimants. Nor do Plaintiff's allegations plausibly establish a "special relationship" or position of trust sufficient to impose independent fiduciary duties.

Plaintiff retained independent counsel, remained free to accept or reject settlement, and participated in judicially supervised proceedings at all relevant times. Under such circumstances, any alleged reliance on AWKO Defendants for individualized legal advice was objectively unreasonable as a matter of law. *See Mansur*, 994 So. 2d at 438. To hold otherwise would fundamentally undermine the structure of multidistrict litigation by subjecting court-appointed leadership counsel to conflicting fiduciary obligations owed simultaneously to thousands of separately represented claimants based merely on generalized MDL communications undertaken pursuant to court authorization.

17

For the reasons discussed above, Plaintiff's Breach of Fiduciary Duty claim fails because Plaintiff cannot establish a fiduciary relationship as a matter of law. To plead a count for Breach of Fiduciary Duty, the Plaintiff must allege the following elements: (1) a fiduciary relationship exists between the plaintiff and defendant; (2) the defendant's breach of that duty; and (3) the breach must cause injury to the plaintiff. *Broower v Wyndham Vacation Resorts, Inc.*, 336 So. 3d 372 (Fla. 5th DCA 2022). "It is axiomatic that to succeed on a cause of action for breach of fiduciary duty, one must first establish the existence of a fiduciary duty." *Real Est. Value Co. v. Carnival Corp.*, 92 So. 3d 255, 261 (Fla. 3d DCA 2012). Because Plaintiff cannot establish that an actionable fiduciary relationship exists, the breach of fiduciary duty claim should be dismissed.

Likewise, because Plaintiff cannot establish a fiduciary relationship, Plaintiff's Fraud by Non-Disclosure also fails and must be dismissed. For Plaintiff to prove Fraud by Non-Disclosure, the Plaintiff must prove the general elements of fraud, but must also prove that there was a confidential or fiduciary relationship between the defendant and the plaintiff that obligated the defendant with a duty to disclose. *Trans Petrol, LTD. v. Radulovic*, 764 So. 2d 878 (Fla. 4th DCA 2000). The *Amended Complaint* fails to plausibly allege any attorney-client, quasi-attorney-client, implied attorney-client, or independently actionable fiduciary relationship between Plaintiff and AWKO Defendants.

Additionally, any alleged reliance or trust of the Plaintiff in the AWKO Defendants is not reasonable or legally enforceable. "To establish such a relationship, the plaintiff must prove both that she placed trust in the defendant and that the defendant accepted that trust." *Cramer v. Palm Ave. Partners, LLC*, 672 B.R. 517, 533 (M.D. Fla. 2025) (citing *Abele v. Sawyer*, 747 So.2d 415, 417 (Fla. 4th DCA 1999)).

> "The fact that one party places trust or confidence in the other does not create a confidential [or fiduciary] relationship in the absence of some recognition, acceptance or undertaking of the duties of a fiduciary on the part of the other party." Moreover, when parties are dealing at arm's length, "a fiduciary relationship does not exist because there is no duty imposed on either party to protect or benefit the other."

*Identity Stronghold, LLC v. Zeidner*, No. 8:16-CV-868-T-35AAS, 2019 WL 12338322, at *10 (M.D. Fla. Sept. 11, 2019) (citations omitted).

In other words, "[t]he fact that one party places trust or confidence in the other does not create a confidential relationship in the absence of some recognition, acceptance or undertaking of the duties of a fiduciary on the part of the other party." *Lanz v. Resol. Tr. Corp.*, 764 F. Supp. 176, 179 (S.D. Fla. 1991). As a result, dismissal is proper.

## B.    PLAINTIFF FAILS TO STATE A CLAIM FOR FRAUDULENT INDUCEMENT.

Plaintiff's fraudulent inducement claim fails as a matter of law because the *Amended Complaint* does not plausibly allege a false statement of material fact,

19

fraudulent intent, reasonable reliance, or causation, and further fails to satisfy Rule 9(b)'s heightened pleading standard.  To state a claim for fraudulent inducement under Florida law, a plaintiff must allege: (1) a false statement of material fact; (2) when the representation was made, the defendant knew or should have known of the falsity of the statement; (3) the defendant intended that the false statement to induce plaintiff's reliance; and (4) the plaintiff justifiably relied upon the false statement to his detriment. *Output, Inc. v. Danka Business Systems, Inc.*, 991 So. 2d 941 (Fla. 4th DCA 2008).  In federal court, such claims must additionally satisfy Rule 9(b), which requires a plaintiff to plead with particularity the precise statements made, the speaker, when and where the statements were made, how the statements misled the plaintiff, and what the defendant gained as a consequence of the alleged fraud. *Brooks v. Blue Cross & Blue Shield of Florida, Inc.,* 116 F.3d 1364, 1380–81 (11th Cir. 1997).

The *Amended Complaint* fails at the outset because Plaintiff cannot plausibly allege he was fraudulently induced into signing agreements that were required by the MDL Court as a prerequisite to obtaining access to common-benefit materials. (Common Benefit Order No. 3, *In Re: 3M Combat Arms Product Liability Litigation*, Case No. 3:19md2885, United States District Court for the Northern District of Florida, Pensacola Division, February 17, 2021, (Dkt. 1659); and Pretrial Order No. 9, Stipulated Order Governing Confidentiality and Privilege, *In Re: 3M Combat*

20

5350236_1

*Arms Product Liability Litigation*, Case No. 3:19md2885, United States District Court for the Northern District of Florida, Pensacola Division, June 17, 2019, (Dkt. 442). Execution of the Protective Order and Participation Agreement was mandated by Court-supervised MDL procedures governing access to protected discovery materials. Plaintiff does not allege that AWKO Defendants fabricated a separate inducement scheme or persuaded Plaintiff to undertake obligations beyond those already imposed by the Court's process. The agreements arose from the MDL Court's administration of common-benefit discovery, not from any independent fraudulent conduct by AWKO Defendants.

The *Amended Complaint* likewise fails to plausibly allege fraudulent intent. Plaintiff merely speculates that AWKO Defendants supposedly never intended to provide full access to common benefit materials. But "[a] mere promise not performed is not fraud." *Alexander/Davis Properties, Inc. v. Graham*, 397 So. 2d 699, 706 (Fla. 4th DCA 1981). Rather, a plaintiff must allege facts demonstrating that, at the time the representation was made, the defendant had a present intent not to perform. *See Prieto v. Smook, Inc.,* 97 So. 3d 916, 918 (Fla. 4th DCA 2012). Conclusory allegations of intent are insufficient under Rule 9(b).

Here, Plaintiff identifies no particularized facts showing any Defendant made a knowingly false statement, possessed a contemporaneous intent not to comply with MDL procedures, or affirmatively misrepresented what discovery materials would

21

5350236_1

be made available. Instead, the allegations amount to nothing more than dissatisfaction with the alleged scope or timing of materials ultimately produced. Such allegations do not state a fraud claim.

The *Amended Complaint* also negates reasonable reliance and causation. Plaintiff admits he was represented by separate retained counsel throughout the underlying litigation. Yet Plaintiff alleges only that he personally sent an email to AWKO Defendants regarding materials covered by the agreements. Plaintiff also acknowledged Bradford responded promptly to previous inquiries by his counsel, Gamble. Plaintiff does not allege that Gamble ever requested additional common benefit materials, followed up on Plaintiff's request, sought clarification, moved to compel compliance before the MDL Court, or otherwise pursued relief through available procedures.

Instead, Plaintiff voluntarily settled his underlying claims soon after requesting the additional common benefit materials directly from Bradford despite being represented by Gamble. These allegations foreclose any plausible inference that AWKO Defendants caused Plaintiff's alleged injuries. Ultimately, Plaintiff attempts to convert an alleged dispute regarding administration of Court-supervised MDL discovery procedures into a tort claim for fraudulent inducement. Rule 9(b) does not permit such speculative and conclusory pleading. Because Plaintiff fails to plausibly allege a knowingly false statement, fraudulent intent, reasonable reliance,

5350236_1

or causation—and fails to plead fraud with particularity—the fraudulent inducement claim should be dismissed with prejudice.

## C. PLAINTIFF'S AMENDED COMPLAINT FAILS TO PLAUSIBLY ALLEGE PROXIMATE CAUSATION, REQUIRING DISMISSAL OF ALL CAUSES OF ACTION.

All four of Plaintiff's causes of action against AWKO Defendants have a proximate cause element and requirement. Fraud by Non-Disclosure requires reliance on the non-disclosure, which causes injury (¶¶ 136-151 Amnd. Comp.). Breach of Fiduciary Duty requires Defendants' alleged breach to cause injury. (¶¶ 152-164 Amnd. Comp.). Fraudulent Inducement requires reliance on a false representation, which causes injury. (¶¶ 165-186 Amnd. Comp.). Finally, Civil Conspiracy requires damage as a result of the acts done under the conspiracy. (¶¶ 187-203 Amnd. Comp.).

Plaintiff's *Amended Complaint* contains core allegations that are fatal to causation for all four causes of action. First, Plaintiff was represented by his own independent attorney(s) at all times. Second, with the advice and assistance of his counsel, Gamble, Plaintiff "repeatedly declined" AWKO Defendants' recommendation for him participate in the settlement programs available and settle his case at the voluntary meeting on March 13, 2024 after the status conference. (¶ 84 Amnd. Comp.). Third, with advice and assistance his counsel, Gamble, Plaintiff

23

voluntarily settled his Combat Arms Earplugs lawsuit with 3M on September 30, 2024, during the CMO 57 opt-out process.[5]

The *Amended Complaint* attempts to leap over Plaintiff's own settlement decision, and the independent advice of his retained counsel, by a conclusory assertion that AWKO Defendants somehow "caused" Plaintiff's alleged losses through their conduct in the MDL. But Rule 8 and Rule 12 require more than speculation and labels. Where independent actors exercise their own judgment, proximate causation fails as a matter of law. "A party cannot recover damages for legal malpractice unless it is shown that the lawyer neglected a reasonable duty which was the proximate cause of the client's loss." *Chipman v. Chonin*, 597 So. 2d 363, 364 (Fla. 3d DCA 1992). That independent decision, made with the advice and availability of counsel, breaks any purported causal chain as a matter of law.

Even accepting Plaintiff's allegations as true, the *Amended Complaint* affirmatively establishes that Plaintiff voluntarily elected to settle his claims in the CMO 57 opt-out process while represented by independent counsel. Any alleged injury, therefore resulted from Plaintiff's own discretionary settlement decision and the advice of his personal attorneys – and not from any actionable conduct by AWKO

---

[5] Plaintiff specifically alleges "On September 30, 2024, Canup entered into a direct settlement agreement with 3M.  Canup's ability to reach this resolution was made possible only through his efforts and the efforts of independent counsel, despite the harm caused by the misconduct of all Defendants named herein. (¶ 100 Amnd. Comp.).

5350236_1

Defendants. Simply put, how can any conduct by AWKO Defendants have proximately caused Plaintiff damages when he, with Gamble's advice and assistance, 1) rejected AWKO Defendants recommendation that he join the settlement programs and settle his case; 2) satisfied the MDL requirements to proceed with his individual opt out case; and 3) negotiated and voluntarily settled his case with 3M outside the settlement program for an amount he accepted?  As a result, Plaintiff cannot plausibly allege that AWKO Defendants proximately caused his alleged damages.

## D.   PLAINTIFF FAILS TO STATE A CLAIM FOR CONSPIRACY

Finally, to plead a count for Civil Conspiracy, the Plaintiff must allege the following elements: "(1) an agreement between two or more parties; (2) to do an unlawful act or to do a lawful act by unlawful means; (3) the doing of an overt act in pursuance of the conspiracy; and (4) damage to plaintiff as a result of the acts done under the conspiracy." *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997).  "Additionally, an actionable conspiracy requires an actionable underlying tort or wrong." *Id.*

The heightened pleading standard of Rule 9(b) also applies to claims brought under the conspiracy, and a bare legal conclusion unsupported by specific allegations of an agreement or overt act will not state a claim.  *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005).  Moreover, because Plaintiff fails to plausibly

5350236_1

allege the underlying tort claims upon which the conspiracy count depends, the conspiracy claim necessarily fails as well. See *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1067 (11th Cir. 2007). The Complaint nowhere alleges with particularity the existence of any actionable agreement, when any such agreement was formed, the specific role of each Defendant, or the precise fraudulent statements or omissions purportedly made in furtherance of the alleged conspiracy. Instead, Plaintiff relies entirely upon conclusory allegations which are insufficient as a matter of law. See *Fullman v. Graddick*, 739 F.2d 553 (11th Cir. 1984). AWKO Defendants have shown that the Plaintiff has not pled any legally recognizable causes of action, requiring dismissal of Plaintiff's Civil Conspiracy claim.

## E. PLAINTIFF LACKS STANDING TO SEEK EQUITABLE RELIEF, INCLUDING AN ACCOUNTING OR DISGORGEMENT.

Plaintiff's requests for equitable relief, including disgorgement and an accounting, fail because Plaintiff lacks Article III standing and, independently, fails to satisfy the substantive requirements for such extraordinary equitable remedies. To establish standing under Article III, a plaintiff must demonstrate "(1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, and (3) likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The Supreme Court has repeatedly emphasized that a plaintiff must allege a "concrete" and "particularized" injury personally suffered by the plaintiff

himself. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24 (2021).  Plaintiff fails to do so here.

The *Amended Complaint* does not plausibly allege that any specific fees allegedly received by AWKO Defendants belonged to Plaintiff or were wrongfully taken from Plaintiff's possession. Nor does Plaintiff allege facts establishing that he retained any ownership interest in the challenged funds. Instead, Plaintiff seeks sweeping equitable relief directed at fees allegedly earned through judicially supervised MDL proceedings. Such generalized grievances concerning MDL administration do not constitute the type of concrete individualized injury required for Article III standing. "No concrete harm, no standing," *Id*. at 417.

Moreover, Plaintiff cannot establish traceability because the alleged injury arose, if at all, only after Plaintiff voluntarily settled his claims while represented by independent counsel in judicially supervised proceedings. Any alleged harm therefore resulted from intervening decisions made by Plaintiff himself and his attorney, not from AWKO Defendants' alleged receipt of fees.

Plaintiff likewise fails to establish entitlement to disgorgement as an equitable remedy. The Supreme Court has made clear that equitable restitution or disgorgement generally requires identifiable funds or property that belong, "in good conscience," to the plaintiff and remain traceable to the defendant's possession. *Great-W. Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 213–14 (2002). Where

27

5350236_1

a plaintiff seeks merely to impose personal liability for money damages, the claim is legal, not equitable, in nature. *Id*. at 210.  That is precisely what Plaintiff attempts here. Plaintiff identifies no segregated or specifically traceable funds belonging to him.

Instead, Plaintiff seeks broad monetary recovery based upon allegations that Defendants improperly benefitted from MDL leadership roles. Such allegations do not support equitable disgorgement. *See Liu v. SEC*, 591 U.S. 71, 79–80 (2020) (recognizing equitable disgorgement is limited and must reflect traditional equitable principles).  Plaintiff's request for an accounting independently fails because an accounting is an "extraordinary remedy" available only where legal remedies are inadequate. *Zaki Kulaibee Establishment v. McFliker*, 771 F.3d 1301, 1311–12 (11th Cir. 2014). Under Florida law, a plaintiff seeking an accounting must establish both a fiduciary relationship or sufficiently complex transaction and the absence of an adequate remedy at law. *Kee v. Nat'l Rsrv. Life Ins. Co.,* 918 F.2d 1538, 1541 (11th Cir. 1990).  Plaintiff satisfies neither requirement.

First, Plaintiff seeks ordinary monetary relief that can be pursued through traditional legal remedies and discovery. The existence of such legal remedies forecloses equitable accounting relief. Second, the *Amended Complaint*'s allegations concerning MDL fee structures and leadership compensation do not involve funds owned by Plaintiff or accounts requiring equitable supervision. Rather, Plaintiff

5350236_1

seeks to re-litigate judicially supervised MDL proceedings through a collateral state-law fiduciary theory. Because Plaintiff fails to allege a concrete individualized injury, fails to identify specific equitable property belonging to him, and possesses an adequate remedy at law, Plaintiff lacks standing to pursue equitable relief and the claims for disgorgement and accounting should be dismissed with prejudice.

**F.    IN ADDITION TO THERE BEING NO STANDING FOR EQUITABLE REMEDIES, PLAINTIFF'S ADDITIONAL PLED DAMAGES ARE IMPROPER AND REQUIRE DISMISSAL.**

Plaintiff's incredulous allegations to recover attorney's fees and travel expenses in the amount of $7404.59 from AWKO Defendants for Gamble's court-ordered in-person attendance at the March 13, 2024, Status Conference fail as a matter of law. As described thoroughly above, AWKO Defendants were not Plaintiff's personal counsel. Additionally, this Court can take judicial notice of the CMO 57 requirements, including that Plaintiff appear in person at the Status Conference with his attorney of record, Gamble. Plaintiff's requests for exemplary damages fail as a matter of law, given the facts as pled by Plaintiff.

As provided herein, Plaintiff has pled no plausible damages as a matter of law.

29

## G.    FLORIDA LAW APPLIES IN THIS CASE.[6]

Interestingly, much of Plaintiff's *Amended Complaint* addresses the issue of jurisdiction and his attempts to convince this Court that the case should still be litigated under Texas law.[7] Plaintiff's attempt to circumvent this Order does not change that Florida federal law is to be applied in this case.  As argued in the prior Motion to Dismiss Plaintiff's Complaint, Florida substantive law applies to the AWKO Defendants.

Florida law governs Plaintiff's claims because the alleged conduct giving rise to the claims occurred in Florida, the relevant MDL proceedings were administered in Florida, and the allegedly operative communications and judicial proceedings upon which Plaintiff bases his claims took place in Florida. Under Florida's choice-of-law principles, Florida has the most significant relationship to the occurrences and parties relevant to the claims asserted against AWKO Defendants.

A federal court sitting in diversity applies the choice-of-law rules of the forum state. *Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007). Florida courts apply the "most significant relationship" test set forth

---

[6] Notably, in the AWKO Defendants' prior Motion to Dismiss Plaintiff's Complaint, great lengths were spent to address why the AWKO Defendants were not a proper party to a lawsuit venued in Texas. The AWKO Defendants specifically incorporate those arguments by reference herein and intend to fully argue those issues if for some reason this matter is remanded back to Texas. [See Doc. 27, Case 4:25-cv-01255-Y filed January 12, 2026 in the United States District Court for the Northern District of Texas.]

[7] Florida substantive law and Texas substantive law are substantially similar on the legal issues presented in this case.

30

in the Restatement (Second) of Conflict of Laws to tort-based claims. *Bishop v. Fla. Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980).  Under that framework, courts consider:

- the place where the injury occurred;
- the place where the conduct causing the injury occurred;
- the domicile or place of business of the parties; and
- the place where the relationship between the parties is centered.

Restatement (Second) of Conflict of Laws § 145(2) (1971).

Those factors overwhelmingly support application of Florida law here.  The alleged conduct underlying Plaintiff's claims occurred in Florida. Plaintiff's allegations arise from actions allegedly taken by court-appointed MDL leadership counsel in connection with multidistrict litigation pending in the United States District Court for the Northern District of Florida. The challenged conduct, including the administration of MDL procedures, communications concerning MDL participation, implementation of common-benefit processes, and the allegedly operative hearing and related judicial proceedings, occurred in and emanated from Florida under the supervision of the MDL court.  The seminal March 13, 2024, Status Conference took place in Florida.

The relationship between Plaintiff and AWKO Defendants, to the extent Plaintiff alleges one existed at all, was centered entirely within the Florida MDL proceedings.  Plaintiff's claims are inseparable from the Florida-based MDL administration and from orders and proceedings entered by the transferee court

31

sitting in Florida. Plaintiff specifically premises his causes of action upon conduct allegedly occurring during or arising from hearings, procedures, and communications connected to the MDL proceedings administered in Florida. Florida possesses the predominant interest in regulating the conduct of attorneys and court-appointed leadership counsel functioning within judicial proceedings pending before Florida federal courts.   Accordingly, Florida law governs Plaintiff's claims against AWKO Defendants.

## H. PLAINTIFF'S ATTACKS ON THE MDL SETTLEMENT AND OTHER COURT ORDERS FAIL.

A review of Plaintiff's Amended Complaint contains multiple references to orders entered by this Court in the 3M MDL litigation, multiple references to the MSA that was ultimately approved by this Court and multiple references to the AWKO Defendants' conduct as leadership counsel for the 3M plaintiffs. The Plaintiff spends significant time discussing the impact of the sealed Master Long Form Complaint (¶ 33 Amnd. Comp.), the MSA (¶¶ 38-52 Amnd. Comp.), Exhibit 10 to the MSA (¶ 52 Amnd. Comp.), CMO 66 (¶ 53 Amnd. Comp.), CMO 67 (¶ 54 Amnd. Comp.) and CMO 57 (¶¶62, 63, 66-68, 85 Amnd. Comp.). Simply put, despite his protestations to the contrary, the Plaintiff is attacking the very foundation of the MDL and the conduct of the AWKO Defendants as appointed lead counsel for the 3M plaintiffs. The JPML recognized this fact very clearly in ordering this litigation be transferred to the MDL for this Court to rule on the issues raised by the

5350236_1

Plaintiff. The plain language of the various orders and pleadings filed in the MDL leave no logical choice but for this Court to rule in favor of the AWKO Defendants on the thinly veiled attempts of the Plaintiff to unwind the resolution of the litigation.

## I.   DISMISSAL WITH PREJUDICE IS PROPER AS PLAINTIFF ALREADY SOUGHT LEAVE TO AMEND AND ANY ADDITIONAL FURTHER AMENDMENTS WOULD BE FUTILE.

Finally, having already sought leave from this Court to file his *Amended Complaint* and still failing to validly plead causes of action, this matter should be dismissed with prejudice as any further amendments would be futile. As the causes of action alleged by the Plaintiff all rest on the Court reaching the absurd conclusion – that the AWKO Defendants somehow represented the Plaintiff – any amendment would be futile, so this matter should be dismissed with prejudice.

## REQUESTED RELIEF

For the reasons above, AWKO Defendants respectfully request that this Court enter an order dismissing Plaintiff's Amended Complaint with prejudice and grant any other such relief as this Court deems just and proper.

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)

I HEREBY CERTIFY that this motion complies with the word limit of Local Rules 7.1(f) and contains 7,456 words, excluding the parts exempted by the rule.

5350236_1

# CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of May 2026, a true and correct copy of the foregoing has been furnished by filing through CM/ECF or some other authorized manner for parties not authorized to receive electronically Notices of Electronic Filing:

Brandon Canup
4812 Hidden Oaks Ln
Arlington, TX 76017
canup.brandon@gmail.com
*Pro Se Plaintiff*

Benjamin James Stevenson
Steven Legal, PLLC
919 Panfiero Dr
Pensacola Beach, FL 32561
bjs@stevensonlegal.com
*Counsel for Defendant, Mostyn Law Firm*

Jonathan Vine
Cole, Scott & Kissane, PA
222 Lakeview Ave., Suit 500
West Palm Beach, FL 33401
Jonathan.vine@csklegal.com
*Counsel for Defendant, Defendants, Gregory Brown and Fleming Nolen & Jez LLP*

Dated:  May 26, 2026

Respectfully Submitted,

/s/ Gregory K. Rettig
Gregory K. Rettig (172774)
Justin T. Keeton (1025509)

34

5350236_1

*Co-Counsel for Defendants Bryan F.*
*Aylstock, Bobby Bradfor and*
*Aylstock, Witkin, Kreiss & Overholtz PLLC*


**FOR THE FIRM:**
**LLOYD, GRAY, WHITEHEAD & MONROE, P.C.**
125 W. Romana Street, Suite 330
Pensacola, Florida 32502
Telephone: (850) 777-3322
Facsimile: (850) 777-3290
Grettig@lgwmlaw.com
Jkeeton@lgwmlaw.com
Lglover@lgwmlaw.com
Egates@lgwmlaw.com

<u>**CERTIFICATE OF SERVICE**</u>


*/s/ Gregory K. Rettig*
*Co-Counsel for Defendants Bryan F.*
*Aylstock, Bobby Bradford and Aylstock,*
*Witkin, Kreiss & Overholtz PLLC*

35

5350236_1

# EXHIBIT A

1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

IN RE: 3M COMBAT ARMS EARPLUG )   Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION, )
                               )   Pensacola, Florida
                               )   March 13, 2024
In re:   BRANDON CANUP         )   10:06 a.m.
         8:20cv14021           )
                               )
                               )
_____)

STATUS CONFERENCE

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE

(Pages 1-47)

A P P E A R A N C E S

FOR THE PLAINTIFF:      Law Office of David G. Gamble
                        By:   **DAVID G. GAMBLE**
                              *davidgamblelaw@gmail.com*
                        2805 Vermont Court
                        Arlington, Texas   76001

                        Aylstock, Witkin, Kreis & Overholtz, PLLC
                        By:   **BRYAN F. AYLSTOCK**
                              *baylstock@awkolaw.com*

                        **BOBBY J. BRADFORD**
                              *bbradford@awkolaw.com*
                        17 E Main Street, Suite 200
                        Pensacola, Florida   32502

*Donna L. Boland, RPR, FCRR*
*Certified Court Reporter*
*1702 E Baars Street * Pensacola, Florida   32503*
**DLBolandUSCR@gmail.com**

APPEARANCES:  (cont'd)


FOR THE PLAINTIFF:       Mostyn Law
                         By:  **MICHAEL A. BURNS**
                              *epefile@mostynlaw.com*
                         3810 W Alabama Street
                         Houston, Texas   77027

FOR THE DEFENDANT:       Moore, Hill & Westmoreland, PA
                         By:  **CHARLES F. BEALL, JR.**
                              *cbeall@mhw-law.com*
                         350 W Cedar Street, Suite 100
                         Pensacola, Florida   32502

PROCEEDINGS

**THE COURT:**  Good morning, Mr. Canup and Mr. Gamble, I believe.  It's nice to see you both, and I appreciate you coming this morning.

I'm Judge Casey Rodgers.  I am the judge presiding over the 3M Combat Arms Earplug MDL.  I've been presiding over it for some time now, more specifically since April of 2019.

Also in the courtroom today from plaintiff's leadership there's Mr. Bryan Aylstock, Mr. Brad Bradford, and Mr. Mike Burns.

Good morning.

And then, from 3M, Mr. Charles Beall.

So, at the time that the parties entered into that global settlement agreement, which was in August of 2023, it was contemplated that the Court would schedule a conference -- this conference -- with every plaintiff who elected to opt out of the settlement.  And there were a couple of reasons for that.

First and foremost, I thought it would be important and hopefully helpful given the sort of massive undertaking of the MDL and enormous amount of time and energy, I'm sure you can imagine, resources and money went into that litigation and contributed to the global settlement.

You all -- neither one of you were here for that litigation.

Mr. Gamble, you actually came in very recently as counsel for Mr. Canup. Previously he had separate counsel throughout his case, but his case was like hundreds of thousands of others that never saw the inside of the courtroom, for obvious reasons.

But, because of that, I felt it would be important to meet with those who are going to continue forward with their cases to have some understanding from me, from my perspective, about the litigation and the extraordinary nature of the litigation before you decide ultimately to go forward with your case, although I know that's the decision you've made, and that's fine. We'll talk about that.

But I also felt -- along those lines, I also felt, as a second reason for these conferences, that it's important for me to afford all plaintiffs who have opted out -- and there are not very many, frankly, which is quite extraordinary -- that you all be afforded one final opportunity to participate in the settlement, if you choose to do so, before the final settlement registration deadline, which is March 25th.

And I felt it would be important for you to be here to meet with me, be able to ask me questions, if you have any questions.

Also, as you can see, leadership counsel from the plaintiffs' side is here, if you have questions of them and/or 3M as well.

And then there's also an opportunity following my remarks for you all to meet with the magistrate judge assigned to this litigation, Judge Hope Cannon, who is very, very familiar with the settlement. She was an instrumental part of that settlement, and she knows the program very well, in case you have questions about the settlement program.

From experience, I've seen where -- and this isn't -- I'm not talking about you all specifically, but in other instances it may be that the plaintiff didn't have a full understanding of the settlement program and how he or she might fit within the various aspects of the program, including the EIF aspect of the settlement program. And there have been some questions about that from other opt-out litigants. So, again, that will be an option for you, if you choose to take advantage of it.

I realize that being here for you today is a big commitment. And again, I appreciate you making that commitment, both of you. I know you're not local. 99.9 percent of the plaintiffs in this litigation are not local.

But it's also a good opportunity for me just to let you know, particularly if you had been *pro se*, Mr. Canup, which you're not. But some who are similarly situated to you in terms of having opted out, they are *pro se*, meaning they're representing themselves. They don't have counsel. They either never had counsel or their counsel has withdrawn.

And so, it's a good time for me to make sure that everyone understands that appearing in court -- believe it or not, even though, you know, we're in this age of technology where we can do things like Zoom very easily, appearing in court is part of litigation.

With you having counsel means for you fortunately most of the time your counsel can appear on your behalf other than today.  But for a *pro se* litigant, those individuals need to know that it's just part and parcel of litigating.  You have to follow court orders.  And if the Court directs you to appear in person in the courtroom, then you have to be here.

Mr. Gamble certainly knows that as an officer of the Court.

So, I'm not going to twist your arm today.  You're not here for that purpose in trying to get you to settle your case.

I do want you to have an opportunity to talk more about that, if you'd like.  You're not required to.

We're here.  I mean, you've made the decision to opt out of the program, and that's your right.  And you've made that decision and, frankly, that's why we're here.

But it's not -- we're going to talk about this.  But it's not as simple in just saying *I want to take my case to trial, I want to fight, you know, I want a jury trial*.  It's not that simple.

And Mr. Gamble, I'm sure, has had some discussions

with you about that; and if he hasn't yet, he will.  There is a lot more to litigating a case than simply saying *I want to litigate my case*.

And this litigation takes on a new meaning because there are certain hurdles that you have to get over -- all people or claimants who are situated like you, you have to get over before you'll ever get to a jury trial.  So we'll talk about those challenges.

But let me first, before I talk about the challenges, just briefly discuss the settlement program and the litigation.

And from my perspective -- and, frankly, I don't know of anyone who has a better perspective than I do to talk to you about the settlement program and about the litigation.  Because, frankly, I'm the only neutral in the courtroom, and I have been very closely associated with the litigation for the nearly five years that I've had the MDL.

I'm very familiar with the claims, very familiar with the defenses, very familiar, obviously, with the management of the litigation throughout the four-and-a-half years or so prior to the settlement, and I'm very, very familiar with the settlement as well.

But the litigation, from my perspective, this litigation in particular, has been extraordinary for several different reasons, not the least of which is the fact that it's the largest MDL in the history of the judiciary.

Never before -- not asbestos, not mesh, not BP Deepwater Horizon -- none of those MDLs even come close to the size of this MDL. And for most of its life, this MDL has occupied a third of the federal judiciary's entire civil docket.

And so, it's extraordinary in that sense because not only is it a big litigation for the parties to have to deal with, but it's a huge undertaking for the judiciary. Extraordinary. And there's a lot of strain and toll that has come with the litigation. So it's been extraordinary in that respect.

It was also extraordinary -- and these are things you won't really know any firsthand knowledge about. Maybe you've heard about some of the things I'm going to mention to you. But you weren't here, like I said, you weren't here on the ground in the trenches for the litigation.

But one of the things right out of the gate that was unique about the 3M litigation was the fact that so much of the discovery, which, Mr. Canup, that means the factual information, the data this is typically in the hands of either the parties, sometimes it's in the hands of a third party, but not to this magnitude.

And what I'm referring to is that most of the factual data was in the hands of the Department of Defense and the Department of Veterans Affairs or the Veterans Affairs

Administration.

And trying to convince those government agencies to produce the amount of data that was necessary to be produced in this litigation, given the number of plaintiffs, was difficult, to say the least.

I traveled to the Pentagon with the parties on a couple of different occasions to the Department of Justice. There was a couple of years' worth of relationship building in trying to get the data. Because there's no question in my mind, if we have to do this on an individual basis, claimant by claimant or plaintiff by plaintiff, servicemember by servicemember, without a centralized process for obtaining that data, we would have been here for years and years and years.

I'm a veteran Army soldier. And when I was first assigned the MDL, I decided to -- because I knew this was going to be an issue, I decided to apply to the National Archives for my records from the '80s, and I still haven't gotten them.

So it's obvious that that would have been unrealistic to think with that many plaintiffs -- at the time I'm talking about we were probably 150,000 to 200,000. Of course, it grew from there.

The other thing that's extraordinary, a couple of other things, in addition to the common, sort of, the military discovery that was in addition to the corporate discovery that was conducted here was some of the defenses in the litigation.

And one of those, notably, is the government contractor defense.

Mr. Gamble is probably familiar with this.

Mr. Canup, you are probably familiar and understand that, as a servicemember, you're precluded, just like I was precluded, from suing the military based on a service-connected or service-related injury. It's called the Feres Doctrine.

Well, when you have a government contractor who builds things for the government -- designs or builds for the government and then people are injured as a result of that, that contractor can raise what's called the government contractor defense.

And if it's granted -- if that defense is accepted, then that contractor moves into the shoes of the United States military and is entitled to sovereign immunity like the military from those claims.

And so, 3M raised that defense right off the bat in the litigation, and I frontloaded that because I didn't know what my ruling would be, I had no idea, but I knew it was a potentially dispositive issue.

And what that means is, the issue was such that, if I granted 3M the defense, if I said, yes, you're entitled to the defense, the game is over, the case is over for everyone, there is no live case.

So that was something that had to be dealt with, and

it was unique.  At the end of the day, I ruled in favor of the plaintiffs and against 3M and actually granted judgment in favor of the plaintiffs on the issue.

However, the issue was part of every appeal that was taken -- I'm getting a little ahead of myself.  But you know there were trials in this litigation, and every one of those plaintiff verdicts was appealed by 3M.

The settlement was reached before those appeals had been decided, although one was -- the first was very close to a decision.  There had been oral argument and I suspect a decision was imminent at the time of -- certainly at the time of the settlement.

It's anybody's guess what the Eleventh Circuit, which is the circuit that -- court of appeals that decides issues in this geographic area from my court -- anybody's guess what the court ultimately would have done with that.

They could have decided that I was entirely wrong and granted 3M the defense, which would have meant game over for everybody.  They may have decided that I was partially wrong or incorrect, in that, there was a jury question on that issue, which would have meant that those verdicts would have been reversed, those cases would have come back from the appellate court for retrial here, and that issue of the government contractor defense would have been a jury question.  And then the juries would have each decided -- the parties would have

litigated that issue in front of the jury, and the jury would have made a decision on that defense.

But I guess the point of this is it is -- that was a bit extraordinary. But the other thing that's something you should keep in mind, both of you, is this is still a live issue.

As I said, it was never decided -- the issue was never decided on appeal by the Eleventh Circuit.

And so, Mr. Canup, if you continue forward and you end up at some point with a trial, if you prevail at that trial, there is no doubt that 3M -- I'll let Mr. Beall speak to this -- but 3M will appeal, and that issue is still a live issue on appeal. So they will argue it and the Eleventh Circuit will -- ultimately may have to decide it.

Also, I mentioned, again, the verdicts, so obviously there were trials. This was most certainly extraordinary as part of this litigation or any litigation, frankly.

There were 16 bellwether trials. Bellwether means we selected the most representative sample of cases that we could come up with, and they were truly -- in my mind it was a -- one day, if you're interested, I can explain it to you.

But it was a very good process that we went through statistically -- it was random at first and then there was a statistical analysis applied called a prevalence analysis to come up with a representative sample.

And we did that and ultimately there were 19 plaintiffs who went to trial over the course of 14 months in 16 different trials. So two of the trials had consolidated plaintiffs, so they had more than one case in a trial. But there were 19 verdicts in 14 months.

I presided personally over six of those trials. I covered for judges in two of the other trials. And I observed every single trial -- if I didn't preside over it, I observed it live via Zoom. And sometimes I had more than one Zoom going at a time because we had trials that were overlapping throughout the district. Again, it was pretty extraordinary.

But I saw, as part of those trials, 13 plaintiffs prevail, and I saw a devastated six plaintiffs lose entirely. And then, from there, again, appeals in every one of those cases.

The other thing that was extraordinary about the litigation -- and again, this was done at random, too. You may be sitting there thinking, Mr. Canup, why was I on the sidelines with -- you weren't alone, I promise you that. There were hundreds of thousands.

The bellwethers were pulled at random, as I said, literally at random. And then the wave cases, which I'm getting ready to talk about, there were four waves. We called them waves because they were cases that were worked up for discovery and they're called waves because they overlapped in

terms of their discovery periods. But there were 500 per wave, so roughly 2,000 cases in the beginning, and they were all pulled at random.

So it's just the luck or not the luck, however you want to look at it, whatever your perspective it, of the draw, in terms of what claimant got into the courtroom versus claimants who didn't. There was nothing intentional about that other than to have a random process and then a representative process for the bellwethers.

One other unique aspect of this litigation that I'm sure both of you are aware of, and I'll just touch on it briefly, was the Aearo bankruptcy. And that was -- "detour" seems to be maybe an understatement. But it certainly took this litigation out of commission for a while.

Aearo was essentially a subsidiary of 3M. They were the company that 3M purchased in 2008 that actually designed the plug. And they filed a bankruptcy. We're not going to get into the specifics of that, but it was -- that direction that the litigation was heading in at that point would have looked very, very different in terms of an ending for the plaintiffs than what happened here.

There are -- again, I don't want to get too technical, but there are automatic stays that come into play when a company files bankruptcy. The company is always seeking a channeling injunction that would prevent future litigation

against that company, they're always seeking third-party releases.

There's a super majority rule where individuals, if there's a plan that is confirmed and it is agreed to by a certain number of the claimants in existence at the time, it can be decided for other claimants who may not agree with the plan that the plan is acceptable and those plaintiffs have to live with that at least for the moment.

The Supreme Court is right now considering some of these issues. But, as it stands right now, state of the law, that's how it works in bankruptcy.

It didn't happen here, but it can still happen. I guess the point is 3M never filed bankruptcy in this litigation. Aearo filed bankruptcy.

However, 3M, they can still file bankruptcy. There's nothing that precludes them from filing bankruptcy. I don't want them to file bankruptcy, but I can't preclude them from filing bankruptcy.

Do I think it's going to happen? No.

Do I know it's not going to happen? No.

I don't know anything about, really, their business model, what pressures they face. I know what I read, just like everybody else, what you read in the press about their business model and spin-offs and things that they're doing and stocks and dividends and those kind of things. I don't know. I mean,

I don't know.

I know they have other litigation hanging over their head -- "they" meaning 3M -- that is substantial, and it's not just this litigation. It's the PFAS litigation that you may have heard something about. So that's another sort of extraordinary aspect of this.

And then finally, the last point I'll make as far as how extraordinary this litigation has been -- and this speaks to, in my view, the fairness of the settlement, and I do believe the program is fair under the circumstances, most of what I've just discussed -- but the fact that there's nearly 100 percent participation by claimants.

So there were just over 300,000 plaintiffs who appeared on a declaration form on September 12th of 2023 -- that was the reference date -- and then ultimately some were -- many were dismissed for different reasons, but ultimately just over 250,000 claimants registered for the settlement -- or registered for the program.

You had to register to -- you registered. But then, when you register, you decide are you opting in or are you opting out.

And so, as far as registering and opting out, we have under 20 cases, 20 plaintiffs who have chosen not to participate in the settlement in favor of litigating. Everyone else has opted into the program. That is extraordinary. The

percentage is, I don't know, 99.99999, something like that. It's very, very, very, very high in terms of participation rate.

So let me speak just a minute, Mr. Canup and Mr. Gamble, to how your case will proceed going forward.

For the reasons I just went over with you, the magnitude of the litigation, the toll of it on not just the parties but also on this Court but also on the judiciary as a whole, it was my decision at the time of the settlement to enter case management orders to effectuate the settlement program but also to manage the litigation going forward.

And at that time, obviously, we had no idea -- I certainly had no idea about how many plaintiffs would actually opt in versus opt out. I didn't know.

But given the toll that the litigation had taken already and the advanced stage of it, you know, pushing five years at that point, the amount of data points that the parties had already gained through the bellwether process, I felt it was important to put in place CMO 57, which is Case Management Order No. 57, and require people going forward to comply with the requirements of that order.

And some may say, *Well, Judge, I don't think that's fair. This isn't the type of order that you enter in a one-off case or in your other civil cases on your docket.*

And I guess my response to that is there's nothing

ordinary about this litigation.

You may feel like, well, it is ordinary, it's unique -- or it's unique, it's ordinary to me or it's unique to me, and I shouldn't be lumped in with all these other people who have made up this litigation. But you are. I mean, it is what it is. You are a part of this litigation.

And this Court has lived this litigation for nearly five years, and I understand it. I understand the complexities of it. I understand the science, which I'll talk to you about in a minute. I understand what juries have done and what they can do, what they won't likely do with certain types of evidence.

Again, there's a great deal of data that I have and the parties have. And so, people who are going to go forward in the litigation, they'll have to meet these requirements in order to do that because there's a lot at stake.

It's a lot to try these cases, and, if you go forward, you will certainly figure that out.

So I'm not going to walk -- you have counsel. And even if you were pro se, I wouldn't walk you through every line of CMO 57. It's 39 pages.

I'm sure Mr. Gamble has familiarized himself with it. He understands that you and he are both bound by it.

But just to highlight a few of the features, there are 30-day deadlines, and there's a number of different sort of

categories of production and things you're required to do.  And those deadlines for you passed on February 20th.

There is a cure period in CMO 57.  And what that means is it's a period where 3M will notify the plaintiff of anything they perceive to be deficient as far as the production of documents, and then there's a 30-day cure period following that notification.

And then, following the cure period, if there are still deficiencies, then there will be a show-cause order, and the parties will come before the Court, and I'll resolve it.

You and Mr. Gamble may say there are no deficiencies.  Mr. Beall and his stable of lawyers may say, yes, there are deficiencies.  And then I'll need to decide if there are.  And if you have been noncompliant with the order, then I will take that and I will rule.

There has been a deficiency letter issued to you.  It was issued on the 8th.  And so the cure deadline for that would be April 8th.  I think the 7th is a Sunday.  But there are a number of deficiencies.  Mr. Beall can speak to this, if he wishes.

There's also a requirement in CMO 57 that I don't believe has been complied with, and it was for you to provide an affidavit regarding the statute of limitations.

Given the age of the cases that were filed -- and yours, I believe, might have been filed in 2020.  I could look

back and confirm that.  But given when the plug was last -- and I know the answers to these questions.  You and your counsel may not know.  But given the time frame where the earplug ceased to be in existence in terms of being manufactured and distributed, there's a good bit of time between that date and the date that cases were filed.

I've made a number of different rulings on the statute of limitations throughout the bellwethers.  But for purposes here, you are required to submit that affidavit, and I don't believe you've done that.

And so, frankly, Mr. Gamble, the case is subject to dismissal on that basis alone if that hasn't been done.  I don't know why it hasn't been done, but keep that in mind.

If you are allowed to submit that, if there's -- I don't know that there's a cure period for the affidavit.  I'd have to look back at CMO 57.

But to the extent you're not in violation yet of the order or if you are in violation of it and I agree with you that there's some sufficient reason for that and I allow you to submit it out of time, one of the first things that will happen in this litigation going forward is that I will set up an early dispositive motion structure for statute of limitations.

And that will include a limited deposition, Mr. Canup, of you by 3M strictly on the issue of statute of limitations, not everything else to do with your case and your claims and

damages and all of that. But on statute of limitations, that will happen.

And then 3M will be given an opportunity -- you, too, as well, either side -- to file a dispositive motion on the issue of statute of limitations. That will need to be addressed before the case goes forward.

The other thing that CMO 57 imposes, I guess, as a requirement is the need to disclose experts and expert reports. And you have 60 days from the date you elected to litigate to do that. That deadline is March 18th. That is subject to a cure period, another 30-day cure period.

So, depending on 3M's notice to you of any deficiency with regards to expert reports, your reports could be due as early as April 18th. Again, that depends on the notice from 3M.

But this expert deadline is a red line. It is a strict deadline. You cannot move forward in your case without an expert. The litigation regarding -- well, the litigation, as I've said, was complex. But it was complex not just because of the size of the litigation. It was complex because of the medical science and what was required as far as proof by the plaintiffs to convince a jury, you know, that not only that the plug was defective -- that's a big part of it -- but also that that defect caused your specific injury.

And the medical science on hearing is complex. I'll

say it's complex. No plaintiff in any jurisdiction in this country, whether it's here or some other jurisdiction in some other district in federal court or state court, can get to trial in one of these cases without a medical expert. It won't happen.

What we saw in the bellwether trials were multiple -- not just one expert, there were multiple experts. There were audiologists, there were ENT doctors, there was a subspecialty of ENT of surgeons called neurotologists, there were acoustical engineering experts, there were ballistics experts, there were military contracting experts.

And I'm sure I'm leaving some out, but there were a number of experts and not just on the defense side. I mean, these were on the plaintiffs' side and then they were met with defense experts.

But for the bellwether plaintiffs, those experts cost over $200,000 per case, and that did not include travel cost. And I know this because I keep track of costs in the bellwether litigation.

And so, in excess of $200,000 per plaintiff bellwether case just for experts. And those are the expert costs, not the attorney time, but these were expert fees.

I saw, Mr. Gamble, in your disclosure -- there was a 26(a) disclosure that your expert witnesses will be disclosed -- I'm quoting -- "by the deadline specified in the Court's

orders."

I just want to make sure you know and it's clear that you have a court-imposed deadline for your experts.

**MR. GAMBLE:** Yes, Your Honor. And we do intend to have both a medical expert and a vocational/damages expert disclosed by that time.

**THE COURT:** Okay, very good. I just didn't want you to think there was going to be some other order entered setting a different deadline.

Okay. So, Mr. Canup, as I said, I've served in the military, and I can only imagine -- you know, no doubt, you've suffered a great deal, you've sacrificed a great deal and I have no doubt you've suffered a great deal.

And I suspect that you -- I don't know you personally, but I suspect that you believe strongly that the CAEv2, the earplug at issue in this case, is responsible for the suffering you've endured. And I sympathize with that. And as I said, I sat through many, many, many, many of these trials.

But something -- I would be remiss if I didn't say this to you, having sat through all of the trials and seen what it takes to get through a trial, is that it's not enough to believe in the merits of your case. I mean, it's just not.

Obviously, you have to prove -- you have to prove your claims, again, no matter how strongly you believe in them. And everyone I've met in connection with this litigation, every

plaintiff I've met believes vehemently to their core in the merits of their case. And even your lawyer believes in the merits of your case.

You still have to prove it on legal issues to me but then from a factual standpoint ultimately to those people who sit over there in the jury box.

And you've got to prove it to them based upon the law and based upon the evidence. And that evidence has to be admissible, and it will have to show by a preponderance of the evidence that the CAEv2 is defective.

And by the way, you don't get to use other jury verdicts to do that. Those jury verdicts are inadmissible. So no one will ever stand up in this courtroom or any other courtroom and argue to your jury that they should find that the CAEv2 is defective in your case because some other juries found that in another case. That will never be permissible in the courtroom. So you have to prove that yourself with your own evidence.

And then, also, that the specific defect caused, as I said just a moment ago, caused your specific injury and damages. And in your case, I don't believe you have a hearing loss claim. Your short form complaint references only tinnitus.

If you had a hearing loss claim, you'd have to show that you sustained a hearing loss at a certain decibel level

from noise exposure, and then, for tinnitus, that you sustained a noise-induced injury causing your tinnitus while you were wearing the Combat Arms Earplug and that you wouldn't have otherwise suffered.

And that was the cases where 3M -- the trials where 3M came away with a defense verdict were cases where the juries just did not believe the plaintiff's injury had been caused while the plaintiff was wearing the earplug.

So, in the military -- I know this and you know this -- there is a lot of noise a lot of the time. Noise is everywhere in the military. And again, I can say that as an enlisted soldier.

Whether you're in the motor pool, whether you're on the range, whether you're flying a helicopter, whether you're fixing helicopters on a flight line, there's noise everywhere, like I said. Could be generators. But you'll have to contend with that. And in every bellwether trial that had to be contended with as well.

And it's not because these jurors in the six cases that I'm talking didn't like the plaintiffs or didn't believe the plaintiffs. In fact, nothing could be further from the truth or the case.

These plaintiffs in those six cases or six trials were extraordinarily likeable. I mean, they were personable. They were nice people. They served our country.

One in particular that comes to mind, a Mr. McCombs, had a story of incredible bravery.  He was in a forward operating base in Afghanistan and out on missions to find the bad guys.  Very compelling story from him.  And he had injury. He had both tinnitus as well as hearing loss.

And if I recall, he had significant injuries.  But the jury could not find that he was able to prove that his injuries were suffered while wearing the plug and exposed to noise and not from some other exposure to noise.  And that was difficult.

Mr. McCombs's jury in particular, a couple of the jurors had tears in their eyes.  They were very saddened that they had to reach the decision that they did.  But under the law, this jury followed the jury instructions and ruled against Mr. McCombs.  Hard for them to do.

And there were others.  Like I said, Mr. McCombs wasn't the only plaintiff who went to trial and lost their case, but they lost everything.  It was over.  And no issues really to appeal on the plaintiff's side.  So that was difficult.

But I just, again, I know that folks have heard a lot about the bellwether trials so there's been a lot reported about them.  None of those reports are by people like me, a judge who sat and listened to every single bit of evidence and knew the law in every single one of those cases.

But there are reports of huge verdicts.  And there

were huge verdicts, but there were also goose egg verdicts, and those people were devastated.

And it wasn't because their lawyers didn't do a phenomenal job.  They did a phenomenal job trying those cases, and they had some of the best experts -- Mr. Beall will tell you that -- some of the best experts you could imagine on the various issues that I've just discussed, but they still lost.  And it wasn't because they weren't injured.  They just couldn't prove that causation.

So I understand -- Mr. Gamble said that you are going to have your experts disclosed and the reports done in a timely fashion, and that's good.

One of the things that I wanted to go over with you, again, because you're here today for me to have a discussion with you about -- and I feel like I would be remiss if I didn't -- about some of the pitfalls of going forward.

I wouldn't want you or anyone else similarly situated to you, Mr. Canup, to have your case dismissed or to have a jury find in favor of 3M and tell you, like they did Mr. McCombs and others, *We don't believe you've proven your case*, without me having had this discussion with you.

It's expensive to go forward with what you're going to take on.  And maybe you're independently wealthy and Mr. Gamble has plenty of money to spend.  They will see to it that you spend it, that I can assure you.

I would be remiss, I feel like, if I didn't have this discussion with you. And you're not the only one I'm talking to like this. I've talked to others, and there's more still to go. As I said, there's some 20 or so people who have opted out.

But, in reviewing your specific DOEHRS data -- and again, I don't believe you have a hearing loss claim. Your complaint is based on tinnitus. And that's probably because your audiograms are all within normal limits.

There was one -- and I don't want to get too in the weeds, but these are things you should know to talk to your expert about. There was one 15 decibel shift at 4000 hertz, and I think it was 2011. But you're still at a 15 dB, so this is still within normal limits. I think you went from a 0 to 15, but you're still within normal limits.

And so, your audiograms are all within normal limits. Maybe that's why there is no hearing loss claim in your case. That would make sense.

But even with normal audiograms -- so, in a courtroom, a normal audiogram is the sort of kiss of death for a hearing loss claim. But in the settlement program, there is an opportunity or a possibility/opportunity for an EIF claim, which is an extraordinary injury fund claim, even with someone with normal audiograms.

And I will let you talk with, if you and your counsel

would like, with leadership more about this, or Judge Cannon, if you like, but there's something called hidden hearing loss that the settlement program has recognized as a category of EIF.

So, with ordinary or normal audiograms, there's no space for you in EPP or DPP with just hearing loss because you have normal audiograms. But there is a space in the EIF possibly, again, for hidden hearing loss. And that means those are people who have normal audiograms but otherwise have injury to their auditory pathway. And so that can be discussed with you as well.

But your tinnitus claim -- and I believe that is the claim that you have -- and by the way, just for Mr. Gamble's benefit, I don't believe -- and Mr. Aylstock can correct me if I'm wrong -- I don't believe any of the bellwether cases were tried based on tinnitus alone. I don't believe we had a strict tinnitus alone -- that that was the only claim.

I think there was a question about one of the plaintiffs where the jury hung their hat. But I think that the case that was presented in all of them included tinnitus and hearing loss.

Am I wrong or right?

MR. AYLSTOCK: I think that's right, Judge. There was a dispute on one case about whether -- I think it was Mr. Adkins -- had hearing loss or not, but we certainly presented

it.

THE COURT:  Right, it was presented that way, yeah.

MR. AYLSTOCK:  Yes, Judge.

THE COURT:  So I guess my point is there has not yet been a test case that I'm aware of on just tinnitus alone.  I'm not aware of.  That doesn't mean that there can't be.  I'm just saying we don't have anything to point to as far as just that type of case.

But regarding your tinnitus, Mr. Canup, there actually is no -- there's no record or any indication of tinnitus in DOEHRS data.

You do have a 10 percent VA rating service-connected for tinnitus from 2013 at the same time the bilateral hearing loss rating was denied, but the tinnitus was granted.  And that service-connected rating would open a door for you with EPP as far as the settlement program.

But with the courtroom, it's going -- it's difficult, I mean, it's going to be more difficult to prove your tinnitus than --

When you're in the settlement program, what the settlement administrators look for is evidence to support your claim.  They don't really look at evidence to contradict your claim.  Do you have evidence to support it.  They're not really interested in whether there's evidence to contradict it.

In the courtroom, quite the contrary, because that's

what these guys -- that's what they do.

And here, you have this tinnitus rating from 2013. And there's a reference also, in addition to -- and I guess this is what the VA sort of hung its hat on, there was a reference to tinnitus in 2013. But there were other references in 2013 that indicate you don't have any difficulty hearing.

There's also -- and I think this is something to take note of -- during the time frame that you say you wore the plug -- the earplug and were injured was during your deployments in 2010 and 2011. Those are the years you say you wore the earplug. But on your post-deployment assessments, both of them, you report "no" to tinnitus.

So I'm not saying you can't prove your tinnitus claim. If the jury just disregards these records and just believes you from the witness stand, maybe so. But again, that's a problem. I can tell you that's a problem.

There also is something else that I think that you and Mr. Gamble do need to be aware of because this was a feature in some of the trials, but I don't know that I ever saw it to this level or degree. But there are references in your records to you never wearing hearing protection devices during your deployment. And that's when your -- obviously, that's when you claim your ears were damaged.

But if there were periods on your deployment where you never wore hearing protection, that's going to be a problem for

you.

I don't know whether that's true or not. And I'm not here to make any credibility -- obviously, that's not why we're here. But I don't even know if you know this, that this is in your records. And maybe you and Mr. Gamble have a good response for that. You'll need one, because these guys don't miss anything.

So I'm not telling you that you're not going to win your case, if you get to trial, or that you're going to lose your case. I have no idea. I just know that there's certainly a possibility you will lose your case. That's how it is with any litigation. No one knows what a jury will do.

And I know for some people I've talked to, you know, they want their day in court. They believe they've been injured, they believe they've been injured by the earplug, they've suffered greatly, and they want some vindication for that.

And believe me, I understand that. But I don't know, if you asked Mr. McCombs or Angela Kelly or some of the others who lost at trial, whether they felt any better or vindicated at having a jury tell them, *We don't accept your case, we don't accept your claim, you haven't proven your case*. Even though you're injured, even though you're hurt, you've suffered, you didn't prove your case, and so case over.

Now, you may be one of the ones that walks out of here

with lots of money.  That's also a possibility.  I just want you and Mr. Gamble to know getting there, even if you do win, is going to take a lot, and then these folks will appeal.

Mr. Beall can speak to that.  They appealed every verdict before.  So there won't be any money until -- no matter how big the verdict is -- until the Eleventh Circuit rules on the issues raised on appeal.

So my purpose today was just to meet with you, to explain to you what this is going to be like going forward, and to give you an opportunity, as I said, to speak with me.  If you have questions, if there's something that I can address for you, I'm happy to do that, if I'm able to.

You have a lawyer, so I certainly -- even if you didn't have a lawyer, I wouldn't try to give you any legal advice.  I'm just giving you my perspective as the judge who has been presiding over this litigation for a long time and has a great deal of familiarity with it so you go forward with your eyes wide open.

And then if you'd like an opportunity, you or Mr. Gamble, to talk with leadership counsel about some of what I've said about the settlement program, some of the more nuanced aspects of the settlement program, that's going to be available to you as an opportunity, if you'd like, and then also Judge Cannon, who is available to speak with you as well and answer any questions.

And then, at the end of the day, if you leave here, you know, you're leaving without settling, you're leaving here having heard from me, you know, I feel better about that. You've had an opportunity to ask questions. And then, if you decide to roll the dice, again, that's your case.

That's what our system is about. The courtroom is here. We try cases. And if it's not here, your case will be tried in a different jurisdiction. I certainly cannot tell you when that will happen, though.

Okay. So let me ask, Mr. Aylstock, if you have anything you all want to add, and then Mr. Beall, and then I'll give Mr. Gamble and Mr. Canup an opportunity if they have any questions of me.

**MR. AYLSTOCK:** Thank you, Your Honor.

Mr. Gamble and Mr. Canup, first of all, thank you for your service. I'm the court-appointed lead counsel. Judge Rodgers gave me the honor and responsibility to lead from the plaintiffs' perspective.

I'll give you a little bit of my take because it might be helpful to you in understanding how we got to where we are.

When this case started, it was sent to Pensacola. And we didn't -- had no idea how big it was going to be. I think I was in chambers with Judge Rodgers and defense counsel, and we estimated maybe there would be 30- or 40,000 cases, maybe up to 50,000.

And it became, as Judge Rodgers said, the largest MDL in history at the time, over 300,000 soldiers and veterans and some contractors as well were in litigation with individual lawsuits.

And that presented a lot of challenges to us as plaintiffs' leadership in trying the cases. It presented a lot of challenges, frankly, to 3M, because they don't -- you know, they're a large company, but they're not -- they don't print money like the United States Government does.

But when we got into this case, we knew our first hurdle was going to be this government contractor defense that the judge indicated. In fact, there were memos written I can show you from so-called experts on our side saying this case is a loser because the government contractor defense gives 3M and its subsidiary Aearo immunity.

And we worked very hard to convince Judge Rodgers that that's not the case, but that issue is still alive. In fact, although we tried all of those cases, my partner Brad, my late partner Neil and I and others, we probably tried half the cases and we were involved in every single one. Mr. Burns was here as well and can attest to that. But everything about this litigation was hard fought.

When it came to the trials, there were no offers provided. We knew we were going to the mat and going to the Eleventh Circuit on that issue, and so we won some and we lost

some.

Mr. McCombs, we tried that case, and it was tough on all of us but especially on him to lose it.

But as we progressed and we got over 300,000 claimants, we realized something has to be done, not just -- I mean, obviously, the court system doesn't have the judges, the juries -- nobody would have gotten relief except a select few in our lifetimes because of the timing of it.

We also realized when it came time to pay, there's a limit to what even 3M could pay. And Aearo is the company that developed the drug *[sic]*. It's a little, tiny company out of Indiana and that's who went into bankruptcy and delayed our resolution for a year.

But there's nothing that prevents them, even Aearo, from doing that again, nor 3M, not that we think that they will because we do have the settlement.

But when it came time to negotiate the settlement, we had to take that into account. Because, had the bankruptcy worked -- and I can assure you they thought it was going to work and we fought very hard against it because the amount of money that was being offered to everybody -- and it would have been open to everybody who filed a lawsuit or not. Every soldier, every veteran who said they used the earplugs, it could have been half a million people. And the amount of money that was being offered in the bankruptcy was under a billion

dollars, so we're talking under $2,000 a case potentially.

And the bad thing about a bankruptcy, from my perspective as a trial lawyer who has tried a bunch of cases in this courtroom, is it doesn't give anybody a real choice. You're stuck. If the majority want to confirm the plan or the super majority, it doesn't give our veterans and active duty people a choice.

So we fought very hard for the better part of a year and ultimately won that issue. And that got us, frankly, back to the settlement table, and we were able to get more than six times the amount of money for just the people who had filed lawsuits or were represented at the time.

So the settlement, as a practical matter -- we knew what the net worth of 3M is, and it's different for market cap. Net worth is assets and liabilities. So about 12-and-a-half, I think, was one of the stipulations, and we were able to get about half of that from them. And that's despite the other challenges 3M faced that are completely unrelated to this, including the forever chemicals and there was another settlement for that.

And so I feel very proud of the settlement. Just so you know, I know that we didn't leave anything on the table. In fact, we knew that they didn't have the cash, and we even got them to give us some stock that's now back into cash.

But when it comes time to think about whether the

settlement is a good thing, I just want you to know, as lead counsel and a guy who was in the room negotiating it with Brad and others, that we feel that we did the absolute best for you and all the other 250,000 people who decided to participate in the settlement.

The other thing -- and we can go over this if you're at all interested -- we tried to do it in a very objective way with regard to looking at the audiograms.

We had the benefit, because Judge Rodgers and some of us traveled to the Pentagon to get this information from the DoD, of your audiograms and everybody's audiograms that was housed at the DoD. And that was an enormous effort in and of itself. But we were able, because of that, to design a system that is very objective.

We look at, okay, what's your military service, how did you get in, when did you get out for your hearing loss, and then, of course, the tinnitus is the other component of it.

So there are potential issues or potential ways to get into the extraordinary injury fund for various things. Judge Rodgers mentioned that. Happy to discuss that with you as well.

Because not every tinnitus case is the same. Some are somewhat bothersome, others it's a heck of a lot worse. And there's lots of treatment and we can talk about that.

So I guess that's sort of my perspective as lead

counsel about the settlement, the process. But everything about this case was hard fought.

There was a lot of, a lot of hours spent. And Mr. Beall and the firms associated with 3M have armies of lawyers, and we fought them back as best we could and got as much as we could for you and everybody else.

THE COURT: All right. Thank you. And I can attest to what Mr. Aylstock just said about how hard fought the litigation was. And I'll turn it over to Mr. Beall in just a minute.

But I've never seen any litigation -- I've been on the bench over 20 years. I've never seen anything fought as hard as this was fought. And the stakes were high, no question. But from, I mean, every turn, you know, 3M was right there, and they were not rolling over, just not rolling over.

And I think Mr. Beall maybe will talk further about that. Because sometimes I worry that some of these -- maybe not you, Mr. Canup, so I don't want to throw you in this pot. But some of these opt-out plaintiffs, they've heard about big jury verdicts, they're not thinking about the plaintiffs who lost their jury trials, they hear about these big verdicts, and they think, well, even if I don't get it to a jury, at some point 3M will just settle with me outside of the settlement program.

I cannot speak directly for 3M. Mr. Beall can do

that.  But I can tell you from my perspective that will never happen.  That will never, ever happen.  They will take you to trial or you will take them to trial, and they will fight you every step of the way getting there, they will fight you all the way through that trial, and then they will fight after that trial.  You may go to bankruptcy in the meantime, depending on how big your verdict is, if you went.  And then they'll appeal.

And my belief -- and again, I don't -- I can't say this based on anything I've heard from 3M directly to me.  But based on my experience with this company, they will pay a verdict before they will settle a case at this juncture.  After everything that's happened, that's my belief.

But, Mr. Beall, why don't you speak for your client instead of me speaking for your client.

**MR. BEALL:**  Thank you, Your Honor.

Thank you, Mr. Aylstock.

And it's a pleasure to meet you, Mr. Gamble and Mr. Canup.  We met just a second ago.

My name is Charles Beall.  I work for a firm called Moore, Hill & Westmoreland here in Pensacola.  But I'm one of the many, many lawyers who are representing 3M in this case.

And we do want to thank you for your service.  We understand that, and we do feel bad for the tinnitus that you say you have.  And we understand that's not something that's fun or enjoyable by any stretch.  We don't want to belittle

that as all.

I know you all feel very strongly about your case, like the people that Mr. Aylstock represented at trial. But I do think it's important to know that 3M feels every bit as strongly on the other side, and not just about whether you can prove the causation issue. But, to this day, we do not believe this plug was defective at all. And at every trial we've had, we've brought in experts to test that, to discuss that.

We have government documents where the government itself tested the earplug and found it to be effective. So, you know, we are going to test that issue the entire time.

We settled this case for business reasons. Because, as Mr. Aylstock pointed out, this is the kind of thing that, you know, you just can't try 300,000 cases over the course of lifetimes and everything. So we made a business decision to settle this case and put a lot of money in the settlement for that reason.

And we did it on a structure that's going to allow for independent medical review of all the claims remaining in litigation.

Judge Rodgers has already talked about your DOEHRS data, which she has access to, and we have experts who are looking at these things. So that's part of what we're doing is making sure that we're getting independent people who are not just people that we pay or that they pay who are looking at

this and seeing are these cases worth proceeding on.

And that structure is supported by the leadership, who settled -- negotiated the settlement, by the hundreds of other plaintiffs' lawyers who have agreed to the settlement, and by the Court itself.

We respect that some people may decide to not take the settlement and to litigate. If so, we're going to, obviously, stick firmly to the requirements the Court has set, we're going to ask the Court to enforce, and I know the Court will enforce the requirements of the Case Management Order 57 you've heard a lot about today and other things.

We are, as Judge Rodgers noted, prepared to try these cases. We have a host of experts lined up that we could probably try this case in a matter of weeks, if we had to do it, because we have all the experts ready.

We tried 16 cases. I don't think that I've ever heard of an MDL where 16 cases were tried before. I was at 12 of them myself. I believe the shortest trial was two weeks. We might have had a trial that ended in nine days, but that would be the exception. These were basically two-weeks-at-a-time trials. So it's a long, expensive process, and that's what we're used to doing.

We will appeal if we lose. We will appeal the government contractor issue. We will appeal evidentiary rulings that we think are against us. Obviously, it's got to

be an issue we think we can win on appeal, but we feel strongly about that. And I'm sure you will feel strongly the other side of our appeals.

For the first set of appeals and I suspect for the future appeals, the attorney we hired to handle this was the leading United States Supreme Court lawyer in the country. I mean, he's the guy that's probably argued the single most cases -- I think over a hundred now -- before the U.S. Supreme Court. So, you know, we're going to spend the money to bring the best people here that we can do.

As Judge Rodgers pointed out, there were six plaintiffs who went to trial and lost. There were, I believe, several of them -- more than half of the trials ended up with a plaintiff verdict. But there were also a number of cases that were in the bellwether process that were going to be tried where the plaintiffs dismissed their cases before they even got to a jury.

For one reason or another, they thought -- I don't know the full reason. I think some of them realized they just can't win or they didn't want to deal with the stress or whatever.

So, of the 27 bellwether cases that were set, 14 of them resulted in no recovery at all. So that's over half. So you can't just look at the ones that were tried.

And those cases were done before the requirements that

Judge Rodgers has talked about earlier were put into place.  So you have a much harder battle than the people that were there before for that very reason.

And I know there is a mediation process in the CMO that we have to go to mediation, which we're willing to do.  But just as Judge Rodgers pointed out, we don't view the mediation process as a chance for us to sweeten the pot.  We view it as a requirement that we're going to go through in good faith and talk about the reasons why we believe you should accept the settlement.

But if you think it's going to be sort of let's hold out and then we'll sort of throw more money on the table, it's not my money, but I can assure you that would be the first time that's happened in this litigation, and I don't expect it to happen now.

Again, you have the right to make these decisions.  And I'm not going to -- obviously, I'm on the other side, so I have an interest in this myself.  But we just want you to be aware where we're coming from as you proceed forward.

And I do appreciate you coming down here.  And again, thank you for your service.

**THE COURT:**  All right.  Thank you, Mr. Beall.

So, Mr. Canup or Mr. Gamble, any questions?

And, of course, you have counsel, Mr. Canup.  You don't have to speak.  But I want to give you the opportunity,

if there are any questions from either one of you.

MR. GAMBLE: Yes. Thank you, Your Honor. And I'll just be real brief.

I understand you have a job to do, and you've done a fine job, and these gentlemen over here have done a fine job. But we do believe in the strength of our case and that, for what he's going to have to deal with the rest of his life and that he's dealing with, $10,000 just isn't going to come near to cut it.

But I understand you've got your job to do and you've got -- 3M has got the big pockets. These two veterans are not going to bankrupt 3M, though. We're not worried about that. That would be quite amazing if we could, but I don't think that part is an issue.

And then going to the procedural stuff, Your Honor, we worked our way through order No. 57, and we have recently got this letter that he gave me today, and we will go through this and try to cure everything that is possible.

THE COURT: Okay.

MR. GAMBLE: And if there's something -- if it turns out there's one or two things that we think we've done and he doesn't, then I guess maybe that's where the Court would come into play.

THE COURT: Yes.

MR. GAMBLE: There was one thing that I was slightly

disturbed about.  The affidavit regarding statute of limitations, I may have missed that in order 57.  I'm kind of Johnny-come-lately to all this.

THE COURT:  I understand.  But there is a requirement in CMO 57, and it does apply to Mr. Canup.  And so you'll find it in the order, but it's a statute of limitations affidavit.

MR. GAMBLE:  Okay.  And I believe Your Honor said, you know, "if the Court were to allow it."  This is not a motion hearing, but to the extent -- if this is proper, I would respectfully request and move to be allowed to supplement that within seven days to get this affidavit in.

THE COURT:  Okay, I'll let you do that.

MR. GAMBLE:  Thank you, Your Honor.

THE COURT:  I'll give you permission to do that.

MR. GAMBLE:  I think that's all we have, Your Honor.

THE COURT:  All right.  One other thing I did not reference -- and again, I'm not trying to pile on.  I know it probably feels like that.

But again, in terms of me making sure that I've covered everything I wanted to cover, the last thing I'll add is -- we've talked about 300,000 cases -- and these were all cases.  These aren't people parked out somewhere, you know, in some software litigation platform.  These were filed cases.

I have dismissed -- and again, this is not directly to your case, but just in general about the litigation and the

claims and lawyers' review of those claims and the merits of them and then also a lawyer's ability to comply with deadlines, there have been well over 100,000 cases dismissed with prejudice.

So I guess the point, Mr. Gamble, is, I'm very serious about the deadlines, and largely because I've been so serious about the deadlines with others.

You know, I'm a judge looking at having dismissed over 100,000 cases for noncompliance. I'm not going to start making exceptions now. So just keep that in mind.

All right. Judge Cannon actually walked in -- hello, Judge Cannon -- to the courtroom a few minutes ago.

I encourage you to at least speak to her for a few minutes and see if she can add anything to the equation for you. If not, then we'll just monitor your compliance with CMO 57, and we'll move on according to a schedule.

All right. It was very nice to meet you both. Thank you for coming.

(Proceedings concluded at 11:16 a.m.)

--------------------

*I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. Any redaction of personal data identifiers pursuant to the Judicial Conference Policy on Privacy are noted within the transcript.*

*s/Donna L. Boland*                              *10-16-2024*
*Donna L. Boland, RPR, FCRR*                      *Date*
*Certified Court Reporter*