# EXHIBIT "1"

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

| | |
|---|---|
| BRANDON CANUP, | Case No. 3:26-cv-3359-MCR-HTC |
| *Plaintiff,* | |
| v. | |
| BRYAN F. AYLSTOCK, et al., | PLAINTIFF'S FIRST AMENDED PETITION |
| *Defendants.* | |

## PLAINTIFF'S FIRST AMENDED PETITION

COMES NOW Plaintiff, Brandon Canup, appearing pro se, and files this First Amended Petition against the Defendants named herein. Plaintiff makes this filing based on personal knowledge as to all matters concerning himself and upon information and belief as to all other matters. In support thereof, Plaintiff respectfully shows the Court as follows:

### I.

### DISCOVERY CONTROL PLAN

1. Plaintiff pleads that discovery should be conducted in accordance with discovery control plan, level 3, pursuant to Rule 190 of the Texas Rules of Civil Procedure.

### II.

### PARTIES

**A.   Plaintiff**

2. Brandon Canup ("Canup") is an individual residing in Tarrant County, Texas.

**B.   Defendants**

FILED USDC FLND PN JFJ
APR 6 '26 AM10:27

FIRST AMENDED PETITION                                                    PAGE          1

3.      Aylstock, Witkin, Kreis & Overholtz, P.L.C. ("AWKO") is a foreign professional limited liability company formed under the laws of Florida, doing business in Texas. Its principal office is located at 17 East Main Street, Suite 200, Pensacola, Florida 32502. AWKO may be served via its registered agent for service of process: Justin Witkin, 17 East Main Street, Suite 200, Pensacola, Florida 32502, or wherever it may be found. In the event AWKO does not maintain a registered agent or cannot otherwise be located with reasonable diligence, it may be served through the Texas Secretary of State as provided by *Tex. Bus. Orgs. Code § 5.251* and *Tex. Civ. Prac. & Rem. Code §§ 17.041–17.045.*

4.      Mostyn Law Firm, P.C. ("Mostyn") is a Texas professional corporation formed under the laws of Texas, with its principal office at 3810 W. Alabama Street, Houston, Texas 77027-5204. Mostyn may be served via its registered agent for service of process: Andrew Browning, at the same address, or wherever it may be found.

5.      Fleming, Nolen & Jez, L.L.P. ("FNJ") is a Texas limited liability partnership with its principal office located at 2800 Post Oak Blvd., Suite 6000, Houston, Texas 77056-6128. FNJ may be served via a General Partner for service of process: George Fleming, at the same address, or wherever it may be found. Because FNJ does not have a registered agent listed on file with the Texas Comptroller as of the date of this filing, it may also be served with process through the Texas Secretary of State pursuant to *Tex. Bus. Orgs. Code § 5.251*, who shall forward process to FNJ's last known address on file.

6.      Bryan Frederick Aylstock ("Aylstock") is an attorney licensed in the State of Florida (Florida Bar No. 78263), and a founding partner of AWKO. He may be served at his primary business address: Aylstock, Witkin, Kreis & Overholtz, PLC, 17 East Main Street, Suite 200, Pensacola, Florida 32502, or wherever he may be found. If service cannot with reasonable

diligence be effected at this address, then pursuant to the Texas long-arm statute, service may be made on the Texas Secretary of State as agent for service of process for this Defendant.

7.      Bobby J. Bradford ("Bradford") is an attorney licensed in the State of Florida (Florida Bar No. 173223) and a partner at AWKO. He may be served at at his primary business address: Aylstock, Witkin, Kreis & Overholtz, PLC, 17 East Main Street, Suite 200, Pensacola, Florida 32502, or wherever he may be found. If service cannot with reasonable diligence be effected at this address, then pursuant to the Texas long-arm statute, service may be made on the Texas Secretary of State as agent for service of process for this Defendant.

8.      Michael Andrew Burns ("Burns") is an attorney licensed in the State of Florida (Florida Bar No. 973130). At all times relevant to this case, he was affiliated with Mostyn Law Firm, a Texas-based law firm. He may be served at his Florida business address: Burns Law LLC, 362 Gulf Breeze Parkway, #294, Gulf Breeze, Florida 32561-4492, or wherever he may be found. If service cannot with reasonable diligence be effected at this address, then pursuant to the Texas long-arm statute, service may be made on the Texas Secretary of State as agent for service of process for this Defendant.

9.      Gregory Donald Brown ("Brown") is an attorney licensed in the State of Texas (Texas Bar No. 24078266). At all times relevant to this case, he was affiliated with FNJ. Brown is listed as an attorney at FNJ on their website and as an attorney at Sorrels Law on his Texas State Bar profile. He may be served at his primary business address: Sorrels Law, 230 Westcott St., Ste. 100, Houston, Texas 77007, or at Fleming, Nolen & Jez, LLP, 2800 Post Oak Blvd., Suite 6000, Houston, Texas 77056-6128, or wherever he may be found.

10.     Cliff Lee Roberts ("Roberts") is an attorney licensed in the State of Texas (Texas Bar No. 17002900). He may be served at his business address: 8191 Southwest Freeway, Suite 116, Houston, Texas 77074-1700, or wherever he may be found.

11.     For ease of reference, Defendants AWKO, Mostyn, Aylstock, Bradford, and Burns may collectively be referred to as the ("Florida Defendants"). Although Mostyn is a Texas law firm, it is included in this group because of its affiliation with Burns, a Florida-based attorney, and its role in the conduct giving rise to this case.

12.     Defendants FNJ, Brown, and Roberts may collectively be referred to as the ("Texas Defendants").

13.     All Defendants may collectively be referred to as the ("Defendants").

## III.

## JURISDICTION AND VENUE

14.     Canup asserts claims arising solely under Texas law and has filed a Motion to Remand challenging federal subject-matter jurisdiction. Canup maintains that federal subject-matter jurisdiction is lacking, including the absence of complete diversity, and that this action should be remanded to the 67th Judicial District Court of Tarrant County, Texas. Subject to and without waiving that position.

15.     The 67th Judicial District Court of Tarrant County, Texas has subject matter jurisdiction over this action pursuant to Section 24.007 of the Texas Government Code. The amount in controversy is within the jurisdictional limits of the Court.

16.     The 67th Judicial District Court of Tarrant County, Texas has personal jurisdiction over all Defendants. One or more Defendants are residents of Texas, maintain their principal place of business in Texas, and regularly conduct business in Texas. Additionally, pursuant to the Texas

Long-Arm Statute, Tex. Civ. Prac. & Rem. Code §§ 17.041–17.069, this Court may exercise jurisdiction over out-of-state Defendants who have purposefully directed activities toward Texas. All out-of-state Defendants have purposefully directed activities toward Texas.

17.     Out-of-state Defendants acted in concert with Texas Defendants and have directed activities into Texas and have purposefully availed themselves of the privileges and benefits of conducting business in Texas and are subject to the jurisdiction of the 67th Judicial District Court of Tarrant County, Texas. The actions described herein demonstrate the Defendants' purposeful involvement in matters connected to Texas, making it both appropriate and consistent with due process for a Texas court to exercise jurisdiction over them.

18.     The exercise of personal jurisdiction over Defendants is therefore consistent with traditional notions of fair play and substantial justice.

19.     Venue is proper in the 67th Judicial District Court of Tarrant County, Texas pursuant to Section 15.001, *et seq.* of the Texas Civil Practice and Remedies Code because a substantial part of the events or omissions giving rise to Canup's claims occurred in Tarrant County, Texas.

20.     Tarrant County, Texas is where Canup resides and relied upon Defendants' actions and representations. The conduct at issue involved communications directed to Canup in Tarrant County, Texas and actions taken with knowledge that their effects would be felt in Tarrant County, Texas.

21.     This action also concerns agreements and attorney-client relationships that were to be performed, in whole or in part, in Tarrant County, Texas. In addition, the underlying litigation was designated for trial in the Northern District of Texas, and Tarrant County served as the central location of Canup's reliance, litigation-related activities, and resulting injury.

22.     Subject to and without waiving Canup's position that this action belongs in state court, and pleaded in the alternative, if this case remains in the federal system, the US District Court for the Northen District of Texas, Fort Worth Division has personal jurisdiction over Defendants because they have sufficient contacts with the State of Texas and that District, including conduct giving rise to Canup's claims in Texas, consistent with due process.

23.     Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in Tarrant County, Texas.

## IV.

## STATEMENT PURSUANT TO RULE 47

24.     Pursuant to Rule 47 of the Texas Rules of Civil Procedure, Canup states that he seeks monetary relief of less than $250,000 and non-monetary relief.

## V.

## BACKGROUND FACTS

25.     On April 3, 2019, the United States Judicial Panel on Multidistrict Litigation transferred multiple actions to the Northern District of Florida for coordinated pretrial proceedings in *In re: 3M Combat Arms Earplug Products Liability Litigation*, Cause No. 3:19-md-02885 ("MDL").

26.     On May 22, 2019, the MDL court issued Pretrial Order No. 7 ("PTO 7"), appointing Aylstock of AWKO and Burns of Mostyn to leadership roles ("PSC") to conduct common benefit work on behalf of all claimants in the MDL.

27.     Throughout the MDL, Florida Defendants represented thousands of individual claimants while serving in leadership roles and maintained attorney-client relationships with those

claimants. Their leadership roles did not prevent the creation of attorney-client relationships with MDL claimants.

28. On June 21, 2019, Canup retained Texas Defendants to investigate, develop, and litigate his claims in the MDL. Between June 20 and June 21, 2019, Canup communicated with Cliff Roberts regarding the representation by email, through which Roberts provided the retainer materials and Canup returned the executed agreement. The agreement provided that Texas Defendants were retained to pursue Canup's claims arising from injuries caused by 3M Combat Arms Earplugs and were authorized to take all actions necessary to prosecute those claims. The agreement further stated that, "Client has the ultimate authority over the decision to settle." Canup was in Tarrant County, Texas when these communications occurred.

29. Collectively Texas Defendants have decades of experience in multidistrict litigation. FNJ attorneys specifically have been involved in MDLs for over 50 years.

30. FNJ attorneys have participated in numerous MDLs, including *In re: 1971 Alaska Airlines Disaster*; *In re: Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Products Liability Litigation*; *In re: Atrium Medical Corp. C-QUR Mesh Products Liability Litigation*; Hormone Replacement Therapy Litigation; Fen-phen Diet Drug Litigation; Rezulin Diabetes Drug Litigation; Ortho Evra Patch Litigation; Hydroxycut Diet Supplement Litigation; Asbestos Litigation; Ford Rollover Litigation; Firestone Tire Litigation; General Motors Rollover Litigation; Transvaginal Mesh Litigation; Sulzer Hip Litigation; Depuy ASR Litigation; Biomet Litigation; and Stryker Hip Litigation.

31. FNJ represented more than 900 individual claimants in this MDL—far more than they could realistically individually develop, litigate, and take to trial.

32.     At the time Texas Defendants entered into the retainer agreement with Canup, they had extensive experience in multidistrict litigation. Texas Defendants knew the nature of MDL proceedings and the practical limitations of mass representation. Texas Defendants were fully aware that most MDLs that proceed result in aggregate settlements rather than individualized trials. Despite this knowledge, Texas Defendants agreed to represent Canup without the present intent to actively pursue his claims. Texas Defendants' conduct was consistent with a model focused on aggregate settlement rather than individualized advocacy. Therefore, Texas Defendants knew their representations that they would actively pursue Canup's claims were false.

33.     On September 20, 2019, Aylstock and Burns among others filed a motion to seal the Master Long Form Complaint ("Master Complaint") in the MDL. In that motion they stated "The unredacted copy will also be sent via email to all counsel of record." That motion was granted on the same day. The Master Complaint was filed on behalf of all Plaintiffs in the MDL.

34.     On June 3, 2020, Texas Defendants filed a Master Short Form Complaint on behalf of Canup in the MDL proceeding, styled *Canup v. 3M Company et al.*, Case No. 8:20-cv-14021. This Short Form Complaint incorporated the Master Complaint.

35.     On December 22, 2020, Brown sent Canup a letter stating that each plaintiff in the MDL was required to prove their individual claim through unique facts and injuries and represented that this was how the 3M case was being pursued on Canup's behalf, reflecting that individualized development was required while simultaneously representing that Canup's claims were being actively pursued by Texas Defendants. These communications were sent to Canup in Tarrant County, Texas.

36.     At some time between February 2, 2021 and August 29, 2023, Texas Defendants signed participation agreements with PSC assigning plaintiffs' leadership a 9% interest in the future recovery of all of their clients.

37.     On May 12, 2022, Brown filed a Notice of Transition, a Notice of Designated Forum designating the United States District Court for the Northern District of Texas, and a Refiled Short Form Complaint in Canup's case, and on May 16, 2022 paid the $402 filing fee. Texas Defendants took no further action in Canup's case until February 15, 2024, when Brown filed a motion to withdraw.

38.     On August 29, 2023, a global settlement agreement ("MSA") was announced between 3M and Plaintiffs' Leadership in the MDL.

39.     The MSA required Defendants to stop developing 3M earplug cases, including client-specific materials and expert work, as of August 29, 2023.

40.     The MSA required Defendants to recommend that all of their eligible clients participate in the settlement and complete a registration form.

41.     The MSA required participating counsel to ensure that all clients in whom they held an interest were registered for the settlement, including recommending that each client complete a registration form.

42.     The MSA required participating counsel to recommend the settlement to all eligible clients and prohibited them from continuing to represent any client who chose not to participate The MSA states that the amount to be paid under the settlement depended on the level of claimant participation and tied attorney compensation to participation levels.

FIRST AMENDED PETITION                                                      PAGE     9

43. The MSA required participating counsel to withdraw from representing any client who chose not to participate and to give up any interest in that client's claim, including ensuring that any other counsel did the same.

44. The terms of the MSA created conflicts of interest between claimants who chose to participate in the settlement and Canup, who chose to continue litigating. Defendants represented other clients who chose to participate in the settlement, and those terms therefore created conflicts of interest between Defendants, as participating counsel under the MSA, and Canup.

45. The MSA established a global settlement with a total value of up to approximately $6 billion to resolve claims related to Combat Arms Earplugs.

46. Settlement funds were paid by 3M into a Qualified Settlement Fund (QSF), which administered and distributed payments to participating claimants and their counsel. Attorneys were compensated from their clients' settlement proceeds through the QSF pursuant to contingent fee agreements.

47. Aylstock negotiated and executed the MSA and is a party to the agreement.

48. The MSA provided that any counsel who submitted a registration form on behalf of a claimant agreed to be bound by its terms, and that those obligations were knowingly and voluntarily undertaken.

49. All Defendants had knowledge of the MSA and its material terms and accepted those terms through their conduct and performance as of August 29, 2023. The MSA constituted an offer to participating counsel, setting forth specific obligations and financial benefits. All Defendants manifested their assent to the MSA by acting in conformity with its terms, including undertaking obligations required for participation and thereafter submitting registration forms on behalf of claimants between August 29, 2023 and March 25, 2024. In doing so, all Defendants

FIRST AMENDED PETITION                                                    PAGE      10

accepted the MSA through conduct, forming an agreement in fact supported by mutual obligations and consideration, including all Defendants' agreement to comply with participation requirements in exchange for eligibility to obtain financial benefits under the MSA.

50. Texas Defendants chose to participate in the MSA and ceased developing Canup's claims on August 29, 2023. Canup was not aware of Texas Defendants' participation in the MSA at that time. Texas Defendants participated in the MSA without Canup's informed consent and before withdrawing from his representation, despite the resulting conflicts of interest.

51. All Defendants benefited financially from participating in the MSA. By participating in the MSA, all Defendants preserved their ability to obtain compensation from settlement proceeds of their other clients, which depended on 100% client participation. Participation allowed Defendants to obtain fees through the QSF rather than continued individual litigation, while avoiding the time, expense, and risk of discovery, expert development, and trial, and providing a more predictable and expedited path to compensation.

52. The MSA references additional material terms contained in Exhibit 10, which is incorporated into the agreement and was never disclosed to Canup. Exhibit 10 governs significant payment obligations, including approximately $100 million and $1.1 billion in settlement payments to the QSF, subject to specified conditions. Because Exhibit 10 has been withheld, the conditions triggering these payments and the full scope of Defendants' obligations remain unknown to Canup, despite their material relevance to the settlement and Defendants' conduct.

53. On September 11, 2023, the MDL court entered Case Management Order No. 66 ("CMO 66"), terminating the plaintiffs' leadership structure and shifting the litigation to settlement administration and individualized work for non-participating claimants. The order limited any further common benefit work to settlement administration-related functions, allowed Aylstock to

continue in a limited settlement administrative role, did not extend any continuing leadership authority to Bradford or Burns, and confirmed that any remaining common benefit activity would be narrowly confined to settlement administration.

54.     On September 11, 2023, the MDL court entered Case Management Order No. 67 ("CMO 67"), limiting common benefit work to settlement-related functions and dividing it into implementation and administration. The order restricted such work after that date to a defined group of firms, prohibited any other firms from performing common benefit work without court approval, and did not authorize individualized representation or prosecution of individual claims.

55.     Mostyn is not among the firms authorized by the Court to perform Settlement Administration work under CMO 67.

56.     Beginning in September 2023 through early 2024, Canup received complex information about the MSA and his claims that Texas Defendants did not meaningfully explain, instead directing him to review materials on his own while pressuring him to participate. As a result, Canup did not understand the settlement process or his options as the registration deadline approached. Texas Defendants did not disclose the full terms of the MSA, including Exhibit 10, or that they had ceased all individualized case development as of August 29, 2023, and did not obtain Canup's informed consent to enter into an agreement that conflicted with his interests.

57.     On September 5, 2023, Brown told Canup in an email he would have the final decision to accept or reject any settlement and that Texas Defendants would provide recommendations. These representations indicated that participation was voluntary and that Texas Defendants would act in Canup's individual interest, but were inconsistent with the MSA, which required universal participation, cessation of case development after August 29, 2023, and

withdrawal from clients who declined to participate. This communication was sent to Canup in Tarrant County, Texas.

58.     On November 6, 2023, Brown sent Canup a letter regarding the 3M global settlement in which he emphasized the urgency of participating, recommended acceptance of the settlement without providing an individualized evaluation of Canup's claims, and stated that the firm would "likely have to withdraw" if Canup declined and that "per the Court-appointed Plaintiffs' Leadership, your case will not be eligible to go to trial until 2030." This communication was sent to Canup in Tarrant County, Texas.

59.     Brown knew that these statements were false and misleading because any withdrawal obligation arose from Texas Defendants' voluntary participation in the MSA, and Brown had already agreed to the MSA, making withdrawal a requirement rather than merely possible.

60.     Brown's statement that Canup's case would not be eligible for trial until 2030 reflects that Texas Defendants were communicating with and relaying information from Plaintiffs' Leadership.

61.     Texas Defendants and Florida Defendants knew or should have known this statement was false or misleading when made because they were involved in the MDL proceedings and aware that no such years long bar to trial existed.

62.     The MDL court addressed this issue of trial delay on August 22, 2024, the MDL court issued an order addressing Canup's motion to lift the stay imposed by CMO 57. In that order, the court stated, "The language regarding a stay in CMO 57 does not bar the meaningful progression of Canup's case or preclude it from going to trial before 2031." The court further

FIRST AMENDED PETITION                                                     PAGE     13

stated, "CMO 57 does not prevent Canup from going to trial before 2031. Canup has not waived his Lexecon rights, so the Court will eventually remand his case when trial-ready."

63. On December 21, 2023, Brown sent Canup a letter urging him to register for the settlement, emphasizing strict deadlines and stating that failure to submit a Registration Form by January 25, 2024 would result in dismissal with prejudice and disqualification from recovery, framing participation as the only viable path. Brown stated Canup could continue litigating but again warned of significant consequences, including likely withdrawal of counsel and that the case would not reach trial until 2030, and recommended participation. These statements were false and misleading, including the representation that the case could not reach trial until 2030, and the characterization of withdrawal as merely "likely," when withdrawal was required due to the conflict of interest created by Texas Defendants' participation in the MSA. This communication was sent to Canup in Tarrant County, Texas.

64. In January 2024, after Texas Defendants repeatedly indicated they would withdraw if Canup declined the settlement, Canup retained attorney David Gamble ("Gamble") to preserve his ability to continue litigating. Texas Defendants remained counsel of record but provided no legal support.

65. In the weeks leading up to his opt-out, including in or around late December 2023, Canup began independently gathering and organizing documents related to his claims after realizing that his case had not been developed by Texas Defendants.

66. On January 21, 2024, Canup officially opted out of the MSA, triggering his production obligations under Case Management Order 57 ("CMO 57"). Canup and Gamble immediately began preparing for those requirements, which included gathering, organizing, and submitting over 25 GB of data within 30 days under threat of dismissal with prejudice.

67.     CMO 57 further required Canup to serve completed expert reports within 60 days of opting out, and in compliance with those requirements, Canup retained experts and incurred expenses for those expert reports in the amount of $11,925.00.

68.     In compliance with CMO 57, Canup retained an ENT specialist on February 27, 2024 to evaluate his hearing-related injuries, including tinnitus and noise-induced hearing loss, and to provide expert opinions for use in the litigation. The initial expert report was required to be disclosed by March 21, 2024, with any supplemental reports due by May 20, 2024.

69.     Despite having knowledge of these requirements since August 29, 2023, Texas Defendants took no action to prepare Canup's case or assist in meeting these obligations.

70.     As a result, Canup was required, with newly retained counsel, to gather, organize, and produce extensive documentation over a compressed timeframe, tasks that would ordinarily have been performed by prior counsel had they chose to actively litigate Canup's claims.

71.     This required Canup to devote substantial time and effort over several months and diverted his energy and attention away from his normal daily activities, resulting in disruption to his routine and significant stress and inconvenience.

72.     On January 22, 2024, after Canup opted out of the settlement, in an email, Brown acknowledged that decision while stating he was still one of Canup's attorneys and sought to have Canup reconsider, warning that the firm was "required by the Court" to withdraw and that opting out could result in "nothing." In that communication, Brown confirmed Texas Defendants remained Canup's counsel after his opt-out. Brown also represented to Canup that he was actively working on Canup's case, which was false. This communication was sent to Canup in Tarrant County, Texas.

73.     Brown's statement that withdrawal was required by the Court was false, as any obligation to withdraw arose from Texas Defendants' voluntary participation in the MSA. The Court did not order Brown or the other Texas Defendants to stop representing Canup. Brown again pressured Canup to abandon his opt-out decision by portraying continued litigation as futile without any individualized analysis of his claims. This communication reflects Texas Defendants' continued representation after opt-out, false statements regarding withdrawal and case activity, and renewed pressure to accept the settlement.

74.     Canup requested his file from FNJ in January of 2024. Canup received a few documents but never his full file. FNJ eventually sent Gamble Canup's file which only contained a single four-page pdf.

75.     On January 18, 2024, Kara Runte of FNJ responded to Canup's request for his file, stating she had forwarded the request and providing only a few pleadings, including a short form complaint filed by Brown, while advising that FNJ could not guarantee production of the full file before the January 24, 2024 settlement deadline. This communication was sent to Canup in Tarrant County, Texas.

76.     FNJ did not produce the file until February 29, 2024, when Dilma Alvarado sent it to Gamble. Canup's file from FNJ consisted of a single four-page PDF. After four years of representation, the file contained only Canup's DD-214 and a VA benefits overview and did not include anything filed in the MDL Court on behalf of Canup or materials Texas Defendants purportedly relied on in recommending settlement. This communication was sent to Gamble in Tarrant County, Texas.

77.     On February 5, 2024 Canup was ordered by the MDL Court to appear "in person, with counsel" at a status conference in Pensacola, Florida scheduled for March 13, 2024.

FIRST AMENDED PETITION                                                    PAGE     16

78.     On February 15, 2024 Brown filed a motion to withdraw as counsel of record for Canup in the MDL within a week of Canup's CMO 57 production deadline. His motion was granted on February 20, 2024, one day before the CMO 57 deadline.

79.     On February 22, 2024, Bradford emailed Gamble regarding Canup's case to gather information about Canup and requested a call. With Canup's knowledge and consent, Gamble communicated with Bradford about his case. Between February 22 and the March 13, 2024 status conference they had multiple discussions about Canup's case, including his medical claims, damages, and potential recovery through the EIF, during which Bradford obtained case-specific information and provided settlement-related materials, including sending EIF protocols and FAQs by email on February 23, 2024 that Gamble requested the day before. Bradford also informed Gamble that he and Aylstock would attend the March 13 conference but did not disclose any intent to formally appear and participate.

80.     Through these communications, Bradford conveyed authority and superior knowledge regarding the MDL and Canup's case, directed communications to Canup through Gamble, obtained confidential and privileged information regarding Canup's claims and litigation posture, and provided legal advice concerning the settlement program under the MSA. Bradford directed these emails and phone calls into Texas, these communications occurred while Canup and Gamble were in Tarrant County, Texas.

81.     On March 13, 2024, without the knowledge of Canup or Gamble, Florida Defendants appeared at the MDL status conference on Canup's behalf, and the transcript lists Aylstock, Bradford, and Burns as appearing "FOR THE PLAINTIFF." Aylstock addressed the Court and spoke directly to Canup by name, offering his assessment of the litigation and settlement. During his remarks, Aylstock referenced Canup's specific circumstances, including his

audiograms and military service, offered to provide case-related materials, emphasized his role in negotiating the settlement, and stated that the settlement represented the maximum recovery available.

82.   This was a case-specific conference concerning Canup's individual claims against 3M, at which Canup was the only MDL plaintiff present. Burns and Bradford also appeared in the proceeding, neither spoke on the record.

83.   Following the hearing on March 13, 2024, Canup and Gamble were taken to a conference room for a closed-door settlement conference with Magistrate Judge Hope Cannon. This proceeding was not scheduled in advance or required, and at the first status conference the Court described any further discussions with Judge Cannon or Aylstock, Bradford, and Burns as voluntary, presenting them only as an "opportunity" if Canup wished to participate.

84.   Judge Cannon brought in Aylstock, Bradford, and Burns, who then gave individual legal advice, reviewed Canup's medical records and discussed Canup's case directly with Canup. During the meeting Florida Defendants engaged directly with Canup regarding multiple aspects of his case. The primary focus of the discussion was repeated efforts to pressure Canup to accept the MSA, which Canup repeatedly declined.

85.   Florida Defendants discussed the requirements imposed by CMO 57, including the obligation to obtain a Personal Attenuation Rating ("PAR"), and noted that such requirements had not been imposed on plaintiffs in the bellwether trials but were being required of claimants who elected to continue litigating against 3M.

86.   They further discussed the concept of Hidden Hearing Loss and the potential to assert such an injury in Canup's case, advising that he needed to locate a specialist to perform the necessary testing and warning that a "clean" result would be bad for his claims.

FIRST AMENDED PETITION                                                    PAGE   18

87.     Florida Defendants also stated that expert witnesses were no longer available to take on cases due to what they described as "litigation fatigue." In addition, they reviewed and discussed Canup's individual records, including his audiograms and Post-Deployment Health Assessments, as well as his responses contained in the assessments.

88.     Florida Defendants further discussed materials they were preparing for opt-out plaintiffs to assist in litigating their claims against 3M, including what they described as a "trial package."

89.     They offered to continue assisting Canup and Gamble, in connection with Canup's case moving forward, and additionally offered to take Canup and Gamble out to lunch to discuss the case further, that offer was declined.

90.     When Florida Defendants entered the room, they already possessed Canup's medical records, including audiograms and post-deployment health assessments from his Army service, which had not been provided by Canup or Gamble and were obtained from an unknown source.

91.     Florida Defendants did not disclose that, as of August 29, 2023, they had agreed to cease all individualized case development under the MSA, were required to recommend settlement to all claimants, and had financial interests tied to claimant participation. Florida Defendants did not disclose the nature or scope of their involvement in Canup's case specific proceedings. They offered to assist Canup and provided guidance on his claims without disclosing that these obligations conflicted with his decision to continue litigating, and did not disclose the existence or terms of Exhibit 10, rendering their statements and offers materially misleading.

92.     As a direct and proximate consequence of Florida Defendants' failure to disclose their involvement in, and intent to appear at, the March 13, 2024 proceedings, Canup incurred fees

and expenses that would not have otherwise been incurred. Canup incurred $6,520.00 in fees for representation by Gamble in preparation for and attendance at the status conference in Pensacola, Florida, as well as $884.59 in related travel and lodging expenses.

93. Canup was unable to access the unredacted Master Complaint, which was filed on behalf of all claimants and referenced by his Short Form Complaint. FNJ denied access and later directed Gamble to seek permission from the PSC, despite unredacted copies having been provided to counsel of record.

94. On April 24, 2024, Canup emailed Kara Runte at FNJ requesting the unredacted Master Complaint, but received no response and the document was not provided.

95. On April 24, 2024, Gamble contacted Bradford to obtain the unredacted Master Complaint, and Bradford responded by email stating that he would provide it only after Gamble signed a participation agreement. With Canup's consent, Gamble signed and returned the documents on April 25, 2024, and Bradford then emailed the unredacted Master Complaint the same day, stating, "Please let me know if you need anything else." Bradford's communications conditioned access to the Master Complaint on execution of a Common Benefit Work Participation Agreement assigning a 9% interest in any recovery to the PSC. Despite this, Bradford did not provide any common benefit work product contemplated by the agreement, and the Master Complaint was already part of Canup's case materials. Bradford further offered to continue assisting Canup and Gamble. Bradford directed these communications into Texas, Gamble and Canup were both in Tarrant County, Texas when these communications occurred.

96. On April 29, 2024, Selena Salvide of FNJ emailed Gamble stating that Greg Brown suggested seeking permission from leadership to obtain the unredacted Master Complaint. This communication was sent to Gamble in Tarrant County, Texas.

FIRST AMENDED PETITION                                                                    PAGE        20

97.     On May 1, 2024, Canup filed an amended complaint and Lexecon non-waiver statement as ordered by the MDL Court with instructions not to add new allegations or claims. 3M moved to dismiss, and on July 18, 2024, the MDL Court dismissed Canup's hearing-loss claims as procedurally barred. The MDL Court's order stated that Canup's former attorneys never attempted to amend his pleadings to include hearing loss claims, despite representing him for years. The MDL Court cited this as a reason that Canup should not be allowed to add new allegations or causes of action.

98.     As a direct and proximate consequence of Texas Defendants' conduct described above, Canup incurred $11,925.00 in expert fees for reports and litigation preparation that became worthless when his hearing-loss-related claims were dismissed on procedural grounds at the pleading stage, as the reports consisted of expert opinions regarding Canup's hearing loss that could not be used once those claims were barred, depriving him of any opportunity to litigate those claims or to present and defend his expert evidence on the merits.

99.     On July 9, 2024, Canup emailed Bradford requesting access to common benefit work product, including the PEC's virtual depository and trial materials referenced in the participation agreement, but received no response.

100.    On September 30, 2024, Canup entered into a direct settlement agreement with 3M. Canup's ability to reach this resolution was made possible only through his efforts and the efforts of independent counsel, despite the harm caused by the misconduct of all Defendants named herein.

## IV.

## CAUSES OF ACTION

Alternative Pleadings.  To the extent necessary, each of the claims set forth below is pleaded in the alternative.

### A.    CLAIMS AGAINST TEXAS DEFENDANTS

### Claim 1:  Fraudulent Inducement

101.    Canup restates and realleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

102.    On June 21, 2019, Texas Defendants entered into a contingency fee agreement with Canup and represented that they would investigate, develop, and pursue his claims through individualized litigation.

103.    These representations were false or misleading when made because Texas Defendants did not have the present intent to individually develop or litigate Canup's claims and instead operated with a model focused on aggregate settlement, and they failed to disclose these material facts.

104.    Texas Defendants made these representations with the intent that Canup rely on them in entering the agreement.

105.    Canup relied on these representations by entering the agreement and allowing Texas Defendants to control his claims for approximately four years.

106.    During this period, Brown repeatedly represented that he was actively pursuing Canup's claims when he was not, including in communications dated December 22, 2020 and January 22, 2024.

107.    As a result, Canup's hearing loss and tinnitus claims were not developed or amended by FNJ Defendants, and the MDL Court dismissed his hearing-loss claims in part based on that lack of development, causing damages.

108.    Texas Defendants' conduct also required Canup to address litigation obligations without prior case development, resulting in additional burden, stress, and expense.

109.    Texas Defendants engaged in conduct that constitutes fraudulent securing of document execution under §32.46 of the Texas Penal Code.

110.    Texas Defendants knowingly secured execution of the retainer agreement with Canup by deception.

111.    These statements and actions were made with the full knowledge and authorization of Texas Defendants' principals and the conduct constitutes a felony violation of the Texas Penal Code.

112.    To the extent FNJ is not found directly liable for its own independent misconduct, FNJ is also vicariously liable for any wrongful acts or omissions committed by Brown and/or Roberts in the course and scope of their employment and/or partnership and/or agency under the doctrine of respondeat superior and Texas agency law.

113.    Accordingly, Canup pleads for, and is entitled to economic damages inconvenience damages and mental anguish damages in an amount sufficient to compensate him for the harm sustained.

114.    Because Texas Defendants' conduct was fraudulent and/or malicious, Canup pleads for, and is also entitled to recover exemplary damages in an amount to be determined by the trier of fact.

115.    Canup further pleads for expenses and pre- and post-judgment interest at the maximum rate permitted by law.

### Claim 2:  Breach of Fiduciary Duty

116. Canup restates and realleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

117. Texas Defendants represented Canup from June 21, 2019 through February 20, 2024 and owed fiduciary duties of loyalty, candor, full disclosure and the obligation to provide independent professional judgement.

118. Texas Defendants breached those duties by entering into and participating in the MSA on August 29, 2023, at least tacitly and in fact, while still representing Canup and without disclosure or informed consent. Texas Defendants thereafter formalized their participation between August 29, 2023 and March 25, 2024 by submitting registration forms for other clients. Because their compensation and financial interests were directly tied to participation in the MSA, Texas Defendants operated under a material conflict of interest that limited their ability to provide independent and objective advice to Canup. Texas Defendants failed to disclose this conflict before advising Canup regarding the settlement and instead continued the representation while acting under that conflict, attempting to influence Canup to take actions that would advance their own financial interests at Canup's expense.

119. The MSA required Texas Defendants to cease developing Canup's claims, recommend settlement to all clients, and withdraw from those who declined—obligations that directly conflicted with Canup's interests. By failing to disclose these obligations while continuing to advise Canup, Texas Defendants breached their duties of loyalty and full disclosure.

120. Texas Defendants further breached their duties of candor and full disclosure by making misleading statements and omissions regarding withdrawal, the viability of litigation, and their role under the MSA, including repeatedly representing that they were actively pursuing

Canup's claims when they were not, and failing to disclose material facts concerning their conflicts and obligations.

121. Texas Defendants breached their duty of loyalty and their obligation to exercise independent professional judgment on Canup's behalf by prioritizing participation in the MSA and the interests of other clients and their own financial interests over the continued representation and advancement of Canup's claims.

122. Texas Defendants breached their fiduciary duties by continuing to represent Canup despite these conflicts and delaying withdrawal until immediately before critical litigation deadlines.

123. Texas Defendants further breached their duties of loyalty and full disclosure by failing to provide Canup with his complete client file and withholding materials necessary to prosecute his claims including the unredacted master complaint.

124. These breaches enabled Texas Defendants to pursue and secure participation in the MSA. After becoming aware of the conflicts created by the MSA, Texas Defendants chose to continue representing Canup while simultaneously aligning themselves with and acting in furtherance of the MSA, rather than taking the ethical path of disclosure and withdrawal before agreeing to participate. In doing so, Texas Defendants engaged in a continuing course of disloyal conduct, including maintaining conflicted representation, failing to pursue Canup's claims while falsely representing that they were doing so, and making misleading statements to induce conduct consistent with MSA participation, all of which facilitated their ability to satisfy the requirements for participation in the MSA.

125. Texas Defendants' breaches of fiduciary duty were a substantial factor in enabling them to obtain, secure, and retain financial benefits through participation in the MSA. By

FIRST AMENDED PETITION                                                    PAGE     25

continuing to act under an undisclosed conflict and advancing their own financial interests while representing Canup, Texas Defendants pursued, facilitated, and sustained their participation in the MSA through a continuous course of disloyal conduct.

126.   To the extent FNJ is not found directly liable, FNJ is also vicariously liable for the breaches of fiduciary duty committed by Brown and/or Roberts in the course and scope of their employment and/or partnership and/or agency under the doctrine of respondeat superior and Texas agency law.

127.   Canup pleads for equitable relief in the form of fee forfeiture, disgorgement, and an equitable accounting of all profits, compensation, and benefits obtained by Texas Defendants that are connected to, facilitated by, or obtained as a result of their breaches of fiduciary duty, including any fees or financial benefits obtained through their participation in the MSA. Disgorgement is warranted regardless of whether Canup suffered actual damages.

**Claim 3: Legal Malpractice (In the Alternative to Fraudulent Inducement)**

128.   Canup restates and realleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

129.   Texas Defendants Brown, Roberts, and FNJ entered into a written contingency fee retainer agreement with Canup to represent him in the MDL. By virtue of this attorney-client relationship, Texas Defendants owed Canup a duty to exercise reasonable care, skill, and diligence commonly possessed and exercised by attorneys similarly situated in the State of Texas.

130.   This duty included, but was not limited to, properly investigating and preparing Canup's claims, maintaining adequate communication with the client, meeting applicable court deadlines, and taking reasonable steps to protect Canup's interests before, during, and after withdrawal of representation.

FIRST AMENDED PETITION                                    PAGE    26

131. Texas Defendants breached their duty of care by failing to investigate and develop Canup's case over a four-year period, including failing to amend pleadings to include hearing-loss claims, which contributed to the MDL court's dismissal of those claims.

132. Texas Defendants' breaches directly and proximately caused injury to Canup. The MDL court cited the absence of prior amendment and development of hearing-loss claims as a reason for barring and dismissing those claims, rendering Canup's expert reports largely useless.

133. As a result of Texas Defendants' breaches, Canup suffered economic damages in the form of wasted expert fees.

134. To the extent FNJ is not found directly liable for its own independent negligence, FNJ is also vicariously liable for any negligence committed by Brown and/or Roberts in the course and scope of their employment and/or partnership and/or agency under the doctrine of respondeat superior and Texas agency law.

135. Accordingly, Canup pleads for and is entitled to monetary damages in an amount sufficient to compensate him for the harm sustained.

## B.    CLAIMS AGAINST FLORIDA DEFENDANTS

### Claim 1: Fraud by Non-Disclosure

136. Canup restates and realleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

137. Florida Defendants communicated with Canup through Gamble, provided legal advice, and sought, obtained, and used confidential and privileged information, including medical records and information regarding his claims and litigation posture, thereby creating a relationship of trust and at minimum an implied attorney-client relationship giving rise to duties of disclosure.

138. Florida Defendants, through communications with Gamble, as Canup's agent, represented they would attend proceedings relating to Canup's case while failing to disclose that they intended to formally appear in court on his behalf, creating a duty to disclose the full nature and scope of their involvement.

139. Florida Defendants failed to disclose material facts, including their intent to formally appear at the March 13, 2024 proceedings, the nature and scope of their involvement, and their access to Canup's medical records from an undisclosed source.

140. Canup was unaware of these facts and had no equal opportunity to discover them.

141. Florida Defendants intended that Canup rely on their nondisclosure, including by complying with the Court's requirement to appear in person with counsel and continuing to treat Gamble as his sole counsel.

142. In reliance on this concealment, Canup attended the proceedings and incurred expenses, including paying for Gamble's travel, lodging, and appearance, which would not have been incurred had the facts been disclosed.

143. Florida Defendants' nondisclosure deprived Canup of the ability to make informed decisions regarding his representation and allowed them to act in furtherance of their own interests while remaining undisclosed.

144. Florida Defendants also accessed and used Canup's confidential medical records without his knowledge or consent, further interfering with his ability to control his case and protect his interests.

145. These harms, including financial loss and loss of decision-making autonomy, were the direct result of Florida Defendants' concealment.

FIRST AMENDED PETITION

146.   Florida Defendants' omissions were intentional, material, and constitute fraud by nondisclosure under Texas law.

147.   Aylstock, Bradford, and Burns acted with authority, and AWKO and Mostyn Law are liable for their conduct, directly or vicariously.

148.   To the extent AWKO and Mostyn Law are not found directly liable, they are vicariously liable for the acts and omissions of Aylstock, Bradford, and Burns committed within the course and scope of their employment and/or partnership and/or agency under the doctrine of respondeat superior and Texas agency law.

149.   Accordingly, Canup pleads for, and is entitled to economic damages in an amount sufficient to compensate him for the harm sustained.

150.   Because Florida Defendants' conduct was fraudulent and/or malicious, Canup pleads for, and is also entitled to recover exemplary damages in an amount to be determined by the trier of fact.

151.   Canup further pleads for expenses and pre and post-judgment interest at the maximum rate permitted by law.

### Claim 2:   Breach of Fiduciary Duty

152.   Canup restates and re-alleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

153.   Florida Defendants communicated with Canup directly and through Gamble, provided legal advice, obtained confidential and privileged information, and appeared in proceedings affecting his rights, with Bradford offering continuous legal guidance over approximately two months, creating at minimum an implied attorney-client relationship and

FIRST AMENDED PETITION                                                     PAGE   29

fiduciary duties. Florida Defendants owed Canup fiduciary duties, including duties of loyalty, candor, confidentiality, and the obligation to avoid conflicts of interest.

154. Florida Defendants breached those duties by involving themselves in Canup's case and providing legal advice while operating under undisclosed conflicts arising from their participation in the MSA and their financial interests tied to settlement participation.

155. Florida Defendants further breached their duties by withholding the Master Complaint and conditioning its release on execution of a participation agreement assigning a 9% interest in Canup's recovery.

156. Florida Defendants also breached their duties by failing to disclose their intent to appear and by appearing on Canup's behalf at the March 13, 2024 proceedings without disclosure or consent.

157. Florida Defendants breached their duties of candor and disclosure by failing to disclose the existence and material terms of the MSA, including Exhibit 10, while advising Canup regarding his claims and settlement.

158. Florida Defendants breached their duties by accessing and using Canup's confidential medical records without consent and failing to disclose the source and manner in which they were obtained.

159. Florida Defendants further breached their duties by conveying authority and providing guidance while their professional judgment was materially limited by conflicts and financial interests.

160. These breaches enabled Florida Defendants to obtain and retain financial benefits through the MSA and directly caused Canup to act and incur expenses he otherwise would not have incurred.

161.    Florida Defendants' breaches were clear and serious, involved conflicts of interest and divided loyalty, and justify equitable forfeiture of all compensation obtained in connection with their misconduct.

162.    Florida Defendants' breaches of fiduciary duty enabled them to maintain, protect, and continue their participation in the MSA and the financial benefits associated with it. Although Florida Defendants were already bound to the MSA, they affirmatively undertook to advise Canup and created an implied attorney-client relationship despite their undisclosed conflicts of interest. While owing Canup fiduciary duties, Florida Defendants continued to provide legal advice while operating under obligations that prevented them from advancing Canup's interests where doing so would conflict with the MSA. By pursuing their own financial interests and maintaining conflicted representation, Florida Defendants engaged in a course of disloyal conduct that allowed them to preserve and benefit from their participation in the MSA.

163.    To the extent AWKO and Mostyn Law are not found directly liable, they are also vicariously liable for the fiduciary breaches committed by Aylstock, Bradford, and Burns committed within the course and scope of their employment and/or partnership and/or agency under the doctrine of respondeat superior and Texas agency law.

164.    Canup pleads for equitable relief in the form of fee forfeiture, disgorgement and an equitable accounting of all profits, compensation, and benefits obtained by Florida Defendants that are connected to, facilitated by, or obtained as a result of their breaches of fiduciary duty, including any fees or financial benefits obtained through their participation in the MSA. Disgorgement is warranted regardless of whether Canup suffered actual damages.

### Claim 3: Fraudulent Inducement

165.    Canup restates and realleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

166.    Bradford refused to provide the unredacted master complaint unless Gamble, as Canup's agent agreed to allocate a 9% interest in Canup's recovery to the PSC and execute a participation agreement, thereby conditioning access to materials necessary for Canup's case on execution of the agreement. The agreement also stated that the PSC would provide access to the rest of the common benefit work produced by the PSC in the MDL.

167.    This representation was material because access to the unredacted master complaint was necessary to evaluate Canup's claims, prepare pleadings, and meaningfully participate in the MDL proceedings.

168.    At the time these representations were made, Bradford had already created at minimum an implied attorney-client relationship with Canup. By virtue of this relationship, Bradford owed Canup fiduciary duties, including duties of candor, full disclosure, loyalty, and the obligation not to place his own interests above those of Canup.

169.    The representations were false when made because Bradford did not have the present intent to provide full access to common benefit materials and had already agreed to the MSA, which prohibited him from further developing cases in the MDL. He knew the master complaint was filed on behalf of all MDL claimants and was already part of Canup's case materials, and that no additional meaningful materials would be provided.

170.    Bradford's conduct was intended to bind Canup to terms that benefitted Bradford, and the PSC, which includes Aylstock and Burns, while depriving Canup of the promised resources.

171. Bradford made these representations with the intent that Canup rely on them in agreeing to allocate a 9% interest in his recovery.

172. By doing so, Bradford sought to secure financial gain.

173. Canup, relied on these representations and agreed to the 9% allocation.

174. Canup did so in the belief that he would receive full access to the MDL's common benefit work, including the materials necessary to evaluate and advance his claims.

175. Aylstock, Bradford, Burns, Mostyn and AWKO were unjustly enriched by their conduct as Aylstock and Burns were members of the PSC.

176. As a direct and proximate result of the fraudulent inducement by Bradford, Canup suffered injury.

177. As a result, Canup incurred the financial burden of allocating 9% of his recovery to the PSC while receiving only the master complaint—which he was already entitled to receive.

178. Canup was deprived of the remaining promised common benefit materials. As a result, Canup was disadvantaged in prosecuting his claims and was required to expend additional time and effort to understand and develop his case without the benefit of the promised work product.

179. Bradford engaged in conduct that constitutes fraudulent securing of document execution under §32.46 of the Texas Penal Code.

180. Bradford knowingly secured execution of the participation agreement with Canup through Gamble, as Canup's agent, by deception. These statements and actions constitute a felony violation of the Texas Penal Code.

181.    These statements and actions were made with the full knowledge and authorization of Bradford's principals, including Aylstock, Burns, AWKO and Mostyn, as members of the PSC, and the conduct constitutes a felony violation of the Texas Penal Code.

182.    To the extent Aylstock, Burns, AWKO and Mostyn are not found directly liable, they are also vicariously liable for the fraudulent inducement committed by Bradford within in the course and scope of his employment and/or partnership and/or agency under the doctrine of respondeat superior and Texas agency law.

183.    Canup seeks equitable relief including an accounting to determine the full extent of any profits, compensation, or financial benefits obtained by Florida Defendants as a result of their fraudulent conduct, and disgorgement of any such improperly obtained amounts, as such information is within Florida Defendants' exclusive knowledge and cannot be ascertained without an accounting.

184.    Canup pleads for, and is entitled to economic damages in an amount sufficient to compensate him for the harm sustained.

185.    Because Bradford's conduct was fraudulent and/or malicious, Canup pleads for, and is also entitled to recover exemplary damages in an amount to be determined by the trier of fact.

186.    Canup further pleads for expenses and pre and post-judgment interest at the maximum rate permitted by law.

## C.    CLAIMS AGAINST ALL DEFENDANTS

### Claim 1:  Civil Conspiracy

187.    Canup restates and realleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

188.    All Defendants entered into a combination or agreement on or about August 29, 2023, whether express or tacit, to act in concert to increase their financial compensation tied to claimant participation in the MSA, including by attempting to induce Canup to participate in the MSA.

189.    All Defendants had a meeting of the minds on the object and course of action of this agreement, as evidenced by their coordinated conduct, shared participation in and operation under the MSA, and ongoing communications within the MDL proceedings. The PSC, which included some or all of the Florida Defendants, provided coordinated information, direction, and messaging to Texas Defendants regarding settlement participation.

190.    In furtherance of this agreement, all Defendants committed overt acts, including concealing material conflicts of interest, failing to disclose obligations under the MSA, and making false or misleading statements regarding the status of Canup's claims, the viability of continued litigation, and the consequences of settlement, for the purpose of inducing Canup to act in a manner consistent with all Defendants' financial interests.

191.    Texas Defendants relayed information from Plaintiffs' Leadership to Canup, including that his case would not be eligible for trial until 2030, which Defendants knew or should have known was false or misleading.

192.    All Defendants further acted in concert by withholding material information and Florida Defendants conditioned access to Canup's case materials on compliance with participation-related terms, including requiring a 9% interest in Canup's recovery.

193.    Florida Defendants further advanced the conspiracy by providing legal advice, appearing on Canup's behalf without disclosure, and obtaining and using confidential information while operating under undisclosed conflicts created by the MSA.

194. These coordinated acts were undertaken to influence Canup's decision-making and increase the likelihood of his participation in the MSA.

195. As a direct and proximate result of Defendants' conspiracy, Canup suffered damages. Canup incurred unnecessary expenses, including transporting substitute counsel to Florida for a hearing at which Florida Defendants appeared on his behalf without disclosure and the loss of value of expert-related expenses and other litigation costs rendered wasted due to Defendants' actions.

196. Canup was further required to expend significant time and effort to investigate and understand the legal and procedural issues necessary to uncover and respond to Defendants' coordinated conduct.

197. These harms were directly caused by Defendants' concerted actions.

198. To the extent the law firms named herein are not found directly liable, they are also vicariously liable for the actions of their partners, associates, employees, or agents committed within the scope of employment and in furtherance of the conspiracy.

199. Because Canup's injuries were caused by the joint and concerted actions of multiple Defendants all Defendants are jointly and severally liable under Texas law.

200. Canup pleads that if any law firm named herein is not found directly liable, it is nonetheless vicariously liable under the doctrine of respondeat superior for the conduct of its partners, agents, or employees acting within the course and scope of their duties.

201. Accordingly, Canup pleads for, and is entitled to economic damages, inconvenience damages, and mental anguish damages in an amount sufficient to compensate him for the harm sustained.

202. Because Defendants' conduct was fraudulent and/or malicious, Canup pleads for, and is also entitled to recover exemplary damages in an amount to be determined by the trier of fact.

203. Canup further pleads for expenses and pre and post-judgment interest at the maximum rate permitted by law.

## VII.

## DAMAGES

204. Canup restates and realleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

205. For each of his claims, Canup seeks recovery of all of the following categories of damages as a direct and proximate result of the Defendants' wrongful conduct.

206. For Texas Defendants' Fraudulent Inducement, Canup is entitled to actual damages including economic damages in the amount of $11,925.00, mental anguish damages, and inconvenience damages. Because these acts were committed knowingly and intentionally, Canup is also entitled to and pleads for exemplary damages as provided by Chapter 41 of the Texas Civil Practice and Remedies Code.

207. In the alternative, for Texas Defendants' Legal Malpractice, Canup seeks economic damages in the amount of $11,925.00, representing the same expert-related losses alleged for Texas Defendants' fraudulent inducement. Recovery under this theory is pleaded in the alternative and not in addition to damages sought for Texas Defendants' fraudulent inducement.

208. For Florida Defendants Fraud by Non-Disclosure, Canup is entitled to economic damages in the amount of $7,404.59. Because these acts were committed knowingly and

intentionally, Canup is also entitled to and pleads for exemplary damages as provided by Chapter 41 of the Texas Civil Practice and Remedies Code.

209. For Florida Defendants Fraudulent Inducement, Canup is entitled to economic damages in an amount to be determined by an accounting. Because these acts were committed knowingly and intentionally, Canup is also entitled to and pleads for exemplary damages as provided by Chapter 41 of the Texas Civil Practice and Remedies Code.

210. As a result of all Defendants' civil conspiracy, each Defendant is jointly and severally liable for all damages arising from the underlying torts described herein, including the economic, mental anguish, inconvenience, and exemplary damages alleged above.

## VIII.

## EQUITABLE REMEDIES

211. Canup restates and realleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

212. For each of the following claims, Canup seeks equitable relief to prevent and remedy the improper benefits and unjust enrichment obtained by Defendants through their wrongful conduct.

213. For Texas Defendants' Breaches of Fiduciary Duty, Canup seeks equitable relief including an accounting, disgorgement, and forfeiture of all compensation, profits, and benefits obtained as a result of their misconduct.

214. For Florida Defendants' Breaches of Fiduciary Duty, Canup seeks equitable relief including an accounting, disgorgement, and forfeiture of all compensation, profits, and benefits obtained as a result of their misconduct.

215. For Florida Defendants' fraudulent inducement, Canup seeks equitable relief including an accounting to determine the full extent of any compensation, fees, or benefits obtained by Defendants in connection with Canup's claims and recovery, and disgorgement of any such improperly obtained amounts.

## IX.

## INTERESTS AND COSTS

216. Canup restates and realleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

217. Canup seeks pre- and post-judgment interest as authorized by law, together with all taxable court costs and litigation expenses.

## X.

## JURY DEMAND

218. Canup requests a jury trial on all claims and issues so triable.

## XI.

## CONDITIONS PRECEDENT

219. All conditions precedent have occurred and been satisfied.

## XII.

## NOTICE PURSUANT TO T.R.C.P. 193.7

220. Canup provides notice to Defendants pursuant to Rule 193.7 of the Texas Rules of Civil Procedure that Canup may utilize as evidence during the trial of this lawsuit all documents exchanged by the parties in discovery in this case.

## XIII.

## PRAYER

221.    ACCORDINGLY, Canup respectfully requests that Defendants be cited to appear and answer, and that Canup be granted judgment against Defendants awarding Canup all damages he is entitled to, including all damages and other relief (at law or in equity) pled in the causes of action and other parts of this instrument above, economic damages, mental anguish damages, inconvenience damages, exemplary damages, costs, pre- and post-judgment interest, equitable accounting, disgorgement, and forfeiture of any fees or benefits wrongfully obtained by Defendants, and all other damages Canup is entitled to in equity or by other applicable law.

222.    Canup further requests such other and further relief at law or in equity to which Canup may show himself justly entitled.

Dated April 6, 2026

Respectfully submitted,

Brandon Canup

4812 Hidden Oaks Ln
Arlington, Texas 76017
(972) 762-4314

canup.brandon@gmail.com

pro se

# EXHIBIT "2"

**FLEMING, NOLEN & JEZ, L.L.P.**
**AND ROBERTS LAW OFFICE**
**CONTRACT OF EMPLOYMENT**

THIS CONTRACT AND AGREEMENT is entered into between the undersigned "Client", and Fleming, Nolen & Jez, L.L.P. ("FNJ") and Roberts Law Office ("Roberts"), as associate counsel, sometimes referred to hereafter as "the Firms." Client agrees to retain the legal services of the Firms in connection with Client's potential claim for damages arising from injuries caused by 3M Combat Arms Earplugs™. If appropriate, the Firms will represent Client, assert and/or dismiss claims, litigate claims, and/or settle claims. Client has the ultimate authority over the decision to settle.

1.    Client's Cooperation: Client is seeking legal services. Client agrees to cooperate fully with the Firms, disclose all relevant facts to the Firms, and promptly comply with all reasonable requests of the Firms on all matters.[1]

2.    The Firms' Right to Withdraw: If for any reason the Firms no longer wish to represent Client, the Firms are authorized and permitted to cease all work on Client's behalf and withdraw from their representation of Client by sending to Client's last known address (by regular mail), written notice of the Firms' intention to withdraw. The Firms and Client agree that upon such withdrawal, the Firms shall cease to be Client's counsel and Client will have the right to seek new counsel.

3.    Statute of Limitations on Client's Claims: the Firms will investigate Client's potential claim and in their sole discretion determine whether to bring a claim on Client's behalf. Client understands that the Firms will not be able to fully evaluate the potential claim until Client has provided enough evidence to prove the alleged harm, injuries, and/or damages. Client also understands that it will take the Firms a *minimum* of forty-five (45) days after receipt of such information to evaluate Client's potential claim. Client understands that Client's claim is subject to a statutory time limit that may expire during the Firms' investigation. Client understands that Defendant(s) may attempt to have Client's claims dismissed based upon those statutes of limitations. Client understands that the statute of limitations in Client's case may have expired before Client ever contacted the Firms, or that the statute of limitations may expire in the very near future, prior to the Firms' completed investigation of Client's potential claim. Client therefore agrees to hold the Firms harmless from any liability for claims not filed prior to this limitations period.

4.    Contingency Fee to the Firms: To compensate the Firms for their services, Client agrees to pay the Firms 40% of all money collected in relation to Client's claim. The fee payable to the attorneys will be divided as follows: 33 1/3% to Roberts Law Office and 66 2/3% to Fleming, Nolen & Jez, L.L.P. **In the event there is no recovery, there is no fee.** Client expressly grants FNJ authority to endorse and deposit into its Trust Account any checks in

---

[1] Client Bankruptcy: Client acknowledges and understands that declaring bankruptcy during the pendency of a lawsuit will likely result in Client losing control of the claim and potentially losing part or all of any recovery that may be paid to settle or resolve the claim. Client agrees to advise Client's Bankruptcy Attorney and the Bankruptcy Trustee of any potential or actual claim related to the Firms' representation of Client. Client agrees to advise Client's Bankruptcy Attorney and the Bankruptcy Trustee of the Firms' representation of Client in connection with the claim or lawsuit. Client agrees to advise the Firms of the bankruptcy proceeding no later than five (5) days after the date upon which Client's Bankruptcy Petition is filed and agrees to promptly provide the Firms with a copy of the Bankruptcy Petition. Client acknowledges and understands that once a Bankruptcy Petition is filed, the claim most likely will be included in the bankruptcy estate and entirely subject to the Bankruptcy Trustee's and/or Bankruptcy Court's control. Client acknowledges, understands, and agrees that the Firms may continue prosecuting the claim and/or lawsuit on behalf of the bankruptcy estate and may be employed by the Bankruptcy Trustee or appointed as Special Counsel by the Bankruptcy Court for the purpose of doing so.

Client's name, and authorizes FNJ to pay any liens related to Client's claim from Client's share of the recovery.

5.     Litigation Costs and Expenses:[2]  FNJ shall advance costs and expenses on Client's behalf.  In accordance with applicable law at the conclusion of this matter, FNJ is entitled to reimbursement from Client's share for such advances.  In the event of a recovery, Client agrees that, out of Client's portion of any recovery, FNJ will be paid all reasonable costs, charges, or expenses made or incurred by the Firms in its handling of the matter.  All charges will be deducted *after* the Firms' contingent fee is calculated. Client understands and agrees that the Firms may provide certain services internally or use outside vendors and service providers to assist in the handling of Client's case, and authorizes the Firms to use their best judgment in selecting them.  Client further agrees not to attempt to unilaterally settle Client's claims.  In the event that Client settles the claim unilaterally, the Firms shall be entitled to recover all of its fees and expenses as set forth herein. Client shall have the right to discharge the Firms at any time and understands that in consideration for the services the Firms provided up to the time of such discharge, the Firms will be entitled to be reimbursed for all their attorney's fees and for costs and disbursements they advanced on behalf of Client with respect to Client's claim.

6.     Waiver: The Firms may undertake representation of additional clients who have also sustained damages as a result of the conduct of the same defendant(s).  Client is hereby advised of, and acknowledges, this potential conflict and the positive and negative aspects of multiple and collective representations.  One aspect of representing multiple clients is the potential for an aggregate or group settlement.  In the event there is an aggregate settlement, client agrees that the Firms, at their sole discretion, may apportion the proceeds and expenses among all clients.

7.     Severability, Arbitration, and Termination:  a) In the event a provision in this Agreement is held to be unenforceable for any reason, such unenforceability shall not affect the validity and/or enforceability of any other provision in this Agreement. This Agreement shall be governed in all respects by the laws of the State of Texas. The courts located in Harris County, Texas shall have exclusive jurisdiction to hear any dispute arising under this Agreement. b) However, at FNJ's election, and at any time, a claim or dispute of any nature arising under this Agreement or in connection with the Firms' representation of Client will be subject to resolution by binding arbitration. The arbitration will be conducted in Houston, Texas, pursuant to the Texas General Arbitration Act and the applicable rules of the American Arbitration Association.  c) The agreement to arbitrate will survive any amendment, modification, or termination of this Agreement unless this paragraph is modified in writing and signed by all

---

[2] Particular Costs and Expenses:  The costs and expenses necessary in this case may include, but are not limited to: court filing fees; process serving fees; witness fees; private investigator fees; photographer/graphic artist fees; fees to experts for consultation and/or appearance at deposition or trial; mail, messenger, and other delivery charges; parking and other local travel; transportation, meals, lodging, and all other costs of necessary out-of-town travel; long distance telephone charges; health care lien resolution charges;  any government or other type of lien resolution charges; probate counsel charges and expenses; bankruptcy counsel charges and expenses; expenses for development of evidence including scientific evidence or studies; imaging, faxing, and photocopying charges; computerized legal research charges; Common Benefit Expenses; court-ordered assessments; interest on costs advanced by the Firms; costs associated with third-party vendors or lawyers resolving liens; and the cost of probate. The Firms may employ such technical experts or investigators who, in its opinion, are necessary to investigate the facts surrounding Client's claim. All such experts shall report exclusively to the Firms.  This list is not exclusive.  Client further agrees that the Firms may at their sole discretion engage a third party including specialized attorneys to research, investigate, negotiate, process and resolve Medicare and other liens.  The client agrees and understands that the charge and costs associated with engaging such a third party is a reimbursable expense and will be paid out of the Client's portion of the recovery, if any.  In the event that probate is required to resolve some or all of Client's claims, Client or client's legal heirs who undertake prosecution of the case are responsible for obtaining and paying probate counsel to probate or administer the estate.  In the event that Client or client's legal heirs fail to timely obtain probate counsel, the Firms may obtain and engage probate counsel at the Firms' sole discretion, and in this event Client agrees and understands that the charges and costs associated with engaging probate counsel is a reimbursable expense and will be paid out of the Client's portion of the recovery, if any.  Client further understands and acknowledges that this provision is intended to, and shall be binding upon Client's heirs who undertake prosecution of the case.

parties to this Agreement. Any modification to this paragraph must expressly reference this paragraph.

8.    Binding Agreement: This Agreement takes the place of any prior agreement. Any change to this Agreement must be in writing and signed by both Client and the Firms. By signing below, Client acknowledges the contents of this Agreement have been carefully reviewed and agrees to be bound by its terms and conditions. Client acknowledges that the Firms have made no representations to Client regarding the outcome of Client's potential claim and considers the Agreement to be fair and reasonable. Client acknowledges that he/she has not signed an attorney-client agreement with any other law firms and that this is the only agreement applicable.

Document Retention Policy: FNJ will retain Client's file for a period of five (5) years after the case is completed. After that five-year period, the entire file will be discarded, and FNJ will not retain a copy of any portion of the file.

| APPROVED IN FULL BY CLIENT: | Client's Home and Mailing Addresses: |
|---|---|
| BRANDON Allen CANUP <br> Client's Full Legal Name <br><br> X _____ <br> Client's Signature <br><br> DATE: June 21 , 2019 <br><br><br> Client's Social Security Number: <br><br> _____ <br><br> Client's Drivers License Number: <br><br> _____ | _____ <br><br> _____ <br><br> _____ <br><br> Client's Telephone Numbers: <br><br> _____ <br> (Home Phone) <br><br><br> _____ <br> (Cell Phone) <br><br> _____ <br> (Business Phone) <br><br> Client's Email Address: <br><br> _____ |

**Personal Information Redacted**

Page 3 of 4

| THE FIRMS | Notice To Client: |
|---|---|
| FLEMING, NOLEN & JEZ, L.L.P.<br><br>By:_____<br>　　Gregory D. Brown<br>　　2800 Post Oak Blvd., Suite 4000<br>　　Houston, TX 77056-6109<br>　　Telephone (713) 621-7944<br>　　Facsimile (713) 621-9638<br>　　gregory_brown@fleming-law.com<br><br>ROBERTS LAW OFFICE<br><br>By:_____<br>　　Cliff L. Roberts<br>　　8191 Southwest Freeway, Suite 116<br>　　Houston, TX 77074-1700<br>　　Telephone (713) 777-4558<br>　　LawyerCLR@aol.com | The State Bar of Texas requires that we provide the following information pursuant to Section 81.079 of the Texas Government Code: **The State Bar of Texas investigates and prosecutes professional misconduct committed by Texas attorneys. Although not every complaint against or dispute with a lawyer involves professional misconduct, the State Bar's Office of General Counsel will provide you with information about how to file a complaint. For more information, call toll-free 1-800-932-1900.** |