# EXHIBIT 1

**No.** 26-11887-C

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

IN RE BRANDON CANUP,

*Petitioner*,

On Petition for Writ of Mandamus from the United States District Court for the Northern District of Florida

No. 3:26-cv-03359-MCR-ZCB

---

## APPENDIX TO PETITION FOR WRIT OF MANDAMUS

## VOLUME I

Brandon Canup
4812 Hidden Oaks Ln
Arlington, Texas 76017
(972) 762-4314
canup.brandon@gmail.com

## INDEX TO APPENDIX

### Description

|  | Docket/ |
|---|---|
| **Volume I** | **Tab No.** |

District Court Docket Sheet ................................................................A

Case Management Order No. 66, MDL 2885 ..........................................B

Case Management Order No. 67, MDL 2885 ..........................................C

Plaintiff's Original Texas State Court Complaint ................................. 1-1

Citation Served on Mostyn Law Firm, P.C. ......................................... 9-1

Texas Secretary of State Records Identifying Mostyn Law Firm, P.C.'s
Registered Agent .......................................................................... 9-3

Defendant Bryan Aylstock's Motion to Transfer Tag-Along Action to
MDL 2885 Before Judicial Panel on Multidistrict Litigation ("JPML") ...............23

AWKO Defendants' First Motion to Dismiss ........................................27

Affidavit of Bryan Aylstock ............................................................ 27-1

JPML Transfer Order .......................................................................30

Plaintiff's Motion for Recusal and Disqualification ...............................37

Excerpts from Transcript of 23rd Case Management Conference, MDL 2885 .... 37-4

Original Complaint, *Kelly v. Aylstock et al,* No. 3:25-cv-01649 .......................... 37-5

Judge Rodgers' Recusal Order, *Kelly v. Aylstock et al,* No. 3:25-cv-01649 ........ 37-6

Original Complaint, *Kelly v. Aylstock et al,* No. 3:25-cv-01947 .......................... 37-8

Judge Rodgers' Recusal Order, *Kelly v. Aylstock et al,* No. 3:25-cv-01947 ........ 37-9

AWKO Defendants' Response to Plaintiff's Motion to Amend Complaint ...........46

FNJ Defendant' Response in Opposition to Plaintiff's Motion for Recusal ..........51

**Volume II**

AWKO Defendants' Response in Opposition to Plaintiff's Motion for Recusal ....56

Transcript, March 13,2024 Status Conference, *Canup v. 3M Co.* ....................... 56-1

Plaintiff's First Amended Complaint (Operative Complaint) .................................60

Order Denying Canup's Motion for Recusal and Disqualification ........................61

Appearance of Benjamin Stevenson for Mostyn Law Firm, P.C...........................62

AWKO Defendants' Second Motion to Dismiss .....................................................66

Mostyn Law Firm P.C.'s Motion to Dismiss..........................................................67

Order Denying Remand ..........................................................................................70

# Tab A

# U.S. District Court
## Northern District of Florida (Pensacola)
## CIVIL DOCKET FOR CASE #: 3:26-cv-03359-MCR-ZCB

CANUP v AYLSTOCK et al
Assigned to: JUDGE M CASEY RODGERS
Referred to: MAGISTRATE JUDGE ZACHARY C BOLITHO
Lead case: 3:19-md-02885-MCR-HTC
Member case: (View Member Case)
Case in other court: Texas Northern, 4:25-cv-01255
Cause: 28:1332 Diversity-Notice of Removal

Date Filed: 04/03/2026
Jury Demand: Plaintiff
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

**Plaintiff**

**BRANDON CANUP**

represented by **BRANDON CANUP**
4812 HIDDEN OAKS LANE
ARLINGTON, TX 76017
972-762-4314
Email: canup.brandon@gmail.com
PRO SE

V.

**Defendant**

**BRYAN F AYLSTOCK**

represented by **GREGORY KENT RETTIG**
LLOYD GRAY WHITEHEAD &
MONROE - PENSACOLA FL
125 W ROMANA STREET
SUITE 330
PENSACOLA, FL 32502
850-777-3322
Fax: 850-777-3290
Email: grettig@lgwmlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JUSTIN TYLER KEETON**
LLOYD GRAY WHITEHEAD &
MONROE - PENSACOLA FL
125 W ROMANA STREET
SUITE 330
PENSACOLA, FL 32502
850-777-3322
Fax: 850-434-6491
Email: jkeeton@lgwmlaw.com

**Defendant**

**BOBBY BRADFORD**

represented by **GREGORY KENT RETTIG**
(See above for address)
*PRO HAC VICE*

ATTORNEY TO BE NOTICED

**JUSTIN TYLER KEETON**
(See above for address)

**Defendant**

**MICHAEL BURNS**

**Defendant**

**CLIFF ROBERTS**                    represented by   **SKIPPER JONATHAN VINE**
COLE SCOTT & KISSANE PA - WEST
PALM BEACH FL
222 LAKEVIEW AVENUE
SUITE 500
WEST PALM BEACH, FL 33401
561-383-9200
Fax: 561-683-8977
Email: jonathan.vine@csklegal.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**GREGORY BROWN**                    represented by   **SKIPPER JONATHAN VINE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**ALYSTOCK WITKIN KREIS &**          represented by   **GREGORY KENT RETTIG**
**OVERHOLTZ PLC**                                     (See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JUSTIN TYLER KEETON**
(See above for address)

**Defendant**

**FLEMING NOLEN & JEZ LLP**          represented by   **SKIPPER JONATHAN VINE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MOSTYN LAW FIRM PC**               represented by   **BENJAMIN JAMES STEVENSON**
STEVENSON LEGAL PLLC -
PENSACOLA BEACH FL
919 PANFERIO DRIVE
PENSACOLA BEACH, FL 32561
702-306-6708
Email: bjs@stevenson-legal.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
|            |   |             |

| Date | No. | Description |
|---|---|---|
| 11/06/2025 | 1 | NOTICE OF REMOVAL filed by Gregory Donald Brown, Alystock, Witkin, Kreis & Overholtz, PLL. In each Notice of Electronic Filing, the judge assignment is indicated, and a link to the Judges Copy Requirements and Judge Specific Requirements is provided. The court reminds the filer that any required copy of this and future documents must be delivered to the judge, in the manner prescribed, within three business days of filing. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms and Instructions found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (Attachments: # 1 Exhibit(s) Plaintiff's State Court Petition, # 2 Exhibit(s) State Court Docket Sheet) (Sorrels, Randy) [Transferred from Texas Northern on 4/3/2026.] (Entered: 11/06/2025) |
| 11/06/2025 | 2 | New Case Notes: A filing fee has not been paid. No prior sanctions found. (For court use only - links to the national and circuit indexes.) File to: appropriate staff attorney. Pursuant to Misc. Order 6, Plaintiff is provided the Notice of Right to Consent to Proceed Before A U.S. Magistrate Judge. Clerk to provide copy to plaintiff if not received electronically. (jnp) [Transferred from Texas Northern on 4/3/2026.] (Entered: 11/06/2025) |
| 11/06/2025 | 3 | Notice and Instruction to Pro Se Party (jnp) [Transferred from Texas Northern on 4/3/2026.] (Entered: 11/06/2025) |
| 11/06/2025 | | ***Clerk's Notice of delivery: (see NEF for details) Docket No:2, 3. Thu Nov 6 09:37:25 CST 2025 (crt) [Transferred from Texas Northern on 4/3/2026.] (Entered: 11/06/2025) |
| 11/10/2025 | 4 | NOTICE of Filing Executed Return of Service filed by Brandon Canup (jnp) [Transferred from Texas Northern on 4/3/2026.] (Entered: 11/10/2025) |
| 11/10/2025 | 5 | Appendix in Support filed by Brandon Canup re: 4 Notice of Filing Executed Return of Service (jnp) [Transferred from Texas Northern on 4/3/2026.] (Entered: 11/10/2025) |
| 11/10/2025 | 6 | CERTIFICATE OF SERVICE by Brandon Canup re 5 Appendix in Support, 4 Notice (Other) *Corrected Certificate of Service* (Canup, Brandon) [Transferred from Texas Northern on 4/3/2026.] (Entered: 11/10/2025) |
| 11/21/2025 | 7 | SUMMONS Returned Unexecuted as to Gregory Brown, Cliff Roberts. (Attachments: # 1 Affidavit(s) Attempted Service on Defendant Gregory Brown, # 2 Affidavit(s) Attempted Service on Defendant Cliff Roberts) (Canup, Brandon) [Transferred from Texas Northern on 4/3/2026.] (Entered: 11/21/2025) |
| 11/21/2025 | 8 | First MOTION to Remand filed by Brandon Canup with Brief/Memorandum in Support. (Attachments: # 1 Proposed Order) (Canup, Brandon) [Transferred from Texas Northern on 4/3/2026.] (Entered: 11/21/2025) |
| 11/21/2025 | 9 | Appendix in Support filed by Brandon Canup re 8 First MOTION to Remand (Canup, Brandon) [Transferred from Texas Northern on 4/3/2026.] (Entered: 11/21/2025) |
| 12/01/2025 | 10 | MOTION to Dismiss filed by Gregory Brown, Fleming Nolen & Jez LLP Attorney Michael Steven Cedillo added to party Gregory Brown(pty:dft), Attorney Michael Steven Cedillo added to party Fleming Nolen & Jez LLP(pty:dft) (Cedillo, Michael) [Transferred from Texas Northern on 4/3/2026.] (Entered: 12/01/2025) |
| 12/09/2025 | 11 | NOTICE of Potential Tag-Along Actions filed by Bryan F. Aylstock (jnp) [Transferred from Texas Northern on 4/3/2026.] (Entered: 12/09/2025) |
| 12/09/2025 | 12 | NOTICE of Errata for Dkt. 2029, 11 Notice of Potential Tag-Along Actions filed by Bryan F. Aylstock (jnp) [Transferred from Texas Northern on 4/3/2026.] (Entered: 12/09/2025) |

| | | |
|---|---|---|
| 12/12/2025 | 14 | RESPONSE filed by Gregory Brown, Fleming Nolen & Jez LLP re: 8 First MOTION to Remand (Attachments: # 1 Exhibit(s) 1, # 2 Exhibit(s) 2) (Cedillo, Michael) [Transferred from Texas Northern on 4/3/2026.] (Entered: 12/12/2025) |
| 12/12/2025 | 15 | MOTION to Stay *Proceedings* filed by Gregory Brown, Fleming Nolen & Jez LLP (Cedillo, Michael) [Transferred from Texas Northern on 4/3/2026.] (Entered: 12/12/2025) |
| 12/15/2025 | 16 | RESPONSE filed by Brandon Canup re: 15 MOTION to Stay *Proceedings* (Canup, Brandon) [Transferred from Texas Northern on 4/3/2026.] (Entered: 12/15/2025) |
| 12/15/2025 | 17 | Appendix in Support filed by Brandon Canup re 16 Response/Objection (Canup, Brandon) [Transferred from Texas Northern on 4/3/2026.] (Entered: 12/15/2025) |
| 12/15/2025 | 18 | RESPONSE filed by Brandon Canup re: 10 MOTION to Dismiss (Canup, Brandon) [Transferred from Texas Northern on 4/3/2026.] (Entered: 12/15/2025) |
| 12/15/2025 | 19 | REPLY filed by Brandon Canup re: 8 First MOTION to Remand (Canup, Brandon) [Transferred from Texas Northern on 4/3/2026.] (Entered: 12/15/2025) |
| 12/23/2025 | 20 | Court's Copy of MOTION for Miscellaneous Relief Requesting Permission for Electronic Filing by Pro Se Litigant with JPML filed by Brandon Canup (jnp) Modified on 1/12/2026 (mmw). [Transferred from Texas Northern on 4/3/2026.] (Entered: 12/23/2025) |
| 12/29/2025 | 21 | REPLY filed by Gregory Brown, Fleming Nolen & Jez LLP re: 15 MOTION to Stay *Proceedings* (Cedillo, Michael) [Transferred from Texas Northern on 4/3/2026.] (Entered: 12/29/2025) |
| 12/29/2025 | 22 | REPLY filed by Gregory Brown, Fleming Nolen & Jez LLP re: 10 MOTION to Dismiss (Cedillo, Michael) [Transferred from Texas Northern on 4/3/2026.] (Entered: 12/29/2025) |
| 12/29/2025 | 23 | Court's copy of documents filed by Bryan F. Aylstock at the JPML (jnp) (Main Document 23 replaced on 12/29/2025) (jnp). [Transferred from Texas Northern on 4/3/2026.] (Entered: 12/29/2025) |
| 01/05/2026 | 24 | Court's copy of documents filed by Brandon Canup at the JPML (jnp) Modified filed on 1/12/2026 (mmw). [Transferred from Texas Northern on 4/3/2026.] (Entered: 01/05/2026) |
| 01/11/2026 | 25 | CERTIFICATE OF SERVICE by Brandon Canup (Attachments: # 1 Exhibit(s) SOS Certificate of Service for Bryan Aylstock, # 2 Exhibit(s) SOS Certificate of Service for Bobby Bradford, # 3 Exhibit(s) SOS Certificate of Service for Michael Burns, # 4 Exhibit(s) SOS Certificate of Service for Aylstock, Witkin, Kreis & Overholtz, PLC, # 5 Exhibit(s) SOS Certificate of Service for Fleming, Nolen & Jez, LLP, # 6 Declaration(s) Declaration of Brandon Canup) (Canup, Brandon) [Transferred from Texas Northern on 4/3/2026.] (Entered: 01/11/2026) |
| 01/12/2026 | 26 | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC-16110109) filed by Alystock Witkin Kreis & Overholtz PLC, Bryan F. Aylstock, Bobby Bradford Attorney Gregory Kent Rettig added to party Alystock Witkin Kreis & Overholtz PLC(pty:dft), Attorney Gregory Kent Rettig added to party Bryan F. Aylstock(pty:dft), Attorney Gregory Kent Rettig added to party Bobby Bradford(pty:dft) (Rettig, Gregory) [Transferred from Texas Northern on 4/3/2026.] (Entered: 01/12/2026) |
| 01/12/2026 | 27 | MOTION to Dismiss filed by Alystock Witkin Kreis & Overholtz PLC, Bryan F. Aylstock, Bobby Bradford (Attachments: # 1 Affidavit(s) Affidavit of Bryan Aylstock, # 2 Exhibit(s) Transcript) (Rettig, Gregory) [Transferred from Texas Northern on 4/3/2026.] (Entered: 01/12/2026) |

| | | |
|---|---|---|
| 01/16/2026 | 28 | ORDER FOR ADMISSION PRO HAC VICE: The Court has considered the Application for Admission Pro Hac Vice of Gregory K. Rettig (doc. 26 ). The application is GRANTED. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Senior Judge Terry R Means on 1/16/2026) (jnp) [Transferred from Texas Northern on 4/3/2026.] (Entered: 01/16/2026) |
| 01/23/2026 | 29 | ORDER GRANTING 15 MOTION TO STAY AND ADMINISTRATIVELY CLOSING CASE: In an effort to more efficiently manage this Court's docket, this case is hereby ADMINISTRATIVELY CLOSED pending the JPML's decision. If this case is not ultimately transferred to the JPML, either party may move to reopen this case within thirty days of the JPML's final decision on the motion to transfer. (Ordered by Senior Judge Terry R Means on 1/23/2026) (jnp) [Transferred from Texas Northern on 4/3/2026.] (Entered: 01/23/2026) |
| 04/02/2026 | 30 | Transfer Order: The JPML has issued the attached order in MDL 2885, and that order has now been filed in the Northern District of Florida. (jnp) [Transferred from Texas Northern on 4/3/2026.] (Entered: 04/03/2026) |
| 04/03/2026 | 31 | Case transferred in from District of Texas Northern; Case Number 4:25-cv-01255. Original file certified copy of transfer order and docket sheet received. (Entered: 04/03/2026) |
| 04/03/2026 | 32 | NOTICE REGARDING ATTORNEY ADMISSION. re 31 Case Transferred In - District Transfer. (emailed to Michael S. Cedillo, counsel for Gregory Brown and Fleming Nolen & Jes LLP) (djb) (Entered: 04/03/2026) |
| 04/03/2026 | 33 | ORDER - The docket reflects case was transferred with several motions pending, including a Motion to Dismiss, ECF No. 27 , filed by Defendants Aylstock Witkin Kreis & Overholtz, PLC, Byran Aylstock, and Bobby Bradford, which Plaintiff has not yet responded to. Plaintiff must respond to the 27 Motion to Dismiss within 14 days of the date of this Order. Signed by JUDGE M CASEY RODGERS on 4/3/2026. (Response to motion due by **4/17/2026**.) (djb) (Entered: 04/03/2026) |
| 04/06/2026 | 34 | Plaintiff Brandon Canup's Motion for Leave to File First Amended Complaint and Memorandum in Support, by BRANDON CANUP. (alb) (Entered: 04/07/2026) |
| 04/06/2026 | 35 | (Proposed) FIRST AMENDED COMPLAINT against ALYSTOCK WITKIN KREIS & OVERHOLTZ PLC, BRYAN F AYLSTOCK, BOBBY BRADFORD, GREGORY BROWN, MICHAEL BURNS, FLEMING NOLEN & JEZ LLP, MOSTYN LAW FIRM PC, Cliff Lee Roberts, filed by BRANDON CANUP. (One service copy provided.) (alb) (Entered: 04/07/2026) |
| 04/07/2026 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 35 First Amended Complaint, 34 Plaintiff Brandon Canup's Motion for Leave to File First Amended Complaint and Memorandum in Support. (alb) (Entered: 04/07/2026) |
| 04/07/2026 | 36 | ORDER re 34 Motion to File an Amended Complaint. Defendants must respond to the motion within 14 days of the date of this Order.(Internal deadline for referral to judge if response not filed earlier: **4/21/2026**). Signed by JUDGE M CASEY RODGERS on 04/07/2026. (alb) (Entered: 04/07/2026) |
| 04/14/2026 | 37 | Plaintiff Brandon Canup's Motion for Recusal and Disqualification and Memorandum in Support, by BRANDON CANUP. (alb) (Entered: 04/14/2026) |
| 04/14/2026 | 38 | Plaintiff Brandon Canup's Motion for Suggestion of Remand to the Judicial Panel on Multidistrict Litigation and Memorandum in Support, by BRANDON CANUP. (alb) (Entered: 04/14/2026) |

Case 3:26-cv-03359-MCR-ZCB Document 86-1 Filed 06/11/26 Page 11 of 388
USCA11 Case: 26-11887 Document: 5-1 Date Filed: 06/05/2026 Page: 10 of 202

| 04/14/2026 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 37 Plaintiff Brandon Canup's Motion for Recusal and Disqualification and Memorandum in Support, 38 Plaintiff Brandon Canup's Motion for Suggestion of Remand to the Judicial Panel on Multi-district Litigation and Memorandum in Support. (alb) (Entered: 04/14/2026) |
|---|---|---|
| 04/14/2026 | | Set Deadlines as to 37 MOTION for Recusal and Disqualification, 38 MOTION for Suggestion of Remand to the Judicial Panel on Multidistrict Litigation. (Internal deadline for referral to judge if response not filed earlier: **4/28/2026**). (djb) (Entered: 04/15/2026) |
| 04/16/2026 | 39 | Plaintiff Brandon Canup's MOTION for Permission to File Electronically by BRANDON CANUP. (djb) (Entered: 04/16/2026) |
| 04/16/2026 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 39 MOTION for Permission to File Electronically (djb) (Entered: 04/16/2026) |
| 04/16/2026 | 40 | ORDER OF RECUSAL. MAGISTRATE JUDGE HOPE T CANNON recused. Case reassigned to MAGISTRATE JUDGE ZACHARY C BOLITHO for all further proceedings. Signed by MAGISTRATE JUDGE HOPE T CANNON on 4/16/2026. Motions referred to ZACHARY C BOLITHO. (djb) (Entered: 04/16/2026) |
| 04/16/2026 | | ACTION REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE ZACHARY C BOLITHO notified that action is needed Re: 39 MOTION for Permission to File Electronically, See also, 40 Order of Recusal. Referred to ZACHARY C BOLITHO. (djb) (Entered: 04/16/2026) |
| 04/17/2026 | | Motions No Longer Referred to MAGISTRATE JUDGE ZACHARY C BOLITHO : 39 MOTION for Permission to File Electronically (djb) (Entered: 04/17/2026) |
| 04/17/2026 | 41 | ORDER - Plaintiff has filed 37 MOTION for Recusal and Disqualification, 38 MOTION for Suggestion of Remand. The motions do not include Defendants position. Accordingly, to the extent Defendants want to respond, their response is due within 14 days of the date of this Order. Signed by JUDGE M CASEY RODGERS on 4/17/2026. (Response to motions due by **5/1/2026**.) (djb) (Entered: 04/17/2026) |
| 04/17/2026 | 42 | ORDER - Canup's 39 MOTION for Permission to File Electronically is GRANTED. Any questions concerning the procedures for registering and filing documents electronically should be directed to Erica Smith, Erica_L_Smith@flnd.uscourts.gov, in the Northern District of Florida, Pensacola Division. Signed by JUDGE M CASEY RODGERS on 4/17/2026. (djb) (Entered: 04/17/2026) |
| 04/17/2026 | 43 | RESPONSE and MEMORANDUM IN OPPOSITION TO AWKO DEFENDANTS' 27 MOTION TO DISMISS, filed by BRANDON CANUP. (djb) (Entered: 04/17/2026) |
| 04/17/2026 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 43 Response to Motion 27 Motion to Dismiss. (djb) (Entered: 04/17/2026) |
| 04/20/2026 | 44 | MOTION for Substituted Service on Defendants Michael Burns and Cliff Roberts by BRANDON CANUP. (djb) (Entered: 04/21/2026) |
| 04/21/2026 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 44 MOTION for Substituted Service on Defendants Michael Burns and Cliff Roberts (djb) (Entered: 04/21/2026) |
| 04/21/2026 | 45 | NOTICE of Appearance by SKIPPER JONATHAN VINE on behalf of GREGORY BROWN, FLEMING NOLEN & JEZ LLP (VINE, SKIPPER) (Entered: 04/21/2026) |

| | | |
|---|---|---|
| 04/21/2026 | 46 | RESPONSE in Opposition re 34 MOTION to Amend/Correct filed by ALYSTOCK WITKIN KREIS & OVERHOLTZ PLC, BRYAN F AYLSTOCK, BOBBY BRADFORD. (RETTIG, GREGORY) (Entered: 04/21/2026) |
| 04/21/2026 | 47 | RESPONSE to Motion re 34 MOTION to Amend/Correct *DEFENDANTS, GREGORY BROWN AND FLEMING NOLEN & JEZ LLP, RESPONSE TO PLAINTIFFS MOTION TO FILE FIRST AMENDED COMPLAINT* filed by GREGORY BROWN, FLEMING NOLEN & JEZ LLP. (VINE, SKIPPER) (Entered: 04/21/2026) |
| 04/22/2026 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 34 MOTION to Amend Complaint, 35 Amended Complaint, 46 Response in Opposition to Motion, 47 Response to Motion (djb) (Entered: 04/22/2026) |
| 04/28/2026 | 48 | MOTION for Leave to File re 46 Response in Opposition to Motion, 34 MOTION to Amend/Correct, 47 Response to Motion *Motion for Leave to File Reply Memorandum in Support of Motion to Amend Complaint* by BRANDON CANUP. (CANUP, BRANDON) (Entered: 04/28/2026) |
| 04/28/2026 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 48 MOTION for Leave to File Reply Memorandum re 46 Response in Opposition to Motion, 47 Response to Motion, re: 34 MOTION to Amend Complaint. (djb) (Entered: 04/28/2026) |
| 05/01/2026 | 49 | RESPONSE to Motion re 38 MOTION to Remand filed by ALYSTOCK WITKIN KREIS & OVERHOLTZ PLC, BRYAN F AYLSTOCK, BOBBY BRADFORD. (RETTIG, GREGORY) (Entered: 05/01/2026) |
| 05/01/2026 | 50 | RESPONSE in Opposition re 38 MOTION to Remand filed by GREGORY BROWN, FLEMING NOLEN & JEZ LLP. (VINE, SKIPPER) (Entered: 05/01/2026) |
| 05/01/2026 | 51 | RESPONSE in Opposition re 37 MOTION for Recusal MOTION to Disqualify Judge filed by GREGORY BROWN, FLEMING NOLEN & JEZ LLP. (VINE, SKIPPER) (Entered: 05/01/2026) |
| 05/01/2026 | 52 | REPLY to Response to Motion re 37 MOTION for Recusal MOTION to Disqualify Judge filed by ALYSTOCK WITKIN KREIS & OVERHOLTZ PLC, BRYAN F AYLSTOCK, BOBBY BRADFORD. (RETTIG, GREGORY) (Entered: 05/01/2026) |
| 05/04/2026 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 51 Response in Opposition to Motion, 52 Reply to Response to Motion, re: 37 MOTION for Recusal and Disqualification and Memorandum in Support; 49 Response to Motion, 50 Response in Opposition to Motion, 38 MOTION for Suggestion of Remand to the Judicial Panel on Multidistrict Litigation and Memorandum in Support. (djb) (Entered: 05/04/2026) |
| 05/05/2026 | 53 | MOTION for Leave to File re 52 Reply to Response to Motion, 51 Response in Opposition to Motion, 37 MOTION for Recusal MOTION to Disqualify Judge *Motion for Leave to File Reply Memorandum in Support of Motion for Recusal and Disqualification* by BRANDON CANUP. (CANUP, BRANDON) (Entered: 05/05/2026) |
| 05/05/2026 | | Set Deadlines as to 53 MOTION for Leave to File Reply Memorandum in Support of Motion for Recusal and Disqualification. re 52 Reply to Response to Motion, 51 Response in Opposition to Motion. (Internal deadline for referral to judge if response not filed earlier: **5/19/2026**). (djb) (Entered: 05/07/2026) |
| 05/06/2026 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 53 MOTION for Leave to File Reply, re 52 |

| | | Reply to Response to Motion for Recusal and Disqualification. (djb) (Entered: 05/06/2026) |
|---|---|---|
| 05/06/2026 | 54 | ORDER - Canup's 34 Motion for Leave to File First Amended Complaint is GRANTED. Defendants' Motions to Dismiss, ECF Nos. 10 , 27 , are DENIED as moot. Canup must file his amended complaint as a separate docket entry within 7 days of the date of this Order. Once filed as a separate docket entry, Canup's amended complaint will be the operative pleading and Defendants must respond to the amended complaint within **14 days** thereafter. Canups Motion for Leave to File Reply Memorandum in Support of his Motion to Amend Complaint, ECF No. 48 , is DENIED as moot. Signed by JUDGE M CASEY RODGERS on 5/6/2026. (Amended Complaint due by **5/13/2026**.) (djb). (Main Document 54 replaced on 5/6/2026) (djb). Modified on 5/6/2026 to note this order is amended (djb). (Entered: 05/06/2026) |
| 05/07/2026 | 55 | RESPONSE to Motion re 53 MOTION for Leave to File re 52 Reply to Response to Motion, 51 Response in Opposition to Motion, 37 MOTION for Recusal MOTION to Disqualify Judge *Motion for Leave to File Reply Memorandum in Support of Motion for Recusal and Disqualifica FNJ DEFENDANTS RESPONSE TO PLAINTIFFS MOTION FOR LEAVE TO FILE REPLY MEMORANDUM IN SUPPORT OF HIS MOTION FOR RECUSAL AND DISQUALIFICATION filed by* GREGORY BROWN, FLEMING NOLEN & JEZ LLP. (VINE, SKIPPER) (Entered: 05/07/2026) |
| 05/08/2026 | 56 | ORDER denying 53 Motion for Leave to File Reply Memorandum in Support of His Motion for Recusal and Disqualification. Signed by JUDGE M CASEY RODGERS on 05/08/2026. (alb) (Entered: 05/08/2026) |
| 05/08/2026 | 57 | MOTION for Leave to File re 50 Response in Opposition to Motion, 38 MOTION to Remand *Motion for Leave to File Reply Memorandum in Support of Motion for Suggestion of Remand* by BRANDON CANUP. (CANUP, BRANDON) (Entered: 05/08/2026) |
| 05/11/2026 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 57 Motion for Leave to File Reply Memorandum in Support of Motion for Suggestion of Remand. (djb) (Entered: 05/11/2026) |
| 05/11/2026 | 58 | ORDER denying 57 Motion for Leave to File Reply Memorandum in Support of Motion for Suggestion of Remand. No extraordinary circumstances have been shown to justify a reply. The undersigned is fully capable of deciding whether the transfer order, prior transcripts, and/or prior orders of this Court have been mischaracterized, without further briefing. Signed by JUDGE M CASEY RODGERS on 5/11/2026. (djb) (Entered: 05/11/2026) |
| 05/12/2026 | 59 | Plaintiff Brandon Canup's Motion to Stay Proceedings and Memorandum of Law in Support, re 38 MOTION to Remand, 37 MOTION for Recusal MOTION to Disqualify Judge, 8 Motion to Stay Pending Remand. (CANUP, BRANDON) Modified on 5/13/2026 to match title of document (alb). (Entered: 05/12/2026) |
| 05/12/2026 | 60 | FIRST AMENDED COMPLAINT against All Defendants All Defendants., filed by BRANDON CANUP. (CANUP, BRANDON) (Entered: 05/12/2026) |
| 05/12/2026 | | Set Deadlines as to 59 Plaintiff Brandon Canup's Motion to Stay Proceedings and Memorandum of Law in Support. (Internal deadline for referral to judge if response not filed earlier: **5/26/2026**). (djb) (Entered: 05/15/2026) |
| 05/13/2026 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 60 Amended Complaint, 59 Plaintiff Brandon Canup's Motion to Stay Proceedings and Memorandum of Law in Support, re 38 MOTION to Remand, 37 MOTION for Recusal MOTION to Disqualify Judge, 8 Motion to Stay Pending Remand. (alb) (Entered: 05/13/2026) |

| 05/17/2026 | 61 | ORDER denying 37 Motion for Recusal and Disqualification. Signed by JUDGE M CASEY RODGERS on May 17, 2026. (aow) (Entered: 05/17/2026) |
|---|---|---|
| 05/26/2026 | 62 | NOTICE of Appearance by BENJAMIN JAMES STEVENSON on behalf of MOSTYN LAW FIRM PC (STEVENSON, BENJAMIN) (Entered: 05/26/2026) |
| 05/26/2026 | 63 | MOTION for Extension of Time to File Response/Reply *FNJ DEFENDANTS MOTION FOR ENLARGEMENT OF TIME TO RESPOND TO PLAINTIFFS FIRST AMENDED PETITION WITH MEMORANDUM OF LAW* by GREGORY BROWN, FLEMING NOLEN & JEZ LLP. (VINE, SKIPPER) (Entered: 05/26/2026) |
| 05/26/2026 | 64 | RESPONSE in Opposition re 59 MOTION to Stay re 38 MOTION to Remand, 37 MOTION for Recusal MOTION to Disqualify Judge, 8 *Motion to Stay Pending Remand FNJ DEFENDANTS RESPONSE IN OPPOSITION TO PLAINTIFFS MOTION TO STAY PROCEEDINGS WITH MEMORANDUM OF LAW* filed by GREGORY BROWN, FLEMING NOLEN & JEZ LLP. (VINE, SKIPPER) (Entered: 05/26/2026) |
| 05/26/2026 | 65 | RESPONSE in Support re 59 MOTION to Stay re 38 MOTION to Remand, 37 MOTION for Recusal MOTION to Disqualify Judge, 8 *Motion to Stay Pending Remand* filed by ALYSTOCK WITKIN KREIS & OVERHOLTZ PLC, BRYAN F AYLSTOCK, BOBBY BRADFORD. (RETTIG, GREGORY) (Entered: 05/26/2026) |
| 05/26/2026 | 66 | MOTION to Dismiss *Plaintiff's Amended Complaint* by ALYSTOCK WITKIN KREIS & OVERHOLTZ PLC, BRYAN F AYLSTOCK, BOBBY BRADFORD. (Internal deadline for referral to judge if response not filed earlier: **6/9/2026**). (RETTIG, GREGORY) (Entered: 05/26/2026) |
| 05/26/2026 | | Set Deadlines/Hearings re 63 Motion for Enlargement of Time to Respond to Plaintiff's First Amended Petition. (Internal deadline for referral to judge if response not filed earlier: **6/9/2026**). (alb) (Entered: 05/27/2026) |
| 05/27/2026 | 67 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by MOSTYN LAW FIRM PC. (STEVENSON, BENJAMIN) (Entered: 05/27/2026) |
| 05/27/2026 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 64 Response in Opposition to 59 Motion to Stay, 65 Response in Support of 59 Motion to Stay. (alb) (Entered: 05/27/2026) |
| 05/27/2026 | 68 | ORDER re 63 Motion for Enlargement of Time to Respond to Plaintiff's First Amended Petition. Defendants Brown and Fleming Nole & Jez LLP must file their response to the amended complaint on or before June 5, 2026. (Internal deadline for referral to judge if response not filed earlier: **6/5/2026**). Signed by JUDGE M CASEY RODGERS on 05/27/2026. (alb) (Entered: 05/27/2026) |
| 05/29/2026 | 69 | ORDER - The 44 MOTION for Substituted Service on Defendants Michael Burns and Cliff Roberts is GRANTED, as requested. Plaintiff is authorized to effect substitute service on Defendants Michael Burns and Cliff Roberts by the methods stated in the motion. Signed by JUDGE M CASEY RODGERS on 5/29/2026. (djb) (Entered: 05/29/2026) |
| 05/29/2026 | 70 | ORDER - Canup's 8 Motion for Remand, is DENIED. Canup's 38 Motion for Suggestion of Remand to the Judicial Panel on Multidistrict Litigation, is DENIED. Canup's 59 Motion to Stay Proceedings, is DENIED as MOOT. Signed by JUDGE M CASEY RODGERS on 5/29/2026. (djb) (Entered: 05/29/2026) |
| 06/02/2026 | 71 | NOTICE *of Filing Summons Request* by BRANDON CANUP (CANUP, BRANDON) (Entered: 06/02/2026) |

6/5/26, 1:54 PM Case 3:26-cv-03359-MCR-ZCB Document 86-1 CM/ECF - U.S. District Court:flnd. Filed 06/11/26 Page 15 of 388

USCA11 Case: 26-11887 Document: 5-1 Date Filed: 06/05/2026 Page: 14 of 202

| 06/02/2026 | 72 | NOTICE *of Filing Summons Request* by BRANDON CANUP (CANUP, BRANDON) (Entered: 06/02/2026) |
|---|---|---|
| 06/02/2026 | 73 | NOTICE *of Filing of Petition for Writ of Mandamus in the U.S. Court of Appeals for the Eleventh Circuit* by BRANDON CANUP (Attachments: # 1 Exhibit Petition for Writ of Mandamus) (CANUP, BRANDON) (Entered: 06/02/2026) |
| 06/03/2026 | 74 | Summons Issued as to MICHAEL BURNS, # 1 CLIFF ROBERTS. (djb) Modified on 6/3/2026 (djb). (Entered: 06/03/2026) |
| 06/03/2026 | 75 | MOTION Accept Motion to Dismiss as Timely re 67 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by MOSTYN LAW FIRM PC. (STEVENSON, BENJAMIN) (Entered: 06/03/2026) |
| 06/03/2026 | | Set Deadlines as to 75 MOTION Accept Motion to Dismiss as Timely re 67 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM. (Internal deadline for referral to judge if response not filed earlier: **6/17/2026**). (djb) (Entered: 06/03/2026) |
| 06/04/2026 | 76 | NOTICE of Appearance by SKIPPER JONATHAN VINE on behalf of CLIFF ROBERTS (VINE, SKIPPER) (Entered: 06/04/2026) |
| 06/05/2026 | 77 | Plaintiff Brandon Canup's Consolidated MOTION for Reconsideration, or in the Alternative, to Certify Order for Interlocutory Appeal, Motion to Stay Proceedings re 70 Order, by BRANDON CANUP. (CANUP, BRANDON) Modified on 6/5/2026 (djb). (Entered: 06/05/2026) |
| 06/05/2026 | | Set Deadlines as to 77 MOTION for Reconsideration, or in the Alternative, to Certify Order for Interlocutory Appeal, Motion to Stay Proceedings, re 70 Order. (Internal deadline for referral to judge if response not filed earlier: **6/22/2026**). (djb) (Entered: 06/05/2026) |
| 06/05/2026 | 78 | MOTION *Motion for Clarification* by BRANDON CANUP. (Attachments: # 1 Exhibit Email with attachments from Diana Rafael of CSK to Brandon Canup on behalf of Cliff Roberts, # 2 Exhibit Emails between Brandon Canup and Benjamin Stevenson on behalf of Mostyn Law Firm, PC, # 3 Exhibit Declaration of Brandon Canup) (CANUP, BRANDON) (Entered: 06/05/2026) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 06/05/2026 13:53:53 | | | |
| **PACER Login:** | bcanup1986 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:26-cv-03359-MCR-ZCB |
| **Billable Pages:** | 9 | **Cost:** | 0.90 |

# Tab B

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19md2885 |
| This Document Relates to All Cases | Judge M. Casey Rodgers Magistrate Judge Hope T. Cannon |

## CASE MANAGEMENT ORDER NO. 66
### (Termination of Plaintiff Leadership Structure)

As a result of the recent Combat Arms Master Settlement Agreement, the litigation has entered a new and different phase. The focus has largely shifted from omnibus advocacy for the common benefit of all MDL plaintiffs to the work of implementing and administering the Settlement Program, much of which is highly individualized, and of course work on behalf of any who elect not to participate in the Settlement Program will be exclusively individualized. It is precisely because of the exemplary contributions of the entire leadership team that the litigation achieved a global resolution; however, given the nature of this new phase, the existing leadership structure is no longer necessary or appropriate going forward, and is therefore terminated. As of the date of this Order, no further work performed or expenses incurred in connection with a leadership role will be considered for

common benefit compensation, except to the extent expressly authorized by the Court.[1]

A separate order will be entered identifying the limited number of firms authorized to continue performing common benefit work in connection with settlement administration, including work required for the stock transfer and the anticipated fairness hearing.

**SO ORDERED**, on this 11th day of September, 2023.

*M. Casey Rodgers*

**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

---

[1] With that said, Bryan Aylstock will continue in his lead counsel role for purposes of discussing all aspects of the settlement with 3M, the Court, and any special master.

# Tab C

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19md2885 |
| This Document Relates to All Cases | Judge M. Casey Rodgers Magistrate Judge Hope T. Cannon |

## CASE MANAGEMENT ORDER NO. 67
### (Common Benefit Time & Expenses for Settlement Implementation & Administration)

Achieving the goals of the Settlement Program will require considerable time and effort from all plaintiffs' attorneys in this litigation, as well as the Special Masters. This Order expressly limits the extent to which work performed and/or expenses incurred in furtherance of the Settlement Program are eligible for common benefit consideration.

Common benefit time and expenses in connection with the Settlement Program fall into one of two categories, either Settlement Implementation or Settlement Administration. Settlement Implementation refers to authorized time and expenses involved in establishing the Settlement Program, which includes negotiating and finalizing the Master Settlement Agreements, communicating with counsel about the Settlement Program, working with ARCHER Systems, LLC and BrownGreer PLC to launch the Settlement Program, and similar work performed on

or before Case Management Conference No. 23 on September 8, 2023.  Firms that were authorized to perform Settlement Implementation work during the relevant period may submit the associated time and expenses for common benefit consideration.

Settlement Administration, in contrast, encompasses authorized work performed and expenses incurred in connection with administering the Settlement Program after September 8, 2023.  Consistent with Case Management Order No. 66, which terminated the plaintiff leadership structure, only the following firms are authorized to perform common benefit work and incur common benefit expenses in connection with the administration of the Settlement Program for this litigation, including work required for the stock transfer and the anticipated fairness hearing: Aylstock, Witkin, Kreis & Overholtz, PLLC; Seeger Weiss LLP; Pittman Dutton Hellums Bradley & Mann, P.C.; and Cory Watson.

To the extent issues and/or disputes arise related to the Combat Arms Master Settlement Agreement ("MSA"), work performed and expenses incurred by individual  members of the "Negotiating Plaintiffs' Counsel" (as defined in the MSA) in connection with resolving such issues and/or disputes is authorized common benefit work.  Additionally, Special Master David R. Herndon is authorized to perform settlement administration work, to the extent necessary, and his work in that regard will be paid from the Common Benefit Qualified Settlement Fund.

**No other firms or individual attorneys may perform work or incur expenses for common benefit consideration after the date of this Order, unless expressly preauthorized by the Court**.

As set forth in prior Orders, Special Master Herndon will prepare a Report and Recommendation for the Court regarding common benefit fee allocations, with the assistance of Special Master Randall Sansom, CPA, according to protocols and procedures that will be established by separate order. *See* Common Benefit Order Nos. 2 & 3, ECF No. 900 & 1659. Special Masters Herndon and Sansom's time and expenses in fulfilling these roles will be paid from the Common Benefit Qualified Settlement Fund. Individual lawyers' time and/or expenses incurred in connection with preparing and/or presenting a claim for compensation and/or reimbursement from the Common Benefit Qualified Settlement Fund is not compensable as common benefit work.

**SO ORDERED**, on this 11th day of September, 2023.

*M. Casey Rodgers*

**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

# Tab 1-1

FILED
TARRANT COUNTY
10/27/2025 1:29 PM
THOMAS A. WILDER
DISTRICT CLERK

**CAUSE NO.** 067-371499-25 _____

| | |
|---|---|
| BRANDON CANUP, | IN THE _____ |
| Plaintiff | DISTRICT COURT |
| v. | |
| BRYAN F. AYLSTOCK, BOBBY BRADFORD, MICHAEL BURNS, CLIFF ROBERTS, GREGORY BROWN, AYLSTOCK WITKIN KREIS & OVERHOLTZ PLC, FLEMING NOLEN & JEZ LLP and MOSTYN LAW FIRM PC, | TARRANT COUNTY,  TEXAS |
| Defendants | |

## PLAINTIFF'S ORIGINAL PETITION

COMES NOW Plaintiff, Brandon Canup, appearing pro se, and files this Original Petition against the Defendants named herein. Plaintiff makes this filing based on personal knowledge as to all matters concerning himself and upon information and belief as to all other matters. In support thereof, Plaintiff respectfully shows the Court as follows:

## I.

## DISCOVERY CONTROL PLAN

1.1    Plaintiff pleads that discovery should be conducted in accordance with discovery control plan, level 3, pursuant to Rule 190 of the Texas Rules of Civil Procedure.

## II.

## PARTIES

### A.    Plaintiff

2.1    Brandon Canup ("Canup") is an individual residing in Tarrant County, Texas.

### B.    Defendants

2.2    Aylstock, Witkin, Kreis & Overholtz, P.L.C. ("AWKO") is a foreign professional limited liability company formed under the laws of Florida, doing business in Texas. Its principal office is located at 17 East Main Street, Suite 200, Pensacola, Florida 32502. AWKO may be served via its registered agent for service of process: Justin Witkin, 17 East Main Street, Suite 200, Pensacola, Florida 32502, or wherever it may be found. In the event AWKO does not maintain a registered agent or cannot otherwise be located with reasonable diligence, it may be served through the Texas Secretary of State as provided by *Tex. Bus. Orgs. Code § 5.251* and *Tex. Civ. Prac. & Rem. Code §§ 17.041–17.045*.

2.3    Mostyn Law Firm, P.C. ("Mostyn") is a Texas professional corporation formed under the laws of Texas, with its principal office at 3810 W. Alabama Street,

Houston, Texas 77027-5204. Mostyn may be served via its registered agent for service of process: Andrew Browning, at the same address, or wherever it may be found.

2.4 Fleming, Nolen & Jez, L.L.P. ("FNJ") is a Texas limited liability partnership with its principal office located at 2800 Post Oak Blvd., Suite 6000, Houston, Texas 77056-6128. FNJ may be served via a General Partner for service of process: George Fleming, at the same address, or wherever it may be found. Because FNJ does not have a registered agent listed on file with the Texas Comptroller as of the date of this filing, it may also be served with process through the Texas Secretary of State pursuant to *Tex. Bus. Orgs. Code § 5.251*, who shall forward process to FNJ's last known address on file.

2.5 Bryan Frederick Aylstock ("Aylstock") is an attorney licensed in the State of Florida (Florida Bar No. 78263), and a founding partner of AWKO. He may be served at his primary business address: Aylstock, Witkin, Kreis & Overholtz, PLC, 17 East Main Street, Suite 200, Pensacola, Florida 32502, or wherever he may be found. If service cannot with reasonable diligence be effected at this address, then pursuant to the Texas long-arm statute, service may be made on the Texas Secretary of State as agent for service of process for this Defendant.

2.6 Bobby J. Bradford ("Bradford") is an attorney licensed in the State of Florida (Florida Bar No. 173223) and a partner at AWKO. He may be served at at

his primary business address: Aylstock, Witkin, Kreis & Overholtz, PLC, 17 East Main Street, Suite 200, Pensacola, Florida 32502, or wherever he may be found. If service cannot with reasonable diligence be effected at this address, then pursuant to the Texas long-arm statute, service may be made on the Texas Secretary of State as agent for service of process for this Defendant.

2.7     Michael Andrew Burns ("Burns") is an attorney licensed in the State of Florida (Florida Bar No. 973130). At all times relevant to this case, he was affiliated with Mostyn Law Firm, a Texas-based law firm. He may be served at his Florida business address: Burns Law LLC, 362 Gulf Breeze Parkway, #294, Gulf Breeze, Florida 32561-4492, or wherever he may be found. If service cannot with reasonable diligence be effected at this address, then pursuant to the Texas long-arm statute, service may be made on the Texas Secretary of State as agent for service of process for this Defendant.

2.8     Gregory Donald Brown ("Brown") is an attorney licensed in the State of Texas (Texas Bar No. 24078266). At all times relevant to this case, he was affiliated with FNJ. Brown is listed as an attorney at FNJ on their website and as an attorney at Sorrels Law on his Texas State Bar profile. He may be served at his primary business address: Sorrels Law, 230 Westcott St., Ste. 100, Houston, Texas 77007, or at Fleming, Nolen & Jez, LLP, 2800 Post Oak Blvd., Suite 6000, Houston, Texas 77056-6128, or wherever he may be found.

2.9    Cliff Lee Roberts ("Roberts") is an attorney licensed in the State of Texas (Texas Bar No. 17002900). He may be served at his business address: 8191 Southwest Freeway, Suite 116, Houston, Texas 77074-1700, or wherever he may be found.

2.10    For ease of reference, Defendants AWKO, Mostyn, Aylstock, Bradford, and Burns may collectively be referred to as the ("Florida Defendants"). Although Mostyn is a Texas law firm, it is included in this group because of its affiliation with Burns, a Florida-based attorney, and its role in the conduct giving rise to this case.

2.11    Defendants FNJ, Brown, and Roberts may collectively be referred to as the ("Texas Defendants").

2.12    All Defendants may collectively be referred to as the ("Defendants").

## III.

## JURISDICTION AND VENUE

3.1    This Court has subject matter jurisdiction over this action pursuant to Section 24.007, et seq. of the Texas Government Code. The amount in controversy exceeds the Court's minimum jurisdictional requirements, exclusive of interest and costs, and the relief sought is within the jurisdictional limits of this Court.

3.2    This Court has personal jurisdiction over all named Defendants. One or more Defendants are residents of Texas, maintain their principal place of business

ORIGINAL PETITION                                    **PAGE**    5

in Texas, and/or regularly conduct business in Texas. Additionally, pursuant to the Texas Long-Arm Statute, *Tex. Civ. Prac. & Rem. Code §§ 17.041–17.069*, this Court may exercise jurisdiction over out-of-state Defendants who have purposefully directed activities toward Texas. Out-of-state Defendants purposefully directed activities toward Texas, including but not limited to: providing legal services to a Texas resident, accessing confidential records of a Texas resident, and appearing and purporting to act on behalf of a Texas resident in litigation proceedings connected to Texas, including matters designated for trial in the Northern District of Texas. Furthermore, all out-of-state Defendants performed common benefit work in the underlying litigation entitling them to collect fees from thousands of Texas Residents. Out-of-state Defendants have purposefully availed themselves of the privileges and benefits of conducting business in Texas and are subject to the jurisdiction of this Court. These actions demonstrate the Defendants' purposeful involvement in matters connected to Texas, making it both appropriate and consistent with due process for a Texas court to exercise jurisdiction over them.

3.3 Venue is proper in this Court pursuant to Section 15.001, *et seq.* of the Texas Civil Practice and Remedies Code. All or a substantial part of the harm resulting from Defendants' conduct was suffered by Plaintiff in Tarrant County, Texas, where Plaintiff resides and relied upon Defendants' actions and representations. Additionally, this lawsuit concerns contracts and attorney-client

relationships that were to be performed, in whole or in part, in Tarrant County. Plaintiff's case was designated for trial in the United States District Court for the Northern District of Texas, and Tarrant County was the central location of Plaintiff's litigation preparation, reliance on Defendants, and resulting injury.

## IV.

## STATEMENT PURSUANT TO RULE 47

4.1   Pursuant to Rule 47 of the Texas Rules of Civil Procedure, Plaintiff states that he seeks monetary relief of less than $250,000, including damages of any kind, penalties, costs, expenses, pre and post-judgment interest. Plaintiff further affirms that he seeks less than $75,000 in monetary damages, exclusive of interest and costs.

## V.

## BACKGROUND FACTS

5.1   On April 3, 2019, the United States Judicial Panel on Multidistrict Litigation transferred multiple actions to the Northern District of Florida for coordinated pretrial proceedings in *In re: 3M Combat Arms Earplug Products Liability Litigation*, Cause No. 3:19-md-02885 ("MDL").

5.2   On May 22, 2019, the MDL court issued Pretrial Order No. 7, appointing various plaintiffs' attorneys to leadership roles ("PSC") to conduct common benefit

work on behalf of all claimants in the MDL. These appointments were set to expire after one year unless renewed.

5.3    On June 21, 2019, Canup retained Texas Defendants Brown, FNJ, and Roberts, to investigate, develop, and litigate his claims in the MDL. Despite this agreement, Texas Defendants failed to meaningfully investigate Canup's injuries or develop his case during their years of representation.

5.4    On August 29, 2023, a global settlement agreement ("MSA") was announced between 3M and Plaintiffs' Leadership in the MDL. The agreement imposed obligations on plaintiffs' attorneys to recommend settlement to 100% of their clients, to withdraw from representation of any claimant who declined to participate and other terms that were hidden from Plaintiffs in the MDL in Exhibit 10 of the MSA. These provisions created undisclosed conflicts of interest between attorneys and their clients.

5.5    Canup received several letters and emails from Texas Defendants pressuring him to accept the settlement, warning that rejection would result in withdrawal of representation, delayed access to trial, and onerous litigation deadlines. However, Texas Defendants never disclosed the full terms of the settlement, including Exhibit 10, which contained material provisions.

5.6    Following multiple communications from Texas Defendants indicating their intent to withdraw if Canup declined to participate in the global settlement,

ORIGINAL PETITION                                                    **PAGE**        8

Canup retained attorney David Gamble ("Gamble") in January 2024. At the time, Texas Defendants were still counsel of record for Canup in the MDL but did not provide substantive legal support. Canup retained Gamble to preserve his ability to litigate, anticipating Texas Defendant's formal withdrawal and recognizing their abdication of duty.

5.7     On January 21, 2024, Canup officially opted out of the MSA triggering his production obligations under Case Management Order 57 ("CMO 57"). Canup and Gamble immediately began preparing for the CMO 57 production requirements which included gathering, organizing, and submitting over 25 GB of data within 30 days under threat of dismissal with prejudice. Despite knowing of these requirements for months, Texas Defendants did not assist in meeting these obligations. Brown filed a motion to withdraw as counsel of record for Canup in the MDL within a week of Canup's CMO 57 production deadline. His motion was granted one day before the CMO 57 deadline.

5.8     Canup requested his file from FNJ in January of 2024. Canup received a few documents but never his full file. FNJ sent Gamble Canup's file which only contained a single four-page pdf.

5.9     On February 5, 2024 Canup was ordered by the MDL Court to appear "in person, with counsel" at a status conference in Pensacola, Florida scheduled for March 13, 2024. In preparation for the March 13, 2024 status conference Bradford

ORIGINAL PETITION                                                    **PAGE**        9

contacted Gamble seeking privileged and confidential information about Canup and his case against 3M and to give advice about the settlement programs in the MSA. Gamble and Bradford spoke several times about Canup's case including but not limited to his medical claims and potential recovery. Bradford informed Gamble that Aylstock and Bradford would be present at the status conference but never informed Gamble of Florida Defendants' intent to make a formal appearance.

5.10    Unbeknownst to either Canup or Gamble, Florida Defendants made a formal appearance in the MDL Court on Canup's behalf at the March 13, 2024 status conference. The hearing transcript lists Aylstock and Bradford from AWKO and Burns from Mostyn as appearing "FOR THE PLAINTIFF." Aylstock participated in the hearing by addressing the MDL Court on the record speaking about the MSA in an attempt to convince Canup to accept the global settlement offer.

5.11    Following the first hearing, Canup and Gamble were led to a conference room where Magistrate Judge Hope Cannon conducted a closed-door settlement conference. This settlement conference was a second official proceeding on March 13, 2024. Judge Cannon brought in Aylstock, Bradford, and Burns, who then gave individual legal advice, reviewed Canup's medical records and discussed Canup's case directly with Canup. The medical documents that were already in Florida Defendants' possession when they entered the room included but were not limited to audiograms and post-deployment health assessments from Canup's time in the US

ORIGINAL PETITION                                                    **PAGE**    10

Army. These confidential and privileged documents were not provided to Florida Defendants by Canup or Gamble. Florida Defendants had gained access to these confidential and privileged documents from another source unknown to Canup or Gamble.

5.12 During that discussion, Aylstock, Bradford, and Burns attempted to pressure Canup to accept the MSA which Canup had already expressly rejected. Florida Defendants were formerly part of the PSC in the MDL and were bound by the terms of the MSA. Florida Defendants did not disclose that their continued compensation was contingent upon claimant participation levels in the MSA, they did not disclose the full terms of the MSA including Exhibit 10, nor did they inform Canup of the conflict created by the MSA's provisions requiring them to recommend settlement to 100% of claimants and to withdraw from clients who opted out. They also failed to disclose that they were making another formal appearance in this second proceeding in the MDL Court on Canup's behalf.

5.13 Florida Defendants' conduct and formal appearances as Canup's counsel created, at minimum, an implied attorney-client relationship, and arguably an express attorney-client relationship. Bradford reached out to Gamble to obtain confidential and privileged information and to discuss Canup's case strategy prior to the proceedings, conduct consistent with representation. At the hearing itself, Defendants Aylstock, Bradford, and Burns formally appeared "FOR THE

PLAINTIFF" on the record, communicated directly with Plaintiff, gave individualized legal advice, and attempted to pressure him into accepting the MSA. These actions, individually and collectively, establish an implied attorney-client relationship, because they would cause any reasonable client to believe Florida Defendants were acting as his attorneys. The formal appearance on the record not only arguably created an express attorney-client relationship but, at the very least, reinforced and confirmed the implied relationship already created by Florida Defendants' conduct. This imposed fiduciary duties including, but not limited to, the duties of loyalty, candor, honesty, disclosure, and conflict avoidance. Despite these obligations, Defendants failed to disclose their intent to appear, their actual formal appearance, their roles in the settlement conference, or their financial stake in maximizing claimant participation.

5.14    Had Canup known that Florida Defendants would appear on his behalf, he could have satisfied the MDL Court's order to appear "in person, with counsel" without transporting Gamble to Florida. Canup incurred substantial costs for Gamble's airfare, lodging, and time. These are expenses he would not have borne had Florida Defendants fulfilled their duty to disclose their participation.

5.15    After the March hearing, Aylstock, Bradford, and Burns took no further action on Canup's behalf, never filed a notice of withdrawal, and never

explained their involvement. Canup did not become aware of their official appearance until he obtained a transcript of the hearing in January 2025.

5.16   Meanwhile, Canup encountered roadblocks accessing the unredacted Master Long Form Complaint ("Master Complaint"). The master complaint was filed on behalf of all claimants and was referenced by all Short Form Complaints filed by the Plaintiffs in this MDL. When the motion to file this document under seal was filed in 2019 it stated that all counsel of record were sent an unredacted copy. Canup was denied access to this document by FNJ. FNJ later contacted Gamble and recommended that he reach out to the PSC to ask for permission to access the master complaint from PSC.

5.17   In April of 2024 Gamble contacted Bradford to get access to the master complaint. On April 24, 2024, Bradford informed Gamble that he would only release the unredacted complaint if Gamble signed a Common Benefit Work Participation Agreement assigning a 9% interest in any future recovery in Canup's case to the PSC. Canup consented to Gamble's signing the agreement to move forward with the litigation.

5.18   On May 1, 2024, Canup filed an amended complaint and Lexecon non-waiver statement as ordered by the MDL Court on April 17, 2024. The order requiring Canup to amend his pleadings stated that he could not add new allegations or causes of action. 3M moved to dismiss. On July 18, 2024, the MDL Court granted

the motion in part, dismissing Canup's hearing-loss-related claims as procedurally barred because they were new allegations and/or causes of action.

5.19    The MDL Court's order stated that Canup's former attorneys never attempted to amend his pleadings to include hearing loss claims, despite representing him for years. The MDL Court cited this as a reason that Canup should not be allowed to add new allegations or causes of action. Canup was harmed by being forced to retain expert witnesses whose work became worthless due to the dismissal of the hearing-loss-related claims, harm that would have been avoided had the Texas Defendants investigated and developed Canup's case as they were legally obligated to do.

5.20    On September 30, 2024, Canup entered into a direct settlement agreement with 3M. Canup's ability to reach this resolution was made possible only through his efforts and the efforts of independent counsel, despite the harm caused by the misconduct of the attorneys named herein.

## VI.

## CAUSES OF ACTION

Alternative Pleadings.  To the extent necessary, each of the claims set forth below is pleaded in the alternative.

### A.    CLAIMS AGAINST TEXAS DEFENDANTS

**Claim 1:  Fraud and Failure to Disclose Facts (pled alternatively as Fraudulent Inducement)**

6.1     Canup restates and realleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

6.2     **Material Misrepresentation:** Texas Defendants Brown, Roberts, and FNJ made material representations to Canup, including that they would actively pursue Canup's claims in the MDL and litigate the case on his behalf. These representations were expressly contained in the written contingency fee retainer agreement executed between Canup and Texas Defendants, which promised diligent investigation, development, and prosecution of Canup's claims. These representations were made to induce Canup to sign the agreement and place exclusive control of his case with Texas Defendants.

6.3     **Knowledge of Falsity:** At the time these representations were made, Texas Defendants knew they were false, or at minimum had no reasonable basis to believe them true. FNJ had prior MDL experience and knew that their business model involved securing clients for global settlements without undertaking individualized litigation. Their subsequent conduct, failing to advance Canup's claims for four years, not amending pleadings to preserve critical causes of action, and abandoning Plaintiff just one day before the CMO 57 production deadline, confirms they never intended to perform the promised litigation services.

6.4     **Intent to Induce Reliance:** Texas Defendants made these misrepresentations with the intent and purpose of inducing Canup to rely on them

ORIGINAL PETITION                                                    **PAGE**        15

and execute the contingency fee agreement, thereby binding Canup to pay them a percentage of any recovery while avoiding the cost and effort of actively litigating his claims.

6.5 **Justifiable Reliance:** Canup justifiably relied on these representations by signing the retainer agreement and allowing Texas Defendants to control and manage his claims in the MDL for approximately four years, without seeking alternative representation or taking independent action, in the belief that Texas Defendants were diligently working on his behalf.

6.6 **Injury Caused by Reliance**: As a direct and proximate result of Canup's reliance on Texas Defendants' misrepresentations, Canup suffered injury. The MDL court cited Texas Defendants' failure to amend pleadings and advance his case as a basis for dismissing Canup's hearing-loss claims, which diminished the value of expert reports prepared for the litigation. Texas Defendants' abandonment of Canup before the CMO 57 compliance deadline caused significant stress, confusion, inconvenience, and anxiety, disrupted Canup's daily life for several months, and forced him to devote substantial time and effort to untangling the MDL process and uncovering how his own attorneys were deceiving him.

6.7 Texas Defendants' conduct also contradicts the terms of the written agreement, which stated that Canup retained ultimate authority over settlement decisions and that Texas Defendants would provide full legal support. Instead, Texas

Defendants used the contract to obtain control of Canup's claims, then abandoned those claims for financial reasons when he exercised his right to opt out of the settlement.

6.8 Texas Defendants violated Section 32.46 of the Texas Penal Code when they engaged in the above-described conduct. Texas Defendants acted knowingly and intentionally. Such violations constitute fraud.

6.9 To the extent FNJ is not found directly liable for its own independent misconduct, FNJ is also vicariously liable for any wrongful acts or omissions committed by Brown and/or Roberts in the course and scope of their employment and/or partnership and/or agency under the doctrine of respondeat superior and Texas agency law.

6.10 Accordingly, Canup pleads for, and is entitled to monetary damages in an amount sufficient to compensate him for the harm sustained.

6.11 Because Texas Defendants' conduct was fraudulent and/or malicious, Canup pleads for, and is also entitled to recover exemplary damages in an amount to be determined by the trier of fact. Canup further pleads for expenses and pre- and post-judgment interest at the maximum rate permitted by law.

## Claim 2: Breach of Fiduciary Duty

6.12 Canup restates and realleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

6.13   **Existence of a Fiduciary Duty:** Texas Defendants Brown, Roberts, and FNJ entered into a written contingency fee retainer agreement with Canup to represent him in the MDL. By virtue of this attorney-client relationship, Texas Defendants owed Canup fiduciary duties of loyalty, candor, disclosure, and zealous representation among others. These duties included the obligation to place Plaintiff's interests above their own, to fully inform Plaintiff of all material facts affecting his case, and to diligently pursue his claims.

6.14   **Breach of the Duty:** Texas Defendants breached their fiduciary duties including but not limited to, duty of full disclosure, duty of good faith and fair dealing, duty of care and duty of loyalty in multiple respects. They failed to investigate and develop Canup's case over a four-year period, leading to the MDL court's dismissal of his hearing-loss claims. They concealed material information about the global settlement structure, including Exhibit 10, and failed to disclose that they intended to recommend settlement to all clients regardless of individual circumstances. They also abandoned Canup at a critical stage of litigation, withdrawing representation one day before the CMO 57 compliance deadline, despite having known of those deadlines for months. In addition, Texas Defendants failed to provide Canup with his full client file and withheld the master complaint from him.

6.15  **Causation:** Texas Defendants' breaches directly and proximately caused injury to Canup. Their failure to amend pleadings was specifically cited by the MDL court as a reason for barring and dismissing Canup's hearing-loss claims, which rendered costly expert reports largely useless. Their last-minute withdrawal disrupted Canup's ability to comply with CMO 57 requirements. Their concealment of material settlement information deprived Canup of the ability to make informed decisions regarding his claims.

6.16  **Damages:** As a result of Texas Defendants' breaches, Canup suffered both economic and non-economic damages. Economically, Canup incurred wasted expert fees. Non-economically, Plaintiff endured significant stress, confusion, inconvenience, and anxiety, disruption Canup's daily life for several months, and forced him to devote substantial time and effort to untangling the MDL process and uncovering how his own attorneys were deceiving him.

6.17  To the extent FNJ is not found directly liable, FNJ is also vicariously liable for the breaches of fiduciary duty committed by Brown and/or Roberts in the course and scope of their employment and/or partnership and/or agency under the doctrine of respondeat superior and Texas agency law.

6.18  Accordingly, Canup pleads for, and is entitled to monetary damages in an amount sufficient to compensate him for the harm sustained.

6.19   Because Texas Defendants' conduct was fraudulent and/or malicious, Canup pleads for, and is also entitled to recover exemplary damages in an amount to be determined by the trier of fact. Canup further pleads for expenses and pre- and post-judgment interest at the maximum rate permitted by law.

### Claim 3:  Negligence (pled in the alternative)

6.20   Canup restates and realleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

6.21   **Existence of a Duty:** Texas Defendants Brown, Roberts, and FNJ entered into a written contingency fee retainer agreement with Canup to represent him in the MDL. By virtue of this attorney-client relationship, Texas Defendants owed Canup a duty to exercise reasonable care, skill, and diligence commonly possessed and exercised by attorneys similarly situated in the State of Texas. This duty included, but was not limited to, properly investigating and preparing Canup's claims, maintaining adequate communication with the client, meeting applicable court deadlines, and taking reasonable steps to protect Plaintiff's interests before, during, and after withdrawal of representation.

6.22   **Breach of the Duty:** Texas Defendants breached their duty of care in multiple respects. They failed to investigate and develop Canup's case over a four-year period, leading to the MDL court's dismissal of his hearing-loss claims. They concealed material information about the global settlement structure, including

Exhibit 10, and failed to disclose that they intended to recommend settlement to all clients regardless of individual circumstances. They also abandoned Canup at a critical stage of litigation, withdrawing representation one day before the CMO 57 compliance deadline, despite having known of those deadlines for months. In addition, Texas Defendants failed to provide Canup with his full client file and withheld the master complaint from him.

6.23 **Causation:** Texas Defendants' breaches directly and proximately caused injury to Canup. Their failure to amend pleadings was specifically cited by the MDL court as a reason for barring and dismissing Canup's hearing-loss claims, which rendered costly expert reports largely useless. Their last-minute withdrawal disrupted Canup's ability to comply with CMO 57 requirements. Their concealment of material settlement information deprived Canup of the ability to make informed decisions regarding his claims.

6.24 **Damages:** As a result of Texas Defendants' breaches, Canup suffered both economic and non-economic damages. Economically, Canup incurred wasted expert fees. Non-economically, Plaintiff endured significant stress, confusion, inconvenience, and anxiety, disruption Canup's daily life for several months, and forced him to devote substantial time and effort to untangling the MDL process and uncovering how his own attorneys were deceiving him.

6.25 To the extent FNJ is not found directly liable, FNJ is also vicariously liable for the breaches of fiduciary duty committed by Brown and/or Roberts in the course and scope of their employment and/or partnership and/or agency under the doctrine of respondeat superior and Texas agency law.

6.26 Accordingly, Canup pleads for, and is entitled to monetary damages in an amount sufficient to compensate him for the harm sustained.

## B. CLAIMS AGAINST FLORIDA DEFENDANTS

### Claim 1: Fraud by Non-Disclosure

6.27 Canup restates and re-alleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

6.28 **Failure to Disclose:** Florida Defendants deliberately failed to disclose material facts. Florida Defendants Aylstock, Bradford, and Burns, while acting on behalf of their respective firms AWKO and Mostyn, deliberately failed to disclose that they intended to formally appear as counsel for Canup at the March 13, 2024 status conference and that they intended to formally appear and participate in a closed-door settlement conference concerning Canup's case. By withholding these facts, Florida Defendants concealed their involvement in Canup's case. These omissions occurred despite their knowledge of a court order requiring Canup to appear "in person, with counsel" if represented.

6.29   **Duty to Disclose:** The Defendants had a duty to disclose such facts to Canup. The Florida Defendants' duty to disclose arose from multiple sources:

a) By making a formal appearance on the record, Florida Defendants created at least an implied and arguably an express attorney-client relationship with Canup, triggering fiduciary duties of candor, loyalty, and disclosure. They had a duty to disclose their intent to make a formal appearance.

b) By partially disclosing their intent to attend the March 13, 2024 status conference to Canup through Gamble while concealing their intent to formally appear, Florida Defendants created a duty to disclose the full scope of their role.

c) By seeking privileged and confidential information about Canup and his case against 3M prior to the March 13, 2024 status conference and by obtaining and using Canup's confidential medical records, Defendants assumed fiduciary-like duties of confidentiality and fair dealing, requiring them to disclose their access and intent.

6.30   **Canup's Ignorance:** Canup was ignorant of the facts and did not have an equal opportunity to discover them. Canup had no knowledge that Florida Defendants intended to appear in court on his behalf, nor that they had accessed his private medical records from an undisclosed source. Because these actions were being concealed and misrepresented Canup had no equal opportunity to discover their conduct or protect his own interests before incurring unnecessary expenses and attending the conference under false pretenses.

6.31 **Intent to Induce:** Florida Defendants intended Canup to act or refrain from acting based on the nondisclosure. Florida Defendants knew that the MDL Court's order required Canup to appear "in person, with counsel." Their nondisclosure was calculated to induce Canup to continue treating Gamble as his sole counsel and to incur the costs of transporting and compensating him to attend the status conference in Florida. By concealing their intention to appear "FOR THE PLAINTIFF," Florida Defendants prevented Canup from making an informed choice such as declining to bring Gamble, objecting to their unauthorized involvement, or challenging their improper access to his records. Their concealment ensured that Canup remained unaware and passive while Florida Defendants acted in ways that advanced their own interests in the MDL.

6.32 **Reliance and Injury:** Canup relied on the Florida Defendants' nondisclosure, which directly resulted in injury. In reliance on their concealment, Canup unnecessarily paid for Gamble's travel, lodging, and appearance at the Florida status conference, expenses that would not have been incurred had he known Florida Defendants would appear as his counsel. Florida Defendants also accessed and used his confidential medical records without consent, depriving him of control over his case and the opportunity to make informed legal decisions with full knowledge of who was acting on his behalf. These harms, including financial costs and disruption of his autonomy, were the direct and foreseeable result of Florida

Defendants' deliberate concealment of material facts they had a duty to disclose.

6.33    Bryan Aylstock, as a founding partner of AWKO, had actual authority to bind the firm. AWKO and Mostyn Law benefitted directly from the concealment and actions of their employees and partners. As such, both firms are directly liable for the misconduct described herein.

6.34    Florida Defendants' omissions and concealments were intentional, material, and calculated to mislead Canup during a critical phase of litigation. This conduct constitutes actionable fraud by non-disclosure under Texas law.

6.35    To the extent AWKO and Mostyn Law are not found directly liable, they are vicariously liable for the acts and omissions of Aylstock, Bradford, and Burns committed within the course and scope of their employment and/or partnership and/or agency under the doctrine of respondeat superior and Texas agency law.

6.36    Accordingly, Canup pleads for, and is entitled to monetary damages in an amount sufficient to compensate him for the harm sustained.

6.37    Because Florida Defendants' conduct was fraudulent and/or malicious, Canup pleads for, and is also entitled to recover exemplary damages in an amount to be determined by the trier of fact. Canup further pleads for expenses and pre and post-judgment interest at the maximum rate permitted by law.

### Claim 2:  Breach of Fiduciary Duty

6.38  Canup restates and re-alleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

6.39  **Existence of Fiduciary Duty:** By formally appearing on the record as counsel "FOR THE PLAINTIFF" at the March 13, 2024 status conference, and by participating in a closed-door settlement discussion regarding Canup's case, the Florida Defendants created at least an implied and arguably an express attorney-client relationship with Canup. This appearance, coupled with their access to Canup's confidential medical records, imposed fiduciary duties of loyalty, candor, and full disclosure. Having assumed the role of Canup's representatives in court and in private negotiations, Florida Defendants were obligated to act in Canup's best interests, disclose material facts, and avoid self-dealing or deception.

6.40  **Breach of Duty:** Florida Defendants breached their fiduciary duties including but not limited to, duty of full disclosure, duty of good faith and fair dealing, duty of care and duty of loyalty in multiple respects. Florida Defendants breached these fiduciary duties in multiple ways. They deliberately failed to inform Canup of their intent to appear as his counsel, concealed their formal appearance in settlement negotiations, and accessed Canup's confidential medical records without authorization. They further failed to disclose material conflicts of interest, including their obligations under the MSA to secure 100% plaintiff participation and the financial penalties they faced if Canup declined to settle. Florida Defendants also

ORIGINAL PETITION  **PAGE**  26

failed to disclose Exhibit 10 to the MSA which contained material terms to the agreement. Instead of candor and loyalty, Florida Defendants acted in their own financial interests by pressuring Canup toward settlement while depriving him of the opportunity to make informed decisions about his representation and case strategy.

6.41    **Causation:** Florida Defendants' breaches directly caused Canup to act and incur expenses that he otherwise would not have. Because Florida Defendants concealed their intent to formally appear as counsel, Canup reasonably believed Gamble was his only representative and paid to transport and lodge Gamble in Florida for the status conference. Canup was further deprived of the ability to object to Florida Defendants' unauthorized access to his confidential medical records, or to challenge their improper participation in court and settlement proceedings. Their concealment and deception stripped Canup of control over his own case and forced him to rely on incomplete and misleading information.

6.42    **Damages:** As a direct and proximate result of Florida Defendants' misconduct, Canup suffered both financial and significant inconvenience damages. He incurred unnecessary out-of-pocket expenses for Gamble's travel and representation. Florida Defendants' concealment and breaches also forced Canup to spend substantial time, energy, and effort to learn about the role and duties of a lawyer, MDL procedures, settlement structures, and fiduciary obligations, simply to understand how his rights were being compromised. Instead of being able to trust

Defendants, Canup was required to divert time away from his personal and professional life to protect himself from those who owed him loyalty and candor. This disruption and burden are concrete injuries that flow directly from Florida Defendants' breaches of fiduciary duty.

6.43   To the extent AWKO and Mostyn Law are not found directly liable, they are also vicariously liable for the fiduciary breaches committed by Aylstock, Bradford, and Burns committed within the course and scope of their employment and/or partnership and/or agency under the doctrine of respondeat superior and Texas agency law.

6.44   Accordingly, Canup pleads for, and is entitled to monetary damages in an amount sufficient to compensate it for the harm sustained.

6.45   Because Florida Defendants' conduct was fraudulent and/or malicious, Canup pleads for, and is also entitled to recover exemplary damages in an amount to be determined by the trier of fact. Canup further pleads for expenses and pre and post-judgment interest at the maximum rate permitted by law.

### Claim 3:  Fraudulent Inducement

6.46   Canup restates and realleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

6.47   **Material Misrepresentation:** Defendants Bradford and AWKO represented to Canup, through Gamble, that if Gamble agreed to allocate a 9%

interest in Canup's recovery in the MDL to PSC, Canup and Gamble would receive full access to the MDL's common benefit work, including the master complaint and other litigation materials. This promise was material because access to the common benefit work was essential for evaluating Canup's claims, preparing pleadings, and ensuring that Canup's case was prosecuted on equal footing within the MDL.

6.48 **Knowledge of Falsity:** At the time Bradford made these representations, he and AWKO had no intention of providing the promised access beyond the master complaint. Bradford and AWKO also knew their representation was false because the master complaint had been filed on behalf of all Plaintiffs in the MDL, and the motion to file it under seal expressly stated that an unredacted copy had already been provided to all counsel of record, making all Plaintiffs in the MDL, including Canup, entitled to it without additional conditions. Bradford and AWKO's subsequent refusal to respond to Canup's request for the remaining common benefit materials demonstrates they knowingly misrepresented their willingness to perform and concealed their true intent.

6.49 **Intent to Induce Reliance:** Defendants Bradford and AWKO made these false promises for the purpose of inducing Canup and or Gamble as an agent of Canup to agree to the 9% common benefit interest. By doing so, Bradford and AWKO sought to secure both financial gain and strategic leverage within the MDL, binding Canup to terms that benefitted Bradford, AWKO and PSC as a whole while

ORIGINAL PETITION                                               **PAGE**      29

depriving Canup of the resources promised.

6.50   **Reliance:** Canup, through Gamble, reasonably relied on Bradford and AWKO's misrepresentations by entering into the agreement and granting PSC a 9% interest in his recovery. Canup through Gamble did so in the belief that he would receive the full scope of common benefit materials, which were essential to advancing his claims in the MDL.

6.51   **Injury:** As a direct and proximate result of Bradford and AWKO's fraudulent inducement, Canup suffered injury. He incurred the financial burden of allocating 9% of his recovery to PSC while receiving only the master complaint, which he was entitled to without further conditions, and being deprived of the other promised materials. This left Canup disadvantaged in prosecuting his claims, forced him to expend additional time and effort to understand the underlying issues without the benefit of the promised work product, and unjustly enriched Bradford and AWKO at his expense.

6.52   Defendants Bradford and AWKO violated Section 32.46 of the Texas Penal Code when they engaged in the above-described conduct. Defendants Bradford and AWKO committed this conduct knowingly and intentionally. Such violations constitute fraud.

6.53   To the extent AWKO is not found directly liable, it is also vicariously liable for the fraudulent inducement committed by Bradford within in the course and

scope of his employment and/or partnership and/or agency under the doctrine of respondeat superior and Texas agency law.

6.54   Accordingly, Canup pleads for, and is entitled to monetary damages in an amount sufficient to compensate him for the harm sustained.

6.55   Because Bradford and AWKO's conduct was fraudulent and/or malicious, Canup pleads for, and is also entitled to recover exemplary damages in an amount to be determined by the trier of fact. Canup further pleads for expenses and pre and post-judgment interest at the maximum rate permitted by law.

## C.   CLAIMS AGAINST ALL DEFENDANTS
### Claim 1:  Civil Conspiracy

6.56   Canup restates and realleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

6.57   **Combination of two or more persons:** Defendants FNJ, Brown, Roberts, Aylstock, Bradford, Burns, AWKO, and Mostyn Law combined and acted together in connection with the MDL. Their actions were coordinated, not isolated, and each Defendant assumed complementary roles under the framework of the MSA which tied their compensation to Plaintiff participation thresholds and withdrawal requirements. This combination reflects a deliberate, concerted effort to protect their financial interests at Canup's expense.

6.58   **Common object or course of action:** The common object of the conspiracy was to secure maximum Plaintiff participation in the MSA, protect Defendants' fees, and eliminate or marginalize clients unwilling to settle. To accomplish this, Defendants withheld material settlement terms, including Exhibit 10 of the MSA and provisions tying attorney compensation to client participation and mandatory withdrawals, while conditioning access to critical litigation documents on Canup's compliance. The Florida Defendants also concealed their formal appearance as Canup's counsel, depriving him of notice that they were representing him in court and settlement discussions. These coordinated acts were calculated to undermine Canup's autonomy, deprive him of full disclosure, and coerce his participation in the settlement program.

6.59   **Meeting of the minds:** Defendants reached a meeting of the minds through coordinated conduct. Texas defendants abandoned Canup for not agreeing to participate in the MSA. Florida Defendants then formally appeared "FOR THE PLAINTIFF" in court allowing them to pressure Canup, in person, to participate in the MSA. Florida Defendants did this without disclosing their intent to formally appear forcing Canup to take Gamble from Texas to Florida to comply with the MDL Court's order to appear "in person, with counsel" resulting in unnecessary economic pressure on Canup. Texas Defendants then withheld the master complaint, a document that was part of Canup's file, and directed Gamble to obtain it from the

PSC. Bradford and AWKO then conditioned its release on signing a fraudulent participation agreement giving PSC a 9% interest in any recovery in Canup's case. These coordinated acts evidence agreement, whether formal or informal, to act in unison toward their shared objective.

6.60 **Unlawful overt acts:** In furtherance of the conspiracy, Defendants engaged in multiple unlawful overt acts, including:

a) concealing material settlement terms from Canup;
b) concealing their intent to appear, and then appearing as Canup's counsel without authority or disclosure;
c) accessing and reviewing Canup's confidential medical records without authorization;
d) concealing their financial and ethical conflicts tied to the MSA; and
e) requiring Canup's counsel to sign a fraudulent 9% participation agreement as the condition for obtaining the master complaint.

Each of these acts breached duties of candor, loyalty, and disclosure owed to Canup, and unlawfully advanced Defendants' scheme to manipulate settlement participation.

6.61 **Damages:** As a direct and proximate result of this conspiracy, Canup suffered damages. He incurred unnecessary expenses transporting substitute counsel to Florida for a hearing where Florida Defendants secretly appeared on his behalf,

was deprived of access to promised common benefit work, and saw his recovery reduced by the 9% diversion of settlement funds. Canup also suffered significant inconvenience by being forced to investigate and learn about complex legal processes in order to uncover and counteract Defendants' scheme, burdens that arose solely because of Defendants' coordinated misconduct.

6.62   To the extent the law firms named herein are not found directly liable, they are also vicariously liable for the actions of their partners, associates, employees, or agents committed within the scope of employment and in furtherance of the conspiracy.

6.63   Additionally, because Canup's injuries were caused by the joint and concerted actions of multiple Defendants, including acts of fraud, breach of fiduciary duty, and conspiracy, all Defendants are jointly and severally liable under Texas law.

6.64   For the avoidance of doubt, Canup pleads that if any law firm named herein is not found directly liable, it is nonetheless vicariously liable under the doctrine of respondeat superior for the conduct of its partners, agents, or employees acting within the course and scope of their duties.

6.65   Accordingly, Canup pleads for, and is entitled to monetary damages in an amount sufficient to compensate him for the harm sustained.

6.66   Because Defendants' conduct was fraudulent and/or malicious, Canup pleads for, and is also entitled to recover exemplary damages in an amount to be

determined by the trier of fact. Canup further pleads for expenses and pre and post-judgment interest at the maximum rate permitted by law.

## VII.

## DAMAGES

7.1    For each of his claims, Canup demands recovery of all of the following categories of damages as a direct and proximate result of the Defendants' wrongful conduct, which include:

7.2    **Actual Damages**

Canup suffered actual damages totaling **$19,807.35 + common benefit fee set aside from settlement in underlying litigation (common benefit fee is less than $20,000)**, including:

(a) $6,520.00 for representation by David Gamble at the March 13, 2024 status conference in Pensacola, Florida;

(b) $884.59 in related travel and lodging expenses;

(c) $11,925.00 for expert reports and litigation preparation rendered futile by Defendants' misconduct; and

(d) $477.76 in miscellaneous litigation costs;

(e) amount set aside from settlement to cover common benefit fee

These damages are recoverable under all applicable causes of action, including fraud and breach of fiduciary duty.

### 7.3 Inconvenience Damages

Defendants' misconduct forced Canup to learn about and understand duties that competent counsel should have performed, including analyzing complex legal issues as well as studying fiduciary duties owed by attorneys, and uncovering fraud and concealment theories that revealed how his own counsel had deceived him. These burdens disrupted Canup's daily life, imposed unnecessary strain, and deprived him of reliable representation. Canup seeks damages for loss of time, disruption, and inconvenience. The amount is left to the discretion of the trier of fact.

### 7.4 Exemplary Damages

Defendants acted with fraud, malice, and conscious disregard of Canup's rights by:

(a) appearing as counsel without consent;
(b) accessing confidential medical records without authorization;
(c) concealing material terms and conflicts of interest;
(d) withdrawing or refusing to act during critical litigation phases; and
(e) pressuring Canup toward an unfair settlement.

Canup seeks exemplary damages under *Tex. Civ. Prac. & Rem. Code ch. 41.003*, in an amount sufficient to punish and deter.

### 7.5 Disgorgement

Canup seeks disgorgement of any common benefit fees traceable to his settlement, Florida Defendants as former members of the PSC in the MDL obtained such benefits through fraud and in breach of duty.

### 7.6   Interest and Costs

Canup seeks pre- and post-judgment interest as authorized by law, together with all taxable court costs and litigation expenses.

## VIII.

## JURY DEMAND

8.1   Canup requests a jury trial on all claims and issues so triable.

## IX.

## CONDITIONS PRECEDENT

9.1   All conditions precedent have occurred and been satisfied.

## X.

## NOTICE PURSUANT TO T.R.C.P. 193.7

10.1   Canup provides notice to Defendants pursuant to Rule 193.7 of the Texas Rules of Civil Procedure that Canup may utilize as evidence during the trial of this lawsuit all documents exchanged by the parties in discovery in this case.

## XI.

## PRAYER

11.1   ACCORDINGLY, Canup respectfully requests that Defendants be cited to appear and answer, and that Canup be granted judgment against Defendants awarding Canup all damages he is entitled to, including all damages and other relief (at law or in equity) pled in the causes of action and other parts of this instrument above, actual damages and losses, economic damages, compensatory damages, exemplary damages, costs, pre- and post-judgment interest, disgorgement of any fees or benefits wrongfully obtained by Defendants, and all other damages Canup is entitled to in equity or by other applicable law.

11.2   Canup further requests such other and further relief, general or special, at law or in equity, to which Canup may show himself justly entitled.

Dated October 27, 2025

Respectfully submitted,

*/s/ Brandon Canup*
Brandon Canup

4812 Hidden Oaks Ln
Arlington, Texas 76017
(972) 762-4314

canup.brandon@gmail.com

pro se

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 107325134
Filing Code Description: Petition
Filing Description: Original Petition
Status as of 10/27/2025 4:25 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Brandon Canup | | canup.brandon@gmail.com | 10/27/2025 1:29:54 PM | NOT SENT |

# Tab 9-1

Case 3:26-cv-03359-MCR-ZCB    Document 9    Filed 11/21/25    Page 5 of 54
Case 3:26-cv-03359-MCR-ZCB    Document 86-1    Filed 06/11/26    Page 64 of 388
USCA11 Case: 26-11887    Document: 5-1    Date Filed: 06/05/2026    Page: 63 of 202

## THE STATE OF TEXAS
### DISTRICT COURT, TARRANT COUNTY

*CITATION*                                     *Cause No. 067-371499-25*

BRANDON CANUP
VS.
BRYAN F. AYLSTOCK, BOBBY BRADFORD, MICHAEL BURNS, ET AL

TO: MOSTYN LAW FIRM PC

B/S REG AGT-ANDREW BROWNING
3810 W ALABAMA ST
HOUSTON, TX 77027-5204

You said DEFENDANTS are hereby commanded to appear by filing a written answer to the PLAINTIFF'S ORIGINAL PETITION at or before 10 o'clock A.M. of the Monday next after the expiration of 20 days after the date of service hereof before the 67th District Court ,100 N CALHOUN, in and for Tarrant County, Texas, at the Courthouse in the City of Fort Worth, Tarrant County, Texas said PLAINTIFF being

BRANDON ALLEN CANUP

Filed in said Court on October 27th, 2025 Against

AYLSTOCK WITKIN KREIS & OVERHOLTZ PLC, MOSTYN LAW FIRM PC, FLEMING NOLEN & JEZ LLP, BRYAN FREDERICK AYLSTOCK, BOBBY J BRADFORD, MICHAEL ANDREW BURNS, GREGORY DONALD BROWN, CLIFF LEE ROBERTS

For suit, said suit being numbered 067-371499-25 the nature of which demand is as shown on said PLAINTIFF'S ORIGINAL PETITION a copy of which accompanies this citation.

PRO SE
Attorney for BRANDON ALLEN CANUP Phone No. (972)762-4314
Address      4812 HIDDEN OAKS LN ARLINGTON, TX 76017

_____Thomas A. Wilder_____, Clerk of the District Court of Tarrant County, Texas. Given under my hand and the seal of said Court, at office in the City of Fort Worth, this the 29th day of October, 2025.

By _____
AMANDA DURAN

A CERTIFIED COPY
ATTEST: 10/29/2025
THOMAS A. WILDER
DISTRICT CLERK
TARRANT COUNTY, TEXAS
BY: /s/ Amanda Duran

NOTICE: You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 AM. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you. In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org.

Thomas A. Wilder, Tarrant County District Clerk, 100 N CALHOUN, FORT WORTH TX 76196-0402

### OFFICER'S RETURN  *06737149925000006*

Received this Citation on the 29th day of October, 2025 at 10.16 o'clock A M, and executed at 10000 Memorial Dr Str 740 Houston TX within the county of Harris, State of TX at 11.05 o'clock A M on the 4th day of November, 2025 by delivering to the within named (Def.): Mostyn Law Firm PC through defendant(s), a true copy of this Citation together with the accompanying copy of PLAINTIFF'S ORIGINAL PETITION Registered Agent Andrew Browning, having first endorsed on same the date of delivery.

Authorized Person/Constable/Sheriff Christina Edwards    Process Server
County of Harris    State of TX    By PSC#13296 Exp 10/31/27    Deputy fe

Fees $_____
State of TX County of Harris    (Must be verified if served outside the State of Texas)
Signed and sworn to by the said Christina Edwards before me this 6th day of November 2025
to certify which witness my hand and seal of office
(Seal):
County of Harris, State of Texas

TIFFANY B LARA
Notary ID #12292798
My Commission Expires
October 27, 2026

2

# Tab 9-3

# FRANCHISE TAX ACCOUNT STATUS

This record as of November 4, 2025 at 11:49:20

# MOSTYN LAW FIRM P.C.

| | |
|---|---|
| **Texas Taxpayer Number:** | 17605902364 |
| **Mailing Address:** | 3810 W ALABAMA ST HOUSTON, TX 77027 - 5204 |
| **Right to Transact Business in Texas:** | ACTIVE |
| **State of Formation:** | TX |
| **SOS Registration Status (SOS status updated each business day):** | ACTIVE |
| **Effective SOS Registration Date:** | 12/17/1998 |
| **Texas SOS File Number:** | 0092487502 |
| **Registered Agent Name:** | ANDREW BROWNING |
| **Registered Office Street Address:** | 3810 W. ALABAMA HOUSTON, TX 77027 |

## Public Information Report for Year

6

Case 3:26-cv-03359-MCR-ZCB Document 8691 Filed 06/11/26 Page 67 of 388

| Title | Name and Address | |
|-------|------------------|---|
| PRESIDENT | **AMBER MOSTYN**<br>3810 WEST ALABAMA<br>HOUSTON, TX 77027 | |

Case 3:26-cv-03359-MCR-ZCB Document 8691 Filed 06/11/26 Page 67 of 388

7

# Tab 23

**FILED**

**December 29, 2025**
KAREN MITCHELL
CLERK, U.S. DISTRICT
COURT

**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| |
|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION |

MDL No.: 2885

**MOTION TO TRANSFER TAG-ALONG ACTION
*BRANDON CANUP V. BRYAN F. AYLSTOCK, ET AL.* TO THE *IN RE 3M* COMBAT
ARMS EARPLUG PRODUCTS LIBAILITY LITIGATION MDL**

Pursuant to Judicial Panel on Multi-District Litigation Rule 7.1(b)(i), Defendant Bryan F. Aylstock respectfully moves the Panel for an Order transferring *Brandon Canup v. Bryan F. Aylstock, et al.*, No. 4:25-cv-01255 (N.D. Texas) as a tag-along action to the United States District Court for the Northern District of Florida for inclusion in MDL No. 2885. Despite being labeled as a legal malpractice action, the *Canup* complaint is nothing of the sort. Rather, Canup is clearly attempting to use his complaint as a trojan horse to collaterally attack the orders of the MDL Court. Indeed, even a cursory reading of the *Canup* complaint is replete with attacks on the MDL Court's orders, the MDL Settlement in the MDL overseen by the Honorable M. Casey Rodgers, and the opt out provisions of that settlement. More importantly, the entire basis of his lawsuit is based upon the fact that Defendants, Aylstock, Bradford, and Burns appeared in their capacity as appointed leadership of the MDL Court at an MDL hearing, an appearance that the official MDL transcript clearly reveals was at the request of the MDL Court, and only in their appointed roles as MDL leadership.

Indeed, the *Canup* complaint falsely alleges that Bryan F. Aylstock, Bobby Bradford and the lawyers at Aylstock, Witkin, Kreis and Overholtz, PLLC, were his lawyers – but the official MDL transcript directly contradicts that allegation and makes clear that their only interaction with

Mr. Canup or the attorney who appeared with him at the MDL hearing, was in their appointed roles as MDL leadership. Any fair reading of the underlying complaint would reveal that what is actually happening is that these lawyers, and the MDL Court itself, are being attacked for their roles related to a hearing held by the MDL Court on March 13, 2024.[1] At no point did Aylstock or any member of his firm represent Mr. Canup. As such, this so-called "malpractice case" is not only "related to" the MDL 2885, but the MDL Court and the interpretation of its orders (and even the meaning of the official MDL transcript of the March 13, 2024, hearing) are central to every claim alleged. Any other Court deciding these issues would therefore be attempting to interpret the orders of the MDL Court itself, which would make no sense; rather transfer of this proceeding to MDL 2885 would clearly "promote the just and efficient conduct" of the *Canup* action and serve the interests of justice. *See* 28 U.S.C. 1407(a).

Finally, it is worth noting that on September 19, 2025, the MDL Court recommended termination of this MDL "subject to this Court's continuing jurisdiction to enforce its Orders, handle any matters related to the settlement, or address any other miscellaneous issues necessary to complete the administration of these cases." The MDL Court further provided it, "would welcome the reopening of the MDL docket and transfer of any such action to this Court for further proceedings, given the Court's familiarity and experience with this litigation" (see JPML Dkt. 2027). As such, transfer is not only appropriate, but necessary. The MDL Court has important institutional knowledge about the litigation, settlement and the MDL Court's Orders at issue in this lawsuit. The *Canup* case provided in the attached Schedule of Action clearly qualifies for transfer under the MDL Court's Order and 28 U.S.C 1407.

---

[1] See Status Conference Hearing Transcript Dated March 13, 2024, attached as Exhibit 3 to the memorandum in support of this motion, and see also Pretrial Order No. 7 (Dkt. 376), Plaintiff Leadership Appointments, In Re: 3M Combat Arms Product Liability Litigation, Case No. 3:19md2885, United States District Court for the Northern District of Florida, Pensacola Division, May 22, 2019.

2

The motion is supported by the accompanying memorandum of law and exhibits, a

Schedule of Action, a copy of the docket sheet and petition, and a proof of service.


DATE: December 10, 2025           Respectfully submitted,

                                  /s/ *Bryan F. Aylstock*
                                  Bryan F. Aylstock, Florida Bar No. 782634
                                  AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
                                  17 East Main Street, Suite 200
                                  Pensacola, FL 32502
                                  Phone: (850) 202-1010
                                  Facsimile: (850) 916-7449
                                  Email: baylstock@awkolaw.com

                                  *Plaintiffs' Counsel*

## BEFORE THE UNITED STATES JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | MDL No.: 2885 |

**MEMORANDUM IN SUPPORT OF MOTION TO TRANSFER TAG-ALONG ACTION
*BRANDON CANUP V. BRYAN F. AYLSTOCK, ET AL.* TO THE *IN RE 3M* COMBAT
ARMS PRODUCT LIABILITY LITIGATION MDL**

### I.    INTRODUCTION

This purported "legal malpractice" lawsuit, which falsely alleges that the undersigned was his attorney, is nothing more than a full-throated attack on the 3M Combat Arms Earplug MDL Court's ("MDL Court") orders and the 3M Combat Arms global settlement ("MDL Settlement"). *See* Plaintiff's Original Petition ("Petition") (attached as Exhibit 1). Plaintiff's Complaint is replete with allegations regarding the interpretation and implementation of the MDL Court's Orders, and its sole basis for the alleged "malpractice" by Aylstock and Bradford (and Burns) is based upon their appearance at an MDL hearing wherein the official MDL transcript clearly states that the MDL asked for their attendance as only on behalf "Plaintiffs' Leadership." Indeed, Canup's own attorney was present and represented him at the MDL hearing, as reflected in that transcript.

What this case is really about is the MDL Settlement, and the MDL Court's implementation of that settlement and management of its docket, including Case Management Order No. 57 wherein the MDL Court created a specific framework for those litigants like this Plaintiff who opted not to participate in the Settlement Program as outlined in the MDL Settlement. Also directly referenced and challenged by this lawsuit are the MDL Courts' Common Benefit Order No. 3,

1

Pretrial Order No. 9 Stipulated Order Governing Confidentiality and Privilege, and the Orders granting withdrawal of Plaintiff's actual former counsel, Cliff Roberts, Gregory Brown and Fleming, Nolen & Jez.[1] Plaintiff's complaint then falsely impugns the MDL Settlement and the MDL Court, alleging that the MDL Settlement's terms cause material conflicts of interest between Plaintiffs and Defendants. Finally, the complaint then falsely states that Aylstock and Bradford were his attorneys based solely upon their appearance on behalf of MDL Leadership and at the explicit request of the MDL Court as reflected in the official MDL transcript of those proceedings – proceedings in which Canup himself brought his own attorney who appeared on the record specifically on behalf of Canup.

It goes without saying that the Orders of the MDL Court, and the MDL Settlement overseen by the Court, are common to all 3M MDL cases. Further, it would be contrary to judicial efficiency to allow 3M claimants, such as *Canup*, to litigate the propriety and interpretation of the MDL Court's orders and MDL Settlement implementation in courts other than the MDL Court. As such, transfer is proper to promote centralization and the efficient conduct of this case and of the litigation overall. *See* 28 U.S.C. § 1407(a).

## II. ARGUMENT

The facts that give rise to this case stem from one of the largest mass torts cases ever handled by the Federal Court system – the 3M combat arms earplug litigation – with more than 350,000 individual claimants at its peak. A global settlement of all cases was reached in MDL

---

[1] *See* Case Management Order No. 57 (Dkt. 3811), Case Management Order for Any Ongoing Litigation Against Defendants, In Re: 3M Combat Arms Product Liability Litigation, Case No. 3:19md2885, United States District Court for the Northern District of Florida, Pensacola Division, August 29, 2023; Common Benefit Order No. 3 (Dkt. 1659), 3M Combat Arms Product Liability Litigation, Case No. 3:19md2885, United States District Court for the Northern District of Florida, Pensacola Division, February 17, 2021; and Pretrial Order No. 9 (Dkt. 442), Stipulated Order Governing Confidentiality and Privilege, 3M Combat Arms Product Liability Litigation, Case No. 3:19md2885, United States District Court for the Northern District of Florida, Pensacola Division, June 17, 2019.

2885 in August of 2023, which ultimately covered more than 252,000 claimants. The Honorable

M. Casey Rodgers made the following comments at the September 8, 2023, Case Management

Conference (*See* Twenty-Third Case Management Conference transcript attached as Exhibit 2):

> But the message here this morning, aside from thanking people for their efforts in getting to the litigation – and getting the litigation to this result, and **I will be thanking some people here in just a moment, but what I want to say on the record this morning, once and for all, is that this settlement is fair. It is fair to the 250,000-plus plaintiffs in the MDL.** (emphasis added). … [But] I also believe it is fair to 3M. And I say this from the perspective of someone who is rather uniquely positioned. I'm positioned as a neutral. And I don't think there's anyone who knows and understands this litigation, both its intricacies and broader whole of it, as well as its risks, more thoroughly as I do as a neutral.
>
> I've been in the trenches of the litigation with the parties since day one, April 3rd, 2019. I've dealt with discovery. I've worked with the government. I've reviewed and ruled on thousands of motions, thousands of objections. I've presided over six trials with nine plaintiffs and listened to the record of ten other trials. I followed closely the appeals of the bellwethers and the Aearo defendant's bankruptcy. No one is in a better position or more credible position to evaluate this settlement than I am. And again I say to all of you that the settlement is fair and the settlement is smart. (Transcript at 6:10 – 7:8)
> ***
> And importantly, those who criticize the settlement, they have no knowledge of the extraordinary risk and extraordinary costs associated with continued litigation of any Combat Arms Earplug claim, much less the costs and the risk of litigating hundreds of thousands of claims; and to criticize it based simply on jury verdicts, theoretical ideals, or market vagaries is just simply not to understand this uniquely complex litigation at all. (Transcript at 8:2-9)
> ***
> And also thank the mediators -- Judge Herndon, Judge Cannon, Judge Keyes -- for bringing us to this resolution. And I also want to thank the negotiating plaintiffs' counsel -- Bryan Aylstock, Clayton Clark, Chris Seeger, Dan Gustafson -- and their teams for working with 3M and Aearo, both to bring this settlement to fruition but also in the coming months as we go forward to work together to successfully reach the participation levels set forth in the Settlement Agreements. I think, as Judge Jones said, this is going to be a long-term commitment for both sides to work together. (Transcript at 25:15-24).

The MDL Settlement was posted on the official website for MDL 2885. *See https://www.uscourts.gov/courts/flnd/3M-MSA_I.pdf* (last accessed Dec. 10, 2025). The MDL Court issued multiple orders implementing the settlement, and explained the process for those claimants who chose to opt-out of the settlement. *See https://www.uscourts.gov/courts/flnd/3M-Case_Management_Order_No_57_Docket_Control_Order_and_Exhibits_1-3.pdf* (last accessed Dec. 10, 2025). As part of the process under CMO 57, the MDL Court ordered Plaintiff *Canup* to appear at an official hearing to discuss his decision to opt out of the MDL settlement. Following that MDL hearing, *Canup* voluntarily settled his lawsuit against 3M during the CMO 57 opt out process on September 30, 2024. Petition at ¶ 5.20. Plaintiff was represented by attorney David Gamble at the MDL hearing and when he settled his 3M lawsuit. *Id.* at ¶ 5.6.

After voluntarily settling his 3M case, Plaintiff filed this action on October 27, 2025. *See* Petition (Exhibit 1). Plaintiff's lawsuit contains allegations against eight Defendants which Plaintiff identified as two separate groups, the "Texas Defendants" and the "Florida Defendants". *Id.* at ¶¶ 2.10-2.11. The "Texas Defendants" are Cliff Robert, Gregory Brown and Fleming, Nolan & Jez LLP. Those lawyers and law firm were hired by Plaintiff and represented him in the 3M litigation until the MDL Court granted their withdrawal motion in January 2024. *Id.* at ¶ 5.6. The "Florida Defendants" are Aylstock, Bradford, Aylstock, Witkin, Kreis & Overholtz, PLLC ("AWKO"), Burns and Mostyn Law. Aylstock was appointed as Plaintiffs' Lead Counsel by the MDL Court. *See* https://www.flnd.uscourts.gov/sites/flnd/files/mdl/Pretrial_Order_No._7.pdf (last accessed Dec. 10, 2025). Burns of Mostyn Law was appointed Plaintiffs' Liaison Counsel by the MDL Court. *Id.* It is undisputed that the Florida Defendants were never hired by *Canup* to represent him. Their only involvement and interactions with Plaintiff were on behalf of Plaintiffs' MDL Leadership at the request of the MDL Court, specifically leading up to the March 13, 2024,

4

MDL Court-ordered Status Conference and subsequent settlement conference.  *See* Petition (Exhibit 1) and Status Conference Transcript (attached as Exhibit 3).[2]

Despite the fact that the MDL Court granted the Texas Defendants' withdrawal motion, the fact that the Florida Defendants' only involvement in Plaintiff's case was their appearance at hearing on behalf of Plaintiffs' MDL Leadership at the request of the MDL Court, the fact that Plaintiff hired new counsel, David Gamble, who appeared on his behalf at that conference before the MDL Court, and the fact that Plaintiff voluntarily settled his case against 3M during the opt-out process, Plaintiff *Canup* filed this action under the false pretense of a legal malpractice claim,[3] and in so doing seeks to collaterally attack the Orders of the MDL Court, appointed leadership for the MDL for fulfilling their duties under the MDL Court's Orders, and the MDL Settlement.

Specifically, Plaintiff's allegations against the Texas Defendants are premised upon criticisms of the MDL Settlement terms and the disclosure thereof, the MDL Court's Settlement Implementation Orders (including CMO 57), and the Texas Defendants withdrawal motion which was granted by the MDL Court.  None of these Orders of the MDL Court were ever opposed by Plaintiff *Canup* in the MDL, and none was ever appealed.  *See* Petition at ¶¶ 5.5, 5.6, 5.7, 6.1-6.26.

---

[2]  The status conference began with the Court welcoming Mr. Canup and his attorney Mr. Gamble, introducing herself, and then telling Mr. Canup: "Also in the courtroom today from plaintiffs' leadership there's Mr. Bryan Aylstock, Mr. Brad Bradford and Mr. Mike Burns." Exhibit 3, Status Conference Transcript at 3:8-9. The MDL Court continued by explaining why she thought it was important to meet with those plaintiffs litigating their cases (like Mr. Canup) so that she could give her perspective of the litigation having overseen it for 5 years, stating: "Also, as you can see, leadership counsel from the plaintiffs' side is here if you have questions of them." *Id.* at 4:23-25. The MDL Court continued by explaining why she thought it was important to meet with those plaintiffs litigating their cases (like Mr. Canup) so that she could give her perspective of the litigation having overseen it for 5 years, stating: "Also, as you can see, leadership counsel from the plaintiffs' side is here if you have questions of them." *Id.* at 28:25-29:1.

[3] Plaintiff's counts for Fraud, Failure to Disclose Facts, Fraudulent Inducement, Breach of Fiduciary Duty, Fraud by Non-Disclosure and Civil Conspiracy are simply legal malpractice allegations under attempted different names.

5

Plaintiff's allegations against the Florida Defendants are similarly based upon criticisms of the MDL Settlement terms, the MDL Court's Settlement Implementation Orders (including CMO 57), and most importantly, the Florida Defendants' appearance at the March 13, 2024 status conference and review of Plaintiff's information at the MDL Court's request, and the requirement that Plaintiff comply with the MDL Courts Orders, including MDL Common Benefit Order No. 3, and MDL Pretrial Order No. 9 Stipulated Order Governing Confidentiality and Privilege allowing Plaintiff to access common benefit work product.

## A.    The MDL Settlement

Plaintiff's allegations of there being actionable misconduct by Plaintiff's Leadership in the MDL Settlement structure, terms, and disclosure has potentially broad implications because the MDL Settlement terms apply to all 252,000 of the settled cases in the 3M MDL. After many years of litigation in the MDL, including no less than 16 bellwether trials, the MDL Settlement was brought about under the guidance of the MDL Court, and specifically negotiated under the watchful eyes of the Honorable David Herndon (Ret.), who was the Court-appointed special master, and the Honorable Hope Cannon – the magistrate judge assigned by the MDL Court. Further, it goes without saying that the MDL Court is intimately familiar with the MDL Settlement's terms and has remained active in the administration of the settlement. Given the MDL Court's "familiarity and experience with this litigation" and the potential implications of Plaintiff's allegations to the MDL Settlement, transfer is warranted. *See* JPML Dkt. 2027; 18 U.S.C. 1407.

## B.    CMO 57 and Florida Defendants role in Plaintiff's case

Case Management Order No. 57 outlines the process and procedures for claimants who chose to opt out of the MDL Settlement. *See https://www.uscourts.gov/courts/flnd/3M-*

6

*Case_Management_Order_No_57_Docket_Control_Order_and_Exhibits_1-3.pdf* (last accessed Dec. 10, 2025).  Part of that Court-ordered process includes a required in-person status conference before the MDL Court and a subsequent settlement conference.  The MDL Court requested Florida Defendants, on behalf of Plaintiffs' MDL leadership, to review the specific case facts for those claimants, including Plaintiff, who chose to opt out of the Global Settlement and litigate their cases (Exhibit 3, Status Conference Transcript at 33:19-25).  The MDL Court wanted Florida Defendants to familiarize themselves with the case-specific information to assist those Plaintiffs who were considering whether or not to opt out of the settlement program with the pros and cons of litigating their cases, how the specific facts of their cases would pertain to the litigation generally and how the specific facts of their cases could apply to both parts of the settlement program, the expedited or deferred pay portion, and the extraordinary injury fund (Exhibit 3, Status Conference Transcript at 4:6-12, 5:7-15).  The MDL Court also asked Florida Defendants to attend Plaintiff *Canup*'s Status Conference on March 13, 2024, and to be available if requested during the subsequent settlement conference (Exhibit 3, Status Conference Transcript at 4:20-5:6).  The MDL Court is intimately familiar with CMO 57 and the circumstances surrounding Plaintiff's Status Conference and Settlement Conference and is certainly in the best position to address Plaintiff's allegations involving both (see JPML Dkt. 2027).

**C.     Common Benefit Order No. 3, Pretrial Order No. 9 Stipulated Order Governing Confidentiality and Privilege**

Finally, *Canup* criticizes Florida Defendants for their roles on behalf of MDL Leadership for requiring Plaintiff and his lawyer, David Gamble, to review, execute and comply with Orders of the MDL Court related to common benefit, confidentiality and privilege.  Each of these Orders required a claimant (or his attorney) to execute of documents before access could be granted to

any confidential information or work product generated in the context of the 3M Combat Arms MDL.

*See* https://www.flnd.uscourts.gov/sites/flnd/files/mdl/Pretrial Order No. 9.pdf and https://www.flnd.uscourts.gov/sites/flnd/files/mdl/Common_Benefit_Order_No._3_and_Exhibit_A.pdf (last accessed Dec. 10, 2025). As stated above, the MDL Court is certainly in the best position to determine the rights and requirements of its Orders and address *Canup*'s allegations involving those Orders.

### III.  CONCLUSION

If plaintiffs could challenge MDL Orders or MDL Settlement terms by filing in separate courts throughout the state and federal systems, every adverse order in a nationwide MDL could be sidestepped simply by filing a "malpractice" claim against appointed MDL leadership and asking those courts to "take a different view." Such would defeat the essential purpose of MDL consolidation and undermine nationwide judicial management of the 3M Combat Arms Product Liability Litigation.

The MDL Court specifically retained jurisdiction for circumstances just like this one, recommending termination of the MDL, "subject to this Court's continuing jurisdiction to enforce its Orders, handle any matters related to the settlement, or address any other miscellaneous issues necessary to complete the administration of these cases." The MDL Court further provided it "would welcome the reopening of the MDL docket and transfer of any such action to this Court for further proceedings, given the Court's familiarity and experience with this litigation" (see JPML Dkt. 2027).

Because Plaintiff's claims hinge on attacking or revisiting MDL Orders and the MDL Settlement, the only appropriate forum is the MDL Court. For the reasons discussed above, the panel should grant this Motion and transfer the above-captioned case into the MDL.

Dated: December 10, 2025

/s/ *Bryan F. Aylstock*
Bryan F. Aylstock, Florida Bar No. 782634
AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
17 East Main Street, Suite 200
Pensacola, FL 32502
Phone: (850) 202-1010
Facsimile: (850) 916-7449
Email: baylstock@awkolaw.com

*Plaintiffs' Counsel*

## BEFORE THE UNITED STATES JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | MDL No.: 2885 |
| --- | --- |

## SCHEDULE OF ACTION

| CASE CAPTION | COURT | CIVIL ACTION NO. | JUDGE |
| --- | --- | --- | --- |
| **Plaintiff:** Brandon Canup<br><br>**Defendants:** Bryan F. Aylstock; Bobby Bradford; Michael Burns; Cliff Roberts; Gregory Brown; Aylstock, Witkin, Kreis & Overholtz, PLC; Fleming Nolen & Jez LLP; Mostyn Law Firm PC | N.D. of Texas, Fort Worth Division | 4:25-cv-01255-Y | Judge Terry R. Means |

Dated: December 10, 2025

/s/ *Bryan F. Aylstock*
Bryan F. Aylstock, Florida Bar No. 782634
AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
17 East Main Street, Suite 200
Pensacola, FL 32502
Phone: (850) 202-1010
Facsimile: (850) 916-7449
Email: baylstock@awkolaw.com

*Plaintiffs' Lead Counsel*

# Tab 27

# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| BRANDON CANUP | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **Case No.**: 4:25-cv-01255 |
| | ) | |
| v. | ) | |
| | ) | |
| BRYAN F. AYLSTOCK, BOBBY | ) | |
| BRADFORD, MICHAEL BURNS, | ) | |
| CLIFF ROBERTS, GREGORY | ) | |
| BROWN, AYLSTOCK WITKIN KREIS | ) | |
| & OVERHOLTZ PLC, FLEMING | ) | |
| NOLEN & JEZ LLP and MOSTYN | ) | |
| LAW FIRM PC, | ) | |
| | ) | |
| Defendants. | ) | |

---

## DEFENDANTS BRYAN F. AYLSTOCK, AYLSTOCK, WITKIN, KREISS & OVERHOLTZ PLLC, AND BOBBY BRADFORD'S MOTION TO DISMISS AND INCORPORATED MEMORANDUM OF LAW

---

**COMES NOW**, Defendants, **BRYAN F. AYLSTOCK, AYLSTOCK, WITKIN, KREISS & OVERHOLTZ PLLC,** AND **BOBBY BRADFORD** ("Defendants"), **<u>appearing specially</u>** and file their *Motion to Dismiss* pursuant to Fed. R. Civ. P. Rule 12(b)(2);(3);(6) and in support thereof, state the following:

## INTRODUCTION

Despite being in its infancy, this purported legal malpractice matter already has an interesting history. First, the facts that give rise to this case stem from one of the largest mass torts cases ever handled by the Federal Court system – the 3M earplug litigation – with more than 350,000 individual claimants at its peak. Second, Bryan F. Aylstock, Bobby Bradford and the lawyers at Aylstock, Witkin, Kreis and Overholtz, PLLC, never represented Plaintiff, but rather were appointed as Lead Counsel for the MDL by United States District Judge M. Casey Rodgers on or about May 22, 2019.[1] There can be no dispute that Bryan F. Aylstock, Bobby Bradford and the lawyers at Aylstock, Witkin, Kreis and Overholtz, PLLC's only interactions with Plaintiff were on behalf of MDL Leadership at the request of the MDL Court. Finally, it is clear that Plaintiff's Complaint is really nothing more than a collateral attack on the 3M Combat Arms global settlement, the MDL Court's Orders, including Case Management Order No. 57 wherein Judge Rodgers created a specific framework for those litigants, like this Plaintiff, who opted not to participate in the Settlement Program as outlined in the Master Settlement Agreement, Common Benefit Order No. 3, Pretrial Order No. 9 Stipulated Order Governing Confidentiality and Privilege and the Orders granting withdrawal of Plaintiff's actual

---

[1] See Pretrial Order No. 7, Plaintiff Leadership Appointments, In Re: 3M Combat Arms Product Liability Litigation, Case No. 3:19md2885, United States District Court for the Northern District of Florida, Pensacola Division, May 22, 2019.

2

former counsel, Cliff Roberts, Gregory Brown and Fleming, Nolen & Jez. [2] This

Court should dismiss the case in its entirety.

## **MOTION TO DISMISS**

1.      Aylstock, Witkin, Kreis & Overholtz, P.L.C. is a Florida professional

limited liability company and is located in Pensacola, Florida. [DOCUMENT 1-1, §

2.2].

2.      Its "Principal Address" and "Mailing Address" are 17 East Main Street,

Suite 200, Pensacola, FL 32502. [See Affidavit of Bryan Aylstock attached as

Exhibit "A" to this Motion].

3.      Aylstock, Witkin, Kreis & Overholtz, PLLC does not have any law

offices in Texas, nor do any of its lawyers have a Texas law license. [Id.]

4.      Bryan Frederick Aylstock is a licensed Florida lawyer and a Florida

resident who may be served in Pensacola, Florida. [Id.; See also DOCUMENT 1-1, §

2.5].

5.      Bryan F. Aylstock is listed as a manager whose address is 17 East Main

Street, Pensacola, FL 32502. [Id].

6.      Bobby J. Bradford is a licensed Florida lawyer and a Florida resident

who may be served in Pensacola, Florida. [DOCUMENT 1-1, § 2.6].

---

[2] See Case Management Order No. 57, Case Management Order for Any Ongoing Litigation Against Defendants, In Re: 3M Combat Arms Product Liability Litigation, Case No. 3:19md2885, United States District Court for the Northern District of Florida, Pensacola Division, August 29, 2023.

5232141_1

7.     Both Bryan F. Aylstock and Bobby Bradford are Florida residents and members of Aylstock, Witkin, Kreis and Overholtz, PLLC. [Id].

8.     None of these Defendants have requested or solicited to legally represent the Plaintiff. [Id].

9.     None of these Defendants have represented or made an appearance for the Plaintiff in any Texas court whether it be state or federal. [Id].

10.     This Court can take judicial notice of the docket from Plaintiff's case in the 3M MDL which shows Defendants were never counsel for Plaintiff. Plaintiff's counsel was the "Texas Defendants" from this lawsuit until their withdrawal was granted and then David Gamble.

11.     This Court can take judicial notice of the docket from Plaintiff's case in the 3M MDL which all pleadings filed on Plaintiff's behalf were filed by the "Texas Defendants" from this lawsuit until their withdrawal was granted and then by David Gamble.  All pleadings filed by 3M in Plaintiff's case from the 3M MDL were served on the "Texas Defendants" from this lawsuit until their withdrawal was granted and then David Gamble.  None were filed by on served upon Defendants.

12.     Defendants never spoke to Plaintiff other than at the March 13, 2024 Status Conference and Settlement Conference.

13.     This Court can take judicial notice of the docket from Plaintiff's case in the 3M MDL which shows subsequent mediations, including the mediation

4

5232141_1

wherein Plaintiff voluntarily settled his case against 3M, were attended by Plaintiff's counsel, David Gamble, and not Defendants.

14. This Court can take judicial notice of the docket from Plaintiff's case in the 3M MDL which shows the actual docket entries for the March 13, 2024 Status Conference and Settlement Conference list Defendants as appearing on behalf of 3M Plaintiff's Leadership and David Gamble appearing as Plaintiff's counsel.

15. This Court can take judicial notice of the transcript from the March 13, 2024 Status Conference wherein the MDL Court repeatedly stated Defendants were present on behalf of the 3M MDL Plaintiff's Leadership. The MDL Court requested Defendants' presence at the Status Conference.

16. This Court can take judicial notice of the transcript from the March 13, 2024 Status Conference wherein the MDL Court made it abundantly clear that whether Plaintiff and/or his counsel, David Gamble, chose to meet with Defendants was a voluntary decision.

17. The Plaintiff even categorizes the above entities and individuals as "Florida Defendants" as opposed to the "Texas Defendants." [DOCUMENT 1-1, § 2.10].

18. This Honorable Court can take judicial notice of the cities and counties within the jurisdiction of U.S. District Court for the Northern District of Florida, and Defendants request this Court to do so.

5

5232141_1

19. The Plaintiff admits that the *In re: 3M Combat Arms Earplug Products Liability Litigation*, Cause No. 3:19-md-02885 ("MDL") was litigated in "Northern District of Florida for coordinated pretrial proceedings[.]" [DOCUMENT 1-1, § 5.1].

20. On August 29, 2023, a global settlement agreement ("MSA") was reached "between 3M and Plaintiffs' Leadership in the MDL" in Florida. [DOCUMENT 1-1, § 5.4].

21. Aylstock was appointed by the MDL Court to serve as "Lead Counsel" for the plaintiffs in the MDL, and the MDL Court set forth his duties (which included settlement discussion) in PTO No. 7 referenced above.

22. The Plaintiff admits that he only retained "Texas Defendants Brown, FNJ, and Roberts" and David Gamble ("Mr. Gamble"). [DOCUMENT 1-1, § 5.6]; [DOCUMENT 1-1, § 5.6]. Further, the Plaintiff admits he never hired or retained the Defendants in this case.

23. On January 21, 2024, Canup officially opted out of the MSA which was located in Florida. [DOCUMENT 1-1, § 5.7].

24. "On February 5, 2024 Canup was ordered by the MDL Court to appear "in person, with counsel" at a status conference in Pensacola, Florida scheduled for March 13, 2024." [DOCUMENT 1-1, § 5.9].

25. It is undisputed that the Plaintiff brought his counsel, Mr. Gamble to this MDL Court ordered hearing because he was his retained lawyer.

5232141_1

26.    The Plaintiff's case against the Defendants relates to the MDL Court ordered status conference and settlement conference that took place on March 13, 2024, in Pensacola, Florida, communications between Bradford and Plaintiff's lawyer, David Gamble at the MDL Court's request leading into the March 13, 2024 hearings and limited communications between Bradford and Plaintiff's lawyer, David Gamble, after the March 13, 2024 hearings.

27.    The entirety of Defendants involvement was at the request of the MDL Court on behalf of Plaintiffs' 3M Leadership.

28.    Plaintiff claims the Defendants "made a formal appearance in the MDL Court on Canup's behalf at the March 13, 2024, status conference." [DOCUMENT 1-1, § 5.10].

29.    The sole basis for this claim is a hearing transcript where the official court reporter for the Northern District of Florida in the caption of the transcript described defendants (as well as Gamble) as appearing for the "FOR THE PLAINTIFF." [DOCUMENT 1-1, § 5.10]. However, throughout the official court transcript of the proceeding itself, the MDL Court itself described defendants as appearing only on behalf of leadership, and were there at the request of the MDL Court to answer any questions about the global settlement of the claims within the MDL. [3]

---

[3] The March 13, 2024 Status Conference transcript is attached as Exhibit B.

30.     Plaintiff communicated exclusively through Mr. Gamble, his lawyer, during the court ordered hearing and communications with the Defendants. *See* [DOCUMENT 1-1, § 6.29(b)] ("through Gamble"); [DOCUMENT 1-1, § 6.47] (same); [DOCUMENT 1-1, § 6.50] (same).

31.     Plaintiff claims the Defendants gave him "individual legal advice" at a court ordered closed-door settlement conference (and in the presence of his lawyer Gamble) after the hearing on March 13, 2024. [DOCUMENT 1-1, § 5.11]. It goes without saying that this alleged act, **which did not happen**, occurred in Pensacola, Florida and not Texas.

32.     Because Mr. Gamble was his lawyer, Magistrate Judge Hope Cannon "led" the two to "a closed-door settlement conference." [DOCUMENT 1-1, § 5.11]. It is undisputed that Magistrate Judge Hope Cannon was the one who "conducted" this settlement conference, not the Defendants. [DOCUMENT 1-1, § 5.11].

33.     After the two were in the conference room in the United States District Court for the Northern District of Florida in Pensacola, Florida, "Judge Cannon brought in Aylstock, Bradford[.]" on behalf of Plaintiffs' MDL Leadership [DOCUMENT 1-1, § 5.11] and Exhibit B.

34.     The plain language of the Plaintiff's *Original Petition* proves that the events or omissions giving rise to the Plaintiff's alleged claims against these Defendants occurred in Florida.

8

## INCORPORATED MEMORANDUM OF LAW

## I.  THIS HONORABLE COURT DOES NOT HAVE PERSONAL JURISDICTION OVER THE DEFENDANTS.

The Federal Rules of Civil Procedure allow a defendant to assert a lack of personal jurisdiction as a defense to suit. Fed. R. Civ. P. Rule 12(b)(2). "When a nonresident defendant presents a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing the district court's jurisdiction over the nonresident." *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985). "The court may determine the jurisdictional issue by receiving affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery." *Id.* However, this Honorable Court need not "credit conclusory allegations, even if uncontroverted." *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th Cir. 2001). The U.S. Supreme Court has held that personal jurisdiction "is an essential element of the jurisdiction of a district court, without which it is powerless to proceed to an adjudication." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999). "Personal jurisdiction comes in two flavors: general and specific." *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 323 (5th Cir. 2021).

### 1.  THE PLAINTIFF HAS FAILED TO PROVE GENERAL PERSONAL JURISDICTION.

5232141_1

"A state court may exercise general jurisdiction only when a defendant is "essentially at home" in the State." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021). "General jurisdiction, as its name implies, extends to "any and all claims" brought against a defendant." *Id.* "Those claims need not relate to the forum State or the defendant's activity there; they may concern events and conduct anywhere in the world." *Id.* However, general personal jurisdiction is only permitted when "a defendant has 'continuous and systematic general business contacts' with the forum state" *Luv N' care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984)). These contacts must be "substantial." *Choice Healthcare, Inc. v. Kaiser Found. Health Plan of Colo.*, 615 F.3d 364, 368 (5th Cir. 2010). "A nonresident defendant's contacts must 'demonstrate a business presence in Texas,' and the Fifth Circuit has emphasized the distinction between 'doing business *with* Texas ... [and] doing business in Texas.' " *Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Georgia, Inc.*, 995 F. Supp. 2d 587, 616 (N.D. Tex. 2014) (quoting *Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 717 (5th Cir. 1999)) (emphasis in the original)

In other words, "[a] corporation is a citizen of both its state of incorporation and the state in which it has its principal place of business." *Harris v. Black Clawson Co.*, 961 F.2d 547, 549 (5th Cir. 1992). "This circuit applies the 'total activity' test

to determine a corporation's principal place of business for diversity purposes." *Id.*

"This test includes both of the traditional tests for determining principal place of

business: the 'nerve center' test and the 'place of activities' test." *Id.* Under the "total

activity" test, the court considers

> the general rules of the two tests in light of the particular circumstances of a corporation's organization [and] balance[s] the facts [of the particular case before it] to determine ... the location of the corporation's principal place of business.

*Id.*

> [U]nder the "nerve center" test, the state in which the corporation has its nerve center, or "brain," is its principal place of business, and under the "place of activity" test, the state in which the corporation carries out its operations is its principal place of business.

*J.A. Olson Co. v. City of Winona, Miss.*, 818 F.2d 401, 404 (5th Cir. 1987).

This determination is important because "every corporation has one and only

one principal place of business." J.*A. Olson Co.*, 818 F.2d at 406. It is undisputed

that Aylstock, Witkin, Kreis & Overholtz, PLLC is registered with the Florida

Division of Corporations. Its "Principal Address" and "Mailing Address" are 17 East

Main Street, Suite 200, Pensacola, FL 32502. Aylstock, Witkin, Kreis & Overholtz,

PLLC does not have any law offices in Texas, nor do any of its lawyers have a

11

licensed Texas attorney.[4] Further, Bryan F. Aylstock is listed as a manager whose address is 17 East Main Street, Pensacola, FL 32502. Both Bryan F. Aylstock and Bobby Bradford are Florida residents. Clearly, all Defendants are Florida residents or are at home in Florida; thus, dismissal is proper. The Plaintiff has failed to prove, let alone plead necessary facts to satisfy this "high bar." *Johnson*, 21 F.4th at 323.

### 2. THE PLAINTIFF HAS FAILED TO SATISFY SPECIFIC PERSONAL JURISDICTION.

"A federal court may satisfy the constitutional requirements for specific jurisdiction by a showing that the defendant has 'minimum contacts' with the forum state such that imposing a judgment would not 'offend traditional notions of fair play and substantial justice.' " *Luv N' care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006) (quoting *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945)). "Because the Texas long-arm statute extends to the limits of federal due process, the two-step inquiry collapses into one federal due process analysis." *Sangha v. Navig8 ShipManagement Priv. Ltd.*, 882 F.3d 96, 101, 109 (5th Cir. 2018).

The Fifth Circuit has "consolidated the personal jurisdiction inquiry into a convenient three-step analysis: '(1) whether the defendant ... purposely directed its

---

[4] *See Anness v. Gen. Elec. Co.*, 2014 WL 12580494, at \*3 n.2 (N.D. Tex. June 5, 2014) (quoting *Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Georgia, Inc.*, 995 F. Supp. 2d 587, 617 (N.D. Tex. 2014)) (noting facts that typically support general jurisdiction include "maintaining offices or property in Texas, stationing employees in Texas, maintaining bank accounts in Texas, or paying Texas taxes.").

5232141_1

activities toward the forum state or purposely availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable.' " *Luv N' care, Ltd.*, 438 F.3d at 469. In other words, "specific jurisdiction is confined to adjudication of "issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). This principle means "the defendant's suit-related conduct must create a substantial connection with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014). As a result, any acts or contacts allegedly committed by the Defendants not related to the Plaintiff's claims against the Defendants must be ignored.

### 3. Dismissal is Proper Because General and Specific Personal Jurisdiction is Lacking.

Equipped only with conclusory allegations, the Plaintiff makes the claim that Defendants somehow are subject to personal jurisdiction in Texas, yet his own *Original Petition* proves otherwise. In simple terms, the Plaintiff states personal jurisdiction exists because of the following reasons. **First**, Plaintiff states that the Defendants "have purposefully directed activities toward Texas" [DOCUMENT 1-1, § 3.2] but without any explanation as to what activities those were. Without some

5232141_1

particular legal activity that Defendants allegedly performed in Texas, Plaintiff's claim that Defendants are subject to personal jurisdiction must fail.

**Second**, Plaintiff states that Defendants "provid[ed] legal services to a Texas resident" and "appear[ed] and purport[ed] to act on behalf of a Texas resident in litigation proceedings connected to Texas[.]"[DOCUMENT 1-1, § 3.2]. This statement directly conflicts with the Plaintiff's own *Original Petition*. Within his *Original Petition*, the Plaintiff alleges that the Defendants made an appearance in Pensacola, Florida on **March 13, 2024**, not in Texas [DOCUMENT 1-1, § 6.28]. Plaintiff's status as a Texas resident is not determinative of jurisdiction over these Defendants. See generally, *Walden v. Fiore*, 571 U.S. 277, 285 (2014).

**Third**, Plaintiff states that Defendants "performed common benefit work in the underlying litigation entitling them to collect fees from thousands of Texas Residents[.]" [DOCUMENT 1-1, § 3.2].   At no point does Plaintiff allege that this common benefit work was performed in Texas, that he was charged for any common benefit work, nor that Defendants received any compensation as part of Plaintiff's case.  Nothing about performing this common benefit work could or should subject them to Texas jurisdiction as the Defendants were obligated to do so based upon their appointment as Lead Plaintiffs' Counsel in the 3M MDL.

**Fourth**, Plaintiff makes the blanket assertion that the Defendants "have purposefully availed themselves of the privileges and benefits of conducting

14

business in Texas[.]" [DOCUMENT 1-1, § 3.2]. However, Defendant does not have a single office in Texas, a single lawyer licensed in Texas, and did not litigate the MDL lawsuit in Texas, so Defendants have not received "the privileges and benefits of conducting business in Texas[.]" [DOCUMENT 1-1, § 3.2].

Notably, Fifth Circuit case law and precedent disagree with the Plaintiff's conclusory statement. The Plaintiff equates attempting to increase a class size for a lawsuit through national advertising with purposely availing itself to personal jurisdiction in each of the fifty states of the United States. "[A]dvertising in national publications is not in itself sufficient to subject a defendant to personal jurisdiction." *Singletary v. B.R.X., Inc.*, 828 F.2d 1135, 1136 (5th Cir. 1987).

> Nor is Plaintiffs' allegation that Defendants Original and MTV broadcast or displayed Plaintiffs' designs sufficient to prove purposeful availment in Texas. In a similar case, the Fifth Circuit declined to exercise personal jurisdiction over a non-resident defendant on the basis of a nationwide television broadcast. The court reached its decision after concluding that even though the defendant had broadcast a television segment nationally, Texas had not been its "focal point."

*Miller v. Original Media Publ'g LLC*, 2013 WL 12109027, at *3 (W.D. Tex. Sept. 13, 2013) (citation omitted).

15

5232141_1

"Advertising and marketing through national media is insufficient, as are isolated visits to a forum." *Jackson v. Tanfoglio Giuseppe, S.R.L.*, 615 F.3d 579, 584 (5th Cir. 2010).[5]

Plaintiff has not provided a scintilla of evidence that these Defendants are subject to the jurisdiction of the Texas courts. The legal services provided by these Defendants were as Lead Plaintiffs' Counsel for the 3M MDL litigaiton, were provided by Florida lawyers and the only interaction that these Defendants ever had with Plaintiff were after the MDL Court asked Defendants to appear on behalf of Plaintiffs' Leadership at the March 13, 2024 conferences. As a result, dismissal is proper.

## II. TEXAS IS THE IMPROPER VENUE FOR PLAINTIFF'S CLAIMS.

Under Rule 12(b)(3), a party may move to dismiss or transfer a claim for improper venue. Fed. R. Civ. P. Rule 12(b)(3). "If venue is improper, the Court has broad discretion to dismiss the case or, in the interest of justice, transfer the case to any district where venue is proper." *Galderma Lab'ys, L.P. v. Teva Pharms. USA, Inc.*, 290 F. Supp. 3d 599, 606 (N.D. Tex. 2017). "This Court, in particular, has consistently held that the plaintiff bears the burden of sustaining venue in the district in which the suit was brought." *Id.* "Moreover, under both Rule 12(b)(1) and Rule

---

[5] *See, e.g., Quick Techs., Inc. v. Sage Grp. PLC*, 313 F.3d 338, 345 (5th Cir. 2002) ("[A]dvertisements are insufficient to establish personal jurisdiction."); *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 481 F.3d 309, 312 (5th Cir. 2007) ("An exchange of communications in the course of developing and carrying out a contract also does not, by itself, constitute the required purposeful availment of the benefits and protections of Texas law.").

5232141_1

12(b)(3), the court is permitted to look at evidence in the record beyond simply those facts alleged in the complaint and its proper attachments." *Ginter ex rel. Ballard v. Belcher, Prendergast & Laporte*, 536 F.3d 439, 441 (5th Cir. 2008). "[T]he court may find a plausible set of facts by considering any of the following: (1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ambraco, Inc. v. Bossclip B.V.*, 570 F.3d 233, 238 (5th Cir. 2009). The Plaintiff has failed to meet this burden for the reasons stated in this motion and the case should be dismissed as to these Defendants.

## III.    THE PLAINTIFF HAS FAILED TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

The Plaintiff has raised four claims against the Defendants which are (1) "Fraud by Non-Disclosure," (2) "Breach of Fiduciary Duty," (3) "Fraudulent Inducement," and (4) "Civil Conspiracy." [DOCUMENT 1-1, §§6.27-6.55; 6.56-6.66]. Notably, the Plaintiff's "Civil Conspiracy" is not a standalone tort; thus, it is dependent on the success of the other claims. "In Texas, 'civil conspiracy is a theory of vicarious liability and not an independent tort.'" *Curtis v. Cerner Corp.*, 621 B.R. 141, 181 (S.D. Tex. 2020) (quoting *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 142 (Tex. 2019)). As a result, we will address each claim with this information in mind.

17

5232141_1

### 1. THE PLAINTIFF HAS FAILED TO PLEAD A VALID CLAIM FOR BREACH OF FIDUCIARY DUTY.

The Plaintiff states that this alleged breach was "fraudulent and/or malicious;" thus, the heightened pleading standard of Federal Rule of Civil Procedure Rule 9 applies. [DOCUMENT 1-1, § 6.45]. "The elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship must exist between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant." *D'Onofrio v. Vacation Publications, Inc.*, 888 F.3d 197, 215 (5th Cir. 2018). The Plaintiff cannot even prove the first element of this alleged claim. "A fiduciary relationship, of course, is a *sine qua non* of a breach of fiduciary duty claim." *Belliveau v. Barco, Inc.*, 987 F.3d 122, 132 (5th Cir. 2021). "Whether a fiduciary duty exists is a question of law." *Kiger v. Balestri*, 376 S.W.3d 287, 290 (Tex. App. 2012). "However, an attorney-client relationship must exist before a fiduciary duty arises." *Id.* "The existence of an attorney-client relationship is determined under state law." *Harrison v. United States*, 2019 WL 3719038, at *5 (N.D. Tex. June 28, 2019), *aff'd*, 2022 WL 873829 (5th Cir. Mar. 24, 2022) (quoting *Hopper v. Frank*, 16 F.3d 92, 95 (5th Cir. 1994)).

As outlined within, the Defendants were lead counsel for all Plaintiffs of the MDL, whereas Mr. Gamble represented the Plaintiff specifically. Despite admitting he withdrew from the [global settlement agreement ("MSA")] on **January 21, 2024,**

18

5232141_1

the Plaintiff claims the Defendants were his lawyer at the court ordered status conference on **March 13, 2024,** when he was told to bring the counsel of his choice. [DOCUMENT 1-1, § 5.7]. If he genuinely believed the Defendants to be his lawyers, the Plaintiff would not have communicated through Mr. Gamble, his lawyer. *See* [DOCUMENT 1-1, § 6.29(b)] ("through Gamble"); [DOCUMENT 1-1, § 6.47] (same); [DOCUMENT 1-1, § 6.50] (same). The objective facts prove that the Defendant did not have or breach a fiduciary duty to the Plaintiff.

The Fifth Circuit has held that a federal court must "examine the parties' statements and action under an objective standard rather than their subjective beliefs." *Harrison v. United States*, 2019 WL 3719038, at *6 (N.D. Tex. June 28, 2019), *aff'd*, 2022 WL 873829 (5th Cir. Mar. 24, 2022) (quoting *Tierra Tech de Mexico SA de CV v. Purvis Equip. Corp.*, 2016 WL 4062070, at *2 (N.D. Tex. July 29, 2016)). "Evidence that a client harbored a mistaken, subjective belief of a formed relationship is insufficient, standing alone, to establish that the attorney had a duty to represent the client: there 'must be some manifestation that both parties intended to create' the relationship." *King v. Lubbock ISD*, 2024 WL 3527965, at *7 (N.D. Tex. July 8, 2024) (quoting *Border Demolition & Env't, Inc. v. Pineda*, 535 S.W.3d 140, 152 (Tex. App. 2017). Viewing the facts objectively, it is clear that these Defendants were not Plaintiff's counsel and had no fiduciary relationship to Plaintiff. As a result, dismissal is proper.

19

## 2. THE PLAINTIFF HAS FAILED TO PLEAD A VALID CLAIM FOR FRAUDULENT INDUCEMENT.

"A dismissal for failure to plead fraud with particularity under Rule 9(b) is treated as a dismissal for failure to state a claim under Rule 12(b)(6)." *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 901 (5th Cir. 1997). The elements of fraudulent inducement are as follows:

> (1) a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the representation was made with the intention that it be acted upon by the other party; (5) *the party acted in reliance on ... the representation*; and (6) the party suffered injury.

*Fisk Elec. Co. v. DQSI, L.L.C.*, 894 F.3d 645, 651 (5th Cir. 2018) (emphasis in the original).

The crux of the Plaintiff's argument is that he never received "full access to the MDL's common benefit work, including the master complaint and other litigation materials." [DOCUMENT 1-1, § 6.47]. Plaintiff merely pleads that the Defendants failed to provide this information and somehow that means the Defendants have committed a fraud. This proposition is not legally permissible. "Failure to perform, standing alone, is no evidence of the promissor's intent not to perform when the promise was made." *Partners & Friends Holding Corp. v. Cottonwood Mins. L.L.C.*, 653 F. Supp. 3d 344, 350 (N.D. Tex. 2023), *aff'd*, 2023

20

5232141_1

WL 8649880 (5th Cir. Dec. 14, 2023) (quoting *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986)). "Plaintiff's allegation that Defendant broke the alleged promise, alone, cannot support the inference that Defendant made the promise with no intent to keep it." *Balch v. JP Morgan Chase Bank, NA*, 2015 WL 1592386, at *4 (N.D. Tex. Apr. 8, 2015). This principle should be applied to a motion to dismiss. *See Wesdem, L.L.C. v. Illinois Tool Works, Inc.*, 70 F.4th 285 (5th Cir. 2023) (citing *Shandong Yinguang Chem. Indus. Joint Stock Co. v. Potter*, 607 F.3d 1029, 1033 (5th Cir. 2010)) (applying the guidance of *Spoljaric* at the 12(b)(6) stage). These Defendants were obligated under Court order to provide the common benefit information to those who either stayed in the settlement group or to counsel who appeared for those opting out of the settlement group after those lawyers consented to the Stipulated Order Governing Confidentiality and Privilege. [Pretrial Order No. 9 from the 3M MDL litigation, Doc. 442 in Case 3:19-md-2885]. Plaintiff's allegations are silent as to his effort or lack thereof to obtain the common benefit work.  Additionally, Plaintiff admittedly voluntarily settled his case with 3M eliminating any injury causation.  For the reasons above, dismissal is proper.

### 3. THE PLAINTIFF HAS FAILED TO PLEAD A VALID CLAIM FOR FRAUD BY NON-DISCLOSURE.

"A dismissal for failure to plead fraud with particularity under Rule 9(b) is treated as a dismissal for failure to state a claim under Rule 12(b)(6)." *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 901 (5th Cir. 1997).

21

5232141_1

"[F]or there to be actionable nondisclosure fraud, there **must** be a duty to disclose," which arises "when there is a fiduciary relationship." *Belliveau v. Barco, Inc.*, 987 F.3d 122, 132 (5th Cir. 2021) (emphasis added). "Whether such a duty to disclose exists in this case is 'entirely a question of law.'" *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 481 (5th Cir. 2000). "In general, there is no duty to disclose without evidence of a confidential or fiduciary relationship." *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 220 (Tex. 2019). "Texas law recognizes a duty to disclose only where a fiduciary or confidential relationship exists." *Bay Colony, Ltd. v. Trendmaker, Inc.*, 121 F.3d 998, 1004 (5th Cir. 1997).

> A fiduciary duty arises "as a matter of law in certain formal relationships, including attorney-client, partnership, and trustee relationships." A confidential relationship is one in which the "parties have dealt with each other in such a manner for a long period of time that one party is justified in expecting the other to act in its best interest."

*Id.* (citations omitted).

"Texas law does not recognize a fiduciary relationship lightly, especially in the commercial context." *Belliveau v. Barco, Inc.*, 987 F.3d 122, 133 (5th Cir. 2021) (quoting *Jacked Up, L.L.C. v. Sara Lee Corp.*, 854 F.3d 797, 809 (5th Cir. 2017)). "Due to its extraordinary nature, the law does not recognize a fiduciary relationship lightly." *Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App. 2008). It is well settled that "not every relationship involving a high degree of trust and confidence rises to the stature of a fiduciary relationship." *Schlumberger Tech. Corp. v. Swanson*, 959

22

5232141_1

S.W.2d 171, 176-77 (Tex. 1997). In this case, no relationship exists, let alone a fiduciary one.

To support his claim that the Defendants acted as his lawyer on **March 13, 2024**, the Plaintiff points to a hearing transcript that states the Defendants were "For the Plaintiff." [DOCUMENT 1-1, § 5.11]. The Plaintiff claims that this "created **at least** an implied and **arguably** an express attorney client relationship with Canup." [DOCUMENT 1-1, § 6.39]. Dismissal is proper on this Count.

Plaintiff admits he hired and brought Mr. Gamble to Pensacola, Florida, to represent him at the **March 13, 2024,** hearing. Plaintiff's argument is not only contradictory but also illogical. He states he "officially opted out of the [global settlement agreement ("MSA")]" on **January 21, 2024**. [DOCUMENT 1-1, § 5.7]. The Plaintiff admits he even hired Mr. Gamble, so he could litigate his claim outside of the MSA. [DOCUMENT 1-1, § 5.6]. To permit him to do so, the MDL Court ordered that he appear in person in Pensacola, Florida, "with counsel[.]" [DOCUMENT 1-1, § 5.9]. As Mr. Gamble is/was his lawyer, the Plaintiff brought Mr. Gamble, his retained lawyer.

Despite being fully aware of this legal representation by Mr. Gamble, the Plaintiff now claims the Defendants were his lawyers, even though Mr. Gamble was present during the hearing and settlement conference. Because Mr. Gamble was his lawyer, Magistrate Judge Hope Cannon "led" the two (Plaintiff and Gamble) to "a

23

5232141_1

closed-door settlement conference." [DOCUMENT 1-1, § 5.11]. It is undisputed that Magistrate Judge Hope Cannon was the one who "conducted" this settlement conference, not the Defendants. [DOCUMENT 1-1, § 5.11]. After the two were in the conference room in Pensacola, Florida, "Judge Cannon brought in Aylstock, Bradford[.]" [DOCUMENT 1-1, § 5.11].

Additionally, this Court can take judicial notice of the docket from Plaintiff's case in the 3M MDL and the transcript of the March 13, 2024 Status Conference in considering Defendants' Motion to Dismiss. The docket from Plaintiff's case and the transcript from the March 13, 2024 Status conference requires dismissal of this Count.  The docket shows the following:  1) all pleadings filed on Plaintiff's behalf were filed by the "Texas Defendants" from this lawsuit until their withdrawal was granted and then by David Gamble.  All pleadings filed by 3M in Plaintiff's case from the 3M MDL were served on the "Texas Defendants" from this lawsuit until their withdrawal was granted and then David Gamble.  None were filed by on served upon Defendants; 2) Mediations after the March 13, 2024 settlement conference, including the mediation wherein Plaintiff voluntarily settled his case against 3M, were attended by Plaintiff's counsel, David Gamble, and not Defendants and 3) the actual docket entries for the March 13, 2024 Status Conference and Settlement Conference list Defendants as appearing on behalf of 3M Plaintiff's Leadership and David Gamble appearing as Plaintiff's counsel.  The transcript of the March 13, 2024

24

Status Conference shows: 1) The MDL Court repeatedly stated Defendants were present on behalf of the 3M MDL Plaintiff's Leadership and that the MDL Court requested Defendants' presence at the Status Conference and 2) the MDL Court made it abundantly clear that whether Plaintiff and/or his counsel, David Gamble, chose to meet with Defendants was a voluntary decision.[6]

In addition to proving a duty to disclose, the Plaintiff must also prove the elements for this claim. To establish fraud by non-disclosure under Texas law, a plaintiff must prove:

> (1) the defendant deliberately failed to disclose material facts; (2) the defendant had a duty to disclose such facts to the plaintiff; (3) the plaintiff was ignorant of the facts and did not have an equal opportunity to discover them; (4) the defendant intended the plaintiff to act or refrain from acting based on the nondisclosure; and (5) the plaintiff relied on the nondisclosure, which resulted in injury.

*CBE Grp., Inc. v. Lexington L. Firm*, 993 F.3d 346, 353 (5th Cir. 2021). Plaintiff has failed to establish each of the above elements; thus, dismissal is proper.

---

[6] The status conference began with the Court welcoming Mr. Canup and his attorney Mr. Gamble, introducing herself, and then telling Mr. Canup: "Also in the courtroom today from plaintiffs' leadership there's Mr. Bryan Aylstock, Mr. Brad Bradford and Mr. Mike Burns." Exhibit B, Status Conference Transcript at 3:8-9. The MDL Court continued by explaining why she thought it was important to meet with those plaintiffs litigating their cases (like Mr. Canup) so that she could give her perspective of the litigation having overseen it for 5 years, stating: "Also, as you can see, leadership counsel from the plaintiffs' side is here if you have questions of them." *Id.* at 4:23-25. The MDL Court continued by explaining why she thought it was important to meet with those plaintiffs litigating their cases (like Mr. Canup) so that she could give her perspective of the litigation having overseen it for 5 years, stating: "Also, as you can see, leadership counsel from the plaintiffs' side is here if you have questions of them." *Id.* at 28:25-29:1. The MDL Court further said: " … If you would like an opportunity, you or Mr. Gamble, to talk with leadership counsel about some of what I've said about the settlement program, some of the more nuanced aspects of the settlement program, that's going to be available to you as an opportunity, if you'd like …". *Id.* at 33:19-23.

25

Additionally, the Defendants cannot have breached any fiduciary duty or confidentiality by discussing the Plaintiff's medical records in a court-ordered settlement conference. [DOCUMENT 1-1, § 5.11]. As a result, the Plaintiff's *Original Petition* is devoid of any facts supporting his claim; thus, dismissal is proper.

### 4. CIVIL CONSPIRACY.

Defendants adopt the argument from the Texas Defendants' Motion to Dismiss. [See Doc. 10, Page 10, FNJ Defendants' Motion to Dismiss filed on December 1, 2025.]

## IV. THE PLAINTIFF'S CLAIMS ARE BARRED BY THE ATTORNEY IMMUNITY DEFENSE.

"[A]ttorneys are immune from civil liability to non-clients 'for actions taken in connection with representing a client in litigation.' " *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015). "This principle is also described as the 'attorney immunity doctrine.'" *Jurek v. Kivell*, 2011 WL 1587375, at *4 n.3 (Tex. App. Apr. 21, 2011). "[A]n attorney owes no professional duty to a third party or non-client." *Banc One Cap. Partners Corp. v. Kneipper*, 67 F.3d 1187, 1198 (5th Cir. 1995). This principle is "staunchly" protected. *Rainey v. Manufacturers & Traders Tr. Co.*, 2024 WL 3378406, at *2 (S.D. Tex. July 10, 2024). "Therefore, an attorney is not ordinarily liable to a third party for damages resulting from performance of professional services." *F.D.I.C. v. Howse*, 802 F. Supp. 1554, 1564 (S.D. Tex. 1992). "This is true even under circumstances where the attorney renders an opinion to his

client on which he knows a third party will rely." *Marshall v. Quinn-L Equities, Inc.*,

704 F. Supp. 1384, 1395 (N.D. Tex. 1988).

> Attorney immunity applies to all "actions taken in connection with representing a client in litigation," even wrongful conduct that is "part of the discharge of the lawyer's duties in representing his or her client," as long as it is not "entirely foreign to the duties of an attorney." For this analysis, the Supreme Court of Texas has repeatedly instructed courts to simply look to the general kind of conduct at issue and whether attorneys engage in that kind of conduct when discharging duties to a client.

*Ironshore Eur. DAC v. Schiff Hardin, L.L.P.*, 912 F.3d 759, 767 (5th Cir. 2019).[7]

"Incorrect, meritless, and even frivolous conduct is not actionable if it satisfies

this standard." *John Kleas Co. Inc. v. Prokop*, 2015 WL 1544797, at *6 (Tex. App.

Apr. 2, 2015).

> An attorney's duties that arise from the attorney-client relationship are owed only to the client, not to third persons, such as adverse parties. They have not retained the attorney and the attorney has not rendered them any services. No privity of contract exists between them and the attorney. They have no right of action against the attorney for any injuries they suffer because of the attorney's fault in performing duties owed only to the client.

*Renfroe v. Jones & Assocs.*, 947 S.W.2d 285, 287 (Tex. App. 1997).

---

[7] *See also Green v. JPMorgan Chase Bank, N.A.*, 2012 WL 12823700, at *9 (N.D. Tex. Aug. 30, 2012) ("This qualified immunity generally applies even if conduct is wrongful in the context of the underlying lawsuit.").

27

5232141_1

The Plaintiff attempts to make this court ordered hearing and settlement the focus of his claim; yet, federal law does not agree with the Plaintiff. "Whether an attorney's conduct was in the scope of his representation of a client is a legal question." *Ironshore Eur. DAC v. Schiff Hardin, L.L.P.*, 912 F.3d 759, 767 (5th Cir. 2019). "Merely labeling an attorney's conduct 'fraudulent' does not and should not remove it from the scope of client representation or render it 'foreign to the duties of an attorney.' " *Highland Cap. Mgmt., LP v. Looper Reed & McGraw, P.C.*, 2016 WL 164528, at *4 (Tex. App. Jan. 14, 2016). "In *Banc One*, we held as a matter of law that neither an expressed nor implied attorney-client relationship existed based on a single letter addressed to plaintiffs and purporting to give an opinion solely for their benefit." *First Nat. Bank of Durant v. Trans Terra Corp. Int'l*, 142 F.3d 802, 807 (5th Cir. 1998) (citing *Kneipper*, 67 F.3d at 1198)). In other words, "[s]olicitation of information alone is not sufficient to establish an implied attorney-client relationship." *Swinford v. Coil Tubing Tech., Inc.*, 2022 WL 2327959, at *2 (S.D. Tex. June 16, 2022). "A contrary policy 'would dilute the vigor with which Texas attorneys represent their clients' and "would not be in the best interests of justice.' " *Renfroe v. Jones & Assocs.*, 947 S.W.2d 285, 288 (Tex. App. 1997). The undisputed facts prove the Defendants were present at this court ordered hearing and settlement to represent the interest 3M Plaintiffs' Leadership. For the reason above, the Plaintiff

28

should not be permitted to recover "under any theory of recovery." *Reagan Nat. Advert. of Austin, Inc. v. Hazen*, 2008 WL 2938823, at \*2 (Tex. App. July 29, 2008).

## V. MANY OF THE PLAINTIFF'S CLAIMED DAMAGES ARE NOT RECOVERABLE AND SHOULD BE DISMISSED.

In Subsection VII and XI, entitled "Damages" and "Prayer" respectively, requests a hodge-podge of damages, many of which are not recoverable, are nonsensical, or are otherwise improperly pleaded. [DOCUMENT 1-1, § 7.1-7.6]; [DOCUMENT 1-1, § 11.1-11.2].

### 1. "DAMAGES" AND "PRAYER" DAMAGES.

#### a. "Damages"

##### i. "Actual Damages"

"[C]ompensatory damages and actual damages mean the same thing." *F.A.A. v. Cooper*, 566 U.S. 284, 299 (2012). Under the guise of labeling them as "Actual Damages," the Plaintiff seeks attorney fees and litigation costs as well as expenses which are not permitted. [DOCUMENT 1-1, § 7.2(a)-(d)]. "Under Texas law, [attorney's fees or other legal costs] are not damages." *Satterfield & Pontikes Constr., Inc. v. United States Fire Ins. Co.*, 898 F.3d 574, 576 n.2 (5th Cir. 2018). In other words, "attorney's fees and litigation expenses may not be recovered unless provided for by statute or by contract between the parties." *Great Am. Ins. Co. v. AFS/IBEX Fin. Servs., Inc.*, 612 F.3d 800, 807 (5th Cir. 2010). Because the Plaintiff fails to cite a contractual provision or statute awarding such damages, dismissal is proper.

29

### ii.  "Inconvenience Damages"

While labeled "Inconvenience Damages," the Plaintiff is essentially seeking money to conduct legal research and prepare his legal arguments, which are not recoverable. [DOCUMENT 1-1, § 7.3]. "[A] pro se litigant who is not a lawyer is not entitled to attorney's fees." *Kay v. Ehrler*, 499 U.S. 432, 435 (1991). Further, the Plaintiff's alleged "loss of time, disruption, and inconvenience" is not recoverable. "Under Texas law, fees and expenses incurred while prosecuting or defending a suit are not recoverable unless recovery is authorized by statute or contract." *Altholz v. Citimortgage, Inc.*, 2012 WL 12886979, at *11 (N.D. Tex. Dec. 13, 2012). "[I]t is settled that time lost is an expense of litigation for which recovery is not allowed." *Beasley v. Peters*, 870 S.W.2d 191, 196 (Tex. App. 1994). The Plaintiff has failed to cite to any contract, statute, or case law that he is entitled to this alleged damage; thus, dismissal is proper.

### iii.  "Exemplary Damages"

Evidence justifying exemplary damages has not been proven or shown. [DOCUMENT 1-1, § 6.37]. "Texas law provides that an award for exemplary damages is justified only upon proving fraud, malice, or gross negligence by **clear and convincing evidence**." *In re Advanced Modular Power Sys., Inc.*, 413 B.R. 643, 683 (Bankr. S.D. Tex. 2009), *aff'd sub nom. Hsu v. West*, 2009 WL 7760300 (S.D. Tex. Dec. 30, 2009) (citing Tex. Civ. Prac. & Rem. Code

5232141_1

Ann. § 41.003)) (emphasis added). The Plaintiff has not pleaded this standard; thus, dismissal is proper.

### iv. "Disgorgement"

The Plaintiff cannot have his cake and eat it too. He desires the documents discussed above and still wants the fees returned, while still stating fraud has occurred. This demand is not legally permitted; thus, dismissal is proper.

### v. "Interest and Costs"

As discussed above, the Plaintiff is not entitled to "litigation expenses;" thus, they should be dismissed.

### b. "Prayer"

### i. "Special" Damages.

The Plaintiff is seeking "special" damages; yet, fails to properly plead them. [DOCUMENT 1-1, § 11.2]. "If an item of special damage is claimed, it **must** be **specifically** stated." Fed. R. Civ. P. Rule 9(g) (emphasis added). As a result, dismissal is proper.

### REQUEST FOR RELIEF

For all the reasons above, dismissal of the Complaint is proper as the Plaintiff has failed to state a cause of action for which relief may be granted.

5232141_1

**Dated**:  January 12, 2026.

Respectfully Submitted,

/s/ Gregory K. Rettig
Gregory K. Rettig (172774)
Justin T. Keeton (1025509)
*Co-Counsel for Defendants Bryan F.*
*Aylstock, Bobby Bradford and Aylstock,*
*Witkin, Kreiss & Overholtz PLLC*

**FOR THE FIRM:**
**LLOYD, GRAY, WHITEHEAD & MONROE, P.C.**
125 W. Romana Street, Suite 330
Pensacola, Florida 32502
Telephone: (850) 777-3322
Facsimile: (850) 777-3290
Grettig@lgwmlaw.com
Jkeeton@lgwmlaw.com
Bgomez@lgwmlaw.com
Rsizemore@lgwmlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on or about January 12, 2026, a true and correct

copy of the foregoing was sent to counsel for all parties via email, US Mail and the

CM/ECF service.

Brandon Canup
4812 Hidden Oaks Ln
Arlington, TX 76017
*Pro Se Plaintiff*

/s/ Gregory K. Rettig
*Co-Counsel for Defendants Bryan F. Aylstock, and*
*Aylstock, Witkin, Kreiss & Overholtz PLLC*

32

5232141_1

# Tab 27-1

---

## AFFIDAVIT OF BRYAN F. AYLSTOCK

---

**STATE OF FLORIDA**　　　　　）

**COUNTY OF ESCAMBIA**　　　　）

Before me, the undersigned, a Notary Public in and for the aforesaid county and state, personally appeared Bryan F. Aylstock who, being by me first duly sworn, deposes and states as follows:

1.　My name is Bryan F. Alystock, and I am over the age of eighteen (18) years. I reside in Santa Rosa County, Florida. I have personal knowledge of the facts contained in this Affidavit.

2.　I am the Founding Partner at Aylstock, Witkin, Kreiss & Overholtz PLLC ("AWKO"). The vast majority of my legal career has been focused on the representation of individuals injured as a result of defective pharmaceutical drugs and medical devices. My efforts, dedication and commitment to such causes have resulted in my appointment to several leadership positions in nationwide multi-district litigations ("MDLs").

3.　Because of that experience, I was appointed Plaintiffs' Lead Counsel in the *In Re: 3M Combat Arms Earplug Products Liability Litigation ("3M MDL")*.

4.　Plaintiff in the instant matter, Brandon Canup, filed a lawsuit alleging legal malpractice and other related theories based upon my leadership position in the 3M MDL. Mr. Canup also sued AWKO partner Bobby Bradford and AWKO under the same allegations. Mr. Canup's lawsuit was initially filed in Texas state

court but was then removed to the Northern District of Texas by other Defendants in this matter.

5. AWKO is a Florida professional limited liability corporation located in Pensacola, Florida. Both the principal and mailing addresses for AWKO are 17 East Main Street, Suite 200, Pensacola, Florida 32502.

6. Aylstock, Witkin, Kreis & Overholtz, PLLC does not have any law offices in Texas, nor do any of its lawyers have a Texas law license.

7. I am a licensed Florida lawyer and a resident of the state of Florida.

8. In my capacity as manager of AWKO, my service address is listed as 17 East Main Street, Pensacola, Florida 32502.

9. My partner, Bobby Bradford, is similarly a licensed Florida lawyer and a resident of the state of Florida.

10. Neither myself, Mr. Bradford or AWKO were ever requested or solicited to legally represent Mr. Canup and never did legally represent Mr. Canup. In fact, at all times material to this matter, Mr. Canup appeared with his own counsel, David Gamble.

11. The only interaction that I ever had with Mr. Canup was at a hearing in Pensacola, Florida convened by Judge Casey Rogers on March 13, 2204 where Mr. Bradford and I were requested by Judge Rodgers to appear on behalf of Plaintiffs' 3M MDL leadership to discuss the status of and possibility of settlement of certain parties who were opting out of the master settlement agreement including Mr. Canup.

2

5231496_1

12.    Mr. Bradford communicated with Mr. Canup's counsel, Mr. Gamble, on behalf of Plaintiffs' 3M MDL leadership at the MDL Court's request in advance of the March 13, 2024 hearing.

13.    Neither myself, Mr. Bradford, or AWKO ever appeared as counsel for Mr. Canup in state or federal court in Texas and have not otherwise availed ourselves of the courts in Texas so as to be subject to the jurisdiction of those courts.

**Further the Affiant saith not:**

Given under my hand, this the 12th day of January, 2026.

_____
BRYAN F. AYLSTOCK

**STATE OF FLORIDA**    )

**COUNTY OF ESCAMBIA**    )

I, the undersigned, a notary public in and for said County, in said State, hereby certify that Bryan F. Aylstock, whose name is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that being informed of the contents of such instrument, executed the same voluntarily on the day the same bears date.

Given under my hand, this the 12th day of January, 2026.

[SEAL]

CHRISTY C. FOREMAN
Notary Public - State of Florida
Commission # HH 612801
My Comm. Expires Mar 9, 2029
Bonded through National Notary Assn.

_____
NOTARY PUBLIC
My Commission Expires: 3/9/2029

3

5231496_1

# Tab 30

CERTIFIED A TRUE COPY
Jessica J. Lyublanovits, Clerk of Court
BY:
Deputy Clerk

UNITED STATES JUDICIAL PANEL
on
MULTIDISTRICT LITIGATION

IN RE: 3M COMBAT ARMS EARPLUG
PRODUCTS LIABILITY LITIGATION                    MDL No. 2885

## TRANSFER ORDER

**Before the Panel:**[*] Defendant Bryan F. Aylstock moves under 28 U.S.C. § 1407(c) to transfer an action pending in the Northern District of Texas and listed on Schedule A to the Northern District of Florida for inclusion in MDL No. 2885. Plaintiff Brandon Canup opposes the motion.

After considering the argument of counsel, we find that this action, though not typical of most MDL No. 2885 actions, involves common questions of fact with the actions transferred to MDL No. 2885. Transfer under 28 U.S.C. § 1407 will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation. We centralized actions in MDL No. 2885 arising out of allegations that defendants' Combat Arms earplugs were defective, causing plaintiffs to develop hearing loss and/or tinnitus. *See In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 366 F. Supp. 3d 1368 (J.P.M.L. 2019). Previously, plaintiff alleged he suffered injuries arising from the use of Combat Arms earplugs, filed suit against 3M Company and related entities directly in MDL No. 2885, and settled his claims. In the *Canup* complaint before the Panel, plaintiff brings claims against his former counsel in the MDL, who withdrew from representation;[1] and MDL No. 2885 court-appointed leadership counsel, including defendant Aylstock.[2] He alleges, *inter alia*, that (1) the leadership counsel defendants appeared at a March 2024 status conference on his behalf without his knowledge, reviewed his confidential medical records, gave him individual legal advice in a closed-door settlement conference, and pressured him to participate in the settlement; (2) the leadership counsel defendants denied him access to common benefit work product without his counsel signing a common benefit work participation agreement; and (3) all defendants conspired "to protect their financial interest at Canup's expense," by assuming "complementary roles under the framework of the [MDL No. 2885 global settlement] which tied their compensation to Plaintiff participation thresholds and withdrawal requirements." *Canup* Compl. at ¶¶ 6.57-6.60.

---

[*]    Judge David C. Norton took no part in the decision of this matter.

[1]    Fleming Nolen & Jez LLP; Gregory D. Brown; and Cliff Roberts.

[2]    Mr. Aylstock; Aystlock Witkin Kreis Overholtz PLC; Mostyn Law Firm PC; and Michael Burns (leadership counsel defendants).

FILED USDC FLND PN
APR 2 '26 PM 3:21



- 2 -

In opposing transfer, plaintiff argues that his claims do not involve factual issues common with those in MDL No. 2885. We disagree. We have found that "[a]ctions involving matters relating to a settlement reached in an MDL are appropriate for transfer to that MDL under 28 U.S.C. § 1407." *In re C.R. Bard, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*, Transfer Order, MDL No. 2187 (J.P.M.L. Oct. 4, 2017), ECF No. 2315, at 1. *See also In re Managed Care Litig.*, 246 F. Supp. 2d 1363, 1365 (J.P.M.L. 2003) ("It is established Panel and court of appeals precedent that settlement matters are appropriate pretrial proceedings subject to centralization under § 1407.") (*citing In re Patenaude*, 210 F.3d 135, 142–144 (3d Cir. 2000)). Here, plaintiff alleges misconduct on the part of, not only his attorneys in his MDL case, but also leadership counsel in the MDL, largely based upon conduct they argue was undertaken in their capacity as court-appointed leadership counsel.[3] Plaintiff challenges the transferee court's orders regarding the settlement and the MDL's case management, including orders regarding common benefit work and appointment of leadership counsel. Transfer, therefore, is appropriate.

Plaintiff further argues that his is a standalone case without opportunity for coordination. While the Panel's docket has been closed for several months, the MDL No. 2885 docket in the Northern District of Florida has remained open and active. In suggesting the Panel close its docket, the transferee judge recommended the termination be subject to the transferee court's "continuing jurisdiction to enforce its Orders, handle any matters related to the settlement, or address any other miscellaneous issues necessary to complete the administration of these cases." Order, *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, MDL No. 2885 (N.D. Fla. Sept. 19, 2025), ECF No. 4171, at p. 1. Moreover, in consultation with the transferee judge, we recently reopened the Panel's docket to transfer a related case to the MDL.

Plaintiff also argues that transfer would be inconvenient to the *Canup* parties and witnesses. But the Panel repeatedly has held that, while it might inconvenience some parties, transfer of an action is appropriate if it furthers the expeditious resolution of the litigation taken as a whole. *See, e.g., In re IntraMTA Switched Access Charges Litig.*, 67 F. Supp. 3d 1378, 1380 (J.P.M.L. 2014).

We decline plaintiff's request to defer our ruling pending a decision on his motion to remand to state court or defendants' motions to dismiss. The pendency of motions to dismiss and jurisdictional motions are not an impediment to Section 1407 transfer.[4] *See, e.g., In re Ford PowerShift Transmission Prods. Liab. Litig.*, 289 F. Supp. 3d 1350, 1352 (J.P.M.L. 2018); *In re Procter & Gamble Co. "Protect, Grow and Restore" Mktg. & Sales Pracs. Litig.*, 796 F. Supp. 3d 1373, 1374 (J.P.M.L. 2025). The parties can present these motions to the transferee judge.

---

[3]    Plaintiff argues that whether the leadership counsel defendants were acting at the direction of the court is a merits issue that should not be decided by the Panel. We do not decide this issue, but we recognize that there is no better court to determine whether defendants acted at the transferee court's direction than the transferee court itself.

[4]    Panel Rule 2.1(d) expressly provides that the pendency of a conditional transfer order does not limit the pretrial jurisdiction of the court in which the subject action is pending. Between the date a remand motion or motion to dismiss is filed and the date that transfer of the action to the MDL is finalized, a court generally has adequate time to rule on the motion if it chooses to do so.

- 3 -

IT IS THEREFORE ORDERED that the action listed on Schedule A is transferred to the Northern District of Florida and, with the consent of that court, assigned to the Honorable M. Casey Rodgers for coordinated or consolidated pretrial proceedings.

PANEL ON MULTIDISTRICT LITIGATION

_____
Karen K. Caldwell
Chair

Nathaniel M. Gorton          Matthew F. Kennelly
Roger T. Benitez             Dale A. Kimball
Madeline Cox Arleo

**IN RE: 3M COMBAT ARMS EARPLUG
PRODUCTS LIABILITY LITIGATION**                    MDL No. 2885

## SCHEDULE A

Northern District of Texas

CANUP v. AYLSTOCK, ET AL., C.A. No. 4:25-01255

# Tab 37

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

| | |
|---|---|
| BRANDON CANUP, | Case No. 3:26-cv-3359-MCR-HTC |
| *Plaintiff,* | |
| v. | |
| BRYAN F. AYLSTOCK, et al., | PLAINTIFF BRANDON CANUP'S MOTION FOR RECUSAL AND DISQUALIFICATION |
| *Defendants.* | |

## PLAINTIFF BRANDON CANUP'S MOTION FOR RECUSAL AND DISQUALIFICATION AND MEMORANDUM IN SUPPORT

COMES NOW Plaintiff Brandon Canup ("Canup"), proceeding pro se, respectfully moves for recusal and disqualification of Judge M. Casey Rodgers and Magistrate Judge Hope T. Cannon pursuant to 28 U.S.C. § 455(a), and pursuant to 28 U.S.C. § 455(b)(1) as to Judge Rodgers. In support, Canup states as follows:

As set forth more fully in the accompanying Memorandum of Law, Defendants assert as part of their defense that their conduct occurred at the request of the Court. Canup disputes that assertion. The existence, timing, and scope of any such request constitute disputed factual issues central to this action. Defendants' position necessarily relies on alleged communications occurring outside of the record, before any noticed proceeding, and without Canup's participation or notice. Because Defendants attribute their conduct directly to such an alleged off-record request, resolution of these issues would necessarily implicate matters within Judge Rodgers' personal extrajudicial knowledge, requiring disqualification under 28 U.S.C. § 455(b)(1).

Additionally, recusal and disqualification is warranted because statements made by Judge Rodgers during proceedings in the underlying litigation expressly endorsed MDL leadership

1


FILED USDC FLND PN
APR 14 '26 PM2:07

counsel, including Defendants named herein and the adequacy of representation provided to the plaintiff population as a whole, including Canup. Those statements bear directly on issues implicated in this action and create an appearance that Judge Rodgers has already formed views aligned with Defendants concerning the adequacy of representation and conduct of attorneys connected to MDL leadership, including Defendants named herein.

These concerns are further reinforced by Judge Rodgers' prior recusals, and the recusals of Magistrate Judge Hope T. Cannon, in materially similar actions involving Aylstock and AWKO alleging attorney misconduct connected to the 3M MDL. Those cases involved substantially similar allegations concerning the adequacy of representation and conduct of attorneys connected to MDL leadership, and both assigned judges declined to preside. Magistrate Judge Hope T. Cannon is likewise assigned to this matter, further reinforcing the appearance concerns described above.

Under these circumstances, a reasonable observer could question the impartiality of the assigned judges in this matter. Recusal and disqualification are therefore appropriate under 28 U.S.C. § 455(a) and § 455(b)(1). Canup incorporates the Memorandum in Support as if fully stated verbatim herein.

WHEREFORE PREMISES CONSIDERED, Canup respectfully requests that Judge M. Casey Rodgers and Magistrate Judge Hope T. Cannon recuse and be disqualified from this matter, that the case be reassigned to a different district judge and magistrate judge, and for such other relief to which he may be justly entitled.

Signed this 14th day of April, 2026.                    Respectfully submitted,

Brandon Canup, Plaintiff
4812 Hidden Oaks Ln
Arlington, Texas 76017
Tel.: (972) 762-4314
canup.brandon@gmail.com

*pro se*


## CERTIFICATE OF CONFERENCE

The moving party complied with the attorney-conference requirement of Local Rule 7.1(B). Canup attempted to confer in good faith by email to resolve the issue(s) set forth. Results of conference(s): FNJ and AWKO Defendants are opposed, therefore, this motion is submitted to the Court as opposed.

Brandon Canup


## CERTIFICATE OF SERVICE

On this 14th date of April 2026, the undersigned caused a true and correct copy of the foregoing instrument to be served on counsel of record for FNJ Defendants via US Mail pursuant to the Federal Rules of Civil Procedure and to counsel of record for AWKO Defendants via email as agreed to by the parties.

Brandon Canup

3

**PLAINTIFF BRANDON CANUP'S MOTION FOR RECUSAL AND DISQUALIFICATION AND MEMORANDUM IN SUPPORT**

COMES NOW Plaintiff Brandon Canup ("Canup"), proceeding pro se, respectfully moves for recusal and disqualification of Judge M. Casey Rodgers and Magistrate Judge Hope T. Cannon pursuant to 28 U.S.C. § 455(a), and pursuant to 28 U.S.C. § 455(b)(1) as to Judge Rodgers. In support, Canup states as follows:

## I.  BACKGROUND

This action arises from alleged attorney misconduct directed specifically at Plaintiff Brandon Canup in connection with his underlying case in the 3M Combat Arms Earplug multidistrict litigation, *Canup v. 3M Company et al.*, No. 8:20-cv-14021-MCR-HTC (N.D. Fla.). This action was originally filed by Canup in Texas state court on October 27, 2025, against Defendants Bryan F. Aylstock ("Aylstock"), Bobby J. Bradford ("Bradford"), Michael A. Burns ("Burns"), Aylstock, Witkin, Kreis & Overholtz, PLC ("AWKO"), Mostyn Law Firm, P.C. ("Mostyn"), Gregory Brown ("Brown"), Cliff Roberts ("Roberts"), and Fleming, Nolen & Jez, LLP ("FNJ"), asserting multiple causes of action including fraud, breach of fiduciary duty, and civil conspiracy. *See* Dkt. 1, Ex. 1 ¶¶ 5.3–5.20, 6.1–6.66. On November 6, 2025, Brown removed the case to federal court in Texas, invoking diversity jurisdiction, among other asserted grounds, despite being a non-diverse Texas defendant, despite Mostyn—another Texas defendant—having already been properly joined and served, and without Mostyn joining in or consenting to removal.

Shortly thereafter, on November 21, 2025, Canup filed a Motion to Remand challenging the removal. Brown and FNJ opposed that motion and it remains unresolved. On December 1, 2025, Brown and FNJ filed a 12(b)(6) motion to dismiss Canup's claims.

On December 10, 2025, Aylstock filed a motion before the Judicial Panel on Multidistrict Litigation ("JPML") seeking to transfer this action as a tag-along action to MDL No. 2885.

On December 12, 2025, Brown and FNJ also moved to stay the proceedings pending consideration of a potential transfer to MDL 2885. Aylstock, Bradford and AWKO later filed their own motion to dismiss on January 12, 2026. The Federal Court in Texas granted the motion to stay and administratively closed the case on January 23, 2026, pending a decision by the JPML.

On April 2, 2026, the JPML entered an order transferring this action to MDL No. 2885 in the Northern District of Florida where it was assigned to Judge Rodgers and docketed on April 3, 2026.

## II.    ARGUMENT AND AUTHORITY

### A. Legal Standard

Under 28 U.S.C. § 455(a), a judge must disqualify herself "in any proceeding in which [her] impartiality might reasonably be questioned." The standard is objective and asks whether a reasonable person, fully informed of the relevant facts, would question the judge's impartiality. *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860–61 (1988). The Eleventh Circuit has further explained that any doubts concerning a judge's impartiality must be resolved in favor of recusal. *United States v. Kelly*, 888 F.2d 732, 745 (11th Cir. 1989).

Recusal is also required where a judge has "personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1). Disqualification is appropriate where the judge's own actions or communications become relevant factual issues in the litigation. *United States v. Alabama*, 828 F.2d 1532, 1541 (11th Cir. 1987).

The inquiry is whether "an objective, disinterested, lay observer fully informed of the facts" would entertain significant doubt about impartiality. *United States v. Patti*, 337 F.3d 1317, 1321 (11th Cir. 2003).

### B. Argument

2

### 1. Defendants Attribute Their Conduct to a Request by the Court

Aylstock has submitted a sworn statement asserting that Aylstock, Bradford and AWKO's involvement with Canup occurred at the Court's request. Aylstock states:

> "The only interaction that I ever had with Mr. Canup was at a hearing in Pensacola, Florida convened by Judge Casey Rodgers on March 13, 2024 where Mr. Bradford and I were requested by Judge Rodgers to appear on behalf of Plaintiffs' 3M MDL leadership to discuss the status of and possibility of settlement of certain parties who were opting out of the master settlement agreement including Mr. Canup." *See* Ex. 1, Affidavit of Bryan F. Aylstock ¶ 11

Bryan Aylstock further states:

> "Mr. Bradford communicated with Mr. Canup's counsel, Mr. Gamble, on behalf of Plaintiffs' 3M MDL leadership at the MDL Court's request in advance of the March 13, 2024 hearing." *See* Ex. 1, Affidavit of Bryan F. Aylstock ¶ 12

These assertions attribute Aylstock, Bradford, and AWKO's conduct directly to a request by Judge Rodgers. Canup disputes these assertions. Canup was not provided notice of any hearing, order, or proceeding in which such a request was discussed, and Canup is not aware of any docket entry reflecting such a request. The docket in *Canup v. 3M Company et al.*, No. 8:20-cv-14021-MCR-HTC, reflects that the Court ordered Canup to appear at a status conference on March 13, 2024, but contains no entry referencing any request that Aylstock, Bradford, or AWKO appear or participate. *See* Ex. 2, Docket Report, *Canup v. 3M Co.*, No. 8:20-cv-14021-MCR-HTC (N.D. Fla.) (reflecting Order to appear and March 13, 2024 status conference).

Likewise, the Order requiring Canup to appear at the March 13, 2024 status conference directs only that Canup "must appear in person, with counsel (if any)," and does not reference any request that Aylstock, Bradford, or AWKO participate. *See* Ex. 3, Order, *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, No. 8:20-cv-14021-MCR-HTC (N.D. Fla. Feb. 5, 2024).

The existence, timing, and scope of any such request are disputed issues of fact in this case, and Aylstock, Bradford, and AWKO rely on the alleged request as part of their defense.

3

Because Aylstock, Bradford, and AWKO attribute their conduct directly to an alleged extrajudicial request by Judge Rodgers, resolution of these disputed issues necessarily implicates alleged communications occurring outside of the record, before any noticed proceeding, and without Canup's participation or notice. Canup was not present for, and received no notice of, any such request from the Court. Accordingly, the existence, timing, and scope of the alleged request cannot be evaluated based on the record and instead implicate Judge Rodgers' personal extrajudicial knowledge of disputed evidentiary facts concerning the proceeding, requiring disqualification under 28 U.S.C. § 455(b)(1). *United States v. Kelly*, 888 F.2d 732, 744–45 (11th Cir. 1989).

### 2. Prior Statements Regarding MDL Leadership and Adequacy of Representation

During proceedings in the underlying MDL, Judge Rodgers made statements expressly praising MDL leadership counsel, which includes Aylstock, Bradford, Burns, AWKO and Mostyn, and endorsing the adequacy of representation provided to the plaintiff population as a whole, which includes Canup. These statements bear directly on issues implicated in this action and create an appearance of partiality under 28 U.S.C. § 455(a).

Specifically, Judge Rodgers stated:

> "[I]n my view the leadership teams on both sides really do exemplify the very best of the legal profession." *See* Ex. 4, *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, No. 3:19-md-2885, Twenty-Third Case Mgmt. Conf. Tr. at 13:14–15 (N.D. Fla. Sept. 8, 2023), ECF No. 3862.

Judge Rodgers further stated:

> "And because we have so many individual plaintiffs, I want to speak to them in -- just for a second in saying that they have all been extremely well represented by the leadership counsel in this litigation on the plaintiff side. 3M, ably represented as well. But I want those 250,000-plus plaintiffs to know that they were represented very well." *Id.* at 13:15–21.

These statements go beyond neutral procedural observations. They are affirmative judicial evaluations of MDL leadership counsel and of the adequacy of the representation provided to plaintiffs as a group, including Canup. This action includes allegations concerning the conduct, role, and duties of attorneys operating within or connected to MDL leadership, including Aylstock, Bradford, Burns, AWKO and Mostyn.

Judge Rodgers' statement that the "250,000-plus plaintiffs … were represented very well" is particularly significant. It is not merely praise for effort or professionalism, but a categorical conclusion that the plaintiff population as a whole, including Canup, received adequate representation. In this action, Defendants' position is that the relevant attorneys acted properly and that the representation provided in connection with the MDL and its settlement structure was adequate. Judge Rodgers' statement mirrors that position and expresses, in broad and unequivocal terms, the same conclusion on a subject materially intertwined with the claims and defenses here. A reasonable observer could therefore view that statement as aligning with Defendants' position and as reflecting a prejudgment of issues that this case places in dispute.

Judge Rodgers further stated:

> "Those who reject the settlement will learn hard lessons that Judge Miller and I already know, but that's for another day." *Id.* at 8:10–12.

Canup is among the plaintiffs who rejected the settlement referenced in that statement. This action includes claims arising from conduct directed at Canup who opted out of the settlement. This statement addresses a very small group of plaintiffs in the MDL that includes Canup and reflects negative conclusions that Judge Rodgers indicated had already been reached concerning them.

Taken together, Judge Rodgers' statements that MDL leadership "exemplif[ied] the best of the legal profession," and that "250,000-plus plaintiffs … were represented very well," can

reasonably be understood as endorsing both the performance of MDL leadership counsel, including Aylstock, Bradford, Burns, AWKO and Mostyn, and the adequacy of the representation they provided. Because those same subjects are closely related to disputed issues in this case, those statements create an objective appearance that Judge Rodgers has already formed views aligned with Defendants on matters presented for adjudication here. See *Liteky v. United States*, 510 U.S. 540, 555–56 (1994); *Liljeberg*, 486 U.S. at 860–61.

### 3. Prior Recusal in Materially Similar Actions

The appearance concerns described above are reinforced by Judge Rodgers' and Magistrate Judge Cannon's prior recusals in materially similar actions involving Aylstock and AWKO and allegations arising from conduct connected to the 3M MDL. Because § 455(a) focuses on whether a reasonable observer would question impartiality, prior recusals in materially similar matters are relevant to the objective appearance analysis. See *Liljeberg*, 486 U.S. at 860; *Patti*, 337 F.3d at 1321.

In *Kelly v. Aylstock*, No. 3:25-cv-01649 (N.D. Fla.), the action was assigned to Judge Rodgers and involved claims against Aylstock and AWKO alleging attorney misconduct connected to representation in the 3M MDL. After assignment, Judge Rodgers entered an order stating:

"I hereby recuse myself from presiding over the above listed case." *See* Ex. 6, *Kelly v. Aylstock*, No. 3:25-cv-01649, Order (N.D. Fla. Sept. 16, 2025).

Magistrate Judge Hope T. Cannon also recused from that same action:

"I hereby recuse myself from handling any proceedings in the above-styled case." *See* Ex. 7, *Kelly v. Aylstock*, No. 3:25-cv-01649, Order (N.D. Fla. Sept. 17, 2025).

The plaintiff in that action voluntarily dismissed the lawsuit and subsequently refiled substantially similar claims against Aylstock and AWKO in *Kelly v. Aylstock*, No. 3:25-cv-01947

(N.D. Fla.), again alleging attorney misconduct arising from MDL-related conduct. That action was again assigned to Judge Rodgers. Judge Rodgers again recused:

"I hereby recuse myself from presiding over the above listed case." *See* Ex. 9, *Kelly v. Aylstock*, No. 3:25-cv-01947, Order (N.D. Fla. Oct. 15, 2025).

Magistrate Judge Cannon likewise recused in that second action:

"I hereby recuse myself from handling any proceedings in the above-styled case." *See* Ex. 10, *Kelly v. Aylstock*, No. 3:25-cv-01947, Order (N.D. Fla. Oct. 14, 2025).

The complaints in the *Kelly* actions alleged attorney misconduct arising from representation within the 3M MDL and challenged conduct by Aylstock and AWKO, who are named as Defendants in this action. For example, the complaint in *Kelly v. Aylstock*, No. 3:25-cv-01649 (N.D. Fla.), alleges that Aylstock and AWKO settled the plaintiff's claim without informed consent, failed to communicate regarding the individual merits of the claim, and entered into an aggregate settlement without evaluating the plaintiff's circumstances. *See* Ex. 5, Compl. ¶¶ 15–18, 50–54.

Likewise, the complaint in *Kelly v. Aylstock*, No. 3:25-cv-01947 (N.D. Fla.), asserts materially similar allegations, including that Aylstock and AWKO entered into an aggregate settlement without informed consent and failed to adequately evaluate individual claims arising from the 3M MDL. *See* Ex. 8, Compl. ¶¶ 15–18, 49–54.

These allegations materially overlap with the subject matter presented in this action, which likewise concerns conduct of attorneys connected to MDL leadership, adequacy of representation, and actions taken in connection with settlement of MDL claims.

These recusals are relevant to the objective appearance analysis under § 455(a). The Eleventh Circuit has explained that the appearance inquiry is context-dependent and requires

7

consideration of all circumstances bearing on perceived impartiality. *Patti*, 337 F.3d at 1321. Where a court has previously declined to preside over materially similar attorney-misconduct actions arising from the same MDL and involving the same Defendants, a reasonable observer could question impartiality when a substantially similar case is later assigned to the same judge. See *Liljeberg*, 486 U.S. at 860.

This history therefore reinforces the appearance concerns created by Judge Rodgers' prior statements regarding MDL leadership and the disputed factual issues involving the extrajudicial request allegedly made by Judge Rodgers. Magistrate Judge Hope T. Cannon likewise recused in the materially similar *Kelly* actions and is assigned to this matter, reinforcing the appearance concerns discussed above.

### 4. Appearance of Impartiality

Collectively, Aylstock, Bradford, and AWKO attribute their conduct to an alleged extrajudicial request by Judge Rodgers, the existence and scope of that alleged request are disputed issues, and resolution of those issues would implicate matters within Judge Rodgers' personal extrajudicial knowledge. Judge Rodgers also expressly praised MDL leadership counsel, stated that plaintiffs "were represented very well," and stated that leadership "exemplif[ied] the very best of the legal profession." Judge Rodgers further made statements concerning plaintiffs rejecting the settlement, and Canup is among those who rejected the global settlement. This action concerns the conduct and duties of attorneys connected to MDL leadership and the circumstances surrounding the alleged request attributed to Judge Rodgers. Magistrate Judge Hope T. Cannon is likewise assigned to this matter and previously recused in materially similar actions involving the same defendants, further reinforcing the appearance concerns.

Under these circumstances, a reasonable observer could question the impartiality of the assigned judges in this matter. Recusal is therefore appropriate under 28 U.S.C. § 455(a).

8

Additionally, because Judge Rodgers is alleged to possess personal extrajudicial knowledge of disputed evidentiary facts concerning the proceeding, disqualification is required under 28 U.S.C. § 455(b)(1).

### III. REQUEST FOR RELIEF

WHEREFORE PREMISES CONSIDERED, Canup respectfully requests that Judge M. Casey Rodgers and Magistrate Judge Hope T. Cannon recuse and be disqualified from this matter, that the case be reassigned to a different district judge and magistrate judge, and for such other relief to which he may be justly entitled.

Signed this 14th day of April, 2026.

Respectfully submitted,

Brandon Canup, Plaintiff
4812 Hidden Oaks Ln
Arlington, Texas 76017
Tel.: (972) 762-4314
canup.brandon@gmail.com

*pro se*

### LOCAL RULE 7.1(F) CERTIFICATION

Pursuant to Local Rule 7.1(F), the undersigned certifies that, based on the Word Count function in Microsoft Word, this Memorandum contains 2,433 words, inclusive of headings, footnotes, and quotations.

Brandon Canup

# Tab 37-4

# EXHIBIT 4

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

IN RE:   3M COMBAT ARMS EARPLUG       )   Case No: 3:19md2885
PRODUCTS LIABILITY LITIGATION         )
                                      )   Pensacola, Florida
                                      )   September 8, 2023
                                      )
                                      )   9:05 a.m.
_____)


**TWENTY-THIRD CASE MANAGEMENT CONFERENCE**


**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HONORABLE M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**
**(Pages 1 through 87)**


<u>APPEARANCES</u>:

(via Zoom)                   The Honorable **JUDGE LAURIE MILLER**,
                             Fourth Judicial District of Minnesota

(via Zoom)                   The Honorable **GARY R. JONES**
                             United States Magistrate Judge (ret.)


For the Plaintiffs:          Aylstock Witkin Kreis & Overholtz, PLLC
                             by:  **BRYAN F. ALYSTOCK**
                             17 East Main Street
                             Pensacola, Florida 32502
                             *balystock@awkolaw.com*

                             Clark Love & Hutson, PLLC
                             by:  **SHELLEY HUTSON**
                             400 Louisiana Street, Suite 1600
                             Houston, Texas 77002
                             *shutson@triallawfirm.com*

                             Seeger Weiss, LLP
                             by:  **CHRISTOPHER A. SEEGER**
                             55 Challenger Road, Sixth Floor
                             Ridgefield Park, New Jersey 07660
                             *cseeger@seigerweiss.com*

APPEARANCES CONT'D:

For the Defendant:       Moore Hill & Westmoreland, PA
by: **CHARLES F. BEALL, JR.**
350 West Cedar Street
100 Maritime Place
Pensacola, Florida 32502
*cbeall@mhw-law.com*


Jenner & Block, LLP
by: **THOMAS J. PERRELLI** and
    **JOANNA WRIGHT**
1099 New York Avenue NW
Suite 900
Washington, DC 20001-4412
*tperrelli@jenner.com*
*jwright@jenner.com*


White & Case, LLP
by: **MICHAEL C. ANDOLINA**
111 South Wacker Drive
Suite 5100
Chicago, Illinois 60606-5055
*mandolina@whitecase.com*

Court of Appeals.

And importantly, those who criticize the settlement, they have no knowledge of the extraordinary risk and extraordinary costs associated with continued litigation of any Combat Arms Earplug claim, much less the costs and the risk of litigating hundreds of thousands of claims; and to criticize it based simply on jury verdicts, theoretical ideals, or market vagaries is just simply not to understand this uniquely complex litigation at all.

Those who reject the settlement will learn hard lessons that Judge Miller and I already know, but that's for another day. For those who embrace the settlement and recognize it for the success that it is, I say to you congratulations. In just a moment, there will be presentations, as I said, about how to participate in the Settlement Program and also for what's in store in the coming months as far as the Settlement Program.

But before we get into that -- and I promise I'm almost done. Lengthy remarks but it's been a lengthy, lengthy litigation. I say that lightly -- I do want to acknowledge the extraordinary work of others who have been in the trenches also over the life of this litigation and whose contributions, while largely unsung, have been important to achieving the successful resolution that we celebrate here today.

First, I want to start with our court's incredible staff: Our clerk's office under the leadership of our Clerk of

negotiations were hard fought as well when they needed to be. But from what -- from that extreme of litigators to the negotiators and everyone in between, everyone was instrumental in arriving at this historic resolution.  Every document reviewed, every deposition taken, every motion filed, every oral argument made, every trial conducted -- you all develop the data points that were necessary to resolve the litigation.  You brought insight into the litigation, and then that was taken forward into the negotiations which resulted, again, what I think is a very fair and successful conclusion.

No one will be surprised to hear me say that I pushed counsel very hard.  I'm sure there will be snickers about that. But most everyone rose to the occasion like the professionals that you are, and in my view the leadership teams on both sides really do exemplify the very best of the legal profession.  And because we have so many individual plaintiffs, I want to speak to them in -- just for a second in saying that they have all been extremely well represented by the leadership counsel in this litigation on the plaintiff side.  3M, ably represented as well.  But I want those 250,000-plus plaintiffs to know that they were represented very well.

Now, there's one more unsung party whose contributions to the resolution of this may not be fully appreciated by everyone, and that individual is Michael Roman. Michael Roman is 3M's chef executive officer and its chairman of

# Tab 37-5

# EXHIBIT 5

USCA11 Case: 26-11887    Document: 5-1    Date Filed: 06/05/2026    Page: 144 of 202

# EXHIBIT A

IN THE CIRCUIT COURT OF THE FIRST JUDICIAL CIRCUIT

IN AND FOR ESCAMBIA COUNTY, FLORIDA

CIVIL DIVISION

RICKY DEAN KELLY,
3772 Merk's Place,
Leland, NC 28451,
Pro Se

**Plaintiff,**

v.

BRYAN F. AYLSTOCK,
AYLSTOCK, WITKIN, KREISS & OVERHOLTZ, PLLC,
17 East Main Street,
Suite 200,
Pensacola, Florida 32502,

**Defendants.**

**Case No.:**
**Division:**

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

**JURY DEMAND ENDORSED HEREIN**

**I. INTRODUCTION**

1. Ricky D. Kelly, a decorated Iraq war veteran, served our nation with honor only to suffer severe hearing damage due to defective earplugs designed to protect him. Trusting

1

in the justice system, he sought legal redress, hiring Aylstock Witkin Kreiss & Overholtz PLLC (AWKO) to champion his cause. Instead of advocacy, Mr. Kelly encountered neglect and deception. AWKO, led by Bryan Aylstock, settled Mr. Kelly's deeply personal claim without his informed consent, crucial discussions, or even basic courtesy of communication, betraying the very essence of fiduciary duty and legal representation.

2. Repeatedly, Mr. Kelly reached out, seeking clarity and reassurance about his case, only to be met with silence or empty promises. This pattern of disregard culminated in a settlement that disregarded Mr. Kelly's rights and interests, decided unilaterally and under terms that served the firm, not the client. Mr. Kelly's trust was not just ignored but exploited, turning his quest for justice into a struggle against those he believed were on his side.

## II. JURISDICTION

3. Subject Matter Jurisdiction: This Court has subject matter jurisdiction over the claims presented in this complaint pursuant to the laws of the State of Florida, as the matters in controversy arise under the statutes and common law of Florida. The Florida Circuit Court is vested with the authority to adjudicate cases involving such legal claims and disputes as set forth in the complaint.

4. Personal Jurisdiction: This Court has personal jurisdiction over the parties in this case because the defendant(s) reside in, conduct business in, or have committed actionable events within Escambia County, Florida. Furthermore, the events or omissions giving rise to the claims occurred within Escambia County, thereby establishing sufficient contacts with this jurisdiction to permit the Court to exercise personal jurisdiction in accordance with the principles of due process under the laws of the State of Florida.

## III. PARTIES

5. Plaintiff - Ricky Dean Kelly is an individual with his domicile at 3772 Merk's Place, Leland, North Carolina, 28451.

6. Defendant - Bryan F. Aylstock is an individual with his domicile in Pensacola, Florida. Mr. Aylstock is being sued in his individual capacity.

7. Defendant - Aylstock, Witkin, Kreiss & Overholtz PLLC is a law firm organized and existing under the laws of the State of Florida with its principal place of business located

2

Case 3:26-cv-01649-TKW-ZCB   Document 1-1   Filed 09/16/25   Page 4 of 15

USCA11 Case: 26-11887   Document: 5-1   Date Filed: 06/05/2026   Page: 147 of 202

at 17 East Main Street, Suite 200, Pensacola, Florida, 32502. The firm is a citizen of Florida for jurisdictional purposes.

## IV. GENERAL ALLEGATIONS

8. On August 29, 2019, Plaintiff Ricky D. Kelly, a decorated Iraq War veteran, entered into a contractual relationship with the law firm Aylstock, Witkin, Kreis & Overholtz, PLLC (hereafter referred to as "AWKO"), to represent him in a lawsuit regarding defective 3M earplugs which allegedly caused him severe hearing damage and tinnitus.

9. Plaintiff was contacted by a female employee at AWKO. She insisted that the contract needed to be signed that day and assured Plaintiff that his attorney would subsequently contact him to discuss his case and answer any questions regarding the contingency contract. She also promised plaintiff to forward him a copy once it was fully executed.

10. Despite these assurances, Plaintiff never received a fully executed copy of the contract. Plaintiff was never contacted by his attorney to discuss the specifics of his case or the details of his contract until months after Defendant agreed to the aggregate settlement.

11. Throughout the subsequent years leading up to August 29th 2023, Plaintiff made multiple attempts to communicate with AWKO to discuss his case and obtain updates specific to his situation. Each attempt was met with generic responses stating that the updates were general MDL updates and not specific to his case. Plaintiff was always informed that we are unable to provide any information on your individual case.

12. During this period, Plaintiff made contact with AWKO to verify the firm had everything needed for his case in emails dated May 20th 2022, June 24th 2022 and July 18th 2023. Defendant did not respond to any of the emails.

13. On June 21, 2022, Plaintiff's case was filed in the North Florida Federal Court under civil action number 7:20-cv-36595.

14. Despite repeated inquiries and requests for information, Plaintiff received no substantive responses from AWKO or information specific to his case from August 29th 2019 through August 29th 2023, the date the Defendant agreed to the aggregate settlement.

3

15. On August 29, 2023, without Plaintiff's informed consent or any prior discussions regarding any specifics of his case or his possible settlement options, Bryan Aylstock of AWKO unilaterally entered into an aggregate settlement that included Plaintiff's claims.

16. Defendant settled the lawsuit at the time when the MDL Court was making preparations to remand cases to their respective districts for trial. Defendant settled the case for six billion which was not in the best interest of the Plaintiff despite one year earlier on a public radio station, Mr. Aylstock stated that 3M's exposure to this lawsuit was north of one trillion.

17. Plaintiff discovered the settlement of his case after the fact, and learned that his case had been settled without a proper evaluation of its merits or his specific circumstances, and crucially, without his informed consent. Defendant failed to provide plaintiff with any of the required disclosures required when settling claims of multiple clients.

18. Subsequent communications from AWKO, including emails from Bryan Aylstock and Julie Orshell, acknowledged that they had not discussed the specifics or complexities of Plaintiff's case with him prior to the settlement.

19. On September 13th 2023, Plaintiff received an email from an employee named Julie Orshell at AWKO. Her email stated that we cannot speculate on possible values of your case, despite Defendant settling his case on August 29th, 2023.

20. On September 13th 2023 Julie Orshell from AWKO, in a phone conversation, and under false pretenses, misled plaintiff by assuring him that his attorney would not withdraw from representing him if he chose to proceed with an additional lawsuit concerning the Iran Terror case, which influenced plaintiff's decision to sign the additional contingency contract.

21. On January 8, 2024, Bryan Aylstock admitted in an email to Plaintiff that they had not yet reviewed all pertinent medical records or discussed the complexities of Plaintiff's case, despite having already settled the case months prior.

23. Plaintiff continued to request a copy of his contingency contract 13 times between September 1, 2023, and October 24, 2023, which AWKO failed to provide until it was too late for Plaintiff to seek alternative legal representation due to the submission of the identification report to the court.

4

24. Defendant further restricted Plaintiff's option to obtain alternative council due to the restrictions of lawyers right to practice clause that defendant negotiated into the aggregate settlement agreement violating rule 4-5.6(b) of the Florida rules of professional conduct

25. During this time Plaintiff became aware that defendant failed to provide a three day right to withdraw from the contingency contract and failing to provide plaintiff with a statement of clients rights as required by the Florida rules of professional conduct 4-1.5.

26. Defendant, Bryan Aylstock, serving dual roles as plaintiff's attorney and serving as the primary attorney for the MDL Plaintiff Steering Committee, Mr. Aylstock negotiated terms in the aggregate settlement that placed his interests and those of the MDL settlement above those of his client, Mr. Kelly.

27. The aggregate settlement negotiated by Mr. Aylstock included terms that were not in the best interest of Plaintiff, such as restrictions on lawyer's right to practice, violating Florida Rule 4-5.6(b)

28. Defendant agreed to a clause in the settlement that says he must recommend this settlement to 100% of his clients in further proof Defendant's self-dealing to obtain a global settlement, while declining to understand and address Plaintiff's case.

29. Defendant negotiated other coercive clauses that pressured clients into settling by threatening withdrawal of Defendant's legal representation, placing burdens on Plaintiff's decision to settle a matter.

30. Defendant negotiated additional terms to place his interests above those of his client such as allowing himself to cease any further development of clients cases as of the settlement date and withdraw from his clients cases requiring all clients to comply with CMO 57 which requires extensive work and involves most of the pre trial work that the Defendants are paid to complete and still receive their full contingency fee of 40%.

31. Defendant, Mr. Aylstock, made several false and misleading statements from January 2024 through March 2024. Including that settling was in the Plaintiffs best interest, despite Defendant remaining uniformed of Plaintiff's case.

32. Plaintiff received an offer of settlement on November 17, 2023 from AWKO for $10,000. The email recommended that Plaintiff accept the settlement. Mr. Aylstock and others at the firm made repeated requests for Mr. Kelly to join settlement stating it was in his best interest. Defendant made these recommendations without evaluating Mr. Kelly's claims.

33. On February 19th, 2024 at 5:45 pm, Plaintiff was abruptly requested by AWKO to provide extensive documentation for a lost wages claim by the end of the day, an unreasonable demand given the timeframe and the age of the required documents, resulting in Plaintiff having to forego his lost wages claim. This was the first request from AWKO for lost wages documents.

33. On March 14th 2024 Defendant Bryan Aylstock revealed confidential information regarding Plaintiff's son's death and the link between Plaintiff's case to a 3M Earplug attorney named Charles Beall, without Plaintiff's consent. Disclosing information detrimental to Plaintiffs case.

34. Defendant failed to have a discussion with Mr. Kelly, as promised, on March 14th 2024 after the hearing in Pensacola to finally discuss his case in detail and his son's potential case against 3M and the relation to Mr. Kelly's case and the death of his son.

35. Defendant failed to discuss this situation in detail with the Plaintiff after repeated requests. Mr. Aylstock was hyper active in pressuring Plaintiff to join settlement and less motivated to understand Plaintiffs case details.

36. Plaintiff's son passed away in 2016, he was a member of the military and suffered hearing damage, and Plaintiff as his father, attempted to inquire about a potential case against 3M for his son's hearing problems he developed while wearing the earplugs and suffered until his passing in 2016.

37. Defendant made a false statement in his answer to Plaintiffs bar complaint, stating Mr. Kelly's son never wore the earplugs and that his son died of an overdose, which shows a inconsiderate lack of regard for Plaintiff's case.

38. In addition, Defendant would never provide the chance for the Plaintiff to explain the connection between his Plaintiffs case and his son's death, a connection the Plaintiff believes attributed to the death of his son.

39. Mr. Aylstock threat to withdraw from Kelly's representation had a coercion aspect that impinges on the clients right to accept or reject a settlement. Rule 4-1.2(a) of the Florida rules states Lawyer must abide by clients decision concerning the objectives of representation and abide by the clients decision to settle a matter.

6

40. While pressuring Plaintiff to settle, Plaintiff requested Defendant to explain what "confidential exhibit number 10" meant in the settlement agreement by phone, by Email and in person on many occasions. Mr. Aylstock refused to provide an answer.

41. On March 22nd 2024, the date of the Federal Judges order requiring defendant to continue his representation of Mr. Kelly until the completion of the CMO 57 process, instead, Mr. Aylstock withdrew on that day from representing Plaintiff, directly contravening the court's order and severely impacting Plaintiffs legal rights and interests.

42. Defendant withdrew against a Federal Judge court order and at a time Plaintiff had court ordered requirements due within days of his withdrawal, causing material adverse effects on Plaintiff's case, also violating Florida rule 4-1.16.

43. On October 16th 2024, Plaintiff received a letter from AWKO stating that this letter is to inform you that your case has been dismissed. Plaintiff received this letter seven months after the defendant withdrew, further displaying AWKO's botched handling of Plaintiff's case.

44. Plaintiff filed a complaint with the Florida Bar detailing these issues, emphasizing the lack of communication, failure to obtain informed consent, and other breaches of fiduciary duty by AWKO and specifically, Bryan Aylstock.

45. Documentation supporting Plaintiff's claims includes emails, phone call records, and a detailed complaint filed with the Florida Bar, which outlines the alleged professional misconduct and violations of the rules of professional conduct by AWKO and Bryan Aylstock.

46. This sequence of events and lack of proper legal representation and consultation has led Plaintiff to suffer significant losses, not only in potential compensation for his injuries but also in legal rights and proper representation.


## V. CAUSES OF ACTION


### COUNT ONE - BREACH OF FIDUCIARY DUTY

47. Plaintiff incorporates all other paragraphs in this Complaint by reference as though fully written here.

7

48. In Florida, a claim for breach of fiduciary duty requires the plaintiff to establish the existence of a fiduciary relationship between the plaintiff and defendant, the defendant's breach of duties arising under that fiduciary relationship, and damages proximately caused by the breach.

49. A fiduciary relationship existed between Plaintiff, Ricky D. Kelly, and Defendant, Aylstock, Witkin, Kreiss & Overholtz PLLC, and specifically with Defendant Bryan Aylstock, as evidenced by the legal representation agreement entered into on August 29, 2019, wherein Defendants agreed to represent Plaintiff in litigation concerning defective 3M earplugs that resulted in Plaintiff's severe hearing damage and tinnitus.

50. Defendants breached their fiduciary duties by entering into an aggregate settlement without Plaintiff's informed consent or knowledge, as required under Florida Rule of Professional Conduct 4-1.8(g). Defendants negotiated and agreed to this settlement dated August 29th 2023, without obtaining or evaluating Plaintiffs complete medical records or discussing the complexities of his case with him, as admitted by Defendant Bryan Aylstock in an email dated January 8th 2024.

51. Defendants breached their fiduciary duties by failing to obtain Plaintiff's informed consent in a writing signed by him after full disclosure of the existence and nature of all claims involved including informing each Plaintiff of the material terms of the settlement, obtaining all Plaintiff's informed consent, participation of each person in the settlement and the amount each Plaintiff will receive before the settlement offer is made or accepted.

52. Defendant further breached their fiduciary duties by placing their best interest in the MDL and a global settlement ahead of the Plaintiff best interests causing an attorney/client conflict of interest.

53. Defendants' breaches of their fiduciary duties were the direct and proximate cause of damages to Plaintiff. Defendants settled Plaintiff's claims without a proper evaluation of the case, thereby undervaluing Plaintiff's claims and coercing him into a settlement that was not in his best interest.

54. This settlement was detrimental to Plaintiff and was negotiated under conditions that placed undue pressure on Plaintiff to settle, as evidenced by the terms of the aggregate settlement, the amount of the settlement was significantly lower than the actual value of Plaintiff's claims.

55. As a result of Defendants' breaches of fiduciary duty, Plaintiff suffered damages including but not limited to loss of potential compensation that could have been

8

recovered had his case been properly evaluated and pursued individually as Plaintiff requested throughout the litigation, before a settlement offer was accepted, eliminating any chance for Plaintiff to negotiate an equitable pre-trial settlement. Defendants caused emotional distress, and other consequential damages due to the mishandling of his legal representation.

56. Plaintiff seeks relief for Defendants' breach of fiduciary duty, including disgorgement of fees collected by Defendants, a full accounting of the aggregate settlement, and damages as proven at trial.

## COUNT TWO - FRAUD

57. Plaintiff incorporates all other paragraphs in this Complaint by reference as though fully written here.

58. In Florida, a claim for fraud requires the plaintiff to establish: (a) a false statement concerning a material fact; (b) the representor's knowledge that the representation is false; (c) an intention that the representation should induce another to act on it; and (d) consequent injury by the party acting in reliance on the representation.

59. Defendant Bryan Aylstock, through his law firm AWKO, made false statements to Plaintiff concerning the handling and settlement of Plaintiff's claims related to the defective 3M earplugs, which are material facts.

60. Defendant knew these representations were false when made. This is evidenced by Defendant's email dated January 8, 2024, where Mr. Aylstock admitted to Plaintiff that they had not connected to go through all of Plaintiff's audiograms and the complexities of his case, despite previously entering into a settlement agreement.

61. Defendant intended for Plaintiff to rely on these false representations as evidenced by the firm's repeated assurances to Plaintiff that his case was being handled appropriately, and that his attorney would contact him to discuss his case, which never occurred.

62. Plaintiff relied on these false statements by remaining with AWKO under the belief that his case was being actively and appropriately managed and that he would be consulted before any settlement was reached.

63. As a direct and proximate result of the reliance on Defendant's false statements, Plaintiff suffered damages including but not limited to entering into an aggregate settlement that was not in his best interest, the loss of opportunity to pursue individual

9

Case 2:26-cv-03359-MCR-ZCB   Document 8637   Filed 04/14/26   Page 155 of 388
Case 3:25-cv-01649-TKW-ZCB   Document 1-1   Filed 09/16/25   Page 11 of 15
USCA11 Case: 26-11887   Document: 5-1   Date Filed: 06/05/2026   Page: 154 of 202

legal claims more favorable to him, and emotional distress from the mishandling of his case.

64. Defendant also made false statement of a material fact in his response to Plaintiff's bar complaint, claiming the case was settled based on the individual assessments of each client's case, which was contrary to the information in Defendant's own emails admitting lack of knowledge about Plaintiff's specific case details.

65. Defendant knew the statement was false when made as evidenced in the emails from Aylstock on January 8th 2024 and Orshell on September 13th 2023.

66. Defendant intended the Florida Bar to act upon his statement in an attempt to avoid accountability.

67. These actions by Defendant constitute fraud under Florida law, and Plaintiff has suffered damages as a direct and proximate result.

68. Defendants made deceptive statements that Plaintiff must sign the settlement by the final registration day or Plaintiff would not be allowed to join settlement afterwards. This was a false statement of material fact.

69. Defendants knew the statement was false and intended plaintiff act upon it.

70. Defendant misled Plaintiff by offering to drop all of his fees if Plaintiff agreed to settle in an apparent attempt to benefit with a kind gesture, all the while, failing to inform Plaintiff that he negotiated that clause in the settlement that does not allow Defendant to receive funds from Plaintiff who refuse to join settlement by the final registration day.

71. Defendant knew this was false when the statement was made. Defendant intended on Plaintiff to act upon it. The statement is a false statement of a material fact.

72. These actions by Defendant constitute fraud under Florida law, and Plaintiff has suffered damages as a direct and proximate result.

73. Plaintiff was coerced into signing additional legal agreements under false pretenses, including a contingency contract for an unrelated legal matter, based on assurances from Defendant's firm that his attorney would not withdraw from his 3M case.

74. This was a false statement of a material fact. Defendant knew the statement was false and intended Plaintiff to act upon it.

10

Case 3:26-cv-03359-HCR-ZCB   Document 8637   Filed 02/11/26   Page 156 of 388
Case 3:25-cv-01649-TKW-ZCB   Document 1-1   Filed 09/16/25   Page 12 of 15
USCA11 Case: 26-11887   Document: 5-1   Date Filed: 06/05/2026   Page: 155 of 202

75. Plaintiff acted upon the fraudulent statement and signed the contingency contract. Shortly after the defendant withdrew from the Plaintiff's 3m case, he withdrew from the Iran terror suit.

76. The Defendants fraudulent statement lead Plaintiff to sign an agreement allowing AWKO to represent Plaintiff in the Iran Terror Lawsuit. Plaintiff was damaged to the extent he could not find replacement council for his particular injuries because the firms he contacted had stopped adding new clients and was unable to pursue his claims for his injuries relating to an IED blast in Iraq.

77. AWKO's deceptive actions halted Plaintiff's efforts to hold Iran accountable for permanent injuries for which he was awarded the Purple Heart. Previous cases proved to be very favorable to prior veterans.

78. Defendant's actions and those of his law firm AWKO deprived Plaintiff of his right to make informed decisions regarding his legal representation and settlement options, directly resulting from their fraudulent conduct.

## COUNT THREE - LEGAL MALPRACTICE/NEGLIGENCE

79. Plaintiff incorporates all other paragraphs in this Complaint by reference as though fully written here.

80. The duty of care required of a legal professional in Florida mandates that an attorney must act with the level of care, skill, and diligence, which is recognized as acceptable and appropriate by reasonably prudent similar attorneys under similar circumstances.

81. Defendant, Aylstock Witkin Kreiss & Overholt PLLC, and specifically Attorney Bryan Aylstock, owed a duty of care to Plaintiff, Ricky D. Kelly, to competently represent and advise him regarding his claims related to defective 3M earplugs, which caused him severe hearing damage and tinnitus.

82. Defendant failed to obtain Plaintiffs informed consent regarding his representation involving multiple clients. Conflicts of interest are present involving payments to Plaintiff's with no medical documentation or proof of injury and fraud currently being investigated on payments of settlement funds to foreign citizens.

83. Defendant breached his duties when he failed to provide Plaintiff with a copy of his contingency contract at a critical time specifically between September 1st 2023 through

11

Case 3:26-cv-03359-MCR-ZCB Document 8637 Filed 04/14/26 Page 157 of 388
Case 3:25-cv-01649-TKW-ZCB Document 1-1 Filed 09/16/25 Page 13 of 15
USCA11 Case: 26-11887 Document: 5-1 Date Filed: 06/05/2026 Page: 156 of 202

October 21st 2023, eradicating any chance to obtain another professional opinion and the possibility of replacing his representation.

84. Defendant also brushed aside multiple requests for answers to questions about the settlement agreement, including withholding information on confidential exhibit 10, while pressuring Plaintiff to sign settlement.

85. Defendant breached his duty by failing to communicate with Plaintiff about significant aspects of his case, including but not limited to the evaluation of Plaintiff's individual claim, and the strategy for pursuing Plaintiff's legal rights.

86. Defendant also failed to provide Plaintiff with a copy of the executed representation agreement and did not discuss the terms or implications of the common representation with Plaintiff, which are critical for informed consent under Florida law.

87. Defendant's abrupt withdrawal, in defiance of a court order, directly forced Plaintiff into the settlement of his claims under terms that were not authorized or agreed upon by Plaintiff, thereby denying Plaintiff the opportunity to fully pursue his legal claims against 3M for the damages he suffered due to the defective earplugs.

88. Defendants misguided and unauthorized statements about Plaintiff's case to the 3M attorney and the fact that Mr. Aylstock would never discuss his son's potential claim for hearing problems he suffered while he was alive or discuss with Plaintiff the impacts of his Tinnitus that had a direct connection to and was a considerable factor that related to the death of Plaintiff's son, Patrick C. Kelly in April 2016.

89. Defendants negligence was a direct cause Plaintiff could not pursue the claims of his son or the claims related to the loss of his son.

90. Defendant refused to answer questions about the settlement agreement after Plaintiff made multiple attempts to understand the settlement contract to make an informed decision.

91. Defendant's failure to perform a full evaluation of Plaintiff's case, to communicate the status and strategy of the case, constitutes negligence.

92. Defendant's misrepresentations to Plaintiff regarding the handling of his case and the settlement process, as well as the failure to follow through on promises made regarding communication and case evaluation, further evidence Defendant's negligence and breach of duty.

12

93. Defendant's actions and inactions have caused Plaintiff significant harm, necessitating this action for legal malpractice and negligence to recover the damages suffered due to Defendant's professional obvious negligence.

## VI. DEMAND

WHEREFORE, Plaintiff Ricky D. Kelly respectfully prays this Court:

A. Grant judgment in favor of Plaintiff on all claims and for the remedies sought in each claim;

B. Issue a judicial determination of the rights, duties, and obligations of the parties hereto;

C. Enjoin Defendant Aylstock Witkin Kreiss & Overholt PLLC from engaging in any further aggregate settlements without the informed consent of all represented clients, as required under Florida Rule of Professional Conduct 4-1.8(g);

D. Order a full accounting and disgorgement of all fees improperly obtained by Defendant through the aggregate settlement process, ensuring transparency and adherence to ethical standards;

E. Award Plaintiff actual damages in an amount of 1.1 million, reflecting the true value of his claims had they been individually evaluated and pursued.

F. Grant Plaintiff the maximum economic, non-economic, actual, statutory, emotional, general, special, punitive, and other damages available under the law, including but not limited to those provided under Florida Statutes and the applicable Rules of Professional Conduct;

G. Award Plaintiff attorney fees, with the appropriate multiplier, plus costs and expenses of litigation, ensuring full compensation for the legal services required to rectify the harm caused by Defendant's actions;

H. Award Plaintiff such other relief that the Court deems just and appropriate under the circumstances to fully address the extent of the harm suffered and to prevent future occurrences of similar misconduct.

## JURY DEMAND:

13

PLAINTIFF HEREBY DEMANDS A JURY ON ALL TRIABLE MATTERS.

Respectfully Submitted,


Ricky D. Kelly
3772 Merk's place
Leland NC 28451

Pro-Se

14

# Tab 37-6

# EXHIBIT 6

Case 3:26-cv-03359-MCR-ZCB   Document 6637   Filed 02/11/26   Page 162 of 388
Case 3:25-cv-01649-TKW-ZCB   Document 3   Filed 09/16/25   Page 1 of 1
USCA11 Case: 26-11887   Document: 5-1   Date Filed: 06/05/2026   Page: 161 of 202

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

RICKY DEAN KELLY,

     Plaintiff,

v.

                              CASE NO. 3:25cv1649-MCR/HTC

BRYAN F. AYLSTOCK and
AYLSTOCK, WITKIN, KREIS &
OVERHOLTZ, PLLC,

     Defendants.

## ORDER

I hereby recuse myself from presiding over the above listed case.

**DONE AND ORDERED** this 16th day of December 2025.

*M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

# Tab 37-8

# EXHIBIT 8

# EXHIBIT A

IN THE CIRCUIT COURT OF THE FIRST JUDICIAL CIRCUIT

IN AND FOR ESCAMBIA COUNTY, FLORIDA

CIVIL DIVISION

RICKY DEAN KELLY,
3772 Merk's Place,
Leland, NC 28451,
Pro Se

**Plaintiff,**

v.

BRYAN F. AYLSTOCK,
AYLSTOCK, WITKIN, KREISS & OVERHOLTZ, PLLC,
17 East Main Street,
Suite 200,
Pensacola, Florida 32502,

**Defendants.**

**Case No.:**
**Division:** Civil

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

**JURY DEMAND ENDORSED HEREIN**

**I. INTRODUCTION**

1. Ricky D. Kelly, a decorated Iraq war veteran, served our nation with honor only to suffer severe hearing damage due to defective earplugs designed to protect him. Trusting

1

in the justice system, he sought legal redress, hiring Aylstock Witkin Kreiss & Overholtz PLLC (AWKO) to champion his cause. Instead of advocacy, Mr. Kelly encountered neglect and deception. AWKO, led by Bryan Aylstock, settled Mr. Kelly's deeply personal claim without his informed consent, crucial discussions, or even basic courtesy of communication, betraying the very essence of fiduciary duty and legal representation.

2. Repeatedly, Mr. Kelly reached out, seeking clarity and reassurance about his case, only to be met with silence or empty promises. This pattern of disregard culminated in a settlement that disregarded Mr. Kelly's rights and interests, decided unilaterally and under terms that served the firm, not the client. Mr. Kelly's trust was not just ignored but exploited, turning his quest for justice into a struggle against those he believed were on his side.

## II. JURISDICTION

3. Subject Matter Jurisdiction: This Court has subject matter jurisdiction over the claims presented in this complaint pursuant to the laws of the State of Florida, as the matters in controversy arise under the statutes and common law of Florida. The Florida Circuit Court is vested with the authority to adjudicate cases involving such legal claims and disputes as set forth in the complaint.

4. Personal Jurisdiction: This Court has personal jurisdiction over the parties in this case because the defendant(s) reside in, conduct business in, or have committed actionable events within Escambia County, Florida. Furthermore, the events or omissions giving rise to the claims occurred within Escambia County, thereby establishing sufficient contacts with this jurisdiction to permit the Court to exercise personal jurisdiction in accordance with the principles of due process under the laws of the State of Florida.

## III. PARTIES

5. Plaintiff - Ricky Dean Kelly is an individual with his domicile at 3772 Merk's Place, Leland, North Carolina, 28451.

6. Defendant - Bryan F. Aylstock is an individual with his domicile in Pensacola, Florida. Mr. Aylstock is being sued in his individual capacity.

7. Defendant - Aylstock, Witkin, Kreiss & Overholtz PLLC is a law firm organized and existing under the laws of the State of Florida with its principal place of business located

2

at 17 East Main Street, Suite 200, Pensacola, Florida, 32502. The firm is a citizen of Florida for jurisdictional purposes.

## IV. GENERAL ALLEGATIONS

8.  On August 29, 2019, Plaintiff Ricky D. Kelly, a decorated Iraq War veteran, entered into a contractual relationship with the law firm Aylstock, Witkin, Kreis & Overholtz, PLLC (hereafter referred to as "AWKO"), to represent him in a lawsuit regarding defective 3M earplugs which a caused him severe hearing damage and tinnitus.

9. Plaintiff was contacted by a female employee at AWKO on August 29th 2019. She insisted that the contract needed to be signed that day and assured Plaintiff that his attorney would subsequently contact him to discuss his case and answer any questions regarding the contingency contract. She also promised plaintiff to forward him a copy once it was fully executed.

10.  Despite these assurances, Plaintiff never received a fully executed copy of the contract and Plaintiff was never contacted by his attorney to discuss the specifics of his case or the details of his contract until months after Defendant agreed to the aggregate settlement. As of present, Plaintiff has never been provided the opportunity to fully detail his case to Defendant.

11.  Throughout the subsequent years leading up to August 29th 2023, Plaintiff made multiple attempts to communicate with AWKO to discuss his case and obtain updates specific to his situation. Every attempt was met with generic responses stating the updates were general MDL updates and not specific to his case. Plaintiff was informed that AWKO were unable to provide any information specific to your individual case.

12.  During the same period, Plaintiff made contact with AWKO to verify the firm had everything needed for his case in emails dated May 20th 2022, June 24th 2022 and July 18th 2023. Defendant failed to respond to any of those emails.

13.  On June 21, 2022, Plaintiff's case was filed in the North Florida Federal Court under civil action number 7:20-cv-36595.

14.  Despite repeated inquiries and requests for information, Plaintiff received no substantive responses from AWKO or information specific to his case from August 29th 2019 through August 29th 2023.

3

15. On August 29, 2023, without Plaintiff's informed consent or any prior discussions with Plaintiff regarding any specifics of his case or his possible settlement options, Bryan Aylstock of AWKO unilaterally entered into an aggregate settlement that included Plaintiff's claims.

16. Defendant settled the lawsuit at the time when the MDL Court was making preparations to remand cases to their respective districts for trial. In the last minute before these cases were to be remanded, Defendant settled the case for six billion which was not in the best interest of the Plaintiff despite one year earlier on a public radio station, Mr. Aylstock stated that 3M's exposure to this lawsuit was north of one trillion. Placing his interests above Plaintiff in making the settlement, Mr. Aylstock ignored the welfare of his client.

17. Plaintiff discovered the settlement of his case after the fact, and learned that his case had been settled without a proper evaluation of its merits or his specific circumstances, and crucially, without his informed consent. Defendant failed to provide plaintiff with any of the disclosures required when settling claims of multiple clients.

18. Subsequent communications from AWKO, including emails from Bryan Aylstock and Julie Orshell, acknowledged that they had not discussed the specifics or complexities of Plaintiff's case with him prior to the settlement.

19. On September 13th 2023, Plaintiff received an email from an employee named Julie Orshell at AWKO. Her email stated that we can't speculate on possible values of your case, despite Defendant settling his case on August 29th, 2023.

20. On September 13th 2023 Julie Orshell from AWKO, in a phone conversation, and under false pretenses, misled plaintiff by assuring him that his attorney would not withdraw from representing him in the 3M case after opting out if he chose to proceed with an additional lawsuit concerning the Iran Terror case, which influenced plaintiff's decision to sign the additional contingency contract.

21. On January 8, 2024, Bryan Aylstock admitted in an email to Plaintiff that they had not yet reviewed all pertinent medical records or discussed the complexities of Plaintiff's case, despite having already settled the case months prior.

23. Plaintiff continued to request a copy of his contingency contract 13 times between September 1, 2023, and October 24, 2023, which AWKO failed to provide until it was too late for Plaintiff to seek alternative legal representation due to the submission of the identification report to the court.

4

Case 3:26-cv-01947-TKW-ZCB Document 8637 Filed 04/14/26 Page 6 of 15
Case 3:25-cv-01947-TKW-ZCB Document 1-1 Filed 10/14/25 Page 6 of 15
USCA11 Case: 26-11887 Document: 5-1 Date Filed: 06/05/2026 Page: 169 of 202

24. Defendant further restricted Plaintiff's option to obtain alternative council due to the restrictions on lawyers right to practice clause that defendant negotiated into the aggregate settlement agreement violating rule 4-5.6(b) of the Florida rules of professional conduct

25. In 2024, Plaintiff became aware that defendant failed to provide a three day right to withdraw from the contingency contract and failed to provide plaintiff with a statement of clients rights as required by the Florida rules of professional conduct 4-1.5.

26. Defendant, Bryan Aylstock, serving dual roles as plaintiff's attorney and serving as the primary attorney for the MDL Plaintiff Steering Committee. Mr. Aylstock failed to inform plaintiff of his dual roles, which Plaintiff believes caused a conflict of interest. Mr. Aylstock negotiated terms in the aggregate settlement that placed his interests and those of the MDL settlement above those of his client, Mr. Kelly.

27. Had Mr.Aylstock followed his basic duties to inform his client about the aggregate settlement and its terms before he agreed to settle, Plaintiff would have informed Mr. Aylstock that his consent would not be given and this settlement would have not proceeded.

28. Defendant negotiated a clause in the settlement agreement that states he must recommend this settlement to 100% of his clients. This agreement was made before Mr. Aylstock knew the details and possible values of Plaintiffs case.

29. Defendant negotiated other coercive clauses that pressured clients into settling by threatening withdrawal of Defendant's legal representation, placing burdens on Plaintiff's decision to settle a matter.

30. Defendant negotiated additional terms in the settlement that place his interests above those of his client such as allowing himself to cease any further development of clients cases as of the settlement date and withdraw from his clients cases requiring all clients to comply with CMO 57 which requires extensive work and involves most of the pre trial work that the Defendants are paid to complete and still receive their full contingency fee of 40%.

31. Defendant, Mr. Aylstock, made several false and misleading statements from January 2024 through March 2024. Including that settling was in the Plaintiffs best interest, despite Defendant remaining uniformed of Plaintiff's case.

5

32. Plaintiff received an offer of settlement on November 17, 2023 from AWKO for $10,000. The email recommended that Plaintiff accept the settlement. Mr. Aylstock and others at the firm made repeated requests for Mr. Kelly to join settlement stating it was in his best interest. Defendant made these recommendations without evaluating Mr. Kelly's claims.

33. On February 19th, 2024 at 5:45 pm, Plaintiff was abruptly requested by AWKO to provide extensive documentation for a lost wages claim by the end of the day, an unreasonable demand given the timeframe and the age of the required documents, resulting in Plaintiff having to forego his lost wages claim. This was the first request from AWKO for lost wages documents.

33. On March 14th 2024 Defendant Bryan Aylstock revealed confidential information regarding Plaintiff's son's death and the link between Plaintiff's case to a 3M Earplug attorney named Charles Beall, without Plaintiff's consent. Disclosing information detrimental to Plaintiffs case.

34. Defendant failed to have a discussion with Mr. Kelly, as promised, on March 14th 2024 after the hearing in Pensacola to finally discuss his case in detail and his son's potential case against 3M and the relation to Mr. Kelly's case and the death of his son.

35. Defendant failed to discuss this situation in detail with the Plaintiff after repeated requests. Mr. Aylstock was hyper active in pressuring Plaintiff to join settlement and less motivated to understand Plaintiffs case details.

36. Plaintiff's son passed away in 2016, he was a member of the military and suffered hearing damage, and Plaintiff as his father, attempted to inquire about a potential case against 3M for his son's hearing problems he developed while wearing the earplugs and suffered from until his passing in 2016.

37. Defendant made a false statement in his answer to Plaintiffs bar complaint, stating Mr. Kelly's son never wore the earplugs and that his son died of an overdose. Both statements are false.

38. In addition, Defendant would never provide the chance for the Plaintiff to explain the connection between his Plaintiffs case and his son's death, a connection the Plaintiff believes attributed to the death of his son.

39. Mr. Aylstock threat to withdraw from Kelly's representation had a coercion aspect that impinges on the clients right to accept or reject a settlement. Rule 4-1.2(a) of the

6

Florida rules states Lawyer must abide by clients decision concerning the objectives of representation and abide by the clients decision to settle a matter.

40. While pressuring Plaintiff to settle, Plaintiff requested Defendant to explain what "confidential exhibit number 10" meant in the settlement agreement by phone, by Email and in person on many occasions. Mr. Aylstock refused to provide an answer.

41. On March 22nd 2024, the date of the Federal Judges order requiring defendant to continue his representation of Mr. Kelly until the completion of the CMO 57 process, instead, Mr. Aylstock withdrew on that day from representing Plaintiff, directly contravening the court's order and severely impacting Plaintiffs legal rights and interests.

42. Defendant withdrew against a Federal Judge court order and at a time Plaintiff had court ordered requirements due within days of his withdrawal, causing material adverse effects on Plaintiff's case.

43. On October 16th 2024, Plaintiff received a letter from AWKO stating that this letter is to inform you that your case has been dismissed. Plaintiff received this letter seven months after the defendant withdrew, further displaying AWKO's negligence in the handling of Plaintiff's case.

44. Plaintiff filed a complaint with the Florida Bar detailing these issues, emphasizing the lack of communication, failure to obtain informed consent, and other breaches of fiduciary duty by AWKO and specifically, Bryan Aylstock.

45. Documentation supporting Plaintiff's claims includes emails, phone call records, and a detailed complaint filed with the Florida Bar, which outlines the alleged professional misconduct and violations of the rules of professional conduct by AWKO and Bryan Aylstock.

46. This sequence of events and lack of proper legal representation and consultation has led Plaintiff to suffer significant losses, not only in potential compensation for his injuries but also in legal rights and proper representation.

## V. CAUSES OF ACTION

## COUNT ONE - BREACH OF FIDUCIARY DUTY

7

47. Plaintiff incorporates all other paragraphs in this Complaint by reference as though fully written here.

48. In Florida, a claim for breach of fiduciary duty requires the plaintiff to establish the existence of a fiduciary relationship between the plaintiff and defendant, the defendant's breach of duties arising under that fiduciary relationship, and damages proximately caused by the breach.

49. A fiduciary relationship existed between Plaintiff, Ricky D. Kelly, and Defendant, Aylstock, Witkin, Kreiss & Overholtz PLLC, and specifically with Defendant Bryan Aylstock, as evidenced by the legal representation agreement entered into on August 29, 2019, wherein Defendants agreed to represent Plaintiff in litigation concerning defective 3M earplugs that resulted in Plaintiff's severe hearing damage and tinnitus.

50. Defendants breached their fiduciary duties by entering into an aggregate settlement without Plaintiff's informed consent or knowledge, as required under Florida Rule of Professional Conduct 4-1.8(g). Defendants negotiated and agreed to this settlement dated August 29th 2023, without obtaining or evaluating Plaintiffs complete medical records or discussing the complexities of his case with him, as admitted by Defendant Bryan Aylstock in an email dated January 8th 2024.

51. Defendants breached their fiduciary duties by failing to obtain Plaintiff's informed consent in a writing signed by him after full disclosure of the existence and nature of all claims involved including informing each Plaintiff of the material terms of the settlement, obtaining all Plaintiff's informed consent, participation of each person in the settlement and the amount each Plaintiff will receive before the settlement offer is made or accepted.

52. Defendant further breached their fiduciary duties by placing their best interest in the MDL and a global settlement ahead of the Plaintiff best interests causing an attorney/ client conflict of interest.

53. Defendants' breaches of their fiduciary duties were the direct and proximate cause of damages to Plaintiff. Defendants settled Plaintiff's claims without a proper evaluation of the case, thereby undervaluing Plaintiff's claims and coercing him into a settlement that was not in his best interest.

54. This settlement was detrimental to Plaintiff and was negotiated under conditions that placed undue pressure on Plaintiff to settle, as evidenced by the terms of the aggregate settlement, the amount of the settlement was significantly lower than the actual value of Plaintiff's claims.

8

Case 3:26-cv-03535-MCR-ZCB   Document 8-3   Filed 02/11/26   Page 174 of 388
Case 3:25-cv-01947-TKW-ZCB   Document 1-1   Filed 10/14/25   Page 10 of 15
USCA11 Case: 26-11887   Document: 5-1   Date Filed: 06/05/2026   Page: 173 of 202

55. As a result of Defendants' breaches of fiduciary duty, Plaintiff suffered damages including but not limited to loss of potential compensation that could have been recovered had his case been properly evaluated and pursued individually as Plaintiff requested throughout the litigation, before a settlement offer was accepted, eliminating any chance for Plaintiff to negotiate an equitable pre-trial settlement. Defendants caused emotional distress, and other consequential damages due to the mishandling of his legal representation.

56. Plaintiff seeks relief for Defendants' breach of fiduciary duty, including disgorgement of fees collected by Defendants, a full accounting of the aggregate settlement, and damages as proven at trial.

## COUNT TWO - FRAUD

57. Plaintiff incorporates all other paragraphs in this Complaint by reference as though fully written here.

58. In Florida, a claim for fraud requires the plaintiff to establish: (a) a false statement concerning a material fact; (b) the representor's knowledge that the representation is false; (c) an intention that the representation should induce another to act on it; and (d) consequent injury by the party acting in reliance on the representation.

59. Defendant Bryan Aylstock, through his law firm AWKO, made false statements to Plaintiff concerning the handling and settlement of Plaintiff's claims related to the defective 3M earplugs, which are material facts.

60. Defendant knew these representations were false when made. This is evidenced by Defendant's email dated January 8, 2024, where Mr. Aylstock admitted to Plaintiff that they had not connected to go through all of Plaintiff's audiograms and the complexities of his case, despite previously entering into a settlement agreement.

61. Defendant intended for Plaintiff to rely on these false representations as evidenced by the firm's repeated assurances to Plaintiff that his case was being handled appropriately, and that his attorney would contact him to discuss his case, which never occurred.

62. Plaintiff relied on these false statements by remaining with AWKO under the belief that his case was being actively and appropriately managed and that he would be consulted before any settlement was reached.

9

63. As a direct and proximate result of the reliance on Defendant's false statements, Plaintiff suffered damages including but not limited to entering into an aggregate settlement that was not in his best interest, the loss of opportunity to pursue individual legal claims more favorable to him, and emotional distress from the mishandling of his case.

64. Defendant also made false statement of a material fact in his response to Plaintiff's bar complaint, claiming the case was settled based on the individual assessments of each client's case, which was contrary to the information in Defendant's own emails admitting lack of knowledge about Plaintiff's specific case details.

65. Defendant knew the statement was false when made as evidenced in the emails from Aylstock on January 8th 2024 and Orshell on September 13th 2023.

66. Defendant intended the Florida Bar to act upon his statement in an attempt to avoid accountability. Defendant intended the Plaintiff to act upon the settlement agreement.

67. These actions by Defendant constitute fraud under Florida law, and Plaintiff has suffered damages as a direct and proximate result.

68. Defendants made deceptive statements that Plaintiff must sign the settlement by the final registration day or Plaintiff would not be allowed to join settlement afterwards. This was a false statement of material fact.

69. Defendants knew the statement was false and intended plaintiff act upon it.

70. Defendant misled Plaintiff by offering to drop all of his fees if Plaintiff agreed to settle in an apparent attempt to benefit with a kind gesture, all the while, failing to inform Plaintiff that he negotiated that clause in the settlement that does not allow Defendant to receive funds from Plaintiff who refuse to join settlement by the final registration day.

71. Defendant knew this was false when the statement was made. Defendant intended on Plaintiff to act upon it. The statement is a false statement of a material fact.

72. These actions by Defendant constitute fraud under Florida law, and Plaintiff has suffered damages as a direct and proximate result.

73. Plaintiff was coerced into signing additional legal agreements under false pretenses, including a contingency contract for an unrelated legal matter, based on assurances from

10

Case 3:26-cv-03359-CB-RWC   Document 86-1   Filed 04/14/26   Page 176 of 388
Case 3:25-cv-01947-TKW-ZCB   Document 1-1   Filed 10/14/25   Page 12 of 15
USCA11 Case: 26-11887   Document: 5-1   Date Filed: 06/05/2026   Page: 175 of 202

Defendant's firm that his attorney would not withdraw from his 3M case if plaintiff chose to opt out of the settlement agreement.

74. This was a false statement of a material fact. Defendant knew the statement was false and intended Plaintiff to act upon it.

75. Plaintiff acted upon the fraudulent statement and signed the contingency contract. Shortly after the defendant withdrew from the Plaintiff's 3m case, he withdrew from the Iran terror suit.

76. The Defendants fraudulent statement lead Plaintiff to sign an agreement allowing AWKO to represent Plaintiff in the Iran Terror Lawsuit. Plaintiff was damaged to the extent he could not find replacement council for his particular injuries because the firms he contacted had stopped adding new clients and was unable to pursue his claims for his injuries relating to an IED blast in Iraq.

77. AWKO's deceptive actions halted Plaintiff's efforts to hold Iran accountable for permanent injuries for which he was awarded the Purple Heart. Previous cases proved to be very favorable to prior veterans.

78. Defendant's actions and those of his law firm AWKO deprived Plaintiff of his right to make informed decisions regarding his legal representation and settlement options, directly resulting from their fraudulent conduct.

## COUNT THREE - LEGAL MALPRACTICE/NEGLIGENCE

79. Plaintiff incorporates all other paragraphs in this Complaint by reference as though fully written here.

80. The duty of care required of a legal professional in Florida mandates that an attorney must act with the level of care, skill, and diligence, which is recognized as acceptable and appropriate by reasonably prudent similar attorneys under similar circumstances.

81. Defendant, Aylstock Witkin Kreiss & Overholt PLLC, and specifically Attorney Bryan Aylstock, owed a duty of care to Plaintiff, Ricky D. Kelly, to competently represent and advise him regarding his claims related to defective 3M earplugs, which caused him severe hearing damage and tinnitus.

82. Defendant failed to obtain Plaintiffs informed consent regarding his representation involving multiple clients. Conflicts of interest are present involving payments to

11

Plaintiff's with no medical documentation or proof of injury and fraud currently being investigated on payments of settlement funds to foreign citizens.

83. Defendant breached his duties when he failed to provide Plaintiff with a copy of his contingency contract at a critical time specifically between September 1st 2023 through October 21st 2023, eradicating any chance to obtain another professional opinion and the possibility of replacing his representation.

84. Defendant also brushed aside multiple requests for answers to questions about the settlement agreement, including withholding information on confidential exhibit 10, while pressuring Plaintiff to sign settlement.

85. Defendant breached his duty by failing to communicate with Plaintiff about significant aspects of his case, including but not limited to the evaluation of Plaintiff's individual claim, and the strategy for pursuing Plaintiff's legal rights.

86. Defendant also failed to provide Plaintiff with a copy of the executed representation agreement and did not discuss the terms or implications of the common representation with Plaintiff, which are critical for informed consent under Florida law.

87. Defendant's abrupt withdrawal, in defiance of a court order, directly forced Plaintiff into the settlement of his claims under terms that were not authorized or agreed upon by Plaintiff, thereby denying Plaintiff the opportunity to fully pursue his legal claims against 3M for the damages he suffered due to the defective earplugs.

88. Defendant disclosed information about plaintiffs case to the 3M attorney without consent of plaintiff. Mr. Aylstock would never discuss his son's potential claim for hearing problems he suffered from while he was alive or discuss with Plaintiff the impacts of his Tinnitus that had a direct connection to and was a considerable factor that related to the death of Plaintiff's son, Patrick C. Kelly in April 2016.

89. Defendants negligence was a direct cause Plaintiff could not pursue the claims of his sons hearing loss or the plaintiff's tinnitus claims related to the loss of his son.

90. Defendant refused to answer questions about the aggregate settlement agreement after Plaintiff made multiple attempts by phone and emails to understand the settlement contract to make an informed decision.

91. Defendant's failure to perform a full evaluation of Plaintiff's case, to communicate the status and strategy of the case, constitutes negligence.

92. Defendant's misrepresentations to Plaintiff regarding the handling of his case and the settlement process, as well as the failure to follow through on promises made regarding communication and case evaluation, further evidence Defendant's negligence and breach of duty.

93. Defendant's actions and inactions have caused Plaintiff significant harm, necessitating this action for legal malpractice and negligence to recover the damages suffered due to Defendant's professional negligence.

## VI. DEMAND

WHEREFORE, Plaintiff Ricky D. Kelly respectfully prays this Court:

A. Grant judgment in favor of Plaintiff on all claims and for the remedies sought in each claim;

B. Issue a judicial determination of the rights, duties, and obligations of the parties hereto;

C. Enjoin Defendant Aylstock Witkin Kreiss & Overholt PLLC from engaging in any further aggregate settlements without the informed consent of all represented clients, as required under Florida Rule of Professional Conduct 4-1.8(g);

D. Order a full accounting and disgorgement of all fees improperly obtained by Defendant through the aggregate settlement process, ensuring transparency and adherence to ethical standards;

E. Award Plaintiff damages in an amount to be determined at trial, reflecting the true value of his claims had they been individually evaluated and pursued.

F. Grant Plaintiff the maximum economic, non-economic, actual, statutory, emotional, general, special, punitive, and other damages available under the law, including but not limited to those provided under Florida Statutes and the applicable Rules of Professional Conduct;

G. Award Plaintiff attorney fees, with the appropriate multiplier, plus costs and expenses of litigation, ensuring full compensation for the legal services required to rectify the harm caused by Defendant's actions;

13

H. Award Plaintiff such other relief that the Court deems just and appropriate under the circumstances to fully address the extent of the harm suffered and to prevent future occurrences of similar misconduct.

**JURY DEMAND:**

PLAINTIFF HEREBY DEMANDS A JURY ON ALL TRIABLE MATTERS.

Respectfully Submitted,

Ricky D. Kelly

3772 Merk's place

Leland NC 28451

Pro-Se

14

# Tab 37-9

# EXHIBIT 9

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

RICKY DEAN KELLY,

     Plaintiff,

v.                                                    CASE NO. 3:25cv1947-MCR/ZCB

BRYAN F. AYLSTOCK and
AYLSTOCK, WITKIN, KREIS &
OVERHOLTZ, PLLC,

     Defendants.

## ORDER

I hereby recuse myself from presiding over the above listed case.

**DONE AND ORDERED** this 15th day of October 2025.

*M. Casey Rodgers*

**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

# Tab 46

# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

BRANDON CANUP                            )
                                          )
   Plaintiff,                        )
                                          )
                                             **Case No.**: 3:26-CV-03359 MCR-ZCB
                                          )
v.                                        )
                                          )
BRYAN F. AYLSTOCK, et al.                 )
                                          )
                                          )
   Defendants.                      )

---

## DEFENDANTS BRYAN F. AYLSTOCK, AYLSTOCK, WITKIN, KREIS & OVERHOLTZ PLLC, AND BOBBY BRADFORD'S RESPONSE TO PLAINTIFF'S MOTION TO FILE FIRST AMENDED COMPLAINT

---

Defendants, **BRYAN F. AYLSTOCK, AYLSTOCK, WITKIN, KREIS & OVERHOLTZ PLLC,** AND **BOBBY BRADFORD** ("AWKO Defendants"), file their *Response to Plaintiff's Motion to File First Amended Complaint* and in support thereof, state the following:

## FACTUAL BACKGROUND

On October 27, 2025, Plaintiff filed his *Original Petition* in state court in Texas. That case was removed by one of the co-Defendants, Gregory Brown on

November 6, 2025 [DOC.1]. On December 1, 2025, Gregory Brown filed his Motion to Dismiss [DOC. 10]. Despite never properly being served, the AWKO Defendants filed their *Motion to Dismiss Plaintiffs' Complaint* on January 12, 2026 [DOC.27].

This action was transferred to this Court by authority of the Judicial Panel on Multidistrict Litigation on April 2, 2026. [DOC. 33]. On April 6, 2026, the Plaintiff filed his *Motion for Leave to File First Amended Complaint and Memorandum in Support* [DOC. 34] and his *First Amended Complaint*. [DOC. 35]. This Court requested that Defendants file their response to Plaintiff's motion. [DOC. 36].

### THE AWKO DEFENDANTS' RESPONSE

Plaintiff does not have a right to amend his complaint as a matter of course under Federal Rule of Civil Procedure 15(a)(1) because the time to do so—within 21 days after service of a motion to dismiss — has expired. Defendant Brown filed his Motion to Dismiss on December 1, 2025 so that time frame expired no later than December 23, 2025. See Fed. R. Civ. P. 15(a)(1)(A)–(B).

Accordingly, Plaintiff may amend his complaint only with the AWKO Defendants' written consent or the Court's leave under Federal Rule of Civil Procedure 15(a)(2). It appears that Plaintiff made an attempt to comply with the conferral requirement of N.D. Fla. Local Rule 7.1(B), which requires a movant to confer with opposing counsel in a good-faith effort to resolve the issues raised by

5319597_1

the motion.  Plaintiff contacted the undersigned counsel via email on Sunday, April 5, 2026 to request our position as to whether the AWKO Defendants would consent to the amendment, The following morning, Monday, April 6, 2026, undersigned counsel requested further information on the proposed amendment but was advised by Plaintiff that another Defendant had already objected so he had filed the Motion. As a result, the AWKO Defendants had no opportunity to consent to the motion prior to its filing.[1]

More importantly, Plaintiff's proposed First Amended Complaint contains the exact same causes of action as his original Complaint and the new and edited allegations do nothing more than repackage the same deficient causes of action and fail to remedy the fundamental legal defects in the original pleading.  The proposed allegations still fail to state a claim as a matter of law and thus are futile.

Nevertheless, because of the early stage of litigation and with this being Plaintiff's first amendment to his complaint, AWKO Defendants do not oppose the motion for leave to amend..[2]

---

[1] Plaintiff failed to comply with the requirement of N.D. Fla. Local Rule 7.1(C), which requires a movant to file a certification of good faith conferral, but the AWKO Defendants are prepared to respond to Plaintiff's proposed First Amended Complaint.

[2] AWKO Defendants will promptly file a Motion to Dismiss Plaintiff's First Amended Complaint. That motion will fully address the uncorrectable deficiencies in Plaintiff's pleading and set forth in detail why dismissal as a matter of law is required.  AWKO Defendants also note that if the Court grants Plaintiff's Motion, it should have the effect of mooting the AWKO Defendants' previously filed Motion to Dismiss [Doc. 27].

5319597_1

WHREFORE, the AWKO Defendants do not oppose Plaintiff's Motion for Leave to Amend and request fourteen (14) days for the AWKO Defendants to substantively respond to Plaintiff's First Amended Complaint.

**Dated**: April 21, 2026.

Respectfully Submitted,

/s/ Gregory K. Rettig
Gregory K. Rettig (172774)
Justin T. Keeton (1025509)
*Counsel for Defendants Bryan F. Aylstock, Bobby Bradford and Aylstock, Witkin, Kreiss & Overholtz PLLC*

**FOR THE FIRM:**
**LLOYD, GRAY, WHITEHEAD & MONROE, P.C.**
125 W. Romana Street, Suite 330
Pensacola, Florida 32502
Telephone: (850) 777-3322
Facsimile: (850) 777-3290
Grettig@lgwmlaw.com
Jkeeton@lgwmlaw.com
Lglover@lgwmlaw.com
Egates@lgwmlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on or about April 21, 2026, a true and correct copy of the foregoing was sent to counsel for all parties via email, US Mail and/or the CM/ECF service.

Brandon Canup
4812 Hidden Oaks Ln
Arlington, TX 76017

5319597_1

canup.brandon@gmail.com
*Pro Se Plaintiff*


/s/Jonathan Vine
**Jonathan Vine**
**Florida Bar No.: 10966**
*Counsel for Defendants Georgy*
*Brown and Fleming Nolen & Jes LLP*


**COLE, SCOTT & KISSANE, P.A.**
**222 Lakeview Avenue, Suite 500**
**West Palm Beach, FL 33401**
**Telephone (561) 383-9200**
**Facsimile (561) 683-8977**
**Jonathan.Vine@csklegal.com**


/s/ Gregory K. Rettig
*Counsel for Defendants Bryan F. Aylstock,*
*and Aylstock, Witkin, Kreiss & Overholtz*
*PLLC*

5319597_1

# Tab 51

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

CASE NO.: 3:26-cv-3359-MCR-HTC

BRANDON CANUP,

    *Plaintiff*,

v.

BRYAN F. AYLSTOCK, BOBBY
BRADFORD, MICHAEL BURNS,
CLIFF ROBERTS, GREGORY
BROWN, AYLSTOCK WITKIN KREIS
& OVERHOLTZ PLC, FLEMING
NOLEN & JEZ LLP, and MOSTYN LAW
FIRM PC,

    *Defendants*.

_____/

## FNJ DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR RECUSAL AND DISQUALIFICATION

Defendants, Gregory Brown and Fleming Nolen & Jez LLP (collectively "FNJ Defendants"), respectfully file this Response in Opposition to Plaintiff's, Brandon Canup's ("Canup"), Motion for Recusal and Disqualification (the "Motion") [DE 37] filed on April 14, 2026, with supporting Memorandum of Law, and as grounds therefore states as follows:

[PAGE INTENTIONALLY LEFT BLANK—CONTINUE TO NEXT PAGE]

Case No. 3:26-cv-3359

## BACKGROUND AND SUMMARY OF RESPONSE

This lawsuit involves an alleged legal malpractice lawsuit arising from the *In re: 3M Combat Arms Earplugs Litigation* (the "MDL"), a multi-district litigation proceeding involving claims by service members and veterans against 3M Company ("3M") based upon allegations that its Combat Arms Earplugs were defective. Canup, an MDL claimant, was initially represented by FNJ Defendants. Ultimately, in 2023, after several bellwether trials, 3M entered into a Master Settlement Agreement ("MSA") to resolve the claims in the MDL, which involved the creation of a benefits program out of which eligible claimants would be paid.

Importantly, the MSA obligated every attorney representing a claimant who had filed a case in the MDL to recommend their clients agree to the MSA and register in the benefits program thereunder and withdraw from representing claimants that chose to opt out of the program. Canup rejected the MSA and FNJ Defendants withdrew as his counsel, as they were obligated to do. Canup later retained new counsel to pursue his claims against 3M. After his efforts to assert new hearing loss claims against 3M was denied, he settled his claims with 3M.

Canup then filed this legal malpractice action on October 27, 2025, in the 67th Judicial District Court of Tarrant County, Texas. FNJ Defendants promptly removed the action to the U.S. District Court for the Northern District of Texas and moved to dismiss Canup's claims pursuant to Federal Rules of Civil Procedure

2

Case No. 3:26-cv-3359

12(b)(6) and (b)(9).  Separately, Defendant Bryan F. Aylstock moved under 28

U.S.C. § 1407(c) to transfer that action to this Court for inclusion in the MDL. The

Judicial Panel on Multidistrict Litigation granted that motion on April 2, 2026. *See*

Transfer Order [DE 30].

Canup has now filed the instant Motion seeking the recusal and

disqualification of Judge M. Casey Rodgers and Magistrate Judge Hope to Cannon

pursuant to 28 U.S.C. § 455(a), and simultaneously seeking the disqualification of

Judge Rodgers pursuant to 28 U.S.C. § 455(b)(1).  Of note, Judge Hope Cannon has

already recused herself.  Accordingly, this Response will only address the requested

recusal and disqualification of Judge Rodgers under 28 U.S.C. § 455(a) and 28

U.S.C. § 455(b)(1).

## MEMORANDUM OF LAW AND ARGUMENT

### I.    Legal Standard

28 U.S.C. Code § 455(a) provides that: "[a]ny justice, judge, or magistrate

judge of the United States shall disqualify himself in any proceeding in which his

impartiality might reasonably be questioned." *Id.*  Separately, 28 U.S.C. Code §

455(b)(1) provides that a district judge shall also himself "[w]here he has a personal

bias or prejudice concerning a party, or personal knowledge of disputed evidentiary

facts concerning the proceeding." *Id.*  As explained herein, both sections are subject

to an objective standard.  The Tenth Circuit has explained that the statute "'must not

3

Case No. 3:26-cv-3359

be so broadly construed that it becomes, in effect, presumptive, so that recusal is mandated upon the merest unsubstantiated suggestion of personal bias or prejudice.'" *Id.* (quoting Franks v. Nimmo, 796 F.2d 1230, 1235 (10th Cir.1986) (further quotation omitted)). If the issue of disqualification is "a close one," the judge must recuse. *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648, 659 (10th Cir. 2002). That said, a judge "has as strong a duty to sit when there is no legitimate reason to recuse as he does to recuse when the law and facts require." *Id.* (*quoting Nichols,* 71 F.3d at 351).

## II.    Recusal Under 28 U.S.C. Code § 455(a).

As mentioned above, 28 U.S.C. Code § 455(a) provides that: "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." *Id.*   This statute embodies an objective standard. *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1524 (11th Cir. 1988).   Under such standard, the test is whether an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt about the judge's impartiality. *Id.*

A judge's rulings and expressions of opinion generally fail to justify recusal. The Eleventh Circuit has explained that "adverse rulings alone do not provide a party with a basis for holding that the court's impartiality is in doubt." *Byrne v. Nezhat,*

**Cole, Scott & Kissane**
www.csklegal.com
Miami | Fort Lauderdale West | Fort Lauderdale East | West Palm Beach | Orlando | Jacksonville | Tampa
Bonita Springs | Naples | Pensacola | Fort Myers | Tallahassee | Key West

Case No. 3:26-cv-3359

261 F.3d 1075, 1103 (11th Cir.2001).  Notably, the Supreme Court explicitly stated in *United States v. Grinnell Corp.,* 384 U.S. 563, 583, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966): "[t]he alleged bias and prejudice to be disqualifying **must stem from an extrajudicial source** ... **other than what the judge learned from his participation in the case**." *Id.*   Although *Grinnell* was decided prior to the enactment of the 1974 amendments which create the current version of § 455(a), in *Liteky v. United States,* 510 U.S. 540, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994), the Supreme Court extended the "extrajudicial source" doctrine from *Grinnell* to recusal under § 455(a).  In *Liteky,* a criminal defendant moved to disqualify the judge prior to his second trial on the grounds that, during the earlier trial, the judge displayed "impatience, disregard for the defense and animosity" toward the defendant.  *Id.* at 542, 114 S.Ct. 1147. The *Liteky* Court rejected the contention that recusal was required, stating:

> First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. In and of themselves (*i.e.,* apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required ... when no extrajudicial source is involved.... Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.

*Id.* (internal citations omitted).

**Cole, Scott & Kissane**
www.csklegal.com
Miami | Fort Lauderdale West | Fort Lauderdale East | West Palm Beach | Orlando | Jacksonville | Tampa
Bonita Springs | Naples | Pensacola | Fort Myers | Tallahassee | Key West

Case No. 3:26-cv-3359

Additionally, as it pertains to commentary by a judge, far more egregious comments than those comments at issue here, wherein Judge Rodgers merely praised the leadership counsel in the largest MDL to date, have not warranted recusal. Indeed, "judicial remarks ... . that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge" unless these remarks "re-veal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky v. United States*, 510 U.S. at 555. To that same end, "expressions of impatience, dissatisfaction, annoyance, and even anger," do not establish bias or impartiality. *Id*. at 555–56. Nor do "[a] judge's ordinary efforts at courtroom administration[]." *Id. United States v. Dana Calley* 24-133440, DE 53-1 (11th Cir. April 6, 2026) (citing *Liteky*). *See also, United States v. Amedeo* 487 F.3d 823 (11th Cir. 2007) (finding that "[n]othing in the record demonstrates that the district court had developed a *personal* or *extrajudicial* bias against Amedeo" and reiterating that "**opinions held by judges as a result of what they learned in earlier proceedings" do *not* constitute bias or prejudice.**").[1]

---

[1] Similarly, in the context of comments regarding attorneys, the Fourth Circuit found no basis for recusal where a district court judge had called an attorney a "son-of-a-b***h" and a "wise-a** lawyer." *In re Beard*, 811 F.2d 818, 830 (4th Cir.1987). The First Circuit also found no question about a judge's ability to rule impartially where he had called an attorney an "untrustworthy manipulator" and described their conduct as "dirty work," because such an attitude toward the attorney, explained the Court, did not reasonably call into question the judge's ability to rule impartially as to the attorney's client. *In re Cooper*, 821 F.2d 833, 841 (1st Cir.1987).

**Cole, Scott & Kissane**
www.csklegal.com
Miami | Fort Lauderdale West | Fort Lauderdale East | West Palm Beach | Orlando | Jacksonville | Tampa
Bonita Springs | Naples | Pensacola | Fort Myers | Tallahassee | Key West

Case No. 3:26-cv-3359

Here, Canup references comments by Judge Rodgers allegedly praising the leadership counsel in the MDL (the Florida Defendants), as a basis for impartiality. Thus, Canup specifically asserts that it is Judge Rodgers' opinions ***formed during the prior proceeding*** which render her impartial. These comments, however, at best, constitute mere expressions of opinion based upon information learned by Judge Rodgers throughout the MDL litigation. Canup does not assert or imply that Judge Rodgers will be impartial due to knowledge or opinions formed via extrajudicial sources. Additionally, although Canup takes issue with certain positive remarks made by Judge Rodgers regarding leadership counsel's work in the MDL litigation, Canup has not identified any negative commentary, let alone antagonism, <u>towards</u> Canup. Indeed, Canup has not alleged that there has been any negative bias against Canup. Thus, objectively, the comments referenced by Canup do not display "a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.* As such, FNJ Defendants disagree with Canup's position and assert that the requisite standard for recusal under 28 U.S.C. Code § 455(a) has not been met.

## III.    <u>Recusal Under 28 U.S.C. Code § 455(b)(1).</u>

Under Section 455(b)(1) recusal of a judge is required "[w]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding" which is "proved by compelling evidence." *Hook v. McDade,* 89 F.3d 350, 355 (7th Cir.1996). Disqualification

**Cole, Scott & Kissane**
www.csklegal.com
Miami | Fort Lauderdale West | Fort Lauderdale East | West Palm Beach | Orlando | Jacksonville | Tampa
Bonita Springs | Naples | Pensacola | Fort Myers | Tallahassee | Key West

Case No. 3:26-cv-3359

under § 455(b) requires that a litigant present evidence of a "negative bias or prejudice [which] must be grounded in some personal animus or malice that the judge harbors against him." *United States v. Balistrieri*, 779 F.2d 1191, 1201 (7th Cir.1985). The standard for finding actual bias is also objective; "it is with reference to the 'well-informed, thoughtful and objective observer, rather than the hypersensitive, cynical and suspicious person' that the objective standard is currently established." *In re Sanders*, 540 B.R. 911, 919 (Bankr. S.D. Fla. 2015) (quoting *Andrade v. Chojnacki,* 338 F.3d 448, 458 (5th Cir.2003)).

Recusal under § 455(b) requires a showing of bias or partiality as to a party. *Hinman v. Rogers,* 831 F.2d 937, 939 (10th Cir.1987) ("[T]he only claim of bias to be considered is that against a party.") (citing *United States v. Burt,* 765 F.2d 1364, 1368 (9th Cir.1985); *Gilbert v. City of Little Rock, Ark.,* 722 F.2d 1390, 1398 (8th Cir.1983), *cert. denied,* 466 U.S. 972, 104 S.Ct. 2347, 80 L.Ed.2d 820 (1984). The Federal Circuit has found that "[t]o warrant recusal, bias or prejudice must be directed against a party and bias exhibited against an attorney will only merit recusal when it results in **material and identifiable harm** to that party's case." *Baldwin Hardware Corp. v. FrankSu Enterprise Corp.,* 78 F.3d 550, 557–58 (Fed.Cir.), *cert. denied,* 519 U.S. 949, 117 S.Ct. 360, 136 L.Ed.2d 251 (1996).

**Cole, Scott & Kissane**
www.csklegal.com
Miami | Fort Lauderdale West | Fort Lauderdale East | West Palm Beach | Orlando | Jacksonville | Tampa
Bonita Springs | Naples | Pensacola | Fort Myers | Tallahassee | Key West

Respectfully, Canup has conflated Judge Rodgers' knowledge as Judge in the MDL litigation with "personal knowledge." While Judge Rodgers may have knowledge of the underlying MDL litigation, as acknowledged within Canup's own Motion, Judge Rodgers' knowledge stems from her position as Judge in the underlying MDL case.

Interestingly, in opposing the transfer of this action, Plaintiff raised an alternative argument, i.e. that his claims **did not** involve factual issues common to those in the MDL litigation. The Panel <u>disagreed</u>, specifically stating in the Transfer Order: "We have found that '[a]ctions involving matters relating a settlement reached in an MDL are appropriate for transfer to that MDL under 28 U.S.C. § 1407.'" Transfer Order at 2 (quoting *In re C.R. Bard, Inc., Pelvic Repair Sys. Prods. Liab. Litig.,* Transfer Order MDL No. 2187 (J.P.M.L. Oct. 4, 2017), ECF No 2315, at 1) (citing *In re Managed Care Litig.,* 246 F. Supp. 2d 1363, 1365 (J.P.M.L. 2003) ("It is established Panel and court of appeals precedent that settlement matters are appropriate pretrial proceedings subject to centralization under § 1407"). Accordingly, the Panel found that transfer was appropriate, likewise noting that the transferee Court recommended that termination of the MDL be subject to the Court's "continuing jurisdiction to enforce its Orders, handle any matters related to the settlement, or address any other miscellaneous issues necessary to complete the

**Cole, Scott & Kissane**
www.csklegal.com
Miami | Fort Lauderdale West | Fort Lauderdale East | West Palm Beach | Orlando | Jacksonville | Tampa
Bonita Springs | Naples | Pensacola | Fort Myers | Tallahassee | Key West

Case No. 3:26-cv-3359

administration of these cases." Order, *In Re 3M Combat Arms Earplug Prods. Liab. Litig.,* MDL No. 2885 (N.D. Fla. Sept. 19, 2025).

Furthermore, in transferring this action, the Panel considered Canup's argument that transfer was inappropriate because the alleged misconduct against leadership counsel was undertaken in their capacity as court-appointed leadership counsel. Within the Transfer Order, the Panel noted as follows:

> Plaintiff argues that whether the leadership counsel defendants were acting at the direction of the court is a merits issue that should not be decided by the Panel. W**e do not decide this issue, but we recognize that there is no better court to determine whether defendants acted at the transferee court's direction than the transferee court itself**.

Transfer Order [DE 30] (emphasis added).

In effect, Canup's Motion for Recusal is yet another attempt to oppose the transfer of this action. Canup appears to conflate "personal knowledge" with judicial knowledge, requesting recusal and disqualification simply based upon Judge Rodgers' prior involvement as Judge in the underlying case and her potential opinions formed on the attorneys during the MDL litigation. Canup's position, however, runs contrary to well established precedent cited above, wherein Courts retain jurisdiction over settlement matters at the conclusion of cases. Under Canup's logic, litigation arising out a settlement would require recusal of the judge involved in the underlying litigation based upon the judge's "extrajudicial knowledge."

10

Canup's position, respectfully, is incorrect. Per Canup's own Motion, Judge Rodgers does not have extrajudicial knowledge; there is no allegation within Canup's Motion to support such a position. As such, Canup has not alleged facts to meet the requisite standard to justify recusal. Additionally, it would serve the interests of justice and judicial economy for this action to be addressed within the MDL, as part of the MDL Court's continuing jurisdiction over the settlement of the MDL actions. Accordingly, FNJ Defendants oppose Canup's Motion for Recusal.

Lastly, it also bears noting that Canup's request should be deemed untimely and waived. Canup did not lodge any objection in the MDL case regarding leadership counsel, FNJ Defendants, or, most importantly, Judge Rodgers. A motion to recuse under section 455(a) must be timely filed. *See Singer v. Wadman*, 745 F.2d 606, 608 (10th Cir. 1984) (motion to recuse under both 28 U.S.C. §§ 144 and 455(a) was untimely) cert. denied, 470 U.S. 1028, 105 S. Ct. 1396, 84 L. Ed. 2d 785 (1985); *see also Oglala Sioux Tribe v. Homestake Mining Co.*, 722 F.2d 1407, 1414 (8th Cir. 1983) (section 455(a) has a timeliness requirement); *United States v. Slay*, 714 F.2d 1093, 1094 (11th Cir. 1983) (same), cert. denied, 464 U.S. 1050, 104 S. Ct. 729, 79 L. Ed. 2d 189 (1984); *Chitimacha Tribe v. Harry L. Laws Co.*, 690 F.2d 1157, 1164 n. 3 (5th Cir. 1982) (same), cert. denied, 464 U.S. 814, 104 S. Ct. 69, 78 L. Ed. 2d 83 (1983); *In re International Business Machines Corp.*, 618 F.2d 923, 932 (2d Cir. 1980) (same). Accordingly, as the comments by Judge Rodgers which Canup takes

**Cole, Scott & Kissane**
www.csklegal.com
Miami | Fort Lauderdale West | Fort Lauderdale East | West Palm Beach | Orlando | Jacksonville | Tampa
Bonita Springs | Naples | Pensacola | Fort Myers | Tallahassee | Key West

Case No. 3:26-cv-3359

issue with occurred **almost three (3) years ago**, in September 2023, and Canup did not seek recusal until April 2026, Canup's motion is untimely.

WHEREFORE, Defendants, GREGORY BROWN AND FLEMING NOLEN & JEZ LLP**,** respectfully request that this Honorable Court deny Plaintiff's, BRANDON CANUP, Motion for Leave to File First Amended Complaint [DE 34] and that this Honorable Court provide such other relief as it deems just and proper, inclusive of any potential attorneys' fees permitted under the applicable agreement referenced by Plaintiff in the operative Complaint.

[CERTIFICATE ON THE FOLLOWING PAGE]

**Cole, Scott & Kissane**
www.csklegal.com
Miami | Fort Lauderdale West | Fort Lauderdale East | West Palm Beach | Orlando | Jacksonville | Tampa
Bonita Springs | Naples | Pensacola | Fort Myers | Tallahassee | Key West

Case No. 3:26-cv-3359

## CERTIFICATE PURSUANT TO LOCAL RULE 7.1(F)

I hereby certify that the above Response in Opposition, excluding the case style, signature block, and any certificate of service, contains 2615 Words, in compliance with Local Rule 7.1(F), and does not exceed eight thousand (8,000) words.

By:  *s/Jonathan Vine*

JONATHAN VINE
Florida Bar No. 10966

## CERTIFICATE OF SERVICE

I hereby certify that on this 1ˢᵗ day of May 2026, a copy of the foregoing is being served upon all counsel of record by CM/ECF.

COLE, SCOTT & KISSANE, P.A.
Counsel for Defendants, ……
222 Lakeview Avenue, Suite 500
West Palm Beach, FL 33401
Telephone (561) 383-9200
Facsimile (561) 683-8977
Jonathan.Vine@csklegal.com

By:  *s/Jonathan Vine*

JONATHAN VINE
Florida Bar No. 10966

**Cole, Scott & Kissane**
www.csklegal.com
Miami | Fort Lauderdale West | Fort Lauderdale East | West Palm Beach | Orlando | Jacksonville | Tampa
Bonita Springs | Naples | Pensacola | Fort Myers | Tallahassee | Key West

**Certificate Of Service**

I HEREBY CERTIFY that I filed both volumes of this Appendix to Petition for Writ of Mandamus using the court's electronic-filing system and that a copy of both volumes of the Appendix were furnished pursuant to Federal Rules of Appellate Procedure 21 and 25(d) via email on this 5th day of June 2026 to the following:

Hon. M. Casey Rodgers
District Judge of the United States District Court,
Northern District of Florida
flnd_rodgers@flnd.uscourts.gov

Gregory K. Rettig
Counsel for Defendants Bryan Aylstock,
Bobby Bradford and Aylstock, Witkin, Kreis &
Overholtz, PLC
grettig@lgwmlaw.com

Jonathan Vine
Counsel for Defendants Gregory Brown,
Cliff Roberts and Fleming, Nolen & Jez, LLP
jonathan.vine@csklegal.com

Benjamin Stevenson
Counsel for Defendant
Mostyn Law Firm, PC
bjs@stevenson-legal.com

*/s/ Brandon Canup*

Brandon Canup, Petitioner
4812 Hidden Oaks Ln
Arlington, Texas 76017
Tel.: (972) 762-4314
canup.brandon@gmail.com

***pro se***

**No.** 26-11887-C

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

---

IN RE BRANDON CANUP,

*Petitioner*,

On Petition for Writ of Mandamus from the United States District Court for the Northern District of Florida

No. 3:26-cv-03359-MCR-ZCB

---

# APPENDIX TO PETITION FOR WRIT OF MANDAMUS

# VOLUME II

---

Brandon Canup
4812 Hidden Oaks Ln
Arlington, Texas 76017
(972) 762-4314
canup.brandon@gmail.com

## INDEX TO APPENDIX

### Description

**Volume I**                                                       **Docket/ Tab No.**

District Court Docket Sheet ................................................................................A

Case Management Order No. 66, MDL 2885 ......................................................B

Case Management Order No. 67, MDL 2885 ......................................................C

Plaintiff's Original Texas State Court Complaint ............................................ 1-1

Citation Served on Mostyn Law Firm, P.C. ..................................................... 9-1

Texas Secretary of State Records Identifying Mostyn Law Firm, P.C.'s
Registered Agent ............................................................................................. 9-3

Defendant Bryan Aylstock's Motion to Transfer Tag-Along Action to
MDL 2885 Before Judicial Panel on Multidistrict Litigation ("JPML") ...............23

AWKO Defendants' First Motion to Dismiss .....................................................27

Affidavit of Bryan Aylstock ........................................................................... 27-1

JPML Transfer Order ........................................................................................30

Plaintiff's Motion for Recusal and Disqualification ...........................................37

Excerpts from Transcript of 23rd Case Management Conference, MDL 2885.... 37-4

Original Complaint, *Kelly v. Aylstock et al,* No. 3:25-cv-01649 .......................... 37-5

Judge Rodgers' Recusal Order, *Kelly v. Aylstock et al,* No. 3:25-cv-01649 ........ 37-6

Original Complaint, *Kelly v. Aylstock et al,* No. 3:25-cv-01947 .......................... 37-8

Judge Rodgers' Recusal Order, *Kelly v. Aylstock et al,* No. 3:25-cv-01947 ........ 37-9

AWKO Defendants' Response to Plaintiff's Motion to Amend Complaint ............46

FNJ Defendant' Response in Opposition to Plaintiff's Motion for Recusal ..........51

**Volume II**

AWKO Defendants' Response in Opposition to Plaintiff's Motion for Recusal ....56

Transcript, March 13,2024 Status Conference, *Canup v. 3M Co.* ....................... 56-1

Plaintiff's First Amended Complaint (Operative Complaint) .................................60

Order Denying Canup's Motion for Recusal and Disqualification .........................61

Appearance of Benjamin Stevenson for Mostyn Law Firm, P.C............................62

AWKO Defendants' Second Motion to Dismiss ....................................................66

Mostyn Law Firm P.C.'s Motion to Dismiss..........................................................67

Order Denying Remand ..........................................................................................70

# Tab 56

# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA PENSACOLA DIVISION

| | |
|---|---|
| BRANDON CANUP ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No.: 3:26-cv-03359-MCR-ZCB |
| v. ) | |
| ) | |
| BRYAN F. AYLSTOCK, et al., ) | |
| ) | |
| Defendants. ) | |

## DEFENDANTS BRYAN F. AYLSTOCK, AYLSTOCK, WITKIN, KREIS & OVERHOLTZ PLLC, AND BOBBY BRADFORD'S RESPONSE TO PLAINTIFF'S MOTION FOR RECUSAL AND DISQUALIFICATION AND MEMORANDUM IN SUPPORT

Defendants, **BRYAN F. AYLSTOCK, AYLSTOCK, WITKIN, KREIS & OVERHOLTZ PLLC,** AND **BOBBY BRADFORD** ("Defendants"), hereby file their Response to Plaintiff's Motion for Recusal in accordance with this Court's Order dated April 17, 2026 (Doc. 41).

### PLAINTIFF'S ALLEGED GROUNDS FOR RECUSAL OR DISQUALIFICATION ARE INSUFFICIENT

Plaintiff demands recusal or disqualification under 28 U.S.C. § 455(a) and 28 U.S.C. § 455(b)(1). [DOC. 37, PAGE 1]. The alleged grounds for recusal or disqualification can be placed in three categories. First, Defendants in their responsive pleadings have asserted they only became involved in Mr. Canup's 3M

Combat Arms Earplug case when requested to do so by the MDL Court on behalf of Plaintiffs' 3M MDL leadership.   Plaintiff alleges an "off-record request" between this Court and Defendants requires recusal or disqualification because the request was "extrajudicial" and implicates the Court's personal knowledge.   [DOC. 37, PAGE 1, 6-7].   Second, Plaintiff claims certain statements made by this Court require recusal or disqualification because the statements implicate the Court's partiality. [DOC. 37, PAGE 2]. Third, Plaintiff alleges recusal or disqualification is required because the Court recused in a different case, *Kelly v. Aylstock*, *et. al.* No. 3:25-cv-01649.[1]

As shown below, Plaintiff's arguments are incorrect and should be denied.

<div align="center">

**LEGAL ARGUMENTS AGAINST RECUSAL
OR DISQUALIFICATION**

</div>

I.    **THE LEGAL STANDARD FOR RECUSAL OR DISQUALIFICATION IS OBJECTIVE.**

Plaintiff has not shown any grounds for recusal or disqualification under 28 U.S.C. § 455(a) and 28 U.S.C. § 455(b)(1).   28 U.S.C. § 455 "creates two primary

---

[1] Defendants have no knowledge of the Court's basis for recusal from the *Kelly* case.  *Canup v. Aylstock, et al* is a different case, with a different Plaintiff, additional different Defendants and different allegations than *Kelly.* And unlike Canup, Kelly was previously represented by Aylstock and Bradford.  Absent some information from the Court to the contrary, Plaintiff's attempt to force recusal or disqualification in this case based upon a recusal order from another case is grounded in nothing more than rank speculation, and must be rejected.

See also *In re Moody*, 755 F.3d 891, 895 (11th Cir. 2014) (quoting *Nichols v. Alley*, 71 F.3d 347, 351 (10th Cir. 1995)(holding "decisions under "§ 455(a) are extremely fact driven and 'must be judged on their unique facts and circumstances more than by comparison to situations considered in prior jurisprudence.' ") and *Diversified Numismatics, Inc. v. City of Orlando, FL.*, 949 F.2d 382, 385 (11th Cir. 1991) (holding "Prior recusals, without more, do not objectively demonstrate an appearance of partiality.")

5326664_1

reasons for recusal." *United States v. Patti*, 337 F.3d 1317, 1321 (11th Cir. 2003). Appellate courts have held that "[a] judge should recuse himself under § 455(a) when there is an appearance of impropriety." *Id.* 28 U.S.C. § 455(a) provides, "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned" 28 U.S.C. § 455(a) (emphasis added). Notably, the Plaintiff admits this is an "objective" standard. [Doc. 37, Page 5].

"Thus, the standard of review for a § 455(a) motion 'is whether an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt about the judge's impartiality,' and any doubts must be resolved in favor of recusal." *Patti*, 337 F.3d at 1321 (citations omitted). Meaning, the objective standard is not viewed from a "hypersensitive, cynical, and suspicious person." *Plaintiff B v. Francis*, No. 5:08-CV-79-RS-AK, 2008 WL 5263435, at *1 (N.D. Fla. Dec. 16, 2008) (quoting *United States v. Jordan*, 49 F.3d 152, 156 (5th Cir. 1995)). In sum, 28 U.S.C. § 455(a) "embodies an objective standard." *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1524 (11th Cir. 1988).

As a result, "[a] judge should not recuse himself based upon unsupported, irrational, or tenuous allegations." *Giles v. Garwood*, 853 F.2d 876, 878 (11th Cir. 1988). *See also Petrano v. Nationwide Mut. Fire Ins. Co.*, No. 1:12CV86-SPM/GRJ,

5326664_1

2013 WL 3321926, at \*2 (N.D. Fla. July 1, 2013), *aff'd sub nom. Petrano v. Old Republic Nat. Title Ins. Co.*, 590 F. App'x 927 (11th Cir. 2014)) ("A litigant cannot create a conflict of interest by asserting a frivolous claim against a judge since 'unsupported, irrational, or tenuous allegations' are not sufficient to make a reasonable person question the judge's impartiality.").

This principle means "Section 455 does not require the judge to accept all allegations by the moving party as true." *United States v. Greenough*, 782 F.2d 1556, 1558 (11th Cir. 1986). The rationale for this rule is clear. "If a party could force recusal of a judge by factual allegations, the result would be a virtual 'open season' for recusal." *Id.* (quoting *Phillips v. Joint Legislative Com.* 637 F.2d 1014 (5th Cir. 1981)).

> This is very different from the disqualification procedure that currently exists in the Florida state courts where judges are required to accept all allegations as true and are prohibited from identifying and rejecting allegations that are misleading, inaccurate, or outright false. Under the Florida state court disqualification procedure, unscrupulous parties are free to abuse and manipulate the system to obtain a judge more to their liking simply by filing an affidavit containing demonstrably false allegations. The federal disqualification procedure operates differently.

*United States v. Ward*, No. 5:24-CR-52-TPB-PRL, 2025 WL 934413, at \*1 (M.D. Fla. Mar. 27, 2025).

Based on this line of cases, it is clear that "a judge also has a duty to retain a case when faced with a meritless recusal motion." *Statton v. Kiser*, No. 8:18-CV-

4

2345-T-60SPF, 2019 WL 6975091, at *1 (M.D. Fla. Dec. 20, 2019). In other words, "a judge has as strong a duty to sit when there is no legitimate reason to recuse as he does to recuse when the law and facts require." *United States v. Malmsberry*, 222 F. Supp. 2d 1345, 1349 (M.D. Fla. 2002). "Judges must not recuse themselves for imaginary reasons[.]" *Murray v. Scott*, 253 F.3d 1308, 1313 (11th Cir. 2001). Plaintiff has not presented objective evidence of bias but rather suggests that his spurious, subjective claims should carry the day despite the facts and law to the contrary.

## II. PLAINTIFF HAS NOT SHOWN THIS COURT TO BE IMPARTIAL OR BIASED AS A MATTER OF LAW.

### a. THE PLAINTIFF HAS NOT SHOWN ANY GROUNDS FOR RECUSAL OR DISQUALIFICATION BECAUSE OF ALLEGED EXTRAJUDICIAL CONDUCT OR KNOWLEDGE

Plaintiff's attempts to label this Court's request for Defendants to make themselves available to assist Plaintiff on behalf of leadership through his counsel, David Gamble, as "extrajudicial" are wrong at best and disingenuous at worst. It cannot be disputed that the Court appointed leadership in this MDL, including Defendants.[2] The Court entered orders defining leadership roles and responsibilities.[3] The Court directed Plaintiffs' leadership to do work the Court deemed necessary to benefit the litigation as a whole. In this specific instance, the

---

[2] *See In Re: 3M Combat Arms Earplug Products Liability Litigation, Pretrial Order 7, May 22, 2019, Doc. 376, p. 1.*
[3] *See In Re: 3M Combat Arms Earplug Products Liability Litigation, Pretrial Order 4, April 19, 2019, Doc. 76, p. 1.*

5

Court requested Defendants to provide information to opt-out litigants about the settlement and its impact on their individual cases.

"Extrajudicial" conduct, by definition, refers to actions taken outside the judicial process and unrelated to a pending proceeding. *See United States v. Cosimano*, No. 8:18-CR-234-MSS-SPF, 2025 WL 3166866, at *1 (M.D. Fla. Nov. 13, 2025) ("Conduct is considered "extra-judicial" when it occurs outside the judicial proceedings."); *Davis v. Bd. of Sch. Comm'rs of Mobile Cnty.*, 517 F.2d 1044, 1052 (5th Cir. 1975) ("The determination should also be made on the basis of conduct extra-judicial in nature as distinguished from conduct within a judicial context."). That is not what occurred here. The Court's directives were issued within this MDL proceeding, to court-appointed plaintiff leadership, for the express purpose of advancing coordinated pretrial proceedings under 28 U.S.C. § 1407.

Plaintiff's argument rests on a fundamental mischaracterization. An action is not "extrajudicial" merely because it occurs outside a formal hearing or is communicated through informal case-management mechanisms. Courts routinely manage litigation through conferences, directives, and other methods that do not have transcripts or orders.[4]

[4] *By Plaintiff's analysis, any judicial action which is not transcribed, not reflected in a docket entry or not entered as an order constitutes extrajudicial information requiring disqualification or recusal.*

Additionally, the transcript from Plaintiff's March 14, 2024 Status Conference shows the Court discussed Defendants' role in Plaintiffs case directly with Plaintiff and his counsel "on the record." The status conference began with the Court welcoming Mr. Canup and his attorney Mr. Gamble, introducing herself, and then telling Mr. Canup: "Also in the courtroom today from plaintiffs' leadership there's Mr. Bryan Aylstock, Mr. Brad Bradford and Mr. Mike Burns." [Ex. A] Status Conference Transcript at 3:8-9]. The MDL Court continued by explaining why she thought it was important to meet with those plaintiffs litigating their cases (like Mr. Canup) so that she could give her perspective of the litigation having overseen it for 5 years, stating: "Also, as you can see, leadership counsel from the plaintiffs' side is here if you have questions of them." *Id.* at 4:23-25. The MDL Court continued by explaining why she thought it was important to meet with those plaintiffs litigating their cases (like Mr. Canup) so that she could give her perspective of the litigation having overseen it for 5 years, stating: "Also, as you can see, leadership counsel from the plaintiffs' side is here if you have questions of them." *Id.* at 28:25-29:1. The Court went on to advise Mr. Canup:

> "So my purpose today was just to meet with you, to explain to you what this is going to be like going forward, and to give you an opportunity, as I said, to speak with me. If you have questions, if there's something that I can address for you, I'm happy to do that, if I'm able to. You have a lawyer, so I certainly – even if you didn't have a lawyer, I wouldn't try to give you any legal advice. I'm just giving you my perspective as the judge who has been

<div align="center">7</div>

presiding over this litigation for a long time and has a great deal of familiarity with it so you go forward with your eyes wide open. And then if you'd like an opportunity, you or Mr. Gamble, to talk with leadership counsel about some if what I've said about the settlement program, some of the more nuanced aspects of the settlement program, that's going to be available to you as opportunity, if you'd like …" *Id. at 32:8-33:23.*

And then, at the end of the day, if you leave here, you know, you're leaving without settling, you're leaving here having heard from me, you know, I feel better about that. You had an opportunity to ask questions. And then, if you decide to roll the dice, again, that's your case. That's what our system is about. The courtroom is here. We try cases …" *Id at 34:1-7.*

Plaintiff and his counsel Defendants' knew Defendants' role in Plaintiff's case Plaintiff's assertions to the contrary are disingenuous. It is undisputed that "[b]ias sufficient to disqualify a judge under section 455(a) and section 455(b)(1) must stem from extrajudicial sources[.]" *United States v. Bailey*, 175 F.3d 966, 968 (11th Cir. 1999). By definition, statements made before this Honorable Court in relation to the underlying MDL litigation cannot be considered extrajudicial sources.

> Applying the "extrajudicial source" standard, the Supreme Court has held that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion," nor do "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases."

*United States v. Marrero*, 219 F. App'x 892, 895 (11th Cir. 2007) (quoting *Liteky v. United States*, 510 U.S. 540, 555–56 (1994)).

<div align="center">8</div>

5326664_1

**b.** **THE PLAINTIFF HAS NOT SHOWN ANY GROUNDS FOR RECUSAL OR DISQUALIFICATION BECAUSE OF BIAS.**

Plaintiff cites three passages from the Court's Case Management Conference

on September 8, 2023 is support of his unfounded allegations the Court is biased or

partial in this case:

Specifically, Judge Rodgers stated:

"[I]n my view the leadership teams on both sides really do exemplify the very best of the legal profession." *See* Ex. 4, *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, No. 3:19-md-2885, Twenty-Third Case Mgmt. Conf. Tr. at 13:14–15 (N.D. Fla. Sept. 8, 2023), ECF No. 3862.

Judge Rodgers further stated:

"And because we have so many individual plaintiffs, I want to speak to them in -- just for a second in saying that they have all been extremely well represented by the leadership counsel in this litigation on the plaintiff side. 3M, ably represented as well. But I want those 250,000-plus plaintiffs to know that they were represented very well." *Id.* at 13:15–21.

[DOC. 37, PAGE 7].

Judge Rodgers further stated:

"Those who reject the settlement will learn hard lessons that Judge Miller and I already know, but that's for another day." *Id.* at 8:10–12.

Canup is among the plaintiffs who rejected the settlement referenced in that statement. 1

[DOC. 37, PAGE 8].

However, it is undisputed that "[b]ias sufficient to disqualify a judge

under section 455(a) and section 455(b)(1) must stem from extrajudicial sources[.]"

*United States v. Bailey*, 175 F.3d 966, 968 (11th Cir. 1999). By definition, statements

9

5326664_1

made before this Honorable Court in relation to the underlying MDL litigation cannot be considered extrajudicial sources.

> Applying the "extrajudicial source" standard, the Supreme Court has held that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion," nor do "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases."

*Unid States v. Marrero*, 219 F. App'x 892, 895 (11th Cir. 2007) (quoting *Liteky v. United States*, 510 U.S. 540, 555–56 (1994)).

That said, there is nothing inappropriate or partial or biased in the Court's criticized comments. Plaintiff's efforts to use such innocuous comments by the Court to seek recusal or disqualification (along with the extrajudicial argument discussed above) is the simply the latest effort by Plaintiff to avoid having this Court interpret its own orders.

For the reasons above, Plaintiff's motion requesting recusal and disqualification should be denied as a matter of law.

## III.    PLAINTIFF HAS NOT SHOWN ANY GROUNDS FOR RECUSAL OR DISQUALIFICATION UNDER 28 U.S.C. § 455(B)(1).

Appellate courts have held that "a judge should recuse himself under § 455(b) when any of the specific circumstances set forth in that subsection exist, which show the fact of partiality." *Patti*, 337 F.3d at 1321. In this case, the Plaintiff alleges the circumstance of 28 U.S.C. § 455(b)(1).

10

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

28 U.S.C. § 455(b)(1).

"A litigant moving for recusal of a federal judge must allege facts supporting his contentions that the judge is biased." *United States v. Walker*, No. 5:17-CR-5-RH/MJF, 2021 WL 6802920, at *8 (N.D. Fla. Dec. 28, 2021) (citing *United States v. Cerceda*, 188 F.3d 1291, 1293 (11th Cir. 1999)). The rationale for this principle is that "judges are presumed to be impartial, and the movant bears the burden of demonstrating an objectively reasonable basis for questioning the judge's impartiality." *Grimshaw v. Metro. Life Ins. Co.*, No. 11-14165-CIV, 2012 WL 13129960, at *1 (S.D. Fla. Aug. 15, 2012). As discussed above, these alleged statements occurred in court and were regarding the underlying MDL litigation; thus, Plaintiff's reliance on 28 U.S.C. § 455(b)(1) is illogical, and the Eleventh Circuit agrees.

> Bailey makes another recusal argument under section 455(b)(1). He argues that Judge Paul acquired personal knowledge of facts relevant to the stock-ownership dispute when Judge Paul met with the parties in chambers and discussed the matter of the stock's being made available to Bailey: In chambers seems to have been where the agreement was first announced. But, whatever knowledge Judge Paul gained about the stock's ownership was acquired in the course of a judicial proceeding. See United

11

5326664_1

> States v. Sims, 845 F.2d 1564, 1570 (11th Cir.1988) (in camera hearing is not extrajudicial); United States v. Page, 828 F.2d 1476, 1481 (10th Cir.1987) (knowledge of disputed evidentiary fact must be gained extrajudicially to require recusal). So, Judge Paul's alleged knowledge of a disputed evidentiary fact does not require recusal in this case.

*United States v. Bailey*, 175 F.3d 966, 969 (11th Cir. 1999).

In this case, Plaintiff is attempting to recuse or disqualify this Court solely for its role in the underlying MDL litigation, which cannot be used to show bias or impartiality. "[P]residing over a different case with the same or similar parties does not necessarily create a basis for bias or partiality arising from an extrajudicial source." *Miccosukee Tribe of Indians of Fla. v. Cypress*, 56 F. Supp. 3d 1324, 1331 (S.D. Fla. 2014). *See also King v. Carlton*, No. 21-CV-21634, 2021 WL 2012371, at *2 (S.D. Fla. May 20, 2021) (quoting *Maldonado v. Rhoden*, No. 3:20-CV-418-BJD-PDB, 2021 WL 1293425, at *1 (M.D. Fla. Apr. 7, 2021)) ("A judge is not biased against a civil litigant merely because the judge participated in a criminal action involving the same litigant or related facts.").

> Petitioner seeks recusal on the theory that because Magistrate Judge Spaulding and the undersigned presided over Petitioner's criminal case, they lack impartiality to preside over the instant proceeding. Petitioner does not cite, and the Court does not find, any authority that Magistrate Judge Spaulding and the undersigned must recuse themselves from this proceeding merely because they presided over Petitioner's criminal case.

12

5326664_1

*Toomer v. United States*, No. 6:10-CV-1197, 2010 WL 4008764, at \*2 (M.D. Fla. Oct. 7, 2010).

> Here, Campbell presented no evidence that the district judge was influenced by any personal or extrajudicial bias. Campbell's only arguments pertaining to impartiality or bias stem from the earlier rulings in this case. Adverse rulings, without some evidence of improper influence, do not constitute bias. Liteky, 510 U.S. at 555, 114 S.Ct. at 1157; Hamm, 708 F.2d at 651. The district judge's failure to disqualify herself from ruling on Campbell's post-judgment motion was not error, much less plain error.

*Campbell v. Sec'y of Dep't of Veterans Admin.*, 603 F. App'x 761, 763 (11th Cir. 2015).

The U.S. Supreme Court has held similarly. "It has long been regarded as normal and proper for a judge to sit in the same case upon its remand, and to sit in successive trials involving the same defendant." *Liteky v. United States*, 510 U.S. 540, 551 (1994). "Also not subject to deprecatory characterization as "bias" or "prejudice" are opinions held by judges as a result of what they learned in earlier proceedings." *Id.* For the reasons above, Plaintiff's motion requesting recusal and disqualification should be denied as a matter of law.

## REQUESTED RELIEF

For the reasons above, Defendants respectfully request that this Court enter an order denying the Plaintiff's request for recusal or disqualification, as he has failed to present the necessary, objective evidence to warrant that result.

13

5326664_1

Dated:  May 1, 2026.

<div style="text-align:right">

Respectfully Submitted,

*/s/ Gregory K. Rettig*
Gregory K. Rettig (172774)
Justin T. Keeton (1025509)
*Co-Counsel for Defendants Bryan F.
Aylstock, and
Aylstock, Witkin, Kreiss & Overholtz PLLC*

</div>

**FOR THE FIRM:**
**LLOYD, GRAY, WHITEHEAD & MONROE, P.C.**
125 W. Romana Street, Suite 330
Pensacola, Florida 32502
Telephone: (850) 777-3322
Facsimile: (850) 777-3290
Grettig@lgwmlaw.com
Jkeeton@lgwmlaw.com
Lglover@lgwmlaw.com
Egates@lgwmlaw.com

<div style="text-align:center">14</div>

5326664_1

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of May 2026, a true and correct copy of the foregoing has been furnished either by filing electronically with the Clerk of Court and/or United States Mail, first-class postage prepaid and properly addressed to:

Brandon Canup
4812 Hidden Oaks Ln
Arlington, TX 76017
*Pro Se Plaintiff*

/s/ Gregory K. Rettig
*Co-Counsel for Defendants Bryan F. Aylstock, and Aylstock, Witkin, Kreiss & Overholtz PLLC*

15

5326664_1

# Tab 56-1

# EXHIBIT

# "A"

Case: 2:26-cv-03359-VMC-PCB Document 86-1 Filed 06/01/26 Page 224 of 388

USCA11 Case: 26-11887    Document: 5-2    Date Filed: 06/05/2026    Page: 21 of 185

1

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

IN RE: 3M COMBAT ARMS EARPLUG   )    Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,   )
                                  )    Pensacola, Florida
                                    )    March 13, 2024
In re:  BRANDON CANUP            )    10:06 a.m.
       8:20cv14021             )
                                      )
_____)

## STATUS CONFERENCE

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE

(Pages 1-47)

## A P P E A R A N C E S

FOR THE PLAINTIFF:        Law Office of David G. Gamble
                          By:   **DAVID G. GAMBLE**
                              *davidgamblelaw@gmail.com*
                          2805 Vermont Court
                          Arlington, Texas   76001

                          Aylstock, Witkin, Kreis & Overholtz, PLLC
                          By:   **BRYAN F. AYLSTOCK**
                              *baylstock@awkolaw.com*

                          **BOBBY J. BRADFORD**
                            *bbradford@awkolaw.com*
                          17 E Main Street, Suite 200
                          Pensacola, Florida   32502

*Donna L. Boland, RPR, FCRR*
*Certified Court Reporter*
*1702 E Baars Street * Pensacola, Florida   32503*
**DLBolandUSCR@gmail.com**

2

APPEARANCES: (cont'd)


FOR THE PLAINTIFF:     Mostyn Law
                       By: **MICHAEL A. BURNS**
                           *epefile@mostynlaw.com*
                       3810 W Alabama Street
                       Houston, Texas  77027

FOR THE DEFENDANT:     Moore, Hill & Westmoreland, PA
                       By: **CHARLES F. BEALL, JR.**
                           *cbeall@mhw-law.com*
                       350 W Cedar Street, Suite 100
                       Pensacola, Florida  32502

3

P R O C E E D I N G S

**THE COURT:** Good morning, Mr. Canup and Mr. Gamble, I believe. It's nice to see you both, and I appreciate you coming this morning.

I'm Judge Casey Rodgers. I am the judge presiding over the 3M Combat Arms Earplug MDL. I've been presiding over it for some time now, more specifically since April of 2019.

Also in the courtroom today from plaintiff's leadership there's Mr. Bryan Aylstock, Mr. Brad Bradford, and Mr. Mike Burns.

Good morning.

And then, from 3M, Mr. Charles Beall.

So, at the time that the parties entered into that global settlement agreement, which was in August of 2023, it was contemplated that the Court would schedule a conference -- this conference -- with every plaintiff who elected to opt out of the settlement. And there were a couple of reasons for that.

First and foremost, I thought it would be important and hopefully helpful given the sort of massive undertaking of the MDL and enormous amount of time and energy, I'm sure you can imagine, resources and money went into that litigation and contributed to the global settlement.

You all -- neither one of you were here for that litigation.

Mr. Gamble, you actually came in very recently as counsel for Mr. Canup. Previously he had separate counsel throughout his case, but his case was like hundreds of thousands of others that never saw the inside of the courtroom, for obvious reasons.

But, because of that, I felt it would be important to meet with those who are going to continue forward with their cases to have some understanding from me, from my perspective, about the litigation and the extraordinary nature of the litigation before you decide ultimately to go forward with your case, although I know that's the decision you've made, and that's fine. We'll talk about that.

But I also felt -- along those lines, I also felt, as a second reason for these conferences, that it's important for me to afford all plaintiffs who have opted out -- and there are not very many, frankly, which is quite extraordinary -- that you all be afforded one final opportunity to participate in the settlement, if you choose to do so, before the final settlement registration deadline, which is March 25th.

And I felt it would be important for you to be here to meet with me, be able to ask me questions, if you have any questions.

Also, as you can see, leadership counsel from the plaintiffs' side is here, if you have questions of them and/or 3M as well.

And then there's also an opportunity following my remarks for you all to meet with the magistrate judge assigned to this litigation, Judge Hope Cannon, who is very, very familiar with the settlement. She was an instrumental part of that settlement, and she knows the program very well, in case you have questions about the settlement program.

From experience, I've seen where -- and this isn't -- I'm not talking about you all specifically, but in other instances it may be that the plaintiff didn't have a full understanding of the settlement program and how he or she might fit within the various aspects of the program, including the EIF aspect of the settlement program. And there have been some questions about that from other opt-out litigants. So, again, that will be an option for you, if you choose to take advantage of it.

I realize that being here for you today is a big commitment. And again, I appreciate you making that commitment, both of you. I know you're not local. 99.9 percent of the plaintiffs in this litigation are not local.

But it's also a good opportunity for me just to let you know, particularly if you had been *pro se*, Mr. Canup, which you're not. But some who are similarly situated to you in terms of having opted out, they are *pro se*, meaning they're representing themselves. They don't have counsel. They either never had counsel or their counsel has withdrawn.

6

And so, it's a good time for me to make sure that everyone understands that appearing in court -- believe it or not, even though, you know, we're in this age of technology where we can do things like Zoom very easily, appearing in court is part of litigation.

With you having counsel means for you fortunately most of the time your counsel can appear on your behalf other than today. But for a *pro se* litigant, those individuals need to know that it's just part and parcel of litigating. You have to follow court orders. And if the Court directs you to appear in person in the courtroom, then you have to be here.

Mr. Gamble certainly knows that as an officer of the Court.

So, I'm not going to twist your arm today. You're not here for that purpose in trying to get you to settle your case.

I do want you to have an opportunity to talk more about that, if you'd like. You're not required to.

We're here. I mean, you've made the decision to opt out of the program, and that's your right. And you've made that decision and, frankly, that's why we're here.

But it's not -- we're going to talk about this. But it's not as simple in just saying *I want to take my case to trial, I want to fight, you know, I want a jury trial.* It's not that simple.

And Mr. Gamble, I'm sure, has had some discussions

Case: 2626-cv-03359-MCR-ZCB Document 8652   Filed 06/01/26   Page 231 of 388
USCA11 Case: 26-11887   Document: 5-2   Date Filed: 06/05/2026   Page: 28 of 185

7

with you about that; and if he hasn't yet, he will.  There is a lot more to litigating a case than simply saying *I want to litigate my case.*

And this litigation takes on a new meaning because there are certain hurdles that you have to get over -- all people or claimants who are situated like you, you have to get over before you'll ever get to a jury trial.  So we'll talk about those challenges.

But let me first, before I talk about the challenges, just briefly discuss the settlement program and the litigation.

And from my perspective -- and, frankly, I don't know of anyone who has a better perspective than I do to talk to you about the settlement program and about the litigation.  Because, frankly, I'm the only neutral in the courtroom, and I have been very closely associated with the litigation for the nearly five years that I've had the MDL.

I'm very familiar with the claims, very familiar with the defenses, very familiar, obviously, with the management of the litigation throughout the four-and-a-half years or so prior to the settlement, and I'm very, very familiar with the settlement as well.

But the litigation, from my perspective, this litigation in particular, has been extraordinary for several different reasons, not the least of which is the fact that it's the largest MDL in the history of the judiciary.

Never before -- not asbestos, not mesh, not BP Deepwater Horizon -- none of those MDLs even come close to the size of this MDL.  And for most of its life, this MDL has occupied a third of the federal judiciary's entire civil docket.

And so, it's extraordinary in that sense because not only is it a big litigation for the parties to have to deal with, but it's a huge undertaking for the judiciary. Extraordinary.  And there's a lot of strain and toll that has come with the litigation.  So it's been extraordinary in that respect.

It was also extraordinary -- and these are things you won't really know any firsthand knowledge about.  Maybe you've heard about some of the things I'm going to mention to you. But you weren't here, like I said, you weren't here on the ground in the trenches for the litigation.

But one of the things right out of the gate that was unique about the 3M litigation was the fact that so much of the discovery, which, Mr. Canup, that means the factual information, the data this is typically in the hands of either the parties, sometimes it's in the hands of a third party, but not to this magnitude.

And what I'm referring to is that most of the factual data was in the hands of the Department of Defense and the Department of Veterans Affairs or the Veterans Affairs

Administration.

And trying to convince those government agencies to produce the amount of data that was necessary to be produced in this litigation, given the number of plaintiffs, was difficult, to say the least.

I traveled to the Pentagon with the parties on a couple of different occasions to the Department of Justice. There was a couple of years' worth of relationship building in trying to get the data. Because there's no question in my mind, if we have to do this on an individual basis, claimant by claimant or plaintiff by plaintiff, servicemember by servicemember, without a centralized process for obtaining that data, we would have been here for years and years and years.

I'm a veteran Army soldier. And when I was first assigned the MDL, I decided to -- because I knew this was going to be an issue, I decided to apply to the National Archives for my records from the '80s, and I still haven't gotten them.

So it's obvious that that would have been unrealistic to think with that many plaintiffs -- at the time I'm talking about we were probably 150,000 to 200,000. Of course, it grew from there.

The other thing that's extraordinary, a couple of other things, in addition to the common, sort of, the military discovery that was in addition to the corporate discovery that was conducted here was some of the defenses in the litigation.

And one of those, notably, is the government contractor defense.

Mr. Gamble is probably familiar with this.

Mr. Canup, you are probably familiar and understand that, as a servicemember, you're precluded, just like I was precluded, from suing the military based on a service-connected or service-related injury. It's called the Feres Doctrine.

Well, when you have a government contractor who builds things for the government -- designs or builds for the government and then people are injured as a result of that, that contractor can raise what's called the government contractor defense.

And if it's granted -- if that defense is accepted, then that contractor moves into the shoes of the United States military and is entitled to sovereign immunity like the military from those claims.

And so, 3M raised that defense right off the bat in the litigation, and I frontloaded that because I didn't know what my ruling would be, I had no idea, but I knew it was a potentially dispositive issue.

And what that means is, the issue was such that, if I granted 3M the defense, if I said, yes, you're entitled to the defense, the game is over, the case is over for everyone, there is no live case.

So that was something that had to be dealt with, and

it was unique. At the end of the day, I ruled in favor of the plaintiffs and against 3M and actually granted judgment in favor of the plaintiffs on the issue.

However, the issue was part of every appeal that was taken -- I'm getting a little ahead of myself. But you know there were trials in this litigation, and every one of those plaintiff verdicts was appealed by 3M.

The settlement was reached before those appeals had been decided, although one was -- the first was very close to a decision. There had been oral argument and I suspect a decision was imminent at the time of -- certainly at the time of the settlement.

It's anybody's guess what the Eleventh Circuit, which is the circuit that -- court of appeals that decides issues in this geographic area from my court -- anybody's guess what the court ultimately would have done with that.

They could have decided that I was entirely wrong and granted 3M the defense, which would have meant game over for everybody. They may have decided that I was partially wrong or incorrect, in that, there was a jury question on that issue, which would have meant that those verdicts would have been reversed, those cases would have come back from the appellate court for retrial here, and that issue of the government contractor defense would have been a jury question. And then the juries would have each decided -- the parties would have

Case 3:26-cv-03359-MCR-ZCB   Document 8652   Filed 06/01/26   Page 236 of 388
USCA11 Case: 26-11887   Document: 5-2   Date Filed: 06/05/2026   Page: 33 of 185

12

litigated that issue in front of the jury, and the jury would have made a decision on that defense.

But I guess the point of this is it is -- that was a bit extraordinary. But the other thing that's something you should keep in mind, both of you, is this is still a live issue.

As I said, it was never decided -- the issue was never decided on appeal by the Eleventh Circuit.

And so, Mr. Canup, if you continue forward and you end up at some point with a trial, if you prevail at that trial, there is no doubt that 3M -- I'll let Mr. Beall speak to this -- but 3M will appeal, and that issue is still a live issue on appeal. So they will argue it and the Eleventh Circuit will -- ultimately may have to decide it.

Also, I mentioned, again, the verdicts, so obviously there were trials. This was most certainly extraordinary as part of this litigation or any litigation, frankly.

There were 16 bellwether trials. Bellwether means we selected the most representative sample of cases that we could come up with, and they were truly -- in my mind it was a -- one day, if you're interested, I can explain it to you.

But it was a very good process that we went through statistically -- it was random at first and then there was a statistical analysis applied called a prevalence analysis to come up with a representative sample.

And we did that and ultimately there were 19 plaintiffs who went to trial over the course of 14 months in 16 different trials. So two of the trials had consolidated plaintiffs, so they had more than one case in a trial. But there were 19 verdicts in 14 months.

I presided personally over six of those trials. I covered for judges in two of the other trials. And I observed every single trial -- if I didn't preside over it, I observed it live via Zoom. And sometimes I had more than one Zoom going at a time because we had trials that were overlapping throughout the district. Again, it was pretty extraordinary.

But I saw, as part of those trials, 13 plaintiffs prevail, and I saw a devastated six plaintiffs lose entirely. And then, from there, again, appeals in every one of those cases.

The other thing that was extraordinary about the litigation -- and again, this was done at random, too. You may be sitting there thinking, Mr. Canup, why was I on the sidelines with -- you weren't alone, I promise you that. There were hundreds of thousands.

The bellwethers were pulled at random, as I said, literally at random. And then the wave cases, which I'm getting ready to talk about, there were four waves. We called them waves because they were cases that were worked up for discovery and they're called waves because they overlapped in

terms of their discovery periods.  But there were 500 per wave, so roughly 2,000 cases in the beginning, and they were all pulled at random.

So it's just the luck or not the luck, however you want to look at it, whatever your perspective it, of the draw, in terms of what claimant got into the courtroom versus claimants who didn't.  There was nothing intentional about that other than to have a random process and then a representative process for the bellwethers.

One other unique aspect of this litigation that I'm sure both of you are aware of, and I'll just touch on it briefly, was the Aearo bankruptcy.  And that was -- "detour" seems to be maybe an understatement.  But it certainly took this litigation out of commission for a while.

Aearo was essentially a subsidiary of 3M.  They were the company that 3M purchased in 2008 that actually designed the plug.  And they filed a bankruptcy.  We're not going to get into the specifics of that, but it was -- that direction that the litigation was heading in at that point would have looked very, very different in terms of an ending for the plaintiffs than what happened here.

There are -- again, I don't want to get too technical, but there are automatic stays that come into play when a company files bankruptcy.  The company is always seeking a channeling injunction that would prevent future litigation

against that company, they're always seeking third-party releases.

There's a super majority rule where individuals, if there's a plan that is confirmed and it is agreed to by a certain number of the claimants in existence at the time, it can be decided for other claimants who may not agree with the plan that the plan is acceptable and those plaintiffs have to live with that at least for the moment.

The Supreme Court is right now considering some of these issues. But, as it stands right now, state of the law, that's how it works in bankruptcy.

It didn't happen here, but it can still happen. I guess the point is 3M never filed bankruptcy in this litigation. Aearo filed bankruptcy.

However, 3M, they can still file bankruptcy. There's nothing that precludes them from filing bankruptcy. I don't want them to file bankruptcy, but I can't preclude them from filing bankruptcy.

Do I think it's going to happen? No.

Do I know it's not going to happen? No.

I don't know anything about, really, their business model, what pressures they face. I know what I read, just like everybody else, what you read in the press about their business model and spin-offs and things that they're doing and stocks and dividends and those kind of things. I don't know. I mean,

I don't know.

I know they have other litigation hanging over their head -- "they" meaning 3M -- that is substantial, and it's not just this litigation. It's the PFAS litigation that you may have heard something about. So that's another sort of extraordinary aspect of this.

And then finally, the last point I'll make as far as how extraordinary this litigation has been -- and this speaks to, in my view, the fairness of the settlement, and I do believe the program is fair under the circumstances, most of what I've just discussed -- but the fact that there's nearly 100 percent participation by claimants.

So there were just over 300,000 plaintiffs who appeared on a declaration form on September 12th of 2023 -- that was the reference date -- and then ultimately some were -- many were dismissed for different reasons, but ultimately just over 250,000 claimants registered for the settlement -- or registered for the program.

You had to register to -- you registered. But then, when you register, you decide are you opting in or are you opting out.

And so, as far as registering and opting out, we have under 20 cases, 20 plaintiffs who have chosen not to participate in the settlement in favor of litigating. Everyone else has opted into the program. That is extraordinary. The

percentage is, I don't know, 99.99999, something like that. It's very, very, very, very high in terms of participation rate.

So let me speak just a minute, Mr. Canup and Mr. Gamble, to how your case will proceed going forward.

For the reasons I just went over with you, the magnitude of the litigation, the toll of it on not just the parties but also on this Court but also on the judiciary as a whole, it was my decision at the time of the settlement to enter case management orders to effectuate the settlement program but also to manage the litigation going forward.

And at that time, obviously, we had no idea -- I certainly had no idea about how many plaintiffs would actually opt in versus opt out. I didn't know.

But given the toll that the litigation had taken already and the advanced stage of it, you know, pushing five years at that point, the amount of data points that the parties had already gained through the bellwether process, I felt it was important to put in place CMO 57, which is Case Management Order No. 57, and require people going forward to comply with the requirements of that order.

And some may say, *Well, Judge, I don't think that's fair. This isn't the type of order that you enter in a one-off case or in your other civil cases on your docket.*

And I guess my response to that is there's nothing

ordinary about this litigation.

You may feel like, well, it is ordinary, it's unique -- or it's unique, it's ordinary to me or it's unique to me, and I shouldn't be lumped in with all these other people who have made up this litigation. But you are. I mean, it is what it is. You are a part of this litigation.

And this Court has lived this litigation for nearly five years, and I understand it. I understand the complexities of it. I understand the science, which I'll talk to you about in a minute. I understand what juries have done and what they can do, what they won't likely do with certain types of evidence.

Again, there's a great deal of data that I have and the parties have. And so, people who are going to go forward in the litigation, they'll have to meet these requirements in order to do that because there's a lot at stake.

It's a lot to try these cases, and, if you go forward, you will certainly figure that out.

So I'm not going to walk -- you have counsel. And even if you were *pro se*, I wouldn't walk you through every line of CMO 57. It's 39 pages.

I'm sure Mr. Gamble has familiarized himself with it. He understands that you and he are both bound by it.

But just to highlight a few of the features, there are 30-day deadlines, and there's a number of different sort of

categories of production and things you're required to do. And those deadlines for you passed on February 20th.

There is a cure period in CMO 57. And what that means is it's a period where 3M will notify the plaintiff of anything they perceive to be deficient as far as the production of documents, and then there's a 30-day cure period following that notification.

And then, following the cure period, if there are still deficiencies, then there will be a show-cause order, and the parties will come before the Court, and I'll resolve it.

You and Mr. Gamble may say there are no deficiencies. Mr. Beall and his stable of lawyers may say, yes, there are deficiencies. And then I'll need to decide if there are. And if you have been noncompliant with the order, then I will take that and I will rule.

There has been a deficiency letter issued to you. It was issued on the 8th. And so the cure deadline for that would be April 8th. I think the 7th is a Sunday. But there are a number of deficiencies. Mr. Beall can speak to this, if he wishes.

There's also a requirement in CMO 57 that I don't believe has been complied with, and it was for you to provide an affidavit regarding the statute of limitations.

Given the age of the cases that were filed -- and yours, I believe, might have been filed in 2020. I could look

back and confirm that.  But given when the plug was last -- and I know the answers to these questions.  You and your counsel may not know.  But given the time frame where the earplug ceased to be in existence in terms of being manufactured and distributed, there's a good bit of time between that date and the date that cases were filed.

I've made a number of different rulings on the statute of limitations throughout the bellwethers.  But for purposes here, you are required to submit that affidavit, and I don't believe you've done that.

And so, frankly, Mr. Gamble, the case is subject to dismissal on that basis alone if that hasn't been done.  I don't know why it hasn't been done, but keep that in mind.

If you are allowed to submit that, if there's -- I don't know that there's a cure period for the affidavit.  I'd have to look back at CMO 57.

But to the extent you're not in violation yet of the order or if you are in violation of it and I agree with you that there's some sufficient reason for that and I allow you to submit it out of time, one of the first things that will happen in this litigation going forward is that I will set up an early dispositive motion structure for statute of limitations.

And that will include a limited deposition, Mr. Canup, of you by 3M strictly on the issue of statute of limitations, not everything else to do with your case and your claims and

Case 3:26-cv-03335-MCR-ZCB   Document 8652   Filed 05/01/26   Page 245 of 388
USCA11 Case: 26-11887   Document: 5-2   Date Filed: 06/05/2026   Page: 42 of 185

21

damages and all of that. But on statute of limitations, that will happen.

And then 3M will be given an opportunity -- you, too, as well, either side -- to file a dispositive motion on the issue of statute of limitations. That will need to be addressed before the case goes forward.

The other thing that CMO 57 imposes, I guess, as a requirement is the need to disclose experts and expert reports. And you have 60 days from the date you elected to litigate to do that. That deadline is March 18th. That is subject to a cure period, another 30-day cure period.

So, depending on 3M's notice to you of any deficiency with regards to expert reports, your reports could be due as early as April 18th. Again, that depends on the notice from 3M.

But this expert deadline is a red line. It is a strict deadline. You cannot move forward in your case without an expert. The litigation regarding -- well, the litigation, as I've said, was complex. But it was complex not just because of the size of the litigation. It was complex because of the medical science and what was required as far as proof by the plaintiffs to convince a jury, you know, that not only that the plug was defective -- that's a big part of it -- but also that that defect caused your specific injury.

And the medical science on hearing is complex. I'll

Case 3:26-cv-03335-MCR-ZCB Document 8652 Filed 05/01/26 Page 246 of 388
USCA11 Case: 26-11887 Document: 5-2 Date Filed: 06/05/2026 Page: 43 of 185

22

say it's complex. No plaintiff in any jurisdiction in this country, whether it's here or some other jurisdiction in some other district in federal court or state court, can get to trial in one of these cases without a medical expert. It won't happen.

What we saw in the bellwether trials were multiple -- not just one expert, there were multiple experts. There were audiologists, there were ENT doctors, there was a subspecialty of ENT of surgeons called neurotologists, there were acoustical engineering experts, there were ballistics experts, there were military contracting experts.

And I'm sure I'm leaving some out, but there were a number of experts and not just on the defense side. I mean, these were on the plaintiffs' side and then they were met with defense experts.

But for the bellwether plaintiffs, those experts cost over $200,000 per case, and that did not include travel cost. And I know this because I keep track of costs in the bellwether litigation.

And so, in excess of $200,000 per plaintiff bellwether case just for experts. And those are the expert costs, not the attorney time, but these were expert fees.

I saw, Mr. Gamble, in your disclosure -- there was a 26(a) disclosure that your expert witnesses will be disclosed -- I'm quoting -- "by the deadline specified in the Court's

orders."

I just want to make sure you know and it's clear that you have a court-imposed deadline for your experts.

**MR. GAMBLE:** Yes, Your Honor. And we do intend to have both a medical expert and a vocational/damages expert disclosed by that time.

**THE COURT:** Okay, very good. I just didn't want you to think there was going to be some other order entered setting a different deadline.

Okay. So, Mr. Canup, as I said, I've served in the military, and I can only imagine -- you know, no doubt, you've suffered a great deal, you've sacrificed a great deal and I have no doubt you've suffered a great deal.

And I suspect that you -- I don't know you personally, but I suspect that you believe strongly that the CAEv2, the earplug at issue in this case, is responsible for the suffering you've endured. And I sympathize with that. And as I said, I sat through many, many, many, many of these trials.

But something -- I would be remiss if I didn't say this to you, having sat through all of the trials and seen what it takes to get through a trial, is that it's not enough to believe in the merits of your case. I mean, it's just not.

Obviously, you have to prove -- you have to prove your claims, again, no matter how strongly you believe in them. And everyone I've met in connection with this litigation, every

24

plaintiff I've met believes vehemently to their core in the merits of their case. And even your lawyer believes in the merits of your case.

You still have to prove it on legal issues to me but then from a factual standpoint ultimately to those people who sit over there in the jury box.

And you've got to prove it to them based upon the law and based upon the evidence. And that evidence has to be admissible, and it will have to show by a preponderance of the evidence that the CAEv2 is defective.

And by the way, you don't get to use other jury verdicts to do that. Those jury verdicts are inadmissible. So no one will ever stand up in this courtroom or any other courtroom and argue to your jury that they should find that the CAEv2 is defective in your case because some other juries found that in another case. That will never be permissible in the courtroom. So you have to prove that yourself with your own evidence.

And then, also, that the specific defect caused, as I said just a moment ago, caused your specific injury and damages. And in your case, I don't believe you have a hearing loss claim. Your short form complaint references only tinnitus.

If you had a hearing loss claim, you'd have to show that you sustained a hearing loss at a certain decibel level

from noise exposure, and then, for tinnitus, that you sustained a noise-induced injury causing your tinnitus while you were wearing the Combat Arms Earplug and that you wouldn't have otherwise suffered.

And that was the cases where 3M -- the trials where 3M came away with a defense verdict were cases where the juries just did not believe the plaintiff's injury had been caused while the plaintiff was wearing the earplug.

So, in the military -- I know this and you know this -- there is a lot of noise a lot of the time. Noise is everywhere in the military. And again, I can say that as an enlisted soldier.

Whether you're in the motor pool, whether you're on the range, whether you're flying a helicopter, whether you're fixing helicopters on a flight line, there's noise everywhere, like I said. Could be generators. But you'll have to contend with that. And in every bellwether trial that had to be contended with as well.

And it's not because these jurors in the six cases that I'm talking didn't like the plaintiffs or didn't believe the plaintiffs. In fact, nothing could be further from the truth or the case.

These plaintiffs in those six cases or six trials were extraordinarily likeable. I mean, they were personable. They were nice people. They served our country.

One in particular that comes to mind, a Mr. McCombs, had a story of incredible bravery.  He was in a forward operating base in Afghanistan and out on missions to find the bad guys.  Very compelling story from him.  And he had injury. He had both tinnitus as well as hearing loss.

And if I recall, he had significant injuries.  But the jury could not find that he was able to prove that his injuries were suffered while wearing the plug and exposed to noise and not from some other exposure to noise.  And that was difficult.

Mr. McCombs's jury in particular, a couple of the jurors had tears in their eyes.  They were very saddened that they had to reach the decision that they did.  But under the law, this jury followed the jury instructions and ruled against Mr. McCombs.  Hard for them to do.

And there were others.  Like I said, Mr. McCombs wasn't the only plaintiff who went to trial and lost their case, but they lost everything.  It was over.  And no issues really to appeal on the plaintiff's side.  So that was difficult.

But I just, again, I know that folks have heard a lot about the bellwether trials so there's been a lot reported about them.  None of those reports are by people like me, a judge who sat and listened to every single bit of evidence and knew the law in every single one of those cases.

But there are reports of huge verdicts.  And there

were huge verdicts, but there were also goose egg verdicts, and those people were devastated.

And it wasn't because their lawyers didn't do a phenomenal job. They did a phenomenal job trying those cases, and they had some of the best experts -- Mr. Beall will tell you that -- some of the best experts you could imagine on the various issues that I've just discussed, but they still lost. And it wasn't because they weren't injured. They just couldn't prove that causation.

So I understand -- Mr. Gamble said that you are going to have your experts disclosed and the reports done in a timely fashion, and that's good.

One of the things that I wanted to go over with you, again, because you're here today for me to have a discussion with you about -- and I feel like I would be remiss if I didn't -- about some of the pitfalls of going forward.

I wouldn't want you or anyone else similarly situated to you, Mr. Canup, to have your case dismissed or to have a jury find in favor of 3M and tell you, like they did Mr. McCombs and others, *We don't believe you've proven your case*, without me having had this discussion with you.

It's expensive to go forward with what you're going to take on. And maybe you're independently wealthy and Mr. Gamble has plenty of money to spend. They will see to it that you spend it, that I can assure you.

I would be remiss, I feel like, if I didn't have this discussion with you.  And you're not the only one I'm talking to like this.  I've talked to others, and there's more still to go.  As I said, there's some 20 or so people who have opted out.

But, in reviewing your specific DOEHRS data -- and again, I don't believe you have a hearing loss claim.  Your complaint is based on tinnitus.  And that's probably because your audiograms are all within normal limits.

There was one -- and I don't want to get too in the weeds, but these are things you should know to talk to your expert about.  There was one 15 decibel shift at 4000 hertz, and I think it was 2011.  But you're still at a 15 dB, so this is still within normal limits.  I think you went from a 0 to 15, but you're still within normal limits.

And so, your audiograms are all within normal limits.  Maybe that's why there is no hearing loss claim in your case.  That would make sense.

But even with normal audiograms -- so, in a courtroom, a normal audiogram is the sort of kiss of death for a hearing loss claim.  But in the settlement program, there is an opportunity or a possibility/opportunity for an EIF claim, which is an extraordinary injury fund claim, even with someone with normal audiograms.

And I will let you talk with, if you and your counsel

would like, with leadership more about this, or Judge Cannon, if you like, but there's something called hidden hearing loss that the settlement program has recognized as a category of EIF.

So, with ordinary or normal audiograms, there's no space for you in EPP or DPP with just hearing loss because you have normal audiograms. But there is a space in the EIF possibly, again, for hidden hearing loss. And that means those are people who have normal audiograms but otherwise have injury to their auditory pathway. And so that can be discussed with you as well.

But your tinnitus claim -- and I believe that is the claim that you have -- and by the way, just for Mr. Gamble's benefit, I don't believe -- and Mr. Aylstock can correct me if I'm wrong -- I don't believe any of the bellwether cases were tried based on tinnitus alone. I don't believe we had a strict tinnitus alone -- that that was the only claim.

I think there was a question about one of the plaintiffs where the jury hung their hat. But I think that the case that was presented in all of them included tinnitus and hearing loss.

Am I wrong or right?

**MR. AYLSTOCK:** I think that's right, Judge. There was a dispute on one case about whether -- I think it was Mr. Adkins -- had hearing loss or not, but we certainly presented

Case 3:26-cv-03359-MCR-ZCB Document 8652 Filed 05/01/26 Page 254 of 388
USCA11 Case: 26-11887 Document: 5-2 Date Filed: 06/05/2026 Page: 51 of 185

30

it.

THE COURT: Right, it was presented that way, yeah.

MR. AYLSTOCK: Yes, Judge.

THE COURT: So I guess my point is there has not yet been a test case that I'm aware of on just tinnitus alone. I'm not aware of. That doesn't mean that there can't be. I'm just saying we don't have anything to point to as far as just that type of case.

But regarding your tinnitus, Mr. Canup, there actually is no -- there's no record or any indication of tinnitus in DOEHRS data.

You do have a 10 percent VA rating service-connected for tinnitus from 2013 at the same time the bilateral hearing loss rating was denied, but the tinnitus was granted. And that service-connected rating would open a door for you with EPP as far as the settlement program.

But with the courtroom, it's going -- it's difficult, I mean, it's going to be more difficult to prove your tinnitus than --

When you're in the settlement program, what the settlement administrators look for is evidence to support your claim. They don't really look at evidence to contradict your claim. Do you have evidence to support it. They're not really interested in whether there's evidence to contradict it.

In the courtroom, quite the contrary, because that's

what these guys -- that's what they do.

And here, you have this tinnitus rating from 2013. And there's a reference also, in addition to -- and I guess this is what the VA sort of hung its hat on, there was a reference to tinnitus in 2013. But there were other references in 2013 that indicate you don't have any difficulty hearing.

There's also -- and I think this is something to take note of -- during the time frame that you say you wore the plug -- the earplug and were injured was during your deployments in 2010 and 2011. Those are the years you say you wore the earplug. But on your post-deployment assessments, both of them, you report "no" to tinnitus.

So I'm not saying you can't prove your tinnitus claim. If the jury just disregards these records and just believes you from the witness stand, maybe so. But again, that's a problem. I can tell you that's a problem.

There also is something else that I think that you and Mr. Gamble do need to be aware of because this was a feature in some of the trials, but I don't know that I ever saw it to this level or degree. But there are references in your records to you never wearing hearing protection devices during your deployment. And that's when your -- obviously, that's when you claim your ears were damaged.

But if there were periods on your deployment where you never wore hearing protection, that's going to be a problem for

you.

I don't know whether that's true or not. And I'm not here to make any credibility -- obviously, that's not why we're here. But I don't even know if you know this, that this is in your records. And maybe you and Mr. Gamble have a good response for that. You'll need one, because these guys don't miss anything.

So I'm not telling you that you're not going to win your case, if you get to trial, or that you're going to lose your case. I have no idea. I just know that there's certainly a possibility you will lose your case. That's how it is with any litigation. No one knows what a jury will do.

And I know for some people I've talked to, you know, they want their day in court. They believe they've been injured, they believe they've been injured by the earplug, they've suffered greatly, and they want some vindication for that.

And believe me, I understand that. But I don't know, if you asked Mr. McCombs or Angela Kelly or some of the others who lost at trial, whether they felt any better or vindicated at having a jury tell them, *We don't accept your case, we don't accept your claim, you haven't proven your case*. Even though you're injured, even though you're hurt, you've suffered, you didn't prove your case, and so case over.

Now, you may be one of the ones that walks out of here

33

with lots of money. That's also a possibility. I just want you and Mr. Gamble to know getting there, even if you do win, is going to take a lot, and then these folks will appeal.

Mr. Beall can speak to that. They appealed every verdict before. So there won't be any money until -- no matter how big the verdict is -- until the Eleventh Circuit rules on the issues raised on appeal.

So my purpose today was just to meet with you, to explain to you what this is going to be like going forward, and to give you an opportunity, as I said, to speak with me. If you have questions, if there's something that I can address for you, I'm happy to do that, if I'm able to.

You have a lawyer, so I certainly -- even if you didn't have a lawyer, I wouldn't try to give you any legal advice. I'm just giving you my perspective as the judge who has been presiding over this litigation for a long time and has a great deal of familiarity with it so you go forward with your eyes wide open.

And then if you'd like an opportunity, you or Mr. Gamble, to talk with leadership counsel about some of what I've said about the settlement program, some of the more nuanced aspects of the settlement program, that's going to be available to you as an opportunity, if you'd like, and then also Judge Cannon, who is available to speak with you as well and answer any questions.

And then, at the end of the day, if you leave here, you know, you're leaving without settling, you're leaving here having heard from me, you know, I feel better about that. You've had an opportunity to ask questions. And then, if you decide to roll the dice, again, that's your case.

That's what our system is about. The courtroom is here. We try cases. And if it's not here, your case will be tried in a different jurisdiction. I certainly cannot tell you when that will happen, though.

Okay. So let me ask, Mr. Aylstock, if you have anything you all want to add, and then Mr. Beall, and then I'll give Mr. Gamble and Mr. Canup an opportunity if they have any questions of me.

**MR. AYLSTOCK:** Thank you, Your Honor.

Mr. Gamble and Mr. Canup, first of all, thank you for your service. I'm the court-appointed lead counsel. Judge Rodgers gave me the honor and responsibility to lead from the plaintiffs' perspective.

I'll give you a little bit of my take because it might be helpful to you in understanding how we got to where we are.

When this case started, it was sent to Pensacola. And we didn't -- had no idea how big it was going to be. I think I was in chambers with Judge Rodgers and defense counsel, and we estimated maybe there would be 30- or 40,000 cases, maybe up to 50,000.

Case 3:26-cv-03359-MCR-ZCB Document 86-2 Filed 06/01/26 Page 259 of 388
USCA11 Case: 26-11887 Document: 5-2 Date Filed: 06/05/2026 Page: 56 of 185

35

And it became, as Judge Rodgers said, the largest MDL in history at the time, over 300,000 soldiers and veterans and some contractors as well were in litigation with individual lawsuits.

And that presented a lot of challenges to us as plaintiffs' leadership in trying the cases. It presented a lot of challenges, frankly, to 3M, because they don't -- you know, they're a large company, but they're not -- they don't print money like the United States Government does.

But when we got into this case, we knew our first hurdle was going to be this government contractor defense that the judge indicated. In fact, there were memos written I can show you from so-called experts on our side saying this case is a loser because the government contractor defense gives 3M and its subsidiary Aearo immunity.

And we worked very hard to convince Judge Rodgers that that's not the case, but that issue is still alive. In fact, although we tried all of those cases, my partner Brad, my late partner Neil and I and others, we probably tried half the cases and we were involved in every single one. Mr. Burns was here as well and can attest to that. But everything about this litigation was hard fought.

When it came to the trials, there were no offers provided. We knew we were going to the mat and going to the Eleventh Circuit on that issue, and so we won some and we lost

some.

Mr. McCombs, we tried that case, and it was tough on all of us but especially on him to lose it.

But as we progressed and we got over 300,000 claimants, we realized something has to be done, not just -- I mean, obviously, the court system doesn't have the judges, the juries -- nobody would have gotten relief except a select few in our lifetimes because of the timing of it.

We also realized when it came time to pay, there's a limit to what even 3M could pay. And Aearo is the company that developed the drug [sic]. It's a little, tiny company out of Indiana and that's who went into bankruptcy and delayed our resolution for a year.

But there's nothing that prevents them, even Aearo, from doing that again, nor 3M, not that we think that they will because we do have the settlement.

But when it came time to negotiate the settlement, we had to take that into account. Because, had the bankruptcy worked -- and I can assure you they thought it was going to work and we fought very hard against it because the amount of money that was being offered to everybody -- and it would have been open to everybody who filed a lawsuit or not. Every soldier, every veteran who said they used the earplugs, it could have been half a million people. And the amount of money that was being offered in the bankruptcy was under a billion

dollars, so we're talking under $2,000 a case potentially.

And the bad thing about a bankruptcy, from my perspective as a trial lawyer who has tried a bunch of cases in this courtroom, is it doesn't give anybody a real choice. You're stuck. If the majority want to confirm the plan or the super majority, it doesn't give our veterans and active duty people a choice.

So we fought very hard for the better part of a year and ultimately won that issue. And that got us, frankly, back to the settlement table, and we were able to get more than six times the amount of money for just the people who had filed lawsuits or were represented at the time.

So the settlement, as a practical matter -- we knew what the net worth of 3M is, and it's different for market cap. Net worth is assets and liabilities. So about 12-and-a-half, I think, was one of the stipulations, and we were able to get about half of that from them. And that's despite the other challenges 3M faced that are completely unrelated to this, including the forever chemicals and there was another settlement for that.

And so I feel very proud of the settlement. Just so you know, I know that we didn't leave anything on the table. In fact, we knew that they didn't have the cash, and we even got them to give us some stock that's now back into cash.

But when it comes time to think about whether the

settlement is a good thing, I just want you to know, as lead counsel and a guy who was in the room negotiating it with Brad and others, that we feel that we did the absolute best for you and all the other 250,000 people who decided to participate in the settlement.

The other thing -- and we can go over this if you're at all interested -- we tried to do it in a very objective way with regard to looking at the audiograms.

We had the benefit, because Judge Rodgers and some of us traveled to the Pentagon to get this information from the DoD, of your audiograms and everybody's audiograms that was housed at the DoD. And that was an enormous effort in and of itself. But we were able, because of that, to design a system that is very objective.

We look at, okay, what's your military service, how did you get in, when did you get out for your hearing loss, and then, of course, the tinnitus is the other component of it.

So there are potential issues or potential ways to get into the extraordinary injury fund for various things. Judge Rodgers mentioned that. Happy to discuss that with you as well.

Because not every tinnitus case is the same. Some are somewhat bothersome, others it's a heck of a lot worse. And there's lots of treatment and we can talk about that.

So I guess that's sort of my perspective as lead

Case 3:26-cv-03353-MCR-ZCB Document 652 Filed 05/01/26 Page 253 of 388
USCA11 Case: 26-11887 Document: 5-2 Date Filed: 06/05/2026 Page: 60 of 185

39

counsel about the settlement, the process. But everything about this case was hard fought.

There was a lot of, a lot of hours spent. And Mr. Beall and the firms associated with 3M have armies of lawyers, and we fought them back as best we could and got as much as we could for you and everybody else.

**THE COURT:** All right. Thank you. And I can attest to what Mr. Aylstock just said about how hard fought the litigation was. And I'll turn it over to Mr. Beall in just a minute.

But I've never seen any litigation -- I've been on the bench over 20 years. I've never seen anything fought as hard as this was fought. And the stakes were high, no question. But from, I mean, every turn, you know, 3M was right there, and they were not rolling over, just not rolling over.

And I think Mr. Beall maybe will talk further about that. Because sometimes I worry that some of these -- maybe not you, Mr. Canup, so I don't want to throw you in this pot. But some of these opt-out plaintiffs, they've heard about big jury verdicts, they're not thinking about the plaintiffs who lost their jury trials, they hear about these big verdicts, and they think, well, even if I don't get it to a jury, at some point 3M will just settle with me outside of the settlement program.

I cannot speak directly for 3M. Mr. Beall can do

that.  But I can tell you from my perspective that will never happen.  That will never, ever happen.  They will take you to trial or you will take them to trial, and they will fight you every step of the way getting there, they will fight you all the way through that trial, and then they will fight after that trial.  You may go to bankruptcy in the meantime, depending on how big your verdict is, if you went.  And then they'll appeal.

And my belief -- and again, I don't -- I can't say this based on anything I've heard from 3M directly to me.  But based on my experience with this company, they will pay a verdict before they will settle a case at this juncture.  After everything that's happened, that's my belief.

But, Mr. Beall, why don't you speak for your client instead of me speaking for your client.

**MR. BEALL:**  Thank you, Your Honor.

Thank you, Mr. Aylstock.

And it's a pleasure to meet you, Mr. Gamble and Mr. Canup.  We met just a second ago.

My name is Charles Beall.  I work for a firm called Moore, Hill & Westmoreland here in Pensacola.  But I'm one of the many, many lawyers who are representing 3M in this case.

And we do want to thank you for your service.  We understand that, and we do feel bad for the tinnitus that you say you have.  And we understand that's not something that's fun or enjoyable by any stretch.  We don't want to belittle

41

that as all.

I know you all feel very strongly about your case, like the people that Mr. Aylstock represented at trial. But I do think it's important to know that 3M feels every bit as strongly on the other side, and not just about whether you can prove the causation issue. But, to this day, we do not believe this plug was defective at all. And at every trial we've had, we've brought in experts to test that, to discuss that.

We have government documents where the government itself tested the earplug and found it to be effective. So, you know, we are going to test that issue the entire time.

We settled this case for business reasons. Because, as Mr. Aylstock pointed out, this is the kind of thing that, you know, you just can't try 300,000 cases over the course of lifetimes and everything. So we made a business decision to settle this case and put a lot of money in the settlement for that reason.

And we did it on a structure that's going to allow for independent medical review of all the claims remaining in litigation.

Judge Rodgers has already talked about your DOEHRS data, which she has access to, and we have experts who are looking at these things. So that's part of what we're doing is making sure that we're getting independent people who are not just people that we pay or that they pay who are looking at

42

this and seeing are these cases worth proceeding on.

And that structure is supported by the leadership, who settled -- negotiated the settlement, by the hundreds of other plaintiffs' lawyers who have agreed to the settlement, and by the Court itself.

We respect that some people may decide to not take the settlement and to litigate. If so, we're going to, obviously, stick firmly to the requirements the Court has set, we're going to ask the Court to enforce, and I know the Court will enforce the requirements of the Case Management Order 57 you've heard a lot about today and other things.

We are, as Judge Rodgers noted, prepared to try these cases. We have a host of experts lined up that we could probably try this case in a matter of weeks, if we had to do it, because we have all the experts ready.

We tried 16 cases. I don't think that I've ever heard of an MDL where 16 cases were tried before. I was at 12 of them myself. I believe the shortest trial was two weeks. We might have had a trial that ended in nine days, but that would be the exception. These were basically two-weeks-at-a-time trials. So it's a long, expensive process, and that's what we're used to doing.

We will appeal if we lose. We will appeal the government contractor issue. We will appeal evidentiary rulings that we think are against us. Obviously, it's got to

be an issue we think we can win on appeal, but we feel strongly about that. And I'm sure you will feel strongly the other side of our appeals.

For the first set of appeals and I suspect for the future appeals, the attorney we hired to handle this was the leading United States Supreme Court lawyer in the country. I mean, he's the guy that's probably argued the single most cases -- I think over a hundred now -- before the U.S. Supreme Court. So, you know, we're going to spend the money to bring the best people here that we can do.

As Judge Rodgers pointed out, there were six plaintiffs who went to trial and lost. There were, I believe, several of them -- more than half of the trials ended up with a plaintiff verdict. But there were also a number of cases that were in the bellwether process that were going to be tried where the plaintiffs dismissed their cases before they even got to a jury.

For one reason or another, they thought -- I don't know the full reason. I think some of them realized they just can't win or they didn't want to deal with the stress or whatever.

So, of the 27 bellwether cases that were set, 14 of them resulted in no recovery at all. So that's over half. So you can't just look at the ones that were tried.

And those cases were done before the requirements that

44

Judge Rodgers has talked about earlier were put into place. So you have a much harder battle than the people that were there before for that very reason.

And I know there is a mediation process in the CMO that we have to go to mediation, which we're willing to do. But just as Judge Rodgers pointed out, we don't view the mediation process as a chance for us to sweeten the pot. We view it as a requirement that we're going to go through in good faith and talk about the reasons why we believe you should accept the settlement.

But if you think it's going to be sort of let's hold out and then we'll sort of throw more money on the table, it's not my money, but I can assure you that would be the first time that's happened in this litigation, and I don't expect it to happen now.

Again, you have the right to make these decisions. And I'm not going to -- obviously, I'm on the other side, so I have an interest in this myself. But we just want you to be aware where we're coming from as you proceed forward.

And I do appreciate you coming down here. And again, thank you for your service.

**THE COURT:** All right. Thank you, Mr. Beall.

So, Mr. Canup or Mr. Gamble, any questions?

And, of course, you have counsel, Mr. Canup. You don't have to speak. But I want to give you the opportunity,

if there are any questions from either one of you.

MR. GAMBLE: Yes. Thank you, Your Honor. And I'll just be real brief.

I understand you have a job to do, and you've done a fine job, and these gentlemen over here have done a fine job. But we do believe in the strength of our case and that, for what he's going to have to deal with the rest of his life and that he's dealing with, $10,000 just isn't going to come near to cut it.

But I understand you've got your job to do and you've got -- 3M has got the big pockets. These two veterans are not going to bankrupt 3M, though. We're not worried about that. That would be quite amazing if we could, but I don't think that part is an issue.

And then going to the procedural stuff, Your Honor, we worked our way through order No. 57, and we have recently got this letter that he gave me today, and we will go through this and try to cure everything that is possible.

THE COURT: Okay.

MR. GAMBLE: And if there's something -- if it turns out there's one or two things that we think we've done and he doesn't, then I guess maybe that's where the Court would come into play.

THE COURT: Yes.

MR. GAMBLE: There was one thing that I was slightly

disturbed about. The affidavit regarding statute of limitations, I may have missed that in order 57. I'm kind of Johnny-come-lately to all this.

THE COURT: I understand. But there is a requirement in CMO 57, and it does apply to Mr. Canup. And so you'll find it in the order, but it's a statute of limitations affidavit.

MR. GAMBLE: Okay. And I believe Your Honor said, you know, "if the Court were to allow it." This is not a motion hearing, but to the extent -- if this is proper, I would respectfully request and move to be allowed to supplement that within seven days to get this affidavit in.

THE COURT: Okay, I'll let you do that.

MR. GAMBLE: Thank you, Your Honor.

THE COURT: I'll give you permission to do that.

MR. GAMBLE: I think that's all we have, Your Honor.

THE COURT: All right. One other thing I did not reference -- and again, I'm not trying to pile on. I know it probably feels like that.

But again, in terms of me making sure that I've covered everything I wanted to cover, the last thing I'll add is -- we've talked about 300,000 cases -- and these were all cases. These aren't people parked out somewhere, you know, in some software litigation platform. These were filed cases.

I have dismissed -- and again, this is not directly to your case, but just in general about the litigation and the

Case 2:26-cv-03359-MCR-ZCB Document 865-2 Filed 06/01/26 Page 271 of 388
USCA11 Case: 26-11887 Document: 5-2 Date Filed: 06/05/2026 Page: 68 of 185

47

claims and lawyers' review of those claims and the merits of them and then also a lawyer's ability to comply with deadlines, there have been well over 100,000 cases dismissed with prejudice.

So I guess the point, Mr. Gamble, is, I'm very serious about the deadlines, and largely because I've been so serious about the deadlines with others.

You know, I'm a judge looking at having dismissed over 100,000 cases for noncompliance. I'm not going to start making exceptions now. So just keep that in mind.

All right. Judge Cannon actually walked in -- hello, Judge Cannon -- to the courtroom a few minutes ago.

I encourage you to at least speak to her for a few minutes and see if she can add anything to the equation for you. If not, then we'll just monitor your compliance with CMO 57, and we'll move on according to a schedule.

All right. It was very nice to meet you both. Thank you for coming.

(Proceedings concluded at 11:16 a.m.)

--------------------

*I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. Any redaction of personal data identifiers pursuant to the Judicial Conference Policy on Privacy are noted within the transcript.*

*s/Donna L. Boland*          *10-16-2024*
*Donna L. Boland, RPR, FCRR*     *Date*
*Certified Court Reporter*

# Tab 60

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

| | |
|---|---|
| BRANDON CANUP, | Case No. 3:26-cv-3359-MCR-HTC |
| *Plaintiff,* | |
| v. | |
| BRYAN F. AYLSTOCK, et al., | PLAINTIFF'S FIRST AMENDED PETITION |
| *Defendants.* | |

## PLAINTIFF'S FIRST AMENDED PETITION

COMES NOW Plaintiff, Brandon Canup, appearing pro se, and files this First Amended Petition against the Defendants named herein. Plaintiff makes this filing based on personal knowledge as to all matters concerning himself and upon information and belief as to all other matters. In support thereof, Plaintiff respectfully shows the Court as follows:

I.

### DISCOVERY CONTROL PLAN

1.    Plaintiff pleads that discovery should be conducted in accordance with discovery control plan, level 3, pursuant to Rule 190 of the Texas Rules of Civil Procedure.

II.

### PARTIES

A.    **Plaintiff**

2.    Brandon Canup ("Canup") is an individual residing in Tarrant County, Texas.

B.    **Defendants**



FILED USDC FLND PN  JFJ
APR 6 '26 AM10:27

FIRST AMENDED PETITION                                   PAGE      1

3.      Aylstock, Witkin, Kreis & Overholtz, P.L.C. ("AWKO") is a foreign professional limited liability company formed under the laws of Florida, doing business in Texas. Its principal office is located at 17 East Main Street, Suite 200, Pensacola, Florida 32502. AWKO may be served via its registered agent for service of process: Justin Witkin, 17 East Main Street, Suite 200, Pensacola, Florida 32502, or wherever it may be found. In the event AWKO does not maintain a registered agent or cannot otherwise be located with reasonable diligence, it may be served through the Texas Secretary of State as provided by *Tex. Bus. Orgs. Code § 5.251* and *Tex. Civ. Prac. & Rem. Code §§ 17.041–17.045.*

4.      Mostyn Law Firm, P.C. ("Mostyn") is a Texas professional corporation formed under the laws of Texas, with its principal office at 3810 W. Alabama Street, Houston, Texas 77027-5204. Mostyn may be served via its registered agent for service of process: Andrew Browning, at the same address, or wherever it may be found.

5.      Fleming, Nolen & Jez, L.L.P. ("FNJ") is a Texas limited liability partnership with its principal office located at 2800 Post Oak Blvd., Suite 6000, Houston, Texas 77056-6128. FNJ may be served via a General Partner for service of process: George Fleming, at the same address, or wherever it may be found. Because FNJ does not have a registered agent listed on file with the Texas Comptroller as of the date of this filing, it may also be served with process through the Texas Secretary of State pursuant to *Tex. Bus. Orgs. Code § 5.251*, who shall forward process to FNJ's last known address on file.

6.      Bryan Frederick Aylstock ("Aylstock") is an attorney licensed in the State of Florida (Florida Bar No. 78263), and a founding partner of AWKO. He may be served at his primary business address: Aylstock, Witkin, Kreis & Overholtz, PLC, 17 East Main Street, Suite 200, Pensacola, Florida 32502, or wherever he may be found. If service cannot with reasonable

FIRST AMENDED PETITION                                            PAGE      2

diligence be effected at this address, then pursuant to the Texas long-arm statute, service may be made on the Texas Secretary of State as agent for service of process for this Defendant.

7. Bobby J. Bradford ("Bradford") is an attorney licensed in the State of Florida (Florida Bar No. 173223) and a partner at AWKO. He may be served at at his primary business address: Aylstock, Witkin, Kreis & Overholtz, PLC, 17 East Main Street, Suite 200, Pensacola, Florida 32502, or wherever he may be found. If service cannot with reasonable diligence be effected at this address, then pursuant to the Texas long-arm statute, service may be made on the Texas Secretary of State as agent for service of process for this Defendant.

8. Michael Andrew Burns ("Burns") is an attorney licensed in the State of Florida (Florida Bar No. 973130). At all times relevant to this case, he was affiliated with Mostyn Law Firm, a Texas-based law firm. He may be served at his Florida business address: Burns Law LLC, 362 Gulf Breeze Parkway, #294, Gulf Breeze, Florida 32561-4492, or wherever he may be found. If service cannot with reasonable diligence be effected at this address, then pursuant to the Texas long-arm statute, service may be made on the Texas Secretary of State as agent for service of process for this Defendant.

9. Gregory Donald Brown ("Brown") is an attorney licensed in the State of Texas (Texas Bar No. 24078266). At all times relevant to this case, he was affiliated with FNJ. Brown is listed as an attorney at FNJ on their website and as an attorney at Sorrels Law on his Texas State Bar profile. He may be served at his primary business address: Sorrels Law, 230 Westcott St., Ste. 100, Houston, Texas 77007, or at Fleming, Nolen & Jez, LLP, 2800 Post Oak Blvd., Suite 6000, Houston, Texas 77056-6128, or wherever he may be found.

10.    Cliff Lee Roberts ("Roberts") is an attorney licensed in the State of Texas (Texas Bar No. 17002900). He may be served at his business address: 8191 Southwest Freeway, Suite 116, Houston, Texas 77074-1700, or wherever he may be found.

11.    For ease of reference, Defendants AWKO, Mostyn, Aylstock, Bradford, and Burns may collectively be referred to as the ("Florida Defendants"). Although Mostyn is a Texas law firm, it is included in this group because of its affiliation with Burns, a Florida-based attorney, and its role in the conduct giving rise to this case.

12.    Defendants FNJ, Brown, and Roberts may collectively be referred to as the ("Texas Defendants").

13.    All Defendants may collectively be referred to as the ("Defendants").

### III.

### JURISDICTION AND VENUE

14.    Canup asserts claims arising solely under Texas law and has filed a Motion to Remand challenging federal subject-matter jurisdiction. Canup maintains that federal subject-matter jurisdiction is lacking, including the absence of complete diversity, and that this action should be remanded to the 67th Judicial District Court of Tarrant County, Texas. Subject to and without waiving that position.

15.    The 67th Judicial District Court of Tarrant County, Texas has subject matter jurisdiction over this action pursuant to Section 24.007 of the Texas Government Code. The amount in controversy is within the jurisdictional limits of the Court.

16.    The 67th Judicial District Court of Tarrant County, Texas has personal jurisdiction over all Defendants. One or more Defendants are residents of Texas, maintain their principal place of business in Texas, and regularly conduct business in Texas. Additionally, pursuant to the Texas

Long-Arm Statute, Tex. Civ. Prac. & Rem. Code §§ 17.041–17.069, this Court may exercise jurisdiction over out-of-state Defendants who have purposefully directed activities toward Texas. All out-of-state Defendants have purposefully directed activities toward Texas.

17.     Out-of-state Defendants acted in concert with Texas Defendants and have directed activities into Texas and have purposefully availed themselves of the privileges and benefits of conducting business in Texas and are subject to the jurisdiction of the 67th Judicial District Court of Tarrant County, Texas. The actions described herein demonstrate the Defendants' purposeful involvement in matters connected to Texas, making it both appropriate and consistent with due process for a Texas court to exercise jurisdiction over them.

18.     The exercise of personal jurisdiction over Defendants is therefore consistent with traditional notions of fair play and substantial justice.

19.     Venue is proper in the 67th Judicial District Court of Tarrant County, Texas pursuant to Section 15.001, *et seq.* of the Texas Civil Practice and Remedies Code because a substantial part of the events or omissions giving rise to Canup's claims occurred in Tarrant County, Texas.

20.     Tarrant County, Texas is where Canup resides and relied upon Defendants' actions and representations. The conduct at issue involved communications directed to Canup in Tarrant County, Texas and actions taken with knowledge that their effects would be felt in Tarrant County, Texas.

21.     This action also concerns agreements and attorney-client relationships that were to be performed, in whole or in part, in Tarrant County, Texas. In addition, the underlying litigation was designated for trial in the Northern District of Texas, and Tarrant County served as the central location of Canup's reliance, litigation-related activities, and resulting injury.

FIRST AMENDED PETITION                                              PAGE        5

22. Subject to and without waiving Canup's position that this action belongs in state court, and pleaded in the alternative, if this case remains in the federal system, the US District Court for the Northen District of Texas, Fort Worth Division has personal jurisdiction over Defendants because they have sufficient contacts with the State of Texas and that District, including conduct giving rise to Canup's claims in Texas, consistent with due process.

23. Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in Tarrant County, Texas.

## IV.

## STATEMENT PURSUANT TO RULE 47

24. Pursuant to Rule 47 of the Texas Rules of Civil Procedure, Canup states that he seeks monetary relief of less than $250,000 and non-monetary relief.

## V.

## BACKGROUND FACTS

25. On April 3, 2019, the United States Judicial Panel on Multidistrict Litigation transferred multiple actions to the Northern District of Florida for coordinated pretrial proceedings in *In re: 3M Combat Arms Earplug Products Liability Litigation*, Cause No. 3:19-md-02885 ("MDL").

26. On May 22, 2019, the MDL court issued Pretrial Order No. 7 ("PTO 7"), appointing Aylstock of AWKO and Burns of Mostyn to leadership roles ("PSC") to conduct common benefit work on behalf of all claimants in the MDL.

27. Throughout the MDL, Florida Defendants represented thousands of individual claimants while serving in leadership roles and maintained attorney-client relationships with those

FIRST AMENDED PETITION PAGE 6

claimants. Their leadership roles did not prevent the creation of attorney-client relationships with MDL claimants.

28.    On June 21, 2019, Canup retained Texas Defendants to investigate, develop, and litigate his claims in the MDL. Between June 20 and June 21, 2019, Canup communicated with Cliff Roberts regarding the representation by email, through which Roberts provided the retainer materials and Canup returned the executed agreement. The agreement provided that Texas Defendants were retained to pursue Canup's claims arising from injuries caused by 3M Combat Arms Earplugs and were authorized to take all actions necessary to prosecute those claims. The agreement further stated that, "Client has the ultimate authority over the decision to settle." Canup was in Tarrant County, Texas when these communications occurred.

29.    Collectively Texas Defendants have decades of experience in multidistrict litigation. FNJ attorneys specifically have been involved in MDLs for over 50 years.

30.    FNJ attorneys have participated in numerous MDLs, including *In re: 1971 Alaska Airlines Disaster*; *In re: Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Products Liability Litigation*; *In re: Atrium Medical Corp. C-QUR Mesh Products Liability Litigation*; Hormone Replacement Therapy Litigation; Fen-phen Diet Drug Litigation; Rezulin Diabetes Drug Litigation; Ortho Evra Patch Litigation; Hydroxycut Diet Supplement Litigation; Asbestos Litigation; Ford Rollover Litigation; Firestone Tire Litigation; General Motors Rollover Litigation; Transvaginal Mesh Litigation; Sulzer Hip Litigation; Depuy ASR Litigation; Biomet Litigation; and Stryker Hip Litigation.

31.    FNJ represented more than 900 individual claimants in this MDL—far more than they could realistically individually develop, litigate, and take to trial.

FIRST AMENDED PETITION                                                    PAGE    7

32.    At the time Texas Defendants entered into the retainer agreement with Canup, they had extensive experience in multidistrict litigation. Texas Defendants knew the nature of MDL proceedings and the practical limitations of mass representation. Texas Defendants were fully aware that most MDLs that proceed result in aggregate settlements rather than individualized trials. Despite this knowledge, Texas Defendants agreed to represent Canup without the present intent to actively pursue his claims.  Texas Defendants' conduct was consistent with a model focused on aggregate settlement rather than individualized advocacy. Therefore, Texas Defendants knew their representations that they would actively pursue Canup's claims were false.

33.    On September 20, 2019, Aylstock and Burns among others filed a motion to seal the Master Long Form Complaint ("Master Complaint") in the MDL. In that motion they stated "The unredacted copy will also be sent via email to all counsel of record." That motion was granted on the same day. The Master Complaint was filed on behalf of all Plaintiffs in the MDL.

34.    On June 3, 2020, Texas Defendants filed a Master Short Form Complaint on behalf of Canup in the MDL proceeding, styled *Canup v. 3M Company et al.*, Case No. 8:20-cv-14021. This Short Form Complaint incorporated the Master Complaint.

35.    On December 22, 2020, Brown sent Canup a letter stating that each plaintiff in the MDL was required to prove their individual claim through unique facts and injuries and represented that this was how the 3M case was being pursued on Canup's behalf, reflecting that individualized development was required while simultaneously representing that Canup's claims were being actively pursued by Texas Defendants. These communications were sent to Canup in Tarrant County, Texas.

FIRST AMENDED PETITION                                                    PAGE       8

36.    At some time between February 2, 2021 and August 29, 2023, Texas Defendants signed participation agreements with PSC assigning plaintiffs' leadership a 9% interest in the future recovery of all of their clients.

37.    On May 12, 2022, Brown filed a Notice of Transition, a Notice of Designated Forum designating the United States District Court for the Northern District of Texas, and a Refiled Short Form Complaint in Canup's case, and on May 16, 2022 paid the $402 filing fee. Texas Defendants took no further action in Canup's case until February 15, 2024, when Brown filed a motion to withdraw.

38.    On August 29, 2023, a global settlement agreement ("MSA") was announced between 3M and Plaintiffs' Leadership in the MDL.

39.    The MSA required Defendants to stop developing 3M earplug cases, including client-specific materials and expert work, as of August 29, 2023.

40.    The MSA required Defendants to recommend that all of their eligible clients participate in the settlement and complete a registration form.

41.    The MSA required participating counsel to ensure that all clients in whom they held an interest were registered for the settlement, including recommending that each client complete a registration form.

42.    The MSA required participating counsel to recommend the settlement to all eligible clients and prohibited them from continuing to represent any client who chose not to participate The MSA states that the amount to be paid under the settlement depended on the level of claimant participation and tied attorney compensation to participation levels.

FIRST AMENDED PETITION                                                    PAGE        9

43.     The MSA required participating counsel to withdraw from representing any client who chose not to participate and to give up any interest in that client's claim, including ensuring that any other counsel did the same.

44.     The terms of the MSA created conflicts of interest between claimants who chose to participate in the settlement and Canup, who chose to continue litigating. Defendants represented other clients who chose to participate in the settlement, and those terms therefore created conflicts of interest between Defendants, as participating counsel under the MSA, and Canup.

45.     The MSA established a global settlement with a total value of up to approximately $6 billion to resolve claims related to Combat Arms Earplugs.

46.     Settlement funds were paid by 3M into a Qualified Settlement Fund (QSF), which administered and distributed payments to participating claimants and their counsel. Attorneys were compensated from their clients' settlement proceeds through the QSF pursuant to contingent fee agreements.

47.     Aylstock negotiated and executed the MSA and is a party to the agreement.

48.     The MSA provided that any counsel who submitted a registration form on behalf of a claimant agreed to be bound by its terms, and that those obligations were knowingly and voluntarily undertaken.

49.     All Defendants had knowledge of the MSA and its material terms and accepted those terms through their conduct and performance as of August 29, 2023. The MSA constituted an offer to participating counsel, setting forth specific obligations and financial benefits. All Defendants manifested their assent to the MSA by acting in conformity with its terms, including undertaking obligations required for participation and thereafter submitting registration forms on behalf of claimants between August 29, 2023 and March 25, 2024. In doing so, all Defendants

accepted the MSA through conduct, forming an agreement in fact supported by mutual obligations and consideration, including all Defendants' agreement to comply with participation requirements in exchange for eligibility to obtain financial benefits under the MSA.

50. Texas Defendants chose to participate in the MSA and ceased developing Canup's claims on August 29, 2023. Canup was not aware of Texas Defendants' participation in the MSA at that time. Texas Defendants participated in the MSA without Canup's informed consent and before withdrawing from his representation, despite the resulting conflicts of interest.

51. All Defendants benefited financially from participating in the MSA. By participating in the MSA, all Defendants preserved their ability to obtain compensation from settlement proceeds of their other clients, which depended on 100% client participation. Participation allowed Defendants to obtain fees through the QSF rather than continued individual litigation, while avoiding the time, expense, and risk of discovery, expert development, and trial, and providing a more predictable and expedited path to compensation.

52. The MSA references additional material terms contained in Exhibit 10, which is incorporated into the agreement and was never disclosed to Canup. Exhibit 10 governs significant payment obligations, including approximately $100 million and $1.1 billion in settlement payments to the QSF, subject to specified conditions. Because Exhibit 10 has been withheld, the conditions triggering these payments and the full scope of Defendants' obligations remain unknown to Canup, despite their material relevance to the settlement and Defendants' conduct.

53. On September 11, 2023, the MDL court entered Case Management Order No. 66 ("CMO 66"), terminating the plaintiffs' leadership structure and shifting the litigation to settlement administration and individualized work for non-participating claimants. The order limited any further common benefit work to settlement administration-related functions, allowed Aylstock to

FIRST AMENDED PETITION                                                    PAGE    11

continue in a limited settlement administrative role, did not extend any continuing leadership authority to Bradford or Burns, and confirmed that any remaining common benefit activity would be narrowly confined to settlement administration.

54.     On September 11, 2023, the MDL court entered Case Management Order No. 67 ("CMO 67"), limiting common benefit work to settlement-related functions and dividing it into implementation and administration. The order restricted such work after that date to a defined group of firms, prohibited any other firms from performing common benefit work without court approval, and did not authorize individualized representation or prosecution of individual claims.

55.     Mostyn is not among the firms authorized by the Court to perform Settlement Administration work under CMO 67.

56.     Beginning in September 2023 through early 2024, Canup received complex information about the MSA and his claims that Texas Defendants did not meaningfully explain, instead directing him to review materials on his own while pressuring him to participate. As a result, Canup did not understand the settlement process or his options as the registration deadline approached. Texas Defendants did not disclose the full terms of the MSA, including Exhibit 10, or that they had ceased all individualized case development as of August 29, 2023, and did not obtain Canup's informed consent to enter into an agreement that conflicted with his interests.

57.     On September 5, 2023, Brown told Canup in an email he would have the final decision to accept or reject any settlement and that Texas Defendants would provide recommendations. These representations indicated that participation was voluntary and that Texas Defendants would act in Canup's individual interest, but were inconsistent with the MSA, which required universal participation, cessation of case development after August 29, 2023, and

withdrawal from clients who declined to participate. This communication was sent to Canup in Tarrant County, Texas.

58.    On November 6, 2023, Brown sent Canup a letter regarding the 3M global settlement in which he emphasized the urgency of participating, recommended acceptance of the settlement without providing an individualized evaluation of Canup's claims, and stated that the firm would "likely have to withdraw" if Canup declined and that "per the Court-appointed Plaintiffs' Leadership, your case will not be eligible to go to trial until 2030." This communication was sent to Canup in Tarrant County, Texas.

59.    Brown knew that these statements were false and misleading because any withdrawal obligation arose from Texas Defendants' voluntary participation in the MSA, and Brown had already agreed to the MSA, making withdrawal a requirement rather than merely possible.

60.    Brown's statement that Canup's case would not be eligible for trial until 2030 reflects that Texas Defendants were communicating with and relaying information from Plaintiffs' Leadership.

61.    Texas Defendants and Florida Defendants knew or should have known this statement was false or misleading when made because they were involved in the MDL proceedings and aware that no such years long bar to trial existed.

62.    The MDL court addressed this issue of trial delay on August 22, 2024, the MDL court issued an order addressing Canup's motion to lift the stay imposed by CMO 57. In that order, the court stated, "The language regarding a stay in CMO 57 does not bar the meaningful progression of Canup's case or preclude it from going to trial before 2031." The court further

FIRST AMENDED PETITION                                                              PAGE        13

stated, "CMO 57 does not prevent Canup from going to trial before 2031. Canup has not waived his Lexecon rights, so the Court will eventually remand his case when trial-ready."

63.     On December 21, 2023, Brown sent Canup a letter urging him to register for the settlement, emphasizing strict deadlines and stating that failure to submit a Registration Form by January 25, 2024 would result in dismissal with prejudice and disqualification from recovery, framing participation as the only viable path. Brown stated Canup could continue litigating but again warned of significant consequences, including likely withdrawal of counsel and that the case would not reach trial until 2030, and recommended participation. These statements were false and misleading, including the representation that the case could not reach trial until 2030, and the characterization of withdrawal as merely "likely," when withdrawal was required due to the conflict of interest created by Texas Defendants' participation in the MSA. This communication was sent to Canup in Tarrant County, Texas.

64.     In January 2024, after Texas Defendants repeatedly indicated they would withdraw if Canup declined the settlement, Canup retained attorney David Gamble ("Gamble") to preserve his ability to continue litigating. Texas Defendants remained counsel of record but provided no legal support.

65.     In the weeks leading up to his opt-out, including in or around late December 2023, Canup began independently gathering and organizing documents related to his claims after realizing that his case had not been developed by Texas Defendants.

66.     On January 21, 2024, Canup officially opted out of the MSA, triggering his production obligations under Case Management Order 57 ("CMO 57"). Canup and Gamble immediately began preparing for those requirements, which included gathering, organizing, and submitting over 25 GB of data within 30 days under threat of dismissal with prejudice.

67.     CMO 57 further required Canup to serve completed expert reports within 60 days of opting out, and in compliance with those requirements, Canup retained experts and incurred expenses for those expert reports in the amount of $11,925.00.

68.     In compliance with CMO 57, Canup retained an ENT specialist on February 27, 2024 to evaluate his hearing-related injuries, including tinnitus and noise-induced hearing loss, and to provide expert opinions for use in the litigation. The initial expert report was required to be disclosed by March 21, 2024, with any supplemental reports due by May 20, 2024.

69.     Despite having knowledge of these requirements since August 29, 2023, Texas Defendants took no action to prepare Canup's case or assist in meeting these obligations.

70.     As a result, Canup was required, with newly retained counsel, to gather, organize, and produce extensive documentation over a compressed timeframe, tasks that would ordinarily have been performed by prior counsel had they chose to actively litigate Canup's claims.

71.     This required Canup to devote substantial time and effort over several months and diverted his energy and attention away from his normal daily activities, resulting in disruption to his routine and significant stress and inconvenience.

72.     On January 22, 2024, after Canup opted out of the settlement, in an email, Brown acknowledged that decision while stating he was still one of Canup's attorneys and sought to have Canup reconsider, warning that the firm was "required by the Court" to withdraw and that opting out could result in "nothing." In that communication, Brown confirmed Texas Defendants remained Canup's counsel after his opt-out. Brown also represented to Canup that he was actively working on Canup's case, which was false. This communication was sent to Canup in Tarrant County, Texas.

73. Brown's statement that withdrawal was required by the Court was false, as any obligation to withdraw arose from Texas Defendants' voluntary participation in the MSA. The Court did not order Brown or the other Texas Defendants to stop representing Canup. Brown again pressured Canup to abandon his opt-out decision by portraying continued litigation as futile without any individualized analysis of his claims. This communication reflects Texas Defendants' continued representation after opt-out, false statements regarding withdrawal and case activity, and renewed pressure to accept the settlement.

74. Canup requested his file from FNJ in January of 2024. Canup received a few documents but never his full file. FNJ eventually sent Gamble Canup's file which only contained a single four-page pdf.

75. On January 18, 2024, Kara Runte of FNJ responded to Canup's request for his file, stating she had forwarded the request and providing only a few pleadings, including a short form complaint filed by Brown, while advising that FNJ could not guarantee production of the full file before the January 24, 2024 settlement deadline. This communication was sent to Canup in Tarrant County, Texas.

76. FNJ did not produce the file until February 29, 2024, when Dilma Alvarado sent it to Gamble. Canup's file from FNJ consisted of a single four-page PDF. After four years of representation, the file contained only Canup's DD-214 and a VA benefits overview and did not include anything filed in the MDL Court on behalf of Canup or materials Texas Defendants purportedly relied on in recommending settlement. This communication was sent to Gamble in Tarrant County, Texas.

77. On February 5, 2024 Canup was ordered by the MDL Court to appear "in person, with counsel" at a status conference in Pensacola, Florida scheduled for March 13, 2024.

78.    On February 15, 2024 Brown filed a motion to withdraw as counsel of record for Canup in the MDL within a week of Canup's CMO 57 production deadline. His motion was granted on February 20, 2024, one day before the CMO 57 deadline.

79.    On February 22, 2024, Bradford emailed Gamble regarding Canup's case to gather information about Canup and requested a call. With Canup's knowledge and consent, Gamble communicated with Bradford about his case. Between February 22 and the March 13, 2024 status conference they had multiple discussions about Canup's case, including his medical claims, damages, and potential recovery through the EIF, during which Bradford obtained case-specific information and provided settlement-related materials, including sending EIF protocols and FAQs by email on February 23, 2024 that Gamble requested the day before. Bradford also informed Gamble that he and Aylstock would attend the March 13 conference but did not disclose any intent to formally appear and participate.

80.    Through these communications, Bradford conveyed authority and superior knowledge regarding the MDL and Canup's case, directed communications to Canup through Gamble, obtained confidential and privileged information regarding Canup's claims and litigation posture, and provided legal advice concerning the settlement program under the MSA. Bradford directed these emails and phone calls into Texas, these communications occurred while Canup and Gamble were in Tarrant County, Texas.

81.    On March 13, 2024, without the knowledge of Canup or Gamble, Florida Defendants appeared at the MDL status conference on Canup's behalf, and the transcript lists Aylstock, Bradford, and Burns as appearing "FOR THE PLAINTIFF." Aylstock addressed the Court and spoke directly to Canup by name, offering his assessment of the litigation and settlement. During his remarks, Aylstock referenced Canup's specific circumstances, including his

FIRST AMENDED PETITION                                    PAGE    17

audiograms and military service, offered to provide case-related materials, emphasized his role in negotiating the settlement, and stated that the settlement represented the maximum recovery available.

82. This was a case-specific conference concerning Canup's individual claims against 3M, at which Canup was the only MDL plaintiff present. Burns and Bradford also appeared in the proceeding, neither spoke on the record.

83. Following the hearing on March 13, 2024, Canup and Gamble were taken to a conference room for a closed-door settlement conference with Magistrate Judge Hope Cannon. This proceeding was not scheduled in advance or required, and at the first status conference the Court described any further discussions with Judge Cannon or Aylstock, Bradford, and Burns as voluntary, presenting them only as an "opportunity" if Canup wished to participate.

84. Judge Cannon brought in Aylstock, Bradford, and Burns, who then gave individual legal advice, reviewed Canup's medical records and discussed Canup's case directly with Canup. During the meeting Florida Defendants engaged directly with Canup regarding multiple aspects of his case. The primary focus of the discussion was repeated efforts to pressure Canup to accept the MSA, which Canup repeatedly declined.

85. Florida Defendants discussed the requirements imposed by CMO 57, including the obligation to obtain a Personal Attenuation Rating ("PAR"), and noted that such requirements had not been imposed on plaintiffs in the bellwether trials but were being required of claimants who elected to continue litigating against 3M.

86. They further discussed the concept of Hidden Hearing Loss and the potential to assert such an injury in Canup's case, advising that he needed to locate a specialist to perform the necessary testing and warning that a "clean" result would be bad for his claims.

FIRST AMENDED PETITION

PAGE 18

87.     Florida Defendants also stated that expert witnesses were no longer available to take on cases due to what they described as "litigation fatigue." In addition, they reviewed and discussed Canup's individual records, including his audiograms and Post-Deployment Health Assessments, as well as his responses contained in the assessments.

88.     Florida Defendants further discussed materials they were preparing for opt-out plaintiffs to assist in litigating their claims against 3M, including what they described as a "trial package."

89.     They offered to continue assisting Canup and Gamble, in connection with Canup's case moving forward, and additionally offered to take Canup and Gamble out to lunch to discuss the case further, that offer was declined.

90.     When Florida Defendants entered the room, they already possessed Canup's medical records, including audiograms and post-deployment health assessments from his Army service, which had not been provided by Canup or Gamble and were obtained from an unknown source.

91.     Florida Defendants did not disclose that, as of August 29, 2023, they had agreed to cease all individualized case development under the MSA, were required to recommend settlement to all claimants, and had financial interests tied to claimant participation. Florida Defendants did not disclose the nature or scope of their involvement in Canup's case specific proceedings. They offered to assist Canup and provided guidance on his claims without disclosing that these obligations conflicted with his decision to continue litigating, and did not disclose the existence or terms of Exhibit 10, rendering their statements and offers materially misleading.

92.     As a direct and proximate consequence of Florida Defendants' failure to disclose their involvement in, and intent to appear at, the March 13, 2024 proceedings, Canup incurred fees

and expenses that would not have otherwise been incurred. Canup incurred $6,520.00 in fees for representation by Gamble in preparation for and attendance at the status conference in Pensacola, Florida, as well as $884.59 in related travel and lodging expenses.

93.    Canup was unable to access the unredacted Master Complaint, which was filed on behalf of all claimants and referenced by his Short Form Complaint. FNJ denied access and later directed Gamble to seek permission from the PSC, despite unredacted copies having been provided to counsel of record.

94.    On April 24, 2024, Canup emailed Kara Runte at FNJ requesting the unredacted Master Complaint, but received no response and the document was not provided.

95.    On April 24, 2024, Gamble contacted Bradford to obtain the unredacted Master Complaint, and Bradford responded by email stating that he would provide it only after Gamble signed a participation agreement. With Canup's consent, Gamble signed and returned the documents on April 25, 2024, and Bradford then emailed the unredacted Master Complaint the same day, stating, "Please let me know if you need anything else." Bradford's communications conditioned access to the Master Complaint on execution of a Common Benefit Work Participation Agreement assigning a 9% interest in any recovery to the PSC. Despite this, Bradford did not provide any common benefit work product contemplated by the agreement, and the Master Complaint was already part of Canup's case materials. Bradford further offered to continue assisting Canup and Gamble. Bradford directed these communications into Texas, Gamble and Canup were both in Tarrant County, Texas when these communications occurred.

96.    On April 29, 2024, Selena Salvide of FNJ emailed Gamble stating that Greg Brown suggested seeking permission from leadership to obtain the unredacted Master Complaint. This communication was sent to Gamble in Tarrant County, Texas.

97.     On May 1, 2024, Canup filed an amended complaint and Lexecon non-waiver statement as ordered by the MDL Court with instructions not to add new allegations or claims. 3M moved to dismiss, and on July 18, 2024, the MDL Court dismissed Canup's hearing-loss claims as procedurally barred. The MDL Court's order stated that Canup's former attorneys never attempted to amend his pleadings to include hearing loss claims, despite representing him for years. The MDL Court cited this as a reason that Canup should not be allowed to add new allegations or causes of action.

98.     As a direct and proximate consequence of Texas Defendants' conduct described above, Canup incurred $11,925.00 in expert fees for reports and litigation preparation that became worthless when his hearing-loss-related claims were dismissed on procedural grounds at the pleading stage, as the reports consisted of expert opinions regarding Canup's hearing loss that could not be used once those claims were barred, depriving him of any opportunity to litigate those claims or to present and defend his expert evidence on the merits.

99.     On July 9, 2024, Canup emailed Bradford requesting access to common benefit work product, including the PEC's virtual depository and trial materials referenced in the participation agreement, but received no response.

100.    On September 30, 2024, Canup entered into a direct settlement agreement with 3M. Canup's ability to reach this resolution was made possible only through his efforts and the efforts of independent counsel, despite the harm caused by the misconduct of all Defendants named herein.

## IV.

## CAUSES OF ACTION

Alternative Pleadings.   To the extent necessary, each of the claims set forth below is pleaded in the alternative.

## A.    CLAIMS AGAINST TEXAS DEFENDANTS

### Claim 1:  Fraudulent Inducement

101.    Canup restates and realleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

102.    On June 21, 2019, Texas Defendants entered into a contingency fee agreement with Canup and represented that they would investigate, develop, and pursue his claims through individualized litigation.

103.    These representations were false or misleading when made because Texas Defendants did not have the present intent to individually develop or litigate Canup's claims and instead operated with a model focused on aggregate settlement, and they failed to disclose these material facts.

104.    Texas Defendants made these representations with the intent that Canup rely on them in entering the agreement.

105.    Canup relied on these representations by entering the agreement and allowing Texas Defendants to control his claims for approximately four years.

106.    During this period, Brown repeatedly represented that he was actively pursuing Canup's claims when he was not, including in communications dated December 22, 2020 and January 22, 2024.

107.    As a result, Canup's hearing loss and tinnitus claims were not developed or amended by FNJ Defendants, and the MDL Court dismissed his hearing-loss claims in part based on that lack of development, causing damages.

108.    Texas Defendants' conduct also required Canup to address litigation obligations without prior case development, resulting in additional burden, stress, and expense.

109.    Texas Defendants engaged in conduct that constitutes fraudulent securing of document execution under §32.46 of the Texas Penal Code.

110.    Texas Defendants knowingly secured execution of the retainer agreement with Canup by deception.

111.    These statements and actions were made with the full knowledge and authorization of Texas Defendants' principals and the conduct constitutes a felony violation of the Texas Penal Code.

112.    To the extent FNJ is not found directly liable for its own independent misconduct, FNJ is also vicariously liable for any wrongful acts or omissions committed by Brown and/or Roberts in the course and scope of their employment and/or partnership and/or agency under the doctrine of respondeat superior and Texas agency law.

113.    Accordingly, Canup pleads for, and is entitled to economic damages inconvenience damages and mental anguish damages in an amount sufficient to compensate him for the harm sustained.

114.    Because Texas Defendants' conduct was fraudulent and/or malicious, Canup pleads for, and is also entitled to recover exemplary damages in an amount to be determined by the trier of fact.

115.    Canup further pleads for expenses and pre- and post-judgment interest at the maximum rate permitted by law.

### Claim 2:  Breach of Fiduciary Duty

FIRST AMENDED PETITION

116. Canup restates and realleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

117. Texas Defendants represented Canup from June 21, 2019 through February 20, 2024 and owed fiduciary duties of loyalty, candor, full disclosure and the obligation to provide independent professional judgement.

118. Texas Defendants breached those duties by entering into and participating in the MSA on August 29, 2023, at least tacitly and in fact, while still representing Canup and without disclosure or informed consent. Texas Defendants thereafter formalized their participation between August 29, 2023 and March 25, 2024 by submitting registration forms for other clients. Because their compensation and financial interests were directly tied to participation in the MSA, Texas Defendants operated under a material conflict of interest that limited their ability to provide independent and objective advice to Canup. Texas Defendants failed to disclose this conflict before advising Canup regarding the settlement and instead continued the representation while acting under that conflict, attempting to influence Canup to take actions that would advance their own financial interests at Canup's expense.

119. The MSA required Texas Defendants to cease developing Canup's claims, recommend settlement to all clients, and withdraw from those who declined—obligations that directly conflicted with Canup's interests. By failing to disclose these obligations while continuing to advise Canup, Texas Defendants breached their duties of loyalty and full disclosure.

120. Texas Defendants further breached their duties of candor and full disclosure by making misleading statements and omissions regarding withdrawal, the viability of litigation, and their role under the MSA, including repeatedly representing that they were actively pursuing

FIRST AMENDED PETITION

PAGE    24

Canup's claims when they were not, and failing to disclose material facts concerning their conflicts and obligations.

121.    Texas Defendants breached their duty of loyalty and their obligation to exercise independent professional judgment on Canup's behalf by prioritizing participation in the MSA and the interests of other clients and their own financial interests over the continued representation and advancement of Canup's claims.

122.    Texas Defendants breached their fiduciary duties by continuing to represent Canup despite these conflicts and delaying withdrawal until immediately before critical litigation deadlines.

123.    Texas Defendants further breached their duties of loyalty and full disclosure by failing to provide Canup with his complete client file and withholding materials necessary to prosecute his claims including the unredacted master complaint.

124.    These breaches enabled Texas Defendants to pursue and secure participation in the MSA. After becoming aware of the conflicts created by the MSA, Texas Defendants chose to continue representing Canup while simultaneously aligning themselves with and acting in furtherance of the MSA, rather than taking the ethical path of disclosure and withdrawal before agreeing to participate. In doing so, Texas Defendants engaged in a continuing course of disloyal conduct, including maintaining conflicted representation, failing to pursue Canup's claims while falsely representing that they were doing so, and making misleading statements to induce conduct consistent with MSA participation, all of which facilitated their ability to satisfy the requirements for participation in the MSA.

125.    Texas Defendants' breaches of fiduciary duty were a substantial factor in enabling them to obtain, secure, and retain financial benefits through participation in the MSA. By

continuing to act under an undisclosed conflict and advancing their own financial interests while representing Canup, Texas Defendants pursued, facilitated, and sustained their participation in the MSA through a continuous course of disloyal conduct.

126.    To the extent FNJ is not found directly liable, FNJ is also vicariously liable for the breaches of fiduciary duty committed by Brown and/or Roberts in the course and scope of their employment and/or partnership and/or agency under the doctrine of respondeat superior and Texas agency law.

127.    Canup pleads for equitable relief in the form of fee forfeiture, disgorgement, and an equitable accounting of all profits, compensation, and benefits obtained by Texas Defendants that are connected to, facilitated by, or obtained as a result of their breaches of fiduciary duty, including any fees or financial benefits obtained through their participation in the MSA. Disgorgement is warranted regardless of whether Canup suffered actual damages.

### Claim 3: Legal Malpractice (In the Alternative to Fraudulent Inducement)

128.    Canup restates and realleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

129.    Texas Defendants Brown, Roberts, and FNJ entered into a written contingency fee retainer agreement with Canup to represent him in the MDL. By virtue of this attorney-client relationship, Texas Defendants owed Canup a duty to exercise reasonable care, skill, and diligence commonly possessed and exercised by attorneys similarly situated in the State of Texas.

130.    This duty included, but was not limited to, properly investigating and preparing Canup's claims, maintaining adequate communication with the client, meeting applicable court deadlines, and taking reasonable steps to protect Canup's interests before, during, and after withdrawal of representation.

FIRST AMENDED PETITION                                                    PAGE    26

131. Texas Defendants breached their duty of care by failing to investigate and develop Canup's case over a four-year period, including failing to amend pleadings to include hearing-loss claims, which contributed to the MDL court's dismissal of those claims.

132. Texas Defendants' breaches directly and proximately caused injury to Canup. The MDL court cited the absence of prior amendment and development of hearing-loss claims as a reason for barring and dismissing those claims, rendering Canup's expert reports largely useless.

133. As a result of Texas Defendants' breaches, Canup suffered economic damages in the form of wasted expert fees.

134. To the extent FNJ is not found directly liable for its own independent negligence, FNJ is also vicariously liable for any negligence committed by Brown and/or Roberts in the course and scope of their employment and/or partnership and/or agency under the doctrine of respondeat superior and Texas agency law.

135. Accordingly, Canup pleads for and is entitled to monetary damages in an amount sufficient to compensate him for the harm sustained.

## B.   CLAIMS AGAINST FLORIDA DEFENDANTS

### Claim 1:  Fraud by Non-Disclosure

136. Canup restates and realleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

137. Florida Defendants communicated with Canup through Gamble, provided legal advice, and sought, obtained, and used confidential and privileged information, including medical records and information regarding his claims and litigation posture, thereby creating a relationship of trust and at minimum an implied attorney-client relationship giving rise to duties of disclosure.

138. Florida Defendants, through communications with Gamble, as Canup's agent, represented they would attend proceedings relating to Canup's case while failing to disclose that they intended to formally appear in court on his behalf, creating a duty to disclose the full nature and scope of their involvement.

139. Florida Defendants failed to disclose material facts, including their intent to formally appear at the March 13, 2024 proceedings, the nature and scope of their involvement, and their access to Canup's medical records from an undisclosed source.

140. Canup was unaware of these facts and had no equal opportunity to discover them.

141. Florida Defendants intended that Canup rely on their nondisclosure, including by complying with the Court's requirement to appear in person with counsel and continuing to treat Gamble as his sole counsel.

142. In reliance on this concealment, Canup attended the proceedings and incurred expenses, including paying for Gamble's travel, lodging, and appearance, which would not have been incurred had the facts been disclosed.

143. Florida Defendants' nondisclosure deprived Canup of the ability to make informed decisions regarding his representation and allowed them to act in furtherance of their own interests while remaining undisclosed.

144. Florida Defendants also accessed and used Canup's confidential medical records without his knowledge or consent, further interfering with his ability to control his case and protect his interests.

145. These harms, including financial loss and loss of decision-making autonomy, were the direct result of Florida Defendants' concealment.

FIRST AMENDED PETITION                                    PAGE        28

146.    Florida Defendants' omissions were intentional, material, and constitute fraud by nondisclosure under Texas law.

147.    Aylstock, Bradford, and Burns acted with authority, and AWKO and Mostyn Law are liable for their conduct, directly or vicariously.

148.    To the extent AWKO and Mostyn Law are not found directly liable, they are vicariously liable for the acts and omissions of Aylstock, Bradford, and Burns committed within the course and scope of their employment and/or partnership and/or agency under the doctrine of respondeat superior and Texas agency law.

149.    Accordingly, Canup pleads for, and is entitled to economic damages in an amount sufficient to compensate him for the harm sustained.

150.    Because Florida Defendants' conduct was fraudulent and/or malicious, Canup pleads for, and is also entitled to recover exemplary damages in an amount to be determined by the trier of fact.

151.    Canup further pleads for expenses and pre and post-judgment interest at the maximum rate permitted by law.

### Claim 2:  Breach of Fiduciary Duty

152.    Canup restates and re-alleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

153.    Florida Defendants communicated with Canup directly and through Gamble, provided legal advice, obtained confidential and privileged information, and appeared in proceedings affecting his rights, with Bradford offering continuous legal guidance over approximately two months, creating at minimum an implied attorney-client relationship and

FIRST AMENDED PETITION

PAGE    29

fiduciary duties. Florida Defendants owed Canup fiduciary duties, including duties of loyalty, candor, confidentiality, and the obligation to avoid conflicts of interest.

154.    Florida Defendants breached those duties by involving themselves in Canup's case and providing legal advice while operating under undisclosed conflicts arising from their participation in the MSA and their financial interests tied to settlement participation.

155.    Florida Defendants further breached their duties by withholding the Master Complaint and conditioning its release on execution of a participation agreement assigning a 9% interest in Canup's recovery.

156.    Florida Defendants also breached their duties by failing to disclose their intent to appear and by appearing on Canup's behalf at the March 13, 2024 proceedings without disclosure or consent.

157.    Florida Defendants breached their duties of candor and disclosure by failing to disclose the existence and material terms of the MSA, including Exhibit 10, while advising Canup regarding his claims and settlement.

158.    Florida Defendants breached their duties by accessing and using Canup's confidential medical records without consent and failing to disclose the source and manner in which they were obtained.

159.    Florida Defendants further breached their duties by conveying authority and providing guidance while their professional judgment was materially limited by conflicts and financial interests.

160.    These breaches enabled Florida Defendants to obtain and retain financial benefits through the MSA and directly caused Canup to act and incur expenses he otherwise would not have incurred.

FIRST AMENDED PETITION                                                PAGE        30

161.    Florida Defendants' breaches were clear and serious, involved conflicts of interest and divided loyalty, and justify equitable forfeiture of all compensation obtained in connection with their misconduct.

162.    Florida Defendants' breaches of fiduciary duty enabled them to maintain, protect, and continue their participation in the MSA and the financial benefits associated with it. Although Florida Defendants were already bound to the MSA, they affirmatively undertook to advise Canup and created an implied attorney-client relationship despite their undisclosed conflicts of interest. While owing Canup fiduciary duties, Florida Defendants continued to provide legal advice while operating under obligations that prevented them from advancing Canup's interests where doing so would conflict with the MSA. By pursuing their own financial interests and maintaining conflicted representation, Florida Defendants engaged in a course of disloyal conduct that allowed them to preserve and benefit from their participation in the MSA.

163.    To the extent AWKO and Mostyn Law are not found directly liable, they are also vicariously liable for the fiduciary breaches committed by Aylstock, Bradford, and Burns committed within the course and scope of their employment and/or partnership and/or agency under the doctrine of respondeat superior and Texas agency law.

164.    Canup pleads for equitable relief in the form of fee forfeiture, disgorgement and an equitable accounting of all profits, compensation, and benefits obtained by Florida Defendants that are connected to, facilitated by, or obtained as a result of their breaches of fiduciary duty, including any fees or financial benefits obtained through their participation in the MSA. Disgorgement is warranted regardless of whether Canup suffered actual damages.

### Claim 3:  Fraudulent Inducement

165. Canup restates and realleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

166. Bradford refused to provide the unredacted master complaint unless Gamble, as Canup's agent agreed to allocate a 9% interest in Canup's recovery to the PSC and execute a participation agreement, thereby conditioning access to materials necessary for Canup's case on execution of the agreement. The agreement also stated that the PSC would provide access to the rest of the common benefit work produced by the PSC in the MDL.

167. This representation was material because access to the unredacted master complaint was necessary to evaluate Canup's claims, prepare pleadings, and meaningfully participate in the MDL proceedings.

168. At the time these representations were made, Bradford had already created at minimum an implied attorney-client relationship with Canup. By virtue of this relationship, Bradford owed Canup fiduciary duties, including duties of candor, full disclosure, loyalty, and the obligation not to place his own interests above those of Canup.

169. The representations were false when made because Bradford did not have the present intent to provide full access to common benefit materials and had already agreed to the MSA, which prohibited him from further developing cases in the MDL. He knew the master complaint was filed on behalf of all MDL claimants and was already part of Canup's case materials, and that no additional meaningful materials would be provided.

170. Bradford's conduct was intended to bind Canup to terms that benefitted Bradford, and the PSC, which includes Aylstock and Burns, while depriving Canup of the promised resources.

FIRST AMENDED PETITION                                      PAGE        32

171.     Bradford made these representations with the intent that Canup rely on them in agreeing to allocate a 9% interest in his recovery.

172.     By doing so, Bradford sought to secure financial gain.

173.     Canup, relied on these representations and agreed to the 9% allocation.

174.     Canup did so in the belief that he would receive full access to the MDL's common benefit work, including the materials necessary to evaluate and advance his claims.

175.     Aylstock, Bradford, Burns, Mostyn and AWKO were unjustly enriched by their conduct as Aylstock and Burns were members of the PSC.

176.     As a direct and proximate result of the fraudulent inducement by Bradford, Canup suffered injury.

177.     As a result, Canup incurred the financial burden of allocating 9% of his recovery to the PSC while receiving only the master complaint—which he was already entitled to receive.

178.     Canup was deprived of the remaining promised common benefit materials. As a result, Canup was disadvantaged in prosecuting his claims and was required to expend additional time and effort to understand and develop his case without the benefit of the promised work product.

179.     Bradford engaged in conduct that constitutes fraudulent securing of document execution under §32.46 of the Texas Penal Code.

180.     Bradford knowingly secured execution of the participation agreement with Canup through Gamble, as Canup's agent, by deception. These statements and actions constitute a felony violation of the Texas Penal Code.

181.    These statements and actions were made with the full knowledge and authorization of Bradford's principals, including Aylstock, Burns, AWKO and Mostyn, as members of the PSC, and the conduct constitutes a felony violation of the Texas Penal Code.

182.    To the extent Aylstock, Burns, AWKO and Mostyn are not found directly liable, they are also vicariously liable for the fraudulent inducement committed by Bradford within in the course and scope of his employment and/or partnership and/or agency under the doctrine of respondeat superior and Texas agency law.

183.    Canup seeks equitable relief including an accounting to determine the full extent of any profits, compensation, or financial benefits obtained by Florida Defendants as a result of their fraudulent conduct, and disgorgement of any such improperly obtained amounts, as such information is within Florida Defendants' exclusive knowledge and cannot be ascertained without an accounting.

184.    Canup pleads for, and is entitled to economic damages in an amount sufficient to compensate him for the harm sustained.

185.    Because Bradford's conduct was fraudulent and/or malicious, Canup pleads for, and is also entitled to recover exemplary damages in an amount to be determined by the trier of fact.

186.    Canup further pleads for expenses and pre and post-judgment interest at the maximum rate permitted by law.

### C.    CLAIMS AGAINST ALL DEFENDANTS

#### Claim 1:  Civil Conspiracy

187.    Canup restates and realleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

188. All Defendants entered into a combination or agreement on or about August 29, 2023, whether express or tacit, to act in concert to increase their financial compensation tied to claimant participation in the MSA, including by attempting to induce Canup to participate in the MSA.

189. All Defendants had a meeting of the minds on the object and course of action of this agreement, as evidenced by their coordinated conduct, shared participation in and operation under the MSA, and ongoing communications within the MDL proceedings. The PSC, which included some or all of the Florida Defendants, provided coordinated information, direction, and messaging to Texas Defendants regarding settlement participation.

190. In furtherance of this agreement, all Defendants committed overt acts, including concealing material conflicts of interest, failing to disclose obligations under the MSA, and making false or misleading statements regarding the status of Canup's claims, the viability of continued litigation, and the consequences of settlement, for the purpose of inducing Canup to act in a manner consistent with all Defendants' financial interests.

191. Texas Defendants relayed information from Plaintiffs' Leadership to Canup, including that his case would not be eligible for trial until 2030, which Defendants knew or should have known was false or misleading.

192. All Defendants further acted in concert by withholding material information and Florida Defendants conditioned access to Canup's case materials on compliance with participation-related terms, including requiring a 9% interest in Canup's recovery.

193. Florida Defendants further advanced the conspiracy by providing legal advice, appearing on Canup's behalf without disclosure, and obtaining and using confidential information while operating under undisclosed conflicts created by the MSA.

194. These coordinated acts were undertaken to influence Canup's decision-making and increase the likelihood of his participation in the MSA.

195. As a direct and proximate result of Defendants' conspiracy, Canup suffered damages. Canup incurred unnecessary expenses, including transporting substitute counsel to Florida for a hearing at which Florida Defendants appeared on his behalf without disclosure and the loss of value of expert-related expenses and other litigation costs rendered wasted due to Defendants' actions.

196. Canup was further required to expend significant time and effort to investigate and understand the legal and procedural issues necessary to uncover and respond to Defendants' coordinated conduct.

197. These harms were directly caused by Defendants' concerted actions.

198. To the extent the law firms named herein are not found directly liable, they are also vicariously liable for the actions of their partners, associates, employees, or agents committed within the scope of employment and in furtherance of the conspiracy.

199. Because Canup's injuries were caused by the joint and concerted actions of multiple Defendants all Defendants are jointly and severally liable under Texas law.

200. Canup pleads that if any law firm named herein is not found directly liable, it is nonetheless vicariously liable under the doctrine of respondeat superior for the conduct of its partners, agents, or employees acting within the course and scope of their duties.

201. Accordingly, Canup pleads for, and is entitled to economic damages, inconvenience damages, and mental anguish damages in an amount sufficient to compensate him for the harm sustained.

202.    Because Defendants' conduct was fraudulent and/or malicious, Canup pleads for, and is also entitled to recover exemplary damages in an amount to be determined by the trier of fact.

203.    Canup further pleads for expenses and pre and post-judgment interest at the maximum rate permitted by law.

## VII.

## DAMAGES

204.    Canup restates and realleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

205.    For each of his claims, Canup seeks recovery of all of the following categories of damages as a direct and proximate result of the Defendants' wrongful conduct.

206.    For Texas Defendants' Fraudulent Inducement, Canup is entitled to actual damages including economic damages in the amount of $11,925.00, mental anguish damages, and inconvenience damages. Because these acts were committed knowingly and intentionally, Canup is also entitled to and pleads for exemplary damages as provided by Chapter 41 of the Texas Civil Practice and Remedies Code.

207.    In the alternative, for Texas Defendants' Legal Malpractice, Canup seeks economic damages in the amount of $11,925.00, representing the same expert-related losses alleged for Texas Defendants' fraudulent inducement. Recovery under this theory is pleaded in the alternative and not in addition to damages sought for Texas Defendants' fraudulent inducement.

208.    For Florida Defendants Fraud by Non-Disclosure, Canup is entitled to economic damages in the amount of $7,404.59. Because these acts were committed knowingly and

FIRST AMENDED PETITION                                                PAGE    37

intentionally, Canup is also entitled to and pleads for exemplary damages as provided by Chapter 41 of the Texas Civil Practice and Remedies Code.

209. For Florida Defendants Fraudulent Inducement, Canup is entitled to economic damages in an amount to be determined by an accounting. Because these acts were committed knowingly and intentionally, Canup is also entitled to and pleads for exemplary damages as provided by Chapter 41 of the Texas Civil Practice and Remedies Code.

210. As a result of all Defendants' civil conspiracy, each Defendant is jointly and severally liable for all damages arising from the underlying torts described herein, including the economic, mental anguish, inconvenience, and exemplary damages alleged above.

## VIII.

## EQUITABLE REMEDIES

211. Canup restates and realleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

212. For each of the following claims, Canup seeks equitable relief to prevent and remedy the improper benefits and unjust enrichment obtained by Defendants through their wrongful conduct.

213. For Texas Defendants' Breaches of Fiduciary Duty, Canup seeks equitable relief including an accounting, disgorgement, and forfeiture of all compensation, profits, and benefits obtained as a result of their misconduct.

214. For Florida Defendants' Breaches of Fiduciary Duty, Canup seeks equitable relief including an accounting, disgorgement, and forfeiture of all compensation, profits, and benefits obtained as a result of their misconduct.

FIRST AMENDED PETITION                                            PAGE     38

215. For Florida Defendants' fraudulent inducement, Canup seeks equitable relief including an accounting to determine the full extent of any compensation, fees, or benefits obtained by Defendants in connection with Canup's claims and recovery, and disgorgement of any such improperly obtained amounts.

## IX.

## INTERESTS AND COSTS

216. Canup restates and realleges all paragraphs above and below as if fully stated herein verbatim, and would further show the Court the following.

217. Canup seeks pre- and post-judgment interest as authorized by law, together with all taxable court costs and litigation expenses.

## X.

## JURY DEMAND

218. Canup requests a jury trial on all claims and issues so triable.

## XI.

## CONDITIONS PRECEDENT

219. All conditions precedent have occurred and been satisfied.

## XII.

## NOTICE PURSUANT TO T.R.C.P. 193.7

220. Canup provides notice to Defendants pursuant to Rule 193.7 of the Texas Rules of Civil Procedure that Canup may utilize as evidence during the trial of this lawsuit all documents exchanged by the parties in discovery in this case.

## XIII.

## PRAYER

221. ACCORDINGLY, Canup respectfully requests that Defendants be cited to appear and answer, and that Canup be granted judgment against Defendants awarding Canup all damages he is entitled to, including all damages and other relief (at law or in equity) pled in the causes of action and other parts of this instrument above, economic damages, mental anguish damages, inconvenience damages, exemplary damages, costs, pre- and post-judgment interest, equitable accounting, disgorgement, and forfeiture of any fees or benefits wrongfully obtained by Defendants, and all other damages Canup is entitled to in equity or by other applicable law.

222. Canup further requests such other and further relief at law or in equity to which Canup may show himself justly entitled.

Dated April 6, 2026

Respectfully submitted,

Brandon Canup

4812 Hidden Oaks Ln
Arlington, Texas 76017
(972) 762-4314

canup.brandon@gmail.com

pro se

# Tab 61

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

**BRANDON CANUP,**

    **Plaintiff,**

**v.**                                  **CASE NO. 3:26cv3359-MCR-ZCB**

**BRYAN F AYLSTOCK, et al.,**

    **Defendants.**

_____/

## ORDER

Plaintiff Brandon Canup has filed a Motion for Recusal and Disqualification pursuant to 28 U.S.C. § 455(a), (b)(1), ECF No. 37, which Defendants oppose, ECF Nos. 51, 52. Having fully reviewed the arguments, I find no grounds to justify recusal.

By way of background, Canup filed a products liability action against the 3M Company that was part of a multidistrict litigation ("MDL") proceeding consolidated in this Court by the Judicial Panel on Multidistrict Litigation ("JPML"), pursuant to 28 U.S.C. § 1407. *See In re 3M Combat Arms Earplug Products Liability Litigation,* MDL No. 2885; *Canup v. 3M*, Member Case No. 8:20-cv-14021-MCR-HTC (N.D. Fla.). This was by far the largest MDL in the federal judiciary's history. Weighing in at 400,000 plaintiffs represented by some 500 different law firms, this behemoth comprised one-third of the judiciary's entire civil docket for more than two years.

Page 2 of 10

At the outset of the litigation, I appointed leadership counsel for the universe of plaintiffs, to shepherd all cases through the coordinated MDL proceedings. Leadership counsel expended enormous resources and extraordinary efforts on behalf of all plaintiffs, including conducting extremely complex discovery involving not only the defendants but also the Department of Defense, the Department of Justice, and the Veterans Administration; retaining and deposing dozens of experts on topics ranging from the science of hearing and sound to the design and testing of hearing devices to military rules and regulations to military weaponry and ballistics, and beyond; engaging in complex motion practice; successfully fighting a bankruptcy along the way; and trying 16 bellwether cases in a period of 14 months. These efforts were conducted on behalf of all plaintiffs and all plaintiffs benefited when leadership successfully negotiated a $6 billion global settlement. Shortly after the settlement was reached, I held a hearing to outline the settlement terms and thank everyone involved for their outstanding service in the litigation—plaintiffs' leadership counsel, defense counsel, my staff, clerk's office staff, and others. *In re 3M Combat Arms Earplug Products Liability Litigation*, 3:19-md-2885-MCR-HTC, Master Docket, ECF No. 3862 (Transcript) (N.D. Fla. Sept. 8, 2023).

Defendant Gregory Brown of Fleming Nolen & Jez LLP ("FNJ") represented Canup in his member case until the global settlement was reached and Canup elected

CASE NO: 3:26cv3359-MCR-ZCB

not to participate in the settlement benefits program, at which time Brown withdrew.

After opting out of the global settlement, Canup retained new counsel, David

Gamble.  I required every opt-out plaintiff to attend an in-person hearing before

continuing to litigate their individual case, at which I discussed the settlement

program and its benefits as well as the risks of going forward individually, provided

a final opportunity for the plaintiff to participate in the settlement program, and

verified that the plaintiff was fully informed before proceeding further.  Canup was

no exception.  He and Gamble attended such a hearing on March 13, 2024.  Also in

attendance were counsel for 3M and three court-appointed MDL plaintiffs'

leadership attorneys, namely Defendants Bryan Aylstock and Bobby Bradford of

Aylstock Witkin Kreis & Overholtz PLLC (the "Aylstock Defendants") and Michael

Burns of Mostyn Law.

At Canup's hearing, as was my practice, I discussed the settlement program,

all the benefits that had been conferred on all plaintiffs by leadership, as well as the

risks of litigating an individual claim on remand.  Leadership counsel were present

to offer details about the settlement program and answer questions.  I made certain

that Canup was fully informed, and I made clear that whether he chose to participate

or opt out of the settlement was his decision.  Canup was then given one final

opportunity to participate in the global settlement, which he declined, as was his

CASE NO: 3:26cv3359-MCR-ZCB

right to do.  Still, with the assistance of his new attorney, Gamble, he then satisfied

the MDL requirements to proceed with his individual opt-out case.  He later attended

court-assisted mediation with his counsel, through which he negotiated his own

settlement with 3M outside of the settlement program.

Canup then filed the instant *pro se* suit in Texas state court against his original

MDL attorneys and the MDL leadership counsel who attended the March 13, 2024

hearing, alleging claims of professional negligence, fraud, breach of fiduciary duty,

and civil conspiracy arising out of their conduct in the MDL.  Brown removed the

case to federal court, and the Aylstock Defendants filed a motion with the JPML,

requesting that the case be transferred to this Court as a tag-along case in the MDL.[1]

After an opportunity for briefing, the JPML granted the request and transferred the

case to this Court on April 2, 2026.  The JPML concluded that Canup's case involves

common questions of fact with the MDL, that this Court (the transferee court)

retained jurisdiction over miscellaneous issues necessary to complete the

administration of the MDL cases, and that Canup's claims against his counsel arise

---

[1] After the global settlement was reached, the undersigned retained jurisdiction over the settlement administration, enforcement of orders, and all miscellaneous issues related to the MDL.  The JPML has since reopened the MDL on the transfer of additional actions.

CASE NO: 3:26cv3359-MCR-ZCB

out of the settlement program and related orders regarding case management, common benefit, and the appointment of leadership counsel in the MDL.

Canup seeks my disqualification under 28 U.S.C. § 455(a) and (b)(1). Under § 455(a), a judge must recuse herself from any proceeding in which her "impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Determining whether there is an appearance of impropriety involves consideration of "whether an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt about the judge's impartiality." *United States v. Patti*, 337 F.3d 1317, 1321 (11th Cir. 2003) (internal quotations omitted) (noting also that any doubts should be resolved in favor of recusal). Recusal is mandatory under subsection (b) if the judge "has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1).

Canup argues that bias, an appearance of impropriety, and extra-judicial communications/knowledge require my disqualification. I disagree. He points first to the fact that leadership counsel were present at a hearing held on March 13, 2024, and suggests impropriety because the request for leadership to attend does not appear

CASE NO: 3:26cv3359-MCR-ZCB

on the public docket in advance of the hearing.[2]  Canup also suggests that the reason

leadership was present and whether the undersigned requested their presence is a

disputed fact in this litigation.  Neither assertion is correct.  The record clearly

reflects that all 160 opt-out plaintiffs were required to attend a hearing, and that at

each hearing held, I requested leadership counsel to be present, along with 3M's

counsel, for the individual plaintiff's (in this case Canup's) benefit—so that the

individual plaintiff could hear the pros and cons of settling or continuing to litigate

and ask any questions before making a final decision on whether to participate in the

settlement program.  This purpose was outlined in the order setting each hearing,

including Canup's.[3]  And, as shown in the hearing transcript from Canup's March

13, 2024 hearing, I explained on the record that I felt it would be important to afford

him one final opportunity to participate in the settlement, to ask me any questions,

and also to have leadership counsel from both sides present to answer questions.

---

[2] Canup's argument is grounded in statements within the affidavit of Defendant Bryan Aylstock, submitted with a now-moot motion to dismiss, stating that Aylstock and Bradford attended a hearing on March 13, 2024, on behalf of leadership, as "requested by Judge Rodgers," and that Bradford communicated with Canup's counsel, Gamble, in advance of the hearing on behalf of leadership and "at the MDL Court's request."  ECF No. 27–1 (Aylstock Affidavit).

[3] While the order setting the March 13, 2024 hearing did not expressly state that leadership counsel must be present, it did require Canup and his attorney to appear and be prepared to discuss not only his continued obligations for litigating a claim but also the benefits of participating in the settlement program.  Member Case No. 8:20cv14021-MCR-HTC, ECF No. 6 (Order, Feb. 5, 2024).

CASE NO: 3:26cv3359-MCR-ZCB

Member Case No. 8:20cv14021-MCR-HTC, ECF No. 59 at 4. At the hearing, plaintiffs' leadership counsel and 3M's counsel were invited to make remarks about the challenges of the MDL, the benefits of the settlement, and the litigation obligations and obstacles going forward. Nothing about this is in dispute or suggests any personal bias, extra-judicial knowledge, or a basis on which a fully informed observer would question my impartiality in the instant case. *See* 28 U.S.C. § 455(a), (b)(1). While judges should err on the side of recusal if potential conflicts exist, recusal is not warranted for "imaginary reasons." *Murray v. Scott*, 253 F.3d 1308, 1313 (11th Cir. 2001).

Canup also argues that I made prior statements to all plaintiffs, including him, about the adequacy of representation provided by leadership counsel that a neutral observer would see as reflecting a prejudgment of issues in dispute in this case. Again, I disagree. The record reflects that after the global settlement was reached, I made general comments on the record commending the professionalism and efforts of the MDL leadership on both sides and thanking them for their hard work that ultimately resolved the MDL in a global settlement. I also assured all plaintiffs that they had been well represented by leadership counsel, who had vigorously pursued

CASE NO: 3:26cv3359-MCR-ZCB

a fair resolution for plaintiffs as a whole.[4]  Contrary to Canup's suggestion, these were general comments about how leadership on both sides of the aisle conducted the MDL and the settlement negotiations and could not be viewed as favoritism or as a comment on the performance of every retained attorney.

As the Supreme Court has stated, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994) (discussing § 455(a) and (b)(1)).  My prior comments do not display the type of deep-seated favoritism that "would make fair judgment impossible," *id*., or that could raise a "significant doubt" about my impartiality, *Patti*, 337 F.3d at 1321.  And I have no bias or personal knowledge of any disputed facts in this case—the only facts within my knowledge are those learned through the course of the MDL, which is not a basis for bias or recusal.

---

[4] I stated that "in my view, the leadership teams on both sides really do exemplify the very best of the legal profession" and that the 250,000 plaintiffs were "represented very well." *In re 3M Combat Arms Earplug Products Liability Litigation*, 3:19-md-2885-MCR-HTC, ECF No. 3862 at 13 (Hearing Tr. Sept. 8, 2023).  Over fifty attorneys participated in plaintiff leadership roles.  Again, at its height, the MDL involved 500 law firms with over 400,000 plaintiffs.

CASE NO: 3:26cv3359-MCR-ZCB

Canup's final argument is that because I recused myself in another "materially similar" case, this bolsters his argument for recusal here. But the case Canup references, *Kelly v. Aylstock*, Case No. 3:25cv1947-TKW-ZCB (N.D. Fla.), is not "materially similar." Kelly's suit alleges professional negligence by Bryan Aylstock in his capacity as Kelly's retained attorney in the MDL. This is a material difference from the instant case. Not one of the leadership attorneys Canup sues in this suit was retained to represent him in the MDL. Moreover, in *Kelly*, when Aylstock (his retained attorney) moved to withdraw, Kelly objected, and I held an *ex parte* hearing. *See Kelly v. 3M,* Member Case No. 7:20-cv-36595-MCR-GRJ, ECF No. 15 (N.D. Fla. Mar. 13, 2024). In the subsequent order granting the motion to withdraw, which is filed under seal, I explained the basis for withdrawal (a fundamental disagreement with counsel) and made comments directly about Aylstock's handling of Kelly's case. Because my remarks commenting on the quality of representation by Kelly's retained counsel could have been viewed as prejudgment of an issue that would be presented in Kelly's professional negligence case, I recused. By contrast, my comments on the record commending the efforts and professionalism of leadership counsel as a whole during the MDL are entirely different and do not reflect any prejudgment on my part about leadership counsel's conduct toward any particular litigant who might have retained them. I recused myself in *Kelly* not out of any

CASE NO: 3:26cv3359-MCR-ZCB

USCA11 Case: 26-11887     Document: 5-2     Date Filed: 06/05/2026     Page: 120 of 185

Page 10 of 10

personal bias or extra-judicial knowledge of facts but because leadership counsel

served also as Kelly's retained counsel and, most importantly, I had commented

directly on the quality of that representation.  That simply is not the case here.

Accordingly, Canup's Motion for Recusal and Disqualification, ECF No. 37, is **DENIED**.

**DONE AND ORDERED** this 17th day of May 2026.


*M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

CASE NO: 3:26cv3359-MCR-ZCB

# Tab 62

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

BRANDON CANUP,

 Plaintiff,         Case No.: 3:26-cv-3359-MCR-ZCB

 v.

BRYAN F. AYLSTOCK, et al,

 Defendants.

_____/

## APPEARANCE OF COUNSEL

On the date of this filing, Benjamin James Stevenson, who is admitted to practice in this court, appears in this case as counsel for Defendant Mostyn Law Finn P.C.

 Respectfully submitted,

> s/Benjamin James Stevenson
> **Benjamin James Stevenson**
> Fla. Bar. No. 598909
> Stevenson Legal, PLLC
> 919 Panferio Drive
> Pensacola Beach, FL 32561
> T. 702.306.6708
> bjs@stevenson-legal.com
>
> *Counsel for Mostyn Law Finn*

# Tab 66

## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA PENSACOLA DIVISION

BRANDON CANUP        )
       )
       Plaintiff,        )
       )       Case No.: 3:26-cv-03359-MCR-ZCB
v.        )
       )
BRYAN F. AYLSTOCK, et al.,        )
       )
       Defendants.        )

## DEFENDANTS BRYAN F. AYLSTOCK, AYLSTOCK, WITKIN, KREIS & OVERHOLTZ PLLC, AND BOBBY BRADFORD'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW

Defendants, **BRYAN F. AYLSTOCK, AYLSTOCK, WITKIN, KREIS & OVERHOLTZ PLLC**, and **BOBBY BRADFORD** ("AWKO Defendants"), hereby file their *Motion to Dismiss Plaintiff's Amended Complaint*. In support, the AWKO Defendants state the following:

### INTRODUCTION AND SUMMARY OF ARGUMENT

The extensive backdrop of the underlying litigation in this purported legal malpractice claim, which masquerades as some sort of fraud/breach of fiduciary duty claim, is important to the Court's analysis of the Plaintiff's claims. First, the facts that give rise to this case stem from one of the largest mass tort cases ever handled by the Federal Court system – the 3M earplug litigation – with more than 350,000

individual claimants at its peak. Second, the AWKO Defendants never represented

Plaintiff, but rather were appointed as Lead Counsel (Bryan Aylstock, specifically)

for the MDL by United States District Judge M. Casey Rodgers on or about May 22,

2019.[1] There can be no dispute that Bryan F. Aylstock, Bobby Bradford and the

lawyers at Aylstock, Witkin, Kreis and Overholtz, PLLC's only interactions with

Plaintiff were on behalf of  Plaintiffs' MDL Leadership at the request of the MDL

Court.

Finally, it is clear that Plaintiff's *Amended Complaint* is really nothing more

than a collateral attack on the 3M Combat Arms global settlement, the MDL Court's

Orders, including Case Management Order No. 57 wherein Judge Rodgers created

a specific framework for those litigants, like this Plaintiff, who opted not to

participate in the Settlement Program as outlined in the Master Settlement

Agreement, Common Benefit Order No. 3, Pretrial Order No. 9, the Order sealing

Exhibit No. 10 to the MSA, and the Orders granting withdrawal of Plaintiff's actual

former counsel, Cliff Roberts, Gregory Brown and Fleming, Nolen & Jez. [2]

---

[1] See Pretrial Order No. 7, Plaintiff Leadership Appointments, *In Re: 3M Combat Arms Product Liability Litigation*, Case No. 3:19md2885, United States District Court for the Northern District of Florida, Pensacola Division, May 22, 2019 (Dkt. 376).

[2] See Case Management Order No. 57, Case Management Order for Any Ongoing Litigation Against Defendants, *In Re: 3M Combat Arms Product Liability Litigation*, Case No. 3:19md2885, United States District Court for the Northern District of Florida, Pensacola Division, August 29, 2023, (Dkt. 3811); Common Benefit Order No. 3, *In Re: 3M Combat Arms Product Liability Litigation*, Case No. 3:19md2885, United States District Court for the Northern District of Florida, Pensacola Division, February 17, 2021, (Dkt. 1659); Pretrial Order No. 9, Stipulated Order Governing Confidentiality and Privilege, *In Re: 3M Combat Arms Product Liability Litigation*,

2

Plaintiff's *Amended Complaint* should be dismissed because it is premised upon legally defective theories that fail as a matter of law and cannot be cured through another conclusory pleading. At its core, the *Amended Complaint* improperly attempts to transform apparent dissatisfaction with court-supervised MDL administration into individualized tort and fiduciary-duty claims against court-appointed Plaintiffs' MDL Leadership counsel who never represented Plaintiff personally. Plaintiff was represented throughout the relevant proceedings by independent retained counsel, and Plaintiff is incapable of establishing either an attorney-client or quasi-attorney-client relationship necessary to support claims for fraud in the inducement, breach of fiduciary duty, or fraudulent inducement. The Amended Complaint likewise fails to plausibly allege the essential elements of fraudulent misrepresentation because it identifies no actionable false statement, no reasonable reliance, and no particularized facts satisfying Rule 9(b).

Equally fatal, Plaintiff cannot establish the causation element for any asserted cause of action. Plaintiff admits his own independently retained counsel advised him throughout the litigation, and Plaintiff voluntarily elected to participate in the CMO

---

Case No. 3:19md2885, United States District Court for the Northern District of Florida, Pensacola Division, June 17, 2019, (Dkt. 442); Order to Seal, *In Re: 3M Combat Arms Product Liability Litigation*, Case No. 3:19md2885, United States District Court for the Northern District of Florida, Pensacola Division, August 29, 2023, (Dkt. 3810); and Order Granting Withdrawal of Counsel, *Canup v. 3M Company, et al.*, Case No. 8:20cv14021, United States District Court for the Northern District of Florida, Pensacola Division, February 20, 2024, (Dkt. 12).

3

5350236_1

57 opt-out process and resolved his case via direct settlement with 3M due only to his and his independent counsel's efforts.

Finally, Plaintiff lacks Article III standing to pursue the vague and speculative damages and equitable remedies sought because he alleges no concrete injury fairly traceable to AWKO Defendants' conduct, identifies no personal ownership interest in any challenged fees or MDL procedures, and no cognizable damages beyond the ordinary burdens attendant to the litigation Plaintiff voluntarily chose to pursue. Accordingly, dismissal is warranted under Rule 12(b)(6) with prejudice, as Plaintiff has already sought leave from this Court to file an *Amended Complaint* and any additional amendments would be futile.

## PROCEDURAL HISTORY

Plaintiff originally filed this lawsuit on October 27, 2025, in the 67th Judicial District Court of Tarrant County, Texas. (*Brandon Canup v. Bryan F. Aylstock, et al.*, Cause No. 067-371499-25, 67th Judicial District Court of Tarrant County, Texas). The lawsuit was removed to the United States District Court for the Northern District of Texas on November 6, 2025 wherein the Fleming Nolen & Jez and AWKO Defendants filed motions to dismiss. (*Brandon Canup v. Bryan F. Aylstock, et al.*, Case No. 4:25-cv-01255-Y, U.S.D.C., Northern District of Texas, Fort Worth Division, Dkts. 10, 27).

4

5350236_1

AWKO Defendants moved under 28 U.S.C. §1407(c) to transfer the lawsuit to the MDL Court.  (Mot. to Transfer, *In Re: 3M Combat Earplugs Products Liability Litigation*, No. 2885 (J.P.M.L. December 10, 2025, Dkt. 2033)).  The JPML granted the AWKO Defendants' transfer motion on April 2, 2026 (Transfer Order, *In Re: 3M Combat Earplugs Products Liability Litigation*, No. 2885 (J.P.M.L. April 2, 2026, Dkt. 2051)). Following transfer to this Court, Plaintiff requested to amend his Complaint on April 6, 2026.  This Court granted Plaintiff's Motion to Amend without opposition on May 6, 2026 (Order, *Canup v. Bryan F. Aylstock et al.*, May 6, 2026, Dkt. 54).  AWKO Defendants file this *Motion to Dismiss* in response to Plaintiff's *Amended Complaint*.

## FACTUAL ALLEGATIONS RELEVANT TO PLAINTIFF'S CLAIMS AND AWKO DEFENDANTS' MOTION TO DISMISS

The following factual allegations arise from Plaintiff's *Amended Complaint*, the hearing transcript from the March 13, 2024, Status Conference referenced in Plaintiff's *Amended Complaint*, emails referenced in Plaintiff's *Amended Complaint*, and information from Plaintiff's case docket from which this Court can take judicial notice.[3]

On June 21, 2019, Plaintiff hired Cliff Roberts, Gregory Brown, and Fleming Nolen & Jez ("Texas Defendants) to represent him in his 3M Combat Arms Earplug

---

[3] AWKO Defendants request the Court to take judicial notice of all docket references in this Motion to Dismiss.

5

case. (¶ 28 Amnd. Comp.).  On June 3, 2020, the Texas Defendants filed suit on Plaintiff's behalf against 3M, styled *Canup v. 3M Company et al.*, Case No. 8:20-cv-14021. (¶ 34 Amnd. Comp.).  Plaintiff's case was not selected for the bellwether or wave process. (See Docket, U.S.D.C. Northern District of Florida, Pensacola Division, *Canup v. 3M Company et al.*, Case No. 8:20-cv-14021). On August 29, 2023, a global settlement agreement was announced by 3M and Plaintiffs' Leadership in the MDL. (¶ 38 Amnd. Comp.).  In January 2024, after the Texas Defendants indicated they would withdraw from representing Plaintiff if he decided to opt-out of the settlement, Plaintiff hired David Gamble ("Gamble") to represent him in his 3M Combat Arms Earplug Lawsuit. (¶ 64 Amnd. Comp.).

On January 21, 2024, Plaintiff formally opted out of the settlement, triggering his obligations under CMO 57, which included production obligations within 30 days of opting out and filing expert reports within 60 days of opting out. (¶ 66-67 Amnd. Comp.).  On February 5, 2024, Plaintiff was ordered by this Court to appear "in person, with counsel" at a status conference in Pensacola, Florida scheduled for March 13, 2024. (¶ 77 Amnd. Comp.).  On February 20, 2024, this Court granted the Texas Defendants motion to withdraw as Plaintiff's counsel in the 3M Combat Arms Litigation. (¶ 78 Amnd. Comp.).  Plaintiff, having already hired Gamble to represent him in his 3M lawsuit, did not oppose Texas Defendants' motion to withdraw. (Motion to Withdraw and Order Granting, U.S.D.C. Northern District of Florida,

5350236_1

Pensacola Division, *Canup v. 3M Company et al.*, Case No. 8:20-cv-14021, Dkts. 10, 12).

The AWKO Defendants' first involvement regarding Plaintiff's 3M lawsuit was on February 22, 2024. (¶ 79 Amnd. Comp.). The Court requested Plaintiffs' MDL Leadership be present at all status conferences for 3M Combat Arms claimants who opted out of the settlement, including Plaintiff (Exhibit A, Status Conference Transcript at p. 3:8-9, March 13, 2024, *Canup v 3M Company, et al.*, Case No. 8:20-cv-14021) and for Plaintiffs' MDL Leadership to be familiar with opt out claimants' cases to assist them with the pros and cons of settling or continuing to litigate. (*Id.* at p. 33:19-25). Bradford emailed Gamble on February 22, 2024, requesting a call to discuss Plaintiff's case. (¶ 79 Amnd. Comp.). Gamble called Bradford and after discussing Plaintiff's case and potential avenues of recovery through the settlement, on February 23, 2024 Bradford emailed Gamble settlement-related materials, including the EIF protocol and FAQs at Gamble's request. (¶ 79 Amnd. Comp.). Additionally, Bradford informed Gamble he and Aylstock would be in attendance at the March 13, 2024, Status Conference. (¶ 79 Amnd. Comp.).

The AWKO Defendants attended the March 13, 2024, Status Conference. (¶ 81 Amnd. Comp.). The status conference began with the Court welcoming Plaintiff and his attorney Gamble, introducing herself, and then telling Plaintiff: "Also in

7

5350236_1

the courtroom today from plaintiffs' leadership there's Mr. Bryan Aylstock, Mr. Brad

Bradford and Mr. Mike Burns." (Exhibit. A, Status Conference Transcript at 3:8-9).

The MDL Court continued by explaining why she thought it was important to

meet with those plaintiffs litigating their cases (like Plaintiff) so that she could give

her perspective of the litigation having overseen it for 5 years, stating: "Also, as you

can see, leadership counsel from the plaintiffs' side is here if you have questions of

them." *Id.* at 4:23-25. The Court went on to advise Plaintiff:

> "So my purpose today was just to meet with you, to explain to you what this is going to be like going forward, and to give you an opportunity, as I said, to speak with me. If you have questions, if there's something that I can address for you, I'm happy to do that, if I'm able to. You have a lawyer, so I certainly – even if you didn't have a lawyer, I wouldn't try to give you any legal advice. I'm just giving you my perspective as the judge who has been presiding over this litigation for a long time and has a great deal of familiarity with it so you go forward with your eyes wide open. And then if you'd like an opportunity, you or Mr. Gamble, to talk with leadership counsel about some if what I've said about the settlement program, some of the more nuanced aspects of the settlement program, that's going to be available to you as opportunity, if you'd like …" *Id. at 32:8-33:23.*

> And then, at the end of the day, if you leave here, you know, you're leaving without settling, you're leaving here having heard from me, you know, I feel better about that. You had an opportunity to ask questions. And then, if you decide to roll the dice, again, that's your case. That's what our system is about. The courtroom is here. We try cases …" *Id at 34:1-7.*

8

Aylstock also spoke at the Status Conference, referencing Plaintiff's specific circumstances. (¶ 81 Amnd. Comp.). The MDL Court also addressed Plaintiff's specific medical records and case specific issues in the Status Conference when discussing Plaintiff's case. (Exhibit A at 33:19-25). Neither Gamble nor Plaintiff objected to AWKO Defendants' presence at the Status Conference (See Exhibit A generally).

The Court gave Plaintiff and Gamble the opportunity to voluntarily meet with Magistrate Judge Hope Cannon for a settlement conference after the Status Conference. (¶ 83 Amnd. Comp.). The Court also gave Plaintiff and Gamble the opportunity to voluntarily meet with Aylstock, Bradford and Burns after the Status Conference. (¶ 83 Amnd. Comp.). Plaintiff and Gamble chose to meet with Judge Cannon and then with Judge Cannon, Aylstock, Bradford and Burns. (¶ 84 Amnd. Comp.). During the meeting, the AWKO Defendants engaged directly with Plaintiff and Gamble regarding multiple specific aspects of Plaintiff's case. The AWKO Defendants recommended Plaintiff participate in the programs available within the 3M settlement and to settle his case. Despite the Aylstock Defendant's recommendation, Plaintiff declined to settle his case as was his right. (¶ 84 Amnd. Comp.).

After the Status Conference on March 13, 2024, the AWKO Defendants had no involvement with Plaintiff's case until Gamble contacted Bradford on April 24,

9

5350236_1

2024, to obtain the un-redacted Master Complaint.  Bradford responded the same day and advised that he would provide requested information once Gamble signed and returned the Confidentiality and Protective Order documents required by PTO 9 and the Participation Agreement required by Common Benefit Order No. 3.  (¶ 95 Amnd. Comp.) and (Common Benefit Order No. 3, *In Re: 3M Combat Arms Product Liability Litigation*, Case No. 3:19md2885, United States District Court for the Northern District of Florida, Pensacola Division, February 17, 2021, (Dkt. 1659); and Pretrial Order No. 9, Stipulated Order Governing Confidentiality and Privilege, *In Re: 3M Combat Arms Product Liability Litigation*, Case No. 3:19md2885, United States District Court for the Northern District of Florida, Pensacola Division, June 17, 2019, (Dkt. 442).

On April 25, 2024, Gamble returned the required documents and Bradford forwarded the requested information. (¶ 95 Amnd. Comp.).  The AWKO Defendants had no other involvement with Plaintiff's case until July 9, 2024, when Plaintiff, despite being represented by Gamble, emailed Bradford seeking access to common benefit work product. (¶ 99 Amnd. Comp.).  Bradford, who responded immediately to Gamble's previous requests, did not respond to Plaintiff's email since he was represented by Gamble.  (¶ 99, 79, 95 Amnd. Comp.). Plaintiff's *Amended Complaint* contains no allegations that Gamble (or Plaintiff after the one time) ever followed up or requested additional common benefit work product from the AWKO

10

5350236_1

Defendants or any other member of Plaintiffs' MDL Leadership. (*See generally* Amended Complaint). The AWKO Defendants had no further involvement with Plaintiff's 3M case. (*See generally* Amended Complaint). With the assistance of Gamble, Plaintiff satisfied the MDL requirements to proceed with his individual opt out case. (See docket - *Canup v. 3M Company, et al.*, U.S.D.C. Northern District of Florida, Pensacola Division, Case No. 8:20-cv-14021). On September 30, 2024, Plaintiff settled his 3M case outside of the settlement program. (¶ 100 Amnd. Comp.). Plaintiff's "ability to reach this resolution was made possible only through his efforts and the efforts of independent counsel, despite harm caused by the misconduct of all Defendants named herein." (¶ 100 Amnd. Comp.).

Based on the above allegations, Plaintiff brings four claims against the AWKO Defendants: (1) fraud by nondisclosure; (2) breach of fiduciary duty; (3) fraudulent inducement; and (4) civil conspiracy.

## STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of a complaint. The "complaint must include 'enough facts to state a claim to relief that is plausible on its face.'" *Hunt v. Amico Props., L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility is found where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

11

alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Iqbal*, 556 U.S. at 679 (noting the plausibility inquiry presents a "context-specific task," requiring the court to draw on "judicial experience and common sense"). Mere legal conclusions lacking "adequate factual support" are not entitled to an assumption of truth. *Mamani v. Berzain*, 654 F.3d 1148, 1153 (11th Cir. 2011); *see also Twombly*, 550 U.S. at 555 (noting "a formulaic recitation of the elements of a cause of action will not do").

The allegations in the complaint must set forth enough facts "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Additionally, "a complaint is subject to dismissal under Rule 12(b)(6) when its factual allegations, on their face, establish an affirmative defense that bars recovery." *Myrick v. Fulton Cnty., Ga.*, 69 F.4th 1277, 1297 (11th Cir. 2023). The Court limits its "consideration to the well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed." *LaGrasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004).

Additionally, fraud claims are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). Rule 9(b) requires a plaintiff alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy Rule 9(b), a complaint must allege: "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and

<center>12</center>

5350236_1

(2) the time and place of each such statement and the person responsible for making same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Brooks v. Blue Cross & Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1380–81 (11th Cir. 1997). Rule 9(b) must be read in conjunction with Rule 8(a)'s plausibility requirement. Thus, a complaint alleging fraud must contain sufficient factual matter to state a plausible claim for relief and cannot rely on conclusory allegations, unwarranted deductions, or formulaic recitations of elements. See *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–57 (2007).

## MEMORANDUM OF LAW

**A. PLAINTIFF CANNOT ESTABLISH AN ACTIONABLE FIDUCIARY RELATIONSHIP OR AN ATTORNEY-CLIENT, QUASI ATTORNEY-CLIENT, OR IMPLIED ATTORNEY-CLIENT RELATIONSHIP WITH THE AWKO DEFENDANTS.**

Plaintiff's claims for Breach of Fiduciary Duty, Fraud by Non-Disclosure and Civil Conspiracy are premised on Plaintiff establishing an actionable fiduciary or attorney-client relationship. Despite Plaintiff's effort to the contrary, his *Amended Complaint* fails to plausibly allege any attorney-client, quasi-attorney-client, implied attorney-client or independently actionable fiduciary relationship between Plaintiff and Defendants. Under Florida law, the test for an attorney-client relationship, "is a subjective one and hinges upon the client's belief that he is consulting a lawyer in

13

that capacity and his manifested intention is to seek professional legal advice.

However, this subjective belief must ... be a reasonable one." *The Fla. Bar v. Beach,*

675 So. 2d 106, 109 (Fla. 1996) (citation and internal quotation marks omitted).

*Mansur v. Podhurst Orseck, P.A.*, 994 So. 2d 435, 438 (Fla. 3d DCA 2008).

> For belief of an attorney-client relationship to be reasonable, the client must have "consulted the attorney with the manifested intention of retaining him for legal services." Jackson, 372 F.3d at 1282 (emphasis in original). Jackson noted that "[t]he plain meaning of 'manifest' is 'to show plainly,' and ... it is the lawyer being charged with representing a client who must have been plainly shown the client's intention to form the attorney-client relationship." Id. at 1282 n.30.

*Nat'l Equestrian League, LLC v. White*, No. 20-21746-CIV, 2021 WL 4690665, at *6 (S.D. Fla. Oct. 7, 2021).

The information properly before this Court for its consideration[4] makes clear

the extraordinary implausibility of Plaintiff's theory that AWKO Defendants

represented him at all, much less at an actionable level. Here, the *Amended*

*Complaint* affirmatively establishes Plaintiff hired and was represented his own

counsel during the entirety of his 3M Combat Arms Earplug lawsuit, first by the

Texas Defendants and then as of January 2024 by Gamble. (¶ 28, 64 Amnd. Comp.).

The AWKO Defendants never represented Plaintiff, and never even had any

involvement or contact with Plaintiff until February 22, 2024, when Bradford

---

[4] Including Plaintiff's factual allegations, documents central to or referenced in the complaint, and matters judicially noticed.

14

reached out to Plaintiff's counsel Gamble at the MDL Court's request leading up to the March 13, 2024 Status Conference.  (*See generally* Amended Complaint and ¶ 70 Amnd. Comp.).

The transcript of the Status Conference makes abundantly clear that the MDL Court carefully delineated AWKO Defendants' limited role and never suggested AWKO Defendants were acting as Plaintiff's personal attorneys. To the contrary, the Court repeatedly framed AWKO Defendants' responsibilities as part of their court-appointed MDL Leadership functions, namely, facilitating communications regarding settlement programs and options, and responding to questions from represented claimants and their counsel. Nothing in the transcript remotely suggests the formation of an attorney-client relationship between AWKO Defendants and individually represented plaintiffs such as Plaintiff. The Status Conference transcript makes it equally clear that Gamble was present as Plaintiff's counsel, which makes sense considering he was Plaintiff's attorney of record.   (Exhibit A, Status Conference Transcript at p. 4:1-2).

Plaintiff's attempted reliance on the transcript from the Status Conference listing Aylstock, Bradford and Burns as appearing "FOR THE PLAINTIFF" as a basis for establishing an attorney-client relationship is unreasonable and contrary to all relevant facts before this Court.  First, the Court made Aylstock, Bradford and Burns' role at the Status Conference abundantly clear. (Exhibit A, Status Conference

<div align="center">15</div>

5350236_1

Transcript at p. 3:8-9). Second, the AWKO Defendants never represented Plaintiff, never filed an appearance on his behalf or appeared on his behalf. (*See generally* the docket, U.S.D.C. Northern District of Florida, Pensacola Division, *Canup v. 3M Company et al.*, Case No. 8:20-cv-14021).

Third, Plaintiff knew Aylstock and Bradford were going to attend the Status Conference. (¶ 79 Amnd. Comp.). Fourth, the Minute Entry for the Status Conference referenced in the Court's Docket Report (Dkt. 13) clearly shows Aylstock, Bradford and Burns were present on behalf of Plaintiffs' MDL Leadership Counsel. (U.S.D.C. Northern District of Florida, Pensacola Division, *Canup v. 3M Company et al.*, Case No. 8:20-cv-14021). Fifth, every pleading filed on Plaintiff's behalf in the 3M MDL was filed by the Texas Defendants, until their withdrawal was granted, and then by Gamble. All pleadings filed by 3M in Plaintiff's case from the 3M MDL were served on the Texas Defendants until their withdrawal was granted, and then Gamble. None were filed by or served upon AWKO Defendants. (See generally the docket, U.S.D.C. Northern District of Florida, Pensacola Division, *Canup v. 3M Company et al.*, Case No. 8:20-cv-14021).

Sixth, the docket from Plaintiff's case in the 3M MDL which shows subsequent mediations, including the mediation wherein Plaintiff voluntarily settled his case against 3M, were attended by Plaintiff's counsel, Gamble, and not AWKO

16

5350236_1

Defendants. (*See* Dkts. 54, 55, U.S.D.C. Northern District of Florida, Pensacola Division, *Canup v. 3M Company et al.*, Case No. 8:20-cv-14021).

Plaintiff's conclusory allegations cannot transform generalized litigation-management communications into individualized attorney-client relationships, particularly where the plaintiff remained represented by separate counsel. Allowing that would improperly convert routine MDL leadership functions, including responding to claimant inquiries, communicating court-approved settlement procedures, and explaining available litigation options, into personal representation of thousands of separately represented claimants. Nor do Plaintiff's allegations plausibly establish a "special relationship" or position of trust sufficient to impose independent fiduciary duties.

Plaintiff retained independent counsel, remained free to accept or reject settlement, and participated in judicially supervised proceedings at all relevant times. Under such circumstances, any alleged reliance on AWKO Defendants for individualized legal advice was objectively unreasonable as a matter of law. *See Mansur*, 994 So. 2d at 438. To hold otherwise would fundamentally undermine the structure of multidistrict litigation by subjecting court-appointed leadership counsel to conflicting fiduciary obligations owed simultaneously to thousands of separately represented claimants based merely on generalized MDL communications undertaken pursuant to court authorization.

17

5350236_1

For the reasons discussed above, Plaintiff's Breach of Fiduciary Duty claim fails because Plaintiff cannot establish a fiduciary relationship as a matter of law. To plead a count for Breach of Fiduciary Duty, the Plaintiff must allege the following elements: (1) a fiduciary relationship exists between the plaintiff and defendant; (2) the defendant's breach of that duty; and (3) the breach must cause injury to the plaintiff. *Broower v Wyndham Vacation Resorts, Inc.*, 336 So. 3d 372 (Fla. 5th DCA 2022). "It is axiomatic that to succeed on a cause of action for breach of fiduciary duty, one must first establish the existence of a fiduciary duty." *Real Est. Value Co. v. Carnival Corp.*, 92 So. 3d 255, 261 (Fla. 3d DCA 2012). Because Plaintiff cannot establish that an actionable fiduciary relationship exists, the breach of fiduciary duty claim should be dismissed.

Likewise, because Plaintiff cannot establish a fiduciary relationship, Plaintiff's Fraud by Non-Disclosure also fails and must be dismissed. For Plaintiff to prove Fraud by Non-Disclosure, the Plaintiff must prove the general elements of fraud, but must also prove that there was a confidential or fiduciary relationship between the defendant and the plaintiff that obligated the defendant with a duty to disclose. *Trans Petrol, LTD. v. Radulovic*, 764 So. 2d 878 (Fla. 4th DCA 2000). The *Amended Complaint* fails to plausibly allege any attorney-client, quasi-attorney-client, implied attorney-client, or independently actionable fiduciary relationship between Plaintiff and AWKO Defendants.

18

5350236_1

Additionally, any alleged reliance or trust of the Plaintiff in the AWKO Defendants is not reasonable or legally enforceable. "To establish such a relationship, the plaintiff must prove both that she placed trust in the defendant and that the defendant accepted that trust." *Cramer v. Palm Ave. Partners, LLC*, 672 B.R. 517, 533 (M.D. Fla. 2025) (citing *Abele v. Sawyer*, 747 So.2d 415, 417 (Fla. 4th DCA 1999)).

> "The fact that one party places trust or confidence in the other does not create a confidential [or fiduciary] relationship in the absence of some recognition, acceptance or undertaking of the duties of a fiduciary on the part of the other party." Moreover, when parties are dealing at arm's length, "a fiduciary relationship does not exist because there is no duty imposed on either party to protect or benefit the other."

*Identity Stronghold, LLC v. Zeidner*, No. 8:16-CV-868-T-35AAS, 2019 WL 12338322, at *10 (M.D. Fla. Sept. 11, 2019) (citations omitted).

In other words, "[t]he fact that one party places trust or confidence in the other does not create a confidential relationship in the absence of some recognition, acceptance or undertaking of the duties of a fiduciary on the part of the other party." *Lanz v. Resol. Tr. Corp.*, 764 F. Supp. 176, 179 (S.D. Fla. 1991). As a result, dismissal is proper.

## B.   PLAINTIFF FAILS TO STATE A CLAIM FOR FRAUDULENT INDUCEMENT.

Plaintiff's fraudulent inducement claim fails as a matter of law because the *Amended Complaint* does not plausibly allege a false statement of material fact,

<div align="center">19</div>

fraudulent intent, reasonable reliance, or causation, and further fails to satisfy Rule 9(b)'s heightened pleading standard.  To state a claim for fraudulent inducement under Florida law, a plaintiff must allege: (1) a false statement of material fact; (2) when the representation was made, the defendant knew or should have known of the falsity of the statement; (3) the defendant intended that the false statement to induce plaintiff's reliance; and (4) the plaintiff justifiably relied upon the false statement to his detriment. *Output, Inc. v. Danka Business Systems, Inc.*, 991 So. 2d 941 (Fla. 4th DCA 2008).  In federal court, such claims must additionally satisfy Rule 9(b), which requires a plaintiff to plead with particularity the precise statements made, the speaker, when and where the statements were made, how the statements misled the plaintiff, and what the defendant gained as a consequence of the alleged fraud. *Brooks v. Blue Cross & Blue Shield of Florida, Inc.,* 116 F.3d 1364, 1380–81 (11th Cir. 1997).

The *Amended Complaint* fails at the outset because Plaintiff cannot plausibly allege he was fraudulently induced into signing agreements that were required by the MDL Court as a prerequisite to obtaining access to common-benefit materials. (Common Benefit Order No. 3, *In Re: 3M Combat Arms Product Liability Litigation*, Case No. 3:19md2885, United States District Court for the Northern District of Florida, Pensacola Division, February 17, 2021, (Dkt. 1659); and Pretrial Order No. 9, Stipulated Order Governing Confidentiality and Privilege, *In Re: 3M Combat*

5350236_1

*Arms Product Liability Litigation*, Case No. 3:19md2885, United States District Court for the Northern District of Florida, Pensacola Division, June 17, 2019, (Dkt. 442). Execution of the Protective Order and Participation Agreement was mandated by Court-supervised MDL procedures governing access to protected discovery materials. Plaintiff does not allege that AWKO Defendants fabricated a separate inducement scheme or persuaded Plaintiff to undertake obligations beyond those already imposed by the Court's process. The agreements arose from the MDL Court's administration of common-benefit discovery, not from any independent fraudulent conduct by AWKO Defendants.

The *Amended Complaint* likewise fails to plausibly allege fraudulent intent. Plaintiff merely speculates that AWKO Defendants supposedly never intended to provide full access to common benefit materials. But "[a] mere promise not performed is not fraud." *Alexander/Davis Properties, Inc. v. Graham*, 397 So. 2d 699, 706 (Fla. 4th DCA 1981). Rather, a plaintiff must allege facts demonstrating that, at the time the representation was made, the defendant had a present intent not to perform. *See Prieto v. Smook, Inc.,* 97 So. 3d 916, 918 (Fla. 4th DCA 2012). Conclusory allegations of intent are insufficient under Rule 9(b).

Here, Plaintiff identifies no particularized facts showing any Defendant made a knowingly false statement, possessed a contemporaneous intent not to comply with MDL procedures, or affirmatively misrepresented what discovery materials would

21

5350236_1

be made available. Instead, the allegations amount to nothing more than dissatisfaction with the alleged scope or timing of materials ultimately produced. Such allegations do not state a fraud claim.

The *Amended Complaint* also negates reasonable reliance and causation. Plaintiff admits he was represented by separate retained counsel throughout the underlying litigation. Yet Plaintiff alleges only that he personally sent an email to AWKO Defendants regarding materials covered by the agreements. Plaintiff also acknowledged Bradford responded promptly to previous inquiries by his counsel, Gamble. Plaintiff does not allege that Gamble ever requested additional common benefit materials, followed up on Plaintiff's request, sought clarification, moved to compel compliance before the MDL Court, or otherwise pursued relief through available procedures.

Instead, Plaintiff voluntarily settled his underlying claims soon after requesting the additional common benefit materials directly from Bradford despite being represented by Gamble. These allegations foreclose any plausible inference that AWKO Defendants caused Plaintiff's alleged injuries. Ultimately, Plaintiff attempts to convert an alleged dispute regarding administration of Court-supervised MDL discovery procedures into a tort claim for fraudulent inducement. Rule 9(b) does not permit such speculative and conclusory pleading. Because Plaintiff fails to plausibly allege a knowingly false statement, fraudulent intent, reasonable reliance,

22

5350236_1

or causation—and fails to plead fraud with particularity—the fraudulent inducement claim should be dismissed with prejudice.

**C. PLAINTIFF'S AMENDED COMPLAINT FAILS TO PLAUSIBLY ALLEGE PROXIMATE CAUSATION, REQUIRING DISMISSAL OF ALL CAUSES OF ACTION.**

All four of Plaintiff's causes of action against AWKO Defendants have a proximate cause element and requirement. Fraud by Non-Disclosure requires reliance on the non-disclosure, which causes injury (¶¶ 136-151 Amnd. Comp.). Breach of Fiduciary Duty requires Defendants' alleged breach to cause injury. (¶¶ 152-164 Amnd. Comp.). Fraudulent Inducement requires reliance on a false representation, which causes injury. (¶¶ 165-186 Amnd. Comp.). Finally, Civil Conspiracy requires damage as a result of the acts done under the conspiracy. (¶¶ 187-203 Amnd. Comp.).

Plaintiff's *Amended Complaint* contains core allegations that are fatal to causation for all four causes of action. First, Plaintiff was represented by his own independent attorney(s) at all times. Second, with the advice and assistance of his counsel, Gamble, Plaintiff "repeatedly declined" AWKO Defendants' recommendation for him participate in the settlement programs available and settle his case at the voluntary meeting on March 13, 2024 after the status conference. (¶ 84 Amnd. Comp.). Third, with advice and assistance his counsel, Gamble, Plaintiff

voluntarily settled his Combat Arms Earplugs lawsuit with 3M on September 30, 2024, during the CMO 57 opt-out process.[5]

The *Amended Complaint* attempts to leap over Plaintiff's own settlement decision, and the independent advice of his retained counsel, by a conclusory assertion that AWKO Defendants somehow "caused" Plaintiff's alleged losses through their conduct in the MDL. But Rule 8 and Rule 12 require more than speculation and labels. Where independent actors exercise their own judgment, proximate causation fails as a matter of law. "A party cannot recover damages for legal malpractice unless it is shown that the lawyer neglected a reasonable duty which was the proximate cause of the client's loss." *Chipman v. Chonin*, 597 So. 2d 363, 364 (Fla. 3d DCA 1992). That independent decision, made with the advice and availability of counsel, breaks any purported causal chain as a matter of law.

Even accepting Plaintiff's allegations as true, the *Amended Complaint* affirmatively establishes that Plaintiff voluntarily elected to settle his claims in the CMO 57 opt-out process while represented by independent counsel. Any alleged injury, therefore resulted from Plaintiff's own discretionary settlement decision and the advice of his personal attorneys – and not from any actionable conduct by AWKO

---

[5] Plaintiff specifically alleges "On September 30, 2024, Canup entered into a direct settlement agreement with 3M. Canup's ability to reach this resolution was made possible only through his efforts and the efforts of independent counsel, despite the harm caused by the misconduct of all Defendants named herein. (¶ 100 Amnd. Comp.).

24

5350236_1

Defendants. Simply put, how can any conduct by AWKO Defendants have proximately caused Plaintiff damages when he, with Gamble's advice and assistance, 1) rejected AWKO Defendants recommendation that he join the settlement programs and settle his case; 2) satisfied the MDL requirements to proceed with his individual opt out case; and 3) negotiated and voluntarily settled his case with 3M outside the settlement program for an amount he accepted?  As a result, Plaintiff cannot plausibly allege that AWKO Defendants proximately caused his alleged damages.

## D.   PLAINTIFF FAILS TO STATE A CLAIM FOR CONSPIRACY

Finally, to plead a count for Civil Conspiracy, the Plaintiff must allege the following elements: "(1) an agreement between two or more parties; (2) to do an unlawful act or to do a lawful act by unlawful means; (3) the doing of an overt act in pursuance of the conspiracy; and (4) damage to plaintiff as a result of the acts done under the conspiracy." *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997).  "Additionally, an actionable conspiracy requires an actionable underlying tort or wrong." *Id.*

The heightened pleading standard of Rule 9(b) also applies to claims brought under the conspiracy, and a bare legal conclusion unsupported by specific allegations of an agreement or overt act will not state a claim.  *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005).  Moreover, because Plaintiff fails to plausibly

25

5350236_1

allege the underlying tort claims upon which the conspiracy count depends, the conspiracy claim necessarily fails as well. See *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1067 (11th Cir. 2007). The Complaint nowhere alleges with particularity the existence of any actionable agreement, when any such agreement was formed, the specific role of each Defendant, or the precise fraudulent statements or omissions purportedly made in furtherance of the alleged conspiracy. Instead, Plaintiff relies entirely upon conclusory allegations which are insufficient as a matter of law. See *Fullman v. Graddick*, 739 F.2d 553 (11th Cir. 1984). AWKO Defendants have shown that the Plaintiff has not pled any legally recognizable causes of action, requiring dismissal of Plaintiff's Civil Conspiracy claim.

**E. PLAINTIFF LACKS STANDING TO SEEK EQUITABLE RELIEF, INCLUDING AN ACCOUNTING OR DISGORGEMENT.**

Plaintiff's requests for equitable relief, including disgorgement and an accounting, fail because Plaintiff lacks Article III standing and, independently, fails to satisfy the substantive requirements for such extraordinary equitable remedies. To establish standing under Article III, a plaintiff must demonstrate "(1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, and (3) likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The Supreme Court has repeatedly emphasized that a plaintiff must allege a "concrete" and "particularized" injury personally suffered by the plaintiff

5350236_1

himself. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24 (2021). Plaintiff fails to do so here.

The *Amended Complaint* does not plausibly allege that any specific fees allegedly received by AWKO Defendants belonged to Plaintiff or were wrongfully taken from Plaintiff's possession. Nor does Plaintiff allege facts establishing that he retained any ownership interest in the challenged funds. Instead, Plaintiff seeks sweeping equitable relief directed at fees allegedly earned through judicially supervised MDL proceedings. Such generalized grievances concerning MDL administration do not constitute the type of concrete individualized injury required for Article III standing. "No concrete harm, no standing," *Id*. at 417.

Moreover, Plaintiff cannot establish traceability because the alleged injury arose, if at all, only after Plaintiff voluntarily settled his claims while represented by independent counsel in judicially supervised proceedings. Any alleged harm therefore resulted from intervening decisions made by Plaintiff himself and his attorney, not from AWKO Defendants' alleged receipt of fees.

Plaintiff likewise fails to establish entitlement to disgorgement as an equitable remedy. The Supreme Court has made clear that equitable restitution or disgorgement generally requires identifiable funds or property that belong, "in good conscience," to the plaintiff and remain traceable to the defendant's possession. *Great-W. Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 213–14 (2002). Where

5350236_1

a plaintiff seeks merely to impose personal liability for money damages, the claim is legal, not equitable, in nature. *Id*. at 210. That is precisely what Plaintiff attempts here. Plaintiff identifies no segregated or specifically traceable funds belonging to him.

Instead, Plaintiff seeks broad monetary recovery based upon allegations that Defendants improperly benefitted from MDL leadership roles. Such allegations do not support equitable disgorgement. *See Liu v. SEC*, 591 U.S. 71, 79–80 (2020) (recognizing equitable disgorgement is limited and must reflect traditional equitable principles). Plaintiff's request for an accounting independently fails because an accounting is an "extraordinary remedy" available only where legal remedies are inadequate. *Zaki Kulaibee Establishment v. McFliker*, 771 F.3d 1301, 1311–12 (11th Cir. 2014). Under Florida law, a plaintiff seeking an accounting must establish both a fiduciary relationship or sufficiently complex transaction and the absence of an adequate remedy at law. *Kee v. Nat'l Rsrv. Life Ins. Co.,* 918 F.2d 1538, 1541 (11th Cir. 1990). Plaintiff satisfies neither requirement.

First, Plaintiff seeks ordinary monetary relief that can be pursued through traditional legal remedies and discovery. The existence of such legal remedies forecloses equitable accounting relief. Second, the *Amended Complaint*'s allegations concerning MDL fee structures and leadership compensation do not involve funds owned by Plaintiff or accounts requiring equitable supervision. Rather, Plaintiff

28

5350236_1

seeks to re-litigate judicially supervised MDL proceedings through a collateral state-law fiduciary theory. Because Plaintiff fails to allege a concrete individualized injury, fails to identify specific equitable property belonging to him, and possesses an adequate remedy at law, Plaintiff lacks standing to pursue equitable relief and the claims for disgorgement and accounting should be dismissed with prejudice.

**F.      IN ADDITION TO THERE BEING NO STANDING FOR EQUITABLE REMEDIES, PLAINTIFF'S ADDITIONAL PLED DAMAGES ARE IMPROPER AND REQUIRE DISMISSAL.**

Plaintiff's incredulous allegations to recover attorney's fees and travel expenses in the amount of $7404.59 from AWKO Defendants for Gamble's court-ordered in-person attendance at the March 13, 2024, Status Conference fail as a matter of law.   As described thoroughly above, AWKO Defendants were not Plaintiff's personal counsel.   Additionally, this Court can take judicial notice of the CMO 57 requirements, including that Plaintiff appear in person at the Status Conference with his attorney of record, Gamble.  Plaintiff's requests for exemplary damages fail as a matter of law, given the facts as pled by Plaintiff.

As provided herein, Plaintiff has pled no plausible damages as a matter of law.

29

## G.    FLORIDA LAW APPLIES IN THIS CASE.[6]

Interestingly, much of Plaintiff's *Amended Complaint* addresses the issue of jurisdiction and his attempts to convince this Court that the case should still be litigated under Texas law.[7] Plaintiff's attempt to circumvent this Order does not change that Florida federal law is to be applied in this case.  As argued in the prior Motion to Dismiss Plaintiff's Complaint, Florida substantive law applies to the AWKO Defendants.

Florida law governs Plaintiff's claims because the alleged conduct giving rise to the claims occurred in Florida, the relevant MDL proceedings were administered in Florida, and the allegedly operative communications and judicial proceedings upon which Plaintiff bases his claims took place in Florida. Under Florida's choice-of-law principles, Florida has the most significant relationship to the occurrences and parties relevant to the claims asserted against AWKO Defendants.

A federal court sitting in diversity applies the choice-of-law rules of the forum state. *Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007). Florida courts apply the "most significant relationship" test set forth

---

[6] Notably, in the AWKO Defendants' prior Motion to Dismiss Plaintiff's Complaint, great lengths were spent to address why the AWKO Defendants were not a proper party to a lawsuit venued in Texas. The AWKO Defendants specifically incorporate those arguments by reference herein and intend to fully argue those issues if for some reason this matter is remanded back to Texas. [See Doc. 27, Case 4:25-cv-01255-Y filed January 12, 2026 in the United States District Court for the Northern District of Texas.]

[7] Florida substantive law and Texas substantive law are substantially similar on the legal issues presented in this case.

30

5350236_1

in the Restatement (Second) of Conflict of Laws to tort-based claims. *Bishop v. Fla. Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980). Under that framework, courts consider:

- the place where the injury occurred;
- the place where the conduct causing the injury occurred;
- the domicile or place of business of the parties; and
- the place where the relationship between the parties is centered.

Restatement (Second) of Conflict of Laws § 145(2) (1971).

Those factors overwhelmingly support application of Florida law here. The alleged conduct underlying Plaintiff's claims occurred in Florida. Plaintiff's allegations arise from actions allegedly taken by court-appointed MDL leadership counsel in connection with multidistrict litigation pending in the United States District Court for the Northern District of Florida. The challenged conduct, including the administration of MDL procedures, communications concerning MDL participation, implementation of common-benefit processes, and the allegedly operative hearing and related judicial proceedings, occurred in and emanated from Florida under the supervision of the MDL court. The seminal March 13, 2024, Status Conference took place in Florida.

The relationship between Plaintiff and AWKO Defendants, to the extent Plaintiff alleges one existed at all, was centered entirely within the Florida MDL proceedings. Plaintiff's claims are inseparable from the Florida-based MDL administration and from orders and proceedings entered by the transferee court

31

5350236_1

sitting in Florida. Plaintiff specifically premises his causes of action upon conduct allegedly occurring during or arising from hearings, procedures, and communications connected to the MDL proceedings administered in Florida. Florida possesses the predominant interest in regulating the conduct of attorneys and court-appointed leadership counsel functioning within judicial proceedings pending before Florida federal courts.   Accordingly, Florida law governs Plaintiff's claims against AWKO Defendants.

## H.    PLAINTIFF'S ATTACKS ON THE MDL SETTLEMENT AND OTHER COURT ORDERS FAIL.

A review of Plaintiff's Amended Complaint contains multiple references to orders entered by this Court in the 3M MDL litigation, multiple references to the MSA that was ultimately approved by this Court and multiple references to the AWKO Defendants' conduct as leadership counsel for the 3M plaintiffs. The Plaintiff spends significant time discussing the impact of the sealed Master Long Form Complaint (¶ 33 Amnd. Comp.), the MSA (¶¶ 38-52 Amnd. Comp.), Exhibit 10 to the MSA (¶ 52 Amnd. Comp.), CMO 66 (¶ 53 Amnd. Comp.), CMO 67 (¶ 54 Amnd. Comp.) and CMO 57 (¶¶62, 63, 66-68, 85 Amnd. Comp.). Simply put, despite his protestations to the contrary, the Plaintiff is attacking the very foundation of the MDL and the conduct of the AWKO Defendants as appointed lead counsel for the 3M plaintiffs. The JPML recognized this fact very clearly in ordering this litigation be transferred to the MDL for this Court to rule on the issues raised by the

32

Plaintiff. The plain language of the various orders and pleadings filed in the MDL leave no logical choice but for this Court to rule in favor of the AWKO Defendants on the thinly veiled attempts of the Plaintiff to unwind the resolution of the litigation.

**I.    DISMISSAL WITH PREJUDICE IS PROPER AS PLAINTIFF ALREADY SOUGHT LEAVE TO AMEND AND ANY ADDITIONAL FURTHER AMENDMENTS WOULD BE FUTILE.**

Finally, having already sought leave from this Court to file his *Amended Complaint* and still failing to validly plead causes of action, this matter should be dismissed with prejudice as any further amendments would be futile. As the causes of action alleged by the Plaintiff all rest on the Court reaching the absurd conclusion – that the AWKO Defendants somehow represented the Plaintiff – any amendment would be futile, so this matter should be dismissed with prejudice.

## REQUESTED RELIEF

For the reasons above, AWKO Defendants respectfully request that this Court enter an order dismissing Plaintiff's Amended Complaint with prejudice and grant any other such relief as this Court deems just and proper.

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)

I HEREBY CERTIFY that this motion complies with the word limit of Local Rules 7.1(f) and contains 7,456 words, excluding the parts exempted by the rule.

5350236_1

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of May 2026, a true and correct copy of the foregoing has been furnished by filing through CM/ECF or some other authorized manner for parties not authorized to receive electronically Notices of Electronic Filing:

Brandon Canup
4812 Hidden Oaks Ln
Arlington, TX 76017
canup.brandon@gmail.com
*Pro Se Plaintiff*

Benjamin James Stevenson
Steven Legal, PLLC
919 Panfiero Dr
Pensacola Beach, FL 32561
bjs@stevensonlegal.com
*Counsel for Defendant, Mostyn Law Firm*

Jonathan Vine
Cole, Scott & Kissane, PA
222 Lakeview Ave., Suit 500
West Palm Beach, FL 33401
Jonathan.vine@csklegal.com
*Counsel for Defendant, Defendants, Gregory Brown and Fleming Nolen & Jez LLP*

Dated:  May 26, 2026

Respectfully Submitted,

*/s/ Gregory K. Rettig*
Gregory K. Rettig (172774)
Justin T. Keeton (1025509)

34

5350236_1

*Co-Counsel for Defendants Bryan F.*
*Aylstock, Bobby Bradfor and*
*Aylstock, Witkin, Kreiss & Overholtz PLLC*

**FOR THE FIRM:**
**LLOYD, GRAY, WHITEHEAD & MONROE, P.C.**
125 W. Romana Street, Suite 330
Pensacola, Florida 32502
Telephone: (850) 777-3322
Facsimile: (850) 777-3290
Grettig@lgwmlaw.com
Jkeeton@lgwmlaw.com
Lglover@lgwmlaw.com
Egates@lgwmlaw.com

## CERTIFICATE OF SERVICE

*/s/ Gregory K. Rettig*
*Co-Counsel for Defendants Bryan F.*
*Aylstock, Bobby Bradford and Aylstock,*
*Witkin, Kreiss & Overholtz PLLC*

5350236_1

# Tab 67

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

BRANDON CANUP,

     Plaintiff,

     v.

BRYAN F. AYLSTOCK, et al,

     Defendants.

Case No.: 3:26-cv-3359-MCR-ZCB

_____/

## MOSTYN LAW'S MOTION TO DISMISS

Defendant Mostyn Law Firm P.C. did not advise Plaintiff Brandon Canup, access his medical records, or demand that he agree to anything. Maybe others did, but not Mostyn Law. Under Rule 12(b)(6), because Canup fails to state a claim upon which relief can be granted against Mostyn Law, the Court should dismiss all claims against it.

## ARGUMENT

Canup alleges no direct dealings with Mostyn Law. Canup was not its client—Canup retained other counsel to represent him in pursuing a claim against 3M Company for faulty earplugs. First Am. Compl. (ECF 60) ("FAC") ¶ 28, 64. Instead, Canup identifies Mostyn Law as a "Florida Defendant," FAC ¶ 11, and alleges that these defendants communicated with Canup through his attorney, FAC ¶ 137, 153. In doing so, Canup does not distinguish Mostyn Law's conduct from the others. *See*

*Barmapov v. Amuial*, 986 F.3d 1321, 1324 (11th Cir. 2021) (affirming the dismissal of a shotgun pleading that lumped defendants together "rendering it unclear and confusing as to which defendant was being charged with which specific conduct." (cleaned up)). Still, in the light most favorable to Canup, he appears to allege that Mostyn Law acted through Defendant Michael Burns and Defendant Bobby Bradford. That its liability was vicarious.

Canup's four claims against Mostyn Law should be dismissed for two reasons. First, the underlying claims against its alleged agents must be dismissed, and because Mostyn Law's liability depends on the success of those claims, the claims against Mostyn Law cannot survive. Second, Canup fails to plausibly allege that Burns or Bradford acted on behalf of Mostyn Law. Without agency, no vicarious liability follows.

## 1.   The claims against alleged agents fail, and consequently, the claims against Mostyn Law fail.

Mostyn Law's liability depends on Burns's and Bradford's liability. Under Texas and Florida law, respondeat superior and vicarious liability is derivative in nature—a principal cannot be held liable unless an agent's conduct is actionable. *Johnson v. Sawyer*, 47 F.3d 716, 730 (5th Cir. 1995) ("*Respondeat superior* does not impose liability on the employer [or principal] *unless* the employee's [or agent's] conduct has been actionable.") (citing *Knutson v. Morton Foods, Inc.,* 603 S.W.2d 805, 807 n.2 (Tex. 1980));

*Tsuji v. Fleet*, 366 So. 3d 1020, 1032 (Fla. 2023). Accordingly, because the claims against the alleged agents fail, so do the claims against Mostyn Law.

To avoid duplicate briefing, Mostyn Law adopts the motions to dismiss filed by Bryan Aylstock, Bradford, and their firm (ECF 66).[1]

## 2.     Burns and Bradford were not Mostyn Law's agents.

Canup fails to plausibly allege that Burns or Bradford acted on Mostyn Law's behalf. Each is considered in turn.

Canup alleges that Burns provided legal advice to Canup. FAC ¶ 84. In doing so, Canup alleges Burns committed fraud (Count B1) and breached a fiduciary duty to Canup (Count B2). FAC at 27-31. Canup identifies Burns as Mostyn Law's agent— Burns was "affiliated with Mostyn Law," FAC ¶ 8. Canup's theory is that Mostyn Law is liable for Burns's alleged misconduct. FAC at ¶ 147-48, 163.

Even if Burns was affiliated with Mostyn Law for some work, the complaint makes clear that he was not acting for Mostyn Law during any alleged misconduct. The misconduct alleged in the complaint began in September 2023, FAC ¶ 56, shortly

---

[1] The Court may apply Florida law because it is substantially the same as Texas law and would not affect the outcome of the issues address in the motion to dismiss. *See Toyota Motor Co. v. Cook*, 581 S.W.3d 278, 283 (Tex. App. 2019) ("We only undertake a choice of law analysis if a conflict of law exists that affects the outcome of an issue."); *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 419 (Tex. 1984).

after a master settlement was reached in the 3M multidistrict litigation ("MDL"), FAC ¶ 38. Fairly, in 2019, the Court had appointed "Burns of Mostyn" to the plaintiffs' leadership. FAC ¶ 26. Yet by the time of the misconduct in 2023, the Court had already terminated the MDL's existing plaintiffs' leadership structure. FAC ¶ 53. Burns had no further leadership authority. *Id.* Mostyn Law had no role in leadership. FAC ¶ 55. Indeed, its involvement in leadership ended in 2020, when Burns left Mostyn Law, started Burns Law LLC, and served in MDL leadership through his new firm. Because Burns was no longer acting in his leadership role by September 2023, he was no longer acting on Mostyn Law's behalf in that expired role. Canup never alleges otherwise.

Separately, Canup alleges that Bradford committed fraud (Count B3). FAC at 32-34. Bradford was a partner at Defendant Aylstock, Witkin, Kreis & Overholtz PLC. FAC at ¶ 7. Nevertheless, Canup contends that Mostyn Law is liable because it too was "Bradford's principal[]." FAC at ¶ 181-182. Yet Canup never explains what made Bradford an agent of Mostyn Law. This "bare assertion[]" "amount[s] to nothing more than a "formulaic recitation of the elements." *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009). As such, it is "not entitled to be assumed true." *Id.* This Court should reject as implausible Canup's conclusionary allegation that Bradford acted on Mostyn Law's behest while he was a partner in another firm. "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 555 (2007). And here, Canup offers nothing aside from a bare assertion that Bradford was Mostyn Law's agent.

## CONCLUSION

As alleged in the complaint, Mostyn Law was not involved any misconduct. Because Canup's claims against the two alleged agents fail, the vicarious claims against Mostyn Law fail. The Court should dismiss all claims against Mostyn Law.

### N.D.  Fla. Loc. R. 56.1(E) Certificate of Word Limit

This filing contains 1,011 words.

Respectfully submitted,

> s/Benjamin James Stevenson
> **Benjamin James Stevenson**
> Stevenson Legal PLLC
> 919 Panferio Drive
> Pensacola Beach, FL 32561
> T. 702.306.6708
> bjs@stevenson-legal.com
>
> *Counsel for Mostyn Law Finn*

# Tab 70

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

**BRANDON CANUP,**

     **Plaintiff,**

**v.**                                         **CASE NO. 3:26cv3359-MCR-ZCB**

**BRYAN F AYLSTOCK, et al.**

     **Defendants.**

_____/

## <u>ORDER</u>

Plaintiff Brandon Canup, appearing *pro se*, filed this action in Texas state court, alleging claims including fraud and professional negligence against several attorneys and law firms involved in multidistrict litigation ("MDL") consolidated in this Court, *In re 3M Combat Arms Earplug Products Liability Litigation,* MDL No. 2885, Case No. 3:19-md-2885-MCR-HTC (N.D. Fla.). Defendant Gregory Brown removed the case to federal court in the Northern District of Texas, and subsequently, the Judicial Panel on Multidistrict Litigation ("JPML") transferred it to this Court as a tag-along action related to the 3M MDL.[1] Before the transfer, Canup timely filed a Motion to Remand to state court, ECF No. 8, and after the

---

[1] In August 2023, a global settlement of the claims against 3M was reached that included all cases in the MDL and Minnesota state court. In connection with the settlement, the undersigned retained jurisdiction over the settlement, enforcement of all orders, and all related miscellaneous issues. Also, before Canup's case was transferred, the JPML reopened the MDL for the transfer of additional actions.

transfer to this Court, he filed a Motion for Suggestion of Remand to the JPML, ECF No. 38.  Defendants have filed opposition briefs, and now, having fully considered the Parties' arguments and the law, the Court denies both motions.

## I.   Background

To adequately resolve the motions, a full recitation of the background facts is necessary.

### A. *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, MDL No. 2885

On April 3, 2019, the JPML centralized the 3M MDL proceeding in this Court pursuant to 28 U.S.C. § 1407 and transferred eight cases, in which the plaintiffs claimed that 3M and related companies had defectively designed the 3M Combat Arms Earplug, causing the plaintiffs' hearing loss and/or tinnitus.  *See In re 3M Combat Arms Earplug Prods. Liab. Litig.,* MDL No. 2885.  At the time of centralization, the JPML had been notified of 635 related federal actions filed in 33 federal districts.  Case No. 3:19-md-2885-MCR-HTC, Master Docket, ECF No. 1 (JPML initial transfer order).  Over the next two years, the number of plaintiffs ballooned to 400,000, by far the largest MDL in the federal judiciary's history, requiring extensive judicial case management and court oversight of all aspects of the pretrial proceedings.  At the outset of the litigation, the Court appointed leadership counsel for the universe of plaintiffs, to shepherd all cases through the

CASE NO: 3:26cv3359-MCR-ZCB

coordinated MDL proceedings, and also entered a common benefit order setting out procedures, limitations, and guidelines for participating counsels' access to common benefit work product and sharing of common litigation costs.[2]  For two years, leadership counsel conducted extensive and complex fact and expert discovery related to military rules and regulations, the science of audiometry and sound, and the design and testing of hearing devices.  The discovery involved multiple meetings and exhaustive discussions with the Department of Defense, the Department of Veterans Affairs, and the Department of Justice over the course of three years. During this time, leadership counsel also engaged in vigorous motion practice in this Court and successfully challenged a bankruptcy proceeding in a separate court. After completion of the common discovery, 16 bellwether cases were selected for case specific workup and then tried by juries within a period of 14 months, pursuant to demanding scheduling orders.

After laying this groundwork, plaintiffs' leadership counsel successfully negotiated a $6 billion global settlement with 3M.  The Court appointed a settlement administrator and is currently overseeing the administration of that settlement, as well as resolving miscellaneous issues and processing tag-along cases.

---

[2] As amended, the common benefit order assessed a holdback of 9% from all claimants' gross recoveries.  Master Docket, ECF No. 3875.

CASE NO: 3:26cv3359-MCR-ZCB

Case 3:26-cv-03359-MCR-ZCB Document 86-10 Filed 06/12/26 Page 372 of 388
USCA11 Case: 26-11887    Document: 5-2    Date Filed: 06/05/2026    Page: 169 of 185

Page 4 of 19

In reaching a global settlement, all MDL attorneys agreed that by submitting a registration form, counsel had concluded that the settlement was in each client's best interests and had agreed to recommend participation to every eligible client. The settlement agreement provided that if a plaintiff disregarded his/her counsel's recommendation and opted not to participate in the settlement and to continue litigating, counsel would take steps to withdraw from representation, with Court approval.[3]

The Court established a schedule (CMO 57) to manage any case in which a plaintiff opted not to participate in the settlement program and instead to proceed with litigation. Case No. 3:19-md-2885, Master Docket, ECF No. 3811 (CMO 57). The Court required every opt-out plaintiff to attend an in-person hearing, at which the undersigned discussed the settlement program and its benefits as well as the risks of going forward in an individual case, provided a final opportunity for the plaintiff to participate in the settlement program, and verified that the plaintiff was fully informed before proceeding further. The Court invited leadership counsel and

---

[3] Also, as is common in global settlements of this nature, 3M retained a right to walk away from the settlement if, as of the final participation registration date, the participation level was less than 98%. *See* Combat Arms Master Settlement Agreement, Articles 5 and 7 (available on the Court's public website: https://www.flnd.uscourts.gov/3m-products-liability-litigation-mdl-no-2885).

CASE NO: 3:26cv3359-MCR-ZCB

defense counsel to be present at these hearings to explain the details of the settlement program and answer any questions from the plaintiff.

## B. Canup's Underlying 3M Member Suit

Canup asserts that he retained Texas attorneys Gregory Brown, Cliff Roberts, and the law firm of Fleming, Nolen & Jez, LLP ("FNJ") to investigate and develop his claim against 3M. In June 2020, Canup filed a products liability complaint in the MDL, asserting that the Combat Arms Earplugs were defectively designed and that his use of the product caused him to suffer tinnitus. *See Canup v. 3M*, Member Case No. 8:20-cv-14021-MCR-HTC, ECF No. 1 (N.D. Fla. Jun. 3, 2020). Brown appeared on Canup's behalf until the global settlement was reached and Canup elected not to participate in the settlement program, at which time Brown filed an unopposed motion to withdraw. Canup then retained new counsel, David Gamble. Brown stated in his motion to withdraw that he had begun to transfer Canup's files to Gamble, so the Court allowed him to withdraw. *See id.* ECF Nos. 9, 10, 12.

Canup and Gamble attended his hearing on March 13, 2024, at which, consistent with the procedure described above, the undersigned discussed the settlement program and its benefits as well as the risks of going forward individually, provided Canup another opportunity to participate in the settlement program, and verified that he was fully informed before proceeding further. 3M's counsel was

CASE NO: 3:26cv3359-MCR-ZCB

Page 6 of 19

also present as were three court-appointed plaintiffs' leadership attorneys, namely, Bryan Aylstock, Bobby Bradford, and Michael Burns. These lawyers were present for the purpose of offering details about the settlement program and answering questions. Also, during a closed-door settlement conference that day with Magistrate Judge Cannon, and with leadership counsel and his own attorney, Gamble, present but not counsel for 3M, Canup was given one final opportunity to participate in the global settlement, which he declined, as was his right.

Aided by Gamble, Canup then successfully completed all requirements under CMO 57 to continue litigating his case against 3M. He later attended mediation with Gamble, as required by CMO 57, through which he negotiated his own settlement with 3M outside of the settlement program. *See id.* ECF Nos. 8 (Order Feb. 12, 2024); 53 (Report of Settlement Sept. 17, 2024).[4] Gamble filed a stipulated dismissal on behalf of Canup, signed also by 3M, on October 13, 2024.

## C. The Instant Litigation

On October 27, 2025, Canup filed the instant lawsuit in Texas state court against Brown, Roberts, and FNJ ("FNJ Defendants") and also leadership counsel Aylstock, Bradford, and the Aylstock firm ("Aylstock Defendants"), Burns, and the

---

[4] Leadership counsel were not present at this mediation.

CASE NO: 3:26cv3359-MCR-ZCB

Page 7 of 19

Mostyn Law Firm.  As to his retained counsel (the FNJ Defendants), Canup asserted claims of fraud, breach of fiduciary duty, and professional negligence alleging they failed to disclose conflicts inherent in the MDL proceeding and abandoned his case at a critical point.  As to leadership counsel, Canup asserted claims of fraud and breach of fiduciary duty, alleging they failed to disclose that they intended to appear on March 13, 2024 or that they had obtained his confidential medical records.[5]  He also alleged that leadership failed to fully disclose conflicts and penalties they faced if they were unable to secure 100% participation in the global settlement (referencing Exhibit 10 to the settlement documents), and that Bradford induced him to accept a 9% fee (common benefit assessment) to be deducted from his MDL recovery.  In a civil conspiracy claim against all Defendants, Canup alleged the Defendants conspired to assume "complementary roles" under the global settlement that "tied their compensation to Plaintiff participation thresholds and withdrawal requirements" in an effort to protect their own financial interests at Canup's expense.  ECF No. 1–1.  He seeks actual damages in the amount of $19,807.35 (Gamble's fee and travel expenses for attending the March 13, 2024 hearing and costs of obtaining expert reports and other litigation preparation expenses) plus disgorgement of the

---

[5] Canup asserted that leadership counsel created an implied attorney-client relationship when they appeared at his March 13, 2024 hearing and in a closed-door settlement conference that day.

CASE NO: 3:26cv3359-MCR-ZCB

9% common benefit fee that he asserts was set aside from his settlement pursuant to the Court's order, and additional unspecified damages for inconvenience, exemplary damages, and interest and costs.

Brown immediately removed the lawsuit to federal court in the Northern District of Texas, *see* 28 U.S.C. § 1441(a), and Canup filed a timely motion to remand, contesting jurisdiction and asserting that several defects in the removal process require remand to state court.

Before any ruling was entered on that motion, Aylstock asked the JPML to transfer the case to this Court as a tag-along action in the 3M MDL.[6] Canup opposed transfer and had an opportunity to fully brief his objections. The JPML rejected Canup's arguments and issued a transfer order, concluding that the instant case involves common questions of fact with the MDL actions, implicates conduct by court-appointed leadership counsel in settlement matters arising from the MDL proceedings, and challenges MDL orders regarding case management, settlement, leadership appointment, and common benefit. Following the transfer to this Court, Canup moved for a suggestion of remand to the JPML.

---

[6] The Northern District of Texas case was stayed pending a transfer decision.

CASE NO: 3:26cv3359-MCR-ZCB

## II.   Discussion

### A. Motion to Remand to State Court

It is axiomatic that "[f]ederal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  A defendant may remove a case from state court only if the federal court has original jurisdiction over the subject matter.  *See* 28 U.S.C. § 1441(a).  Original jurisdiction is established through a federal question or diversity of citizenship.  *See* 28 U.S.C. §§ 1331, 1332.  And the removing defendant bears the burden of demonstrating that federal jurisdiction exists.  *Williams v. Best Buy Co.*, 269 F.3d 1316, 1319 (11th Cir. 2001).

The Notice of Removal alleges diversity jurisdiction based on fraudulent and improper joinder[7] and federal question jurisdiction on grounds that the claims arise out of the MDL proceedings, which were consolidated through 28 U.S.C. § 1407, and involve a substantial federal issue, consistent with *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005).  Because the Court agrees that federal question jurisdiction is met, as discussed below, diversity jurisdiction and the issues related to fraudulent joinder need not be addressed.[8]

---

[7] Complete diversity is not met.  Canup is a Texas citizen.  The FNJ Defendants and Mostyn Law Firm are also Texas citizens, and the Aylstock Defendants and Burns are Florida citizens.

[8] Canup argues also that the forum defendant rule precludes removal.  Under that rule, an action "removable solely on the basis of the jurisdiction under § 1332(a) of this title may not be removed

CASE NO: 3:26cv3359-MCR-ZCB

Page 10 of 19

The causes of action alleged in Canup's suit are all framed as state law claims. But in *Grable*, the Supreme Court adopted a rule recognizing that some state court causes of action support federal question jurisdiction if the claims necessarily "implicate significant federal issues." 545 U.S. at 312 (allowing removal of a quiet title action filed in state court after a tax sale, involving an issue of whether the IRS gave proper notice, as "arising under" federal law). The Court explained, however, that "even when the state action discloses a contested and substantial federal question," a federal forum is appropriate "only if federal jurisdiction is consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331." *Id.* at 313–14. Four factors guide the *Grable* analysis—the federal issue must be: "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013) (citing *Grable*, 545 U.S. at 313–14). The doctrine applies in only a "special and small category of cases," in which all four requirements are met. *AST & Sci. LLC v. Delclaux Partners SA*, 143 F.4th 1249,

---

if any of the parties in interest, joined and properly served as defendants is a citizen of the State in which such action is brought." 28 U.S.C. § 1441(b)(2). By its terms, the forum defendant rule only applies to bar removal in a case that is removed "solely" on diversity grounds, *id.*, so it is inapplicable here where removal is also based on federal question jurisdiction.

CASE NO: 3:26cv3359-MCR-ZCB

1252–53 (11th Cir.) (quoting *Gunn*, 568 U.S. at 258), *cert. denied*, 146 S. Ct. 370 (2025).

This is one of those special cases. An MDL proceeding is unique. While § 1407 does not establish or create federal jurisdiction, the litigation that occurs under the MDL umbrella is carried out under federal court oversight, federal court scheduling orders, and federal court leadership appointment and common benefit orders. Here, Canup's allegations about the Defendants' breach of professional duties owed to him and allegations of fraud based on MDL leadership's conduct are inextricably intertwined with the Court's case management and settlement administration orders. Thus, the first *Grable* factor (whether a federal issue is necessarily raised) is met. It is disingenuous for Canup to argue otherwise. And there is no question that the issues—concerning whether the conduct alleged was taken pursuant to or governed by this Court's orders—are actually disputed, so the second *Grable* factor is also met.

Although the federal question presented here is unique, the Court concludes that the third factor (which requires a substantial federal issue) is also satisfied. The 3M MDL was created and transferred to the undersigned pursuant to 28 U.S.C. § 1407. All case management and settlement administration orders were entered under that statutory authorization. The crux of Canup's complaint concerns

CASE NO: 3:26cv3359-MCR-ZCB

Defendants' misconduct in connection with the 3M MDL settlement. And notably the undersigned specifically retained jurisdiction to enforce all orders related to the settlement and to handle any matters related to it and/or any miscellaneous issues necessary to complete the administration of the cases.

As the undersigned has previously recognized, "[a]n MDL judge bears the 'enormous' task of 'moving thousands of cases toward resolution on the merits while at the same time respecting their individuality.'" *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, No. 3:19-md-2885, 2023 WL 9197648, at *1 (N.D. Fla. June 29, 2023) (quoting *In re Phenylpropanolamine (PPA) Prod. Liab. Litig.,* 460 F.3d 1217, 1231 (9th Cir. 2006)). Carrying out this task in an organized and efficient manner demands that the transferee judge define and strictly adhere to broadly applicable and even-handedly applied case management rules. *See id.* (noting that firm MDL case management is required "if the coordinated cases are to move in a diligent fashion toward resolution by motion, settlement, or trial" (quoting *In re PPA*, 460 F.3d at 1232)). In the 3M MDL, leadership counsel on both sides had a hand in collaborating with the Court to fashion workable case management and settlement procedures. All counsel were required to comply. *See id.* ("counsel must collaborate with the court")*; In re PPA*, 460 F.3d at 1231-32 ("For it all to work, multidistrict litigation assumes cooperation by counsel"). Those pretrial orders, and counsels'

CASE NO: 3:26cv3359-MCR-ZCB

and the parties' compliance with those orders, "are the engine that drives disposition on the merits," and the transferee judge's firm enforcement of them results "in better administration of the vehicle of multidistrict litigation." *In re 3M*, 2023 WL 9197648, at *1 (quoting *In re Cook Medical, Inc. Pelvic Repair Sys. Prof. Liab. Litig.*, 2018 WL 4698953, at *2 (S.D. W.Va. Sept. 28, 2018)). A post hoc, post-settlement collateral challenge to those orders by an individual litigant could disrupt the entire MDL 3M settlement structure involving over 250,000 plaintiffs, which in turn would have far reaching implications across the federal judiciary both in the 3M MDL and more broadly, given that similar MDL management structures are implemented routinely in MDLs across the federal system as a whole.[9]  Thus, allowing an individual litigant to maintain this sort of challenge in a state court could have serious ramifications for the MDL system as whole. Consequently, Canup's claims present a substantial federal issue.

The final *Grable* factor is also met. While state courts ordinarily are vested with "a special responsibility for maintaining standards among members of the licensed professions," *Gunn*, 568 U.S. at 264, the federal-state balance is not disturbed here because the standards of conduct at issue and the allegations of fraud

---

[9] Notably, the 3M MDL settlement administration is on-going and will not be complete until 2029.

CASE NO: 3:26cv3359-MCR-ZCB

arise out of duties counsel performed under federal court orders in the MDL proceeding. The *Grable* doctrine "captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." 545 U.S. at 312. Common sense dictates that this Court should be able to hear these state law claims because they turn on the interpretation and construction of federal court orders within the MDL, which this Court has retained jurisdiction to address. Allowing a state court to decide those issues would undermine this Court's responsibility to oversee the 3M MDL and enforce its orders and would threaten uniformity in their application, which is essential to the overall MDL process, as discussed above. Admittedly, the situation is out of the ordinary, but in the undersigned's assessment, applying arising-under jurisdiction in this narrow MDL-centered context will not "disturb[] any congressionally approved balance of federal and state judicial responsibilities." *Id.* at 314. To the extent Canup's complaint raises any purely state law claims having no impact on the MDL process, those claims can be addressed under the Court's supplemental jurisdiction. 28 U.S.C. § 1367.

CASE NO: 3:26cv3359-MCR-ZCB

Finally, Canup argues that the rule of unanimity requires remand due to Brown's failure to obtain the consent of all properly joined and served defendants—namely, Mostyn Law Firm, which Canup argues was properly served two days before the Notice of Removal was filed. The rule of unanimity applies "when a civil action is removed solely under section 1441(a)" and requires that "all defendants who have been properly joined and served must join in or consent to the removal of the action."[10]  28 U.S.C. § 1446(b)(2)(A). The rule must be strictly enforced but does not "establish a wooden rule;" a technical defect related to unanimity can be cured. *Stone v. Bank of New York Mellon, N.A*., 609 F. App'x 979, 981 (11th Cir. 2015)[11] (quoting *Esposito v. Home Depot U.S.A., Inc*., 590 F.3d 72, 77 (1st Cir. 2009)); *see id.* ("A technical defect related to the unanimity requirement may be cured by opposing a motion to remand prior to the entry of summary judgment.").

While there are questions concerning whether Mostyn Law Firm was properly joined and served at the time of removal, the Court need not address the merits of these arguments because to the extent any defect in unanimity existed, it has been

---

[10] By its express terms, the unanimity rule applies to all actions removed based on original jurisdiction—§ 1441(a)—and thus, it applies regardless of whether removal is based on diversity or federal question jurisdiction. *See Mulder v. Wilson*, 462 F. Supp. 2d 1214, 1215 (M.D. Ala. 2006).

[11] While *Stone* is unpublished, the undersigned finds it persuasive.

CASE NO: 3:26cv3359-MCR-ZCB

cured.  The record now reflects that all Defendants who have been served, including

Mostyn Law Firm, have appeared in this proceeding and that Mostyn Law Firm has

challenged the Amended Complaint on its merits.  Its consent to removal can be

implied by the filing of a motion to dismiss that does not challenge jurisdiction.  *See*

*Stone*, 609 F. App'x at 981; *see also Frink v. Cargill, Inc.*, No. 1:22-cv-4330-VMC-

CCB, 2023 WL 11780360, at *3 & n.1 (N.D. Ga. June 22, 2023) (defendant indicates

its consent to the court's jurisdiction without procedural defect in removal by filing

an answer), *report and recommendation adopted*, No. 1:22-cv-04330-VMC, 2023

WL 11780359 (N.D. Ga. July 12, 2023); *Stephens v. GuideOne Mut. Ins. Co.,* No.

1:19-cv-05534-ELR, 2020 WL 13587976, at *1 n.1 (N.D. Ga. Apr. 21, 2020) (citing

*Stone* for the proposition that that courts also recognize "other forms of manifested

consent, such as filing a motion to dismiss after the removal of the case"); *Griffin v.*

*Jonesboro Nursing & Rehab. Ctr., LLC,* No. 1:19-cv-03096-ELR, 2019 WL

13212709, at *3 (N.D. Ga. Nov. 7, 2019) (citing *Stone* and concluding procedural

defect in the manner or timing of consent can be cured); *Frederick v. Lafont*, No.

3:16cv35-MCR/EMT, 2016 WL 11745551, at *1 (N.D. Fla. May 27, 2016) (citing

*Stone* and noting that the Eleventh Circuit has rejected "a formalistic application of

CASE NO: 3:26cv3359-MCR-ZCB

Case 3:26-cv-03359-MCR-ZCB Document 8671 Filed 05/29/26 Page 385 of 388
USCA11 Case: 26-11887 Document: 5-2 Date Filed: 06/05/2026 Page: 182 of 185

Page 17 of 19

the unanimity rule"). Any technical lack of unanimity or issue as to the timing of the consent has been remedied and thus is not a basis for remand.[12]

### B. Motion for Suggestion of Remand to JPML

The transferee court may make a suggestion of remand to the JPML, pursuant to the Rules of Procedure of the United States Judicial Panel on Multidistrict Litigation, Rule 10.1(b). The rule does not enumerate under what grounds the suggestion may be made, and Canup does not cite to any case law authorizing the undersigned to suggest remand to the JPML in this circumstance. But typically, a suggestion for remand would occur when the "pretrial proceedings have run their course" in a particular case, even if the consolidated proceedings have not yet concluded. *In re Aqueous Film-Forming Foams Prod. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, 2025 WL 4072664, at *2 (D.S.C. June 24, 2025) (internal quotations omitted), *reconsideration denied*, 2025 WL 4072671 (D.S.C. Oct. 14, 2025); *see also In re Brand-Name Prescription Drugs Antitrust Litig.*, 264 F. Supp. 2d 1372, 1376 (J.P.M.L. 2003) ("A transferee judge's suggestion of remand to the Panel is an obvious indication that he has concluded that the game no longer is worth

---

[12] Canup also alleged procedural defects in removal due to Brown's failure to pay the filing fee with the Notice of Removal and include the state court record. These arguments do not justify remand and are thus rejected because the record reflects that the filing fee has been paid, and the Notice of Removal included the state court petition.

CASE NO: 3:26cv3359-MCR-ZCB

the candle (and, therefore, that he perceives his role under section 1407 to have ended).").  "Because the purpose of multidistrict litigation is for the convenience of the parties and witnesses and to promote the just and efficient conduct of the cases, the decision of whether to suggest remand should be guided in large part by whether one option is more likely to insure the maximum efficiency for all parties and the judiciary." *In Re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, No. 00-CV-1898, 2024 WL 4711129, at *3 (S.D.N.Y. Nov. 7, 2024) (internal quotation marks omitted).

In its transfer order, the JPML acknowledged that this action was not typical but rejected Canup's arguments and concluded that the allegations of his complaint involve common questions of fact with the centralized MDL actions.  The JPML noted that "there is no better court to determine whether defendants acted at the transferee court's direction than the transferee court itself."  ECF No. 30 at 2 n.3. The JPML also concluded that Canup is challenging orders of the transferee court regarding case management, settlement, leadership appointment, and common benefit and expressly noted that the undersigned (transferee court) retained "continuing jurisdiction to enforce its orders, handle any matters related to the settlement, or address any other miscellaneous issues necessary to complete the

administration of these cases." ECF No. 30 at 2 (JPML Transfer Order, quoting MDL 2885, ECF No. 4171 at 1 (N.D. Fla. Sept. 19, 2025)).

Canup's arguments have been fully addressed and rejected by the JPML. His request for a suggestion of remand, rehashing the same arguments he presented to the JPML and challenging the JPML's conclusion, is essentially asking the undersigned to reconsider the JPML's transfer decision. The undersigned declines to do so.

Accordingly:

1. Canup's Motion for Remand, ECF No. 8, is **DENIED**.

2. Canup's Motion for Suggestion of Remand to the Judicial Panel on Multidistrict Litigation, ECF No. 38, is **DENIED**.

3. Canup's Motion to Stay Proceedings, ECF No. 59, is **DENIED as MOOT**.

**DONE AND ORDERED** this 29th day of May 2026.

*M. Casey Rodgers*

**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

CASE NO: 3:26cv3359-MCR-ZCB

**Certificate Of Service**

I HEREBY CERTIFY that I filed both volumes of this Appendix to Petition for Writ of Mandamus using the court's electronic-filing system and that a copy of both volumes of the Appendix were furnished pursuant to Federal Rules of Appellate Procedure 21 and 25(d) via email on this 5th day of June 2026 to the following:

Hon. M. Casey Rodgers
District Judge of the United States District Court,
Northern District of Florida
flnd_rodgers@flnd.uscourts.gov

Gregory K. Rettig
Counsel for Defendants Bryan Aylstock,
Bobby Bradford and Aylstock, Witkin, Kreis &
Overholtz, PLC
grettig@lgwmlaw.com

Jonathan Vine
Counsel for Defendants Gregory Brown,
Cliff Roberts and Fleming, Nolen & Jez, LLP
jonathan.vine@csklegal.com

Benjamin Stevenson
Counsel for Defendant
Mostyn Law Firm, PC
bjs@stevenson-legal.com

/s/ Brandon Canup

Brandon Canup, Petitioner
4812 Hidden Oaks Ln
Arlington, Texas 76017
Tel.: (972) 762-4314
canup.brandon@gmail.com

***pro se***